No. 25-5243

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

Refugee and Immigrant Center for Education and Legal Services, et al.,

Plaintiffs-Appellees

v.

Kristi Noem, Secretary of the U.S. Department of Homeland Security, in her official capacity, et al.,

Defendants-Appellants

————————————————

On Appeal from the United States District Court for the District of Columbia

Case No. 1:25-cv-00306-RDM (Hon. Randolph D. Moss)

————————————————

**BRIEF OF *AMICI CURIAE* THE GLOBAL STRATEGIC LITIGATION COUNCIL; HUMAN RIGHTS WATCH; PHYSICIANS FOR HUMAN RIGHTS; REFUGEES INTERNATIONAL; TRIVENI DEFRIES, MD, MPH; BARBARA EISOLD, PhD; MICHELE HEISLER, MD, MPA; JIM RECHT, MD; AND ADAM RICHARDS, MD, PhD, MPH, IN SUPPORT OF PLAINTIFFS-APPELLEES AND FOR AFFIRMANCE**

————————————————

*Counsel for* amici curiae:

Ian M. Kysel, Associate Clinical Professor of Law
Courtney Bell, Student Attorney*
Transnational Disputes Clinic
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14850
ian.kysel@cornell.edu
(607) 255-5503
*Motion for Student Appearance filed
concurrently with this brief*

Michael Garcia Bochenek
Human Rights Watch
350 Fifth Avenue, 34th Floor
New York, NY 10118
bochenm@hrw.org
(212) 290-4700

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. Parties and *Amici*

Except for *amici* submitting this brief and for *amicus* Federation for American Immigration Reform, all parties and *amici* appearing before the district court and in this Court are listed in the Brief for Appellants.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that organizational *amici* Human Rights Watch, Physicians for Human Rights and Refugees International are donor-funded, nonprofit organizations that have no parent corporations and that *amicus* Global Strategic Litigation Council is a project of the Center for Transformative Action, a donor-funded, nonprofit organization with no parent corporations. Organizational *amici* do not issue stock.

### B. Rulings Under Review

References to the ruling under review appear in the Brief for Appellants.

### C. Related Cases

This case has not previously been before this or any other court.

*/s/ Ian Kysel*

i

# TABLE OF CONTENTS

Certificate as to Parties, Rulings and Related Cases......................................................... i

Table of Authorities ..................................................................................... iv

Statement of Interest of *Amici Curiae*............................................................1

Consent of the Parties.................................................................4

Rule 29(a)(4)(E) Statement .........................................................4

Introduction and Summary of Argument .......................................5

I. Argument .................................................................................7

    A. Many of those unlawfully expelled under the 212(f) proclamation fled past

        persecution or in fear of future harm. ...................................................9

    B. U.S. officials denied access to asylum, held many asylum-seekers

        incommunicado, separated families, and subjected them to other abuses...........12

    C. Hundreds of these asylum-seekers were then sent to countries in which they

        were not a citizen and had no legal status, where many were again detained,

subjected to cruel treatment, and threatened with return to persecution or torture in their home countries...........................................................................................22

D. Some asylum-seekers were returned to their home countries by the U.S. government while others were coerced into returning to their home countries from third countries and face further threats to their life, liberty, and well-being............................................................................................................26

Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type Style Requirements Pursuant to Fed. R. App. P. 32(g)(1) ............................30

Certificate of Digital Submission.......................................................................31

Certificate of Service.......................................................................................32

# TABLE OF AUTHORITIES

**Published Cases**

*Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015) ...................................12

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999).......................................................9

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....................................................9

*INS v. Stevic*, 467 U.S. 407 (1984) .......................................................................9

*Negusie v. Holder*, 555 U.S. 551 (2009)...............................................................9

**Other Court Filings**

Declaration of Eldon Vail, *Doe v. Johnson*, No. 4:15-cv-00250
(D. Ariz. filed Aug. 17, 2017), ECF No. 206-2....................................................12

Ex. 1, "Implementation of Active Executive Orders—February 28, 2025,"
 at USA00031, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v.
Noem*, No. CV 25-306 (D.D.C. Feb. 3, 2025), ECF No. 52-1 .........................22

Findings of Fact and Conclusions of Law, *Doe v. Johnson*,
No. 4:15-cv-00250 (D. Ariz. Feb. 19, 2020), ECF No. 482.............................12

Op., *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
No. CV 25-306 (D.D.C. July 2, 2025), ECF 71 ..................................................8

Order, *Flores v. Sessions*, No. 85-cv-04544 (C.D. Cal. June 27,
2017), ECF No. 363 ...........................................................................................12

Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544
(C.D. Cal. Jan. 17, 1997) ............................................................................ 12, 21

**Statutes**

8 U.S.C. § 1158(a)(1)..........................................................................................13

iv

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................ 13

8 U.S.C. § 1225(b)(1)(B) ..................................................................... 13

8 U.S.C. § 1225(b)(1)(B)(iii) ................................................................. 8

8 U.S.C. § 1229a .................................................................................... 8

8 U.S.C. § 1229a(a)(3) ........................................................................... 8

8 U.S.C. § 1231 note ............................................................................... 9

Foreign Affairs Reform and Restructuring Act of 1998, § 2242(b),
Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ........................... 9

Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ................ 8

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102
(Mar. 17, 1980) ....................................................................................... 9

**Treaties**

Convention against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, Dec. 10, 1984,
113 S. TREATY DOC. NO.100-20 (1988), 1465 U.N.T.S. 85 ............... 9, 21, 28

Convention relating to the Status of Refugees, July 28, 1951,
189 U.N.T.S. 150 ............................................................................. 9, 28

International Covenant on Civil and Political Rights,
Mar. 23, 1976, 999 U.N.T.S. 171 ................................................. 9, 21, 28

Protocol relating to the Status of Refugees, Jan. 31, 1967,
19 U.S.T. 6223 ................................................................................. 9, 28

**Other Authorities**

8 C.F.R. § 115.114 ............................................................................21

Articles on Responsibility of States for Internationally Wrongful Acts, in GAOR, 55th Sess., Supp. No. 10, U.N. Doc. A/56/10 (2001) ................... 26, 28

Comm. against Torture, General Comment No. 4, U.N. Doc. CAT/C/GC/4 (Feb. 9, 2018) ................................................................28

Correal, Annie, *Costa Rica Will Take Central Asian and Indian Migrants Deported by U.S.*, N.Y. TIMES, Feb. 17, 2025 ....................................................25

*Costa Rica Could Hold U.S. Deportees for Up to Six Weeks, President Says*, Reuters, Feb. 19, 2025 ......................................................................28

Exec. Comm. of the High Commissioner's Programme, Note on International Protection, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) ................28

Fassihi, Farnaz, & Julie Turkewitz, *Lawsuit Against Panama Challenges Detention of Trump Detainees*, N.Y. TIMES, Mar. 1, 2025 .............................................................................................1

H.R. Rep. No. 96-781 (1980) (Conf. Rep.) ..........................................9

Human Rights Comm., General Comment No. 20, U.N. Doc. HRI/ GEN/1/Rev.7 (1992)...............................................................28

HUMAN RIGHTS FIRST, "I'M A PRISONER HERE": BIDEN ADMINISTRATION POLICIES LOCK UP ASYLUM-SEEKERS (2022)......................19

HUMAN RIGHTS FIRST & REFUGEES INTERNATIONAL, "THIS IS AN ORDER FROM TRUMP": ABUSE, EXPULSIONS, AND REFOULEMENT OF PEOPLE SEEKING ASYLUM (2025)................................................................1

HUMAN RIGHTS WATCH, IN THE FREEZER: ABUSIVE CONDITIONS FOR WOMEN AND CHILDREN IN US IMMIGRATION HOLDING CELLS (2018) ....... 19, 20

HUMAN RIGHTS WATCH, "NOBODY CARED, NOBODY LISTENED":

THE US EXPULSION OF THIRD-COUNTRY NATIONALS TO
PANAMA (2025) ............................................................................ 1, 25

HUMAN RIGHTS WATCH, "THE STRATEGY IS TO BREAK US":
THE US EXPULSION OF THIRD-COUNTRY NATIONALS TO
COSTA RICA (2025) ........................................................................... 1

*New Evidence Details Credible Fear of Return for Individuals
Detained and Expelled from the United States to Panama*,
PHYSICIANS FOR HUMAN RIGHTS (Mar. 31, 2025) ............................... 1

Rodríguez-Mega, Emiliano, & James Wagner, *Costa Rica
Violated Rights of 81 Migrant Children Deported by U.S.,
Lawsuit Says*, N.Y. TIMES, Apr. 17, 2025 ............................................ 1

*Panama Government Official Describes His Country's Role in Trump's
Immigration Crackdown*, PBS News, Feb. 26, 2025 ........................... 28

Proclamation 10888 of January 20, 2025, Guaranteeing the States
Protection Against Invasion, 90 Fed. Reg. 8333 (Jan. 29, 2025) ............... 1, 7, 8

U.N. OFFICE OF HIGH COMM'R FOR HUMAN RIGHTS, ISTANBUL
PROTOCOL: MANUAL ON THE EFFECTIVE INVESTIGATION AND
DOCUMENTATION OF TORTURE AND OTHER CRUEL, INHUMAN OR
DEGRADING TREATMENT OR PUNISHMENT, U.N. DOC.
HR/P/PT/8/Rev.2, U.N. Sales No. E.22.XIV.4 (2022) ........................................ 2

UNHCR Advisory Opinion on the Extraterritorial Application of
Non-Refoulement Obligations Under the 1951 Convention relating
to the Status of Refugees and Its 1967 Protocol (2007) .............................. 26, 28

U.S. Border Patrol, Policy: Hold Rooms and Short-Term Custody
(Jan. 31, 2008) ................................................................................ 12

U.S. Customs and Border Protection, "CBP National Standards
on Transport, Escort, Detention and Search" (Jan. 30, 2025) ........................ 12

U.S. Customs and Border Protection, National Standards on
Transport, Escort, Detention, and Search (Oct. 2015) .............................. 12, 21

# GLOSSARY

| Term or Abbreviation | Full Name |
|---|---|
| 212(f) Proclamation | Proclamation 10888 of January 20, 2025, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333 (Jan. 29, 2025) |
| ARSIWA | Articles of Responsibility of States for Internationally Wrongful Acts |
| CAT | Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| CBP | U.S. Customs and Border Protection |
| The Council | Global Strategic Litigation Council |
| DHS | U.S. Department of Homeland Security |
| *Flores* Settlement Agreement | Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544 (C.D. Cal. Jan. 17, 1997) |
| HRF | Human Rights First |
| HRW | Human Rights Watch |
| ICCPR | International Covenant on Civil and Political Rights |
| ICE | U.S. Immigration and Customs Enforcement |
| Istanbul Protocol | United Nations Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| PHR | Physicians for Human Rights |
| PTSD | Post-Traumatic Stress Disorder |
| RI | Refugees International |
| TEDS Standards | U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search |

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are organizations and individuals with substantial expertise in the rights and well-being of asylum-seekers and other migrants, including the rights of those detained by U.S. and other countries' immigration authorities. Together, *amici* have interviewed and evaluated scores of individuals expelled pursuant to 212(f) proclamation[1] practices. Separately and together, they have a unique perspective on the human impact of the proclamation on hundreds of vulnerable individuals, including asylum-seekers.[2]

---

[1] "212(f) proclamation" is used throughout to refer to Proclamation 10888 of January 20, 2025, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333 (Jan. 29, 2025).

[2] These interviews have resulted in various publications and evidence submitted in lawsuits. *See, e.g.*, HUMAN RIGHTS FIRST ("HRF") & REFUGEES INTERNATIONAL ("RI"), "THIS IS AN ORDER FROM TRUMP": ABUSE, EXPULSIONS, AND REFOULEMENT OF PEOPLE SEEKING ASYLUM (2025), https://humanrightsfirst.org/wp-content/uploads/2025/05/ThisIsAnOrderFromTrumpReport_final1.pdf; HUMAN RIGHTS WATCH ("HRW"), "NOBODY CARED, NOBODY LISTENED": THE US EXPULSION OF THIRD-COUNTRY NATIONALS TO PANAMA (2025), https://www.hrw.org/sites/default/files/media_2025/04/us_panama0425%20web.pdf; HRW, "THE STRATEGY IS TO BREAK US": THE US EXPULSION OF THIRD-COUNTRY NATIONALS TO COSTA RICA (2025), https://www.hrw.org/sites/default/files/media_2025/05/costarica0525%20web.pdf; *New Evidence Details Credible Fear of Return for Individuals Detained and Expelled from the United States to Panama*, PHYSICIANS FOR HUMAN RIGHTS (Mar. 31, 2025), https://phr.org/news/new-evidence-details-credible-fear-of-return-for-individuals-detained-and-expelled-from-the-united-states-to-panama/; Farnaz Fassihi & Julie Turkewitz, *Lawsuit Against Panama Challenges Detention of Trump Detainees*, N.Y. TIMES, Mar. 1, 2025, https://www.nytimes.com/2025/03/01/world/americas/panama-migrants-us-lawsuit.html; Emiliano Rodríguez-Mega & James Wagner, *Costa Rica Violated Rights of 81 Migrant Children Deported by U.S., Lawsuit Says*, N.Y. TIMES, Apr. 17, 2025, https://www.nytimes.com/2025/04/17/world/americas/costa-rica-migrants-lawsuit.html.

Organizational *amici* the Global Strategic Litigation Council (the "Council"), Human Rights Watch ("HRW"), Physicians for Human Rights ("PHR") and Refugees International ("RI") are leading non-partisan, nonprofit human rights organizations which share a common goal to promote human rights, including by calling for protection of the rights of refugees and other displaced people worldwide. They engage in research, policy analysis and legal and other advocacy to reform laws, policies and practices that infringe upon migrant rights. Organizational *amici* have appeared as friends of the court before U.S. and other courts, including this Court.

The five individual clinicians, leading experts in evaluations using the standards set out in the United Nations Manual on Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the "Istanbul Protocol"),[3] with extensive medical, psychiatric and/or psychological training and experience, include the medical director of PHR and faculty members at leading universities. They regularly evaluate migrants *pro bono* and document the physical and psychosocial impacts of human rights violations. Individual *amici* clinicians have appeared as expert

---

[3] U.N. Doc. HR/P/PT/8/Rev.2, U.N. Sales No. E.22.XIV.4 (2022), https://www.ohchr.org/sites/default/files/documents/publications/2022-06-29/Istanbul-Protocol_Rev2_EN.pdf.

witnesses and provided evaluations filed in immigration and other U.S. proceedings.

Pursuant to Circuit Rule 29(b), *amici* certify that this brief is necessary to provide detailed accounts of individuals expelled pursuant to the 212(f) proclamation. *Amici* are well-suited to provide this Court with insights into the types and extent of harm caused by acts and omissions at the core of this appeal. *Amici* respectfully submit that this brief brings to the Court's attention issues that have not been completely briefed or discussed below, and which are of essential importance to the matter.

## CONSENT OF THE PARTIES

Pursuant to D.C. Circuit Rule 29(b), *amici* certify that all parties to this appeal have consented to the filing of this brief.

## RULE 29(a)(4)(E) STATEMENT

i. No party's counsel authored the brief in whole or in part;

ii. No party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and

iii. No person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparing for or submitting the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Jalil*,[4] a 21-year-old from Afghanistan, and his family were expelled in circumstances that illustrate the impacts of the 212(f) proclamation. He arrived at the southern U.S. border on January 20, 2025, with his two sisters, *Mariam* and *Khadeeja*, along with Khadeeja's husband, *Baseem*, and their 1-year-old daughter. They had been scheduled through the U.S. Customs and Border Protection ("CBP") One app to apply for asylum, but CBP had cancelled all appointments that day. Each was fleeing harm from the Taliban for their own reasons—Jalil was a musician in a country in which music had been banned; Baseem was facing reprisals for his work for Afghanistan's National Security Council in the former government—and the whole family dreamed of the youngest being able to attend school and eventually work. Jalil was separated from his sisters and his niece immediately. "The last thing I said to my family was to not be afraid; there is nothing to be afraid of, we are all safe," he remembers.

Over the course of two months, Jalil was moved from CBP to U.S. Immigration and Customs Enforcement ("ICE") custody and between different

---

[4] All names throughout this brief are pseudonyms used to protect individuals from reprisals and heightened risk of harm.

facilities in different states. Each time, he reiterated his intent to apply for asylum, but officials never permitted him to do so. "From the day I came to the U.S., I did not see the face of a judge and no interview happened, no one asked me why I went to the United States," said Jalil. In late March, U.S. immigration authorities sent him to Afghanistan via Dubai. On his layover, an American in a uniform took him to a closed room where he waited for hours before he was handed his passport and taken to a plane leaving for Kabul.

While in Dubai, Jalil learned that CBP had denied Mariam the right to seek asylum in the United States and had expelled her to Panama. Panamanian authorities held Mariam in detention for weeks, first in a hotel and then in a remote location in the jungle, always under armed guard, unable to access lawyers or contact family. Jalil also learned that CBP had expelled Khadeeja, Baseem and their baby girl to Costa Rica without the opportunity to seek asylum. Costa Rican authorities detained them for two months in a rural migrant shelter intended for very short stays, guarded by security forces who kept control of their passports, with no care or services for their baby—nor for the other 80 children held there.

This brief illustrates the harm of the government's attempt to dismantle the asylum system. In a selection of *amici*'s extensive interviews included below,

people adversely affected by the 212(f) proclamation describe their separation from family members, their arbitrary and often incommunicado detention, and their expulsion from the United States without due process or the opportunity to seek asylum or other protection. Many have been returned to home countries where they are at risk of persecution or torture or sent to third countries where they face further rights violations. In some cases of third-country expulsions, they have been coerced to return or left with no practical option but to return, to the countries they fled—where they face the risk of persecution or other irreparable harm.

Today, Jalil is in hiding in Afghanistan. "I do not have any hope for myself," he says. The stories of those like Jamil, Mariam, Khadeeja, Baseem and their daughter who have been harmed by the actions that are before this Court underscore the importance of denying the Government's appeal and upholding the district court's order.

## I. ARGUMENT

The 212(f) proclamation purported to end territorial asylum at the U.S.-Mexico border[5] and directed CBP and other agencies to expel noncitizens who

---

[5] Proclamation 10888, sec. 2.

7

crossed that border without inspection.[6] It has since effectively prevented many

who arrived at or between ports of entry from being able to seek asylum or

other protection against return to persecution or torture. Through the scores of

asylum seeker interviews *amici* have collectively conducted,[7] and as illustrated

by the representative personal narratives presented below, *amici* have

documented asylum-seekers' credible fears of persecution and other serious

harm in their home countries (**Section** A); their mistreatment by U.S. officials,

including family separation, incommunicado detention and denial of the right to

seek asylum (**Section** B); their expulsion to countries of which they were not

citizens nor had legal status, where they faced arbitrary detention, denial of

human rights and essential services, and coercion to return to their home

countries (**Section** C); and in some cases, their forcible or coerced return to

countries where they fear persecution, torture or other serious harm (**Section**

D). As documented by individual *amici* clinicians, many of those evaluated now

experience clinical symptoms consistent with past experiences of harm,

including torture or other ill-treatment, in their home countries, the United

---

[6] *Id.*, sec. 5. In doing so, the proclamation attempted to "sidestep the statutory text," Op. at 75, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (D.D.C. July 2, 2025), ECF No. 71, of the removal procedures set forth in the Immigration and Nationality Act, codified at 8 U.S.C. §§ 1101 *et seq.* Removal proceedings under 8 U.S.C. §§ 1229a are the "sole and exclusive procedure" for removal unless Congress provides otherwise, *id.* § 1229a(a)(3), as it did in *id.* § 1225(b)(1)(B)(iii) (expedited removal).

[7] See note 2 *supra*.

States, or third countries. This brief concludes that the human consequences of the 212(f) proclamation and the many violations of U.S. and international law and standards support Appellees' request that the Court uphold the summary judgment order below and deny the Government's appeal.

## A. Many of those unlawfully expelled under the 212(f) proclamation fled past persecution or in fear of future harm.

All of the scores of people interviewed and evaluated by *amici* said they fled to the United States because they were not safe in their home countries. People reported being targeted for persecution because of their actual or perceived political opinion; their religion, ethnicity or sexual orientation; and the languages they spoke. They described facing or reasonably fearing sexual violence, death threats, and the murder of family members.[8] Many described

---

[8] The applicable international law includes the International Covenant on Civil and Political Rights ("ICCPR"), Dec. 16, 1996, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976; ratified by United States June 8, 1992); the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 113 S. TREATY DOC. NO.100-20 (1988), 1465 U.N.T.S. 85 (ratified by United States Oct. 21, 1994); and the Protocol relating to the Status of Refugees ("Refugee Protocol"), Jan. 31, 1967, 19 U.S.T. 6223 (entered into force Oct. 4, 1967; accession by United States Nov. 1, 1968), which incorporates the substantive protections of the Convention relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980), "with the understanding that it is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." H.R. Conf. Rep. No. 96-781, at 20 (1980) (Conf. Rep.). See also INS v. Stevic, 467 U.S. 407, 426 n.20 (1984) (noting that a principal motivation of the Refugee Act was to make "U.S. statutory law clearly reflect[] our legal obligations under international agreements."); INS v. Cardoza-Fonseca, 480 U.S. 421, 436 (1987) (same); INS v. Aguirre-Aguirre, 526 U.S. 415, 427 (1999) (same); Negusie v. Holder, 555 U.S. 551 (2009) (same). Congress also enacted legislation to implement the United States' nonrefoulement obligation under the Convention Against Torture. Foreign Affairs Reform and Restructuring Act of 1998, § 2242(b), Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998), codified at 8 U.S.C. § 1231 note.

9

ongoing and in some cases increased risk of future harm if returned, as described in greater detail in Sections C and D below.

*Stephanie*, a 32-year-old woman and member of the Anglophone minority in Cameroon, told HRW that she had received an arrest warrant for allegedly aiding the militia. Police officers attacked her village, burned down her house, detained and beat her brother, and shot and killed her father because the officers claimed she and her family had collaborated with groups advocating for the separation of Anglophone Cameroon. One of these officers raped Stephanie, then 29 weeks pregnant. Stephanie fled with the aid of her aunt. Upon discovering that Stephanie had left, soldiers shot her aunt in the back. Stephanie lost her baby shortly afterward, which she attributes to the ordeal she faced.

*Ahmad*, a 29-year-old atheist and member of the Hazara minority in Afghanistan, told PHR that he endured years of harm and persecution following the Taliban's return to power in 2021. He was imprisoned for allegedly not fasting as a legally enforced religious observance. During his arrest and detention, he endured beatings by the Taliban which left permanent scars, confirmed by a PHR clinician. These attacks, coupled with his ethnic and religious minority status and the risk that his public activities critical of the Taliban would become known, left Ahmad fearful of execution. A medical

10

evaluation described Ahmad as having symptoms consistent with Post-Traumatic Stress Disorder ("PTSD") and Moderate Depression, exacerbated by recurrent fears of being returned to Afghanistan—as well as new nightmares about transportation between Panamanian facilities.

*Ivan,* a gay man from Russia, where gay men, lesbians, and bisexual, transgender and queer people often face persecution, told HRW that he had faced years of targeted persecution that caused physical and mental harm. After his neighbors told the police that Ivan was gay, police pursued Ivan for over a year, knocking on his door regularly and threatening to arrest him, and then doing so. Less than two months before Ivan fled to the United States, state officials came into his home and beat him so severely that he was hospitalized with contusions and a concussion.

Clinical evaluations of many of these and dozens of other individuals reveal that most of them displayed clear symptoms of acute stress disorder or PTSD consistent with their accounts of torture and ill-treatment in their home countries—and later in the United States and third countries.

**B. U.S. officials denied access to asylum, held many asylum-seekers incommunicado, separated families, and subjected them to other abuses.**

People seeking asylum at the U.S. border are often held for processing in CBP facilities, where, according to CBP standards, they should generally be detained for no more than 72 hours.[9] These facilities were not designed for longer stays and do not accommodate the basic needs of people, especially children.[10] But many of the people interviewed by *amici* said CBP detained them for periods that ranged from one week to more than a month, in contravention of CBP standards[11] and, in the many cases of children who were held more than 20 days, in violation of the *Flores* Settlement Agreement.[12]

---

[9] U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ("TEDS Standards") 14 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf. *See also* U.S. Border Patrol, Policy: Hold Rooms and Short-Term Custody § 6.2.1 (Jan. 31, 2008), https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/2008%20USBP%20Hold%20Room%20Policy_Redacted.pdf. An unredacted version of the Border Patrol policy is available at https://www.documentcloud.org/documents/818095-bp-policy-on-hold-rooms-and-short-term-custody/.

[10] *See, e.g.*, Findings of Fact and Conclusions of Law, *Doe v. Johnson*, No. 4:15-cv-00250 (D. Ariz. Feb. 19, 2020), ECF No. 482; Decl. of Eldon Vail, *Doe v. Johnson*, No. 4:15-cv-00250 (D. Ariz. filed Aug. 17, 2017), ECF No. 206-2.

[11] TEDS Standards, at 14. CBP has acknowledged that the TEDS Standards "reflect[] key legal and regulatory requirements." CBP, "CBP National Standards on Transport, Escort, Detention and Search" (Jan. 30, 2025), https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.

[12] Order at 30, *Flores v. Sessions*, No. 85-cv-04544 (C.D. Cal. June 27, 2017), ECF No. 363 (citing *Flores v. Lynch*, 212 F. Supp. 3d 907, 914 (C.D. Cal. 2015); Stipulated Settlement Agreement ¶ 12A, *Flores v. Reno*, No. CV 85-4544 (C.D. Cal. Jan. 17, 1997)).

12

### 1) Denial of access to asylum

CBP agents ignored repeated requests for asylum, claimed that asylum was no longer available in the United States, and did not refer people for fear screenings, the people interviewed by *amici* said.[13]

*Arun,* a 36-year-old man who asked that his country of origin not be made public, interviewed by HRW, said, "As soon as I crossed, the U.S. Border Patrol was there. They asked me if I had a knife or a gun. I said, 'No, I am a refugee, and I want asylum.' . . . They took my phone, but I told them all my documents are on my phone. I said, 'Please, sir, can I go to the court for asylum?' They said, 'You should stay in your country. You can't come to our country, and we will send you back.' I told them my life is in danger in my home country. The next day they took me in handcuffs and leg shackles on a bus. I was not allowed to talk. . . . When they sent me to Panama they gave me no documents, no statement, nothing . . .  saying why I was being deported."

*Ivan,* the gay man from Russia introduced in Section A, said that he had prepared a four-page typed account of his experiences before he reached the

---

[13] Noncitizens who are physically present in the United States may seek asylum "whether or not" they entered at "a designated port of arrival" and "irrespective" of status. 8 U.S.C. § 1158(a)(1). Even if subject to expedited removal, people who "indicate[] . . . an intention to apply for asylum . . . or a fear of persecution" are entitled to a credible fear interview by an asylum officer and "prompt review by an immigration judge" of the officer's finding. *Id.* §§ 1225(b)(1)(A)(ii), (b)(1)(B).

U.S.-Mexico border. "During my arrest, while they were going through my bag I also asked for political asylum. I said, 'Please check my bag. I have documents with my story in English.' They would not take my papers."

*Kamran,* a 37-year-old man from Iran, told HRW that one CBP officer spoke to him while he and his family were detained in Texas, and another officer spoke to him in San Diego, but they refused to hear his account of persecution in his home country. "They only wanted to know how I entered the U.S., what the route was, and who helped me. I kept saying we suffered religious persecution and were seeking asylum, but the officers did not want to listen," he said, adding, "They did not grant us an interview."

*Araz,* a 35-year-old Armenian woman interviewed by HRW and RI, spent 29 days in CBP detention before she and her two sons, 12 and 8, were expelled to Costa Rica. She said, "I genuinely don't understand—why did they hold us for such a long time if they pushed us out anyway? It just doesn't make sense. When we were in detention, I thought we just had to push through it—they will eventually process us and get us released. But no. We never even had an interview. They never let me explain about my case, about the threats I faced."

In many instances, DHS officials told people *amici* interviewed that there was no more asylum in the United States. For example, *Ahmad,* from

14

Afghanistan, introduced in Section A, told PHR that when he crossed from Tijuana to San Diego in February 2025 and asked for asylum, CBP agents told him, "The new president does not accept these things."

*Karina,* a 42-year-old woman who had fled Russia with her 5-year-old son and 15-year-old daughter, told RI that she repeatedly stated to CBP officers that they were seeking asylum. "The officers explained there is a new president so asylum is not possible."

*Nadia,* a 39-year-old woman from Russia traveling with her 15-month-old son, and one of the few who said they had received or were told they would receive an interview with an asylum officer, told HRW, "At the end [of the interview], the officer said, 'There is no more asylum in the United States.'" The officer nonetheless said she would have a chance to explain her case to an immigration judge. Instead, U.S. authorities expelled her to Costa Rica.

### 2) Incommunicado detention

*Mina,* a 27-year-old Christian convert from Iran, told the Council and HRW that during the 11 days she was in CBP detention, "I told [CBP agents] I wanted a lawyer. Every day, I asked about a lawyer, and I asked when I would get an interview." She continued, "On the wall I saw a sign telling us our rights. It said we can see our family. It also said we can make phone calls, including to a

15

lawyer. The U.S. immigration officers never let us do any of these things, even when we asked."

*Colette*, from Cameroon, was interviewed by the Council and evaluated by a PHR clinician. After Colette entered the United States from Tijuana in January 2025, CBP held her in incommunicado detention. U.S. border officials confiscated her phone and belongings. She could not contact family members or legal counsel. CBP detention staff permitted her only one shower, during which she was continuously supervised by guards. She was kept in overcrowded conditions with constant noise, preventing sleep. She was never provided with the opportunity to raise credible fear or claim asylum. Collette described feeling terrified, confused, and physically and mentally exhausted.  Dr. Recht determined that while Colette had pre-existing PTSD symptoms prior to her escape from Cameroon, she developed additional symptoms and experienced exacerbations of her existing PTSD symptoms after her arrival in the United States.

*Meron,* from Ethiopia, was interviewed by the Council and evaluated by a PHR clinician. When Meron entered San Diego in January 2025, she told PHR

that she was detained and not given the opportunity to explain her asylum claim. Her only supporting documentation was seized by CBP officers, and she was detained in a crowded facility for 15 days with no access to phones or communication. Immigration officials and detention staff ignored her questions and gave her no information before expelling her to Panama.

*Amici* heard many similar accounts. For example, *Amelia*, who was sent to Panama in February told RI when she asked to make a phone call, U.S. immigration officers cursed at her, saying, "If you want to communicate, go to your country."

*Nasrin,* a 25-year-old woman from Turkey, said of the 27 days she and her husband spent in CBP detention near San Diego before their expulsion to Costa Rica, "Our family didn't know we were alive. There was a poster on the wall that said people could contact their family. I told them someone in my family had been killed and that it was important to talk to my family, but the officials wouldn't let me."

In the few cases where *amici* heard that people in CBP detention were permitted brief phone calls, some of these individuals still went days or weeks without the ability to make a call. For instance, *Tanya*, a 33-year-old Russian

woman sent to Costa Rica, told HRW she had been allowed two brief phone calls during the 32 days she was held at the Otay Mesa border station.

### 3) Family separation

*Jalil, Mariam, Khadeeja* and her husband, *Baseem,* and their 1-year-old, all introduced in the Introduction and Summary of the Argument, described to the Council, HRW and RI their experiences of separation. "The United States separated our entire family," Mariam said. She was expelled to Panama after 18 days in CBP detention. Her sister, Khadeeja, her brother-in-law and their 1-year-old were expelled to Costa Rica. DHS officials put Jalil, her brother, on a plane to Dubai and handed him over to United Arab Emirates immigration officials, who put him on a flight to Kabul.

*Hadi,* a 35-year-old who fled Iran with his wife in 2024 to escape persecution for their political views and their religious faith as Christian converts, told the Council and HRW that after they surrendered to CBP agents at the Texas border in February 2025, he was expelled to Costa Rica while his wife remained in the United States. "At first I thought separation was a normal process. . . . Men are in one place, women are in another. But when the immigration police told me they were sending me to Costa Rica, when I asked where is my wife, first the police said, 'I don't know.' I kept asking them,

'Where is my wife?' . . . . Finally, the police said to me, 'Your wife is going there too.' . . . That was not true. She wasn't in Costa Rica when I arrived." She is still in immigration detention in the United States, he told the Council in September.

In addition to such cases of family separation during summary expulsions, families are routinely separated while in CBP detention. Men and women are placed in different holding cells. Teenage boys are also usually held separately from men and from adult women and girls.[14]

*Araz,* who was introduced above, said that "the most horrible thing" about her 29 days of CBP detention was that "once they brought us to San Ysidro detention center, they separated my 12-year-old boy from me. They just took him away. He was crying, begging to stay with me, but they did not pay any attention. For 29 days my child was separated from me. Sometimes, he was in a cell all alone; sometimes with other boys aged 13 to 15. I was so afraid for him, I was afraid the other boys would hurt him. . . . He'd never ever been on his own."

---

[14] *See, e.g.*, HRW, IN THE FREEZER: ABUSIVE CONDITIONS FOR WOMEN AND CHILDREN IN US IMMIGRATION HOLDING CELLS 25-29 (2018), https://www.hrw.org/sites/default/files/report_pdf/uscrd0218_web.pdf; HRF, "I'M A PRISONER HERE": BIDEN ADMINISTRATION POLICIES LOCK UP ASYLUM-SEEKERS 12-15 (2022), https://humanrightsfirst.org/wp-content/uploads/2022/09/ImaPrisonerHere.pdf.

19

Additionally, in at least five cases documented by *amici*, including the cases of Araz and Karina, discussed in Section A, CBP did not allow reunification with spouses and children who were already living in the United States and pursuing asylum claims. Their expulsion under 212(f) left them indefinitely—and potentially permanently—separated from their spouses and/or children.

**4)   Other abuses**

Conditions in CBP holding cells and processing centers are consistently abusive. They are often uncomfortably cold—in fact, Spanish speakers held in these detention facilities commonly refer to them as *hieleras* (freezers)—and Border Patrol agents regularly limit people to a single layer of clothing. Some people receive showers once every three or four days or even less often; others have no access to showers at all. They often cannot brush their teeth more than once a week, if at all. Cells are often overcrowded and usually lit 24 hours a day, and the constant movement of people and frequent shouted orders from border agents mean that people are rarely able to sleep more than an hour or two at a time.[15] As described in the previous section, families are often separated while in detention and may not be able to speak to each other at all for weeks or longer.

---

[15] *See, e.g.*, HRW, IN THE FREEZER, at 7-21.

*Tanya,* the 33-year-old Russian woman introduced above, said of her 32 days in the Otay Mesa border station, "The conditions were beyond awful. There wasn't enough food, we weren't allowed outside at all, even the kids." CBP officers placed her and her 9-year-old daughter in a "family room," an overcrowded cell holding women and children. "In a few days, I got really sick—high fever, vomiting . . . I was so ill I thought I would not make it. I actually had heart pains and fainted twice. My daughter was frightened, hysterical. A medic checked me out but didn't do anything, except giving me a few anti-flu pills."

Individual *amici* clinicians found that most people they evaluated showed clear symptoms of acute stress disorder or PTSD that worsened significantly after their U.S. detention and the expulsion experiences described in the next section. These abusive detention practices violated the United States' international obligations.[16] They also violated the binding terms of the *Flores* Settlement Agreement and regulations governing DHS holding facilities and did not comply with CBP detention standards.[17]

---

[16] ICCPR, arts. 7, 24; CAT, art. 16.

[17] Stipulated Settlement Agreement ¶ 12A (requiring that any immigration detention of children be in "facilities that are safe and sanitary" and "consistent with the . . . concern for the particular vulnerability of minors"); 8 C.F.R. § 115.114 ("Juveniles shall be detained in the least restrictive setting appropriate to the juvenile's age and special needs . . . consistent with the need to protect the juvenile's well-being and that of others . . . ."); TEDS Standards §§ 1.6, 5.1, 5.6.

21

**C. Hundreds of these asylum-seekers were then sent to countries in which they were not a citizen and had no legal status, where many were again detained, subjected to cruel treatment, and threatened with return to persecution or torture in their home countries.**

Following their ordeal and denial of humanitarian protection in the United States, many asylum-seekers were removed or expelled to third countries. This included being sent without notice or explanation, shackled, to Panama and Costa Rica.[18] As described above, CBP separated some families, for example, detaining one spouse in the United States and sending the other to another country; in other cases, CBP did not allow people to reunite with spouses and children who were already pursuing asylum claims in the United States.

Once expelled to third countries, people faced serious abuses and rights violations. Two hundred ninety-nine people were held incommunicado, under armed guard, in the Decapolis Hotel-turned-prison in Panama City. Many of those were sent back to their home countries, while 112 were transferred under armed guard to a fenced jungle encampment, where they were held in shipping containers. Another 200, including 81 children, were sent to Costa Rica,

---

[18] CBP guidance issued to implement the 212(f) proclamation also directed officers to directly repatriate migrants to Mexico in various circumstances. *See* Ex. 1, "Implementation of Active Executive Orders— February 28, 2025," at USA00031, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 25-cv-00306 (D.D.C. Feb. 3, 2025), ECF No. 52-1.

detained in a former factory with no access to education or services appropriate to their needs. These individuals were subject to arbitrary detention and ill-treatment as a result of U.S. action.

### 1) Detention and ill-treatment in third countries

*Meron,* the woman from Ethiopia introduced in Section B, was with a group of other Ethiopian travel companions whom U.S. officials placed on a military plane without notice or information about their destination. When she arrived in Panama, authorities took her under guard to the Decapolis Hotel, forcibly separated her from her companions, and held her alone and incommunicado. With a history of being held in prison, Meron's mental health deteriorated rapidly, with stress exacerbated by her inability to speak the local language. Dr. DeFries' evaluation of Meron found her to exceed the criteria for both PTSD and Depression, which worsened particularly during her days in Panama. Meron continues to suffer from these conditions, as well as experiencing headaches and palpitations when she thinks about her time in Panama.

*Fatima,* a student from Afghanistan who was interviewed by the Council and evaluated by PHR*,* said that when she was expelled to Panama, she was taken from family members who remained in U.S. custody. Housed under prison-like conditions in the Decapolis Hotel, Fatima's mental state reached

"rock bottom," in part because pictures taken without her consent of her without a hijab and unaccompanied by male relatives were published in international media. Dr. Heisler found Fatima's symptoms to be consistent with Major Depression, including intrusive memories of her detention, feelings of dehumanization, insomnia, and numbness.

**2) Summary denial of asylum and pressure to return to risk of harm**

Not long after their expulsion, a few individuals were able to apply for asylum in Panama. However, the Council's review of the written decisions revealed that authorities summarily denied several of the first applications within 48 hours. The Panamanian government did not permit these asylum-seekers to provide evidence in support of their applications, allow them access to interpreters, nor provide any information about the procedure before rejecting their applications. Panamanian officials told some asylum-seekers that the Panamanian government would reject any appeals. These asylum-seekers said they fled persecution, including sexual violence, in their home countries, and each feared for their safety if returned. Evaluations by individual *amici* clinicians determined that, for many, the denials exacerbated worsening mental health and contributed to feelings of dejection and hopelessness.

24

People expelled to Costa Rica and Panama said that on their arrival and for weeks thereafter, officials from each country told them their only options were to return to their home countries or to travel to another country that would accept them. Their uncertain status added to the pressure they faced. Costa Rica's president and other senior officials initially said the country's only role was to serve as a "bridge" to home countries.[19] The Panamanian government issued short-term humanitarian permits with the proviso that those remaining in Panama beyond the permits' validity would be deported.[20]

Expulsion increased the risks some would face if returned to their home countries. For instance, while *Mina,* discussed in Section B, was held in Panama, her name appeared in media articles. In Iran, Mina's family members were then told by an Iranian government security agency officer that they should prevent her from giving interviews to "foreign-enemy-media outlets." The officer stated that if Mina again spoke publicly and was returned to Iran, "she will find herself in a black hole with severe consequences."

People expelled to Costa Rica and Panama described detention, physical and emotional harm, and deep fear. Individual *amici* clinicians, who only evaluated

---

[19] Annie Correal, *Costa Rica Will Take Central Asian and Indian Migrants Deported by U.S.*, N.Y. Times, (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/world/americas/costa-rica-deportation-flights.html.

[20] HRW, "Nobody Cared, Nobody Listened," at 28.

asylum-seekers sent to Panama, determined that many developed new psychological symptoms from the detention conditions and coercion to return to third countries. These practices violated Costa Rica and Panama's international obligations and, to the extent that they did so on the instructions of, under the direction or control of, or coerced by the United States, the United States is also responsible for those violations.[21]

## D. Some asylum-seekers were returned to their home countries by the U.S. government while others were coerced into returning to their home countries from third countries and face further threats to their life, liberty, and well-being.

Many of those interviewed by *amici*, as noted in Section A above, fled their home countries to escape persecution or other human rights abuses. The U.S. government has used the 212(f) proclamation to expel some directly to their countries of feared persecution, as with Jalil, with whose story this brief opens. Others expelled to third countries have been pressured into returning to the countries they fled.

---

[21] Responsibility of States for Internationally Wrongful Acts ("ARSIWA"), arts. 16-18, in GAOR, 55th Sess., Supp. No. 10, U.N. Doc. A/56/10 (2001); UNHCR Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol, ¶¶ 24, 32-43 (2007), https://www.refworld.org/policy/legalguidance/unhcr/2007/en/40854.

Two Russians interviewed by RI, *Svetlana* and *Mikhail*, fled religious- and political-based persecution in Russia with their four children, including a 4-month-old baby. U.S. authorities expelled the family to Russia without screening their asylum claims. Active members of a church targeted by the government for political reasons, the family fled after the church's pastor was arrested and church members were subjected to raids. They repeatedly stated that they were seeking asylum and showed evidence of their asylum claim, but CBP officers did not refer the family for a fear screening and instead forced them to sign a document they could not read before forcibly expelling them to Russia.

*Eduard*, a 26-year-old man from Russia, told HRW that his wife and her child, whom he helped raise from a very young age, returned to Russia in late April, despite their fears of harm there, because his wife concluded she had no other option. Other individuals told *amici* they were forcibly returned, coerced into returning, or returned because they believed all avenues of protection were foreclosed. They are now in hiding or no longer feel they can safely remain in contact with *amici*.

Directly returning individuals to persecution, torture or serious human rights violations breaches the United States' international obligations.[22] When Costa Rica and Panama returned people to harm—with the U.S. government footing the bill[23]—or left them with no practical option other than to return to such harm, they also violated international law.[24] To the extent that they did so on the instructions of or on the direction or otherwise under the effective authority and control of or coerced by the United States, the United States is also responsible for those violations.[25]

**CONCLUSION**

The result of the 212(f) proclamation, as shown by the cases *amici* documented and the representative stories presented above, is that countless

---

[22] Refugee Protocol, art. 1(1) (incorporating Refugee Convention, art. 33); Convention against Torture, art. 3; ICCPR, art. 7; Human Rights Comm., General Comment No. 20, ¶ 9, U.N. Doc. HRI/ GEN/1/Rev.7 (1992) ("States parties must not expose individuals to the danger of torture or cruel, inhuman or degrading treatment or punishment upon return to another country by way of their extradition, expulsion or refoulement."); Exec. Comm. of the High Commissioner's Programme, Note on International Protection, ¶ 96, U.N. Doc. A/AC.96/951 (Sept. 13, 2001) (obligation of nonrefoulement "has come to be considered a rule of customary international law binding on all States").

[23] *See Panama Government Official Describes His Country's Role in Trump's Immigration Crackdown*, PBS News, Feb. 26, 2025, https://www.pbs.org/newshour/show/panama-government-official-describes-his-countrys-role-in-trumps-immigration-crackdown; *Costa Rica Could Hold U.S. Deportees for Up to Six Weeks, President Says*, Reuters, Feb. 19, 2025, https://www.reuters.com/world/americas/costa-rica-could-hold-us-deportees-up-six-weeks-president-says-2025-02-19/.

[24] Refugee Convention, art. 33(1) (prohibition of refoulement applies to expulsions or returns effected "in any manner whatsoever"); Exec. Comm. of the High Commissioner's Programme, Note on International Protection, ¶ 16 (prohibition includes "indirect refoulement"); Comm. against Torture, General Comment No. 4, ¶ 14, U.N. Doc. CAT/C/GC/4 (Feb. 9, 2018) (calling on states not to adopt "dissuasive measures" that would compel return to risk of torture and other ill-treatment).

[25] UNHCR Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations, ¶¶ 24, 32-43; ARSIWA arts. 16-18.

28

asylum-seekers were harmed, many have been returned to danger and, alarmingly, some have disappeared beyond reach.

For the reasons stated above, *amici* respectfully support Appellees' request that this Court deny the appeal.

Dated: September 19, 2025          Respectfully submitted:


                                   /s/ *Ian Kysel*


Michael Garcia Bochenek            Ian M. Kysel
Human Rights Watch                 Courtney Bell, Student Attorney*
350 Fifth Avenue, 34th Floor       Transnational Disputes Clinic
New York, NY 10118                 Cornell Law School
(212) 290-4700                     Myron Taylor Hall
bochenm@hrw.org                    Ithaca, NY 14850
                                   (607) 255-5503
                                   ian.kysel@cornell.edu

                                   *Attorneys for* Amici Curiae


   *Motion for Student Appearance filed concurrently with this brief*

29

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(g)(1)**

I hereby certify as follows:

1. The undersigned certifies under Fed. R. App. P. 32(g)(1) that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(b). The brief is printed in proportionally spaced 14-point type, and the brief has 6,400 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Court Rule 32(e)(1)).

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Ian Kysel*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify as follows:


a.  All required privacy redactions have been made.

b.  The hard copies of any pleading required to be submitted to the clerk's

office are exact copies of the ECF filing.

*/s/ Ian Kysel*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of September, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ian Kysel*