**[DECIDED APRIL 24, 2026]**

**No. 25-5243**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION
AND LEGAL SERVICES, *et al.*,
*Plaintiffs-Appellees,*

v.

MARKWAYNE MULLIN, *et al.*,
*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**PETITION FOR REHEARING EN BANC**
———————————

PATRICK GLEN
KATHERINE J. SHINNERS
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *General Litigation and Appeals*
    *Section*

BRETT A. SHUMATE
  *Assistant Attorney General*
YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*
DREW C. ENSIGN
  *Deputy Assistant Attorney*
  *General*
BENJAMIN HAYES
  *Senior Counsel to the Assistant*
    *Attorney General*
  U.S. Department of Justice
    Civil Division
  950 Pennsylvania Avenue, N.W.
  Washington, DC 20530

# TABLE OF CONTENTS

INTRODUCTION AND RULE 40(b) STATEMENT ................................1

STATEMENT...................................................................................4

    A.    Statutory Background....................................................4

    B.    Factual Background ......................................................6

          1.    The Border Crisis........................................6

          2.    The President's Proclamation to Secure the
               Border...........................................................9

    C.    Procedural Background.................................................10

REASONS FOR GRANTING REHEARING...........................................12

I.    The Panel Decision Squarely Conflicts With *Huisha-Huisha*. .....12

II.    The Panel Decision Threatens National Security and
    Cripples the Executive's Ability to Secure the Homeland. ...........17

CONCLUSION .......................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) .......................... 1, 2, 3, 12, 13, 14, 15, 16

*INS v. Aguirre-Aguirre,*
  526 U.S. 415 (1999) .................................................................................. 6

*Moncrieffe v. Holder,*
  569 U.S. 184 (2013) .................................................................................. 6

*Trump v. Hawaii,*
  585 U.S. 667 (2018) .................................................................................. 5

*United States ex rel. Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) .................................................................................. 5

*United States v. Texas,*
  173 F.4th 659 (5th Cir. 2026) (en banc) ................................................. 1

**Statutes:**

8 U.S.C. §1158 .......................................................................................... 10

8 U.S.C. §1158(b)(1)(A) ............................................................................. 5

8 U.S.C. §1182(a)(1) ............................................................................... 4, 9

8 U.S.C. §1182(a)(2) ............................................................................... 4, 9

8 U.S.C. §1182(a)(3) ............................................................................... 4, 9

8 U.S.C. §1182(f) ........................................................................................ 4

8 U.S.C. §1185(a)(1) .................................................................................. 5

8 U.S.C. §1225(b)(1) .................................................................................. 7

8 U.S.C. §1231(b)(3) ................................................................................ 10

42 U.S.C. §265 ..................................................................................... 11, 12

ii

**Federal Rules:**

Fed. R. App. P. 40(b)(2)(A) ..........................................................................3

Fed. R. App. P. 40(b)(2)(D) ..........................................................................3

Fed. R. App. P. 41(d)..................................................................................21

**Regulation:**

8 C.F.R. §208.18...................................................................................10

**Other Authority:**

Proclamation 10888, 90 Fed. Reg. 8333 ....................................1, 2, 9, 17

# GLOSSARY

INA....................................................... Immigration and Nationality Act

## INTRODUCTION AND RULE 40(B) STATEMENT

A divided panel of this Court affirmed an injunction against the President's most successful measure to combat the crisis at the southern border. That holding contravenes this Court's precedent in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), and risks cataclysmic consequences for border security and public safety. Rehearing en banc is plainly warranted and urgently needed.

In January 2025, the country faced an unprecedented crisis at the southern border. Millions of illegal, unvetted aliens had flooded into the country, inflicting a "jarring … human toll":

> More than 6 million illegal aliens, from over 100 countries, flooded Texas's international border during approximately 2021-2023. In one year alone, about 2.5 million unlawfully crossed, well over 100,000 of whom were unaccompanied minors. And in a three-year period, Border Patrol agents arrested over 15,000 illegal aliens with criminal convictions, apprehended roughly 2,000 gang members, and encountered, at the border, 336 persons on the terrorist watchlist. There, violent transnational cartels became paramilitary forces, whose illicit conduct ranged from pumping "illegal drugs like fentanyl" into the United States to "trafficking humans," all to the tune of billions of dollars.

*United States v. Texas*, 173 F.4th 659, 662 (5th Cir. 2026) (en banc).

Immediately upon taking office, the President took action to combat that invasion by issuing Proclamation 10888, *Guaranteeing the States*

*Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025).  Invoking his authority under 8 U.S.C. §§1182(f) and 1185(a), as well as Article II, the President temporarily "suspended" the entry of aliens who illegally cross the southern border into the United States, as well as aliens who fail to provide immigration officials with adequate medical and criminal histories.  *Id.* at 8335.

To effectuate that suspension, the Proclamation (among other things) prohibits aliens who enter in violation of the suspension on entry from invoking provisions of the immigration laws, principally asylum, that would permit their continued presence in the United States.  That restriction was well grounded in statutory law and this Court's precedent.  Only a few years before, this Court unanimously upheld the Executive's authority to foreclose aliens' access to asylum procedures and to preemptively deny asylum applications.  Asylum is "discretionary," this Court held, and the Executive may exercise that discretion to "foreclose[] the statutorily mandated procedures that aliens use to apply for asylum": "[I]f the asylum decision has already been made … then those procedures would be futile."  *Huisha-Huisha*, 27 F.4th at 730-31.

2

Although a majority of a motions panel (Judges Millett and Katsas) partially stayed the district court's injunction against these measures, a different panel majority (Judges Pillard and Childs) affirmed.  The merits panel held that aliens must be given the opportunity to *apply* for asylum, even though the Executive indisputably has discretion to deny every one of those applications and has "shown an intent to exercise that 'discretion.'"  *Huisha-Huisha*, 27 F.4th at 731.  That squarely conflicts with *Huisha-Huisha*, as three members of this Court have agreed. Add.156-59 (Millett, J.); Add.175 (Katsas, J.); Add.72-73 (Walker, J., dissenting).  The majority opinion's direct "conflict[]" with Circuit precedent warrants en banc review.  Fed. R. App. P. 40(b)(2)(A).

This also is a "question[] of exceptional importance," which independently warrants en banc review.  Fed. R. App. P. 40(b)(2)(D). The Proclamation has been an "indispensable tool" for securing the southern border.  Add.232, 236 (Mullin Decl. ¶¶10, 15).  In fact, it has been "the most effective" tool.  Add.219, 226-27 (Ruark Decl. ¶¶51, 65).  If allowed to take effect, the district court's injunction will inflict "severe and far reaching" harm.  Add.235-36 (Mullin Decl. ¶14).  It will trigger another surge of aliens seeking to unlawfully enter the country.  And it will

3

"provide a significant boon" to the criminal and terrorist organizations that "operat[e] near the border," Add.235-36 (Mullin Decl. ¶14), which stand poised to restart their operations trafficking in narcotics, weapons, and humans, and funneling terrorists and other national security threats into the United States. The panel's decision thus portends a return to the catastrophic border crisis that previously plagued the country.

The Court should grant the petition for rehearing en banc.

## STATEMENT

### A.    Statutory Background

Beyond the many grounds on which an alien may be inadmissible under the Immigration and Nationality Act ("INA"), *see, e.g.*, 8 U.S.C. §1182(a)(1)-(3), Congress has given the President expansive powers to suspend or restrict the entry of aliens whose presence in the country he determines would be detrimental to the interests of the United States. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. §1182(f).

4

Section 1182(f) "exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). Similarly, §1185(a) makes it unlawful "for any alien to depart from or enter" the country, or attempt to do so, "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe," "[u]nless otherwise ordered by the President." 8 U.S.C. §1185(a)(1).

These statutory authorities supplement the President's Article II power to exclude aliens. As the Supreme Court has acknowledged, "[t]he exclusion of aliens is a fundamental act of sovereignty" that "is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

The Executive Branch also has considerable statutory authority over aliens' ability to obtain relief from removal under the INA, including through asylum. The INA provides that aliens "may apply for asylum," but granting those applications is entirely discretionary: "The Secretary of Homeland Security or the Attorney General *may* grant asylum to an alien." 8 U.S.C. §1158(b)(1)(A) (emphasis added). Thus, "the decision whether asylum should be granted to an eligible alien is committed to the

5

[Executive's] discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *see Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (asylum is a "form[] of discretionary relief").

## B.     Factual Background

### 1.     The Border Crisis

On Inauguration Day, the country faced an unprecedented crisis at the southern border. Over the preceding four years, federal agents had encountered some 9 million illegal aliens along the border and untold millions more illegally entered by evading detection. Add.181-85 (Ruark Decl. ¶¶2, 5-7); *see* JA.66-68. By January 2025, immigration officials were encountering and releasing 1,780 unauthorized aliens per day at the southwest border alone. Add.207-08 (Ruark Decl. ¶40); *see* JA.67.

This border crisis "imposed substantial negative foreign policy consequences on the United States," Add.240 (Rubio Decl. ¶9), but its most severe consequences materialized at home. Congress has directed that aliens arriving at the border generally shall be ordered removed expeditiously "without further hearing or review" or, if they indicate an intent to apply for asylum or assert a fear of persecution, "shall be detained pending a final determination of credible fear of persecution." 8

6

U.S.C. §1225(b)(1)(A)-(B).  But the unprecedented volume of aliens made it impossible to detain and process the millions of aliens eligible for such expedited removal, or to "verify" the "criminal record or national-security risks associated with the illegal entry of every alien at the southern border."  Add.181-90 (Ruark Decl. ¶¶2, 5-17); *see* JA.68-70.  As a result, "millions of aliens who potentially pose significant threats to health, safety, and national security moved into communities nationwide, imposing substantial costs and constraints on the States."  Add.181, 183-96 (Ruark Decl. ¶¶2, 15-23); *see* JA.69-70.

This dynamic was exacerbated by the substantial numbers of aliens who expressed an intent to apply for asylum—no matter how frivolous the claim—to secure their presence in the United States "for a lengthy period."  Add.186-89 (Ruark Decl. ¶¶11-15); *see* JA.68, 70.  Unable to process this skyrocketing volume, aliens raising meritless asylum claims were released into the country to await a hearing scheduled years in the future.  Add.186-87 (Ruark Decl. ¶¶10-11); *see* JA.70-71.  That, in turn, inflamed the border crisis by incentivizing still more aliens to cross the border illegally with the (well-founded) belief that, if apprehended, they

would be released into the United States for years.  Add.188-89 (Ruark Decl. ¶¶14-15).

International cartels, transnational criminal organizations, and foreign terrorist organizations leveraged the border chaos to perpetrate their illegal activities, including smuggling in narcotics, weapons, and humans.  Add.190-96 (Ruark Decl. ¶¶18-23); Add.249-52 (Lukas Decl. ¶¶5-11); *see* JA.72-74, 82-84, 93-131.  These criminal organizations "operate with substantial financial resources"—using "advanced technology including drones, night vision equipment, and radios to track and monitor [U.S. Border Patrol]."  Add.191-92 (Ruark Decl. ¶20); *see* JA.73.  And they operate on both sides of the border.  They "took advantage of the influx of crossings at the southern border to illegally enter the United States."  Add.192-93 (Ruark Decl. ¶21); *see* Add.249 (Lukas Decl. ¶5).  As a result, members of terrorist and criminal organizations such as MS-13 and Tren de Aragua "gained a foothold in, and endangered, communities throughout the United States," including through rampant "murder, assault, and kidnapping."  Add.193-96 (Ruark Decl. ¶¶22-23).

### 2. The President's Proclamation to Secure the Border

In January 2025, the President invoked his authority under §§1182(f) and 1185(a), as well his inherent constitutional authority, to issue Proclamation 10888. The Proclamation determines "that the current situation at the southern border qualifies as an invasion," declares that "the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States," and temporarily suspends the "entry into the United States of such aliens." 90 Fed. Reg. at 8335. The Proclamation also temporarily suspends entry of aliens who fail to "provide federal officials with sufficient medical information and reliable criminal history and background information" to demonstrate that they are not inadmissible under 8 U.S.C. §1182(a)(1)-(3). *Id.*

The Proclamation enforces the entry bar in two primary ways. First, it directs that aliens who violate the entry bar be "repel[led], repatriate[d], or remove[d]" from the United States. 90 Fed. Reg. at 8336. Second, in an effort to turn off one of the primary magnets for illegal immigration, the Proclamation prohibits aliens who enter the United States in violation of the entry bar from "invoking [the] provisions of the

9

INA that would permit their continued presence in the United States, including, but not limited to" the asylum statute, 8 U.S.C. §1158. *Id.*[1]

The Department of Homeland Security issued guidance to implement the Proclamation's directives. JA.97-170. The guidance instructs that aliens who violate the entry suspension may not apply for asylum. JA.101-02.

### C.    Procedural Background

Plaintiffs—three organizations and 13 aliens—filed this lawsuit alleging that the Proclamation and implementing guidance are unlawful. JA.34-42. The district court granted in part plaintiffs' motions for class certification and partial summary judgment. JA.189-316. The court vacated the guidance; declared the Proclamation unlawful "insofar as it purports to suspend or restrict access to asylum [or] withholding of removal" or "implement[s] extra-statutory or extra-regulatory removal or repatriation procedures"; and enjoined the Government from removing

---

[1] The Proclamation also prohibits invoking provisions authorizing withholding of removal, 8 U.S.C. §1231(b)(3), and protection under the Convention Against Torture, 8 C.F.R. §208.18. The injunction against those aspects of the Proclamation and guidance has not been stayed. Although the government maintains its contention that those aspects are lawful, this petition focuses on asylum.

plaintiffs or class members "using non-statutory repatriation or removal proceedings" and "without complying with the asylum statute."   JA.301-19.

A motions panel of this Court (Millett, Pillard, Katsas, JJ.) granted in part the Government's motion for a stay pending appeal.  Relevant here, Judge Millett and Judge Katsas concluded that the Government was likely to succeed in showing that the Proclamation and guidance "effect an upfront, categorical discretionary denial of asylum" that is lawful under this Court's decision in *Huisha-Huisha.*  Add.124, 156-159 (Millett, J.); Add.175 (Katsas, J.).  The panel otherwise denied a stay, except to narrow the class definition to aliens "who are or will be affected by the litigation."  Add.142 (Millett, J.); *see* Add.176-77 (Katsas, J.).

The merits panel (Pillard, Walker, Childs, JJ.) issued a split decision affirming the district court's judgment.  Relevant here, the majority held that the Executive's discretionary authority over asylum does not include the authority to preemptively deny asylum applications and foreclose aliens' ability to apply for asylum.  Add.29-40.  The panel refused to apply *Huisha-Huisha* and instead limited it to the specific statutory context in which it arose—public health orders under 42 U.S.C.

11

§265. Add.38-39. Judge Walker dissented from that portion of the panel decision. Add.72-83.

## REASONS FOR GRANTING REHEARING

**I.    The Panel Decision Squarely Conflicts With *Huisha-Huisha*.**

The panel's decision cannot be reconciled with *Huisha-Huisha*, in which a unanimous panel of this Court upheld the Executive's discretionary authority to preemptively deny asylum and foreclose access to the asylum procedures for aliens who enter the United States in violation of a statutory bar on entry.

**A.**    *Huisha-Huisha* involved public-health orders issued during the COVID-19 pandemic, which were issued under statutory authority that empowers the Surgeon General to "prohibit, in whole or in part, the introduction of persons" from countries posing a risk of communicable diseases. 42 U.S.C. §265. Exercising that authority, the Centers for Disease Control and Prevention issued orders that prohibited covered aliens from entering the United States by land and authorized the expulsion of aliens who evaded that entry prohibition, "without allowing them to apply for asylum." *Huisha-Huisha*, 27 F.4th at 721, 726.

12

This Court upheld those orders' preemptive denial of asylum.  As the Court explained, asylum "is a matter of executive 'discretion,'" and the public-health orders reflected an "exercise [of] that 'discretion' by foreclosing asylum for the specific subset of border crossers covered by [it]." *Huisha-Huisha*, 27 F.4th at 730, 731.  In reaching that conclusion, the Court was fully aware of the "statutorily mandated procedures that aliens use to apply for asylum," and it acknowledged that the Executive was depriving aliens of an "opportunity to apply for asylum." *Id*.  But the Court did not find that problematic because "if the asylum decision has already been made," recourse to "those procedures would be futile." *Id*. at 731.

*Huisha-Huisha* controls here.  No different than the public-health orders, the Proclamation and implementing guidance are an "exercise" of the President's "'discretion' [to] foreclos[e] asylum for the specific subset of border crossers covered by [it]." 27 F.4th at 731.  As Judge Millett explained, "*Huisha-Huisha* [held] that such categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time."  Add.157 (Millett, J.).  Judge Katsas agreed that "the same reasoning [from *Huisha-Huisha*] extends to aliens covered by a

13

section 212(f) proclamation suspending entry." Add.175 (Katsas, J.). And Judge Walker concluded that this "court has already rejected" reading the asylum statute to "confer[] a right to file frivolous or futile applications." Add.72-73 (Walker, J., dissenting).

Indeed, the Proclamation is an even clearer exercise of the Executive's discretion to pre-deny asylum applications. *Huisha-Huisha* found that the public-health orders foreclosed asylum even though they did not even *mention* asylum, 27 F.4th at 730-31; "such silence was sufficient to close the door on the asylum process across the board," Add.158 (Millett, J.). The Proclamation, by contrast, "twice expressly bars noncitizens from 'invoking' Section 1158 [the asylum statute]" and both times "cite[s] directly to the asylum statute." Add.157-58 (Millett, J.). The guidance too "is explicit that noncitizens 'are not permitted to apply for asylum.'" Add.158 (Millett, J.).

*Huisha-Huisha* thus dictates that the Proclamation and guidance are lawful exercises of the Executive's authority to preemptively deny asylum to aliens who enter in violation of a statutory entry bar.

**B.**    The panel opinion contravenes *Huisha-Huisha.* According to the majority, *Huisha-Huisha* "hinged" on the need to "harmonize" the

14

§265 authority to expel aliens for public-health reasons with the asylum statute. Add.38-39. *Huisha-Huisha* did reconcile §265 with the asylum statute, but—critically—it "based" its "reconciliation … on the discretionary nature of asylum," not on some specific feature of §265 or on the existence of a public-health emergency. 27 F.4th at 730; *see* Add.157 (Millett, J.). It thus makes no difference that "this case" involves only "the INA itself," Add.39, because *Huisha-Huisha*'s holding rests on the "discretionary" nature of *asylum*—the same dispositive issue here. Because *asylum* is "discretionary," the Executive can "foreclos[e] asylum for the specific subset of border crossers" who violate the Proclamation's entry bar, just as it could "foreclos[e] asylum for the specific subset of border crossers covered by [the] §265 Order." *Huisha-Huisha*, 27 F.4th at 731.

To be sure, the *mechanism* the Executive used to exercise discretion in *Huisha-Huisha* (the public-health orders) differs from the mechanism used here (the §§1182(f) and 1185(a) Proclamation and guidance), the power exercised is the same in both cases. And the fact that the Proclamation prevents aliens from even invoking the asylum procedures does not change the calculus here anymore than it did in *Huisha-Huisha*:

15

"[I]f the asylum decision has already been made … then those procedures would be futile." *Huisha-Huisha*, 27 F.4th at 731.

The logic of *Huisha-Huisha* thus applies fully here. And *Huisha-Huisha* did not "limit the effect of [its] ruling" in any way. *Cf.* Add.39. To be sure, *Huisha-Huisha* recognized that "[i]n normal times" aliens generally have a right to apply for asylum before being removed from the United States. 27 F.4th at 730. But the Proclamation was not issued in "normal" times; it was issued to redress a border crisis of unprecedented magnitude, and *Huisha-Huisha* authorized "such categorical and upfront rejections of asylum … in emergency situations." Add.157 (Millett, J.). Courts have no basis to second-guess the Executive's determination that a crisis is sufficiently dire to warrant the exercise of emergency authorities—be they in §265 (as in *Huisha-Huisha*) or in §§1182(f) and 1185(a) (as here).

The panel majority also reasoned that *Huisha-Huisha* upheld the preemptive asylum denial only because a contrary rule would "critically weaken" §265's objective of preventing the "introduction" of aliens with "communicable diseases" into the country "in the interest of the public health." Add.39. That rationale does not differentiate *Huisha-Huisha* at

16

all. The suspension authority under §§1182(f) and 1185(a) applies to aliens whose entry and presence "would be detrimental to the interests of the United States," and the Proclamation applied that authority to prohibit the entry of aliens who are public health, public safety, and national security risks. 90 Fed. Reg. at 8334-8335. Just as the preemptive denial of asylum in *Huisha-Huisha* was necessary to avoid "critically weaken[ing]" the "suspension of the right to introduce" aliens under §265, so too the preemptive denial of asylum through the Proclamation and guidance is necessary to avoid "critically weaken[ing]" the Proclamation's suspension on entry, because it removes a primary magnet to illegal entry and violation of the entry bar. The panel erred in privileging the former set of policy priorities over the latter.

## II. The Panel Decision Threatens National Security and Cripples the Executive's Ability to Secure the Homeland.

En banc review is independently warranted because, if left undisturbed, the panel's decision will severely undercut the Executive's ability to maintain operational control of the border—sparking a new wave of illegal immigration that will re-empower the foreign criminal and

17

terrorist organizations and international cartels that exploited the southern border during the prior administration.

The Proclamation has "had a monumental impact on illegal border crossings and restoring operational control at the southern border, making the United States and its citizens safer." Add.182-83 (Ruark Decl. ¶4). In fact, the Proclamation has been "an indispensable tool" for securing the border and "address[ing] the significant national security and public safety threats that arise constantly at the border." Add.236 (Mullin Decl. ¶15). That is true of the Proclamation generally, but also of the Proclamation's restrictions on asylum in particular. By preemptively denying asylum, the Proclamation prevents aliens who evade the Proclamation's entry bar from exploiting the asylum process through the filing of frivolous applications and remaining in the United States for potentially years. Add.188-89 (Ruark Decl. ¶14); Add.235 (Mullin Decl. ¶13); Add.246 (Hegseth Decl. ¶6).

In the four years preceding the Proclamation, "at least 9 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered" too. Add.181-82 (Ruark Decl. ¶2). By contrast, during "the 465-

18

day period from January 21, 2025 through April 30, 2026, encounters by the U.S. Border Patrol [] at the southern border decreased by 93 percent compared to the same number of days prior to the issuance of the Proclamation (October 14, 2023 – January 20, 2025)"—the lowest levels since the 1960s. Add.182-83 (Ruark Decl. ¶4). And the number of enforcement actions at the southern border resulting in releases has dropped from nearly 1,780 per day between October 14, 2023, and January 20, 2025, to *less than one per day*. Add.207-08 (Ruark Decl. ¶40).

By stemming the tide of illegal entry, the Proclamation also ended the diversion of critical resources away from combatting the transnational criminal organizations and traffickers in drugs, weapons, and humans that had exploited the border crisis. Add.233 (Mullin Decl. ¶¶11). As a result, border officials have confiscated thousands of weapons and explosives, seized thousands of pounds of drugs, and disrupted human trafficking rings. Add.209-18 (Ruark Decl. ¶¶42-49). They have further cut off major revenue streams for the cartels and other criminal enterprises, which "are reportedly selling property and firing personnel to account for loss in fentanyl income that supports their

operations." Add.216-17 (Ruark Decl. ¶48); Add.251-52 (Lukas Decl. ¶11).

The panel decision affirming the district court's will cause "severe and far reaching" harm. Add.235-36 (Mullin Decl. ¶14); *see* Add.218-27 (Ruark Decl. ¶¶ 50-65); Add.244-45, 246 (Hegseth Decl. ¶¶2, 7). It will "incentiviz[e]" another "surge of aliens" and jeopardize the Government's efforts to maintain "operational control of the border." Add.218-19 (Ruark Decl. ¶¶50-51). Enjoining the Proclamation's restrictions on asylum would be particularly devastating for border security; it would turn on one of the key magnets for illegal migration and reward aliens who violate the Proclamation's entry bar with months or years in the United States simply because they pursue meritless asylum claims. Add.235 (Mullin Decl. ¶13); Add.188, 221 (Ruark Decl. ¶¶14, 54). All this will, in turn, "provide a significant boon" to the criminal organizations "operating near the border." Add.235-36 (Mullin Decl. ¶14). Once again, critical government resources will be "diverted away from responding" to national security and public safety threats, which will allow those criminal organizations to enhance their unlawful and dangerous operations at the border. Add.218-22 (Ruark Decl. ¶¶50-55).

This Court should not force the country to endure (or even risk) yet another wave of mass illegal immigration and the rampant human suffering that will inevitably follow, least of all in service of a supposed "right to file frivolous or futile" asylum applications, Add.72 (Walker, J., dissenting), by illegal aliens who invaded the country despite an uncontested prohibition on their entry.

## CONCLUSION

The Court should grant the petition for rehearing en banc. At a minimum, if the Court denies the petition, it should withhold issuance of the mandate pending the Solicitor General's determination whether to seek certiorari, so that the partial stay pending appeal remains in place and the dire consequences described above can be forestalled. *See* Fed. R. App. P. 41(d).

Respectfully submitted,

PATRICK GLEN
KATHERINE J. SHINNERS

*Senior Litigation Counsel*
*Office of Immigration Litigation*
*General Litigation and Appeals Section*

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

DREW C. ENSIGN
  *Deputy Assistant Attorney*
  *General*

BENJAMIN HAYES
  *Senior Counsel to the Assistant*
  *Attorney General*

*/s/ Benjamin Hayes*
  U.S. Department of Justice
  Civil Division
  950 Pennsylvania Avenue, N.W.
  Washington, DC 20530
  (202) 514-8214
  *Benjamin.T.Hayes@usdoj.gov*

*Counsel for Appellants*

June 2026

22

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,893 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the count of Microsoft Word.

*/s/ Benjamin Hayes*

Benjamin Hayes

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2026, I electronically filed the foregoing petition with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Benjamin Hayes*

Benjamin Hayes

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

Panel Opinion................................................................................. A1

Stay Order and Opinions................................................................ A121

Declaration of Eric Ruark................................................................ A180

Declaration of Markwayne Mullin..................................................... A228

Declaration of Marco Rubio.............................................................. A237

Declaration of Pete Hegseth............................................................. A244

Declaration of Aaron Lukas.............................................................. A248

Certificate as to Parties, Rulings, and Related Cases........................A256