**[DECIDED APRIL 24, 2026]**

No. 25-5243

## United States Court of Appeals
## for the District of Columbia Circuit

—————————————————————————————

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL
SERVICES, et al.,
*Plaintiffs-Appellees*

v.

MARKWAYNE MULLIN, et al.,
*Defendants-Appellants*

—————————————————————————————

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-00306-RDM (Hon. Randolph D. Moss)

—————————————————————————————

**PLAINTIFFS-APPELLEES' RESPONSE TO DEFENDANTS-
APPELLANTS' PETITION FOR REHEARING EN BANC**

—————————————————————————————

Keren Zwick
Richard Caldarone
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd.,
Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Lee Gelernt
    *Counsel of Record*
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, D.C. 20006
T: 202-355-4471
crowmelissa@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

Morgan Russell
Cody Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris
David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants, No. 25-5243 (D.C. Cir. Aug. 22, 2025).

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Organizational Plaintiffs Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project have no parent corporations, and no publicly held company owns 10% or more of the Organizational Plaintiffs.

### B.    Rulings Under Review

References to the ruling under review appear in Defendants-Appellants' Petition.

### C.    Related Cases

Counsel is not aware of related cases.

*/s/ Lee Gelernt*

i

## **TABLE OF CONTENTS**

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ..............................................................................................i

TABLE OF AUTHORITIES ............................................................... iii

GLOSSARY OF TERMS ......................................................................v

INTRODUCTION ...............................................................................1

STATEMENT ......................................................................................3

 A. Statutory Background.............................................................3

 B. Factual Background................................................................5

 C. Prior Proceedings .................................................................5

ARGUMENT ......................................................................................6

I. The Panel's Correct Decision Does Not Conflict With *Huisha-Huisha*........................................................................................6

 A. The Panel's Decision Is Correct.........................................6

 B. The Panel Decision Is Consistent with *Huisha-Huisha*......12

II. The Government's Overstated Claims About The Border Do Not Warrant Rehearing.......................................................................15

CONCLUSION ................................................................................18

# TABLE OF AUTHORITIES[*]

**CASES**

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) .............8, 10

*East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020)...............8

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018)................10

*Galvan v. Press*, 347 U.S. 522 (1954) ...........................................................................18

*Garcia v. Garland*, 73 F.4th 219 (4th Cir. 2023) .......................................................9

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) .................2, 12, 13, 14

*Las Americas Immigrant Advocacy Center v. Department of Homeland Security*, 783 F. Supp. 3d 200 (D.D.C. 2025), *appeal docketed*, No. 25-5313 (D.C. Cir. Aug. 28, 2025)..........................................................8, 10

*Mullin v. Al Otro Lado*, No. 25-5, 2026 WL 1825741 (U.S. June 25, 2026) .......................................................................................................8

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019)..............................................8, 10

*Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987) .....................................................9

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ...........................................................8

*Trump v. East Bay Sanctuary Covenant*, 586 U.S. 1062 (2018) .........................9, 10

*Trump v. Hawaii*, 585 U.S. 667 (2018) ......................................................................3

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................12

**STATUTES**

*8 U.S.C. § 1158(a)(1)..............................................................................................4, 8

*8 U.S.C. § 1158(b)(1)...................................................................................................4

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*8 U.S.C. § 1158(b)(2)..................................................................................4

8 U.S.C. § 1158(b)(2)(C) ......................................................................4, 10, 18

8 U.S.C. § 1158(d)(5)(A) ..............................................................................9

8 U.S.C. § 1158(d)(5)(B) ....................................................................4, 10, 18

8 U.S.C. § 1182 .............................................................................................3

8 U.S.C. § 1182(f)...........................................................................................3

8 U.S.C. § 1225(b)(1)..................................................................................3, 4

8 U.S.C. § 1225(b)(1)(A) ...............................................................................9

8 U.S.C. § 1225(b)(1)(B) ............................................................................4, 9

8 U.S.C. § 1229a(a)(3) ...................................................................................3

8 U.S.C. § 1231(b)(3)......................................................................................4

8 U.S.C. § 1252(b)(4)(D) .............................................................................4, 9

**OTHER AUTHORITIES**

8 C.F.R. § 208.9(a)..........................................................................................9

8 C.F.R. §§ 208.16–208.18 ............................................................................4

8 C.F.R. § 208.30 ...........................................................................................4

Application for a Stay Pending Appeal, *Trump v. East Bay Sanctuary Covenant*, No. 18A615 (U.S. Dec. 11, 2018).............................................. 8-9

Government Brief, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) (No. 21-5200), 2021 WL 4935466.............................................. 13-14

Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025)..........................5, 7

*Securing the Border*, 89 Fed. Reg. 81156 (Oct. 7, 2024)............................1, 11, 13

# GLOSSARY OF TERMS

| | |
|---|---|
| CAT | Convention Against Torture |
| DHS | Department of Homeland Security |
| Guidance | DHS's guidance implementing the Proclamation (JA97-170) |
| INA | Immigration and Nationality Act |
| JA | Joint Appendix, No. 25-5243 (D.C. Cir. Aug. 22, 2025) |
| PHSA | Public Health Service Act, 42 U.S.C. § 201 et seq. |
| Proclamation | Proclamation No. 10888, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) |

## **<u>INTRODUCTION</u>**

By statute, Congress created procedures for removing noncitizens who are not lawfully present, with built-in protections for those fleeing persecution and torture—asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). By fiat, the President in January 2025 created his own repatriation system ending those protections. The district court and merits panel both held this action unlawful in full, and all six judges at the merits and stay stages have agreed that most of the Proclamation is *ultra vires*.

The sole contested issue, concerning asylum, does not warrant further review. The government claims that because the ultimate asylum decision is discretionary, the President can eliminate asylum entirely by declaring that no one will receive asylum and prohibiting people from even applying. The panel correctly rejected this claim, consistent with the Department of Justice's unbroken position dating back to Ted Olson in the 1980s and continuing through the first Trump Administration—all the way until this Proclamation. *Securing the Border*, 89 Fed. Reg. 81156, 81163 & n.53 (Oct. 7, 2024). Congress created a statutory right to apply for asylum. It created detailed procedures for assessing claims. And it created specific limitations on the right to apply and express—but limited—authority to create new restrictions. Although the Executive now claims unchecked power to ignore Congress's system and wholly eliminate asylum, our separation of powers says otherwise.

The panel's decision does not conflict with *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). That preliminary-stage decision concerned the Public Health Service Act ("PHSA") in Title 42 during COVID-19, and it reconciled a conflict the court found between Title 42 and the asylum statute by allowing the government to forego compliance with the asylum statute. Here, however, no such conflict exists. And *Huisha-Huisha* did not bless the government's new, unlimited theory allowing the Executive to end asylum at will. Moreover, even in COVID-19's unique emergency context, *Huisha-Huisha* was tentative, emphasizing the question was "close[]" and "deserve[d] attention" at the merits stage. *Id.* at 730. Here, Judge Millett deemed *Huisha-Huisha* probative when this case was *also* "[a]t [a] similarly preliminary stay stage"—appending similar caveats. Add.158. The government remarkably does not even mention those caveats.

That leaves only the government's overstated claims about consequences. But the panel decision makes an on-the-ground difference only on the margins: since August 2025 the government has had to comply with the stay panel's holdings requiring screening for withholding and CAT protection—holdings the government does not contest here. Moreover, border crossings had already plummeted *before* the Proclamation issued. If the Executive believes Congress's statutes no longer meet the moment, it must seek relief down Pennsylvania Avenue.

The petition should be denied. Plaintiffs-Appellees do not object to the government's request to withhold issuance of the mandate pending the filing and disposition of a petition for writ of certiorari, provided the stay is conditioned on the filing of any petition for certiorari within 30 days of this petition's denial.

## STATEMENT

### A.    Statutory Background

The Immigration and Nationality Act ("INA") creates "a comprehensive and detailed scheme" governing entry and removal of noncitizens. Add.3.

First, Congress specified categories of "inadmissible" noncitizens. *Trump v. Hawaii*, 585 U.S. 667, 695 (2018); *see* 8 U.S.C. § 1182. Section 1182(f) authorizes the President to add to those categories by "suspend[ing]" or imposing "restrictions" on "entry" of noncitizens whose entry he finds "detrimental to the interests of the United States." 8 U.S.C. § 1182(f).

Second, the INA sets forth comprehensive removal procedures for those who arrive in the U.S. Congress created two forms of removal: ordinary, where noncitizens receive full adversarial hearings before immigration judges, with procedural and appeal rights, 8 U.S.C. § 1229a(a)(3); and expedited, where noncitizens have more limited process but get screenings if they express an intention to apply for asylum or fear of persecution, *id.* § 1225(b)(1). If noncitizens establish

3

a credible fear, they are entitled to plenary review based on a full record. *Id.* § 1225(b)(1)(B).

Third, Congress provided three substantive protections: asylum, withholding of removal, and CAT relief. Subject to exceptions not applicable here, Congress created a right for noncitizens in the United States to "apply for asylum." 8 U.S.C. § 1158(a)(1). Separately, the INA sets forth eligibility requirements for asylum: an individual must qualify as a "refugee" and must not fall within an enumerated bar. *Id.* § 1158(b)(1)–(2). Congress authorized the Attorney General and DHS Secretary to place "additional limitations and conditions" on eligibility, but required them to act "by regulation" and to create only limits "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C), (d)(5)(B); Add.36-37. While individual applications may be denied even when a noncitizen is eligible, discretionary denials are rare and subject to judicial review to determine whether they are "manifestly contrary to the law" or "an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); Add.10-11.

Withholding and CAT relief restrict the countries to which individuals may be removed. Add.11. Noncitizens seeking such relief undergo screening, 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 208.30, and the government "may not" remove noncitizens to countries where they face persecution or torture. 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 208.16–208.18; Add.11.

4

### B.    Factual Background

In January 2025, the President created a new repatriation system eliminating these protections. Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025) (the "Proclamation"). The Proclamation purports to suspend "entry" of persons "engaged in the invasion across the southern border"—though the entry bar is meaningless because it applies only to noncitizens who are *already* inadmissible. *Id.* §§ 1-2; Add.3-4, 12-13. The Proclamation then directs that those individuals be "restrict[ed]" from invoking "provisions of the INA that would permit their continued presence in the United States, including but not limited to" asylum. Proclamation §§ 1-3; Add.12.

DHS implemented the Proclamation through guidance (the "Guidance") instructing that covered individuals "are not permitted to apply for asylum" and creating two new summary-removal pathways. Add.12-13; JA101, 109.

### C.    Prior Proceedings

Plaintiffs-Appellees challenged the Proclamation and Guidance. The district court granted summary judgment for Plaintiffs, vacated the Guidance, and enjoined the use of non-statutory repatriations as well as the bars on asylum and CAT protection. JA318-21. The government sought a stay pending appeal, and the motions panel stayed only the asylum portion. Add.121-22. The panel unanimously

5

agreed that the INA does not authorize the President to create a new removal system or override withholding and CAT.[1]

The merits panel unanimously held that the Proclamation and Guidance exceed the President's authority under Section 1182(f), which permits the suspension of *entry* but supplies no power to remove those already present using non-statutory procedures or to displace the INA's protections for withholding and CAT. Add.27-29. The panel also held the President could not unilaterally eliminate asylum. Add.29-40. Judge Walker dissented on asylum.

## ARGUMENT

### I.   The Panel's Correct Decision Does Not Conflict With *Huisha-Huisha.*

The panel held that the President cannot with the stroke of a pen eliminate the statutory right to seek asylum and nullify the statutory limits on the Executive's authority to create new asylum bars. That conclusion is correct and does not conflict with *Huisha-Huisha*.

#### A.   The Panel's Decision Is Correct.

In district court, the government claimed it found a new power in Section 1182(f) to override asylum—a claim the district court rejected. JA285. Now, however, the government has abandoned that theory, and for good reason. Not only

---

[1] The stay panel also clarified the class definition, which the merits panel affirmed, and the government does not contest. Add.49.

does it conflict with decades of Executive interpretation rejecting that theory, *supra* at 1, but all six judges rejected that theory's essential premise. They have recognized that the INA distinguishes between *entry* and *removal* and that Section 1182(f) addresses only entry, not removal.[2] Section 1182(f) thus cannot displace the asylum statute's removal restrictions.[3]

The government has now pivoted to an even more sweeping theory. It reasons that because the DHS Secretary and the Attorney General may—after full hearings—deny asylum in individual cases, the President has unlimited "authority to foreclose [noncitizens'] access to asylum procedures and to preemptively deny asylum applications." Pet. 2. This theory does not depend on Section 1182(f) or any other statute; it rests on the "discretionary" nature of asylum. *Id.* Hence, per the government, the President has carte blanche to indefinitely suspend asylum applications for whatever group of noncitizens he chooses, for whatever period of time he wishes. Neither the Proclamation nor Guidance relies on this theory, Proclamation § 3; JA101, which is reason enough to reject it. And this theory is also

---

[2] *E.g.*, Add.174 (Katsas, J., concurring in part and dissenting in part) ("[E]ntry and removal are distinct concepts…."); Add.88 n.111 (Walker, J., dissenting) ("I largely agree with the majority's explanation that 'departure' and 'removal' are separate concepts."); *see* Add.19, 29 (Childs, J.); JA286 (Moss, J.).

[3] The government "disclaims any inherent power to summarily remove noncitizens" under Article II. Add.53.

wrong, as the panel held. Discretionary authority to deny asylum at the end of the process does not permit the Executive to ignore Congress's reticulated system.

First, the government's theory conflicts with the asylum statute's mandatory application provision, which specifies that any noncitizen "physically present in … or who arrives in the United States … may apply" for asylum "irrespective" of "status" and whether they arrived at a "designated port of arrival." 8 U.S.C. § 1158(a)(1); *see* Add.30. The Supreme Court reaffirmed this right only last week. *Mullin v. Al Otro Lado*, No. 25-5, 2026 WL 1825741, at *4 (U.S. June 25, 2026).

The Proclamation and Guidance cannot be squared with this text. The government's theory also conflicts with myriad decisions recognizing and enforcing that textual right.[4] And it conflicts with the government's own position in the first Trump Administration, which represented to the Supreme Court that "Section 1158(a)(1) by its plain terms requires … that [a noncitizen] be permitted to 'apply' for asylum, regardless of the [noncitizen's] manner of entry." App. for Stay Pending

---

[4] *E.g.*, *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021); *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019); *Las Americas Immigrant Advoc. Ctr. v. Dep't of Homeland Security*, 783 F. Supp. 3d 200 (D.D.C. 2025), *appeal docketed*, No. 25-5313 (D.C. Cir. Aug. 28, 2025); *accord Succar v. Ashcroft*, 394 F.3d 8, 28 (1st Cir. 2005).

Appeal at 29, *Trump v. E. Bay Sanctuary Covenant*, No. 18A615 (U.S. Dec. 11, 2018).[5]

Second, the government's theory conflicts with the entire structure of the INA and its required procedures. The INA and its regulations mandate individualized consideration through specific procedures, including: (1) interviews or hearings for "[c]onsideration of asylum applications," involving a "multi-step credible fear screening process" for noncitizens in expedited removal, 8 U.S.C. § 1158(d)(5)(A); Add.33; *see* 8 U.S.C. § 1225(b)(1)(A)-(B); (2) actual "adjudicat[ion of] the claim of *each* asylum applicant," 8 C.F.R. § 208.9(a) (emphasis added); and (3) case-by-case review of asylum applications by immigration judges and the Board of Immigration Appeals based on "the totality of the [individual's] circumstances," *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (B.I.A. 1987); *see* Add.32-34. Discretionary denials at the end of the process are subject to individualized judicial review to assess whether the decision is "manifestly contrary to the law" or "an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D); Add.10-11. Such "denials … are exceedingly rare." *Garcia v. Garland*, 73 F.4th 219, 225 (4th Cir. 2023) (quotation marks omitted).

Moreover, the INA specifically addresses the precise question here, identifying when the Executive can create new categorical bars. The Executive

---

[5] The Supreme Court denied the government's stay request. 586 U.S. 1062 (2018).

*cannot* add to the asylum statute's limitations on applications. While the Attorney General and DHS Secretary may create "additional limitations and conditions" on eligibility to *receive* asylum, they must act "by regulation" and any new limits must be "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B); Add.36-37. Courts again have enforced these limits.[6]

The government's theory is irreconcilable with this detailed edifice. It would allow the President, or the DHS Secretary or the Attorney General, to foreclose access to asylum without complying with the procedures Congress required for even *narrow* restrictions on asylum—the requirement to act "by regulation," *i.e.*, notice-and-comment rulemaking. And this theory would eliminate the critical *substantive* constraint on that authority—that any restrictions must be "consistent with" the asylum statute. *Supra*. As Judge Bybee remarked about a similar (if less extreme) rule, it would be "the hollowest of rights that [a noncitizen] must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 771 (9th Cir. 2018) (denying stay of district court TRO pending appeal); *see* 586 U.S. 1062 (2018) (same). More: The government's theory would wipe out the myriad ways the INA requires

---

[6] *E.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 669-71; *O.A.*, 404 F. Supp. 3d at 147-50; *Las Americas Immigrant Advoc. Ctr.*, 783 F. Supp. 3d at 222-29.

individualized consideration. The panel properly enforced Congress's careful scheme and rejected the government's attempt to subvert it.

Third, the government's argument conflicts with decades of Executive interpretation. Consistent with "the text and structure of the governing statutes," it has been the Executive's "consistent position for four decades" that the President may not unilaterally deny noncitizens the right to apply for asylum. 89 Fed. Reg. at 81163 & n.53. In 1984, Assistant Attorney General Theodore Olson so concluded. *Id.* He reached this conclusion based on Section 1182(f), and it applies with even greater force to the government's new theory. Until now, no proclamation had been "understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum." *Id.*

The government's new theory also makes nonsense of a decade of Executive regulation. Under both parties, the DHS Secretary and Attorney General have exercised the powers Congress conferred to create more targeted asylum bans—bans courts have reviewed and often invalidated. *Supra* at 10 n.6. But on the government's new theory, prior administrations could have accomplished the same end by simply *declaring* they would not grant asylum. No one ever thought that maneuver credible. "[J]ust as established practice may shed light on the extent of power conveyed …, so the want of assertion of power … is equally significant in determining whether

11

such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quotation marks omitted).

**B.     The Panel Decision Is Consistent with *Huisha-Huisha*.**

The panel decision is also consistent with *Huisha-Huisha*'s tentative conclusions about a different statute.

**1.** This case is missing *Huisha-Huisha*'s linchpin—a statutory conflict between one statutory provision (PHSA Section 265) and the asylum statute (Section 1158 of the INA). The *Huisha-Huisha* panel concluded that PHSA Section 265 authorized the Executive to "expel" noncitizens who posed a risk to public health during the COVID-19 pandemic. 27 F.4th at 729. The panel then had to harmonize that reading with Section 1158's mandatory right to apply for asylum. Calling it the "closest question in th[e] case," the court relied on "the discretionary nature of asylum" to resolve the conflict in favor of PHSA Section 265. *Id.* at 730-31.

No such statutory conflict exists here. As the stay and merits panels unanimously agreed, neither Section 1182(f) nor any other statute authorized the President to create a new repatriation regime; in contrast to PHSA Section 265, they afford *no* "expulsion" authority. Add.19; Add.156; Add.174; *see* JA262. Indeed, as explained, the government no longer even rests its asylum argument on any specific

authority conveyed by Section 1182(f). *Supra* at 6-7.[7] And while the government avers that eliminating asylum will further the *policy goals* underlying "the Proclamation's suspension of entry," by supposedly "remov[ing] a magnet," Pet. 17, that is not the type of statutory conflict that was *Huisha-Huisha*'s essential predicate. Contrary to the government's claims, Pet. 15, *Huisha-Huisha* did not hold that even absent such a conflict, the "discretionary" aspect of asylum relief, by itself, confers unchecked authority to eliminate asylum entirely. Endorsing that theory, absent the sort of conflict *Huisha-Huisha* found, would confer an unlimited authority to eliminate asylum that *Huisha-Huisha* did not approve.

*Huisha-Huisha* differs in other ways too. It weighed PHSA Section 265's "reference to the 'suspension of *the right to* introduce such persons and property'"— a textual hook the panel found "perhaps [to] allude[] to the suspension of" statutorily required asylum procedures. 27 F.4th at 731. That observation was consistent with the government's brief, which argued for far more cabined authority than the government now seeks. Gov't Br. at 41, *Huisha-Huisha*, 27 F.4th 718 (No. 21-5200),

---

[7] Indeed, the same Justice Department that litigated *Huisha-Huisha* distinguished Section 265 from Section 1182(f), explaining that Section 265's "grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8." 89 Fed. Reg. at 81164 n.55 (emphasis added).

13

2021 WL 4935466. Here, by contrast, the government can point to no similar text, leaving it only with a boundless claim of Executive power.

As the panel explained, this case also differs because it involves "only the INA itself." Add.39. The INA is a single statute that provides the mandatory right to apply for asylum, procedures for applying and processing applications, and procedures for case-by-case judicial review. *Supra* at 8-10. As the stay and merits panels recognized, Sections 1182(f) and 1185(a) are limited to entry and do not authorize repatriation or removal of noncitizens already in the United States. So those provisions naturally have nothing to say about the INA's separate protections from removal. That again makes this case fundamentally different from *Huisha-Huisha*, which relied on the discretionary nature of asylum to resolve conflicts between the INA and another statutory scheme.

**2.** *Huisha-Huisha*'s preliminary and tentative posture doubly forecloses the government's claimed conflict. *Huisha-Huisha* made clear that even as to reconciling asylum with PHSA Section 265, "[n]o one should read our opinion to bind … future circuit panels regarding the final answer to the challenging merits questions raised by this case," and (as noted) it emphasized the further "attention" the asylum issue warranted. 27 F.4th at 730. Likewise, Judge Millett viewed *Huisha-Huisha*'s preliminary analysis as probative when this case was *also* at a preliminary stage—emphasizing the "very preliminary stay stage" and that, "as in *Huisha-*

*Huisha*, it remains open to definitive resolution" by the merits panel. Add.158. It is hard to imagine two opinions doing *more* to avoid a definitive resolution, and the government does itself no credit by claiming *Huisha-Huisha* "controls," Pet. 13, without acknowledging these statements. Instead, the government would have the Court now read *Huisha-Huisha* to mean that that panel intended, without saying so, to upend the entire asylum structure and reject the consistent Executive view.

## II.    The Government's Overstated Claims About The Border Do Not Warrant Rehearing.

The government's dark warnings about "mass illegal immigration," Pet. 21, cannot make up for the lack of conflict or any exceptionally important or close legal question. The Court should not be fooled by the government's claims, which are based on improper and untested declarations not before the district court or merits panel.

First, the government incorrectly claims that the Proclamation was instrumental in reducing southern border crossings. Its own data shows otherwise. The government says there was a 93 percent decrease in southern border apprehensions when comparing two cherry-picked periods before and after the Proclamation issued. Pet. 18-19. But "by the time the Proclamation was issued on January 20, 2025, border apprehensions had already fallen more than 90 percent from their peak … in December 2023." Brief of the Cato Institute as *Amicus Curiae* in Support of Plaintiffs-Appellees at 3-4, *RAICES*, No. 25-5243 (D.C. Cir. Sept. 19,

15

2025) ("Cato Brief"); *see id.* at 7-9 (explaining that the decline in crossings during 2024 is best explained by labor market conditions and Panama reducing migration through its territory by 90 percent). Indeed, data from January 1 to 19, 2025—before the Proclamation—shows that January 2025 was on pace to be "a routine month for Border Patrol apprehensions" *without* the Proclamation: "72 percent of months since FY 2000 had higher apprehensions, as did roughly 84 percent of months since FY 1980, when the Refugee Act was enacted." *Id.* at 5 (footnote omitted).

Even the further decrease in crossings *after* January 20, 2025, cannot be credited to the Proclamation, because "southern border apprehensions of unaccompanied children [not subject to the Proclamation] fell by virtually the same rate (66 percent) as noncitizens who are subject to the Proclamation (68 percent)." *Id.* at 5-6. And even assuming *arguendo* that the Proclamation could be partly credited for that further decrease—from a routine level of monthly apprehensions to what the government describes as "the lowest levels since the 1960s" (an era before the Refugee Act), Pet. 19—this administration's *policy* preference for such aberrantly low numbers would not constitute an exceptionally important *legal* issue warranting review. That is especially so because Congress itself made asylum availability a linchpin of our immigration system and struck a precise balance—via expedited removal—between procedural protections and speedy removals.

Second, the government ignores that since August 2025, the unstayed portions of the district court's judgment have required the government to screen noncitizens at the border for withholding and CAT protection. Those measures require the government to provide individualized interviews that assess, respectively, risks of persecution and torture. Add.11-12, 55-56, 122-23. And those measures substantially limit the government's summary-removal authority, as the government cannot remove people who pass their screening interviews to countries where they face persecution or torture. Add.41-42. The government does not even try to show that the *incremental* effect of the panel's decision—which, when the mandate issues, will just require screening interviews to assess asylum eligibility, alongside eligibility for withholding of removal and CAT protection—will have the extraordinary consequences it claims.

Third, the government does not show that the Proclamation has been responsible for any change in drug trafficking or other criminal activity. Pet. 19-20. Amicus comprehensively refuted these same assertions. *See* Cato Brief 15-36; *e.g.*, *id.* at 17 ("DHS's own data shows that southern border apprehensions are not correlated with southern border drug seizures"). And the few more recent incidents and statistics discussed in the government's new declarations show no connection to the Proclamation. Add.209-18 (Ruark Decl. ¶¶ 42-49). They simply indicate that both before and after the Proclamation, DHS conducted drug seizures at border ports

17

and law enforcement operations along the border. The government does not even identify any increase or decrease in such events since the Proclamation issued, much less show a change attributable to the Proclamation.

If the Executive wishes to place "additional limitations and conditions" on asylum eligibility, it must respect the restrictions Congress imposed: it must act "by regulation" and adopt only limits that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B). When our Constitution has "entrusted exclusively to Congress" the policies governing "the entry of [noncitizens]" and "their right to remain," *Galvan v. Press*, 347 U.S. 522, 531 (1954), it should not be too much to ask that the Executive follow the statutes Congress enacted.

## CONCLUSION

The petition should be denied.

Dated: July 2, 2026                     Respectfully submitted:

                                        /s/ *Lee Gelernt*

Keren Zwick                             Lee Gelernt
Richard Caldarone                        *Counsel of Record*
Mary Georgevich                         Omar C. Jadwat
NATIONAL IMMIGRANT JUSTICE              AMERICAN CIVIL LIBERTIES
CENTER                                  UNION FOUNDATION
111 W. Jackson Blvd.,                   IMMIGRANTS' RIGHTS PROJECT
 Suite 800                              125 Broad Street, 18th Floor
Chicago, IL 60604                       New York, NY 10004
T: 312-660-1370                         T: 212-549-2660
kzwick@immigrantjustice.org             lgelernt@aclu.org

rcaldarone@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES
1901 Pennsylvania Avenue, NW
Suite 900, PMB 228
Washington, D.C. 20006
T: 202-355-4471
crowmelissa@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

ojadwat@aclu.org

Morgan Russell
Cody Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris
David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

19

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Federal Rule of Appellate Procedure 40(d), that the preceding brief complies with the type-volume limitation of the Rules, containing 3,899 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Lee Gelernt*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Lee Gelernt*