No. 25-5243

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

KRISTI NOEM, *et al.*,
*Appellants.*

―――――――――

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

―――――――――

## APPELLANTS' EMERGENCY MOTION
## FOR A STAY PENDING APPEAL
(Relief requested by July 11, 2025)

―――――――――

BRIAN C. WARD
*Acting Assistant Director*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044

BRETT A. SHUMATE
*Assistant Attorney General*
YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
BENJAMIN HAYES
*Special Counsel to the Assistant Attorney General*
U.S. Department of Justice,
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2000

## CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Plaintiffs are Refugee and Immigrant Center for Education and Legal Services; Las Americas Immigrant Advocacy Center; Florence Immigrant & Refugee Rights Project; N.S.; D.G.; E.G.; G.A.; M.A.; F.A., and her minor children K.A. and Y.A.; A.M., Z.A., and their minor children T.A. and A.T.; and B.R.

Defendants are Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; Michael Banks, in his official capacity as Chief of U.S. Border Patrol; Diane Sabatino, in her official capacity as Acting Executive Assistant Commissioner, CPB Office of Field Operations; Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. Immigration and Customs Enforcement; Marco Rubio, in his official capacity as Secretary of State; U.S. Department of State; Pamela J. Bondi, in her official capacity as Attorney General of the United States; U.S. Department of Justice; Angelica Alfonso-Royals, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services; U.S. Citizenship and Immigration Services; Donald J. Trump, in his official capacity as President of the United States.

*Amici* are Immigration Reform Law Institute; and State of Texas.

No intervenors participated in the district court.

**B.     Rulings under Review**

The ruling under review consists of an opinion (Doc. 71) and order (Doc. 73) on cross-motions for summary judgment and a motion for class certification, which the district court issued on July 2, 2025.  The opinion and order are attached to this motion as Exhibits A and B.

**C.     Related Cases**

This case has not previously been before this Court.  Overlapping issues are present in the following cases:  *Tabatabaeifar v. Scott*, No. 2:25-cv-1238 (D. Ariz.); *Davtyan v. United States Attorney General et al.*, No. 25-cv-1826 (D. Ariz.); *Togoev v. United States Attorney General et al.*, No. 25-cv-1960 (D. Ariz.); *Kunitskii v. Figueroa*, No. 25-cv-1845 (D. Ariz.); *Kunitskaia v. Rivas*, No. 25-cv-1846 (D. Ariz.); *Kniazev v. Kline*, No. 25-cv-2036 (D. Ariz.).

/s/ *Drew C. Ensign*
Drew C. Ensign
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-2331

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT ....................................................................................................3

ARGUMENT ....................................................................................................6

    I.    The Government Is Likely To Succeed on the Merits............................6

        A.    The Proclamation is a lawful exercise of the President's expansive powers under the INA. .................................................7

            1.    Section 1182(f) authorizes the President to implement an entry bar by expelling aliens who violate it. ...........................................................................7

            2.    Section 1182(f) supplements the INA's ordinary removal provisions.........................................................9

            3.    Section 1182(f)'s removal and repatriation authority does not conflict with the INA's asylum or withholding provisions....................................................12

        B.    The district court certified a sprawling global class in blatant circumvention of the prohibition on nationwide injunctions. ......14

            1.    The district court violated Rule 23 by certifying an indeterminate global class..................................................14

            2.    The INA prohibits a class-wide injunction here. ..............17

    II.    The Equitable Factors Overwhelmingly Favor a Stay. ..........................18

CONCLUSION.................................................................................................20

CERTIFICATE OF COMPLIANCE.................................................................22

CERTIFICATE OF SERVICE .........................................................................23

iii

# INTRODUCTION

Only five days after the Supreme Court forbade sweeping universal injunctions, the district court certified a global class and enjoined the President's most successful measure to combat the crisis at the southern border. That decision is fundamentally wrong and its consequences are profoundly dangerous. The district court stayed its own decision for 14 days; this Court should extend that stay pending appeal. The Government respectfully asks for a ruling (or an administrative stay) by July 11, 2025, to allow sufficient time to seek relief from the Supreme Court, which it will request, if necessary, on July 14.

On the day he took office, the President issued a Proclamation declaring an invasion at the southern border. To combat it, the Proclamation suspended the entry into the United States of aliens participating in the invasion, and ordered that those who enter in violation of that bar are restricted from accessing provisions of the Immigration and Nationality Act (INA) that would permit their continued presence in the United States, including asylum or withholding of removal. The Proclamation is authorized by Section 212(f) of the INA, 8 U.S.C. §1182(f), which supplements the President's Article II authority and authorizes him to suspend the entry of aliens if he determines (as he did) that their entry would be detrimental to the interests of the United States. As this Court has held in an analogous context, such a power to suspend the *entry* of aliens necessarily includes the power to *expel* those aliens that enter in violation of that bar,

1

lest the power to deny entry be rendered "nugatory." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022).

Despite that common-sense rationale, the district court held that the President lacks authority to implement the (uncontested) entry bar by repelling those who violate it. Instead, the court ruled, he must resort to ordinary removal procedures, including access to asylum and withholding of removal—as if the Proclamation did not exist. On that basis, the court enjoined the Proclamation's directive coast-to-coast. That perverse decision renders the President's suspension power toothless. It cannot be squared with *Huisha-Huisha* or the INA.

Making matters worse, the district court certified a sweeping class in a transparent effort to evade the Supreme Court's just-imposed limits on nationwide injunctions. In doing so, the court failed to grapple with material differences among class members; embraced an indeterminate and unidentifiable set of people around the world; and swept up aliens who are not yet suffering any injury due to the Proclamation and thus plainly lack Article III standing.

Absent a stay, the district court's order threatens to unwind the great progress this Administration has made in securing the southern border. The Proclamation has proven to be "the most effective tool for managing the emergency at the southern border." Gunduz Decl. ¶43 (Ex. C). Stripping the Government of that critical power will trigger yet another wave of illegal mass migration, embolden the criminal cartels

2

who exploit such crises, divert resources away from combatting those threats, and ultimately endanger American citizens.

The Court should grant a stay pending appeal.

## STATEMENT

**A.**     Federal law broadly empowers the President to suspend the entry of aliens he determines are "detrimental to the interests of the United States":

> Whenever the President finds that the entry of aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. §1182(f).  This statute "exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).  In addition, the President has broad authority to adopt "reasonable rules, regulations, and orders" governing the entry of aliens, and to make entry "subject to such limitations and exceptions as [he] may prescribe."  8 U.S.C. §1185(a)(1).

**B.**     Immediately upon taking office, President Trump exercised his authority under §1182(f) to issue Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025).  The Proclamation explained that over the last four years, "at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States."  *Id.* at 8334.  The "sheer number of illegal aliens entering"

3

the country had "overwhelmed the system," leaving "millions of aliens who potentially pose significant threats to health, safety, and national security" throughout the nation. *Id.* at 8333, 8334; *see also* Noem Decl. ¶¶2-3 (Ex. D).

Faced with this crisis, the Proclamation "declare[d] that an invasion is ongoing at the southern border" for purposes of Article IV of the Constitution, 90 Fed. Reg. at 8334, 8335.  To suppress that invasion, the President invoked his authority under 8 U.S.C. §1182(f) and §1185(a), and Article II of the Constitution, to determine that "the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interest of the United States," and to suspend the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased."  *Id.* at 8335.  In addition, the Proclamation determined that entry of "any alien who fails, before entering the United States, to provide federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of [8 U.S.C. §1182(a)(1)-(3)]" is "detrimental to the interests of the United States."  *Id.*

To give teeth to the suspension on *entry*, the Proclamation ordered the immediate *expulsion* of those aliens who enter the United States in violation of the suspension.  To that end, the Proclamation directed the Secretary of Homeland Security to coordinate with the Secretary of State and the Attorney General to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border."  90 Fed. Reg. at 8336.  And it prohibited aliens who violate the entry bar from

4

"invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" the asylum statute, 8 U.S.C. §1158, as long as the Proclamation is in effect. *Id.*

The Department of Homeland Security later issued guidance instructing agents and officers how to implement the Proclamation's directive. Doc. 44-1–44-3; Doc. 44 at 7-9. Although the guidance specifies various steps to implement removal and repatriation—for instance, that agents should continue to screen aliens to ensure compliance with the Convention Against Torture (CAT)—the Proclamation is the ultimate source of such authority.

**C.** Three organizations and 13 individual plaintiffs filed this lawsuit alleging that the Proclamation and implementing guidance violate a host of statutes, including the Administrative Procedure Act, the asylum statute, and the withholding of removal statute. *See* Doc. 11.

Plaintiffs moved for summary judgment and for certification of a class under Rule 23(b)(2). On July 2, the court granted Plaintiffs' motions in substantial part. Relevant here, the court certified a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." Doc. 71 at 104 (Ex. A). It also concluded that the Proclamation (and guidance) were unlawful. *Id.* at 70-102. Accordingly, the court vacated the guidance; declared the Proclamation unlawful "insofar as it purports to suspend or restrict access to asylum, withholding of removal" or "implement[s] extra-statutory or extra-regulatory

removal or repatriation procedures"; and enjoined the Government from removing Plaintiffs or class members "using non-statutory repatriation or removal proceedings" and "without complying with the asylum statute."  Doc. 73 at 1-3 (Ex. B).

The district court denied a stay pending appeal, *see* Doc. 71 at 127, and directed that its order take effect immediately as to the named Plaintiffs, Doc. 73 at 3.  But the court delayed the effective date of its order as to absent class members until July 16, 2025, "to allow Defendants the opportunity to seek a stay in the court of appeals and to implement the Court's decision in an orderly fashion."  *Id.*

## ARGUMENT

A stay pending appeal turns on "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).  Each factor weighs heavily in favor of a stay.

## I.     The Government Is Likely To Succeed on the Merits.

The Proclamation's removal-and-repatriation directive is a lawful exercise of the President's power under §1182(f).  In holding otherwise, the district court adopted a fundamentally flawed interpretation of the statute and flouted this Court's precedent. And the court's focus on the implementing guidance was misguided.  The Proclamation itself authorizes the expulsion of aliens who violate its entry bar, supplementing (not supplanting) other authorities.  Because the Proclamation is lawful, the guidance is too.

6

To make matters worse, the court's global class elides key restraints on class certification and circumvents the now-established bar on universal injunctive relief.  Reversal on the merits is therefore likely.

### A. The Proclamation is a lawful exercise of the President's expansive powers under the INA.

The Proclamation is a lawful exercise of the President's authority under the INA. The district court acknowledged that §1182(f) grants the President sweeping authority to suspend the *entry* of any class of aliens he deems "detrimental to the interests of the United States."  Doc. 71 at 74.  Nonetheless, the court invalidated the Proclamation's additional directive that those who violate the uncontested bar on entry be immediately expelled from the United States.  The court thus read the immigration laws to force the President to give those who violate the entry bar the opportunity to apply for asylum and withholding of removal—as if the Proclamation did not exist.  That is irreconcilable with this Court's precedent and would render §1182(f) a dead letter.

#### 1. *Section 1182(f) authorizes the President to implement an entry bar by expelling aliens who violate it.*

Supplementing his authority under Article II, §1182(f) authorizes the President "to suspend the entry of all aliens or any class of aliens" he deems to be "detrimental to the interests of the United States."  That express grant of authority—reinforced by the power to adopt "reasonable rules, regulations, and orders" governing entry of aliens, 8 U.S.C. §1185(a)(1)—necessarily includes the power to implement such an entry ban, including by expelling those who enter in violation of the suspension.  Otherwise, the

7

President's exclusion power would be toothless: Aliens barred from entry could disregard the suspension, enter anyway, and secure access to asylum and withholding of removal under the ordinary procedures, as if the bar did not exist.

This Court's decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), makes clear that a supplemental authority to prohibit the entry of aliens includes the concomitant authority to expel aliens who illegally evade that prohibition. That case involved 42 U.S.C. §265, which empowered the Centers for Disease Control to "prohibit, in whole or in part, the introduction of persons" from countries posing a risk of communicable diseases. This Court held that the power to exclude that class of aliens necessarily included the power to expel those who violate the prohibition, since the former would "be rendered largely nugatory if the Executive could not take any action against a[n otherwise] covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *Id.* at 729.

So too for the President's more potent §1182(f) power: Absent the power to expel, the authority to prohibit entry would be "rendered largely nugatory." *Huisha-Huisha*, 27 F.4th at 729. Yet the Supreme Court has consistently refused to interpret statutes in a manner that would eviscerate their objectives and efficacy. *See, e.g., County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 178-79 (2020) (rejecting reading that would have "create[d] … large and obvious loophole in one of the key regulatory" provisions); *King v. Burwell*, 576 U.S. 473, 492 (2015) (rejecting interpretation that would lead to result "that Congress designed the Act to avoid"); *Am. Paper Inst. Inc. v. Am. Elec. Power Serv.*

8

*Corp.*, 461 U.S. 402, 421 (1983) (Congress does not "paralyze with one hand what it sought to promote with the other"); *The Emily*, 22 U.S. (Wheat.) 381, 390 (1824) (rejecting interpretation that would render "evasion of the law … almost certain").

The Supreme Court's decision in *Sale v. Haitian Centers Council, Inc*, 509 U.S. 155 (1993), offers further confirmation that §1182(f) embraces the power to implement its own terms. There, the Court opined that the statute would authorize a naval blockade outside U.S. territorial waters to "deny illegal Haitian migrants the ability to disembark on our shores." *Id.* at 187. The Proclamation is merely the flip side of the *Sale* coin; rather than taking preemptive action to prevent aliens subject to the bar from reaching the border, the Proclamation seeks to ensure that aliens who physically enter *despite* the suspension of entry can be expelled. That falls equally within the INA's scope.

### 2. *Section 1182(f) supplements the INA's ordinary removal provisions.*

The district court did not dispute the President's sweeping authority under §1182(f) to exclude the entry of aliens, nor did it identify any provision prohibiting the President from expelling aliens who enter in violation of the Proclamation's entry bar. Doc. 71 at 75. Instead, the court reasoned that construing §1182(f) and §1185(a) to authorize such expulsions would conflict with the INA.[1] That is wrong.

---

[1] The district court speculated that the Proclamation does not itself authorize the removal or repatriation of aliens who enter the United States in violation of the suspension, separate from the INA's existing removal procedures. Doc. 71 at 73. That is why the court focused heavily on the implementing guidance. But the Proclamation itself refutes the court's position. It directs Executive departments to "take all (continued . . .)

9

*First*, the district court said §1182(f) is about admissibility, not removal.  Doc. 71 at 81.  A similar argument was made in *Huisha-Huisha*, to no avail: This Court held that power to prevent the "introduction" of aliens includes power to *expel* them.  So too here.  And reading §1182(f) to embrace an authority necessary to its effective operation is hardly tantamount to "hiding [an] elephant[] in [a] mousehole[]."  *Id.* at 77.  The authority to suspend entry is express in §1182(f) and, as *Huisha-Huisha* makes clear, the power to exclude is toothless without the concomitant power to expel.

None of the district court's hair-splitting theories for limiting *Huisha-Huisha* has any force.  The court reasoned that an implied power to expel "made perfect sense" there, else §265's objective of preventing the spread of infectious disease "would not be achieved."  Doc. 71 at 81-82.  But the same logic applies here.  Section 1182(f)'s objective is to enable the President to prevent the "*entry* of any aliens … *into the United States*" when their entry "would be detrimental to the interests of the United States."  8 U.S.C. §1182(f) (emphasis added).  Just as §265's goal of preventing the spread of infectious disease in the United States would be nullified absent the authority to expel aliens carrying that disease, so too §1182(f)'s goal of preventing the entry of aliens

---

appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States … as an exercise of the suspension power in section 212(f) and 215(a) of the INA[.]"  90 Fed. Reg. at 8336.  By its terms, the Proclamation "create[s] a new mechanism for expelling those unlawfully in the United States."  Doc. 71 at 73.

"detrimental to the interests of the United States" would be nullified absent the power to expel those aliens from the United States.[2]

It also makes no difference that §265 is directed toward the "introduction" of aliens, whereas §1182(f) speaks to suspension of "entry." *Cf.* Doc. 71 at 82-83. Both statutes are obviously concerned with the continued presence of the aliens in the United States. Section 1182(f) is not focused solely on the alien's split-second act of crossing the border but agnostic to their continued presence in the country thereafter.

*Second*, reading §1182(f) to authorize removal or repatriation does not swallow the INA's other removal provisions. *Cf.* Doc. 71 at 77. Sections 1225 and 1229a provide the default means for removing illegal aliens from the United States; by contrast, §1182(f) confers *emergency* powers on the President to *temporarily* "suspen[d]" the entry of classes of aliens whose entry would be "detrimental to the interests of the United States." Section 1182(f) is directed at a different problem and offers a different solution. That narrow, time-limited authority supplements, not supplants, the INA's general removal provisions. *Cf. USDA v. Kirtz*, 601 U.S. 42, 63 (2024) (when faced with "multiple and sometimes overlapping legal" provisions, a court's "duty lies not in preferring one over another but in giving effect to both"). Indeed, §1225(b)(1) and §1229a still have effect today. For example, the Proclamation has no application to

_____

[2] To the extent there is anything special about "a public health statute," Doc. 71 at 81, the Proclamation is directed, in part, at preventing the entry of "illegal aliens crossing the southern border" with "communicable diseases." 90 Fed. Reg. at 8334.

11

aliens unlawfully in the United States because they overstayed a visa. Removal of such aliens continues to be governed by the INA's provisions for removal.

### 3.    *Section 1182(f)'s removal and repatriation authority does not conflict with the INA's asylum or withholding provisions.*

The district court also reasoned that reading §1182(f) to authorize removal and repatriation would conflict with the INA's asylum and withholding provisions. Wrong again.

Start with asylum. The court emphasized that the INA allows an alien "physically present in the United States" to claim asylum, even if the alien did not "arrive … at a designated port of arrival," 8 U.S.C. §1158(a)(1), whereas the Proclamation does not. Doc. 71 at 89-97. But that reasoning ignores that asylum is solely a matter of discretion. 8 U.S.C. §1158(b)(1)(A). The Proclamation reflects an "exercise [of] that 'discretion' by foreclosing asylum for the specific subset of border crossers covered by [it]." *Huisha-Huisha*, 27 F.4th at 731. For that reason, it makes no difference that the Proclamation "forecloses the statutorily mandated procedures that aliens use to apply for asylum": "[I]f the asylum decision has already been made," recourse to "those procedures would be futile." *Id.*

The district court reasoned that the Executive can modify the asylum *eligibility* criteria only by regulation. Doc. 71 at 93-94 (citing 8 U.S.C. §1158(b)(2)(C), (d)(5)(B)). That misses the point: The Executive has total discretion to deny asylum *even to those who otherwise are eligible.* And when the President announces a policy that asylum will *not* be

12

granted to a category of aliens, any application would be pointless, even frivolous. *Cf.* 8 U.S.C. §1158(d)(4). The Government should not be compelled to offer a pointless procedure solely for procedure's sake.

Exposing the perversity of its ruling, the district court seemed to recognize that, notwithstanding §1158(a)(1), an §1182(f) entry suspension may block covered aliens from entering the United States at a port of entry and applying for asylum. Doc. 71 at 97 n.15. It makes no sense to treat lawbreaking aliens more favorably than those who seek to present themselves at a port of entry. Nor is that the law. Under the longstanding "entry fiction" principle, an alien who has not been inspected remains an applicant for admission who has not yet "entered" the country. *Cf. DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 214-15 (1953). So, an alien who has managed to evade an entry suspension is no different for these purposes from one who seeks to present at a port of entry; both may be precluded from applying for asylum.

Finally, the Proclamation does not conflict with the withholding of removal statute. That statute provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §1231(b)(3)(A). That provision speaks solely to removal; by contrast, §1182(f) addresses barriers to entry and concomitant removal and repatriation. In any event, §1185(a) provides that entry into

13

the United States is "subject to such limitations and exceptions as the President may prescribe." For aliens who violate the entry bar, the Proclamation permissibly creates such "limitations and exceptions" to claiming the benefit of withholding of removal. Regardless, the injunction goes well beyond requiring the Government to provide withholding of removal (or CAT protection, which the implementing guidance seeks to keep available) to aliens governed by the Proclamation. The district court's sweeping order therefore cannot be justified on this theory.

*    *    *

The Proclamation is a valid exercise of the President's authority to suspend the entry of aliens invading the southern border and to expel those who violate that suspension. The contrary ruling below conflicts with this Court's precedent, the best reading of the statute, and common sense.

### B. The district court certified a sprawling global class in blatant circumvention of the prohibition on nationwide injunctions.

The district court's order should also be stayed because the court entered injunctive relief across a sweeping and inchoate global class in defiance of Rule 23's requirements and the INA's prohibitions on class-wide relief.

#### 1. The district court violated Rule 23 by certifying an indeterminate global class.

The amorphous class certified here—"all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States"—is astoundingly broad. Indeed, it is universal, encompassing any

14

alien *anywhere in the world* who may *at some future time* be present in the United States and subject to the Proclamation, regardless of the relief they might seek or be eligible for. This violates Rule 23. It is also a transparent end-run around *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (June 27, 2025). As several Justices cautioned, the ban on universal injunctions it not "an invitation to certify nationwide classes without scrupulous adherence to the rigors of Rule 23." *Id.* at *18 (Alito, J., concurring).

At the outset, the district court erred in certifying a class that includes aliens not currently subject to the Proclamation or even present in the United States, but who may be at some indefinite future time. A person may sue in federal court, whether as an individual or a class member, only if he has standing, which requires an "injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422, 423 (2021). Of course, aliens who are not currently or imminently subject to the Proclamation or present in the United States have suffered no injury and are not in danger of any. A class that sweeps in such individuals is thus inconsistent with Article III. Moreover, a judicial order resolving the rights of "parties that … had no good or reasonably foreseeable reason to sue" at the time of the decision would raise "significant questions under the Due Process Clause." *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, No. 23-1226, 606 U.S. ---, 2025 WL 1716136, at *8 n.5 (2025). The interests of persons who have no reason to sue or intervene also cannot be "fairly and adequately protect[ed]," Fed. R. Civ. P. 23(a)(4), given their inability to monitor or participate in the litigation. All this cuts against the novel practice of certifying

15

indeterminate prospective classes of anyone who might be subject to government action in the future.

Beyond that, the varying factual circumstances of members of the class are incompatible with Rule 23(a)'s commonality and typicality prongs. *See* Fed. R. Civ. P. 23(a)(2)-(3). The district court reasoned that the class satisfied those requirements because all members "face the same threat" of being subject to the Proclamation and losing the opportunity to seek certain protections under the INA. Doc. 71 at 106. But members and future members of the certified class are and will be differently situated in material ways. For example, the class includes aliens who do not claim or manifest fear of return and thus cannot claim that the Proclamation has caused them to lose any statutory protections. Indeed, some aliens are ineligible for asylum or withholding of removal for other reasons, *see* 8 U.S.C. §§1231(a)(5), (b)(3)(B), 1158(a)(2), (b)(2), and thus cannot claim harm from the Proclamation. At most, the Proclamation could only work to expedite these aliens' repatriation or removal, and they do not suffer the same legal injury asserted by those who are potentially eligible for relief or protection from removal. And some class members will not be processed under the Proclamation at all. The district court failed to grapple with these divergences.

The class also flunks Rule 23(b)(2), which applies only where the defendant has "acted or refused to act on grounds that apply generally to the class, so that … relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—

16

the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The district court concluded that the class satisfied Rule 23(b)(2) because "the Proclamation and guidance apply equally to—and they affect the legal rights of—all" class members. Doc. 71 at 107. But the divergent factual and legal issues demonstrate this is not a case in which the challenged policy "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360. The relief sought by the class members can (and must) instead be parceled out based on class members' particular circumstances in the form of party-specific injunctions. That reality precludes a Rule 23(b)(2) certification.

### 2.    *The INA prohibits a class-wide injunction here.*

At minimum, the district court's entry of class certification was erroneous for an additional reason: On the district court's own rationale, class-wide relief was barred by 8 U.S.C. §1252(f)(1). That provision "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions" on a class-wide basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Again, the district court held that removals under the Proclamation had to proceed under the INA's ordinary removal and expedited-removal procedures. That was wrong for the reasons explained above. But accepting the district court's premise, the consequence is that no class-wide injunctive relief mandating compliance with those procedures was permissible.

17

In particular, the provision of the INA dictating the procedures for expedited removal—8 U.S.C. §1225(b)—is indisputably subject to §1252(f)(1).  And the district court's injunction compels the Government "to enforce, implement, or otherwise carry out," *Aleman Gonzalez*, 596 U.S. at 550, those procedures—specifically, the provisions allowing aliens to assert an asylum claim, receive a credible fear determination, and obtain a hearing before being subject to expedited removal.  Doc. 73 at 2.

The district court tried to evade §1252(f) on the theory that Plaintiffs are seeking "an order enjoining … implement[ation of] the Proclamation" only, not the "operation" of any part of §1225(b).  Doc. 71 at 71.  But the court cannot have it both ways.  Either removals under the Proclamation may proceed separate from the other INA removal provisions (in which case there is no basis for *any* injunction) or else they must proceed consistent with those provisions (in which case §1252(f)(1) disallows injunctive relief on a class-wide basis).  Either way, the district court's class-wide injunction cannot survive.

## II.    The Equitable Factors Overwhelmingly Favor a Stay.

The remaining stay factors, which merge here, weigh heavily in favor of a stay. *Nken*, 556 U.S. at 435.  The district court's global injunction irreparably harms the Executive Branch and the public interest by displacing the President's judgment to exclude the entry of a class of aliens he has deemed "detrimental to the interests of the United States."  And it does so to protect aliens who have no right to remain in the country and no ability to secure asylum or withholding of removal.

18

The damage from the court's injunction will be severe. The Proclamation has been an "extremely effective" and "indispensable tool" for securing the border, Noem Decl. ¶¶7, 11; indeed, it has been "the most effective tool for managing the emergency at the southern border," Gunduz Decl. ¶¶42-43; *see id.* ¶4. Prior to the Proclamation, the vast numbers of aliens arriving at the southern border overwhelmed the Government's capabilities and resulted in millions of aliens being released into the country after requesting asylum or other relief to await a hearing date—often years away. *Id.* ¶¶11-14. And as word spread, the number of aliens asserting meritless claims to gain entry increased. *Id.* ¶14. The Proclamation ended that perverse cycle; after it issued, encounters at the southwest border between ports of entry decreased by 82%, "to the lowest level they have been since the 1960s," and releases into the interior plummeted to less than one per day. *Id.* ¶36.

By stemming the tide of illegal entry, the Proclamation also ended the diversion of critical government resources from combatting the transnational criminal organizations and traffickers in drugs, weapons, and humans, which exploited the border crisis. Noem Decl. ¶¶4-5, 7-8 (describing Proclamation's effectiveness at preventing diversion and combatting criminal and foreign terrorist organizations); *see* Doc. 44-6 ¶¶5-19 (DNI detailing "national security threats posed by the current border crisis"); *accord* Gunduz Decl. ¶¶15-21, 37-40.

If not stayed, the district court's injunction will cause "severe and far reaching" harm. Noem Decl. ¶10. It will "incentiviz[e]" another "surge of aliens seeking to cross

19

at and between [ports of entry]" and jeopardize the Government's efforts to maintain "operational control of the border," Gunduz Decl. ¶¶42-43, 46-48—exactly as has happened before when nationwide injunctions blocked Executive efforts to secure the border, *see id.* ¶¶44-45. And once again, critical government resources will be "diverted away from responding" to national security and public safety threats, "provid[ing] a significant boon" to the criminal organizations "operating near the border." Noem Decl. ¶¶9-10; *see* Gunduz Decl. ¶48.

This Court should not force the American people to endure yet another wave of illegal immigration and the rampant human suffering that will inevitably follow, least of all in service of the futile pursuit of asylum by illegal aliens who entered the country in the face of an uncontested prohibition on their entry.

## CONCLUSION

The Court should grant a stay pending appeal (or an administrative stay) by July 11, 2025.

Respectfully submitted,

BRIAN C. WARD
*Acting Assistant Director*
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
U.S. Department of Justice, Civil
Division
Office of Immigration Litigation
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
(202) 598-7537

BRETT A. SHUMATE
*Assistant Attorney General*
YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
/s/ *Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
BENJAMIN HAYES
*Senior Counsel to the Assistant Attorney General*
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
*Drew.C.Ensign@usdoj.gov*
(202) 514-2000

Dated:  July 7, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,193 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Garamond type.

*/s/ Drew C. Ensign*
Drew C. Ensign

Dated: July 7, 2025                 Attorney for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


/s/ *Drew C. Ensign*
Drew C. Ensign

Dated: July 7, 2025                Attorney for Appellants

# EXHIBITS

Exhibit A…………………………………… District Court Opinion (Doc. 71)

Exhibit B…………………………………… District Court Order (Doc. 73)

Exhibit C…………………………………… Declaration of Ihsan Gunduz, dated July 6, 2025

Exhibit D…………………………………… Declaration of Kristi Noem, Secretary of Homeland Security, dated July 7, 2025

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, *et al.*, |
| *Plaintiffs*, |
| v. |
| KRISTI NOEM, *Secretary of Homeland Security, in her official capacity*, *et al.*, |
| *Defendants*. |

Civil Action No. 25-306 (RDM)

### MEMORANDUM OPINION

On January 20, 2025, the President issued a proclamation declaring that "the current situation at the southern border qualifies as an invasion" because "the sheer number of aliens entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border."  Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333, 8334–35 (Jan. 20, 2025) (the "Proclamation").  The Proclamation, in effect, prevents anyone who crosses the southern border of the United States at any place other than a designated port of entry, as well as anyone who enters anywhere else (including at a designated port of entry) without a visa or without extensive medical information, criminal history records, and other background records, from applying for asylum or withholding of removal.  On Defendants' telling, this dramatic step was necessary to restore order to an immigration system that has become overrun by those who enter the United States without authorization and then seek to stay here by applying for asylum or withholding of removal.  On Plaintiffs' telling, in contrast, the Proclamation and

implementing guidance ignore the governing statutes and regulations and purport to rely on statutory and constitutional provisions that neither contemplate nor permit such a wholesale rewriting of the Nation's immigration laws.

The Proclamation contains five operative sections, all of which—along with the Department of Homeland Security's implementing guidance—are at issue in this case:

The first and second sections operate together.  The first "direct[s] that entry into the United States" on or after January 20, 2025, of "aliens engaged in the invasion across the southern border" is "suspended until [the President] issue[s] a finding that the invasion . . . has ceased."  Proclamation, § 1.  The implementing guidance clarifies that this group includes aliens who enter the United States "between the ports of entry on the southern land border."  Dkt. 52-1 at 5.  The second, in turn, restricts those individuals from invoking any provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., "that would permit their continued presence in the United States, including but not limited to" the asylum statute, 8 U.S.C. § 1158.  Proclamation, § 2.  Sections 1 and 2 of the Proclamation are premised on two statutory sources of authority:  8 U.S.C. § 1182(f), which authorizes the President to suspend or to restrict entry into the United States of any class of aliens if he finds that their entry "would be detrimental to the interests of the United States," and 8 U.S.C. § 1185(a), which makes it "unlawful . . . for any alien to . . . enter the United States, except under such reasonable rules, regulations, and orders and subject to such limitations and exceptions as the President may prescribe."

The third section relies on the same two sources of statutory authority but cuts a broader geographic swath.  It applies regardless of the point of entry, and it suspends "entry into the United States of" any alien who, after January 20, 2025, "fails, before entering the United States,

to provide Federal officials with sufficient medical information and reliable criminal history and background information" to permit the government to determine, among other things, whether the alien has "received vaccination against vaccine-preventable diseases," has a communicable disease or dangerous physical or mental disorder, is a drug abuser, has a disqualifying conviction, or poses a threat to national security or public safety, *see* 8 U.S.C. § 1182(a). Proclamation, § 3.  Like Section 2, Section 3 also directs immigration authorities to "restrict" these aliens from obtaining "access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to," the right to apply for asylum.  *Id.*

The fourth section does not rely on any statutory authority but, rather, invokes Article II and Article IV, Section 4 of the Constitution.  Proclamation, § 4.  As relevant here, Article II vests "[t]he Executive Power" of the United States in the President, while Article IV, Section 4 guarantees that "[t]he United States . . . shall protect each [State in the Union] against Invasion." Relying on these constitutional provisions, the Proclamation "suspend[s] physical entry of any alien engaged in the invasion across the southern border of the United States" and "direct[s] the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, to take appropriate actions . . . to achieve the objectives of" the Proclamation. Proclamation, § 4.

Finally, the fifth section directs "[t]he Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, [to] take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border" after January 20, 2025.  Proclamation, § 5.  That provision relies on both the statutory and the constitutional authorities invoked in support of the preceding sections, and "delegate[s]" the President's

relevant constitutional authority to the Secretaries of Homeland Security and State and the Attorney General for purposes of effectuating the Proclamation. *Id.*

Plaintiffs are thirteen individuals—A.M., Z.A., T.A., A.T., N.S., D.G., B.R., M.A., G.A., F.A., K.A., Y.A., and E.G—and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services ("RAICES"), Las Americas Immigrant Advocacy Center ("Las Americas"), and the Florence Immigrant & Refugee Rights Project ("Florence Project"). The thirteen individual plaintiffs, all of whom are or were subject to the Proclamation, have allegedly "suffered past persecution and/or fear future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion[s]," or have allegedly "suffered or fear torture." Dkt. 12 at 1. They allege that they have fled persecution in Afghanistan, Ecuador, Cuba, Egypt, Brazil, Turkey, and Peru. Dkt. 11 at 9–10 (Am. Compl. ¶¶ 12–19). Some of the individual plaintiffs (N.S., D.G., F.A., K.A., Y.A., and E.G.) have already been removed from the United States—or, as Defendants sometimes call it, "repatriated"—pursuant to the Proclamation, either to their own country or to third countries like Panama. *See* Dkt. 43-3 at 4–5 (Hollinder Decl. ¶¶ 6, 10); Dkt. 43-7 at 4, 6 (Huettl Decl. ¶¶ 8, 21). Other individual plaintiffs (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) are still in the United States. *See* Dkt. 43-3 at 3 (Hollinder Decl. ¶ 4); Dkt. 43-7 at 4–5 (Huettl Decl. ¶¶ 10, 14, 16). The individual plaintiffs seek to proceed both individually and on behalf of a putative class of all others who "were, are, or will be subject to" the Proclamation. *Id.* at 27 (Am. Compl. ¶ 86). The three organizational plaintiffs provide legal services to individuals seeking asylum in the United States and other forms of relief from immigration proceedings. *Id.* at 6–8 (Am. Compl. ¶¶ 9–11).

The fifteen defendants include President Trump, along with three cabinet-level
Departments (the Departments of Homeland Security, State, and Justice); three components of
the Department of Homeland Security (Customs and Border Patrol ("CBP"), Immigration and
Customs Enforcement ("ICE"), and United States Citizenship and Immigration Services
("USCIS")); and multiple agency officials sued in their official capacities (collectively, the
"Agency Defendants").  Dkt. 11 at 11–13 (Am. Compl. ¶¶ 20–35).

Plaintiffs allege that the Proclamation and its implementation are unlawful and mark a
dramatic break with decades of Executive Branch precedent.  Dkt. 11 at 4 (Am. Compl. ¶ 3).
Among other things, they allege that the Proclamation and its implementation supplant the INA
with a non-statutory immigration regime, which violates (1) the asylum statute, which gives
aliens "physically present in the United States" the right to apply for asylum, "irrespective of
such alien's status," 8 U.S.C. § 1158(a)(1); (2) the withholding of removal statute, which
prohibits the Secretary of Homeland Security from "remov[ing] an alien to a country if the
Attorney General [or the Secretary] decides that the alien's life or freedom would be threatened
in that country because of the alien's race, religion, nationality, membership in a particular social
group, or political opinion," 8 U.S.C. § 1231(b)(3); (3) the Foreign Affairs Reform and
Restructuring Act of 1998 ("FARRA"), which implements the United Nations Convention
against Torture and Other Curel, Inhuman, or Degrading Treatment or Punishment ("Convention
Against Torture" or "CAT"), 8 U.S.C. § 1231 note, and the Department of Justice and
Department of Homeland Security regulations implementing FARRA, *see* 8 C.F.R. §§ 208.16,
1208.16, which require immigration officials to process applications for protection under CAT in
a prescribed manner; and (4) the INA generally, which establishes the exclusive procedures for

determining whether and how to remove an alien from the United States.[1]  Dkt. 11 at 34–38
(Am. Compl. ¶¶ 128–31).

Most fundamentally, Plaintiffs posit that the authorities that Defendants invoke in support
of the Proclamation and implementing guidance do not authorize Defendants' actions.  They
challenge Defendants' reliance on 8 U.S.C. § 1182(f), which permits the President to "suspend"
or "restrict[]" entry into the United States, and 8 U.S.C. § 1185(a), which makes it unlawful for
aliens to enter the United States "except under such reasonable rules . . . as the President may
prescribe," to justify the denial of "access to asylum and other forms of protection," Dkt. 11 at 41
(Am. Compl. ¶ 149).  They also allege that the Proclamation exceeds the President's authority
under Article II of the Constitution and his authority, if any, under Article IV, Section 4.  *Id.* at
41–42 (Am. Compl. ¶¶ 155–56).  And they allege that the Proclamation and implementing
guidance violate "fundamental separation-of-powers principles" by purporting to "override
Congress's careful and longstanding decisions to provide protections for noncitizens fleeing
danger."  *Id.* at 42 (Am. Compl. ¶¶ 158–60).

Finally, Plaintiffs assert a series of claims under the Administrative Procedure Act
("APA"), 5 U.S.C. §§ 701 *et seq.*, against the Agency Defendants, alleging that the
implementing guidance is contrary to law, 5 U.S.C. § 706(2)(A).  Dkt. 11 at 38–39 (Am. Compl.
¶¶ 132–37).  Plaintiffs have also raised three APA claims that rely on the administrative record:
two arbitrary-and-capricious claims and a claim that the guidance was adopted without
observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D).  *Id.* at 38–40

---

[1] The Amended Complaint also alleged that the Proclamation violates the Trafficking Victims
Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(a)(5)(D), which provides specific
protection to unaccompanied minors.  Relying on Defendants' representations that they are not
applying the Proclamation to unaccompanied minors, however, Plaintiffs are not currently
pursuing that claim.  Dkt. 52 at 25 n.7.

(Am. Compl. ¶¶ 132–43).  At the joint request of the parties, the Court is holding those claims in abeyance.  Min. Entry (Feb. 26, 2025).  But the Court, nonetheless, required Defendants to produce the complete administrative record, *see* Min. Entry (May 13, 2025), which they did on June 3, 2025, *see* Dkt. 68.

Before the Court are Plaintiffs' motion to certify a class, Dkt. 13; Plaintiffs' motion for a preliminary injunction, Dkt. 14; Plaintiffs' motion for summary judgment, Dkt. 51, which the Court consolidated with the motion for preliminary relief, *see* Min. Order (Feb. 26, 2025); and Defendants' cross-motion for summary judgment, Dkt. 44.  Given the time-sensitive nature of Plaintiffs' challenges to impending "repatriations" and removals, and given the difficult questions posed by Plaintiffs' request that the Court grant relief to those who have already been removed from the United States, the Court will address the claims of those Plaintiffs and putative class members who are currently in the United States in this decision and will, after providing an opportunity for further briefing, address the claims of those who have already been removed in a subsequent decision.

For the reasons that follow, the Court concludes that neither the INA nor the Constitution grants the President or the Agency Defendants authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals from the United States, without an opportunity to apply for asylum or withholding of removal and without complying with the regulations governing CAT protection.  The Court recognizes that the Executive Branch faces enormous challenges in preventing and deterring unlawful entry into the United States and in adjudicating the overwhelming backlog of asylum claims of those who have entered the country.  But the INA, by its terms, provides the sole and exclusive means for removing people already

present in the country, and, as the Department of Justice correctly concluded less than nine months ago, neither § 1182(f) nor § 1185(a) provides the President with the unilateral authority to limit the rights of aliens present in the United States to apply for asylum.  Nor can Article II's Vesting Clause or Article IV's Invasion Clause be read to grant the President or his delegees authority to adopt an alternative immigration system, which supplants the statutes that Congress has enacted and the regulations that the responsible agencies have promulgated.  As the Framers understood, "every breach of the fundamental laws," even when "dictated by necessity," undermines respect for the rule of law and "forms a precedent for other breaches where the same plea of necessity does not exist at all, or is less urgent or palpable." *The Federalist No. 25*, at 167 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Here, nothing in the INA or the Constitution grants the President or his delegees the sweeping authority asserted in the Proclamation and implementing guidance.  An appeal to necessity cannot fill that void.

The Court will, accordingly, **GRANT** in part Plaintiffs' motion for summary judgment, Dkt. 51; will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, and will **DEFER** ruling on the remaining portions of the parties' cross-motions.  The Court will also **DIRECT** that the parties submit a joint status report proposing a schedule for further briefing on whether the Court can and should grant relief to those Plaintiffs and putative class members who are no longer present in the United States.

# TABLE OF CONTENTS

I. BACKGROUND ................................................................................................ 10

  A.  Statutory and Regulatory Background ........................................................ 10

    1.  Admissibility and Inadmissibility ......................................................... 10

    2.  Statutory Protections: Asylum, Withholding of Removal, and CAT Protection ......... 12

    3.  Formal and Expedited Removal Procedures ......................................... 16

  B.  Prior Administrative Actions ...................................................................... 19

  C.  Challenged Actions .................................................................................... 26

    1.  The Proclamation .................................................................................. 27

    2.  Implementing Guidance ........................................................................ 28

II. LEGAL STANDARD ..................................................................................... 37

III. ANALYSIS ..................................................................................................... 38

  A.  Threshold Issues ........................................................................................ 38

    1.  Article III Standing ............................................................................... 38

    2.  Statutory Jurisdiction ........................................................................... 56

    3.  Causes of Action .................................................................................. 61

  B.  Merits ......................................................................................................... 70

    1.  "212(f) Direct Repatriation" and "212(f) Expedited Removal" ................... 72

    2.  Suspension of Asylum .......................................................................... 89

    3.  Suspension of Withholding of Removal ............................................... 98

    4.  Extra-Regulatory CAT Protection Procedures .................................... 100

  C.  Class Certification ..................................................................................... 103

    1.  Rule 23(a) ............................................................................................ 105

    2.  Rule 23(b)(2) ....................................................................................... 112

  D.  Remedy ...................................................................................................... 113

    1.  Vacatur ................................................................................................. 114

    2.  Declaratory Judgment .......................................................................... 117

    3.  Injunction ............................................................................................. 117

  E.  Request for Stay Pending Appeal .............................................................. 125

CONCLUSION .................................................................................................... 128

# I. BACKGROUND

## A.    Statutory and Regulatory Background

The INA sets out a comprehensive scheme that governs entry and removal of aliens from the United States.  Among other things, it specifies which aliens may lawfully enter the United States, *see, e.g.*, 8 U.S.C. §§ 1181, 1184; which aliens are inadmissible, *see, e.g.*, *id.* § 1182; which previously admitted aliens are subject to removal, *see, e.g.*, *id.* § 1227; what protections aliens can claim, *see, e.g.*, *id.* §§ 1158, 1231; and the procedures for removing aliens, *see, e.g.*, *id.* §§ 1225(b)(1), 1229a.

### 1.    *Admissibility and Inadmissibility*

The INA sets forth criteria for determining whether an alien seeking admission is admissible or inadmissible.  Under the INA, no "immigrant"—other than a refugee admitted at the discretion of the Attorney General and certain returning resident immigrants, *see* 8 U.S.C. § 1181(c)—may be admitted into the United States "unless at the time of application for admission he" or she "has a valid unexpired immigrant visa."  *Id.* § 1181(a).  Congress has also specified "[c]lasses of aliens" who are "inadmissible"—*i.e.*, those who are ineligible to receive a visa and ineligible for admission into the United States.  *Id.* § 1182.  An alien is inadmissible, for example, if he or she is "determined . . . to have a communicable disease of public health significance" or fails "to present documentation of having received" specified vaccinations, *id.* § 1182(a)(1) ("Health-Related Grounds"); if he or she has been convicted of "a crime involving moral turpitude," has been convicted of two or more non-political offenses with an aggregate sentence of five years or more, or has "been an illicit trafficker in any controlled substance," *id.* § 1182(a)(2) ("Criminal and Related Grounds"); or if a consular officer has reasonable grounds to believe that he or she is entering the United States to engage in espionage or sabotage or terrorist activity, or "the Secretary of State has reasonable ground[s] to believe" permitting his or

her entry "would have potentially serious adverse foreign policy consequences for the United

States," *id.* § 1182(a)(3) ("Security and Related Grounds").  "An alien present in the United

States without being admitted or paroled, or who arrives in the United States at any time or place

other than as designated by the Attorney General" is also "inadmissible," *id.* § 1182(a)(6), but is

deemed "an applicant for admission," *id.* § 1225(a).

Aliens are also inadmissible if they were previously ordered removed or if they were

previously unlawfully present in the United States for an extended period.  With certain

exceptions, an alien who has previously been ordered removed is inadmissible for five years

after the date of removal if he or she was removed upon arrival or by means of expedited

removal, or ten years after removal otherwise.  *Id.* § 1182(a)(9)(A).  If an alien has been ordered

removed twice or has been convicted of an aggravated felony, that bar increases to 20 years.  *Id.*

Moreover, even if an alien voluntarily departs from the United States, he or she is deemed

"inadmissible" for three years if he or she was "unlawfully present . . . for a period of more than

180 days but less than 1 year," and he or she is deemed inadmissible for ten years if he or she

was unlawfully present for a year or longer.  *Id.* § 1182(a)(9)(B)(i).  But, notably, "[n]o period of

time in which an alien has a bona fide application for asylum pending under section 1158 . . .

shall be taken into account in determining the period of unlawful presence in the United States"

for purposes of this latter provision.  *Id.* § 1182(a)(9)(B)(iii).

In addition to the statutory limitations, "Congress has also delegated to the President

authority to suspend or restrict the entry of aliens in certain circumstances."  *Trump v. Hawaii*,

585 U.S. 667, 683 (2018).  "The principal source of that authority, § 1182(f), enables the

President to 'suspend the entry of all aliens or any class of aliens' whenever he 'finds' that their

entry 'would be detrimental to the interests of the United States.'"  *Id.* (quoting 8 U.S.C.

§ 1182(f)).  This provision "entrusts to the President the decisions whether and when to suspend

entry . . . and on what conditions."  *Id.* at 684.  A second source of that authority, § 1185(a)(1),

"'substantially overlaps' with § 1182(f)."  *Id.* at 683 n.1 (alteration omitted).  It provides that,

"[u]nless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter

. . . the United States except under such reasonable rules, regulations, and orders, and subject to

such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).

Inevitably, some aliens gain entry to the United States without being lawfully admitted.

Aliens who enter without being admitted are usually "remov[able]" upon the order of "an

immigration officer," *id.* § 1225(b)(1)(A), or an immigration judge, *id.* § 1229a.  Several

statutory provisions, however, allow otherwise removable aliens to remain in the United States

or restrict the countries to which those aliens may be removed.  Three of these types of relief are

relevant for present purposes: asylum, withholding of removal, and Convention Against

Torture—or CAT—protection.

> 2.      *Statutory Protections*: *Asylum, Withholding of Removal, and CAT Protection*

Asylum is the most protective of these types of relief.  The INA authorizes the Attorney

General and Secretary of Homeland Security ("Secretary") to grant asylum to any "alien who has

applied for asylum in accordance with the requirements and procedures established by the"

Attorney General or Secretary if "such alien is a refugee within the meaning of" the INA.  8

U.S.C. § 1158(b)(1)(A); *see also id.* § 1103(a)(1) & (3).  An alien qualifies as a "refugee" for

purposes of the INA if he or she is "unable or unwilling to return to, and is unable or unwilling to

avail himself or herself of the protection of" his or her country of nationality (or, in the case of a

person with no nationality, his or her most recent country of residence) "because of persecution

or a well-founded fear of persecution on account of race, religion, nationality, membership in a

particular social group, or political opinion."  *Id.* § 1101(a)(42).  Asylum creates a path to lawful

permanent resident status and citizenship and confers other benefits, including the right to work

in the United States and to receive certain forms of financial assistance from the federal

government. *See id.* § 1158(c); *see also* Aliens Subject to a Bar on Entry Under Certain

Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55936 (Nov.

9, 2018).

Asylum applications are governed by the INA and its implementing regulations. Under

the INA, any alien "physically present" or "who arrives in the United States" "may apply for

asylum," regardless of "whether or not" the alien arrived "at a designated port of arrival" and

"irrespective of such alien's status." 8 U.S.C. § 1158(a). There are, however, exceptions to this

"general" rule. *Id.* An alien may not apply for asylum, for example, (1) "if the Attorney General

[or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral

agreement, to a country (other than the country of the alien's nationality . . .) in which the alien's

life or freedom would not be threatened," *id*. § 1158(a)(2)(A); (2) if the alien cannot

"demonstrate[] by clear and convincing evidence" that he or she filed his or her asylum

application within one year after arriving in the United States, subject to certain exceptions, *id.*

§ 1158(a)(2)(B); or (3) if the alien, again subject to certain exceptions, "previously applied for

asylum and had such application denied," *id.* § 1158(a)(2)(C). The INA requires the Attorney

General and the Secretary to "establish a procedure for consideration of asylum applications"

and requires immigration officials to "advise the alien of the privilege of being represented by

counsel and of the consequences . . . of knowingly filing a frivolous asylum application." *Id.*

§ 1158(d)(1) & (4); *see also id.* § 1103(a)(3). Aliens may apply for asylum affirmatively or

defensively. Aliens who are not in any kind of removal proceeding may file an affirmative

application for asylum. *See id.* § 1158(a)(1); 8 C.F.R. § 208.1(a)(1). In contrast, aliens who are

subject to regular removal proceedings under 8 U.S.C. § 1229a or expedited removal

proceedings under 8 U.S.C. § 1225(b)(1) may file an asylum application as a defense to removal,

*see* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R.

§ 208.30(f).

     The Attorney General and the Secretary are tasked with determining whether an alien

qualifies for asylum, and their authority to grant or to deny asylum is, for the most part,

discretionary. *See* 8 U.S.C. § 1158(b)(1)(A). There are, however, certain statutory limitations

on their discretion to grant asylum. *See id.* § 1158(b)(2). Neither the Attorney General nor the

Secretary may, for example, grant asylum to an alien who "participated in the persecution of any

person," who has "been convicted by a final judgment of a particularly serious crime," or who

poses "a danger to the security of the United States." *Id.* § 1158(b)(2)(A)(i)–(ii), (iv). In

addition to those statutory limitations, the INA authorizes the Attorney General and Secretary to

issue regulations "establish[ing] additional limitations and conditions, consistent with [8 U.S.C.

§ 1158,] under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see also id*.

§ 1103(a)(3); 6 U.S.C. § 202. The existing regulatory limitations are set forth at 8 C.F.R.

§§ 208.13(c) and 208.35(a).

     An alien who is ineligible for asylum or who is denied asylum may still apply for

withholding of removal and CAT protection. An alien is eligible for withholding of removal if

he or she can show "that it is more likely than not that he or she would be persecuted on account

of" a protected ground if removed from the United States. 8 C.F.R. § 1208.16(b)(2); *see also* 8

U.S.C. § 1231(b)(3). Withholding of removal, accordingly, requires a more substantial showing

than the "well-founded fear of persecution" standard applicable in asylum cases. *See Kouljinski*

*v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007). Unlike asylum, however, withholding of removal

14

is not discretionary; the INA "*requires* the Attorney General [or the Secretary of Homeland Security] to withhold deportation of an alien who demonstrates that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is deported."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (emphasis added); *see also* 8 U.S.C. § 1231(b)(3) ("[T]he Attorney General *may not* remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.") (emphasis added).  Although withholding is thus mandatory, the relief that it provides is more circumscribed than asylum; withholding does not preclude the government from removing the alien to a third country where the alien would not face persecution, does not establish a pathway to lawful permanent resident status and citizenship, and does not afford derivative protection for the alien's family members. *See* 83 Fed. Reg. at 55939.

The Convention Against Torture, as implemented in the United States, provides another avenue of protection for aliens facing removal.  It is the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  8 U.S.C. § 1231 note (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture).  Congress has implemented this policy by instructing "the heads of the appropriate agencies" to prescribe regulations to effectuate Article 3 of the United Nations Convention Against Torture.  *See id.*  Under the existing implementing regulations, an alien may establish entitlement to CAT protection by demonstrating "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R.

§ 208.16(c)(2).  Like withholding of removal, CAT protection does not preclude the government

from removing the alien to a third country where he or she would not be tortured.

    3.    *Formal and Expedited Removal Procedures*

    Before 1996, "an individual in the United States without proper documentation could be

considered 'deportable,' 8 U.S.C. § 1251(a) (1995), if, among other things, that person had

'entered the United States without inspection or at any time or place other than as designated by

the Attorney General[,]' *see id*. § 1251(a)(1)(B) (1995)."  *Make The Road New York v. Wolf*, 962

F.3d 612, 618 (D.C. Cir. 2020).  Deportation proceedings involved "a hearing before a special

inquiry officer [at] which the individual had the right to be represented, to examine the

government's evidence, and to present evidence on his or her behalf," and "[a]n officer's

determination that an individual was deportable was subject to judicial review."  *Id.*  Since

enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),

Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), in 1996, however, removal proceedings have

followed two alternative routes, the second of which requires far less process.

    Under the first route, which follows the pre-IIRIRA approach, "formal" or "regular"

removal proceedings are conducted before an immigration judge within the Department of

Justice's Executive Office of Immigration Review ("EOIR").  *See* 8 U.S.C. § 1229a.  Under this

route, the alien is entitled to various procedural guarantees, including the rights to written notice

of the charge of removability, to counsel of the alien's choice (at no expense to the government),

to appear at a hearing before an immigration judge and to examine and to present evidence, to

appeal an adverse decision to the Board of Immigration Appeals ("BIA"), and to seek judicial

review.  *Id.* §§ 1229(a)(1), 1229a(b)(4), 1229a(c)(5), 1252(a); 8 C.F.R. §§ 1003.1(b),

1240.11(a)(2), 1240.15.  An alien placed in formal removal proceedings may avoid removal by

establishing, through this adversarial process, that he or she is eligible for asylum, withholding of

removal, CAT protection, or some other form of relief. *See* 8 U.S.C. § 1229a(c)(4).

The second type of proceedings, known as "expedited removal," affords considerably

less process to a subset of aliens. The INA mandates the use of expedited removal for aliens

who are arriving in the United States without valid entry documents. *See id.* § 1225(b)(1)(A)(i).

It also authorizes the use of expedited removal for aliens who have "not been admitted or paroled

into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an

immigration officer, that [they have] been physically present in the United States continuously

for the 2-year period immediately prior to the date of the determination of inadmissibility." *Id.*

§ 1225(b)(1)(A)(iii). With respect to the second category, however, the Secretary has "sole and

unreviewable discretion" to apply expedited removal to some, none, or all of the aliens in that

group. *Id.* Initially, the Secretary only applied expedited removal to aliens "arriving" at a point

of entry or "'interdicted in international or United States waters and brought into the United

States.'" *Make The Road New York*, 962 F.3d at 619–20 (citation omitted). Currently, however,

the Secretary uses expedited removal to the maximum extent permitted by the statute—that is,

for anyone who was not admitted or paroled into the United States and who cannot satisfy the

two-year physical presence requirement, regardless of whether that person is found at the border

or anywhere else in the United States.[2]

---

[2] In 2002, the Commissioner of the Immigration and Naturalization Service ("INS") expanded
the subclass of those eligible for expedited removal to include "all aliens who arrive in the
United States by sea, either by boat or other means, who are not admitted or paroled, and who
have not been physically present in the United States continuously for the two-year period prior
to a determination of inadmissibility by a[n] [INS] officer." Notice Designating Aliens Subject
to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act,
67 Fed. Reg. 68924, 68925 (Nov. 13, 2002). In 2004, the Secretary of Homeland Security
expanded the subclass once again, this time reaching inadmissible aliens "who [were] physically

Under expedited removal procedures, the Secretary may remove an alien from the United

States "without further hearing or review[,] unless the alien indicates either an intention to apply

for asylum under [8 U.S.C. § 1158] or a fear of persecution" supporting a claim to withholding

of removal or CAT protection.  8 U.S.C. § 1225(b)(1)(A)(i).  If "the alien indicates either an

intention to apply for asylum . . . or a fear of persecution, the [immigration] officer [is required

to] refer the alien for an interview by an asylum officer," who must determine whether the alien

has a credible "fear of persecution."  *Id.* § 1225(b)(1)(A)(ii).  For purposes of the asylum

officer's assessment, a credible fear of persecution means "that there is a significant possibility

. . . that the alien could establish eligibility for asylum."  *Id.* § 1225(b)(1)(B)(v).[3]  If the asylum

---

present in the U.S. without having been admitted or paroled following inspection by an
immigration officer at a designated port-of-entry, who are encountered by an immigration officer
within 100 air miles of any U.S. international land border, and who ha[d] not established to the
satisfaction of an immigration officer that they ha[d] been physically present in the U.S.
continuously for the 14-day period immediately prior to the date of encounter."  Designating
Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

That designation applied until 2019, when the Secretary expressed his intent to "exercise the full
remaining scope of its statutory authority" to apply expedited removal procedures to all aliens
determined inadmissible under 8 U.S.C. § 1182(a)(6)(C) or 8 U.S.C. § 1182(a)(7).  *See*
Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409, 35409 (Jul. 23, 2019).  That
designation remained in place until March 2022, when the Secretary returned to the pre-2019
designation.  *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited
Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).  Finally, on January 24, 2025, the Acting
Secretary rescinded the rescission to again "apply expedited removal to the fullest extent
authorized by statute."  Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24,
2025).

[3]  The standard for establishing a "credible fear" is lower than the standard for obtaining asylum
itself.  The Supreme Court has indicated that to prevail on an asylum claim, applicants must
establish that there is roughly a 10% chance that they will be persecuted on account of a
protected ground if they are returned to their country of origin.  *See Cardoza-Fonseca*, 480 U.S.
at 431–32, 440.  In contrast, to prevail at the initial credible fear interview, applicants usually
need only show "a significant possibility" that they could establish eligibility for asylum,
withholding of removal, or CAT protection.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R.
§ 208.30(e)(2).  There is one exception: a 2024 rule created a separate credible fear regime for
most aliens who enter the southern border during periods when border crossings are high, which

officer determines that the alien has a credible fear, "the alien [is] detained for further

consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically placed in

formal removal proceedings.  If, on the other hand, the asylum officer determines that the alien

does not have a credible fear of persecution, "the officer shall order the alien removed from the

United States without further hearing or review."  *Id.* § 1225(b)(1)(B)(iii)(I).

## B.    Prior Administrative Actions

The Proclamation at issue in this case is not the first executive action adopted to restrict

access to asylum for those crossing the southern border, although the two most analogous actions

differ from the present approach in important respects.

In 2018, President Trump issued a proclamation that, like the Proclamation at issue here,

relied on § 1182(f) and § 1185(a) to declare that "[t]he entry of any alien into the United States

across the international boundary between the United States and Mexico," at any point other than

a designated port of entry, "is hereby suspended and limited" for a period of ninety days or until

"an agreement permits the United States to remove aliens to Mexico" pursuant to 8 U.S.C.

§ 1158(a)(2)(A).[4]  Proclamation 9822, Addressing Mass Migration Through the Southern Border

of the United States, 83 Fed. Reg. 57661, 57663 (Nov. 15, 2018) ("2018 Proclamation").  The

2018 Proclamation was unlike the Proclamation at issue today, however, in two respects.  First, it

expressly reserved the right of any alien to be "considered for withholding of removal."  *Id.*

_____

requires aliens to demonstrate a "reasonable probability" that they will be persecuted.  *See*
Securing the Border, 89 Fed. Reg. 81156, 81168 (Oct. 7, 2024); *see also infra* at 22–26.  That
component of the rule was recently upheld.  *See Las Americas Immigrant Advoc. Ctr. v. U.S.
Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, 2025 WL 1403811, at *19 (D.D.C. May 9, 2025).

[4] 8 U.S.C. § 1158(a)(2)(A) provides that an alien may not apply for asylum in the United States
"if the Attorney General determines that the alien may be removed, pursuant to a bilateral or
multilateral agreement, to a country (other than the country of the alien's nationality . . .) in
which the alien's life or freedom would not be threatened."

Second, it did not purport to have any stand-alone effect.  It was, of course, already unlawful to enter the United States outside of a designated port of entry, and so the suspension of entry alone had no separate legal effect on the status of any of the aliens it covered.  8 U.S.C. § 1325(a).  The 2018 Proclamation was given teeth only through an interim final rule promulgated by the Attorney General and the Secretary the same day the President issued the proclamation.

Relying on their authority under 8 U.S.C. § 1158(b)(2)(C) to "establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," the Attorney General and Secretary amended the governing regulations to add the following:

> *Additional limitation on eligibility for asylum*. For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order.  This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

8 C.F.R. § 208.13(c)(3) (2018); *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55935 (Nov. 9, 2018) (the "2018 Rule").  The 2018 Rule also amended the regulation governing credible fear determinations in expedited removal proceedings, 8 C.F.R. § 208.30, by directing asylum officers to make a "negative credible fear determination" if the alien was in the class of aliens that the rule rendered ineligible for asylum.  *Id*. § 208.30(e)(5) (2018).  Thus, operating in conjunction, the 2018 Proclamation and the joint Department of Justice–Department of Homeland Security rule barred anyone who unlawfully entered the United States across the

southern border after November 9, 2018, from obtaining asylum, but continued to allow qualified applicants to obtain withholding of removal.

The 2018 Rule was short lived. Ten days after the rule was promulgated, a district court issued a temporary restraining order barring its implementation, *see E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018); that court subsequently issued a preliminary injunction further barring implementation, *see E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018); and the Court of Appeals for the Ninth Circuit affirmed that decision, *see E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020), as modified by *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021).

While the Ninth Circuit litigation addressed the plaintiffs' motion for preliminary relief, this Court considered the lawfulness of the 2018 Rule on the merits in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019). After extensive briefing and oral argument, the Court concluded that the interim final rule was unlawful, and it, accordingly, vacated the rule. *Id.* at 147–54. As the Court explained, § 1158(b)(2)(C) permits the Attorney General and Secretary to "establish additional limitations and conditions" of eligibility for asylum, but only to the extent those limitations are "consistent with" § 1158. *Id.* at 148. Section 1158, in turn, provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, *may apply* for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). The parties agreed, moreover, "that a regulation barring all aliens who enter the United States from Mexico outside a designated port of entry from *applying* for asylum would be 'inconsistent with' § 1158(a)(1) and, thus, *ultra vires*." 404 F. Supp. 3d at 148. The only question, then, was whether the rule could survive scrutiny merely because it made all aliens entering from Mexico outside a port of entry *ineligible*

for asylum, rather than barring those individuals from *applying*. As the Court explained, common usage, the manner in which asylum claims are considered, and other immigration regulations made clear that, at least in the relevant context, there was no meaningful difference between a rule barring the covered aliens from applying for asylum and a rule treating them as ineligible. *Id.* at 148–50. Finally, the Court observed:

> Even assuming that the phrases "may not apply" and "are ineligible" reflect some subtle distinction in meaning, the relevant question is not whether the Rule uses the exact same words as in the statutory prohibition. The question, instead, is whether the Rule is "consistent with," 8 U.S.C. § 1158(b)(2)(C), the statutory mandate that any alien present in the United States "may apply for asylum," regardless of "whether or not" the alien entered the United States "at a designated port of arrival," 8 U.S.C. § 1158(a)(1). Defendants do not even attempt to satisfy that test, nor could they.

*Id.* at 149. Although Defendants initially appealed the Court's decision in *O.A.*, the parties later agreed to dismiss the appeal. *See O.A. v. Biden*, 2023 WL 7228024 (D.C. Cir. Nov. 1, 2023).

That is how things stood until June 2024, when President Biden issued a proclamation, which, like the 2018 Proclamation, invoked § 1182(f) and § 1185(a) to suspend and limit entry of certain aliens across the southern border. Proclamation 10773, Securing the Border, 89 Fed. Reg. 48487 (June 7, 2024) (the "2024 Proclamation"). Unlike the 2018 Proclamation, however, this proclamation was keyed to the average number of aliens (over a period of 7 consecutive calendar days, which was later extended to 28 consecutive days) who were either physically apprehended by U.S. immigration authorities at or near the border within 14 days of their entry between ports of entry or determined to be inadmissible at a southwest border of entry. 2024 Proclamation, 89 Fed. Reg. at 48491–92, §§ 2, 4; *see also* Proclamation 10817, Amending Proclamation 10773, 89 Fed. Reg. 80351, 80352 (Oct. 2, 2024). When the number of "encounters" fell below a designated number, the suspension was discontinued after a 14-day

waiting period, but it would be reinstated if the 7-consecutive-day average reached a designated number.  2024 Proclamation, 89 Fed. Reg. at 48491, § 2.

Like the 2018 Proclamation, the 2024 Proclamation was given operative effect through an interim final—and, later, a final—rule promulgated by the Attorney General and the Secretary.  And like the 2018 Rule, the 2024 interim final rule, *see* Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024), and the 2024 final rule, *see* Securing the Border, 89 Fed. Reg. 81156 (Oct. 7, 2024) (together, "2024 Rule"), were premised on the Attorney General and Secretary's authority to promulgate regulations "establish[ing] additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," 8 U.S.C. § 1158(b)(2)(C).  Under both versions of the 2024 Rule, when a suspension of entry is in effect—referred to as "emergency border circumstances"—a covered alien who enters the United States across the southern border is ineligible for asylum, except under "exceptionally compelling circumstances."  8 C.F.R. § 208.35(a); 2024 Rule, 89 Fed. Reg. at 81164; *see also* 2024 Proclamation, § 3(b) (defining covered aliens and excluding, for example, visa holders, members of the U.S. Armed Forces, and permanent resident aliens).  "Exceptionally compelling circumstances," include, for example, those facing "an acute medical emergency," facing "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," or who satisfy the definition of a "victim of a severe form of trafficking in persons" under 8 U.S.C. § 214.201.  8 C.F.R. § 208.35(a)(2).  Beyond this change in asylum eligibility, the 2024 Rule made a host of additional changes that would apply during "emergency border circumstances."  Asylum officers would no longer ask specific fear questions to elicit whether an alien might have a credible fear and, instead, would refer aliens for a credible fear interview only if they affirmatively manifested fear.  89 Fed. Reg. at 81168, 81232–45.  In

addition, the screening standard in credible-fear interviews was increased from "significant possibility" to "reasonable probability." *Id.* at 81245–50.

In adopting this rule, the Attorney General and Secretary acknowledged certain limitations contained in the relevant statutory authorities. First and foremost, they observed that "the [2024] Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures." *Id.* at 81163. As they explained, this "recognition that" 8 U.S.C. § 1182(f) does not authorize the President to "affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades." *Id.* Rather, as the Attorney General and Secretary further explained, although the President's authority under § 1182(f) is broad, it operates only "within its 'sphere,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 683–84), and it "does not authorize the President to override the asylum statute," *id.* That is because § 1182(f) delegates authority to the President to "'supplement the other grounds of inadmissibility in the INA,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 684)— that is, to specify who may "enter" the United States. In contrast, "[t]he right to apply for asylum" contained in 8 U.S.C. § 1158(a) "turns on whether a noncitizen is 'physically present' or has 'arrive[d] in the United States," *id.* at 81164 (quoting 8 U.S.C. § 1158(a)(1)). "As a result, the power under [§ 1182(f)] to suspend 'entry' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States." *Id.*

Second, the Attorney General and Secretary recognized that their statutory authority to set "additional limitations and conditions" on eligibility for asylum pursuant to § 1158(b)(2)(C) does not extend to withholding of removal (or CAT protection). Although the 2024 Rule modified certain procedures relating to withholding of removal, the Attorney General and Secretary stressed that the "rule's limitation on asylum eligibility does not affect a noncitizen's

ultimate eligibility for statutory withholding of removal" under § 1231(b)(3).  89 Fed. Reg. at 81253.

Finally, while reserving their objections to the decision, the Attorney General and Secretary recognized that the Ninth Circuit had concluded that the 2018 Rule was invalid because any regulation adding limitations to asylum eligibility that do not appear in the statute must be "consistent with" the statute, 8 U.S.C. § 1158(b)(2)(C), and the statute permits "[a]ny alien who is physically present in the United States" to apply for asylum, "whether or not" the alien entered at "a designated port of arrival" and "irrespective of such alien's status," 8 U.S.C. § 1158(a)(1).  *See* 89 Fed. Reg. at 48735 (citing *E. Bay*, 993 F.3d. at 670).  The 2024 Rule sought to distinguish *East Bay* on the ground that the 2024 Proclamation and 2024 Rule "differ significantly from the prior categorical bar on 'manner of entry' because they do not treat the manner of entry as dispositive in determining eligibility."  *Id.*  Rather, the limitation contained in the 2024 Rule applied only "during emergency border circumstances" and, even then, the rule provided asylum officers and immigration judges with authority "to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists."  *Id.*  As a result, the Attorney General and Secretary took the position that:

> The [2024 Rule] is within the scope of the Departments' authority and does not conflict with the statutory requirement that noncitizens "physically present in the United States" be permitted to apply for asylum because it adds a limitation on asylum eligibility as permitted under . . . 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B).  The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with . . . 8 U.S.C. 1158(a)(1).  *E.g.*, *East Bay Sanctuary Covenant v. Biden* (*East Bay III*), 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was "effectively a categorical ban" on migrants based on their method of entering the United States, in conflict with . . . 8 U.S.C. 1158(a)(1)).

89 Fed. Reg. at 81169–70.

In May 2025, this Court (Contreras, J.) struck down portions of the 2024 Rule.  *See Las Americas Immigrant Advoc. Center v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d __, 2025 WL 1403811 (D.D.C. May 9, 2025).  First, the Court held that the rule's "limitation on asylum eligibility" for aliens who arrive in the United States outside a port of entry "exceed[ed] the authority that Congress conferred on the Secretary of Homeland Security to 'establish additional limitations and conditions' on asylum that are 'consistent with' section 1158 of the INA" because "place-of-entry-based bans" are inconsistent with § 1158's instruction that "asylum is available 'whether or not' a noncitizen arrives 'at a designated port of entry.'"  *Id.* at *14–15 (quoting 8 U.S.C. § 1158).  Second, the Court held that the Secretary's decision to no longer ask specific fear questions and, instead, to refer aliens for a credible fear interview only if they manifested fear was arbitrary and capricious because it "risk[ed] different results for identically situated" aliens.  *Id.* at *15.  It therefore struck down that portion of the regulation as well.  The Court, however, upheld the 2024 Rule's change to the screening standard in credible-fear interviews—the shift from a "significant possibility" to a "reasonable probability" standard—because the Secretary had "reasonably explained why changed circumstances" justified the heightened standard.  *Id.* at *18.

## C.    Challenged Actions

The challenged actions in this case differ from the 2018 and 2024 Proclamations and Rules in several significant respects.  Most notably, unlike the 2018 and 2024 Rules, which relied on the statutory delegation to the Attorney General and the Secretary of authority to establish, "by regulation," "additional limitations and conditions" on *eligibility for asylum*, 8 U.S.C. § 1158(b)(2)(C), the Proclamation at issue here relies exclusively on the President's statutory authority to suspend or restrict *entry into the United States*, 8 U.S.C. §§ 1182(f), 1185(a)(1), and his constitutional authority.  Moreover, rather than engage in a rulemaking, the

Secretary has implemented the Proclamation at issue here through informal guidance, consisting primarily of purely internal email communications with agency personnel.

     1.    *The Proclamation*

After describing the difficulties posed by the "ongoing influx" of millions of aliens across the southern border of the United States," the Proclamation contains five operative sections. Proclamation, 90 Fed. Reg. 8333–36.  The first two sections apply to aliens who are "engaged in the invasion across the southern border."  Proclamation, §§ 1–2.  The first, entitled "Suspension of Entry," proclaims that "the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interest of the United States" and invokes § 1182(f) to "direct that entry into the United States of such aliens be suspended" until the President issues an order declaring the invasion over.  Proclamation, § 1. The second section then directs that "aliens engaged in the invasion . . . are restricted from invoking provisions of the INA that would permit their continued presence in the United States," including the right to apply for asylum under 8 U.S.C. § 1158(a).  Proclamation, § 2.

The third section imposes similar restrictions for "any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements" in 8 U.S.C. § 1182(a)(1)–(3), which, as described above, impose a series of limitations on admissibility on "health-related grounds," "criminal and related grounds," and "security and related grounds."  Proclamation, § 3; *see also* 8 U.S.C. § 1182(a) & (1)–(3).  The Proclamation declares that entry of these individuals into the United States "is detrimental to the interests of the United States" and, once again invoking § 1182(f) and § 1185(a), it "direct[s] that entry into the United States of such aliens be suspended."  Proclamation, § 3.  Those who fall into this category, like those "engaged in the invasion," are also precluded from invoking "provisions of

the INA that would permit their continued presence in the United States," including the right to apply for asylum under 8 U.S.C. § 1158(a).  Proclamation, § 3.

   The fourth section take a different approach to the same problem.  It also suspends the entry of those "engaged in the invasion across the southern border," but rather than rely on any statutory authority to do so, this section relies on "the authorities provided to [the President] under Article II of the Constitution of the United States, including [the President's] control over foreign affairs, and [his authority] to effectuate the guarantee of protection against invasion required by Article IV, Section 4."  Proclamation, § 4.  The fourth section also "direct[s] the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of [the Proclamation], until [the President] issue[s] a finding that the invasion at the southern border has ceased."  Proclamation, § 4.

   Finally, the fifth section directs the Secretary of Homeland Security, acting in coordination with the Secretary of State and the Attorney General, to "take all appropriate actions to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order."  Proclamation, § 5.  Combining the sources of authority invoked in support of the preceding sections, this section relies on § 1182(f) and § 1185(a), as well as a "delegat[ion]" of the President's constitutional authority.  *Id.*

   2.   *Implementing Guidance*

   In response to the directive that the Secretary "take all appropriate action" to implement the Proclamation, *id.* § 5, the Department of Homeland Security has issued implementing guidance regarding the procedures to follow with respect to "alien[s] subject to the Proclamation," Dkt. 52-1 at 13.  That guidance includes emails sent to U.S. Border Patrol ("USBP") personnel explaining how to process aliens subject to the Proclamation; an Office of

Field Operations memorandum describing how to implement active executive orders, including

the Proclamation; and USCIS training materials instructing asylum officers on how to conduct

credible fear interviews for aliens subject to the Proclamation.

       a.  U.S. Border Patrol Emails

The administrative record includes three emails containing USBP guidance.  The first

email has the subject line "Update Field Guidance for Southern Border RE: 212(F) Presidential

Proclamation Guaranteeing the States Protection Against Invasion" and was sent on February 4,

2025, for "disseminat[ion] . . . to all Southwest Border Sectors."  Dkt. 52-1 at 5.  As one might

expect from guidance directed at border agents on the southern border, it is concerned primarily

with the first category of aliens identified in the Proclamation: those "engaged in the invasion

across the southern border."  *See* Dkt. 52-1 at 5; *see also* Proclamation, § 2.  For purposes of

implementing the 2025 Proclamation, the guidance defines an "illegal alien invading the United

States" to mean "an alien who crosses between the ports of entry on the southern land border."

*Id.*  The guidance directs that "aliens invading the United States"—*i.e.*, those subject to the

Proclamation—"are **not permitted to apply for asylum**."  *Id.* (emphasis in original).

The second email, also sent on February 4, 2025, has the subject line "Field Guidance for

Northern and Coastal Borders RE: 212(F) Presidential Proclamation Guaranteeing the States

Protection Against Invasion" and was sent "to all Northern and Coastal Border Sectors."  Dkt.

52-1 at 13.  This guidance, in contrast, focuses on the second category of aliens identified in the

Proclamation: those "who fail[], before entering the United States, to provide Federal officials

with sufficient medical information and reliable criminal history and background information,"

Proclamation, § 3.  *See* Dkt. 52-1 at 13.  The guidance provides that "the entry of aliens who

[have] failed to provide such information is suspended, and they are restricted from invoking

provisions of the INA, **including asylum**, that would permit their continued presence."  *Id.*

(emphasis in original).  The guidance also provides that aliens with valid travel documents have "[p]resumptively" provided sufficient information such that they do not fall within the Proclamation's ambit.  *Id.*

Both February 4 emails then describe the procedures to be used when processing individuals subject to the Proclamation.  Those subject to the Proclamation "may be processed" in one of two ways: "as a 212(f) Direct Repatriation" or by "212(f) Expedited Removal" (which is sometimes referred to as "Expedited Removal – Per 212(F)").  *Id.* at 5–6, 13–14.  According to Defendants, the difference between the two pathways is that "[a]liens subject to expedited removal procedures are served with a Notice to Alien Ordered Removed and issued an Expedited Removal Order (Form I-860)," while "[a]liens processed for repatriation are not issued a removal order."  Dkt. 59 at 7.  Beyond the issuance of a notice and order, however, Defendants fail to identify any difference between the two "212(f)" procedures.  According to Defendants, issuance of a removal order matters only because "repatriations do not carry the same immigration or criminal consequences as expedited removal."  *Id.* at 8; *see also* 8 U.S.C. § 1182(a)(9)(A) (aliens "ordered removed" in expedited removal or formal removal proceedings initiated upon the alien's arrival are inadmissible for periods of at least five years); *id.* § 1231(a)(5) (aliens with prior orders of removal can have those orders reinstated if they again enter illegally); *id.* § 1326 (aliens who are removed while "an order of . . . removal is outstanding" and later reenter are subject to criminal penalties).  The February 4 emails instruct that the "appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances," Dkt. 52-1 at 5, 13, subject to the constraint that only aliens "able to be repatriated to their country of last transit" (or, in the case of the Southwest border, to Mexico, *see* Dkt. 52-1 at 5) could be processed by means of a "212(f) Direct Repatriation," *id.*

The February 4 emails also instruct officers to omit several steps from the INA's § 1225(b)(1) expedited removal procedure, regardless of which pathway is followed. Under Department of Homeland Security regulations, immigration officers overseeing a § 1225(b)(1) expedited removal are required to follow precise procedures: First, the immigration officer "read[s] (or ha[s] read) to the alien all information contained on Form I-867A," which among other things, informs the alien that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country" and instructs the alien to tell the officer about any "fear" or "concern" about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867A (*available in* 9 Charles Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16K (2024)). Second, the immigration officer uses Form I-867B to ask the alien specific questions designed to elicit whether the alien fears persecution or return to their home country and records the answers to those questions on the form.[5] *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867B (*available in* 9 Charles Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16L (2024)). Then, "[i]f an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the officer refers the alien for an interview by an asylum officer and "provide[s] the alien with a written disclosure on Form M-444," which provides aliens with information about the credible fear interview process and informs them of their rights to consult with someone prior to the interview and the right to request review by an immigration judge of an officer's determination.

---

[5] Form I-867B questions include: (1) "Why did you leave your home country or country of last residence?" (2) "Do you have any fear or concern about being returned to your home country or being removed from the United States?" and (3) "Would you be harmed if you are returned to your home country or country of last residence?"

*Id.* § 235.3(b)(4)(i).  The February 4 emails, however, direct that immigration officers processing

aliens subject to the Proclamation "should not use" Form I-867A, Form I-867B, or Form M-444

and should not "ask specific fear questions" at all.  Dkt. 52-1 at 5, 13.  If, however, an alien

spontaneously "manifests fear" regarding the country where USBP intends to return him or her

to, the immigration officer is instructed to "refer [the] alien" to USCIS for a "Convention against

Torture (CAT) screening."  Dkt. 52-1 at 5–6; 13–14.  If the screening comes back negative,

meaning that USCIS determined that the alien had not shown it was more likely than not that he

or she would be tortured in the relevant country, "USBP should continue with the process of

repatriation or removal."  *Id.* at 9.  If it comes back positive, the individual is reprocessed and

detained.  *Id.*

   The final email included in the administrative record was sent on February 19, 2025,

seemingly to all border sectors, to provide them with the "update" that aliens could now be sent

to "several Central American countries" with which the United States "has enacted agreements"

pursuant to which those countries have agreed "to receive third country nationals who have

illegally entered" the United States.  Dkt. 52-1 at 20.  To take advantage of those agreements, the

February 19 email advises immigration officers that individuals subject to the Proclamation can

be removed by means of "212(f) Direct Repatriations to Third Countr[ies]."  *Id.* at 21.  Before

removal, CBP "will notify" anyone who is not being transferred to his or her country of

nationality of the "country [to which he or she] will be sent" by giving that person a "212(f) Tear

Sheet."  *Id.* at 20, 25.  Aliens "who manifest a fear of the country to which CBP intends to

[remove] them" will be referred for CAT screening with respect to that country.  *Id.* at 20.  If the

CAT screening is negative, CBP will "continue with transfer of the alien to the designated

country."  *Id.*  If the CAT screening is positive, CBP can either "designate another third country

for removal" or place the person into full EOIR proceedings for adjudication of his or her CAT

claim.  *Id.*  If another third country is designated, and "the alien manifests a fear for the newly

designated country, CBP will again refer the case to USCIS for another CAT screening relative

to the newly designated country," and the process starts again.  *Id.*

> b.  Office of Field Operations memorandum

The administrative record also includes a February 28, 2025 memorandum sent to various

officials in the Office of Field Operations from Ray Provencio, the Acting Executive Director of

Admissibility and Passenger Programs in the Office of Field Operations.  Dkt. 52-1 at 26.

According to the memorandum, the Proclamation "leverage[s] INA 212(f) authorities" to

"provide[] the ability for U.S. Customs and Border Protection . . . personnel to immediately and

efficiently repatriate undocumented aliens that are not excepted at all U.S. ports of entry."  *Id.*  It

also includes a "Muster" with "[u]pdates regarding certain non-arriving aliens" that reiterates

many of the instructions in the emails discussed above and affirms that CAT screening will

remain available for those who affirmatively manifest a fear to the immigration officer.  *See, e.g.*,

*id.* at 28 ("CBP officers will not provide Forms I-867A and I-867B and will not provide

individualized advisals on asylum."); *id.* ("CBP officers will refer any alien who manifests fear

to [USCIS] for a [CAT] screening.").  The Muster further directs that a covered "alien[] who

claims or manifests a fear at the international boundary line to CBP personnel is not excepted

from the Proclamation."  *Id.*

> c.  USCIS training materials

The administrative record also contains training materials provided to USCIS personnel,

instructing them on the new procedures for CAT assessments.  *See* Dkt. 52-1 at 38–74.  Those

documents contain details about specific CAT screening procedures—including which forms to

use and how to fill them out.  Essentially, the guidance instructs USCIS asylum officers to use a

much higher screening standard for CAT claims, which departs from the standard set forth in the governing regulations.

Under the governing regulations, asylum officers conduct a credible fear screening, at which the standard of proof asks whether there is "a significant possibility" that it is more likely than not that the individual will be tortured.  8 C.F.R. § 208.30(e)(3).  If the alien can carry that burden, he receives notice and moves on to the next stage of the process, where he can be represented by counsel and present witnesses and evidence, and where he must show that it is "more likely than not" that he would be tortured if removed to the proposed country.  *Id.* §§ 208.9(b), 208.16(c)(2).  The guidance instructs asylum officers to perform CAT "assessments" rather than credible fear screenings.  According to the guidance, CBP or ICE will refer an individual who claims a fear of torture to USCIS "for CAT assessment."  Dkt. 52-1 at 43.  An asylum officer will then conduct a "CAT-Only assessment," *id.* at 44, at which the applicant "must show that it is more likely than not that [the applicant] will be tortured in the country to which [the applicant] may be returned," *id.* at 46.  Aliens in CAT-Only assessments are "not entitled to a consultant, legal representative, or a consultation period."  *Id.* at 45.  In essence, the new procedures require that an alien carry his burden at the initial hearing without the benefit of counsel or consultation.  The guidance also makes clear that the assessment is CAT-Only—that is, the applicant is not considered for asylum or withholding of removal.

### D.    Procedural History

The organizational plaintiffs filed this action on February 3, 2025, *see* Dkt. 1, and promptly amended their complaint to add the individual plaintiffs, *see* Dkt. 11.  Plaintiffs also promptly filed a motion for class certification, Dkt. 13; a motion for a preliminary injunction,

Dkt. 14; and an emergency motion to stay the removal of the individual plaintiffs who still remained in the United States, Dkt. 15.

The Court scheduled a hearing for the next day, February 20, 2025. Min. Entry (Feb. 20, 2025). At the hearing, the parties informed the Court that "it appear[ed]" that one of the individual plaintiffs—N.S.—had likely been removed from the United States that morning. Dkt. 19 at 15 (Feb. 20, 2025 Hrg. Tr. 15:5–6). To "preserve the Court's jurisdiction" while the parties briefed the emergency motion, the Court entered an administrative stay prohibiting the government from removing any individual plaintiffs still in the United States pending a hearing on the emergency motion. *Id.* (Feb. 20, 2025 Hrg. Tr. 13:14–19). Defendants subsequently filed a response representing that they will not remove any of the individual plaintiffs pursuant to the Proclamation during the pendency of this case, *see* Dkt. 21 at 2, and the Court, relying on that representation, denied Plaintiffs' emergency motion as moot, Dkt. 23 at 2. The Court also ordered Defendants to "provide the Court and Plaintiffs' counsel with at least seven days' notice before removing any of the individual plaintiffs from the United States during the pendency of this action" to "permit the parties to have the opportunity to be heard, if necessary" before removal. *Id.* at 3. Finally, the Court ordered the parties to file a joint status report addressing "whether the Court should consolidate the hearing on Plaintiffs' Motion for a Preliminary Injunction with the merits, pursuant to Fed. R. Civ. P. 65(a)(2)." *Id.*

The parties agreed to consolidation under Rule 65(a)(2), Dkt. 24, and the Court, accordingly, consolidated the hearing on the preliminary injunction motion with the merits, Min. Entry (Feb. 26, 2025). The parties also proposed that "the Court hold in abeyance any claims based on the administrative record, namely portions of the Sixth Claim for Relief raising arbitrary-and-capricious arguments under the Administrative Procedure Act" to "avoid the need

to set aside additional time in the schedule for Defendants to assemble, review, certify, and produce the administrative record." Dkt. 24 at 2. In lieu of an administrative record, Defendants "agree[d] to provide the relevant guidance documents." *Id.* The Court adopted the parties' proposal and set a briefing schedule for the motion for class certification and for cross-motions for summary judgment. Min. Entry (Feb. 26, 2025).

The Court held a hearing on those motions on April 29, 2025. *See* Min. Entry. At the hearing, the Court ordered supplemental briefing from Defendants on two issues: first, whether an alien subject to the Proclamation could file an affirmative asylum application outside the context of any removal proceedings and whether doing so would prevent his or her removal or repatriation, and, second, what the differences were between expedited removal under the Proclamation ("212(f) Expedited Removal") and repatriation under the Proclamation ("212(f) Direct Repatriation"). *See* Dkt. 59. The Court also, at Plaintiffs' request, granted leave to file a supplemental brief on whether 8 U.S.C. § 1252(f)(1) barred class-wide relief and whether, in any event, class-wide relief was necessary in this case, Dkt. 58, and the Court provided the parties with an opportunity to respond to each other's supplemental briefs, Dkt. 60; Dkt. 61.

Finally, after the close of briefing, the Court concluded that it required additional information from both Plaintiffs and Defendants to resolve the pending motions and to ensure that the record is complete for purposes of any appeal. The Court ordered Plaintiffs to file supplemental declarations from each individual plaintiff "indicating whether he or she provided Federal officials with the medical information, criminal history, and other background information required by the Proclamation," Min. Entry (May 13, 2025), and gave Defendants an opportunity to respond to those declarations, Min. Entry (May 20, 2025). The Court also ordered Defendants to compile and produce the complete administrative record. *See id.* The additional

materials have now been filed, *see* Dkt. 64; Dkt. 65; Dkt. 67, and the case is now ripe for

decision as to persons who have not yet been removed from the United States.

## II. LEGAL STANDARD

In the normal course, summary judgment may be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air

Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010),

*aff'd*, 663 F.3d 476 (D.C. Cir. 2011). On the other hand, "[i]n a case involving review of a final

agency action under the Administrative Procedure Act, . . . the Court's role is limited to

reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Id*.

at 32. Instead, summary judgment serves as "the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review." *Cath. Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117

(D.D.C. 2009) (internal quotations omitted).

Under the APA, "agency actions will be set aside if they are contrary to law—if, in other

words, they are not 'authorized by the statutory text,'" *Fisher v. Pension Benefit Guar. Corp.*,

151 F. Supp. 3d 159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255

(2006)), or some other source of lawful authority. In reviewing the executive's reliance on

statutory authority, the Court should pay "[c]areful attention to the judgment of the Executive

Branch" to the extent it "help[s] inform that inquiry" and should "respect" lawful delegations of

"authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024). But the

meaning of the relevant statutory text is ultimately a question for the Court, which "must

exercise [its] independent judgment" in interpreting the law. *Id*. at 412.

Nor does the fact that "the 'executive's' action . . . is essentially that of the President . . .

insulate the entire executive branch from judicial review." *Chamber of Com. of the U.S. v.

Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("*Reich*").  To the contrary, "it is now well

established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit

seeking to enjoin the officers who attempt to enforce the President's directive."  *Id*. (citing

*Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and

concurring in the judgment)); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579

(1952).  It is well-settled, moreover, that even though the President is not an "agency" subject to

suit under the APA, his "actions may still be reviewed for constitutionality," *Franklin*, 505 U.S.

at 801 (citing *Youngstown*, 343 U.S. at 579); *see also Dalton v. Specter*, 511 U.S. 462, 469

(1992).

## III.  ANALYSIS

### A.    Threshold Issues

#### 1.    *Article III Standing*

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see*

U.S. Const. art. III, § 2, federal courts are without authority" to resolve disputes unless the

plaintiff has standing—that is, "'a personal stake in the outcome of the controversy [sufficient] to

warrant *his* invocation of federal-court jurisdiction.'"  *Chamber of Com. v. EPA*, 642 F.3d 192,

199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  This

limitation "is founded in concern about the proper—and properly limited—role of the courts in a

democratic society."  *Summers*, 555 U.S. at 492–93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498

(1975)).  To establish Article III standing, a plaintiff must demonstrate a "concrete and

particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be

redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  At least one plaintiff, moreover, must have standing "for each claim" the plaintiffs "seek[] to press," *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006), and for "each form of relief requested," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  The plaintiffs "bear[] the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.

a.   Individual Plaintiffs in the United States

The individual plaintiffs still present in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) have established standing to challenge the bar on asylum and withholding of removal contained in the Proclamation and implementing guidance, as well as the guidance's extra-regulatory procedures for those seeking CAT protection.  They have standing because the Proclamation and implementing guidance make it more difficult for them to access these forms of relief.  Defendants do not dispute that asylum, withholding of removal, and CAT protection are valuable forms of relief that protect non-U.S. citizens from removal to countries where they may face persecution or torture.  Asylum is particularly valuable because it affords the asylee benefits above and beyond avoiding removal, including a path to lawful permanent resident status and citizenship.  As a result, the bars on asylum and withholding of removal and the extra-regulatory procedures for adjudicating CAT claims each injure the individual plaintiffs still in the United States because they make it more difficult (or, with respect to asylum and withholding of removal, impossible) for those plaintiffs to access these valuable forms of relief.[6]  *See Lujan*,

---

[6] The Proclamation applies under two sets of circumstances.  The first, second, fourth, and fifth sections of the Proclamation are directed at those "engaged in the invasion across the southern border of the United States," Proclamation, §§ 1, 2, 4, 5, which, according to the guidance, includes all aliens "who crosse[d] between the points of entry on the southern land border," Dkt. 52-1 at 5.  The third section of the Proclamation is directed at those who "fail[], before entering

504 U.S. at 561–62 (holding that "there is ordinarily little question" that a plaintiff has standing

if she herself is "an object of the action . . . at issue"). Each individual plaintiff, moreover, has

submitted a declaration expressing a desire to seek asylum and setting forth facts sufficient to

state a plausible claim to asylum, withholding of removal, or CAT protection. *See, e.g.*, Dkt. 12-

1 (A.M. Decl.); Dkt. 12-4 (B.R. Decl.); Dkt. 12-5 (M.A. Decl.); Dkt. 12-6 (G.A. Decl.). That is

enough to establish an injury in fact that is fairly traceable to the challenged actions. *See Lujan*,

504 U.S. at 560–61.

Defendants do not dispute that the individual plaintiffs still in the United States are

suffering a cognizable injury caused by the Proclamation and the implementing guidance.

Instead, they argue that the individual plaintiffs' injuries are non-redressable based on 8 U.S.C.

§ 1252(f)(1). Dkt. 44 at 26. On Defendants' telling, § 1252(f)(1) forecloses any equitable relief

that would undermine the operation of the Proclamation (including declaratory relief or vacatur

of the implementing guidance) because it prohibits courts, other than the Supreme Court, from

"enjoin[ing] or restrain[ing] the operation of the provisions" of part IV of the INA, which

includes the provisions that govern regular removal proceedings, 8 U.S.C. § 1229a; expedited

---

the United States, to provide Federal officials with sufficient medical information and reliable
criminal history and background information as to enable fulfillment of the requirements of" 8
U.S.C. § 1182(a)(1)–(3). Proclamation, § 3. Both sets of circumstances can apply to the same
person, and, here, the Court is persuaded by Plaintiffs' supplemental declarations, filed at the
Court's request, that there is at least one individual plaintiff in the United States who is a covered
alien in both relevant respects, *see* Dkt. 64-5 at 1 (G.A. Decl. ¶¶ 4, 9) (declaring that G.A.
crossed the border "on or about February 1, 2025" without submitting any health or other
background information). After Plaintiffs filed their supplemental declarations, Defendants—for
the first time—argued that Plaintiffs lack standing to challenge Section 3 of the Proclamation
because "[w]here Sections 1 and 2 of the Proclamation apply, there is no need to apply Section
3" and so it "has no practical applicability." Dkt. 66 at 3, 6. But that argument ignores the fact
that, if Plaintiffs prevail on their challenges to Sections 1 and 2 of the Proclamation, Section 3
will still stand as a bar to obtaining access to asylum and withholding of removal and will still
impose additional barriers to obtaining CAT protection. Thus, at least one of the individual
plaintiffs has standing to challenge the restrictions as applied to both classes of covered aliens.

removal proceedings, *id.* § 1225(b)(1); and withholding of removal, *id.* § 1231, *see* Dkt. 44 at 68

n.7.  *See* Dkt. 55 at 9–13.  For several reasons, the Court is unpersuaded.

To start, Defendants' redressability argument ignores the fact that § 1252(f)(1) contains a

carve-out for claims by "individual alien[s] against whom proceedings under such part have been

initiated."  8 U.S.C. § 1252(f)(1).  Thus, even if the provision might limit the Court's ability to

provide injunctive relief to individuals who are not yet in immigration proceedings, it has no

bearing on the redressability of the individual plaintiffs' claims to the extent that immigration

proceedings have been initiated against each of them "under" part IV of the INA, *see* Dkt. 43-3

at 3–5 (Hollinder Decl. ¶¶ 4–11) (attesting that A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.

were all issued I-860 Notices to Appear).  And, to the extent the new "212(f) Expedited

Removal" and "212(f) Direct Repatriation" proceedings are not brought "under" part IV of the

INA but, instead, are brought pursuant to the Proclamation, as Defendants assert, § 1252(f)(1)

has no bearing on Plaintiffs' challenges to those extra-statutory proceedings.

Defendants' redressability argument also fails because § 1252(f)(1) does not, in any

event, limit the Court's authority to vacate unlawful agency action under the APA, 5 U.S.C.

§ 706(2), or its authority to issue declaratory relief under the Declaratory Judgment Act, 28

U.S.C. § 2201, and the availability of those remedies alone establishes redressability.

Starting with the availability of APA vacatur, Defendants' contention that § 1252(f)(1)

precludes courts from setting aside unlawful agency action under the APA is meritless.  Two

well-established principles guide the Court's understanding of the interplay between § 1252(f)(1)

and the APA.  First, the courts recognize a "'stron[g] presum[ption]' that repeals by implication

are 'disfavored,'" and, thus, "[a] party seeking to suggest that two statutes cannot be harmonized,

and that one displaces the other, bears the heavy burden of showing 'a clearly expressed

congressional intention' that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal citation omitted). This rule, as the Supreme Court has explained, is premised on a "respect for the separation of powers" and "an appreciation that it's the job of Congress by legislation, not th[e] Court by supposition, both to write the laws and to repeal them." *Id.* at 511. Second, courts apply a "presumption favoring judicial review of administrative action" and, thus, "when a statutory provision is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with [the] traditional understanding[] and basic principle[] that executive determinations generally are subject to judicial review." *Make the Road*, 962 F.3d at 623–24 (internal quotation marks and citation omitted). This "presumption can be overcome only by clear and convincing evidence of congressional intent to preclude judicial review." *Id.* at 624 (internal quotation marks and citation omitted).

Here, Defendants' argument fails even before the Court applies either presumption. The APA mandates that a "reviewing court *shall* . . . set aside agency action . . . found to be . . . not in accordance with law [or] contrary to constitutional . . . power," 5 U.S.C. § 706(2) (emphasis added), and nothing in § 1252(f)(1) conflicts with or otherwise limits that mandate. Section 1252(f)(1) provides that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain the operation* of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added). Thus, by its own terms, § 1252(f)(1) limits only the lower courts' jurisdiction "to enjoin or restrain the operation" of specific statutory provisions; it

neither expressly nor implicitly repeals or supersedes the APA's mandate that reviewing courts

shall "set aside" unlawful agency action.

Section 1252(f)(1) says nothing about vacatur and, instead, "prohibits lower courts from

*entering injunctions* that order federal officials to take or to refrain from taking actions to

enforce, implement, or otherwise carry out" statutory provisions in part IV of the INA, *Garland*

*v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added).  There is a meaningful

difference, moreover, between an injunction and an order vacating a rule or administrative

guidance.  "An injunction is a drastic and extraordinary remedy, which should not be granted as

a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)), while

vacatur is the ordinary and presumptive remedy for substantive violations of the APA, *see, e.g.*,

*Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (noting that "both the

Supreme Court and the D.C. Circuit have held that . . . vacatur[] is the presumptively appropriate

remedy for a violation of the APA"); *see also Allina Health Serv. v. Sebelius*, 746 F.3d 1102,

1110 (D.C. Cir. 2014) ("[V]acatur is the normal remedy."); *Ill. Pub. Telecomms. Ass'n v. FCC*,

123 F.3d 693, 693 (D.C. Cir. 1997) ("[T]he practice of the court is ordinarily to vacate [an

unlawful] rule.").  Understood in this light, the limitation found in § 1252(f)(1) is consistent with

established precedent, which distinguishes between the typical APA remedy of "vacating an

agency action" and the more dramatic remedy of enjoining future agency action, which courts

should refrain from doing unless necessary to effectuate the court's decision.  *L.M.-M. v.*

*Cuccinelli*, 442 F. Supp. 3d 1, 36 (D.D.C. 2020).

Defendants respond by noting that § 1252(f)(1) not only restricts the authority of lower

courts "to enjoin" the operation of the provisions of part IV but also precludes lower courts from

"restrain[ing]" the operation of those provisions. Dkt. 55 at 12.  The parties debate whether "the

term 'restrain' in [§] 1252(f)(1)" merely forms the second half of "a 'common doublet'" or

whether it imposes a distinct limitation more sweeping than the bar on class-wide injunctive

relief. *Id.* For present purposes, however, the Court need not join this debate, because regardless

of whether the words "enjoin" and "restrain" are synonyms or merely close cousins, "restrain"

does not mean "vacate." The word "restrain" means "to hold (as a person) back from some

action, procedure, or course." *Restrain*, Webster's Third New International Dictionary at 1936

(1993); *see also Aleman Gonzalez*, 596 U.S. at 549 (quoting Oxford English Dictionary). It is, in

other words, concerned with barring future action. A "vacatur" order, in contrast, "annul[s]" an

action already taken. *Vacatur*, Black's Law Dictionary at 1782 (10th ed. 2014).

To be sure, the word "restrain" is, at times, given a broader meaning, which "captures

orders that merely inhibit acts," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015) (emphasis

omitted); *see also Aleman Gonzalez*, 596 U.S. at 549. But statutory terms are best construed in

light of the company that they keep, *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008),

and, here, § 1252(f)—which is entitled "Limit on Injunctive Relief"—refers to the "authority to

*enjoin* or restrain," 8 U.S.C. § 1252(f)(1) (emphasis added). It follows that § 1252(f)(1) is best

construed to give the word "restrain" a meaning that is similar in kind to the commonly

understood meaning of "enjoin." Both refer to a court order that bars the party that is the subject

of the order from taking a future action, on pain of contempt. Yet, even if the Court were to

accept Defendants' dubious premise and were to assume that "restrain" simply means to

"inhibit," their argument would still fail. Simply put, the word "restrain," even if so broadly

construed, cannot plausibly be read to encompass a judicial order that affects future agency

action only by vacating some past action. Had Congress intended the prohibition to sweep that

broadly, it could easily "have said so in words far simpler than those that it wrote." *Biden v.*

*Texas*, 597 U.S. 785, 798 (2022).  It could have, for example, barred lower courts from entering

any order "respecting the operation of the provisions of part IV" of the INA.  Congress is

presumed to have chosen its words with care, and this Court is bound by that choice.

The Court, accordingly, concludes that § 1252(f)(1) cannot plausibly be read to supersede

the APA and to bar lower courts from granting the traditional form of APA relief in cases that

are otherwise properly brought under the APA and that challenge agency action taken under (or

relating to) part IV of the INA.

The same is true of declaratory relief.  Here, Defendants candidly concede that the D.C.

Circuit rejected their capacious reading of § 1252(f)(1) in *Make the Road New York*, where the

court held that § 1252(f)(1) "prohibits only injunctions" and "does not proscribe the issuance of a

declaratory judgment," 962 F.3d at 635.  *See* Dkt. 55 at 13 n.2.  Defendants, nonetheless, contend

that the Supreme Court's decision in *Aleman Gonzalez*, 596 U.S. at 543, has somehow called that

holding into question.  Dkt. 55 at 13 n.2.  But—far from it—*Aleman Gonzalez* expressed no view

on the question, merely observing: "Because only injunctive relief was entered here, we have no

occasion to address" the Government's argument that "§ 1252(f)(1) not only bars class-wide

injunctive relief but also prohibits . . . class-wide declaratory relief."  596 U.S. at 551 n.2.  This

Court, accordingly, must follow binding D.C. Circuit precedent.  *See Brewster v. Comm'r of

Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979).

That resolves the question.  It bears note, however, that six Supreme Court justices have

expressed the same view, albeit in separate opinions in different cases.  Most recently, Justice

Alito wrote for the plurality in *Nielsen v. Preap* that the district courts have "jurisdiction to

entertain . . . request[s] for declaratory relief," notwithstanding § 1252(f)(1).  586 U.S. 392, 402

(2019) (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.).  And, in *Jennings v. Rodriguez*,

Justices Breyer, Ginsburg, and Sotomayor reached the same conclusion. *See* 583 U.S. 281, 355

(Breyer, J., joined by Ginsburg, J., and Sotomayor, J., dissenting); *see also Aleman Gonzalez*,

596 U.S. at 572 n.9 (Sotomayor, J., joined by Kagan, J., and Breyer, J., concurring in part)

(expressing skepticism that § 1252(f)(1) limits class-wide declaratory relief).  As a matter of

plain language, that conclusion is well-founded.

     Although the Supreme Court has not had occasion to address the application of

§ 1252(f)(1) to claims for vacatur or declaratory relief in a controlling opinion, the Court's recent

opinion in *Biden v. Texas* further supports this reading of the statute.  In that case, the Court had

no reason to decide whether § 1252(f)(1) applies to "declaratory relief and relief under [§] 706 of

the APA," 597 U.S. at 801 n.4, but the Court stressed that the "scope" of § 1252(f)(1) is

"narrow[]" and that it "deprives courts of the power to issue a *specific* category of remedies:

those that 'enjoin or restrain the operation of' the relevant sections of the statute."  597 U.S. 785,

798 (2022) (emphasis added).  The Court also cited to its prior observation in *Reno v. American-*

*Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), that, "[b]y its plain terms, and even

by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief."  *Biden v.*

*Texas*, 597 U.S. at 801 (citing *Reno*, 525 U.S. at 481).

     In reaching these conclusions, the Court relied on two features of the statutory text that

bear on Defendants' argument here.  First, the Court noted that nothing in the language of

§ 1252(f)(1) "strips the lower courts of subject matter jurisdiction over" claims brought under the

INA or the APA.  *Id.* at 798.  As the Court explained, "[a] limitation on subject matter

jurisdiction . . . restricts a court's 'power to adjudicate a case,'" *id.* (quoting *United States v.*

*Cotton*, 535 U.S. 625, 630 (2002)), whereas § 1252(f)(1) "bears no indication that lower courts

lack power to hear any claim brought under" part IV of the INA.  *Id.*  It simply limits the

authority of the lower courts to order a particular form of relief. *Id.* Second, a "parenthetical"

contained in § 1252(f)(1) "explicitly preserves [the Supreme] Court's power to enter injunctive

relief," which shows that Congress intended to preserve the Supreme Court's authority to grant

even that drastic form of relief. *Id.* at 786. But because the Supreme Court's original

jurisdiction does not extend to adjudicating claims under the INA and the APA, *see* U.S. Const.,

art. III, § 2, the only way that parenthetical can be given meaning is by preserving the authority

of the lower courts to grant *some* form of relief in these cases. *Id.* at 799.

 Given the plain language of § 1252(f), the "strong presumption favoring judicial review

of administrative action," *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021), and existing

precedent, it is thus unsurprising that other courts have held that § 1252(f)(1) does not strip lower

courts of authority to grant declaratory relief and to vacate agency action that is not in

accordance with law. *See, e.g.*, *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D.

Fla. 2023); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022). This

Court concurs in that reading of the statute.

 At this point, it is worth pausing to note that the Supreme Court not only read

§ 1252(f)(1) narrowly in *Biden v. Texas*, but the Court also held that there is "no basis for . . .

conclu[ding] that [§] 1252(f)(1) concerns subject matter jurisdiction" at all. 597 U.S. at 801.

Thus, to the extent Defendants raise a jurisdictional argument, one might reasonably conclude

that they run head on into binding Supreme Court precedent holding that § 1252(f)(1) merely

limits the form of relief a court may grant and does not limit a court's subject-matter jurisdiction.

Defendants answer this difficulty by framing their argument as one of redressability. If

§ 1252(f)(1) bars *every* form of relief that this Court might grant to a plaintiff with respect to a

particular claim, that claim is non-redressable, and the plaintiff lacks standing. But even

assuming that a merits defense can so easily be transformed into a jurisdictional bar, *cf.*

*Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 106 F.4th 1134, 1141 (D.C. Cir.

2024) (so long as claim to relief remains "facially plausible," "nothing more is required to

preserve jurisdiction"), Defendants' non-redressability defense faces a high hurdle, which

Defendants cannot clear.  For the reasons discussed above, § 1252(f)(1) does not limit the

Court's authority to order vacatur of an unlawful rule or guidance or to grant declaratory relief.

In other words, it leaves in place significant, alternative forms of redress.

Defendants raise one, final redressability argument, which merits only brief discussion.

They argue that the Court lacks authority to enjoin the President, Dkt. 55 at 19 (citing *Mississippi*

*v. Johnson*, 71 U.S. 475, 501 (1867)), and that, as a result, setting aside the implementing

guidance will not redress the Plaintiffs' asserted injuries.  On Defendants' telling, no matter what

the Court does, the Proclamation will remain in effect and, even if the implementing guidance is

enjoined or vacated, the Proclamation will continue to preclude immigration officials from

considering Plaintiffs' requests for asylum or withholding of removal.  Justice Scalia spoke

directly to this issue in his concurring opinion in *Franklin v. Massachusetts*.  He wrote:

> None of these conclusions, of course, in any way suggests that Presidential
> action is *unreviewable*. Review of the legality of Presidential action can
> ordinarily be obtained in a suit seeking to enjoin the officers who attempt to
> enforce the President's directive, *see, e.g.*, *Youngstown Sheet & Tube Co. v.
> Sawyer*, 343 U.S. 579, 572 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388
> (1935)—just as unlawful legislative action can be reviewed, not by suing
> Members of Congress for the performance of their legislative duties, *see, e.g.*,
> *Powell v. McCormack*, 395 U.S. 486, 503–06 (1969); *Dombrowski v. Eastland*,
> 387 U.S. 82 (1967); *Kilbourn v. Thompson*, 103 U.S. 168 (1881), but by
> enjoining those congressional (or executive) agents who carry out Congress's
> directive. Unless the other branches are to be entirely subordinated to the
> Judiciary, we cannot direct the President to take a specified executive act or the
> Congress to perform particular legislative duties.

505 U.S. at 828–29 (Scalia, J., concurring in part and concurring in the judgment). D.C. Circuit

precedent, moreover, is to the same effect. As the D.C. Circuit observed in *Reich*: "Even if the

Secretary were acting at the behest of the President, this 'does not leave the courts without power

to review the legality'" of the action and "'to compel subordinate executive officials to disobey

illegal Presidential commands.'" 74 F.3d at 1328 (quoting *Soucie v. David*, 448 F.2d 1067, 1072

n.12 (D.C. Cir. 1971)). Because the President does not personally take "the final step necessary"

to reject a request for asylum or withholding of removal, much less to repatriate or to remove an

individual from the United States, this is not one of those rare cases in which the courts are

powerless to review executive action. *Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C.

Cir. 1993). As a result, the question of how most appropriately to effectuate the Court's decision

is a question of remedy and not redressability.

      b.  Organizational Plaintiffs

The organizational plaintiffs also have standing to challenge the Proclamation and

implementing guidance, including the restrictions on asylum and withholding of removal, the use

of "212(f) Direct Repatriations" and "212(f) Expedited Removal," and the extra-regulatory

procedures for adjudicating CAT protection claims.

An organization "can assert standing on its own behalf, on behalf of its members or both." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, the organizational plaintiffs rely on the first approach, which requires that they, "like an individual plaintiff, . . . show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)). To meet this burden, Plaintiffs rely on the framework recognized in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). In that case, a fair housing organization claimed that the defendant's discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices. *Id*. The Supreme Court held that the organization had standing to challenge the housing practices. As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests." *Id*.

The D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases); *see also* 13A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 3531.9.5 (3d ed. 2018) (same). But *Havens* is not without limits. When "a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)

50

(emphasis in original) (quoting *Lujan*, 504 U.S. at 562).  An organization that seeks to establish *Havens* standing must show more than a mere "setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, a "'self-inflicted' budgetary choice,'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("*ASPCA*") (quoting *Equal Rights Ctr.*, 633 F.3d at 1139), or an effect on the "organization['s] lobbying activities," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Rather, it must show that the challenged action "directly affected and interfered with" the organizations' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, and that "the [organization] used its resources to counteract that injury" or incurred other tangible losses, *ASPCA*, 659 F.3d at 25.[7]

Here, the organizational plaintiffs have satisfied this burden.  RAICES, Las Americas, and Florence Project have each identified various ways that the Proclamation and implementing guidance have interfered with their core business activity of providing direct legal services to individuals at risk of removal, including asylum seekers.  The declaration submitted by RAICES' legal director, for example, attests that the organization "provides free and low-cost immigration legal services to underserved immigrant children, families and individuals" in support of its mission to "defend the rights of immigrants and refugees."  Dkt. 14-1 at 1 (Hidalgo Decl. ¶ 3). The Proclamation and guidance interfere with that work because "the process of summarily expelling noncitizens without the opportunity for credible fear interviews frustrates and impedes RAICES from [its] fundamental day-to-day work of representing noncitizens with protection needs."  *Id.* (Hidalgo Decl. ¶ 4).  The Proclamation, for example, has greatly diminished

---

[7] It is unclear whether *ASPCA*'s separate use-of-resources inquiry is still required after *Alliance of Hippocratic Medicine*, but the Court will, out of an abundance of caution, consider whether Plaintiffs could satisfy the requirement, if it still exists.

RAICES' ability to provide legal services to those who would ordinarily proceed through the expedited removal process. Last year, RAICES provided legal services to about 15 such people every week. *See id.* at 2 (Hidalgo Decl. ¶ 9). Since the Proclamation went into effect on January 20, those opportunities have vanished. RAICES has "made contact with" only a few aliens who entered the country after that date, and "none of those people have been permitted to seek protection." *Id.* at 3 (Hidalgo Decl. ¶ 14). RAICES has had to "divert resources" to respond to the Proclamation and guidance by, among other things, "searching for alternative ways to contact detained individuals and families" and "training staff." *Id.* at 3 (Hidalgo Decl. ¶ 17). As a result, the organization has incurred additional expenses and has faced new obstacles in pursuing its core business activity. *Id.* at 4 (Hidalgo Decl. ¶ 18).

Similarly, Las Americas has shown that the Proclamation and guidance have frustrated and will continue to frustrate its ability to provide legal services to immigrants and will impose tangible burdens on the organization. The declaration submitted by Las Americas' legal services director describes the organization's mission and the activities that it pursues to support that mission. *See generally* Dkt. 14-2 (Babaie Decl.). Las Americas' mission is "to provide high-quality legal services to low-income immigrants, and to advocate for human rights." *Id.* at 1 (Babaie Decl. ¶ 3). To that end, the organization "provide[s] immigration counseling and representation to immigrants seeking asylum and other forms of humanitarian relief, including by representing individuals facing expedited removal who are referred for credible fear interviews." *Id.* The organization "cannot carry out much of [its] core work" if "noncitizens cannot access asylum or other statutory protections." *Id.* at 6 (Babaie Decl. ¶ 30). As the Babaie declaration explains, Las Americas "opened more than 800 new cases in 2024" and "[m]ore than half of the people that Las Americas serves are asylum seekers." *Id.* at 3 (Babaie Decl. ¶ 13).

Yet, since the Proclamation was issued, the organization has "not received calls for [a credible fear interview] consultation from anyone who entered the country." *Id.* at 4 (Babaie Decl. ¶ 19). Indeed, "[i]n response to the enforcement of the Proclamation, it is fair to say that *all* of Las Americas' work has been forced to change." *Id.* at 5 (Babaie Decl. ¶ 24). The Proclamation has also "forced [the organization] to divert limited resources away from individual representation" to find alternative ways to serve its missions, including, for example, "assisting families trying to find the location of loved ones who attempt[] to seek protection at the border." *Id.* at 6 (Babaie Decl. ¶ 31). Finally, the Babaie declaration explains that 85% of the organization's revenue comes from grants, some of which "have requirements regarding the number of people [the organization] serve[s] as well as caveats on the geography and types of services provided." *Id.* at 2 (Babaie Decl. ¶ 7). Because Las Americas' grants, most of which "are heavily metrics based," *id.* at 6 (Babaie Decl. ¶ 32), and because "many funders are interested in funding work that reaches the greatest number of people possible," *id.* at 7 (Babaie Decl. ¶ 35), the organization will incur expenses working to shore up its donor relationships and risks "losing out on grants" aimed at reaching the greatest number of people, since the Proclamation has undermined, and will continue to undermine, Las Americas' ability to connect with clients, *id.*

Finally, the Florence Project has also shown that the Proclamation and guidance have frustrated, and will continue to frustrate, its activities and will impair its ability to provide legal services to those seeking asylum, withholding of removal, and CAT protection. The Florence Project "is a 501(c)(3) non-profit legal services organization" whose "mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona." Dkt. 14-3 at 1 (St. John Decl. ¶ 2). Its goal is to "ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and

53

humanely." *Id.* The organization "represent[s] hundreds of adult clients before the asylum

office, immigration courts, and the Board of Immigration Appeals . . . each year, including many

who are seeking humanitarian relief, such as asylum, withholding of removal, and protection

under the Convention Against Torture." *Id.* at 2 (St. John Decl. ¶ 4). "In 2023, Florence Project

staff provided individualized legal support to at least one thousand adults in ICE custody who

specifically were seeking some fear-based form of protection." *Id.* at 3 (St. John Decl. ¶ 9). Yet,

"in sharp contrast to years of experience and migration and detention trends, as of February 18,

2025, Florence Project has still not been able to identify or [to] meet with any asylum seekers in

ICE custody who entered the United States, whether by entering without inspection or presenting

at a port of entry, after the Proclamation took effect on January 20, 2025." *Id.* at 4 (St. John

Decl. ¶ 13). The Proclamation and guidance have, as a result, "substantially interfere[d] with"

the organization's "core" activity of providing legal services to those seeking "fear-based

humanitarian protection" or connecting those individuals "with *pro bono* legal representation."

*Id*. (St. John Decl. ¶¶ 13–14). Like the other organizations, these hurdles have also required the

Florence Project to divert resources to responding to the changed landscape and threaten "serious

long-term financial consequences." *Id*. at 4–7 (St. John Decl. ¶¶ 15–20). As "the number of

people who can be helped with asylum and related forms of relief will inevitably decrease[,] . . .

so too will [the organization's] ability to be paid to do that mission-driven work." *Id.* at 6 (St

John Decl. ¶ 19). Indeed, "[t]he Florence Project receives funding through the [National

Qualified Representative Program] prime contractor on a flat rate based on the number of cases

[it has] open and the number of net new cases [it] agree[s] to accept in a given option year," and,

given the restrictions imposed in the Proclamation and guidance, the organization "stands to lose

tens, if not hundreds of thousands of dollars[,] in funding." *Id.* at 6–7 (St. John Decl. ¶ 20).

These uncontested declarations demonstrate that the Proclamation and implementing guidance have had—and will continue to have—a significant and direct detrimental effect on the organizational plaintiffs' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395; have required—and will continue to require—the organizational plaintiffs to expend substantial "resources to counteract that injury," *ASPCA*, 659 F.3d at 25; and will likely result in either a large loss of funding to the organizations or require the expenditure of resources to renegotiate or to amend grants or contracts or to find alternative sources of funding.  In *Alliance for Hippocratic Medicine*, the Supreme Court noted that the effect on the "core business activities" of the organizational plaintiff in *Havens* was "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."  602 U.S. at 395.  By the same token, the "core business activities" of the organizational plaintiffs in this case are not dissimilar to the interests of a "vendor who is prevented from selling his product to third parties by [an] unlawful regulation" and who "may challenge that regulation 'on the basis of the vendor-vendee relationship alone.'"  *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999) (emphasis and citation omitted).  No more is required to establish standing under *Havens* and *Alliance for Hippocratic Medicine*.

Defendants disagree, arguing that a "less demanding case load" does not injure the organizations' "ability to carry out" their existing activities: they can still provide services to aliens who do end up in the "expedited removal credible fear process or in removal proceedings."  Dkt. 44 at 29–30 (emphasis omitted).  But there is no requirement that an organization prove that the challenged agency actions absolutely foreclose it from pursuing its core business activities.  A defendant's actions need only cause a "perceptibl[e] impair[ment],"

*Havens*, 455 U.S. at 379, and some attendant expenditure or loss of resources, *ASPCA*, 659 F.3d at 25.  The organizational plaintiffs have made that showing—and then some.

    2.    *Statutory Jurisdiction*

Defendants also contend that the Court lacks statutory jurisdiction to consider the organizational plaintiffs' claims that (1) "challenge the Proclamation" on the ground that "it 'contradicts the specific restrictions' found in the expedited removal statute;" (2) allege that "agency actions are leading to 'removals without compliance with the procedures required by the INA,' including procedures related to expedited removal;" or (3) "seek relief from any expedited removal orders entered pursuant to the Proclamation."  Dkt. 55 at 23 (citations omitted). Defendants' argument fails for several reasons.

Most fundamentally, Defendants' argument misconstrues Plaintiffs' claims and misconceives the nature of the challenged governmental action.  Before turning to those difficulties, however, the Court pauses to note Defendants' concession that § 1252 allows "claim[s] that can be asserted . . . by an individual alien."  *Id.*  Their argument, in other words, applies only to the organizational plaintiffs, and the Court agrees that Defendants' § 1252 argument does not extend to the claims of the individual plaintiffs.  Given the Court's conclusion that the individual plaintiffs have Article III standing as well, and because only one plaintiff needs standing to maintain each claim asserted in a case, *see Town of Chester*, 581 U.S. at 439, it seems unlikely that the Court even needs to reach Defendants' challenge to the Court's statutory jurisdiction to consider the organizational plaintiffs' claims.  *See L.M.-M.*, 442 F. Supp. 3d at 22–23.  But, in any event, that challenge is unfounded.

The Court starts, as it must, with the statutory text.  *See Lamie v. U.S. Tr.*, 540 U.S. 526,

534 (2004).  Section 1252(a)(2) provides, in relevant part, as follows:

**(A)  Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

(i)  except as provided in subsection (e), any *individual determination* or to entertain any other cause or *claim arising from or relating* to the implementation or operation of an order of removal *pursuant to section 1225(b)(1)* of [Title 8],

(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of *such section*,

(iii) the application of *such section* to individual aliens, including the determination made *under section 1225(b)(1)(B)* of [Title 8], or

(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement *the provisions of section 1225(b)(1)* of [Title 8].

8 U.S.C. § 1252(a)(2)(A) (emphasis added).  Boiling these subparagraphs down to their

operative terms, § 1252(a)(2)(A) divests the courts of habeas, mandamus, all writs, or any other

jurisdiction to "review" any action taken pursuant to—or taken to invoke, to apply, or to

implement—the expedited removal statute, § 1225(b)(1), except as authorized in § 1252(e).

When it came to the application and implementation of the expedited removal statute, Congress

covered the waterfront: § 1252(e) provides the sole avenue of review for expedited removal

"determination[s]" and the "implementation or operation of" expedited removal orders, 8 U.S.C.

§ 1252(a)(2)(A)(i); decisions made by the Attorney General (or the Secretary) "to invoke" the

expedited removal procedure, *id.* § 1252(a)(2)(A)(ii); "the application of" the expedited removal

provision "to individual aliens," *id.* § 1252(a)(2)(A)(iii); or the adoption "by the Attorney

General" or the Secretary of "procedures and policies" to implement the expedited removal statute, *id*. § 1252(a)(2)(A)(iv).

Here, however, Plaintiffs do not challenge any expedited removal order entered pursuant to § 1225(b)(1) or the implementation of any such order.  Nor do they challenge the Attorney General or the Secretary's decision to invoke § 1225(b)(1), their application of § 1225(b)(1) to any individual alien, or their adoption of any procedures or policies "to implement" § 1225(b)(1). Rather, Plaintiffs challenge the lawfulness of the Proclamation—raising the question whether the President is authorized under 8 U.S.C. § 1182(f) and § 1185(a) or the Constitution to restrict and suspend access to each and every provision "of the INA that would permit" the covered individuals to remain in the United States, Proclamation, §§ 2, 3—and the lawfulness of the agency guidance that implements the Proclamation—including by "repatriat[ing]" or "remov[ing]" individuals pursuant to the Proclamation, Proclamation § 5, rather than under the usual INA procedures.

Although the Court must avoid conflating jurisdiction with the merits, Plaintiffs' contention that they are challenging the Proclamation and its implementation (and not the Attorney General or the Secretary's implementation of § 1225(b)(1)) finds support in the administrative record.  To start, the Proclamation itself purports to authorize "repatriation" and "removal" of "any alien engaged in the invasion across the southern border," not as an exercise of the Attorney General or the Secretary's authority under § 1225(b)(1), but, rather, "as an exercise of the [President's] suspension power in [8 U.S.C. § 1182(f) and § 1185(a)] of the INA . . . or as an exercise of [the President's] delegated authority under the Constitution of the United States."  Proclamation, § 5.  Consistent with that command, the implementing guidance directs that "[a]ll illegal aliens subject to Presidential Proclamation 10888 . . . will be processed pursuant

to sections 212(f) [8 U.S.C. § 1182(f)] and 215(a) [8 U.S.C. § 1185(a)] of the Immigration and

Nationality Act." Dkt. 52-1 at 20. The documentation provided to covered individuals is to the

same effect. The "212(f) Tear Sheet" included in the administrative record informs the affected

individual that he or she is "being transported from the United States . . . *under Presidential

Proclamation 10888* . . . as an alien whose entry to the United States has been suspended

*pursuant to sections 212(f) and 215(a)* of the Immigration and Naturalization Act, as well as the

power of the President under the Constitution of the United States." *Id.* at 25 (emphases added).

    Other portions of the administrative record refer to "212(f) Direct Repatriations" and

"212(f) Expedited Removal" or "Expedited Removal – Per 212(F)." *See, e.g.*, *id*. at 6, 11–14,

18–19, 21. When asked to explain the difference between a "212(f) Direct Repatriation" and a

"212(f) Expedited Removal," Defendants identified only one difference: An individual subject to

"212(f) Expedited Removal" receives "a Notice to Alien Ordered Removed and [is] issued an

Expedited Removal Order," while an individual subject to a "212(f) Direct Repatriation" does

not. Dkt. 59 at 7–8. As Defendants further explained, *id.* at 8, this difference has collateral

immigration consequences, given the temporary inadmissibility of those previously subject to

removal orders and the risk of criminal liability for reentry, *see* 8 U.S.C. §§ 1182(a)(9)(A),

1231(a)(5), 1326, but it is otherwise inconsequential.

    Two things stand out about this approach. First, there is no such thing as "direct

repatriation" under the INA. Second, "212(f) Expedited Removal" is not the same thing as

expedited removal under 8 U.S.C. § 1225(b)(1). Section 1225(b)(1) permits "an immigration

officer" to order the immediate removal of an inadmissible alien, "*unless* the alien indicates

either an intention to apply for asylum under section 1158 of [Title 8] or a fear of persecution."

8 U.S.C. § 1225(b)(1) (emphasis added). The provision then goes on to describe, in detail, the

procedures for conducting the required asylum and credible fear interviews, reviewing the initial determinations made by asylum officers, and referring matters for full removal proceedings. *Id.* And all of that—that is, the defining characteristics of a § 1225(b)(1) expedited removal proceeding—is precisely what the Proclamation and guidance do not allow. Notably, Defendants are not even purporting to implement § 1225(b)(1); they are, on their own telling, implementing the Proclamation. *See infra* at 107–10. The Proclamation is premised on a distinct set of statutory and constitutional provisions, and, by its own terms, the Proclamation operates separate and apart from "provisions of the INA that would permit [an alien's] continued presence in the United States." Proclamation, §§ 2, 3. Nothing in § 1252(a)(2)(A) limits the Court's jurisdiction to consider the lawfulness of a proclamation (or the implementation of a proclamation) issued pursuant to § 1182(f) and § 1185(a) and the President's non-INA "authority to protect the sovereignty of the United States," *see* Proclamation, preamble.

Finally, the Court notes an important difference between § 1252(a)(2)(A)(i) and § 1252(f)(1). In *Aleman Gonzalez*, the Supreme Court read § 1252(f)(1)—and, in particular, the limitation on class-wide court orders enjoining or restraining "the operation of the provisions of part IV"—to deprive the lower courts of authority to issue "injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. at 548, 550 (emphasis omitted). Section 1252(a)(2)(A)(i), in contrast, does not refer to the "operation" of any statutory provision but, rather, refers to the "operation of *an order of removal pursuant to [§] 1225(b)(1)*." 8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added). That matters because this case does not involve "an order of removal [entered] pursuant to [§] 1225(b)(1)." *Id.* To the contrary, by Defendants' own account, all of the "212(f) Direct Repatriations" and all of the "212(f) Expedited Removal"

orders are undertaken "per" § 1182(f) (INA § 212(f))—not § 1225(b)(1).  *See, e.g.*, Dkt. 52-1 at 12; *see also* Dkt. 44 at 20, 58; Dkt. 55 at 28–29 (asserting that covered aliens "do not fall within the bounds of" § 1225(b)(1)).

Accordingly, even if the Court did not have statutory jurisdiction based on the individual plaintiffs' claims, the Court would have both Article III and statutory jurisdiction based on the organizational plaintiffs' claims.[8]

3.    *Causes of Action*

Defendants' final set of threshold arguments posit that Plaintiffs lack an APA or a non-statutory cause of action.  They are incorrect on both counts.

a.    APA Cause of Action

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  At times, the APA merely provides the required waiver of sovereign immunity necessary to bring suit under another statute, while, at other times,

---

[8] Although the Court need not reach the issue, the Court's conclusion would, in any event, likely remain the same, even if § 1252(a)(2)(A) applied to the organizational plaintiffs' claims.  That is because § 1252(a)(2)(A) permits challenges under § 1252(e)(3), and that provision authorizes timely challenges to "written policy guideline[s]" implementing § 1225(b)(1).  Defendants' sole counterargument posits that § 1252(e)(3) only permits claims by "*individuals* subject to . . . expedited removal."  Dkt. 44 at 35–36.  But that misreads both the statute and is inconsistent with recent precedent from this Court.  Most notably, nothing in the text of § 1252(e)(3) limits review to individuals.  Although Defendants invoke *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA*"), in support of their reading of the statute, recent precedent from this Court reads *AILA* to address only third-party standing—a theory that the organizational plaintiffs do not advance in this case and that, accordingly, Defendants do not challenge.  *See Las Americas Immigrant Advocacy Center*, 2025 WL 1403811, at *9 n.8.  And although Defendants also invoke the D.C. Circuit's decision in *Make the Road New York*, 962 F.3d at 627, that decision also read *AILA* to address only third-party standing.  When it came to resolving the jurisdictional question that was before it, moreover, the *Make the Road New York* court held that Make the Road New York *had standing*, albeit on a theory of associational standing.  *Id.* at 623–28.

the APA provides both the waiver of sovereign immunity and the cause of action.  *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–91 (D.C. Cir. 2006).  The APA cause of action, however, is available only to review "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.  The APA's scope of review provision, in turn, authorizes a reviewing court to, among other things, "set aside agency action . . . found to be . . . not in accordance with law."  *Id.* § 706(2)(A).  Here, Defendants contend that APA review is unavailable to the Plaintiffs for a variety of reasons, none of which are ultimately persuasive.

*First*, Defendants argue that the Proclamation does not constitute "agency action" and that the implementing guidance does not constitute "final agency action distinct from the Proclamation."  Dkt. 44 at 39.  Although they are correct that the Proclamation is not itself subject to APA review, their characterization of the implementing guidance misses the mark.  An agency action is deemed final if two conditions are met.  First, the action "must mark the consummation of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted).  "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 178 (internal quotation marks omitted).  Both conditions are satisfied here.  The guidance "consummates" the Department of Homeland Security's decision regarding the implementation of the Proclamation; there is nothing preliminary, tentative, or inchoate about it.  It is equally clear, moreover, that the guidance has real "legal consequences" for those subject to the Proclamation, including the individual plaintiffs in this case, some of whom have already been removed from the United States pursuant to the guidance.

Nor is the guidance "indistinct" from the Proclamation.  To be sure, the guidance

implements the Proclamation, but it also adds both detail and real-world consequences.  The

guidance—not the Proclamation—sets out two types of removal procedures that will apply to

aliens subject to the Proclamation, instructs officers and agents not to ask aliens specific fear

questions or to use forms otherwise required under the agencies' regulations, and instructs

immigration officers to use a heightened standard when screening covered aliens for CAT

protection.  *See, e.g.*, Dkt. 52-1 at 13.  This is not a case of guidance that is "purely informational

in nature" or that merely "'restate[s]' legal requirements derived from independent sources of

law."  Dkt. 55 at 21 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir.

2004)).  Defendants maintain that "[t]o the extent aliens are removed or repatriated because they

entered in violation of the Proclamation, that is a direct legal consequence of the President's

suspension order."  Dkt. 55 at 21–22.  But as the D.C. Circuit observed in response to a similar

argument in *Reich*, the fact that the agency is implementing a presidential directive "hardly

seems to insulate" the agency action "from judicial review under the APA, even if the validity of

the" presidential directive is "thereby drawn into question."  74 F.3d at 1327.  If this were a case

in which the President had "final constitutional or statutory responsibility for the final step

necessary for the agency action directly to affect the parties," the implementing guidance might

be disregarded.  *Pub. Citizen*, 5 F.3d at 552.  But it is not.  Indeed, in recognition of that fact, the

Proclamation directs "[t]he Secretary of Homeland Security, in coordination with the Secretary

of State and the Attorney General" to "take all appropriate action to repel, repatriate, or remove

any alien engaged in the invasion."  Proclamation, § 5.

*Second*, Defendants argue that APA review is precluded here because of "other

limitations on judicial review" that the APA leaves intact.  Dkt. 44 at 41 (quoting 5 U.S.C.

§ 702(1)).  In particular, Defendants maintain that "the longstanding limitation on review of Executive decisions to deny entry to aliens" bars review.  *Id.*  If that were all that was at issue, this would be a far different case, and it might raise the question regarding the President's independent constitutional authority to protect the borders of the United States, which was left unanswered in *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).  But this case, unlike *Trump v. Hawaii* and *Sale*, turns on whether the President's authority to limit "entry" carries with it the authority to close the avenues of humanitarian relief that are available to those who have already entered the United States and whether that authority can supersede or displace the INA.  None of the language in § 1182(f) that "exudes deference to the President," such as "'[w]henever [the President] finds that the entry' of aliens 'would be detrimental' to the national interest,'" he may suspend or limit entry "'for such period as he shall deem necessary,'" *Trump v. Hawaii*, 585 U.S. at 684 (quoting 8 U.S.C. § 1182(f)), is at issue here.

*Third*, Defendants argue that APA review is unavailable because the decision at issue— the President's decision to invoke § 1182(f) and § 1185(a)—is "committed to agency discretion by law."  Dkt. 44 at 41 (quoting 5 U.S.C. § 701(a)(2)).  The Court does not doubt that the President is entitled to substantial deference in deciding whether to "suspend the entry of all aliens or any class of aliens" to promote "the interests of the United States."  8 U.S.C. § 1182(f); *see also Trump v. Hawaii*, 585 U.S. at 684.  The deference that the President receives *within the realm* of § 1182(f)—that is, when deciding whether and when to suspend or limit "entry" into the United States and whom to include in the excluded class—does not mean, however, that he is entitled to the same level of deference *outside that realm*—that is, when attempting to deny those

64

who have already entered the United States access to "portions of the immigration system," to

those who have already entered the United States, *see* Proclamation, preamble.

*Fourth*, Defendants argue that the organizational plaintiffs lack zone-of-interests

standing.  Dkt. 44 at 36–38.  Zone-of-interests standing is a non-jurisdictional doctrine that asks

whether a "plaintiff's complaint fall[s] within the zone of interests protected by the law

invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)

(internal quotation marks and citation omitted).  The zone-of-interests test is, in other words, a

"tool for determining who may invoke the cause of action" created in the statute at issue.  *Id.* at

130.  "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency

action presumptively reviewable,'" the test, at least in the APA context, "'is not meant to be

especially demanding.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

567 U.S. 209, 225 (2012) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  "The

interest [the plaintiff] asserts must be 'arguably within the zone of interests to be protected or

regulated by the [underlying] statute' that [the plaintiff] says was violated."  *Id.* at 224 (quoting

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).  Courts "do not

require any 'indication of congressional purpose to benefit the would-be plaintiff,'" and the

Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate

that the benefit of any doubt goes to the plaintiff."  *Id.* at 225 (quoting *Clarke*, 479 U.S. at 399–

400).  "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or

inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

Congress intended to permit the suit.'"  *Id.* (quoting *Clarke*, 479 U.S. at 399).

The organizational plaintiffs satisfy this permissive test.  Notably, their interests in

providing legal assistance to asylum seekers is consistent with the INA's purpose to "establish[]

. . . [the] statutory procedure for granting asylum to refugees." *Cardoza-Fonseca*, 480 U.S. at 427. As in *O.A.*, the organizational plaintiffs' "interest in representing asylum seekers furthers the purposes of the INA," *see* 404 F. Supp. 3d at 144, which instructs the government to advise aliens filing an application for asylum "of the privilege of being represented by counsel" and to "provide the alien a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis," 8 U.S.C. § 1158(d)(4).

Defendants argue that *O.A.* relied on a "more lenient version" of the zone-of-interests test that "no longer survives the Supreme Court's more recent decision in *United States v. Texas*, 599 U.S. 670 (2023)." Dkt. 44 at 38. According to Defendants, *Texas* "clarified . . . that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others." *Id.* (citing *United States v. Texas*, 599 U.S. at 674, 677). But the Supreme Court has made clear that Article III standing and zone-of-interests standing are entirely different concepts, and *United States v. Texas* addressed only Article III standing. Nothing in that decision calls into question the zone-of-interests test set forth in *Lexmark*, 572 U.S. at 126, and *Patchak,* 567 U.S. at 225, which is the standard that the Court applied in *O.A.*, 404 F. Supp. 3d at 144. Nor did the Supreme Court announce a new understanding of Article III standing in *United States v. Texas*. To the contrary, the Court merely applied the well-established rule that the executive's exercise of prosecutorial discretion is, by and large, unreviewable. *United States v. Texas*, 599 U.S. at 674 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)).[9]

---

[9] Neither *INS v. Legalization Assistance Project of the Los Angeles County Federation of Labor* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) nor *Federation for American Immigration Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897, 900–04 (D.C. Cir. 1996), supports a contrary conclusion. *See* Dkt. 44 at 37. Justice O'Connor's in-chambers opinion in *LAP* reflects the views of a single Justice relating to a different statute, the Immigration Reform and Control Act of 1986 ("IRCA"). *FAIR*, too, is inapposite. The organization at issue in that case was

b.  Non-Statutory Cause of Action

Plaintiffs also bring a non-statutory—or equitable—cause of action challenging the

Proclamation itself.  Defendants argue that no such cause of action is cognizable for a

hodgepodge of reasons, most of which receive little more than a sentence in Defendants' briefs.

They argue that the Proclamation itself "unambiguously forecloses judicial review," Dkt. 44 at

43; that, in any event, "proclamations are [simply] management tools for implementing the

President's policies, not legally binding documents that may be enforced against the Executive

Branch," *id.*; that § 1182(f) and § 1185(a) vest the President with discretion that is not subject to

"judicial second-guessing," *id*. at 43–45; that the President's authority to exclude or expel aliens

"remains largely immune from judicial control," *id.* at 45 (citation omitted); that the President's

authority "stems not [only] from legislative power but is inherent in the executive power to

control the foreign affairs of the nation," *id.* (citation and emphasis omitted); that "the power

over aliens is of a political character and therefore subject only to narrow judicial review," *id.* at

46 (citation and emphasis omitted); that the "courts are categorically barred from issuing

injunctions that would purport to enjoin or otherwise constrain the President in the performance

of his official duties," Dkt. 55 at 19 (citation omitted); that Plaintiffs' claims here are statutory,

"even if dressed in separation-of-powers garb," *id*.; and, finally, that Plaintiffs' claims fail to

---

"dedicated to ensuring that levels of legal immigration are consistent with the absorptive
capacity of the local areas where immigrants are likely to settle," and it brought suit challenging
the INA's scheme for "parole and adjustment of status of Cuban nationals" into the United
States.  *FAIR*, 93 F.3d at 899 (internal quotation omitted).  The D.C. Circuit held that the
organization's mission bore no more than a "marginal[] rela[tionship]" to the statutory purposes
of the INA, because it pointed to no language of congressional intent that "even hint[ed] at a
concern about [the] regional impact" of immigration.  *Id*. at 900–01 (internal quotation marks
omitted).

allege a violation sufficiently egregious to support "an *ultra vires* claim," *id.* at 20 n.4 (emphasis added).

To the extent this litany of arguments either rehashes arguments addressed above or anticipates the merits, which are addressed below, the Court will not repeat itself here. A couple of points, however, warrant at least brief mention. To start, non-statutory review of unlawful executive action existed long before the APA was enacted, and "[n]othing in the subsequent enactment of the APA altered" the understanding that, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *see also Reich*, 74 F.3d at 1328. Nor is there any merit to Defendants' suggestion that *ultra vires* review is available only in cases alleging a constitutional claim. To be sure, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015), involved a claim premised on the Supremacy Clause. But the Supreme Court did not limit its recognition of a right to sue to enjoin "violations of federal law by federal officials" to constitutional claims. *Id.* As the D.C. Circuit explains in *Reich*, moreover, the long history of the non-statutory cause of action started with a statutory claim in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), in which the Supreme Court assumed the constitutionality of the statutes at issue and addressed, instead, whether the Postmaster General acted in accordance with those statutes, and has been applied on numerous occasions to statutory claims. 74 F.3d at 1327–28 (citing leading cases).

Nor is there any merit to Defendants' suggestion that presidential actions lie beyond the scope of review, even when the relief is limited to enjoining the actions of subordinate government officials. To the contrary, the D.C. Circuit engaged in precisely that form of review in *Reich*, 74 F.3d at 1328; it is the approach that Justice Scalia endorsed in his concurrence in

*Franklin v. Massachusetts*, 505 U.S. at 823–29; and it is what happened in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  As the D.C. Circuit wrote in *Soucie v. David*: "The fact that the President may have ordered" the subordinate official to engage in the challenged conduct "does not leave the courts without power to review the legality of" that conduct, "for courts have power to compel subordinate executive officials to disobey illegal Presidential commands."  448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971).  In this respect, Defendants' unsupported contention that federal courts not only lack the power to enjoin the President, but also lack the power to "otherwise constrain" how he discharges his "official duties," Dkt. 55 at 19, is not only wrong, but at odds with the fundamental tenet that ours is "a government of laws and not of men," *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (internal quotation marks omitted); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 575 (D.D.C. 1952).  And their argument that the substance of the Proclamation is unreviewable merely because it recites the usual boilerplate disclaiming the creation of "any right or benefit, substantive or procedural, enforceable at law or in equity," Proclamation, § 6, requires only the briefest of responses; putting aside Defendants' misreading of the Proclamation, the Executive Branch, in any event, cannot avoid judicial review by simply declaring that its actions are unreviewable.

There are, of course, limits on the availability of *ultra vires* or non-statutory review. Congress (unlike the Executive Branch) may "preclude[] non-statutory judicial review," *Reich*, 74 F.3d at 1328, and certain exercises of presidential authority are committed to the President's exclusive discretion.  The Court, however, has already addressed the relevant statutory limits on its jurisdiction and authority, and, in the field of immigration, the President shares authority with Congress.  *See* U.S. Const. art. I, § 8 ("The Congress shall have Power To . . . establish an

uniform Rule of Naturalization.").  As precedent reflects, in areas of shared presidential and

congressional authority, the courts have presumptive authority to determine whether the

President has usurped an authority that Congress neither delegated to him nor left for him to

exercise unimpeded by statute.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981);

*Youngstown*, 343 U.S. 579; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993).[10]

## B.    Merits

Plaintiffs challenge the Proclamation and implementing guidance as an unlawful effort to

supplant the detailed provisions of the INA with an alternative set of immigration laws

established by executive "fiat."  Dkt. 52 at 11.  They argue that the Proclamation and guidance

purport to establish an alternative extra-statutory system for removing or repatriating aliens in

"212(f) Expedited Removals" and "212(f) Direct Repatriations," rather than under the rules and

procedures that Congress has enacted.  And they argue that, under this alternative system, the

right to apply for asylum, 8 U.S.C. § 1158, the right to withholding of removal, 8 U.S.C.

§ 1231(b)(3), 8 C.F.R. §§ 208.16, 1208.16, and the procedural protections ordinarily available to

CAT applicants, 8 U.S.C. § 1231 note (head of agency must implement CAT by "prescrib[ing]

regulations"); 8 C.F.R. §§ 208.9, 208.30, 1208.30, are abrogated for those aliens subject to the

Proclamation.

Plaintiffs further argue that none of the authorities that Defendants invoke in support of

the Proclamation and guidance authorize such a wholesale rewriting of the INA and the

governing regulations.  Plaintiffs stress that, even if § 1182(f) and § 1185(a) confer broad

---

[10] Defendants also contend that the determination of what constitutes an "invasion" is a
nonjusticiable political question.  *See* Dkt. 44 at 47–48.  But because the Invasion Clause of
Article IV does not provide authority for the challenged actions that is not found elsewhere, *see
infra* at 84–89, the Court need not make any such determination.

discretion on the President to suspend or to restrict "entry" into the United States, those provisions do not authorize the President or the Secretary to suspend access to asylum and withholding of removal or to disregard the regulations governing CAT determinations.  Nor, on Plaintiffs' telling, do those provisions permit the President or the Secretary to supplant the INA's detailed procedures for removal of aliens who are unlawfully present in the United States with non-statutory, non-regulatory, and less protective "212(f) Expedited Removals" and "212(f) Direct Repatriations."  And, Plaintiffs continue, neither the President's Article II authority nor whatever independent authority he might have under Article IV, Section 4 allows him or those acting at his direction to take any of these actions.  As the Supreme Court recently observed, Congress maintains "plenary power over immigration," and the President's exercise of delegated authority cannot exceed the bounds that Congress has set.  *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024).  Yet, according to Plaintiffs, that is precisely what the Proclamation and implementing guidance purport to do.

Defendants disagree with each of these arguments, and they maintain that the Proclamation and implementing guidance constitute a permissible, albeit novel, use of § 1182(f) and § 1185(a), and that the President's constitutional authority both bolsters that conclusion and provides an independent basis for the Proclamation and guidance.  Their arguments, for the most part, turn on an appeal to efficacy and an implied (albeit not express) authority to take all steps necessary to stop unauthorized individuals from crossing the southern border, Proclamation, § 2, or entering the United States elsewhere, without "sufficient medical information and reliable criminal history and background information," Proclamation, § 3.

For the reasons explained below, the Court concludes that Plaintiffs have the better of the arguments and that neither the INA nor the Constitution authorizes the changes in immigration

law embodied in the Proclamation and implementing guidance.  The Court will first address the

creation of the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms

and will then consider the suspension of the rights to apply for asylum and to obtain withholding

of removal and the changes made to the procedures for seeking CAT protection.

1.     *"212(f) Direct Repatriation" and "212(f) Expedited Removal"*

a.   <u>Statutory Authority</u>

The first question is whether the INA authorizes the use of the new "212(f) Direct

Repatriation" and "212(f) Expedited Removal" mechanisms in lieu of traditional removal

procedures.  The parties agree that the regular removal procedures set forth in § 1229a constitute

"'the sole and exclusive procedure[s]' for ordering the removal of noncitizens" from the United

States, Dkt. 52 at 16 (quoting 8 U.S.C. § 1229a(a)(3)), "[u]nless otherwise specified in [the

INA]," Dkt. 55 (quoting same).[11]  They also agree that expedited removal under § 1225(b)(1)

constitutes an "otherwise specified" procedure, thereby establishing at least two routes to

removal: regular removal and expedited removal.  Their disagreement, instead, turns on whether

"§ 1182(f) is an INA provision that 'otherwise specifie[s]' that an alien may be repatriated" or

---

[11] This reading of the statute most naturally starts with § 1225(a), which provides that any "alien
present in the United States who has not been admitted . . . shall be deemed for purposes of
[Chapter 12 of the INA] an applicant for admission."  8 U.S.C. § 1225(a)(1).  Section
1229a(a)(3), in turn, provides that, "[u]nless otherwise specified in [Chapter 12], a proceeding
under [§ 1229a] shall be the sole and exclusive procedure for determining whether an alien may
be admitted," 8 U.S.C. § 1229a(a)(3).  Section 1225(b)(1) qualifies under the "otherwise
specified" exception because it provides for expedited removal of certain aliens.  Absent some
other authorization found in Chapter 12, these provisions provide the "sole and exclusive
procedure[s]" for removal of an alien who enters the United States without documentation.  *See
United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021); *cf. Marcello v. Bonds*, 349 U.S.
302, 309–10 (1955) (holding that Congress intended the pre-IIRIRA removal procedures to be
the sole and exclusive means for deportation of aliens).  Finally, even without § 1229a(a)(3)'s
exclusivity provision, the same conclusion would apply.  Congress has crafted detailed rules and
procedures that would be rendered meaningless if an agency were free to adopt its own rules and
procedures in place of those that Congress enacted.

removed without complying with the procedures set forth in § 1229a (regular removal) or § 1225(b)(1) (expedited removal). Dkt. 55 at 24 (describing "[t]he government's claim here"). In Defendants' view, the President's authority to suspend or limit "entry" into the United States necessarily carries with it the authority to "repatriate" those who enter the United States in violation of the Proclamation. In other words, according to Defendants, "212(f) Direct Repatriation" (and, presumably, "212(f) Expedited Removal") is a necessary byproduct of the right to deny entry, and that implied authority is sufficient to bring the President's exercise of his § 1182(f) authority within the "otherwise specified" exception to the exclusive-procedures clause. *Id.* at 24–26. The Court is unpersuaded for several reasons.

At the outset, it bears note that the Proclamation does not purport to establish a new "212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism in lieu of the existing statutory procedures. Rather, the word "repatriate" appears only twice in the Proclamation—once in the preamble, where the President describes his constitutional (rather than statutory) authority, and once in Section 5 of the Proclamation, where the President directs the Secretary to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States." It was only in the implementing guidance issued by USCIS and U.S. Customs and Border Protection that the concepts of "212(f) Direct Repatriation" and "212(f) Expedited Removal" emerge. *See* Dkt. 52-1 at 5–6, 13–14. As a result, to the extent Defendants' argument is premised on an exercise of the President's authority under § 1182(f), the President did not purport to create a new mechanism for expelling those unlawfully in the United States—"otherwise" than as specified in § 1225(b)(1) and § 1229a. Nor do Defendants cite any authority indicating that the President's authority under § 1182(f) is delegable to USCIS and U.S. Customs and Border Protection.

But, in any event, even if it were possible to read the INA to permit such a delegation of implied § 1182(f) authority, § 1182(f) cannot plausibly be read to authorize the President, the Secretary, or their subordinates to supplant the § 1225(b)(1) and § 1229a removal procedures with the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms.  The Court, once again, starts with the statutory text, which grants the President discretion to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" or to "impose on the entry of aliens any restrictions he may deem appropriate."  8 U.S.C. § 1182(f).  "By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. at 683–84.  But that is all that it does.

Putting aside for the moment Defendants' claim of implied authority, it is safe to conclude that § 1182(f) does not, by its terms, authorize the President, the Secretary, or any of their subordinates to replace the regular, 8 U.S.C. § 1229a, or expedited, *id*. § 1225(b)(1), removal procedures set forth in the INA with a new, non-statutory "212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism.  At the time § 1182(f) was enacted, "entry" was defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise."  INA, Pub. L. No. 414, § 101(a)(13), 66 Stat. 163, 167 (1952).  Section 1182(f), accordingly, authorizes the President to prohibit "all aliens or any class of aliens" from "coming . . . into" the United States for a designated period of time; it does not grant him the power to "repatriate" or to peremptorily remove those who have already entered without utilizing the statutory procedures for doing so.

Nor does the President's authority under § 1182(f) to impose "restrictions" "on the entry of aliens" suffice to trigger the "otherwise specified" exception to the "sole and exclusive procedure[s]" for removing those who have entered the United States.  8 U.S.C. § 1229a(a)(3).

As the Supreme Court explained in *Trump v. Hawaii*, "[f]airly read, [§ 1182(f)] vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA—including in response to circumstances that might affect the vetting system or other 'interests of the United States.'" 585 U.S. at 691. In other words, § 1182(f) is best read to permit the President to impose non-statutory restrictions on "the entry of aliens." But the authority to "impose on the *entry* of aliens any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f) (emphasis added), does not mean that the President has the authority to alter the rules that apply to those who have already entered.[12]

Defendants' attempts to sidestep the statutory text are unavailing. *First*, Defendants maintain that "[n]othing in Section 1182(f) forecloses repatriation of illegal immigrants who manage to gain physical entry into the United States notwithstanding a Proclamation barring such entry." Dkt. 44 at 49. That is true but unhelpful. A failure to forbid is not a grant of authority, and the authority granted here, as discussed above, is limited to the sphere of "entry." *See INS v. Chadha*, 462 U.S. 919, 953 n.16 ("Executive action [under legislatively delegated authority] is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review . . . ."); *see also Trump v. Hawaii*, 585 U.S. at 688 (finding that the § 1182(f) proclamation at issue in that case did "not exceed any textual

---

[12] Defendants do not argue that aliens subject to the Proclamation have not "entered" the United States, presumably because Plaintiffs do not raise a due process challenge, *see infra* at 83–84, and because the Proclamation and guidance seek to govern the expulsion of covered aliens, regardless of how long (after January 20, 2025) they have been in the United States, where they are located, or whether they are detained. A blurring of the meaning of the word "entry" as used in the INA would also complicate the enforcement of other provisions of the statute. For example, 8 U.S.C. § 1326 provides that any alien who "enters" after having previously been denied admission or removed is subject to a fine or imprisonment. It is hard to imagine the government taking the position that those criminal penalties would not attach to an alien who had only succeeded in making it a short way past the border before being apprehended.

limit on the President's authority"); *cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

("An agency may not confer power upon itself.").

  *Second*, Defendants contend that a "[s]uspension on entry must necessarily encompass

the ability to expel" because, otherwise, "the statute's authority to prohibit physical entry" would

be "render[ed] . . . ineffective." Dkt. 44 at 49. This is not a textual argument but, rather, posits

that § 1182(f) includes an implied authority to take whatever actions are necessary to give effect

(or, more aptly, to give maximum effect) to a suspension of entry. As an initial matter, the Court

notes that Defendants' implied-authority argument is a peculiar one under the present

circumstances, since the President has suspended "entry" of individuals who were already

forbidden from entering, only then to argue that he has the implied authority to take whatever

actions he (or his subordinates) deems necessary to give effect to his (redundant) suspension of

entry. There is an impressive bootstrapping element to that argument.

  In other contexts, moreover, the authority to suspend entry is undoubtedly meaningful.

That is, for example, what spurred the litigation leading to the Supreme Court's decision in

*Trump v. Hawaii*, 585 U.S. 667 (2018). Presidents have also used § 1182(f) to exclude aliens

whose actions "threaten[ed] the peace, security, or stability of Libya," Executive Order 13726,

81 Fed. Reg. 23559, 23559 (Apr. 21, 2016), or to exclude "members of the military junta in

Sierra Leone and members of their families," Proclamation 7062, 63 Fed. Reg. 2871, 2871 (Jan.

16, 1998). In general, statutory grants of authority to the Executive Branch do not carry with

them a sweeping, implied authority analogous to Congress's power under the Necessary and

Proper Clause, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). Just as the courts

will not "rewrite [a] statute . . . as if it" pursued "a single policy at all costs," *Advoc. Christ*

*Medical Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025), so too the President may not assert an

authority not found in the text of a statute merely because that additional authority would render his statutorily authorized actions more effective.

In this respect, Defendants' appeal to an implied authority runs headlong into the aphorism about hiding elephants in mouseholes. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). To be sure, § 1182(f) confers a broad authority on the President to suspend or restrict the entry of aliens when doing so, in his view, is in the "interests of the United States." 8 U.S.C. § 1182(f). But it is a different matter altogether to read § 1182(f) in a manner that is unmoored to the statutory text and, instead, to authorize the President (or his subordinates) to use a § 1182(f) suspension on entry as a springboard to take whatever enforcement actions deemed necessary to give effect to the suspension. That assertion of implied authority is particularly striking, moreover, when used to replace the statutorily prescribed procedures with non-statutory mechanisms—to permit immigration authorities, for example, to pack any covered aliens onto a bus or airplane and to expel them from the country, without complying with § 1225(b)(1) or § 1229a. It is also striking when used to enforce a presidential prohibition on entry that merely echoes the prohibition that Congress itself included in the INA. Indeed, if § 1182(f) could be read that capaciously, Congress could have altogether dispensed with enacting IIRIRA and creating the expedited removal procedure, since the President would have already had the unilateral authority to deploy a version of the expedited removal rules (or a truncated version of those rules or no rules at all) based on nothing more than his authority to suspend or restrict the entry of any class of aliens into the United States (including those who are already barred from entry). Neither the plain language of § 1182(f) nor history nor common sense permits cramming such a large elephant into even the most spacious of mouseholes.

Defendants assert, however, that two cases—the Supreme Court's decision in *Sale v. Haitian Centers Council Inc.*, 509 U.S. 155 (1993), and the D.C. Circuit's decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)—support their view that § 1182(f) must be read to grant the President (or his subordinates) an implied repatriation authority.  The Court is unpersuaded on both counts.  In *Sale*, the Supreme Court held, without any explanation, that it was "perfectly clear" that § 1182(f) authorized the President to place a naval blockade *outside* U.S. territorial waters to *turn back* Haitian migrants whose entry had been suspended.  509 U.S. at 187.  On Defendants' telling, the power to repatriate is "simply the other side of the *Sale* coin;" just as the President can take "preventative action to ensure that aliens subject to the Proclamation do not reach the border," so too can he take remedial action if a covered alien enters anyway.  Dkt. 44 at 50.  But *Sale*'s observation that a President could take an action to prevent aliens whose entry was suspended from ever reaching U.S. soil—that is, to prevent their "entry"—does not imply that he also enjoys the power to use extra-statutory methods to expel those aliens after they have already entered the United States.  Indeed, if anything, *Sale* suggests that once someone has physically entered the United States, the protections of the INA attach.  As the *Sale* Court observed, the naval blockade was intended to "prevent[] Haitians . . . from reaching our shores *and invoking* [*the INA's*] *protections*."  *Id.* at 160 (emphasis added).

Defendants' reliance on *Huisha-Huisha* is also misplaced.  *Huisha-Huisha* said nothing about 8 U.S.C. § 1182(f) and, instead, addressed a statute found in Title 42 that is designed to protect the public health.  27 F.4th at 721.  That provision, 42 U.S.C. § 265, authorizes the Surgeon General—and the Centers for Disease Control and Prevention ("CDC"), by delegation—to issue an order that "prohibit[s], in whole or in part, the introduction of persons and property from such countries or places as [the CDC] shall designate in order to avert" a

"serious danger" to the public health posed by "the danger of introduction" of a communicable

disease "into the United States."  In 2020, during the onset of the COVID-19 pandemic, the CDC

issued implementing interim regulations that defined "introduction into the United States of

person from a foreign country" to mean "the movement of a person from a foreign country . . .

into the United States so as to bring the person in contact with others in the United States, or so

as to cause the contamination of property in the United States . . . in a manner that the [CDC]

determines to present a risk of transmission of a communicable disease."  Suspension of

Introduction of Persons Into United States from Designated Foreign Countries or Places for

Public Health Purposes, 85 Fed. Reg. 16559, 16563 (Mar. 24, 2020).  The interim regulations

further defined "'serious danger of the introduction of such communicable disease into the

United States' to mean the potential for introduction of vectors of the communicable disease into

the United States, even if persons or property in the United States are already infected or

contaminated with the communicable disease."  *Id.*

Acting pursuant to this statutory and regulatory authority and in light of the threat to

public health posed by the COVID-19 pandemic, the CDC issued an order in March 2020

suspending "the introduction of all covered aliens"—defined to include those "traveling from

Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into

the congregate settings in land [Ports of Entry] or Border Patrol stations"—"into the United

States" for a designated period of time.  Notice of Order Under Sections 362 and 365 of the

Public Health Service Act, 85 Fed. Reg. 17060, 17061 (March 26, 2020).  The CDC

subsequently extended the designated period of time on several occasions, and took the position

that the "'suspension' clause in § 265 grants the CDC the 'authority to temporarily suspect the

effect of any law, rule, degree, or order by which a person would otherwise have the right to be

introduced or [to] seek introduction into the U.S.'"  *Huisha-Huisha*, 718 F.4th at 726 (quoting 85

Fed. Reg. 56423, 56426 (Sept. 11, 2020)).  The rights subject to suspension under a § 265 order,

on the CDC's view, included the right to apply for asylum and the right to seek withholding of

removal or CAT protection.

Among other challenges, which are discussed below, the *Huisha-Huisha* plaintiffs argued

that 42 U.S.C. § 265 permits the CDC only to bar "introduction" of an alien into the United

States and that it does not authorize the CDC or the Department of Homeland Security to "expel"

those who have already been "introduced into the United States." *Id.* at 728.  In the preliminary

posture of a motion for a preliminary injunction, the D.C. Circuit was unpersuaded, but for

reasons that have little bearing on this case.  First and foremost, the court stressed that § 265

provides public health officials with authority to bar the introduction of persons into the United

States "during a public-health emergency." *Id.* at 729.  The COVID-19 pandemic and the spread

of the virus throughout the United States was precisely the type of emergency that § 265 was

designed to address.  The court, accordingly, observed that the authority provided in § 265

"could be rendered largely nugatory if the Executive could not take any action against a covered

alien who disregarded the prohibition and managed to set foot on U.S. soil." *Id.*  That reading of

a different statute than the statute at issue here, of course, made perfect sense, and it cohered with

the governing regulations.  As the statutory text makes clear, the purpose of § 265 is not to

control immigration but, rather, to control "the introduction of [a dangerous communicable

disease] into the United States." 42 U.S.C. § 265.  And as the governing regulations made clear,

a communicable disease is "introduced" into the United States when "vectors" of the disease

reach into the country.  85 Fed. Reg. at 16563.  If those potential "vectors" were allowed to

remain in place while removal proceedings played out, the disease would spread, and the goal of

preventing spread of the disease in the United States would not be achieved.  In short, the D.C.

Circuit reasoned that § 265 must read in light of its purpose, and that purpose can be served only

through prompt expulsion.

Section 1182(f) shares none of those unique characteristics.  To start with the obvious,

§ 1182(f) is not a public health statute, and it is not concerned with the vectors by which a

communicable disease can be spread.  Rather, it is located in § 1182, a provision within the INA

entitled "Inadmissible aliens."  As the Supreme Court explained in *Trump v. Hawaii*, § 1182

"establishes numerous grounds on which an alien abroad may be inadmissible to the United

States," and, in § 1182(f) "Congress has also delegated to the President authority to suspend or

restrict the entry of aliens in certain circumstances."  585 U.S. at 683.  By providing authority to

suspend "entry" into the United States, § 1182(f) is of a piece with rest of § 1182.  *Id.* at 695 n.4.

There is no textual or other reason, moreover, to conclude that a proclamation suspending entry

of a class of aliens pursuant to § 1182(f) confers greater enforcement authority—or better

justifies a reason to resort to extra-statutory enforcement mechanisms—that any other limitation

on entry or admissibility found in § 1182.

By Defendants' reasoning, one of two things must be true:  Either those federal agencies

engaged in enforcing the immigration laws should be allowed to "repatriate" anyone who is

inadmissible pursuant to any of the provisions of § 1182, including any "alien present in the

United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i).  Or there is

something unique about those barred entry pursuant to § 1182(f).  But the first proposition

proves too much and would render the detailed provisions found in § 1225(b)(1) (expedited

removal) and § 1229a (regular removal)—as well as the "exclusive procedures" provision, 8

U.S.C. § 1229a(a)(3)—meaningless.  Use of those provisions would be optional, and

enforcement authorities would be free to craft their own rules and procedures (or, indeed, simply to dispense with any rules and procedures) for expelling aliens from the United States. That, of course, is not the system that Congress has prescribed. That, then, leaves the second proposition, which fares no better. Congress could have provided the President with the authority, not only to suspend or restrict "entry," but also to "suspend" the normal removal procedures when operating pursuant to § 1182(f). Unlike with respect to 42 U.S.C. § 265, however, there is no reason—and certainly no reason that can be coherently cabined—to read § 1182(f) to confer such additional implicit authority on the President. Indeed, if that were the case, § 1225(b)(1) and § 1229a would, again, be dead letters (or at least optional processes that the enforcement agencies could disregard), since the President could always do as he has done here and bar entry to a class of aliens who are already barred entry under any of the other provisions of § 1182, and then declare that the only way to give that proclamation meaning is to permit non-statutory expulsions.

*Huisha-Huisha* is unhelpful to Defendants for a second reason as well. Section 1182(f) and 42 U.S.C. § 265 not only appear in different titles of the U.S. Code (titles that are focused on very different substantive fields), but the controlling statutory text is different. As noted above, the governing CDC regulations defined "introduction into the United States" to mean "the movement of a person from a foreign country . . . into the United States *so as to bring the person in contact with others in the United States* . . . in a manner that the [CDC] determines to present a risk of transmission of the communicable disease." 85 Fed. Reg. at 16563 (emphasis added). That is a reasonable interpretation of the phrase "introduction of persons . . . in order to avert" the danger of a communicable disease, as that phrase is used in § 265. But that is not what the word "entry" means, as used in the INA; rather, as explained above, since the time § 1182(f) was enacted, and consistent with common usage, "entry" has referred to "any coming of an alien into

the United States, from a foreign port of place or from an outlying possession, whether

voluntarily or otherwise."  INA, Pub. L. No. 414 § 101(a)(13), 66 Stat. 163, 167 (1952); *see also*

*Entry*, *Entrance*, *Enter* Webster's New Collegiate Dictionary at 274–75 (1953) (defining "enter"

as "entrance" and "entrance" as "the act of entering," which, in turn, is defined as "go[ing] or

com[ing] in").  Thus, while § 265 can be read to cover the continuing "introduction" of a

disease-causing "vector" into the interior of the United States, even after the individual has

crossed the border, the same is not true of the word "entry," as used in § 1182(f).

　　　That, then, leads to one final question posed by *Huisha-Huisha*'s analysis of the CDC's

authorization to expel aliens pursuant to § 265.  In that case, the plaintiffs argued "that aliens

finish introducing themselves once they cross the border."  27 F.4th at 729.  In response, the

D.C. Circuit first observed that the concept of entry into the United States is not fixed and that,

*for purposes of the due process clause*, the Supreme Court has held that an alien who merely "set

foot on U.S. soil"—in that case, the plaintiff "succeeded in making it 25 yards into U.S. territory

before he was caught"—"cannot be a said to have 'effected an entry.'"  *DHS v. Thuraissigiam*,

591 U.S. 103, 139–40 (2020); *Huisha-Huisha*, 27 F.4th at 729.  But far from calling into

question the longstanding understanding of "entry" for purposes of construing § 1182(f), the

D.C. Circuit reaffirmed that "aliens who make it one foot over the border are on U.S. soil and *are*

*thus entitled to certain statutory protections*."  *Huisha-Huisha*, 27 F.4th at 729 (emphasis added).

And, notably, the Supreme Court decision the court cited in support of that proposition counted

"the right to a 'determin[ation]' whether [the plaintiff] had 'a significant possibility' of

'establish[ing] eligibility for asylum,'" as among those statutory protections that attach upon entry.[13] *Thuraissigiam*, 591 U.S. at 140.

The Court, accordingly, concludes that Defendants lack statutory authority to supplant the usual removal procedures set forth in § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with new, non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures.

      b.  <u>Constitutional Authority</u>

Nor is the Court persuaded by Defendants' contention that, "[e]ven without . . . Section 1182(f), the President's action here would be supported by the inherent authority of the Execuive over admission decisions." Dkt. 44 at 52. Defendants' argument involves two steps. They first argue that "the power of excluding aliens from U.S. territory is an inherent attribute of sovereignty exercised by the political branches of government." *Id.* And they then argue that, even though "the Executive's inherent authority over expulsion is not likely as broad as its authority over exclusion," "mandating the repatriation of aliens whose entry was barred at the time they entered the United States on account of a Presidential Proclamation under Section

---

[13] Although *Huisha-Huisha* also notes that an alien "'who is present in the United States in violation of . . . any . . . law of the United States . . . is deportable,'" 27 F.4th at 729 (quoting 8 U.S.C. § 1227(a)(1)(B)), that provision has no bearing on the question presented here. Section 1227 addresses whether aliens who have been "admitted to the United States" are "deportable"— or, to use the language of IIRIRA, "removable." It does not, however, address the separate question of what process immigration authorities must follow to effectuate that deportation or removal. Nor does § 1227(a)(1)(B) otherwise apply to the individual plaintiffs and putative class members in this case, none of whom have been "admitted to the United States." *See* 8 U.S.C. § 1101(a)(13) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Rather, as described above, aliens like the individual plaintiffs and putative class members who are "present in the United States" but who "have not been admitted" are deemed "applicant[s] for admission," *id.* § 1225(a)(1), and the "sole and exclusive procedure for determining whether an alien may be admitted" is a full removal proceeding under § 1229a, unless "otherwise specified" in Title 8, *id.* § 1229a(a)(3).

1182(f) is a permissible Executive Branch exercise of inherent authority, [which] is also consistent with the broad parameters Congress" has specified. *Id.* at 53. In Defendants' view, the President is therefore permissibly operating in *Youngstown* Category Two. *Id.* at 53–54 (citing *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)).

The argument fails for several reasons. As an initial matter, the Court once again notes that the President did not establish the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures as an exercise of his constitutional authority; at best, he delegated authority to the Secretary to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border." Proclamation, § 5. Accordingly, the Court is not called upon to review a presidential decree in this respect but, rather, decisions made by U.S. Border Patrol and USCIS officials regarding how to implement the Proclamation. But even had the President directed that immigration enforcement authorities supplant the detailed procedures for removing inadmissible aliens set forth in § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures, the argument would fail.

The principal authority that Defendants invoke, *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), does more harm than good to their argument. That case, of course, preceded enactment of the INA in 1952, but much of the Court's reasoning remains illuminating today. What is perhaps most notable about *U.S. ex rel. Knauff* is that it recognizes the shared responsibilities of the legislative and executive branches "concerning the admissibility of aliens," but it—appropriately—casts Congress as the lead when it comes to prescribing the rules. *Id.* at 542; *see also Jarkesy*, 603 U.S. at 129 (referring to Congress's "plenary power over immigration"); *Demore v. Kim*, 538 U.S. 510, 521 (2003) (referring to Congress's "broad power

over naturalization and immigration"). In *U.S. ex rel. Knauff*, the Court rejected a nondelegation challenge and upheld Congress's authority to "place[]" "the decision to admit or to exclude an alien . . . with the President." *U.S. ex rel. Knauff*, 338 U.S. at 543. The Supreme Court explained its reasoning as follows:

> Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, *Congress may* in broad terms authorize the executive to exercise the power, *e.g.*, as was done here, for the best interests of the country during a time of national emergency. Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent.

*Id.* (emphasis added). In other words, although the legislature typically sets the conditions on entry by legislation, Congress may authorize the Executive Branch to exercise the authority to limit entry when it is in "the best interests" of the United States to do so, and it may "entrust[]" the Executive Branch to set appropriate "procedures for carrying out . . . congressional intent." *Id.*

Nowhere in *U.S. ex rel. Knauff* or in any other decision has the Supreme Court ever suggested that the President's inherent authority to protect the borders of the United States permits him to supplant rules proscribed by Congress. In this respect, the present case is the polar opposite of *U.S. ex rel. Knauff*. In *U.S. ex rel. Knauff*, the question was whether Congress could authorize the President or his delegee to exclude certain aliens and to "specify the procedures for carrying out th[at] congressional intent." 338 U.S. at 542–43. Here, the question is whether the President or his delegees may disregard the rules that Congress has specified and expel individuals who are already in the United States without complying with the "exclusive procedure[s]" set by statute, *see* 8 U.S.C. § 1229a(a)(3); *see also id.* § 1225(b)(1) (expedited removal); *id.* § 1229a (regular removal). Except in circumstances, not present here, where the

86

President exercises an exclusive authority, *Youngstown*, 343 U.S. at 637–38 (Jackson, J.,

concurring), neither he nor his delegees are "free from the ordinary controls and checks of

Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576

U.S. 1, 21 (2015), and they must abide by the law as Congress has prescribed it.  If military

exigencies provided insufficient basis for President Truman to seize the steel mills, *Youngstown*,

343 U.S. at 587–88, the crisis at the southern border does not provide the President or his

delegees with sufficient basis to ignore the removal procedures that Congress enacted in the INA

and IIRIRA.

That conclusion carries particular force here, moreover, because, unlike in *U.S. ex rel.*

*Knauff*, the present dispute is not about the power to exclude but, rather, about the power to

expel.  *U.S. ex rel. Knauff* gestures at the importance of this difference, noting: "Whatever the

rule may be concerning *deportation of persons who have gained entry into the United States*, it is

not within the province of any court, unless expressly authorized by law, to review the

determination of the political branches of the Government *to exclude* a given alien."  338 U.S. at

543 (emphasis added).  Even more importantly, Defendants themselves candidly acknowledge

that "the Executive's inherent authority over expulsion is not likely as broad as its authority over

exclusion."  Dkt. 44 at 53.  That concession makes sense given the limited rights that aliens

typically possess before entering the United States and the unique authority that the political

branches maintain over who is permitted to enter the country.  *See, e.g.*, *U.S. ex rel. Knauff*, 338

U.S. at 542–43; *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).  But once an alien

has entered the United States, the INA and decades of historical practice, *see, e.g.*, *NLRB v. Noel*

*Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of

great weight in proper interpretation of constitutional provisions regarding the relationship

between Congress and the President."), establish that the Executive Branch is bound to follow the will of Congress in expelling inadmissible aliens.

Defendants' reliance on the Constitution's guarantee that the "United States . . . shall protect each [state] against Invasion," U.S. Const., art. IV, § 4 (the "Invasion Clause"), fails for the same reasons. Defendants themselves place little or no independent reliance on the Invasion Clause and, instead, merely suggest that the President plays *some* role in protecting the States "against Invasion." Dkt. 44 at 65. But even assuming that is correct, Defendants do not dispute that Congress plays the primary role in crafting the governing rules and that, under the *Youngstown* framework, *see Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring), the President may not act in derogation of the laws that Congress has enacted. Although relevant precedent is sparse, the Supreme Court has opined that the responsibility for "carry[ing] into effect" the Guarantee Clause "is primarily a legislative power," *Texas v. White*, 74 U.S. 700, 701 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885), and that it "rest[s] with Congress . . . to determine . . . the means proper to be adopted to fulfill th[e] guarantee" against "domestic violence," *Luther v. Borden*, 48 U.S. 1, 43 (1849). There is no reason to believe that the Invasion Clause, which appears in the very same sentence of Article IV as these provisions, allocates responsibility any differently. That conclusion finds further support in Article I of the Constitution, moreover, which grants Congress the power to "provide for calling forth the Militia to . . . repel Invasions," U.S. Const., art. I, § 8, cl. 15, leaving little doubt that responsibility under the Invasion Clause is, at the very least, shared between the political branches. Finally, it is far from clear that the Invasion Clause confers any power to act that is not found elsewhere in Articles I and II of the Constitution. Unlike Article IV, Section 4, which speaks in terms of the *responsibility* of "[t]he United States" to protect the States, Articles

I and II speak in terms of the "*Power*[s]" vested in the Congress and the President to perform their constitutional responsibilities.[14]  If the President lacks authority under the Vesting Clause of Article II to supplant the INA with an alternative set of immigration laws, that power cannot be found in Article IV, Section 4.

The Court, accordingly, concludes that the President lacks the inherent constitutional authority to supplant § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with non-statutory repatriation or removal rules.  To hold otherwise would render much, if not most, of the INA simply optional.

2.    *Suspension of Asylum*

Plaintiffs further argue that the Proclamation runs afoul of the asylum statute, 8 U.S.C. § 1158, by "restrict[ing]" covered aliens from "invoking" the asylum provisions of the INA.  Proclamation, §§ 2, 3.  The Court agrees.

---

[14] Although the Court need not reach the issue, it is telling that Defendants have offered no support whatsoever for the dubious proposition that the Framers understood or used the word "Invasion" to include illegal immigration.  *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government.") (citing *The Federalist No. 43*, at 167 (James Madison) (Clinton Rossiter ed., 1961)).  To be sure, many questions relating to the implementation of Article IV, Section 4 may be nonjusticiable.  *But see New York v. United States*, 505 U.S. 144, 185 (1992).  "It is emphatically the province and duty of the judicial department," however, "to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 137 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting same).  Illegal immigration undoubtedly poses serious challenges, but Defendants do not suggest that it involves "armed hostility," threatened or effectuated, by "another political entity" against a "State in th[e] Union."  *Padavan*, 82 F.3d at 28.  Defendants' Invasion Clause argument, accordingly, fails for this reason as well.

The Court, once again, starts with the statutory text and "must enforce plain and unambiguous statutory language according to its terms," *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).  The words of the statute, moreover, must be "placed in context," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), and must be read "with a view to their place in the overall statutory scheme," *id.* at 133 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Here, the relevant text provides as follows:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added).  Although the word "may" is, of course, permissive, the choice of whether to apply for asylum is left to the applicant; the statute requires the government to provide the applicant with that opportunity.  In other words, under the plain language of § 1158(a)(1), the government *must* provide an alien present in the United States with the *option* of applying for asylum.  That requirement is then echoed in other provisions of the INA.  Under § 1225(b)(1), for example, if an "alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution, the officer *shall* refer the alien for an interview by an asylum officer," the "asylum officer *shall* conduct interviews of [those] aliens referred" to her, and, "[i]f the officer determines . . . that an alien has a credible fear of persecution . . . , the alien

*shall* be detained for further consideration of the application for asylum."  8 U.S.C.

§ 1225(b)(1)(A), (B) (emphases added).  Read in this context, it is clear that, even though asylum

is itself a discretionary form of relief, providing aliens with the opportunity to apply for asylum

(and the opportunity to be heard) is mandatory.

Defendants offer two nontextual responses to this logic: they first argue that a bar on

applying for asylum is necessary to give effect (or, at least, maximum effect) to the

Proclamation's bar on entry, and, second, they argue that asylum is a discretionary form of relief

that the Attorney General is free to deny and that, as a result, permitting aliens to apply for

asylum would be futile if the Attorney General has already decided that their applications will be

denied.  Dkt. 44 at 56–57.  Defendants invoke the D.C. Circuit's opinion in *Huisha-Huisha* in

support of both contentions.  A comparison of this case and *Huisha-Huisha*, however, merely

highlights why Defendants' argument fails here.

### a.

Defendants' first argument regarding the right to apply for asylum tracks their argument

regarding repatriation.  In both contexts, Defendants rely on *Huisha-Huisha*'s observation that

the statutory authority conferred in § 265 to "prohibit . . . the introduction of persons . . . in order

to avert" the spread of a communicable disease in the United States, 42 U.S.C. § 265, "could be

rendered largely nugatory if the Executive could not take any action against a covered alien who

[has] disregarded the prohibition and managed to set foot on U.S. soil," *Huisha-Huisha*, 27 F.4th

at 729.  The flaws with extending that argument to § 1182(f), which are discussed above, apply

equally here, and the Court will not repeat itself.  But two additional difficulties warrant mention.

First, the conflict that the D.C. Circuit confronted in *Huisha-Huisha* was both direct and

irreconcilable.  Although the initial screening for asylum can take place quickly, for those who

establish a "credible fear of persecution," the process can take years to complete. 8 U.S.C.

§ 1225(b)(1)(B)(ii). Permitting aliens who pose a "serious danger" of introducing a hazardous,

communicable disease into the United States, 42 U.S.C. § 265, to remain in the United States for

months or years while their asylum applications are finally adjudicated cannot be reconciled with

the "public health" imperative served by a § 265 order. Despite this direct and clear conflict, the

D.C. Circuit nonetheless treated the § 265 order's "foreclose[ure] [of] the statutorily mandated

procedures that aliens use to apply for asylum" as "the closest question in [the] case" and a

question that "deserve[d] attention from the District Court . . . [on] the merits." 27 F.4th at 730.

And the court strove to "harmoniz[e]" the two statutory commands, as "best" it could, by relying

on the discretionary nature of asylum and by noting that "§ 265's text" might be read to allude

"to the suspension of [the asylum] procedures with its reference to the 'suspension of the right to

introduce such persons and property' as 'is required in the interest of the public health.'" *Id.* at

730–31 (quoting 42 U.S.C. § 265). That is, unlike § 1182(f), § 265 can plausibly be construed

not just to bar entry, but also to bar the continuing introduction of disease "vectors" into the

United States by permitting aliens to remain here while their asylum applications were

adjudicated, which would place it in direct conflict with the current asylum adjudication process.

Here, in contrast, the asserted conflict is far less direct and far less clear. To be sure,

efforts to keep aliens from unlawfully entering the United States would be aided by denying

statutory benefits, including the right to apply for asylum, to those who have managed to cross

the border. But that is a consideration that Congress sought to balance in the INA, when it—

even without a presidential proclamation—barred the admission of undocumented aliens, and

when it, nonetheless, mandated that "[*a*]*ny* alien who is physically present in the United States

. . . , *irrespective of such alien's status*, may apply for asylum in accordance with [§ 1158] or,

where applicable, section 1225(b)."  8 U.S.C. § 1158(a) (emphases added).  One can agree or

disagree with the balance that Congress struck, but there is little doubt that Congress considered

the question when it enacted IIRIRA in 1996, *see O.A. v. Trump*, 404 F. Supp. 3d at 148, and it is

that balance that the Court must apply.

  Defendants' necessity argument confronts a second difficulty, which was not addressed

in *Huisha-Huisha*, presumably because the order at issue in that case was issued pursuant to Title

42, while the proclamation at issue here was issued under the INA.  In any event, the INA—as

opposed to Title 42—provides the Executive Branch with substantial authority, which if

exercised in accordance with law, allows the Secretary and the Attorney General to impose

additional, non-statutory limitations on eligibility for asylum.  That is the mechanism that the

Executive Branch invoked to support the 2018 and 2024 Proclamations, discussed above, *see

supra* at 19–26.  Although those prior efforts were, in large part, unsuccessful for reasons not at

issue here, *see id.*, Defendants fail even to gesture at the possibility that they could have, but

have not, used the authority that Congress provided to curtail the right to asylum.

  In particular, § 1158(b)(2)(C) provides that the Attorney General—and, now, the

Secretary as well, *see* 6 U.S.C. §§ 251, 271(b)(3), (5), 557—"may by regulation establish

additional limitations and conditions, consistent with this section, under which an alien shall be

eligible for asylum."  8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) ("The Attorney

General may provide by regulation for any other conditions or limitations on the consideration of

an application for asylum not inconsistent with this chapter.").  That authority is sufficient to

avoid a conflict of the type at issue in *Huisha-Huisha*, since the Secretary and the Attorney

General are authorized to issue regulations that limit eligibility for asylum, and immigration

officials can promptly resolve "mandatory denials" of asylum.  *See* 8 C.F.R. § 208.13(c).  To be

sure, those regulations must be "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C), and an applicant who is ineligible for asylum is still eligible to considered for withholding of removal and CAT protection, *see* 8 C.F.R. § 208.13(c). But Congress has enacted those limitations on prompt removal, and neither the President nor this Court is free to disregard those statutory mandates. What matters for present purposes is that Defendants' necessity argument does not support the ban on asylum contained in the Proclamation. To the extent that availability of asylum is the issue, Congress provided a mechanism—the adoption of regulations promulgated by the Attorney General and the Secretary—to alleviate that issue, and Defendants may not circumvent that statutorily prescribed means of adopting "additional limitations" on asylum. 8 U.S.C. § 1158(b)(2)(C).

Notably, this conclusion is not a new one, and, indeed, the Department of Justice itself has long held this view of the law. As the Department explained in the 2024 final rule, although the Attorney General and Secretary have broad rulemaking authority, a presidential proclamation—standing alone—"cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures." 89 Fed. Reg. at 81163. Indeed, "[t]his recognition that [§ 1182(f)] does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades." *Id.* That recognition started with Assistant Attorney General Theodore Olson's 1984 opinion concluding that § 1182(f) "did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane," and it continued with the Department's 2018 reaffirmation—during the first Trump administration— that "'[a]n alien whose entry is suspended or restricted under [a § 1182(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration law[,]'

including 'expedited-removal proceedings' where they could 'raise any claims for protection.'"

*Id.* at 81163 n.53 (quoting 2018 Rule).  According to the Department of Justice, the President has

invoked § 1182(f) more than 90 times since 1981, but, prior to the Proclamation at issue here, no

president has ever sought to use that provision "to affect the right of noncitizens on U.S. soil to

apply for, or noncitizens' statutory eligibility to receive, asylum."  *Id.*

The Department of Justice is not typically in the business of construing presidential

authority narrowly.  *See* Jack Goldsmith, *The Terror Presidency* 36 (2007) ("Not surprisingly,

OLCs of both parties have always held robust conceptions of presidential power.")  Yet the

Department rejected the precise assertion of congressionally delegated authority asserted in the

Proclamation.  Its analysis is persuasive and bears quoting at length:

> That longstanding understanding follows from the text and structure of the
> governing statutes.  Section [1182(f)] provides that under certain circumstances,
> the President may "suspend the entry of all aliens or any class of aliens as
> immigrants or nonimmigrants, or impose on the entry of aliens any restrictions
> he may deem to be appropriate." [ ] 8 U.S.C. 1182(f). Although this provision—
> first enacted in 1952—"grants the President broad discretion," it "operate[s]"
> only within its "sphere." *Trump v. Hawaii*, 585 U.S. 667, 683–84, 695 (2018).
> Section [1182] (entitled "Inadmissible aliens"), generally "defines the universe
> of aliens who are admissible" and "sets the boundaries of admissibility into the
> United States."  *Id.* at 695.  Hence, when section [1182(f)] authorizes the
> President to suspend "entry," it "enabl[es] the President to supplement the other
> grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk v. Reagan*,
> 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry
> into the United States.
>
> This authority, though broad, does not authorize the President to override the
> asylum statute.  First enacted in the Refugee Act, the asylum statute today
> provides that "[a]ny alien who is physically present in the United States or who
> arrives in the United States[,]. . . irrespective of such alien's status, may apply
> for asylum." . . . 8 U.S.C. 1158(a)(1).  The right to apply for asylum thus turns
> on whether a noncitizen is "physically present" or has "arrive[d] in the United
> States."  *Id.*  As a result, the power under [§ 1182(f)] to suspend "entry" does
> not authorize the President to override the asylum rights of noncitizens who have
> already physically entered the United States and who are entitled to an
> adjudication of eligibility under the applicable statutory and regulatory rules and
> standards.

89 Fed. Reg. at 81163–64 (footnotes omitted).

Finally, it is noteworthy that the same Department of Justice that litigated the *Huisha-Huisha* case in the D.C. Circuit distinguished 42 U.S.C. § 265 and *Huisha-Huisha* from the present circumstances.  Quoting the CDC final rule at issue in *Huisha-Huisha*, the Department explained that, unlike § 1182(f), § 265 "originates in a 'broad public health statue' that Congress intended to 'operate[] separately and independently of the immigration power' and authorizes the CDC 'to temporarily suspend the effect of any law[] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,' . . . including the immigration laws."  89 Fed. Reg. at 81164 n.55 (quoting Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424, 56426, 56442 (Sept. 11, 2020)).  At least as of October 2024, the Department of Justice held the view that *Huisha-Huisha* dealt solely with an emergency public health statute that "has no relevance to the interpretation of [§ 1182(f)], which is in title 8."  *Id.*

The Court, for all these reasons, is unpersuaded by Defendants' necessity argument.

## b.

Defendants' futility argument fares no better.  As the D.C. Circuit observed in *Huisha-Huisha*, the § 265 order at issue in that case did more than foreclose a "grant of asylum; it also foreclose[d] the statutorily mandated procedures that aliens use to apply for asylum."  27 F.4th at 731.  At least at the preliminary injunction stage, however, the court was unpersuaded that the loss of those procedures provided sufficient basis to enjoin the order.  *Id.*  That was because, as the court explained, "the asylum decision ha[d] already been made" in the § 265 order, and, as

96

result, foreclosing the procedures required by statute was harmless. As the court wrote, "those procedures would be futile." *Id.*

For the reasons explained above, however, that analysis does not hold here. Rather, as the Department of Justice observed in the 2024 final rule, and consistent with four decades of Executive Branch interpretation, § 1182(f) does not authorize the President to restrict aliens from invoking protection under the asylum statute. In short, the authority to suspend or restrict "entry" into the United States does not constitute—or carry with it—the authority to adopt "additional limitations" on eligibility for asylum. And, if the Proclamation did not—and could not—alter the eligibility requirements for asylum, then the further suspension of "the statutorily mandated procedures that aliens use to apply for asylum," cannot "be futile." *Huisha-Huisha*, 27 F.4th at 731.[15]

*    *    *

Finally, Defendants fail to advance any constitutional arguments that differ from those addressed and rejected above. The Court, accordingly, concludes that the Proclamation and guidance are contrary to law to the extent that they prohibit covered aliens from applying for asylum or implement new limitations on asylum that have not been adopted by regulation.

---

[15] It is a closer question whether the President can, under § 1182(f), prohibit covered aliens from applying for asylum upon arrival at a port of entry. Section 1158(a)(1) and § 1182(f) are at least arguably in greater tension with respect to aliens arriving at the border. Pursuant to § 1158(a)(1), an alien "who arrives in the United States" may apply for asylum, which would provide such aliens a path to entry. The President's authority to suspend entry pursuant to § 1182(f) thus might arguably extend to preventing aliens from applying for asylum prior to entry. *Cf. Sale*, 509 U.S. at 160, 187 (stating that § 1182(f) gave the President the authority to set up a naval blockade to prevent covered aliens from reaching U.S. soil). Because Plaintiffs do not press this theory or seek to limit operation of the Proclamation in this manner, the Court need not resolve the question.

3.    *Suspension of Withholding of Removal*

Plaintiffs also contend that the guidance violates the withholding of removal statute, 8

U.S.C. § 1231(b)(3)(A), because it instructs asylum officers that withholding of removal is not

available for aliens subject to the Proclamation.  Withholding of removal, unlike asylum, is

"mandatory;" it leaves "the Executive [with] no discretion" to deny the protection to those who

can satisfy the statutory requirements.  *Huisha-Huisha*, 27 F.4th at 731.  Thus, "to expel aliens to

places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an

exception to § 1231(b)(3)(A)."  *Id.* at 731–32.  Neither § 1182(f) nor § 1185(a) is such a statute:

those statutes make no mention of withholding of removal or § 1231(b)(3)(A), and they say

nothing about the removal of aliens who have already entered the United States, much less about

where the Executive Branch may send aliens subject to removal.  *Cf. Huisha-Huisha*, 27 F.4th at

732.  It is also plainly possible to "give effect . . . both" to § 1182(f) and § 1185(a) and to

§ 1231(b)(3)(A).  *Id.*  The President may suspend or restrict entry into the United States under

§ 1182(f) and § 1185(a), while still respecting § 1231(b)(3)(A), which does not authorize entry

into the United States but merely precludes the government from expelling those who do enter

"to a place where they will likely be persecuted."  *Id.*  In other words, the government can,

consistent with the withholding of removal statute, still expel covered aliens so long as it does

not send them to countries where they will likely face persecution.

Defendants respond that the withholding of removal statute constrains the Secretary and

the Attorney General, not the President.  *See* Dkt. 55 at 28.  But that contention ignores two

important facts.  *First*, the Proclamation says nothing about withholding of removal.  Rather, it

says that covered aliens "are restricted from invoking provisions of the INA that would permit

their continued presence in the United States."  Proclamation, §§ 2, 3.  And, as the D.C. Circuit

observed in *Huisha-Huisha*, § 1231(b)(3)(A) "does not prohibit the Executive from immediately

expelling aliens;" it simply limits where an inadmissible alien may be sent.  27 F.4th at 732.

Presumably for this reason, the Proclamation includes an express reference to asylum (which

allows an eligible person to remain in the United States) but makes no mention of withholding

(which does not).

    *Second*, Defendants' argument ignores the fact that the removals and repatriations at

issue are, in fact, being carried out under the direction of the Secretary.  All of the relevant

guidance was issued by components of the Department of Homeland Security, and the USCIS

and U.S. Border Patrol officials and employees engaged in those processes operate under the

direction of the Secretary.  As a result, Defendants cannot escape the operation of

§ 1231(b)(3)(A), which declares that the Secretary "may not remove an alien to a country if the

[Secretary] decides that the alien's life or freedom would be threatened in that country because

of the alien's race, religion, nationality, membership in a particular social group, or political

opinion."  8 U.S.C. § 1231(b)(3)(A); *see also* 6 U.S.C. §§ 251, 271(b)(3), (5), 557.  That

provision does not include an exception for occasions when the President exercises his authority

under § 1182(f) and § 1185(a) to suspend or restrict entry.

    Defendants also suggest that § 1231(b)(3)(A) does not apply because covered aliens are

not subject to "removal" under the INA but, rather, to non-statutory "212(f) Direct Repatriation"

or "212(f) Expedited Removal."  That argument fails for the reasons given above, including the

fact that neither the President nor the Secretary possesses the authority to supplant the carefully

crafted INA removal procedures with less protective, non-statutory procedures.  The argument

also fails for the reasons given in *Huisha-Huisha*.  In that case, the covered aliens were subject to

the Title 42 procedures, instead of the INA procedures.  But the D.C. Circuit nonetheless

concluded that the plaintiffs were likely to prevail on the merits of their challenge to the CDC's

effort to restrict access to withholding of removal.  27 F.4th at 731–32.  Finally, to the extent this

argument turns on an asserted presidential authority to disregard—or to direct his subordinates to

disregard—a clear statutory stricture, Defendants fail to argue—much less to carry their burden

of showing—that the President may exercise a shared constitutional authority that runs counter

to congressional mandate.  *See id.*; *see also Youngstown*, 343 U.S. at 637 (Jackson, J.,

concurring); *Zivotofsky ex rel. Zivotofsky*, 576 U.S. at 10.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and

contrary to law to the extent it instructs asylum officers or others that withholding of removal is

not available for aliens subject to the Proclamation.  Except as Congress has specified, 8 U.S.C.

§ 1231(b)(3)(B), all aliens present in the United States are entitled to protection under

§ 1231(b)(3)(A).

4.    *Extra-Regulatory CAT Protection Procedures*

Finally, Plaintiffs contend that the guidance's extra-regulatory CAT protection

procedures violate FARRA.  FARRA instructed "the heads of the appropriate agencies" to issue

regulations to implement the protections included in the Convention Against Torture.  8 U.S.C.

§ 1231 note (b).  To comply with that directive, the Attorney General and Secretary have issued

regulations that instruct asylum officers on the procedures for adjudicating CAT protection

claims.  *See, e.g.*, 8 C.F.R. § 208.16(c).  Under those regulations, asylum officers first conduct a

credible fear screening, at which aliens must demonstrate that there is "a significant possibility"

that it is more likely than not that they will be tortured if returned to the country at issue.  *Id.*

§ 208.30(e)(3).  If the asylum officer makes a positive credible fear determination, USCIS can

then send the applicant to full removal proceedings or can "retain jurisdiction over the

application . . . for further consideration in a hearing pursuant to § 208.9."  *Id.* § 208.30(f).  If

USCIS retains jurisdiction, an asylum officer will conduct a second interview to adjudicate the

individual's CAT protection claim. *Id.* § 208.9. That interview must be scheduled at least 21

days after the applicant has received the record of his positive credible fear determination. *Id.*

§ 208.9(a)(1). At the second interview, the applicant "may have counsel or a representative

present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.*

§ 208.9(b). To qualify for CAT protection, an applicant must demonstrate in the interview that

"it is more likely than not that he or she would be tortured if removed to the proposed country."

*Id.* § 208.16(c)(2).

      The guidance that Plaintiffs challenge changes this process by instructing asylum officers

to require that an alien carry his ultimate burden at the first interview. Instead of starting with a

credible fear screening and then moving to an adjudication interview, the asylum officer

conducts a "CAT-Only assessment," Dkt. 52-1 at 44, at which the applicant "must show that it is

more likely than not that [the applicant] will be tortured in the country to which [the applicant]

may be returned," *id.* at 46. Aliens in CAT-Only assessments are "not entitled to a consultant,

legal representative, or a consultation period." *Id.* at 45. In essence, the new procedures require

that an alien carry his burden at the initial hearing without the benefit of counsel or consultation

and without the time to prepare accorded under the regulations.

      Agencies are, of course, bound to follow their own regulations, even when the procedures

therein are "possibly more rigorous than otherwise would be required," *Morton v. Ruiz*, 415 U.S.

199, 235 (1974), and they may not adopt guidance or other procedures that conflict with or

disregard duly promulgated regulations, *see U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35–36

(D.C. Cir. 2005) (holding that substantive changes to regulations must be promulgated through

notice and comment rulemaking); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260,

267–68 (1954) (holding that regulations are binding "as long as [they] remain operative"). Here,

Defendants do not dispute that the guidance at issue is inconsistent with the regulations. The guidance is, as a result, arbitrary and capricious and contrary to law. *See Nat'l Environ. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009–11 (D.C. Cir. 2014).

Defendants offer two responses, which are in tension with one another. In their opening brief, they argued that the Proclamation applies only to those benefits found in the INA, and since "CAT protection is not provided by the INA," it "is not subject to the Proclamation's limitations." Dkt. 44 at 62. But if the Proclamation does not limit or modify the rules relating to CAT protection, Defendants are left without any justification for discarding the CAT regulations in the guidance. Defendants then shift gears in their reply brief and argue that because "the covered aliens do not fall within the bounds of the regulatory provisions cited by Plaintiffs," Defendants are not required to apply the CAT regulations in adjudicating their claims. Dkt. 55 at 28–29. Although not crystal clear, Defendants appear to argue that because the Proclamation supplants the expedited (§ 1225(b)(1)) and regular (§ 1229a) removal procedures set forth in the INA with the non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures, the CAT regulations—which take the INA removal procedures as a given—are inapplicable. But that argument has it exactly backwards. As the Court has explained above, nothing in § 1182(f) or § 1185(a) authorizes the President (or his subordinates) to supplant the statutory removal procedures with alternative, less protective procedures. The fact that the Secretary and Attorney General complied with their statutory obligation to issue regulations to implement the CAT protections, 8 U.S.C. § 1231 note (b), in the context of the INA-mandated removal procedures does not imply that the CAT regulations apply only sometimes, but, rather, confirms that no one—including the Secretary and the Attorney General—ever contemplated that the Executive Branch could simply sidestep § 1225(b)(1) and § 1229a.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and contrary to law to the extent it purports to replace the CAT procedures set forth in the existing regulations with less protective "§§ 212(f) and 215(a)" "CAT Assessment Instructions and Implementation Guidance."  Dkt. 52-1 at 38–39.

## C.    Class Certification

The Court must next consider whether to grant Plaintiffs' motion for class certification.[16] To proceed on behalf of a class, a plaintiff or group of plaintiffs must clear two hurdles.  First, the putative class representatives must demonstrate that "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  These four "prerequisites," *DL v. District of Columbia*, 860 F.3d 713, 723 (D.C. Cir. 2017), are referred to as numerosity, commonality, typicality, and adequacy of representation, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 460 (2013). Second, the "plaintiffs must then demonstrate that their proposed class falls into one of the categories of class actions listed in Rule 23(b)."  *DL*, 860 F.3d at 723.  Here, Plaintiffs rely on

---

[16]  As in *O.A.*, "[t]he question of class certification arises in an unusual posture in this case because the Court directed that the parties brief the merits on an expedited basis (to obviate the need for further litigation on Plaintiffs' motions for preliminary relief) and because the parties consolidated their briefing on class certification with the merits."  404 F. Supp. 3d at 154. Although mindful of the fact that Rule 23(c)(1) directs courts to resolve class certification motions "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1)(A), the Court notes that the rule grants district courts "great discretion in determining the appropriate timing for such a ruling," *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997); *see also* 7A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 1785.3 (3d ed. 2018) ("The time at which the court finds it appropriate to make its class-action determination may vary with the circumstances of the particular case.").  Thus, district courts are not required to decide class certification issues before ruling on the merits.

Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Because "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)), the party seeking class treatment "must affirmatively demonstrate . . . compliance" with Rule 23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

As explained below, the Court is persuaded that, with one modification to the class definition, Plaintiffs are entitled to proceed on behalf of the proposed class. The Court will, accordingly, certify a class (or subclass) consisting of all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States. The Court will postpone addressing whether it is also appropriate to certify a class (or subclass) of individuals who were subject to the Proclamation and guidance and have already been repatriated or removed from the United States because those individuals stand in a markedly different posture than those who have yet to be repatriated or removed, because their claims implicate distinct questions of law, and because the relief that they seek is different. *See Wagner v. Taylor*, 836 F.2d 578, 589–90 (D.C. Cir. 1987) (noting a court's "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23"); 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759 (4th ed. 2025) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may . . . redefine the class to bring it within the scope of Rule 23 . . . .").

The Court will appoint Plaintiffs' counsel to represent the class of individuals who are or will be subject to the Proclamation and the guidance within the United States and will appoint the Individual Plaintiffs who still remain in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) as the class (or subclass) representatives.

1.    *Rule 23(a)*

The proposed class, as modified, satisfies the four "prerequisites" set forth in Rule 23(a). First, the proposed class satisfies the numerosity requirement.  Although the numerosity requirement does not set a "specific threshold," "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth*., 241 F.R.D. 33, 37 (D.D.C. 2007).  Plaintiffs may satisfy the requirement, moreover, by supplying estimates of putative class members*, see Pigford v. Glickman*, 182 F.R.D. 341, 347–48 (D.D.C. 1998), "so long as there is a reasonable basis for the estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).  Relying on information shared on social media by U.S. Border Patrol officials, Plaintiffs estimate that "hundreds of noncitizens are being apprehended at the border each day and subjected to the Proclamation," Dkt. 13 at 5 & n.3, and Defendants' data supports that estimate, *see* Dkt. 43-2 at 18 (Gunduz Decl. ¶ 36) (reporting 240 encounters per day during a two-week period in February).  That is more than sufficient to satisfy the numerosity requirement.

The second and third requirements, commonality and typicality, often overlap.  The commonality requirement is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and the typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3).  For commonality, class members' claims must "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity

105

will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Dukes*, 564 U.S. at 350. For typicality, the proposed representative plaintiffs must "possess the

same interest and suffer the same injury" as the members of the putative class. *Gen. Tel. Co. of

Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks and citations omitted).

"While commonality requires a showing that the *members* of the class suffered an injury

resulting from the defendant's conduct, the typicality requirement focuses on whether the

*representatives* of the class suffered a similar injury from the same course of conduct." *Bynum v.

D.C.*, 214 F.R.D. 27, 34 (D.D.C. 2003). Here, both requirements are satisfied by the proposed

class, as modified above. All members of that class, including the proposed class

representatives, face the same threat of injury: (1) loss of the protections afforded to aliens under

§ 1225(b)(1) (expedited removal) or § 1229a (regular removal); (2) loss of the right to seek

asylum and the right to seek, and where appropriate to obtain, withholding of removal as set

forth in the INA and the extant regulations; and (3) loss of the right to apply for CAT protection

pursuant to regulations adopted pursuant to FARRA. "Not only do all class members present the

same challenge[s] to the [Proclamation and guidance], but there is also no evident variation

among them concerning their ultimate entitlement to [the] relief [they seek]: if any person in the

class has a meritorious claim, they all do." *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019).

Defendants disagree, arguing that the class is "overbroad" for several reasons.[17] Some of

those reasons fall aside in light of the Court's decision to modify the proposed class to include, at

least for present purposes, only those individuals subject to the Proclamation and guidance who

---

[17] Defendants raise these arguments both to challenge the breadth of the proposed class and to
challenge Plaintiffs' efforts to satisfy the commonality and typicality requirements. *See* Dkt. 43
at 25–32; *id.* at 32–36. The Court will address the arguments together.

are still in the United States.  Defendants' remaining arguments remain relevant but are nonetheless unavailing.

*First*, Defendants argue that the proposed class is improper because "it includes those who lack entitlement to the claimed statutory protections;" that is, they object to the proposed class because not every proposed member has or will claim or manifest a fear of persecution and because some of the proposed class members are or will be "statutorily ineligible for protection." Dkt. 43 at 10–11.  The Court is unpersuaded.  Unlike in *Dukes*, where the Supreme Court reasoned that no "glue" held together each of the purported acts of discrimination alleged by a class of women, 564 U.S. at 352, Plaintiffs and the putative class members share an interest in some or all of the relief sought.  Commonality is satisfied where there is "a uniform policy or practice that affects all class members," *DL*, 713 F.3d at 128, and that principle applies with equal force to the typicality requirement.  Here, the Proclamation and guidance apply equally to—and they affect the legal rights of—all of the members of the proposed, modified class. Because all putative class members will, absent relief, face non-statutory repatriation or removal proceedings without the protections embodied in the INA, FARRA, and their implementing regulations, Defendants' first argument is unavailing.

*Second*, Defendants argue that the "procedures for implementing the Proclamation could change in the future in ways that are material to the proposed class members' claims and claimed injuries."  Dkt. 43 at 29.  But the relief Plaintiffs seek—vacatur of the current guidance and a declaration that the Proclamation is unlawful to the extent it prohibits them from seeking statutory and regulatory protections—does not depend on hypothetical future procedures that are not before the Court.

*Third*, Defendants argue that "[t]hose class members who have received, or will receive, § 1225(b)(1) expedited removal orders under the Proclamation can only obtain limited habeas review and relief with respect to their expedited removal orders" and that such review is ineligible for class treatment under § 1252(e)(1)(B).   Dkt. 43 at 35; *see also id*. at 30–31.   But § 1252(e)(1)(B) applies only to the extent that Plaintiffs seek "judicial review under" § 1252(e)—that is, if a plaintiff seeks "[j]udicial review of [(1)] determinations under section 1225(b)" or (2) the "implementation" of § 1225(b), 8 U.S.C. § 1252(e)(3)(A).   Here, Plaintiffs do not seek judicial review of either a determination rendered under § 1225(b) or the Secretary or Attorney General's implementation of that provision.

Significantly, Plaintiffs do not seek judicial review of a determination entered pursuant to § 1225(b).   As explained above, the "212(f) Expedited Removal" orders at issue in this case were issued under the auspices of the President's § 1182(f) authority, not under the Secretary or Attorney General's authority under § 1225(b).   *See supra* at 57–61; *see also Tabatabaeifar v. Scott*, 2025 WL 1397114, at *2 (D. Ariz. May 14, 2025) (concluding that an alien being processed under the Proclamation for "Expedited Removal – Section 212(f)" was not being removed "pursuant to Seton 1225(b)").   Defendants themselves concede as much.   They argue, for example, that the "212(f) Direct Repatriations" and "212(f) Expedited Removals" at issue are not subject to the rules set forth in § 1225(b) (or § 1229a) because "[t]he Proclamation does not speak to removal proceedings" and, instead, constitutes an exercise of the President's authority under § 1182(f), § 1185(a), and the Constitution, *see, e.g.*, Dkt. 44 at 43, 58; *see also id.* at 60; Dkt. 55 at 24–25, 27–30.   They cannot have it both ways.   Defendants cannot in some places argue that the removals at issue are governed solely by the Proclamation and the President's authority under § 1182(f), § 1185(a), and the Constitution, while arguing in others that many

(and perhaps most) of the removals at issue are, in fact, governed by § 1225(b) and are thus subject to the limitations found in § 1252(e)(1)(B).  Simply put:  If § 1225(b) does apply, Plaintiffs are entitled to apply for asylum and withholding of removal, which are the fundamental procedural protections that exists in expedited removal.  And, if it does not apply, § 1252(e)(1)(B) has no bearing on Plaintiffs' motion for class certification.

Even putting this concession aside, Defendants offer no plausible basis to conclude that the "212(f) Expedited Removal" orders constitute "determinations under section 1225(b)." Calling the process "expedited removal"—or, more precisely, "212(f) Expedited Removal"— does not, of course, mean that the resulting order qualifies as a "determination under section 1225(b)."  As the Supreme Court has observed, "calling a thing by a name does not make it so," *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Relations Comm'n*, 429 U.S. 167, 174 (1976), and thus merely incorporating the words "expedited removal" into the label at issue here is of no moment.  But even more to the point, the "212(f) Expedited Removal" process lacks *any* of the hallmarks of a § 1225(b) removal.  Under § 1225(b), the immigration officer must "order the alien removed from the United States . . . unless the alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of prosecution."  8 U.S.C. § 1225(b)(1)(A)(i). If the alien expresses "an intention to apply for asylum . . . or a fear of prosecution, the officer shall refer the alien for an interview by an asylum officer."  *Id.* § 1225(b)(1)(A)(ii).  The asylum officer then conducts the required interview and, if she "determines . . . that [the] alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and if the officer determines that the "alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review," *id.* § 1225(b)(1)(B)(iii)(I).  None of that occurs under a

"212(f) Expedited Removal."  To the contrary, when asked to explain the difference between

"212(f) Direct Repatriation" (which involves, as far as the Court can discern, nothing more than

the physical expulsion of the individual at issue) and "212(f) Expedited Removal," Defendants

identified only one thing: aliens processed pursuant to the latter receive Form I-860: Notice and

Order of Expedited Removal, which is a form used in § 1225(b) proceedings.  Dkt. 59 at 7.

Without attempting to chronicle the essential elements of a § 1225(b) removal determination, it

is safe to conclude that a single form—which is not mentioned in the statute and simply informs

the recipient that the Secretary has determined that she is inadmissible and has ordered her

removal—does not suffice.  The Court, accordingly, is unpersuaded that a "212(f) Expedited

Removal" order qualifies as a "determination[] under section 1225(b)(1)."

Defendants do not even suggest that Plaintiffs' challenge is directed at the Secretary or

Attorney General's "implementation" of § 1225(b)—and for good reason.  As explained above,

Plaintiffs challenge the Proclamation and its implementation.  *See, e.g.*, Dkt. 11 at 4 (Am.

Compl. ¶ 3) ("The Proclamation is both unlawful and unprecedented."); *id.* at 34 (Am. Compl.

¶ 113) ("The Proclamation and Defendants' actions to implement and enforce the Proclamation

violate 8 U.S.C. § 1158(a)(1)."); *see also id.* at 37–38 (Am. Compl. ¶¶ 128–31).  The

Proclamation, in turn, is not premised on any authority assertedly found in § 1225(b)(1) or on the

Attorney General's (and now the Secretary's) authority to interpret and to implement IIRIRA.

To the contrary, all agree that the challenged actions rise or fall based on the President's asserted

authorities under § 1182(f), § 1185(a), and the Constitution.  In short, this case does not implicate the "implementation" of IIRIRA.[18]

Finally, Plaintiffs also satisfy Rule 23(a)'s adequacy of representation requirement.  This requirement imposes two conditions on plaintiffs seeking to represent a class: first, "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and second, "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).  Defendants do not dispute that the proposed class representatives share interests with the members of the class, and the Court has no reason to conclude otherwise.  Nor do Defendants dispute that Plaintiffs' counsel are qualified to represent the class, and, in any event, the Court has considered that question *sua sponte* and concludes that current counsel are well-qualified.  The declarations submitted in support of class certification demonstrate that current counsel are willing and able to vigorously litigate this case and to protect the interests of absent class members.  *See* Dkt. 13-1 (Crow Decl.); Dkt. 13-2 (Michelman Decl.); Dkt. 13-3 (Russell Decl.); Dkt. 13-4 (Zwick Decl.).  The Court, accordingly, concludes that the adequacy of representation requirement is satisfied.

---

[18] Although Defendants do not raise the issue, the Court concludes for these same reasons that judicial review of this case is not proscribed by 8 U.S.C. § 1252(b)(9), often referred to as the "zipper clause."  That provision provides that:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States *under this subchapter* shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9) (emphasis added).  Because the actions taken to remove the individual plaintiffs and putative class members were taken outside the procedures set forth in the INA, the zipper clause does not bar review of those actions prior to the issuance of a final order of removal.

2.      *Rule 23(b)(2)*

Plaintiffs have also carried their burden under Rule 23(b).  As Plaintiffs explain, they ask the Court to certify the class under Rule 23(b)(2), which applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (internal quotation marks and citations omitted).  Rule 23(b)(2) imposes "two requirements: (1) that defendant's actions or refusal to act are generally applicable to the class and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class."  *Bynum*, 214 F.R.D. at 37.  "To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.'"  *DL*, 860 F.3d at 726 (quoting *Dukes*, 564 U.S. at 360).

Both requirements of Rule 23(b)(2) are satisfied.  The Proclamation and guidance preclude all putative class members from seeking asylum or withholding of removal and will make it more difficult to secure CAT protection.  These actions are generally applicable to the individual plaintiffs and the class they seek to represent.  The relief Plaintiffs seek, moreover— vacatur of the guidance, a declaration that the challenged aspects of the Proclamation are unlawful, and an injunction prohibiting Defendants from implementing the Proclamation would, "in one stroke," prevent Defendants from employing non-statutory procedures to remove or repatriate those subject to the Proclamation and would require Defendants to provide all covered individuals with access to the forms of humanitarian relief set forth in § 1158, § 1231(b)(3), FARRA, and the implementing regulations.  *Dukes*, 564 U.S. at 350.

In response, Defendants argue that the proposed class does not qualify under Rule 23(b)(2) because no "single injunction" can provide complete relief to all Plaintiffs. Dkt. 43 at 36–37. They argue, in particular, that a prospective injunction would not redress the claims of class members who were already removed. *Id.* at 37. But the Court is not yet prepared to certify a class that includes those who have already been repatriated or removed pursuant to the Proclamation and guidance. This is, accordingly, a question for another day.

\* \* \*

The Court, accordingly, concludes that Plaintiffs have carried their burden of demonstrating that class treatment is warranted under Rule 23(b)(2). The Court will enter a separate order certifying the proposed class, designating the individual plaintiffs who are still present in the United States as class representatives, and appointing Plaintiffs' counsel to serve as class counsel.

## D.    Remedy

This brings the Court to the question of remedy. Plaintiffs urge the Court (1) to "[v]acate the guidance insofar as it permits Defendants" to engage in non-statutory removals, restricts covered individuals from invoking the INA's protections, and departs from the regulatory CAT screening standards; (2) to "[d]eclare that Defendants [] cannot lawfully implement or enforce the Proclamation or [the implementing guidance]" to take any of those actions; and (3) to "[e]njoin Defendants from implementing or enforcing the Proclamation" to take any of those three actions. Dkt. 52 at 42–43.[19] Defendants disagree, countering that "the Court may not issue

---

[19] Plaintiffs also ask that the Court restrict Defendants from relying on removal orders issued pursuant to the Proclamation and order Defendants to facilitate the return of individual plaintiffs and other class members who were removed or repatriated under the Proclamation. *See* Dkt. 52 at 42–43. As explained above, the Court requires further briefing before it can resolve whether it

relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs;" that the

Court lacks jurisdiction to enter a class-wide injunction under § 1252(f)(1); and that, even if the

Court could issue broad injunctive relief, it should decline to do so because "[t]he balance of the

equities weighs heavily against issuing injunctive relief because the Proclamation is critical for

combating a sustained surge of illegal migration across the southern border."  Dkt. 55 at 30–31.

The Court will consider each form of relief in turn.

1.    *Vacatur*

As explained above, the Court has concluded that the implementing guidance is "not in

accordance with law," 5 U.S.C. § 706(2)(A).  When a court reaches that conclusion, the APA

typically mandates that the Court "shall" "set aside" the challenged "agency action."  *Id*. § 706.

That is, under the plain language of the APA, the Court must "annul or vacate" the unlawful

agency action.  *See Set Aside*, Black's Law Dictionary (10th ed. 2014).  That reading of the APA,

moreover, is consistent with longstanding and consistent practice in this circuit.  *See, e.g*.,

*Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common

remedy when we find a rule is invalid is to vacate."); *Blue Water Navy Viet. Veterans Ass'n, Inc.

v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the 'normal remedy.'") (quoting

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *Sugar Cane Growers

Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an agency . . .

clearly violates the APA we would vacate its action.").  To be sure, decisions in this circuit have,

on occasion, remanded a rule without vacatur*, see Allied–Signal, Inc. v. U.S. Nuclear Regul.

Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), but Defendants cite no authority suggesting

---

has the authority to—and whether it should—grant relief to aliens no longer present in the
United States.

that any remedy short of vacatur is appropriate here.  *Cf. Milk Train, Inc. v. Veneman*, 310 F.3d

747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (positing that vacatur is always required);

*Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., concurring) (same).

To the extent Defendants argue that the vacatur remedy should be limited to the

individual plaintiffs, that contention is both at odds with settled precedent and difficult to square

with the statutory text of the APA, which offers no such limitation.  The D.C. Circuit has "made

clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the

ordinary result is that the rules are vacated—*not that their application to the individual*

*petitioners is proscribed*.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir.

1989)) (emphasis added).

In explaining its basis for reaching that conclusion, the D.C. Circuit invoked Justice

Blackmun's opinion in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), which,

although a dissent, "apparently express[ed] the view of all nine Justices on th[e] question."  *Nat'l*

*Mining Ass'n*, 145 F.3d at 1409.  Justice Blackmun wrote:

> The Administrative Procedure Act permits suit to be brought by any person
> "adversely affected or aggrieved by agency action."  In some cases the "agency
> action" will consist of a rule of broad applicability; and if the plaintiff prevails,
> the result is that the rule is invalidated, not simply that the court forbids its
> application to a particular individual.  Under these circumstances a single
> plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief
> that affects the rights of parties not before the court.  On the other hand, if a
> generally lawful policy is applied in an illegal manner on a particular occasion,
> one who is injured is not thereby entitled to challenge other applications of the
> rule.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting).  As explained by the D.C. Circuit in *National*

*Mining Association*, this view was shared by the three Justices who joined Justice Blackmun's

dissent and by the majority, which observed that a final agency action may "be challenged under

the APA by a person adversely affected—and the entire [agency program], insofar as the content

of that particular action is concerned, would thereby be affected." *Id.* at 890 n.2; *see also Nat'l*

*Mining Ass'n*, 145 F.3d at 1409 (citing same). This Court is, of course, bound by the D.C.

Circuit's decision in *National Mining Association* and the "countless" Supreme Court and D.C.

Circuit opinions that have "vacated agency actions . . . rather than merely providing injunctive

relief that enjoined enforcement of the rules against the specific plaintiffs," *Corner Post, Inc. v.*

*Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024) (Kavanaugh, J., concurring)

(collecting cases); *see also, e.g.*, *Trump v. Casa, Inc.*, No. 24A886, 606 U.S. ___, ___, 25 WL

1773631, at *19 (June 27, 2025) (Kavanaugh, J., concurring) (noting that "in cases under the

Administrative Procedure Act, plaintiffs may ask a court to . . . 'set aside' a new agency rule");

*Thornburgh*, 878 F.2d at 495 n. 21.

Even without this controlling precedent, moreover, the Court would follow the plain

language of the APA, which provides that "[t]he reviewing court *shall . . . set aside* agency

actions . . . found to be . . . not in accordance with law." 5 U.S.C. § 706 (emphasis added).

Defendants, moreover, have failed to identify any plausible manner in which the Court could set

the guidance aside as to the individual plaintiffs and the organizational plaintiffs, while leaving it

in place as to all others. Fortunately, however, the Court need not engage in such gymnastics

because the language of the APA, the controlling D.C. Circuit precedent, and decades of

Supreme Court and D.C. Circuit practice leave little doubt that, if unlawful, the guidance must be

"set aside"—that is, cancelled, annulled, or revoked, *see Corner Post, Inc.*, 603 U.S. at 829

(Kavanaugh, concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933)).

The Court, accordingly, concludes that the proper remedy includes vacatur of the

challenged guidance. This remedy is appropriate with or without a class action and with or

without the organizational plaintiffs, *See Nat'l Mining Ass'n*, 145 F.3d at 1409, and it will afford much—although not all—of the relief that Plaintiffs seek in this case.

    2.    *Declaratory Judgment*

    The Court will also enter a declaratory judgment as to all Defendants other than the President declaring that the Proclamation is unlawful insofar as it purports to suspend or restrict access to asylum, withholding of removal, or the existing regulatory processes for obtaining CAT protection.  The Court will not, however, enter declaratory relief against the President. Although "the possibility" that declaratory relief "*might* be available against the President in extraordinary cases" appears to have been "le[ft] open" by the D.C. Circuit, such relief would be appropriate only if "the conduct at issue . . . involve[s] a ministerial duty" or if "relief is [un]available against other executive officials and so the President" must be "sued as a last resort." *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021).  Neither of those two circumstances is present here.  Plaintiffs, however, argue that declaratory relief against the President is available under the D.C. Circuit's decision in *National Treasury Employees Union v. Nixon (NTEU)*, 492 F.2d 587 (D.C. Cir. 1974).  But that case involved a "ministerial duty," *id.* at 616, and Plaintiffs do not argue—nor could they—that the conduct at issue here is ministerial in nature.  More importantly, declaratory relief that runs against the executive officials responsible for carrying out the Proclamation suffices to clarify which aspects of the Proclamation cannot be lawfully implemented by those officials.

    3.    *Injunction*

    Plaintiffs also seek an injunction prohibiting the Agency Defendants from implementing the Proclamation to take any of the challenged actions.  According to Defendants, 8 U.S.C. § 1252(f)(1) deprives the Court of "authority to issue an injunction against the implementation of the Proclamation."  Dkt. 44 at 67.  Although § 1252(f)(1) does not bear on Plaintiffs' core claims

or the core relief that they seek both individually and on behalf of class, it does limit the scope of

any class-wide relief that the Court might grant.

Section 1252(f)(1) provides as follows:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of
> part IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application
> of such provisions to an individual alien against whom proceedings under such
> part have been initiated.

8 U.S.C. § 1252(f)(1).  The Supreme Court construed § 1252(f)(1) in *Garland v. Aleman*

*Gonzalez*, 596 U.S. 543 (2022), and that decision and its progeny guide the Court's analysis.

The principal question addressed in *Aleman Gonzalez* was how best to read the phrase "to

enjoin or restrain the operation of the provisions of part IV of this subchapter."  8 U.S.C.

§ 1252(f)(1).  The respondents in *Aleman Gonzalez* brought two suits—one in the Western

District of Washington and the other in the Northern District of California—seeking to compel

the government to comply with its obligation under 8 U.S.C. § 1231(a)(6) "to provide bond

hearings in cases like theirs."  596 U.S. at 546.  The district courts "certified classes, agreed with

respondents' claims on the merits, and entered class-wide injunctive relief," and the Ninth

Circuit affirmed in relevant respects.  *Id.*  The question before the Supreme Court was whether

that injunction enjoined or restrained "the operation of" § 1231(a)(6) or, instead, merely

compelled compliance with that provision.

The Supreme Court concluded that § 1252(f)(1) not only bars class-wide injunctive relief

limiting the "operation" of a covered provision but also bars injunctive relief compelling officials

to comply with the covered provisions.  As the Court construed § 1252(f)(1), it "generally

prohibits lower courts from entering injunctions that order federal officials to take or to refrain

118

from taking actions to enforce, implement, or otherwise carry out the specified statutory

provisions." *Id.* at 550. Applying *Aleman Gonzalez* here, Defendants correctly observe that

§ 1252(f)(1) would preclude the Court from granting a class-wide injunction compelling the

Secretary "to provide aliens with credible fear interviews under Section 1225 or [full] removal

proceedings under Section 1229a," since both of those provisions are found in part IV of the

INA. Dkt. 43 at 38. But, with one exception discussed below, that is not the relief that Plaintiffs

seek, nor does it accurately reflect the nature of their claims.

What Plaintiffs do seek, and what is not subject to § 1252(f)(1), is an order enjoining the

Agency Defendants from implementing the Proclamation. *See, e.g.*, Dkt. 70 at 1. No portion of

the Proclamation is premised on any provision found in part IV of the INA, nor (except as

discussed below) do Plaintiffs challenge the Proclamation on the ground that it fails to comply

with any provision found in that part. Instead, they argue that neither § 1182(f) and § 1185(a),

which are located in part II of the INA, nor the Constitution provide the authority asserted in the

Proclamation, and they ask that the Court enjoin the implementation of the Proclamation on the

ground that it lacks any statutory or constitutional basis. The asylum statute, 8 U.S.C. § 1158(a),

which provides Plaintiffs with the right to apply for asylum and which is the only statutory right

expressly suspended in the Proclamation, is also found in part II of the INA, and the CAT

provision is found in FARRA, which is an entirely different statute. To the extent Plaintiffs seek

class-wide injunctive relief (running against the Agency Defendants) relating to the operation or

implementation of *these* provisions, Defendants' reliance on § 1252(f)(1) is unavailing. The

Court can grant effective injunctive relief without ordering any federal official "to take or to

refrain from taking actions to enforce, implement, or otherwise carry out" any provision found in

part IV. *Aleman Gonzalez*, 596 U.S. at 550.

To be sure, but-for the Proclamation and guidance, the putative class members' claims for asylum and withholding of removal would, in all likelihood, be processed pursuant to the provisions of the INA governing expedited removal, 8 U.S.C. § 1225(b)(1), or regular removal, *id.* § 1229a.  Although those provisions are found in part IV, Plaintiffs are not asserting a class-wide right to participate in any particular form of removal proceeding and, indeed, they are not asking to be placed in any specific type of removal proceedings.  Rather, they are asking the Court to bar Agency Defendants' non-statutory, Proclamation-based efforts to expel them from the United States without providing them with the right to apply for asylum under § 1158(a), without complying with the requirements contained in § 1158(b)(2)(C) for adopting additional limitations on eligibility for asylum, and without complying with the established CAT procedures, as required by FARRA.  To the extent the relief that Plaintiffs seek—enjoining implementation of the Proclamation—might have downstream effects on removal proceedings, those effects are merely incidental to Plaintiffs' permissible challenges to the Proclamation and guidance, and such "collateral effect[s]" do not trigger § 1252(f)(1).  *Aleman Gonzalez*, 596 U.S. at 553 n.4 (distinguishing circumstances in which "a court may enjoin unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original); *see also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement proceeding [under part IV] may be a collateral consequence of an unsuccessful adjustment application.").  In this respect, Plaintiffs' claims are unlike those raised in *N.S. v. Dixon*, No. 21-5275, __ F.4th __, 2025 WL 1775150, at *8 (D.C. Cir. June 27, 2025), where the injunction at issue "directly and

substantially restricted the ability of . . . federal officials to 'carry out'" the arrest and detention

of deportable aliens pursuant to 8 U.S.C. § 1226, which is located in part IV of the INA.

Although Plaintiffs do not seek an order requiring Defendants to institute removal

proceedings under § 1225(b)(1) or § 1229a or to "enforce, implement, or otherwise carry out

[those] statutory provisions," *Aleman Gonzalez*, 596 U.S. at 550, they do invoke the exclusive-

procedure provision found in § 1229a(a)(3), which is located in part IV of the INA.  They do so,

however, only to support their contention that § 1182(f) and § 1185(a) do not authorize the

President to establish a non-statutory removal regime and to show that, under the *Youngstown*

framework, the President lacks the independent constitutional authority to do so.  But neither of

those arguments seeks to "enjoin or restrain the operation of" § 1229a(a)(3); rather, they merely

bolster Plaintiffs' contention that neither § 1182(f) and § 1185(a), nor the Constitution, authorize

the President (or his subordinates) to adopt and to implement an extra-statutory system for

expelling aliens from the United States.

The relevant question for purposes of § 1252(f)(1), however, is whether the "the plaintiff

seeks to "enjoin or restrain" a "provision" located in part IV, not whether the plaintiff cites to

authority found in part IV to support his request to enjoin or restrain a federal official's

enforcement or implementation of a distinct statutory or constitutional provision.  In seeking a

stay in *U.S Department of Homeland Security v. D.V.D*, the Solicitor General made precisely this

point.  He stressed that courts must avoid

> conflat[ing] the question of what provisions the injunction is *enforcing* with the
> question of what provisions the injunction is *restraining*.  Section 1252(f)(1)
> does not address *why* an injunction may issue; it addresses *what* that injunction
> may run against.

*U.S. Department of Homeland Security v. D.V.D*, No. 24A1153, Reply Br. in Support of

Application for Stay of Injunction (June 5, 2025), at 4 (emphasis in original); *see also* Dkt. 70-1

at 6.  That describes the current circumstances to a tee.  Plaintiffs do not seek an order

compelling Defendants to comply with § 1229a(a)(3)—or § 1229a or § 1225(b) more

generally—but discuss those provisions merely to show that neither § 1182(f) and § 1185(a) nor

the Constitution authorize the President (or his subordinates) to adopt extra-statutory procedures

for expelling aliens and to support their request that the Court enjoin the Agency Defendants

from implementing the Proclamation.

 One of Plaintiffs' claims does, however, implicate § 1252(f)(1).  In particular, in Count

Two of the Amended Complaint, Plaintiffs allege that § 1231(b)(3) "precludes the removal of

noncitizens to countries where it is more likely than not that their 'life or freedom would be

threatened . . . because of [their] race, religion, nationality, membership in a particular social

group or political opposition,'" and they allege that "[t]he Proclamation and Defendants' actions

to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing

regulations by barring withholding of removal for noncitizens in the United States."  Dkt. 11 at

35 (Am. Compl. ¶¶ 116–17) (quoting 8 U.S.C. § 1231(b)(3)).  Because this provision—which

codifies the right to withholding of removal—is found in part IV of the INA, the Court must

consider whether § 1252(f)(1), as construed in *Aleman Gonzalez*, precludes the Court from

granting class-wide injunctive relief with respect to that claim.

 The question is a close one because Plaintiffs' principal challenge is directed at the

Proclamation and its implementation, and they do not ask that the Court enter an injunction

compelling Defendants to comply with § 1231(b)(3).  *See* Dkt. 51-1 at 1–3.  Instead, they

challenge the wholesale displacement of § 1231(b)(3) and a host of other portions of the INA

with a presidentially decreed, alternative immigration system, and they challenge the President's

authority under § 1182(f) and § 1185(a) and the Constitution to effect such a change in the law.

Dkt. 11 at 35 (Am. Compl. ¶ 118). But Plaintiffs' complaint turns, at least in part, on the contention that § 1231(b)(3) establishes a statutory right to withholding of removal and that Defendants should be required to comply with that statutory mandate, and *Aleman Gonzalez* holds that § 1252(f)(1) "is not limited to the covered provisions 'as *properly* interpreted.'" *N.S.*, 2025 WL 1775150, at *7 (quoting *Aleman Gonzalez*, 596 U.S. at 552–54) (emphasis in original).

In any event, the Court is persuaded that it lacks authority to issue a class-wide injunction requiring the Agency Defendants to comply with § 1231(b)(3), and the Court, accordingly, will not do so. But that does not mean that the Court must deny the principal injunctive relief that Plaintiffs seek—that is, an order precluding the Agency Defendants from implementing the Proclamation. Among other things, as noted above, the Proclamation expressly refers to asylum, but it says nothing about withholding of removal, and although the Proclamation purports to suspend "access to provisions of the INA that would permit continued presence in the United States," Proclamation, §§ 2–3, withholding of removal does not permit aliens to remain in the United States—it merely specifies to where an alien may be removed. As a result, enjoining the Agency Defendants from implementing the Proclamation would not "enjoin or restrain" the operation of § 1231(b)(3).

It is one thing to read the phrase "authority to enjoin or restrain the operation of the provisions of part IV" to prevent lower courts from issuing class-wide injunctions directing how the Secretary and Attorney General should implement the covered provisions. *Aleman Gonzalez*, 596 U.S. at 550. It would be a different matter altogether to read that phase to preclude a court from enjoining the implementation of the Proclamation, which contains no mention of § 1231(b)(3). The Court, accordingly, concludes that it has jurisdiction to enter a class-wide injunction that enjoins implementation of the Proclamation, notwithstanding the prohibition in

§ 1252(f)(1), but the Court clarifies that the class-wide injunction does not compel compliance with § 1231(b)(3). In this limited respect, the class will need to rely on the Court's vacatur order and declaratory judgment.

*    *    *

Having concluded that an injunction is available, the Court must decide, as a matter of its equitable discretion, whether to exercise that authority?

Notably, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury. *Id.* When addressing a similar question in the past, this Court declined to issue an injunction for just this reason. *See O.A.*, 404 F. Supp. 3d at 154.

The present circumstances, however, differ in an important respect. In *O.A.*, the Court relied on the defendants' representation "that they w[ould] abide by the Court's order, . . . and Department of Justice guidance regarding vacatur under the APA provide[d] that the 'Department litigators should' comply 'with circuit precedent,' including the D.C. Circuit's decision in *National Mining Association*," which instructs that the legal consequences of vacatur under the APA extend beyond the parties to a case. *Id.* Here, in contrast, Defendants have themselves expressed doubt that an order merely setting aside the guidance would be effective. They assert that, "if the guidance alone were . . . vacated . . . , the Plaintiffs would still be able to be repatriated under the Proclamation's authority." Dkt. 55 at 22. When asked about this at oral argument, moreover, Defendants doubled down, asserting that all of the actions that Plaintiffs

challenge "flow from the Proclamation itself, which is the only final action at issue." Dkt. 56 at

51 (Hrg. Tr. 51:7–10). The Court has, of course, rejected that proposition, *see supra* 62–63, but

Defendants' suggestion that the Proclamation will continue to compel immigration officials to

operate outside the ordinary bounds of the INA, even if the implementing guidance is set aside,

is enough to distinguish this case from *O.A.* and to raise doubts about whether an order setting

aside the implementing guidance will suffice.

The Court, accordingly, concludes that this is one of the rare cases in which injunctive

relief is required. The injunction, of course, will not run against the President. Moreover, the

Court will narrowly tailor the injunction to prohibit defendants from implementing the

Proclamation, including by adopting extra-statutory expulsion procedures pursuant to § 1182(f)

and § 1185(a) and the President's residual constitutional authority; removing aliens without

complying with § 1158(a); narrowing eligibility for asylum without complying with

§ 1158(b)(2)(C); or altering the CAT procedures in violation of FARRA.

### E.    Request for Stay Pending Appeal

Finally, Defendants "ask for a stay pending appeal" or for "a 14-day delay of the

effective date of any order" to "seek a stay from the D.C. Circuit in an orderly manner" and to

address the "significant operational concerns involved in turning . . . off the proclamation." Dkt.

56 at 65–66 (Hrg. Tr. 65:23–66:6). The Court appreciates those concerns but must also weigh

the fact that thousands of individuals will be repatriated or removed from the United States

pursuant to an unlawful assertion of extra-statutory authority and the risk that, once repatriated or

removed, their likelihood of obtaining meaningful relief will suffer a significant, if not

insurmountable, setback.

The Court concludes that Defendants have failed to carry their burden of satisfying "the

stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*,

904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066

(D.C. Cir. 2017).  In deciding whether to grant a stay pending appeal, the Court must consider

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance

of the stay will substantially injure the other parties interested in the proceeding; and (4) where

the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*,

481 U.S. 770, 779 (1987)); *see also Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974

(D.C. Cir. 1985).  "The first two factors of the traditional standard are the most critical," and they

require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some

'possibility of irreparable injury.'"  *Nken*, 556 U.S. at 434 (citations omitted).  Here, Defendants

have failed to carry their burden with respect to any of the four factors.

First, for all the reasons given above, the Court is unpersuaded that Defendants are likely

to succeed on the merits on appeal.  Defendants have offered no separate argument that "casts

doubt on the Court's decision."  *TECO Guatemala Holdings, LLC v. Rep. of Guatemala*, No. 17-

102, 2020 WL 13612440, at *2 (D.D.C. Mar. 6, 2020).

Second, although the Court recognizes that the judiciary should not lightly intervene in

the affairs of the Executive Branch and that implementing the immigration laws presents

supreme challenges, the Court is unpersuaded that requiring Defendants to return to the

processes that Congress required and that applied just a few months ago would cause Defendants

irreparable harm.  Although enjoining the President from exercising an exclusive constitutional

prerogative might, standing alone, give rise to irreparable injury, requiring the Agency

Defendants to comply with the law as Congress enacted pursuant to its "plenary power over

immigration," *Jarkesy*, 603 U.S. at 129 (2024), would not.  For decades, courts have, where

appropriate, set aside or enjoined agency action that is contrary to law without any suggestion that such orders inflict *per se* irreparable injury on the government.

The final two factors weigh heavily in favor of denying Defendants' request for a stay. A stay would allow Defendants to continue removing class members using extra-statutory procedures, and Defendants have taken the position that this Court lacks the authority to provide relief to any aliens once they are removed. *See, e.g.*, Dkt. 44 at 25–26; Dkt. 55 at 14. Although the Court has yet to address the merits of that contention, the question is a difficult one, and a substantial possibility exists that continued implementation of the Proclamation during the pendency of an appeal will effectively deprive tens of thousands of individuals of the lawful processes to which they are entitled. The Court recognizes that timing is crucial—both for Defendants and Plaintiffs—and that the question whether to grant a stay can, at times, matter as much as the underlying merits of a case. But where the Court is persuaded that the government is acting unlawfully; where that unlawful activity may well cause irreparable injury to the plaintiffs; and where the government may continue to enforce the law using lawful means, the balance of harms and public interest weigh against granting a stay.

Although the Court is unpersuaded that it should stay its decision pending appeal, the Court agrees with Defendants that they should have the opportunity to seek a stay from the court of appeals and that it will take some time to effectuate the Court's class-wide order. The Court will, accordingly, postpone the effective date of its class-wide order by fourteen days. During that period, however, Defendants shall take steps to ensure that they will are fully prepared to implement the Court's order without further delay. The Court's order granting relief to the individual plaintiffs who remain in the United States will take immediate effect.

## CONCLUSION

For all these reasons, the Court will **GRANT** in part Plaintiffs' motion for summary judgment, Dkt. 51, will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, will **DENY** as moot Plaintiffs' motion for a preliminary injunction, Dkt. 14, and will **DEFER** ruling on the remaining portions of the parties' cross-motions.  The Court will postpone the effective date of its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from the Court of Appeals and to prepare to implement the Court's order.  Pursuant to Rule 54(b), the Court determines that there is no just reason for delaying entry of final judgment with respect to the individual and class claims of those Plaintiffs and class members who are present in the United States or will be in the United States, with the exception of their two APA arbitrary-and-capricious claims and their APA claim that the guidance was adopted without observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D), *see* Dkt. 11 at 38–40 (Am. Compl. ¶¶ 132–43).  The Court will, accordingly, **ENTER** partial final judgment.  Finally, the Court will **DIRECT** that the parties promptly submit a joint status report proposing a schedule for further briefing on whether the Court can and should grant relief to those Plaintiffs and putative class members who are no longer present in the United States.

Separate orders will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 2, 2025

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,

      *Plaintiffs*,

   v.

KRISTI NOEM, *et al.*,

      *Defendants*.

Civil Action No. 25-306 (RDM)

## ORDER

For the reasons set forth in the Court's Memorandum Opinion, Dkt. 71, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment, Dkt. 51, is **GRANTED** in

part, **DENIED** in part, and **DEFERRED** in part; and it is further

**ORDERED** that Plaintiffs' motion to certify a class, Dkt. 13, is **GRANTED** in part and

**DEFERRED** in part; and it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction, Dkt. 14, is **DENIED** as

moot in light of the Court's merits decisions; and it is further

**ORDERED** that the agency guidance implementing Proclamation 10888, 90 Fed. Reg.

8333 (Jan. 20, 2025), is **VACATED** pursuant to 5 U.S.C. § 706(2) to the extent that it authorizes

extra-statutory and extra-regulatory removals or repatriations of covered individuals; precludes

the individual plaintiffs and class members from accessing their statutory rights to apply for

asylum; precludes the individual plaintiffs and class members from applying for and, where

appropriate, obtaining withholding of removal; and departs from the Convention Against Torture

("CAT") protection screening standards set forth in the Department of Justice and Department of Homeland Security CAT regulations; and it is further

**DECLARED** as to the Agency Defendants that Proclamation 10888 is unlawful insofar as it purports to suspend or to restrict access to asylum, withholding of removal, or the existing regulatory processes for obtaining CAT protection or authorizes the Agency Defendants to adopt or to implement extra-statutory or extra-regulatory removal or repatriation procedures; and it is further

**DECLARED** as to the Agency Defendants that neither 8 U.S.C. §§ 1182(f) & 1185(a) nor the President's authority under the Vesting Clause or Article IV, Section 4 of the Constitution authorizes the President or his subordinates to suspend or to restrict access to the provisions of the Immigration and Nationality Act that permit the continued presence in the United States of individuals, irrespective of their status, who have entered and who are present in the United States; and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from implementing the Proclamation to remove individual plaintiffs or class members using non-statutory repatriation or removal proceedings; and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from removing any individual plaintiffs or class members without complying with the asylum statute, 8 U.S.C. § 1158(a); and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from narrowing the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C); and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' CAT protection claims; and it is further

**ORDERED** that the parties shall meet and confer and submit to the Court a joint status report proposing next steps for the case on or before July 11, 2025; and it is further

**ORDERED** that the parties shall appear for a status conference on July 15, 2025, at 10:00 a.m., in Courtroom 8; and it is further

**ORDERED** that this Order shall not take effect with respect to the absent class members until July 16, 2025, to allow Defendants the opportunity to seek a stay in the court of appeals and to implement the Court's decision in an orderly fashion, but shall take immediate effect with respect to the named individual plaintiffs who are currently present in the United States; and it is further

**ORDERED** that partial final judgment is hereby entered pursuant to Federal Rule of Civil Procedure 54(b) as to the claims of those individual plaintiffs and class members who are or will be present in the United States, with the exception of the portions of the Sixth Claim for Relief raising arbitrary-and-capricious arguments under the Administrative Procedure Act, *see*

Dkt. 11 at 39 (Am. Compl. ¶ 138), and all of the Seventh Claim for Relief, *see id.* at 39–40 (Am.

Compl. ¶¶ 139–43), all of which have been held in abeyance pending further order of the Court.

      This Order constitutes a final, appealable judgment of the Court within the meaning of

Rule 58(a) of the Federal Rules of Civil Procedure.

      **SO ORDERED**.

                    /s/ Randolph D. Moss
                    RANDOLPH D. MOSS
                    United States District Judge

Date:  July 2, 2025

# Exhibit C

No. 25-5243

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

KRISTI NOEM, Secretary of the
U.S. Department of Homeland Security,
in her official capacity, *et al.*,
*Appellants*.

---

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

---

**DECLARATION OF IHSAN GUNDUZ**

---

I, Ihsan Gunduz, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge and documents and information made known or available to me from

official records and reasonably relied upon in the course of my employment, hereby

declare as follows:

1.    I am the Acting Deputy Assistant Secretary for Border Policy for the

U.S. Department of Homeland Security ("DHS") and have served in this role since

May 5, 2025. Prior to this role, I served as the Acting Deputy Assistant Secretary for Border and Immigration Policy for DHS since February 16, 2025. Prior to this acting role, I served as the Director for Border Policy for DHS from December 4, 2023 to February 16, 2025. I previously served as Senior Policy Analyst for Border and Immigration Policy from April 12, 2021, to December 3, 2023. I also served as Policy Analyst for Border and Immigration Policy from June 9, 2019, to April 11, 2021. Prior to my roles at DHS's Office of Strategy, Policy, and Plans, I served as an Asylum Officer at the U. S. Citizenship and Immigration Services from November 26, 2017, to June 8, 2019. I previously submitted a declaration in this case on March 24, 2025, which was filed on the district court's docket (Doc. 44-5). This declaration updates the information provided in my prior declaration.

## I.     The Necessity of the Proclamation

2.     Since fiscal year 2021, at least 9 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States.[1] Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 FR 8333 (Jan. 20, 2025) (the "Proclamation"). The sheer number of aliens entering the United States has overwhelmed Congress's complex scheme, the Immigration and Nationality Act

---

[1] Office of Homeland Security Statistics, "Immigration Enforcement and Legal Processes Monthly Tables," Nationwide CBP Encounters by Encounter Type and Region, https://ohss.dhs.gov/topics/immigration/immigration-enforcement/monthly-tables.

(INA), 8 U.S.C. 1101 *et seq.*, to protect United States sovereignty and prevent entry of aliens who pose threats to public health, safety, or national security. *Id.* As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide, imposing substantial costs and constraints on the States. *Id.*

3.    In response to this unprecedented influx of aliens, on January 20, 2025, the President issued a Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States." Proclamation 10888, 90 FR at 8334–35. The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum in section 208 of the INA, 8 U.S.C. § 1158. *Id.* at 8335. The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA." *Id.*

4.    In the first 161 days after it was issued (January 21 - June 30, 2025), the Proclamation has had a monumental impact on illegal border crossings and restoring operational control at the southern border. Encounters by the U.S. Border

3

Patrol ("USBP") at the southern border decreased by 82 percent, to the lowest level they have been since the 1960s.  The success of the Proclamation is further demonstrated by the removal or return of more than 28,500 aliens encountered at the southwest border (SWB). The number of SWB enforcement actions resulting in releases has dropped from nearly 1,700 per day to fewer than one per day.  If the Proclamation is enjoined for any period of time, however, DHS anticipates that circumstances at the southern border would rapidly deteriorate to pre-Proclamation conditions or worse, exacerbating the threats to national security and public safety that the federal government is obligated to guard against.[2]

## II.     The Problem of the Influx of Illegal Aliens Crossing the Southern Border.

5.     In routine circumstances, the provisions of the INA work to prevent the admission of aliens who do not serve the national interest, such as those who pose threats to public health, INA § 212(a)(1), 8 U.S.C. § 1182(a)(1); safety, § 212(a)(2) (8 U.S.C. § 1182(a)(2)); and national security, § 212(a)(3) (8 U.S.C. § 1182(a)(3)). *See* Proclamation, 90 FR 8333.  But in circumstances where the volume of illegal entries into the United States overwhelms the system, and access to necessary screening information is limited for aliens who have traveled from around the world

---

[2] OHSS analysis of May 2025 OHSS Persist Dataset based on data provided by CBP and ICE and CBP data downloaded from the Unified Immigration Portal (UIP) on July 2, 2025.

to enter the United States illegally, these provisions may be rendered wholly ineffective. *Id.*

6.     The sheer number of aliens who have entered the country between ports of entry (POEs) at the southern border and who have been released into the United States over the last four years have created exactly these circumstances.  As detailed below, these conditions have made the Proclamation's provisions—suspending and restricting entry, making asylum protections unavailable to certain aliens, and requiring medical and criminal history documentation—indispensable to preserving national security and public safety.

7.     In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s, with USBP making over 1.6 million encounters.  In FY 2022, DHS reached a record high number of encounters at the SWB, with total USBP encounters exceeding 2.2 million.  And in FY 2023, DHS yet again reached another record year of encounters, totaling over 2 million between SWB POEs.  In the first eight-plus months of FY 2024 up through June 4, 2024, there were approximately 1.3 million USBP encounters at the SWB.  From June 5, 2024, to January 20, 2025,

despite the proclamations and rules instituted by the prior administration in June 2024 and October 2024, there were over 408,000 USBP encounters at the SWB.[3]

8.    Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009-546, Congress created an expedited removal system for removing certain inadmissible aliens arriving in the United States and certain aliens who entered illegally and were apprehended within two years of their entry.  Those procedures were aimed at facilitating the swift removal of inadmissible aliens while also expeditiously resolving any asylum claims.

9.    When it was first implemented approximately three decades ago, expedited removal worked well, but its utility has been diminished by the substantial increase in aliens crossing the southern border and the increased rates at which they invoke the credible fear process for determining asylum eligibility.  Additionally, in recent years a significant percentage of aliens who are amenable to expedited removal, but are not processed through expedited removal due to resource constraints, are instead released into the United States and placed into removal proceedings under INA § 240, 8 U.S.C. § 1229a ("section 240 removal

---

[3] OHSS analysis of February 2025 OHSS Persist.

proceedings"), without any pre-screening to determine a potential eligibility for asylum or related protection.

10.     Specifically, over 1.5 million aliens were encountered by USBP at the SWB between POEs in FY 2024, and about 378,900 were processed for expedited removal, just 25 percent of aliens encountered during that year.[4]  Instead, DHS released the majority of these aliens into the United States with notices to appear ("NTAs") for removal proceedings pursuant to section 240 removal proceedings[5]—a process that in most cases takes years to resolve.[6]

11.     While challenges to fully utilizing expedited removal are not new, the problem has worsened dramatically over the last four years.  During FY 2014 through FY 2019, DHS released only 10 percent of aliens apprehended by USBP at the SWB into the United States pending section 240 removal proceedings.[7]  In

---

[4] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025. Most remaining encounters were released with NTAs (924,900, 60 percent of the total), with an additional 140,800 (9 percent) voluntary returning to Mexico and 84,500 (6 percent) subject to reinstatement of a removal order.

[5] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025.

[6] For example, EOIR decisions completed in January 2025 were, on average, initiated in August 2022, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that), but 67 percent of EOIR cases initiated during that time were still pending as of January 2025, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 21, 2025.

[7] OHSS, Analysis of July 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, "SWB Encounter Book-Outs," *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book-Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

contrast, from March 20, 2021, through May 11, 2023, DHS released 30 percent of aliens apprehended by USBP into the United States, and the percentage of encounters resulting in such releases increased to 64 percent between May 12, 2023, and June 4, 2024.[8]  The vast majority of these releases involved aliens who were amenable to expedited removal but were instead placed directly into section 240 removal proceedings and released into the United States.

12.    Moreover, aliens encountered at the SWB between POEs who were processed for expedited removal have been more likely to indicate an intent to apply for asylum or some other form of protection in recent years, which prevents their immediate removal.[9]  From FY 2014 to FY 2024, the overall percentage of aliens encountered at the SWB between POEs and processed for expedited removal who indicated an intention to apply for asylum, expressed a fear of persecution or torture, or expressed a fear of return to their country and were referred for a credible fear interview increased from approximately 21 percent to 45 percent; similarly, the total

---

[8] OHSS analysis of CBP data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on Sept. 3, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book-Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

[9] Fifty percent of aliens encountered at the SWB processed for expedited removal in the post-title 42 period (after the end of implementation of the Center for Disease Control and Prevention's public health Order pursuant to Title 42 of the U.S. Code on May 11, 2023) through the end of FY 2024 made fear claims, up from thirty-four percent in the pre-pandemic period from FY 2014 through FY 2019.  OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset.

number of credible fear referrals for interviews increased from about 41,000 in FY 2014 to about 153,000 in FY 2024.[10]

13.     DHS's inability to process most inadmissible aliens through expedited removal in recent years due to the sheer number of aliens who have entered the United States unlawfully, combined with the increase in the number of aliens in expedited removal making fear claims and being referred to section 240 removal proceedings, has had serious consequences for immigration enforcement and adjudication, border security, and communities across the country.

14.     Such large-scale releases have created further incentives for aliens to cross illegally into the United States with the belief that, even if initially apprehended and detained, they will ultimately be released to live and work in the United States during their removal proceedings, which, as exacerbated by the drastic increases in initial case receipts of aliens who are subject to but unable to be processed via expedited removal, may take years to resolve.  *See Securing the Border*, 89 FR 81156, 81158 (Oct. 7, 2024).  This period of time, in addition to the length of time it can take before a removal occurs after a final removal order is issued, creates a strong incentive for some number of aliens without potentially meritorious asylum

---

[10] OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset. *See also* USCIS, *Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions*, https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.

or other claims to make the dangerous journey to the southern border to take their chances on being allowed to remain in the United States for a lengthy period. *Id.* at 81182. More specifically, 61% of aliens processed under expedited removal at the SWB made fear claims even though only 17% of aliens whose cases are completed by the Executive Office for Immigration Review are granted asylum or other form of relief from removal.[11]

15.     As a result of these circumstances, screening for public health, safety, and national security has been compromised—further worsening the costs to and constraints on the States and communities forced to absorb these large-scale releases of illegal aliens.

16.     Notably, DHS lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by INA § 212(a)(1), 8 U.S.C. § 1182(a)(1). Proclamation, 90 FR at 8333.  And effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as aliens who are admitted lawfully would.  *Id.* As a result, innumerable aliens potentially carrying communicable diseases of public

---

[11] OHSS analysis of December 2024 OHSS Enforcement Lifecycle Dataset.

health significance illegally cross the southern border and enter communities across the United States. *Id.*

17.     Moreover, due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by INA § 212(a)(2)–(3), 8 U.S.C. § 1182(a)(2)–(3). *Id.* Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials. *Id.*

18.     The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other Transnational Criminal Organizations (TCOs) on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. *Id.* The risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that inhibit operational control of the border. *Id.*

19.     Critically, not only did overall encounters at the SWB increase from FY 2021 to FY 2024, but so did encounters with aliens that pose threats to national security and public safety. USBP encountered 385 aliens on the terrorist watchlist from FY 2021 to FY 2024 between POEs at the SWB, a 3,400 percent increase from

the previous years (FY 2017 through FY 2020).[12]  In contrast, encounters of aliens
on the terrorist watchlist and those with known gang affiliations are both down
sharply in recent months. In FY 2025 (through May 2025), the USBP has
apprehended just 41 watchlisted individuals attempting to enter the country illegally
between POEs on the SWB.[13]  Further, in FY 2023 and FY 2024, respectively, there
were 639 and 523 USBP encounters with individuals with known gang affiliations
between the POEs, compared to 363 in FY 2020 and 348 in FY 2021.[14]  From
January 21, 2025 to June 6, 2025, USBP apprehended just 145 individuals with gang
affiliations, a pace that projects to 329 per year.[15]

20.     TCOs and Foreign Terrorist Organizations (FTOs) have capitalized on
the invasion at the SWB.  TCOs and FTOs take advantage of USBP agents being
pulled away from their patrol duties along the borders to detention-related activities
to aid in the processing of large groups that characterize the heavy migration flow
across the border, utilizing diversionary tactics to circumvent USBP deployment
posture and technologies to move illicit contraband and criminal aliens into the
interior of the United States.  Cartels, for example, operate with substantial financial

---

[12] *See* CBP, *CBP Enforcement Statistics*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on Feb. 12, 2025) ("CBP TSDS Encounters at and Between Land Ports of Entry" table); *see,* CBP, *Terrorist Screening Data Set Encounters*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited March 22, 2025).

[13] *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics).
[14] *See* CBP, *Gang Affiliated Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on July 2, 2025).
[15] OHSS analysis of data downloaded from UIP July 2, 2025.

resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting.

21.     TCOs and FTOs have also taken advantage of the influx of crossings at the southern border to illegally enter the United States between POEs or fraudulently through parole at POEs.   In 2023 and 2024, for example, eight individuals from Tajikistan entered the United States through various means, including at and between POEs.   Some of these individuals claimed asylum after securing an appointment through the now-terminated CBP One mobile application ("CBP One app") scheduling function and presenting themselves at a POE.  At the time of entry or encounter, none of the individuals was determined to have any information in their background that impacted their ability to be paroled into the United States; however, after entry, they were arrested and suspected of having ties to the Islamic State (ISIS), according to public news sources.[16]   Separately, as reported by the Department of Justice (DOJ), on February 26, 2025, another Tajik national who was illegally present in the United States was arrested after facilitating the payment of

---

[16] *See* CNN, *Feds arrested 8 Tajik nationals on immigration charges after probe found potential ties to terrorism, sources say* (last updated June 12, 2024), https://www.cnn.com/2024/06/11/us/tajik-nationals-arrested-terror-ties-probe/index.html (last visited on March 22, 2025).

tens of thousands of dollars to ISIS-linked extremists overseas, possessing assault rifles, and declaring himself "ready" in a video sent to such individuals.  The Tajik national traveled to the United States in June 2016 on a non-immigrant tourist visa, overstayed his visa, then attempted to enter into a sham marriage with an American citizen, which was never recognized.[17]

### III.    The Impact and Limitations of the Securing the Border Proclamations and Rule.

22.    On June 3, 2024, in response to circumstances at the southern border and a projected increase in illegal immigration absent policy charges, President Biden issued Presidential Proclamation 10773, 89 FR 48487 (June 3, 2024) ("June STB Proclamation"),[18] invoking INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), finding that the entry into the United States of certain aliens during

---

[17] *See* United States Attorney's Office, Eastern District of New York, *Tajik National Arrested in Brooklyn for Conspiring to Provide Material Support to ISIS* (last updated Feb. 26, 2025), https://www.justice.gov/usao-edny/pr/tajik-national-arrested-brooklyn-conspiring-provide-material-support-isis (last visited on March 22, 2025).

[18] On September 27, 2024, President Biden issued a proclamation amending the June STB Proclamation.  *See* Presidential Proclamation 10817, 89 FR 80351 (Oct. 7, 2024).  That proclamation amended the June STB Proclamation in two ways to change the way that southern border encounters are calculated for purposes of discontinuing or reactivating the June STB Proclamation's suspension and limitation on entry of certain aliens at the southern border.  First, previously the suspension and limitation on entry would be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters.  *See* 89 FR at 48491.  Under the revised Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive calendar days before the 14-day waiting period is triggered.  *See* 89 FR at 80353.  Second, the revised Proclamation now counts encounters of unaccompanied alien children from non-contiguous countries as encounters factored into the aforementioned calculation.  *See id.*

emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those aliens. *Id.* at 48491. The June STB Proclamation established thresholds based on the number of encounters between POEs for when the suspension and limitation on entry would be discontinued, continued, or reactivated. *Id.* It also directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492.

23. Shortly thereafter, DHS and DOJ issued a corresponding IFR, Securing the Border, 89 FR 48710 (June 7, 2024) ("STB IFR"). The STB IFR effectuated three key changes to the process for those aliens described in the June STB Proclamation who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June STB Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances; (2) rather than asking specific questions of every alien encountered and processed for expedited removal, providing general notice on credible fear and referring an alien for a credible fear interview only if the alien manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to

15

have a credible fear of persecution for asylum purposes because of the STB IFR's limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and protection under the CAT regulations under a "reasonable probability" standard, defined as "substantially more than a 'reasonable possibility' but somewhat less than more likely than not." STB IFR, 89 FR at 48718; *see also* 8 C.F.R. §§ 208.35(b)(2)(i), (iii).

24.     Following the June STB Proclamation, STB IFR, and later final rule, Securing the Border, 89 FR 81156 (Oct. 7, 2024) ("STB final rule"), encounter numbers between POEs decreased from an average of 4,910 per day in the six months prior to the rule to an average of 1,880 per day between June and December 2024.[19]  However, the STB Proclamations and rules did not go far enough to ensure that the immigration system operates in the manner intended by Congress and with the rigor within the President's authority.  Critically, the STB Proclamations and rule contained exceptions and thresholds for deactivation that prevented them from fully achieving these goals.

25.     Most prominently, the STB Proclamations contained exceptions to accommodate the Biden Administration's use of the CBP One app[20] for aliens who

---

[19] OHSS, analysis of December 2024 OHHS Persist Dataset.

[20] In January 2023, the Biden administration announced a new functionality for the CBP One app, which was originally intended to provide a wide variety of services to legitimate travelers and the trade community.  *See* CBP, CBP/DHS/PIA-068, *Privacy Impact Assessment for the CBP One™*, at 1, July 25, 2024), https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application.

sought appointments to be processed at a POE. Almost all aliens who used the application were then issued NTAs for section 240 removal proceedings and released into the United States, rather than being placed in expedited removal. In FY 2023 and FY 2024, there were 266,840 and 505,720 NTA releases, respectively, for aliens using the application. In FY 2025 through January 20, 2025, there were 153,570.[21]

26. Further, the STB rule itself also contained an exception for exceptionally compelling circumstances. 8 C.F.R. § 208.35(a)(2)(i), 8 C.F.R. § 1208.35(a)(2)(i). Over 7,800 aliens who were apprehended by USBP between the POEs at the southern border between June 5, 2024, and January 20, 2025, were able to establish this exception to the STB rule's asylum eligibility limitation during their credible fear screening, and USCIS returned positive fear determinations in approximately 5,900 (83 percent) of these cases, despite these aliens having entered in violation of the STB Proclamations' suspension and limitation on entry.[22] In comparison, for the approximately 55,000 aliens who were found to be subject to

---

Aliens scheduled about 978,000 appointments through the CBP One app from the scheduling functionality's release through January 2024. *See* OHSS analysis of data provided by CBP Passenger Systems Program Directorate Jan. 22, 2025. Each appointment represents an alien or traveling group who scheduled an appointment, showed proof of the appointment to a U.S. official at the physical boundary between the United States and Mexico, and was permitted to enter a POE for inspection and processing.

[21] Fiscal Years 2019 to January 31, 2025 data from Office of Homeland Security Statistics January 2025 Persist Dataset. February 2025 data from OHSS analysis of CBP data downloaded from UIP on March 5, 2025.

[22] OHSS analysis of data downloaded from UIP Jan. 21, 2025.

the STB rule's asylum eligibility limitation during their credible fear screening and therefore screened at the "reasonable probability" standard, USCIS returned positive fear determinations in 28,400 cases, or just 52 percent of the time.[23]

27.    Therefore, although the STB Proclamations and rules were aimed at deterring aliens from illegally entering the United States and delivering timely consequences to those who did, the CBP One app exception and the rule's exceptionally-compelling-circumstances exception fell far short of securing the border and instead allowed a substantial number of aliens to be released into the United States.

28.    The impact of STB was also undercut by other prior administration's policies that granted parole into the United States to large numbers of aliens, including for certain Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals and their immediate family members.  In FY 2023 and FY 2024, approximately 532,000 Cuban, Haitian, Nicaraguan, and Venezuelan aliens and their

---

[23] OHSS analysis of data downloaded from UIP Jan. 21, 2025.

immediate family members were processed and released into the United States pursuant to CHNV parole processes.[24]

## IV.    The Proclamation is Critical to Addressing the Influx of Illegal Immigration at the Southern Border.

29.    As detailed above, the public health and national security risks posed by the influx of innumerable aliens into the United States, and the insufficient actions of the prior administration, requires the federal government to take measures to uphold its obligations to the States and to the American people.  Accordingly, the President issued the Proclamation pursuant to INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), declaring that the entry into the United States on or after January 20, 2025, of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States.  *See* Proclamation, 90 FR 8333.  The President took and directed a range of actions in the Proclamation, including:

- Directing that entry of aliens engaged in the invasion across the southern border into the United States is suspended until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 1);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8

---

[24] OHSS analysis of February 2025 OHSS Persist Dataset.

U.S.C. §§ 1182(f) and 1185(a)(1), that aliens engaged in the invasion across the southern border of the United States on or after January 20, 2025, are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 2);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States, on or after January 20, 2025, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. §§ 1182(a)(1)–(3), is detrimental to the interests of the United States, and directing that entry into the United States of such aliens be suspended and restricting their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, *see* 90 FR 8335, (§ 3);

- Invoking the authorities provided to the President under Article II of the Constitution of the United States, including the President's control over

20

foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4 of the Constitution, to suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and directing the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of the Proclamation, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335–36, (§ 4); and

- Directing the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after January 20, 2025, whether as an exercise of the suspension power in section 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), or as an exercise of the President's delegated authority under the Constitution of the United States, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 at FR 8336 (§ 5).

30.    USBP implements the Proclamation on the southern border in two ways.  First, certain aliens may be processed for INA § 212(f) repatriation.  Second,

aliens who cannot be directly repatriated under INA § 212(f) are generally processed for expedited removal. Both processing pathways are necessary for DHS to continue to maintain near-operational control at the SWB for two reasons. First, processing for INA § 212(f) repatriation allows DHS to immediately return aliens to their country of origin or a third country that will accept them without expending its limited law enforcement and detention resources. Second, some countries either do not immediately allow repatriation or do not immediately issue travel documents when aliens lack valid travel documents for DHS to remove them. Aliens subject to the Proclamation—either INA § 212(f) repatriation or expedited removal—who manifest a fear are referred to USCIS for an assessment under the CAT.

31.    At the northern and coastal borders, USBP implements Section 3 of the Proclamation only. This means that an alien encountered between POEs on the northern or coastal borders is only subject to the Proclamation if he or she lacks sufficient documentation showing medical, criminal history, and background information.

32.    The Proclamation does not impact USBP's processing of unaccompanied alien children (UACs), who continue to be processed consistent with the requirements of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement Agreement.

22

33.     In any case, if an alien cannot be removed or repatriated directly to his or her country of citizenship—which is mostly applicable to countries that DHS has deemed "hard to remove"—USBP will notify the alien of the country to which he or she will be transferred and will provide the alien with a tear sheet identifying the destination country.  Aliens, who manifest a fear of being removed to the specified country will be referred for a CAT assessment to USCIS.  If the CAT determination is negative, USBP will continue to remove the alien to the designated country.  If the CAT determination is positive, USBP may designate another third country for removal or repatriation, or USBP may place the alien into proceedings with the Executive Office for Immigration Review (EOIR).

34.     Aliens subject to the Proclamation whom CBP does not directly remove or repatriate to a designated country are transferred to ICE custody.  Aliens who manifest fear while in ICE custody are referred to USCIS for a CAT assessment.  If the CAT assessment is negative, ICE will effectuate removal or repatriation.  If the CAT assessment is positive, another country may be designated as a country of removal or repatriation.

35.     CBP Office of Field Operations ("OFO") implements Section 3 of Proclamation at the land border POEs and at air and seaports.  At land border POEs on both the southern and northern border, aliens who lack valid entry documents, or who otherwise fail to provide sufficient medical information or reliable criminal

history and background information are prevented from entering the United States at the physical border.  Similarly, an alien who arrives at an air or seaport who is determined to be subject to Section 3 of the Proclamation is generally processed for expedited removal or a withdrawal of their application for admission.

**V.**    **The Proclamation is Indispensable to Maintaining Operational Control of the Border and Protecting National Security and Public Safety.**

36.    The Proclamation, which complements other executive orders and actions, has been highly effective up to the present.  SWB encounters between POEs have fallen from an average of about 1,600 aliens per day in the 161-day period ending on January 20, 2025, to an average of about 290 per day between January 21 and June 30, 2025.[25]  SWB releases from USBP custody fell from an average of about 260 per day to an average of less than 1 per day in the same two time periods.  Further, illegal aliens encountered since the Proclamation was implemented generally have been quickly repatriated or removed.[26]

37.    By reducing the number of encounters and the number of aliens in custody, the Proclamation has freed up CBP resources to address national security and public safety threats and to secure the border.  The immediate savings on

---

[25] OHSS May 2025 Persist, and OHSS analysis of CBP data provided on July 1, 2025 and CBP data downloaded from UIP on July 2, 2025.

[26] OHSS analysis of May 2025 OHSS Persist Dataset and  CBP data downloaded from UIP on July 2, 2025.

facilities alone are significant.  In mid-March, in response to the lower encounter numbers, CBP began reducing the number of soft-sided facilities along the SWB, which will save between $5 and $30 million per month per facility.  But facilities are only one component of the substantial costs of illegal border crossings. Processing aliens at the border is also resource- and personnel-intensive—and as the number of aliens apprehended and in custody increases, USBP must assign additional agents to processing duties.  But any reassignment of agents to processing duties diverts them from other activities, including law enforcement priorities like combatting criminal activity at the border.  For example, based on data pulled by USBP, as of July 3, 2025 approximately 4 percent of agents along the SWB were assigned to processing tasks, as compared to 6 percent on March, 21, 2025, 16 percent on December 1, 2024, and nearly 14 percent on June 3, 2024.

38.    Criminal activity at the border is a persistent problem during both periods of high and low encounters.  On a typical day in 2024, for example, CBP arrested 86 wanted criminals at U.S. POEs and 49 wanted criminal between U.S. ports of entry; seized 1,571 pounds of drugs (including 60 pounds of fentanyl), $152,418 of illicit currency and other monetary instruments, and 55 shipments with $15 million worth of products with Intellectual Property Rights violations; and intercepted five fraudulent documents and 13 shipments worth $4.8 million under

forced labor.[27]   When border encounters are lower, however, CBP is better positioned to focus its resources on addressing and responding to criminal activity. In FY 2025 to April 2025, OFO encountered 8,445 criminal aliens,[28] and in FY 2025 through May 2025, USBP arrested 5,597 aliens with criminal convictions, including for the most severe crimes: 14 for homicide/manslaughter, 443 for assault/battery/domestic violence, 264 for burglary/robbery/larceny/theft/fraud, and 86 for sexual offenses.[29]   For example, in June 2025, USBP agents arrested a registered sex offender, with a previous conviction for aggravated sexual assault of a child, who was attempting to illegally enter the United States through the Southern Border.[30]  In May 2025 in Southern Texas, USBP agents encountered and arrested a man convicted of aggravated sexual assault of a child who had illegally reentered the United States after deportation. [31]  In March 2025, USBP agents encountered and arrested a man in Southern Arizona who had illegally reentered the United States

---

[27] *See* CBP, *Snapshot, A Summary of CBP Facts and Figures*, June 2025 (based on 2024 data) https://www.cbp.gov/sites/default/files/2025-07/25_0702_cbp-snapshot-fy24_0.pdf (last visited July 4, 2025).
[28] *See* CBP,*CBP Enforcement Statistics, Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement*, last updated June 18, 2025, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited July 4, 2025).
[29] *See* CBP, *Criminal Alien Statistics*, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last visited July 4, 2025).
[30] *See* CBP, *Border Patrol Agents Arrest Sex Offender*, last updated June 23, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-arrest-sex-offender-2 (last visited July 4, 2025).
[31] *See* CBP, *Border Patrol agents apprehend previously deported sex offender*, last updated May, 21, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-apprehend-previously-deported-sex-offender (last visited July 4, 2025).

and was previously convicted of multiple counts of sexual battery by a victim under 12 years old.[32] That same month, USBP agents encountered and arrested a man and two women attempting to smuggle three aliens into the United States through the SWB; the male human smuggler was previously convicted of sexual offenses against a minor, and one of the female smugglers had prior convictions for human smuggling and conspiracy to commit monetary instruments laundering.[33] Additionally, in FY 2025 up until May 2025, USBP had 268 gang-affiliated apprehensions, including from the most violent gangs recently designated as foreign terrorist organizations, such as 38 from Tren de Aragua and 42 from MS-13.[34] For example, in May 2025, USBP encountered and arrested an illegal alien who was not only confirmed to be an MS-13 gang member but also was wanted by the International Criminal Police Organization (INTERPOL) for murder.[35] In FY 2025 up until June 4, 2025, CBP officers and agents also seized 2,367 firearms, 5 explosives, and 16 other types of weapons, as well as 502,352 quantities of gun parts and ammunition and $26.6

---

[32] *See* CBP, *U.S Border Patrol arrests registered sex offender near Sasabe, Arizona*, last updated March 28, 2025, https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-arrests-registered-sex-offender-near-sasabe-arizona (last visited July 4, 2025).

[33] *See* CBP, *Border Patrol agents arrest sex offender among group smuggling three women*, last updated March 25, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-arrest-sex-offender-among-group-smuggling-three (last visited July 4, 2025).

[34] *See* CBP, *CBP Enforcement Statistics, Gang Affiliated Enforcement*, last updated June 18, 2025, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited July 4, 2025).

[35] *See* CBP, *Border Patrol apprehends known MS-13 gang member with international warrant*, last updated May 30, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-apprehends-known-ms-13-gang-member-international-warrant (last visited July 4, 2025).

million in currency.[36]  Additionally, lowering border encounters and freeing-up CBP can further increase public safety by enabling CBP to  partner with local, state, and other federal agencies to investigate and arrest illegal aliens convicted of heinous crimes.  For example, in March 2025, USBP agents in Miami teamed up with ICE and local police to arrest 10 illegal aliens who were all registered sex offenders for crimes including lewd & lascivious acts on a child under age 16, lewd and lascivious sexual battery with a victim 12-15 years old, and solicitation of a child.[37]  If encounters at the SWB increase again, criminal activity also can be expected to increase, while CBP's available resources to respond to criminal activity – like that just described – will, once again, be severely diminished.

39.    For the same reasons, lower border encounters allow CBP to allocate more resources to national security.  In late January 2025, at POEs, OFO commenced enhanced inspections of flights, private aircraft, and cargo to and from Colombia. CBP denied boarding to flagged visa holders and, in coordination with the Department of State, enforced the travel ban on Colombian officials.[38]  In late

---

[36] *See* CBP, *Weapons and Ammunition Seizures*, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/weapons-and-ammunition-seizures (last visited July 4, 2025); CBP, *Currency & Other Monetary Instrument Seizures*, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/currency-other-monetary-instrument-seizures (last visited July 4, 2025).

[37] *See* CBP, *10 Sex Offenders Arrested in Florida by U.S. Border Patrol Agents in the Miami Sector*, last updated March 24, 2025, https://www.cbp.gov/newsroom/local-media-release/10-sex-offenders-arrested-florida-us-border-patrol-agents-miami-sector (last visited July 4, 2025).

[38] *See* CBP, *CBP is taking decisive measures under President Trump's orders in response to Colombia* (last updated Jan. 27, 2025), https://www.cbp.gov/newsroom/announcements/cbp-

February 2025, Tucson Sector Border Patrol agents arrested three suspected cartel scouts, and one foot guide associated with the Los Memos transnational criminal organization, a faction of the Cártel de Sinaloa, in southern Arizona.[39]  Just two weeks ago, USBP Special Operations Group helped arrest two Iranian nationals, in a Southern California home linked to human trafficking, after seven individuals on the FBI's Terror Watchlist were arrested at the same location earlier that week.[40]  In June 2025, a Georgian citizen – who arrived in the United States in 2023 claiming credible fear after leading a criminal organization in Georgia, being convicted of foreign human smuggling, and working with the KGB – was arrested after USBP agents uncovered intelligence about the man, who was in possession of stolen goods at the time of arrest.[41]  That same month, USBP agents uncovered and disabled a large-scale narcotics smuggling tunnel linking Tijuana to the San Diego area.  The uncompleted tunnel extended more than 1,000 feet inside the U.S. and was highly

---

taking-decisive-measures-under-president-trumps-orders-response (last visited on March 22, 2025).

[39] *See* CBP, Cartel Scouts, Foot Guide Arrested in Arizona (last updated March 4, 2025), https://www.cbp.gov/newsroom/local-media-release/cartel-scouts-foot-guide-arrested-arizona (last visited on March 22, 2025).

[40] *See* Fox 11 Los Angeles, *North Hills home was Iranian human smuggling hub, CBP says: 2 arrested*, June 27, 2025, https://www.msn.com/en-us/news/us/north-hills-home-was-iranian-human-smuggling-hub-cbp-says-2-arrested/ar-AA1Hzgri (last visited July 4, 2025).

[41] *See* Dallas Express, *Georgian Ex-KGB Criminal Arrested In NYC As Trump Targets Asylum Overhaul*, June 28, 2025, https://www.yahoo.com/news/georgian-ex-kgb-criminal-arrested-153053352.html (last visited July 4, 2025).

sophisticated.[42]  And, in May 2025, USBP agents dismantled a cartel surveillance and scouting site at the top of an Arizona mountain that was equipped with gear to monitor law enforcement activity;[43] at the same time, they arrested two individuals who faced smuggling, conspiracy, and immigration charges.  Again, if CBP resources are again diverted by an influx of illegal encounters at the SWB, CBP's ability to neutralize national security threats will be significantly weakened.

40.    TCOs have also felt the effects of the Proclamation, most notably in reduced income streams from migrant and drug smuggling.  From February to June 2025, there was a 57.6 percent reduction in fentanyl (lbs.) seized by CBP compared to the five month period of August to December 2024.[44]  In March 2025, USBP agents in San Diego – in less than 24 hours – intercepted two drug smuggling attempts, resulting in 139.1 pounds of narcotics seized worth more than $784,000.[45] Between mid-January and the end of February, CBP participated in strategic enforcement operations in California, Arizona, and the Pacific Northwest alongside

---

[42] *See* CBP, *San Diego Sector Border Patrol uncovers sophisticated cross-border drug smuggling tunnel*, last updated June 18, 2025,   https://www.cbp.gov/newsroom/local-media-release/san-diego-sector-border-patrol-uncovers-sophisticated-cross-border (last visited July 4, 2025).

[43] *See* News 4 Tucson, *Nogales cartel lookout dismantled in joint U.S.-Mexico operation*, May 18, 2025,          https://www.kvoa.com/news/crime/nogales-cartel-lookout-dismantled-in-joint-u-s--mexico-operation/article_890c1d2b-9ef0-4681-895c-b1bc3d6c930a.html  (last visited July 4, 2025).

[44] OHSS analysis of CBP Drug Seizure Statistics, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics.

[45] *See* CBP, Back-to-back busts: *U.S. Border Patrol hits drug smugglers hard in 24-hour takedown*, last updated April 22, 2025, https://www.cbp.gov/newsroom/local-media-release/back-back-busts-us-border-patrol-hits-drug-smugglers-hard-24-hour (last visited July 4, 2025).

its federal, state, local, tribal, territorial (FSLTT) and international partners. The operations focused on illicit fentanyl, its analogues, precursor chemicals, and other synthetics like methamphetamine, in addition to other emerging threats like xylazine and nitazenes. During these operations, CBP seized over 10,900 pounds of drugs, consisting of 2,584 pounds of cocaine, 1,266 pounds of fentanyl, 5,683 pounds of methamphetamine, 135 pounds of heroin, 664 pounds of marijuana, and 640 pounds of other illicit substances such as amphetamine, ecstasy, ketamine, hashish, steroids, and xylazine. Additionally, CBP intercepted 140 weapons and seized over $1.3 million in illicit U.S. currency. In total, these joint efforts with FSLTT partners resulted in the cumulative seizure of over 13,348 pounds of illegal drugs, over $1.97 million in illicit U.S. currency, over 180 weapons, and CBP arrests of 317 individuals affiliated with and/or connected to those with direct ties to TCOs. Through strategic intelligence, collaborative operations, and relentless vigilance, CBP continues to disrupt and dismantle cartels that threaten public safety and national security.[46] Cartels are reportedly selling property and firing personnel to account for loss in fentanyl income[47] that supports their operations. They are also

---

[46] *See* CBP, *CBP Releases February 2025 Monthly Update* (last updated March 12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update (last visited on March 22, 2025).
[47] *See* New York Times, *Trumps Threats and Mexico's Crackdown Hit Mexican Cartel*, https://www.nytimes.com/2025/03/02/world/americas/mexico-cartel-fentanyl-trump-tariffs.html.

reportedly seeking new tactics for income, including "large scale smuggling," making USBP resources at the border to confront TCOs as important as ever.[48]

41.    Additionally, even while encounter numbers were lower than average in February 2025, risks to officers and agents and others who operate near the U.S. borders are always present.  In May 2025 alone, CBP records indicate that 21 CBP officers/agents were assaulted.[49]  In June 2025, a 21-year-old Salvadoran national was sentenced to three years in federal prison for assaulting a Border Patrol agent in March 2025.[50]  On June 30, 2025, the Federal Bureau of Investigation presented a criminal complaint against an alien from the Dominican Republic who assaulted a US Border Patrol Agent with an automobile on June 25.[51]  Also in late June, an Egyptian man was convicted on federal charges for violently kicking a CBP law enforcement animal with sufficient force to lift the dog off the ground and cause injury.[52]  In February 2025 alone, CBP records indicate that 30 CBP officers/agents

---

[48] *See* News Nation, *Cartels shift to 'large-scale' smuggling as border crossings drop*,  March 14, 2025,       https://www.newsnationnow.com/us-news/immigration/border-coverage/cartels/cartels-large-scale-smuggling/ (last visited July 4, 2025).

[49] *See* CBP, Assault and Use of Force Statistics, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/assaults-use-force (last visited July 6, 2025).

[50] *See* CBP, *Salvadoran national sentenced to three years for assaulting agent*. last updated June 4, 2025, https://www.cbp.gov/newsroom/local-media-release/salvadoran-national-sentenced-three-years-assaulting-agent (last visited July 4, 2025).

[51] *See* CBP, *Alien arrested by FBI after assaulting a US Border Patrol Agent in Puerto Rico*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/alien-arrested-fbi-after-assaulting-us-border-patrol-agent-puerto-rico (last visited July 4, 2025).

[52] *See* CBP, *Egyptian traveler eats federal charges for kicking Dulles CBP beagle that detected over 100 pounds of prohibited food products*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/egyptian-traveler-eats-federal-charges-kicking-dulles-cbp-beagle (last visited July 4, 2025).

were assaulted.  If border crossing numbers increase again, CBP resources will likely be diverted and risks to CBP personnel and others on the border will likewise increase.

## VI.   If the Proclamation is Enjoined, DHS's Operational Capabilities will be Severely Taxed and Large-Scale Releases of Illegal Aliens will Resume.

42.     The Proclamation is essential to maintaining operational control of the SWB.  Any injunction against implementing the Proclamation would likely undo the substantial benefits to border security, national security, and public safety that flow from the Proclamation's restrictions and subject the States to further large-scale releases of illegal aliens.

43.     In addition to removing the most effective tool for managing the emergency at the southern border, news of an injunction against implementation of the Proclamation likely would lead to another surge of aliens seeking to cross at and between POEs at the SWB, as has happened after other court orders.

44.     On February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), a programmatic implementation of the Secretary of Homeland Security's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C).  STB final rule, 89 FR at 48764–65.  Almost immediately, hundreds of aliens arrived en-masse at POEs across the SWB, attempting to immediately enter the United States and

creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part. *Id*. at 48765. Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the SWB between the POEs. *Id*. Absent immediate and resource-intensive action taken by CBP, the number of aliens gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 aliens who were in section 240 removal proceedings and had been returned to Mexico under MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them. *Id*. And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so, they diverted resources away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel. *Id*.

45.    This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that aliens who arrived before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States. *Id.* at 48765. This surge culminated with what were then the highest recorded USBP encounter levels in U.S. history over the days

immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border. *Id.* Encounters between POEs (which excludes arrival of inadmissible aliens with scheduled appointments through the CBP One app who appeared at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11). *Id.* The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.

46. If the Proclamation is enjoined for any amount of time, the result will almost certainly be similar: substantial numbers of illegal aliens will be incentivized to unlawfully enter the United States between POEs and DHS will be without the most effective tool for managing the emergency at the SWB.

47. Since the Proclamation has been in place (through June 30, 2025), USBP encountered on average 287 aliens per day between POEs and OFO has encountered on average 118 at POEs, who were generally quickly repatriated or removed based on section 212(f).[53] Without this ability to quickly repatriate or

---

[53] OHSS analysis of May 2025 OHSS Persist Dataset based on data provided by CBP and ICE and CBP data downloaded from UIP on July 2, 2025.

remove them, DHS must instead rely on less efficient procedures, such as section 240 removal proceedings, INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A).  In the absence of the Proclamation, DHS does not have the resources to ensure that all aliens who enter illegally between POEs are detained and processed for expeditious removal from the United States.  As described above, when more aliens enter between POEs than DHS has resources to process and detain, DHS may be forced to release aliens into the United States to await section 240 removal proceedings, which may in some cases take years to conclude, further straining local, State, and Federal resources that have already been strained for years.

48.    The damage caused by a reversion to pre-Proclamation conditions at the southern border, and another, ongoing large-scale release of illegal aliens into communities nationwide, would be far-reaching.  As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries."  Proclamation, 90 FR at 8334.  And this is to say nothing of the boon to TCOs and smugglers that would result by the lifting of the suspension and

restrictions at the southern border or the dire consequences of releasing illegal aliens who may pose a threat to national security, public safety, or health.

**VII.**  **Conclusion.**

49.     The Proclamation is an appropriate and necessary response to the unprecedented influx of illegal immigration over the last four years.  The Proclamation is an indispensable tool for stopping the invasion at the border, combatting the challenges that invasion posed for screening for security and safety, and redressing the impact on communities strained by the influx of aliens over the last four years.  Should the Proclamation be enjoined, DHS anticipates that encounters between POE at the SWB will increase dramatically—once again taxing the federal government's resources at the border, undermining its ability to maintain operational control, depriving it of resources to address national security and public safety threat, and endangering and burdening communities throughout the country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 6th day of July, 2025.

IHSAN GUNDUZ

Digitally signed by IHSAN GUNDUZ
Date: 2025.07.06 23:30:02 -04'00'

_____

Ihsan Gunduz
Acting Deputy Assistant Secretary for Border Policy
U.S. Department of Homeland Security

# Exhibit D

No. 25-5243

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

KRISTI NOEM, Secretary of the
U.S. Department of Homeland Security,
in her official capacity, *et al.*,
*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

**DECLARATION OF KRISTI NOEM**

I, Kristi Noem, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge and documents and information made known or available to me from

official records and reasonably relied upon in the course of my employment,

hereby declare as follows:

1.      I am the Secretary for Homeland Security, leading the U.S. Department

of Homeland Security (DHS), and have served in this role since January 25, 2025.

1

2.      In the four years of the Biden Administration, U.S. leaders sent a message with their words and deeds that the southern border was open.  This included eliminating effective tools like the Migrant Protection Protocols, restarting catch-and-release, reducing detention capacity, and even attempting to implement a 100-day moratorium on deportations.

3.      The resulting flood of aliens overwhelmed the system and prevented DHS from effectively controlling the border.  During that time, more than 8 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States.  Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (the Proclamation).  The sheer number of aliens entering the United States effectively prevented Congress's complex scheme, the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, from functioning as intended to protect United States sovereignty and to prevent entry of aliens who pose threats to public health, safety, or national security.  *Id.*  As a result, millions of aliens who potentially pose significant threats to health, safety, and national security moved into communities nationwide, placing substantial costs and constraints on the States.  *Id.*

4.      During those four years, Transnational Criminal Organizations (TCOs), several of which have now been designated as Foreign Terrorist Organizations

(FTOs), capitalized on the invasion at the southern border.  When U.S. Border Patrol (USBP) agents are pulled away from their patrol duties along the borders to perform detention-related activities and to process the large groups that characterize heavy migration flow across the borders, TCOs and FTOs exploit the situation, utilizing diversionary tactics to circumvent USBP deployment posture and technologies to move illicit contraband and criminal aliens into the interior of the United States. Cartels, for example, operate with substantial financial resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting.  This was all too common in the last Administration.

5.      In this sort of border environment, DHS can have no confidence that it is preventing entry of dangerous criminal and terrorists, contraband like fentanyl, and even weapons of mass destruction.

6.      In response to this unprecedented influx of aliens, on January 20, 2025, the President issued a Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States."  Proclamation 10888, 90 Fed. Reg. at 8334–35.  The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted

3

from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum at section 208 of the INA, 8 U.S.C. § 1158. *Id.* at 8335. The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA." *Id*.

7.    The Proclamation has been extremely effective. Rather than the open borders from the last Administration, illegal border crossings have plummeted to record lows. The Proclamation has contributed substantially to what is arguably the greatest achievement of President Trump's Administration—a secure southern border—and it has been a critical tool enabling DHS to quickly remove and repatriate aliens who have illegally entered our country. DHS's other tools, while formidable, were not sufficient to obtain the level of control this Administration has obtained over the southern border through the Proclamation.

8.    When border numbers are as low as they are now, U.S. Customs and Border Protection (CBP)—which includes USBP and also the Office of Field Operations, which runs the ports of entry—is able to dedicate significantly more resources to address national security and public safety threats at the border. Instead of spending all their manpower processing illegal aliens—who will be removed—

when borders crossings are lower, CBP is now able to focus its resources on addressing and responding to activity by dangerous criminals and terrorists that threaten the safety and security of Americans. For example, in May 2025, U.S. Border Patrol encountered and arrested an illegal alien who was not only confirmed to be an MS-13 gang member but who was also wanted by the International Criminal Police Organization (INTERPOL) for murder.[1] Since February, the amount of fentanyl seized by CBP compared to the five-month period of August to December 2024 has decreased nearly 60%.[2] In FY 2025 up until June 4, 2025, CBP officers and agents also seized 2,367 firearms, 5 explosives, and 16 other types of weapons, as well as 502,352 quantities of gun parts and ammunition and $26.6 million in currency.[3] As CBP cracks down on criminal and terrorist organizations, they will

---

[1] *See* CBP, *Border Patrol apprehends known MS-13 gang member with international warrant*, last updated May 30, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-apprehends-known-ms-13-gang-member-international-warrant (last visited July 4, 2025).

[2] OHSS analysis of CBP Drug Seizure Statistics, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics; *see also* Declaration of Ihsan Gunduz dated July 6, 2025, para. 40.

[3] *See* CBP, *Weapons and Ammunition Seizures*, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/weapons-and-ammunition-seizures (last visited July 4, 2025); CBP, *Currency & Other Monetary Instrument Seizures*, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/currency-other-monetary-instrument-seizures (last visited July 4, 2025).

continue to adapt their tactics to avoid detection and disruption, which makes it critical to continue dedicating CBP resources to law enforcement.

9.    Even with encounter numbers lower since January 20, 2025, challenges at our U.S. borders remain significant. In May 2025 alone, CBP records indicate that 21 CBP officers/agents were assaulted.[4]    In June 2025, a 21-year-old Salvadoran national was sentenced to three years in federal prison for assaulting a Border Patrol agent in March 2025.[5]    On June 30, 2025, the Federal Bureau of Investigation presented a criminal complaint against an alien from the Dominican Republic who assaulted a US Border Patrol Agent with an automobile on June 25.[6]    In late January 2025, a U.S. citizen and a Canadian citizen were robbed and attacked by armed suspected Mexican cartel terrorists in the Jacumba Wilderness in southern California.  CBP agents tracked the assailants back to the border where they returned

---

[4] *See* CBP, Assault and Use of Force Statistics, last updated June 17, 2025, https://www.cbp.gov/newsroom/stats/assaults-use-force (last visited July 6, 2025).

[5] *See* CBP, *Salvadoran national sentenced to three years for assaulting agent*. last updated June 4, 2025, https://www.cbp.gov/newsroom/local-media-release/salvadoran-national-sentenced-three-years-assaulting-agent (last visited July 4, 2025).

[6] *See* CBP, *Alien arrested by FBI after assaulting a US Border Patrol Agent in Puerto Rico*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/alien-arrested-fbi-after-assaulting-us-border-patrol-agent-puerto-rico (last visited July 4, 2025).

to Mexico.[7]  If border crossing numbers increase again, CBP resources will likely be diverted away from responding to numerous threats like those just described.

10.    I am gravely concerned about the possibility of the Proclamation being enjoined and what that would mean for the safety and security of the American people.  The damage caused by a reversion to pre-Proclamation conditions at the southern border, including another large-scale release of illegal aliens into communities nationwide, would be severe and far-reaching.  As mentioned previously, DHS cannot determine who or what is coming into our country when the border is not secure.  Enjoining the Proclamation would also provide a significant boon to TCOs, FTOs, and smugglers operating near the border after having been significantly weakened by this Administration's efforts.  There are also significant financial costs.  As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries."  Proclamation, 90 Fed. Reg. at 8334.  While the recently signed reconciliation bill will provide DHS with critical additional resources for border security, its passage does not mitigate my concerns.

---

[7] *See* CBP, *American citizen shot in Jacumba Wilderness north of the U.S.-Mexico Border* (last updated January 23, 2025), https://www.cbp.gov/newsroom/local-media-release/american-citizen-shot-jacumba-wilderness-north-us-mexico-border (last visited July 6, 2025).

That legislation provides important funds to make further improvements in border security, but it was not intended to remediate the harmful consequences that would follow in the event DHS lost its ability to apply the Proclamation.

11.    The Proclamation is an indispensable tool to enabling DHS to maintain operational control of the border, deter illegal entry, and have sufficient resources to address the significant national security and public safety threats that arise constantly at the border.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 7th day of July, 2025.

_____
Kristi Noem
Secretary of Homeland Security

8