# United States Court of Appeals
## for the
## District of Columbia Circuit

---

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, et al.,

*Plaintiffs-Appellees*

v.

KRISTI NOEM, et al.,

*Defendants-Appellants*

---

From the United States District Court for the District of Columbia
Case No. 1:25-cv-00306-RDM (Hon. Randolph D. Moss)

---

## APPELLEES' OPPOSITION TO APPELLANTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

Keren Zwick
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd.,
 Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister St.
San Francisco, CA
T: 415-581-8839
sanguezaedith@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net
Daniel Hatoum
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208

Lee Gelernt
 *Counsel of Record*
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell
Cody Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris
David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306

daniel@texascivilrightsproject.org

Richard Caldarone
REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: (210) 960-3206
richard.caldarone@raicestexas.org

Houston, TX 77288
T: (713) 942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

## A. Parties and Amici

All parties, intervenors, and amici appearing in this Court are listed in the Emergency Motion for Stay Pending Appeal.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Organizational Plaintiffs Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project have no parent corporations, and no publicly held company owns 10% or more of the Organizational Plaintiffs.

## B. Rulings Under Review

References to the rulings at issue appear in the Emergency Motion for Stay Pending Appeal.

*/s/ Lee Gelernt*

# TABLE OF CONTENTS

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES.............................. i

    A. Parties and Amici............................................................................................. i

    B. Rulings Under Review...................................................................................... i

TABLE OF CONTENTS............................................................................................. ii

TABLE OF AUTHORITIES........................................................................................ iii

GLOSSARY OF TERMS ........................................................................................... vii

INTRODUCTION....................................................................................................... 1

BACKGROUND......................................................................................................... 3

    A. Congress's Comprehensive Removal Scheme ............................................... 3

    B. The Proclamation .......................................................................................... 5

    C. Procedural History ........................................................................................ 6

LEGAL STANDARD ................................................................................................. 7

I.   The Government Fails To Show A Strong Likelihood Of Success. ..................... 7

    A. The Proclamation And Its Implementation Are Unlawful.............................. 7

       1. Section 1182(f) Does Not Empower The President To Create His Own
          Repatriation Regime............................................................................... 7

       2. Section 1182(f) Does Not Empower The President To Abrogate Congress's
          Statutory Protections.............................................................................. 11

    B. The District Court Properly Granted Classwide Relief. ................................. 14

II.  The Balance of Equities and Public Interest Weigh Against A Stay. .................. 19

CONCLUSION......................................................................................................... 22

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(d)(2)(A)............................. 25

CERTIFICATE OF SERVICE ................................................................................... 26

# TABLE OF AUTHORITIES

CASES

*A.A.R.P. v. Trump*, 145 S. Ct. 1364 (2025) ..................................... 14-15, 17, 21

*A.B. v. Hawaii State Department of Education*, 30 F.4th 828 (9th Cir. 2022) ............................................................................................. 15

*D.L. v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017), *aff'g* 302 F.R.D. 1 (D.D.C. 2013) ............................................................. 15

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ................ 11

*Garcia Ramirez v. ICE*, 338 F. Supp. 3d 1 (D.D.C. 2018) ................................ 17

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) ......................................... 18

*Gonzales v. DHS*, 508 F.3d 1227 (9th Cir. 2007) ............................................ 19

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) .................. 2, 9, 12-14

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ............................................ 15, 16

*Jefferson v. Ingersoll International Inc.*, 195 F.3d 894 (7th Cir. 1999) .............. 16

*KalshiEx LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) ................................... 21

*Las Americas Immigrant Advocacy Center. v. DHS*, No. CV 24-1702(RC), 2025 WL 1403811 (D.D.C. May 9, 2025) ................................................. 11

*Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .............. 19

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 145 S. Ct. 2006 (2025) ........................................................................................ 16

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................... 7, 21, 22

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ........................................ 11

*Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000) .............. 16

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) ............................... 8

*SEC v. Jarkesy*, 603 U.S. 109 (2024) ................................................................ 1

*Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025)........................................................................................ 2, 14-15

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...............................4, 8, 9, 10

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)...................... 17

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................... 10

S<small>TATUTES</small>

8 U.S.C. § 1158(a)(1)................................................2, 4, 11, 13

8 U.S.C. § 1158(a)(2)................................................................4

8 U.S.C. § 1158(b)(2)(C) ......................................................... 12

8 U.S.C. § 1158(d)(5)(B) ......................................................... 12

8 U.S.C. § 1182(f).......................................1-2, 4, 5, 7-11, 11-14, 18

8 U.S.C. § 1185(a)(1) ...................................... 4, 5, 9, 14, 18

8 U.S.C. § 1225(b)(1)(A)............................................................4

8 U.S.C. § 1225(b)(1)(A)(ii)........................................................4

8 U.S.C. § 1229a(a)(3)................................................................4

8 U.S.C. § 1229a(c)(4)................................................................4

8 U.S.C. § 1231(b)(3)................................................................4

8 U.S.C. § 1231(b)(3)(A) .......................................................... 13

8 U.S.C. § 1231................................................................4-5

8 U.S.C. § 1252(f)(1) ......................................................... 17-19

42 U.S.C. § 265.........................................................9-10, 13-14

O<small>THER</small> A<small>UTHORITIES</small>

8 C.F.R. § 1208.16(c)(2)..........................................................4-5

8 C.F.R. § 1208.16(b)(2)..................................................................4

Alex Nowsrateh, *Terrorism and Immigration: A Risk Analysis*, 1975–2022
   (Aug. 22, 2023), https://www.cato.org/policy-analysis/terrorism-
   immigration ........................................................................ 20

Associated Press, *Panama and Costa Rica Turning into a "Black Hole" for
   Migrants and Deportees from US, Observers Warn* (Feb. 28, 2025),
   https://apnews.com/article/panama-costa-rica-migrants-trump-
   53cb0449a29880e5e6aba8d9b7328416 ................................... 22

CBP, *Frontline Against Fentanyl* (updated May 22, 2025),
   https://www.cbp.gov/border-security/frontline-against-fentanyl ................... 20

DHS, *Secretary Noem Commends President Trump and One Big Beautiful
   Bill Signing into Law: Historic Win for the American People and the
   Rule of Law*, https://www.dhs.gov/news/2025/07/04/secretary-noem-
   commends-president-trump-and-one-big-beautiful-bill-signing-law ............. 20

Farnaz Fassihi, *This Christian Convert Fled Iran, and Ran Into Trump's
   Deportation Policy*, N.Y. Times (Feb. 26, 2025),
   https://www.nytimes.com/2025/02/23/world/middleeast/this-christian-
   convert-fled-iran-and-ran-into-trumps-deportation-policy.html..................... 22

Human Rights Watch, *"The Strategy Is to Break Us," The US Expulsion of
   Third-Country Nationals to Costa Rica* (May 22, 2025),
   https://www.hrw.org/report/2025/05/22/strategy-break-us/us-
   expulsion-third-country-nationals-costa-rica ............................................. 21

Michael T. Light, Jingying He, and Jason P. Robey, *Comparing Crimes
   Rates Between Undocumented Immigrants, Legal Immigrants, and
   Native-Born US Citizens in Texas*, Proceedings of the National
   Academy of Sciences, Vol. 117, No. 51 (Dec. 22, 2020),
   https://pmc.ncbi.nlm.nih.gov/articles/PMC7768760/. ................................. 21

Rachel Monroe, *Is Asylum Still Possible?*, The New Yorker (May 10,
   2025), https://www.newyorker.com/news/letter-from-the-southwest/is-
   asylum-still-possible-edgarlys-castaneda-rodriguez .................................... 22

Reply Brief in Support of Application for Stay, *United States Department
   of Homeland Security v. D.V.D*, 145 S. Ct. 2153 (2025) (No. 24A1153) ........ 18

Proclamation 10,888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025)......2-3, 5, 6-7, 7-13, 14-19, 19-22

Will Freeman, *Tough New Immigration Rules Risk Empowering the Cartels*, Time (Jan. 9, 2024), https://time.com/6553516/new-immigration-rules-empowering-cartels/......................................................21

6 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:28, Westlaw (6th ed. database updated June 2025)...........................................15

6 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 18:45, Westlaw (6th ed. database updated June 2025)...........................................16

United States Opposition to Stay Motion, *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025) (No. 24A1007)....................................................................14

# GLOSSARY OF TERMS

| Term or Abbreviation | Definition | Citation(s) |
|---|---|---|
| APA | Administrative Procedure Act | |
| CAT | Convention Against Torture | |
| D. Ct. Min. Entry | District court's minute entry treating Plaintiffs' motion for a preliminary injunction as one for summary judgment | D. Ct. Min. Entry (Feb. 26, 2025) |
| DHS | Department of Homeland Security | |
| Dkt. | Docket entry in *Refugee and Immigrant Ctr. For Educ. And Legal Servs. et al. v. Noem et al.*, No. 25-cv-306 (D.D.C.) | Dkt. |
| FARRA | Foreign Affairs Reform and Restructuring Act | |
| Guidance | Guidance implementing the Proclamation | Dkt. 44-1–44-3 |
| Gunduz Decl. | Declaration of Ihsan Gunduz | Doc. No. 2124061, Exhibit C |
| INA | Immigration and Nationality Act | |
| Mot. | Emergency Motion for Stay Pending Appeal | Doc. No. 2124061 |
| Noem Decl. | Declaration of Kristi Noem | Doc. No. 2124061, Exhibit D |
| Op. | Memorandum Opinion Granting Plaintiffs' Motion for Summary Judgment | Dkt. 71 |
| Proclamation | Proclamation 10888 | 90 Fed. Reg. 8333 (Jan. 20, 2025) |

**INTRODUCTION**

Via the Immigration and Nationality Act ("INA"), Congress has created a comprehensive system governing removal of noncitizens not lawfully entitled to remain in the United States, including protections for those who fear persecution or torture if removed. Now the Executive has by fiat created *its own* repatriation system, eliminated those statutory protections, and sent thousands of noncitizens to places where they face persecution and death—all relying on the President's power to "suspend … entry" in 8 U.S.C. § 1182(f).

Judge Moss properly rejected the claim that this 1952 statute confers the extraordinary power the government claims to have discovered in January 2025. The government's argument—that "power to suspend … *entry* … necessarily includes the power to *expel*" without legal constraints, Mot. 1—is obviously wrong. Congress has barred many noncitizens from lawfully entering, as reflected in other subsections of Section 1182. When inadmissible noncitizens nonetheless reach U.S. soil, the INA's statutory procedures provide the exclusive mechanism for removing them. And adhering to the INA's protections, far from "nullif[ying]" restrictions on lawful entry under Section 1182, *id.* at 10-11, respects Congress's "plenary power over immigration," *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024). Congress ensured, among other things, that noncitizens who are physically present in the United States may seek asylum *even though* they may be inadmissible, providing that they may

apply "whether or not" they entered "at a designated port of arrival" and "irrespective" of status. 8 U.S.C. § 1158(a)(1).

The decision below follows the text of Section 1182(f), recognizing that authority to "suspend entry" is not a power to remake the removal system. It also accords with four decades of Executive Branch precedent, from the Reagan-Bush Administration to the Trump-Pence Administration, concluding that Section 1182(f) does not confer this power. D. Ct. Dkt. 71 ("Op.") at 94-95. And the decision below is consistent with *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), which differs from this case in ways the government barely addresses.

The district court also carefully tailored its remedies, consistent with *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025). First, it vacated, under the Administrative Procedure Act ("APA"), the guidance that created a new repatriation system and eliminated Congress's statutory protections. Second, the court certified a class of noncitizens who are or will be subject to the Proclamation. For decades, courts have certified similar classes. The government's contention—that an injunctive class cannot be defined to include people who will face an unlawful policy in the future—would preclude class treatment any time the victims of unlawful action cannot be identified in advance, including school desegregation cases and challenges to the executive order on birthright citizenship.

Indeed, these arguments are particularly meritless as grounds for a *stay*: Due

to the guidance's vacatur, the propriety of which the government does not contest, the Executive cannot give effect to its abrogation of Congress's removal procedures. If the government says in reply that it intends to ignore that order and implement the Proclamation some other way—as it suggested below, *see, e.g.*, D. Ct. Dkt. 55 at 22; Op. 124-25—that lawlessness would only underscore why a stay should be denied.

As for overheated rhetoric about "unwind[ing] … progress … made in securing the southern border," Mot. 2, the government ignores that the decision below merely stops it from unlawfully ignoring claims for protection and expelling noncitizens to who-knows-where *after* they cross the border. And when the government avers that the "sheer number of [noncitizens] entering the United States has overwhelmed Congress's complex scheme, the [INA]," Decl. of Ihsan Gunduz ("Gunduz Decl.") ¶ 2 (Mot. Ex. C), it lays bare that the Executive's real dispute is with Congress. If Congress's scheme has gone wrong, then it is for *Congress* to make a change. The President's powers, though broad, do not extend to displacing the choices of the people's elected representatives.[1]

## BACKGROUND

### A.    Congress's Comprehensive Removal Scheme

The INA "sets out a comprehensive scheme that governs entry and removal."

---

[1] Plaintiffs respectfully submit that, regardless of the resolution of the government's motion, expedited merits briefing and argument are warranted.

Op. 10. Section 1182, titled "Inadmissible aliens," "defines the universe of [noncitizens] who are admissible" and specifies that certain noncitizens are inadmissible. *Trump v. Hawaii*, 585 U.S. 667, 695 (2018). Section 1182(f) "operate[s]" within that "sphere[]." *Id.* It authorizes the President to supplement Congress's admissibility restrictions by "suspend[ing] the entry" of noncitizens whose entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1).

Separately, Congress created procedures governing removal of noncitizens who, though inadmissible, find their way to the United States. Regular removal proceedings are the "sole and exclusive procedure" for removal, unless Congress provides otherwise. 8 U.S.C. § 1229a(a)(3). When Congress wanted a more efficient process to remove certain individuals, it created expedited removal. *Id.* § 1225(b)(1)(A).

In both types of proceedings, individuals can raise claims for protection. *See id.* §§ 1229a(c)(4), 1225(b)(1)(A)(ii). Any noncitizen physically present in the United States "may apply for asylum," unless Congress specifies otherwise, 8 U.S.C. § 1158(a)(1)-(2). The government must also withhold removal if it is more likely than not that, upon removal, a noncitizen's' "life or freedom would be threatened" on account of a protected characteristic. *Id.* § 1231(b)(3); 8 C.F.R. § 1208.16(b)(2). And under the Convention Against Torture ("CAT"), the United States cannot expel

"any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16(c)(2).

## B.    The Proclamation

On January 20, 2025, the President issued Proclamation 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"), invoking Sections 1182(f) and 1185(a)(1) to suspend entry of noncitizens across the southern border until the President issues "a finding that the invasion … has ceased." *Id.* § 1. It also bars such noncitizens "from invoking provisions of the INA that would permit their continued presence in the United States," including the asylum statute. *Id.* § 2. And it directs various officials to "take all appropriate action to repel, repatriate, or remove" noncitizens engaged in the "invasion." *Id.* § 5.

DHS issued implementing guidance ("Guidance"). D. Ct. Dkt. 44-1–44-3. Via the Guidance, the Executive has created its own, non-statutory expulsion mechanisms—"212(f) Direct Repatriation" and "212(f) Expedited Removal"—that "omit several steps from the … expedited removal procedure." Op. 30-31. Noncitizens subject to these procedures may not apply for asylum or withholding. *Id.* at 31-32. And the Guidance "replace[d] the CAT procedures set forth in the existing regulations" with "new procedures" that are "less protective." *Id.* at 101-03.

**C. Procedural History**

Organizational plaintiffs challenged the Proclamation and Guidance on February 3, 2025, and later amended their complaint to add individual plaintiffs. D. Ct. Dkt. 1, 11. Plaintiffs sought a declaration that the Proclamation was unlawful, an injunction preventing the government from enforcing it, and vacatur of the Guidance. Plaintiffs also moved for class certification, a preliminary injunction, and to stay the removal of the individual plaintiffs who remained in the United States. D. Ct. Dkt. 13, 14, 15. Plaintiffs did not challenge the Proclamation's application to prevent noncitizens from reaching U.S. soil. D. Ct. Dkt. 52 at 32-33. At the parties' request, the district court treated Plaintiffs' motion for a preliminary injunction as one for summary judgment. D. Ct. Min. Entry (Feb. 26, 2025).

On July 2, the court granted in part Plaintiffs' motion for summary judgment and their motion to certify a class, deferring ruling on portions of the parties' cross-motions. Given the "difficult questions posed by Plaintiffs' request that the Court grant relief to those who have already been removed," the court postponed decision as to those plaintiffs until after "further briefing." Op. 7.

On the merits, the court concluded "that neither the INA nor the Constitution grants the [government] authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals." *Id.* The court certified

a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." *Id.* at 104.

The court vacated the Guidance and entered a declaratory judgment as to all Defendants other than the President, declaring the Proclamation unlawful insofar as it circumvents statutory removal procedures and restricts access to asylum, withholding, and CAT. *Id.* at 117. The court granted "narrowly tailor[ed]" class-wide injunctive relief precluding the Agency Defendants from implementing the Proclamation given the government's suggestion that, if the Guidance were merely vacated, it would not cease the actions the court had found unlawful. *Id.* at 125.

## LEGAL STANDARD

The government bears the burden on four factors: (1) a "strong showing" it is likely to succeed; (2) irreparable injury; (3) whether a stay "will substantially injure" other parties; and (4) "the public interest." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## ARGUMENT

### I. The Government Fails To Show A Strong Likelihood Of Success.

#### A. The Proclamation And Its Implementation Are Unlawful.

##### 1. Section 1182(f) Does Not Empower The President To Create His Own Repatriation Regime.

The government has no textual argument that Section 1182(f) conveys the authority it asserts. The governing text, authorizing the President to "suspend entry,"

encompasses the steps that the Supreme Court considered in *Hawaii*—rendering certain noncitizens inadmissible and preventing their lawful entry, as Presidents have done under Section 1182(f) for decades. 585 U.S. at 692-93. In *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188 (1993), the Court in dicta indicated that Section 1182(f) could authorize another way of preventing lawful entry—a naval blockade on the high seas preventing noncitizens from reaching the United States. But as a matter of ordinary English, common sense, and settled immigration-law principles, entry and removal are two different things: entry involves the "coming of a [noncitizen] into the United States"; removal is the expulsion of a noncitizen already in the United States. Op. 74 (citation omitted). No verbal gymnastics can stretch a power to "suspend entry" to authorize creation of a new regime of "212(f) Direct Repatriation" and "212(f) Expedited Removal."[2]

The government's attempts "to sidestep the statutory text," *id.* at 75, are meritless. Any "power to exclude," it says, necessarily implies a "power to expel," lest the former power be "nullified." Mot. 7, 10-11. But Section 1182(f) *is* accompanied by an expulsion power, conferred in the same removal procedures

---

[2] Contrary to the government's claims, *Sale*'s "observation that a President could take an action to prevent [noncitizens] whose entry was suspended from ever reaching U.S. soil … does not imply that he also enjoys the power to use extra-statutory methods to expel those [noncitizens] after they have already entered." Op. 78. If "anything, *Sale* suggests that once someone has physically entered the United States, the protections of the INA attach." *Id.* (citing *Sale*, 509 U.S. at 160).

governing enforcement of Section 1182's *other* grounds of admissibility. What the government really means is that Section 1182(f)'s power to exclude implies power to expel in any manner it wishes. But nothing about a power to exclude implies, much less necessarily implies, authority to ignore the law.[3]

Nor does *Huisha-Huisha* rescue the government. That case addressed 42 U.S.C. § 265, a public health statute used during the COVID-19 emergency that allows the Surgeon General to prohibit "introduction" into the United States of persons presenting a serious danger of introducing communicable diseases. The panel's core conclusion—that this authority would be "rendered largely nugatory if the Executive could not take any action" against noncitizens who nonetheless set foot on U.S. soil—reflected its judgment about the specific features of Section 265. *Huisha-Huisha*, 27 F.4th at 729. It does not stand for the principle that every authority to exclude conveys an unlimited power to expel. If a public-health statute aims to prevent the spread of grave diseases, courts must weigh whether that statute can displace INA procedures that, if followed, could exacerbate disease spread. But Section 1182(f) is not that kind of statute. It is part of Title 8, where Congress set out mechanisms to address noncitizens who reach U.S. soil despite laws prohibiting

---

[3] While the Government gestures at 8 U.S.C. § 1185(a)(1) as a separate "grant of authority," Stay Mot. 7, it has recognized that this provision "substantially overlaps" with Section 1182(f). *Trump v. Hawaii*, 585 U.S. 667, 683 n.1 (2018). It therefore cannot convey the authority that Section 1182(f) does not.

entry. So a reading that may have "made perfect sense, and … cohered with the governing regulations," for Section 265 makes no sense as to Section 1182(f), which "shares none of [Section 265's] unique characteristics." Op. 80-81.

The government defies reality with its claim that the district court's reading "eviscerate[s]" Section 1182(f). Mot. 8. "[T]he President has invoked § 1182(f) more than 90 times since 1981," even as the Executive Branch has *rejected* the view that Section 1182(f) conveys the authority the government now claims. Op. 94-95. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quotation marks omitted). Section 1182(f) is not "nullified" just because it does not provide the unprecedented authority the government now conjures.

Equally meritless is the government's attempt to deny that, on its reading, Section 1182(f) would "swallow the INA's other removal provisions." Mot. 11. The government's depiction of Section 1182(f) as providing "emergency" powers that apply only "temporarily" and are "narrow" and "time-limited," *id.*, cannot be squared with the position it successfully pressed in *Hawaii*: that Section 1182(f) is *not* "only a residual authority to address emergency situations" and does *not* require an "exigency" or "crisis." 585 U.S. at 684, 691-92. Accepting the government's

position here would license any President to create their own repatriation system whenever they deem doing so in the "interests of the United States"—an untenable result the district court properly rejected. Op. 77.

### 2. Section 1182(f) Does Not Empower The President To Abrogate Congress's Statutory Protections.

Even leaving aside that Section 1182(f) conveys no authority to expel migrants outside statutory procedures, the Proclamation is also unlawful because the President lacks power to wipe away the INA's humanitarian protections by fiat.

*First*, the asylum statute provides that "[a]ny [noncitizen] who is physically present in the United States," "whether or not" they arrived "at a designated port of arrival," and "irrespective" of status, may apply. 8 U.S.C. § 1158(a)(1). By barring noncitizens subject to the Proclamation from applying for asylum, the government violates this provision. *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (invoking Section 1158(a)(1) to invalidate regulation barring from asylum noncitizens who crossed between ports of entry); *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702(RC), 2025 WL 1403811, at *14 (D.D.C. May 9, 2025) (invalidating another asylum restriction);[4] *see E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021) (similar), *stay denied*, No. 18A615 (Dec. 21, 2018). Nor does the power to "suspend entry" authorize the President to displace the asylum statute.

---

[4] The government declined to appeal.

Even when noncitizens enter unlawfully, they remain entitled to apply for asylum. So the President's power to suspend "entry" is irrelevant to whether noncitizens who are present in the United States may apply for asylum. That is why, again, the Executive's decades-old position is that "a presidential proclamation—standing alone—'cannot affect noncitizens' right to apply for asylum.'" Op. 94 (citing 89 Fed. Reg. 81156, 81163 (Oct. 7, 2024)).

The government contends that its violation of Section 1158 is of no moment because "asylum is solely a matter of discretion." Mot. 12. But while "asylum is itself a discretionary form of relief, providing [noncitizens] with the opportunity to apply for asylum (and the opportunity to be heard) is mandatory." Op. 91. The Attorney General and Secretary of Homeland Security have "discretion to deny asylum even to those who otherwise are eligible," Mot. 12, only *after* they have followed these procedures. And the government's position—that the President can short-circuit those procedures by issuing a Proclamation that categorically precludes asylum—makes a mockery of the entire scheme. Congress authorized creation of new bars to asylum, but only if they are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B). The government's position would erase that limit.

Nor, again, does *Huisha-Huisha* help the government. Making a preliminary assessment of "the closest question in the case," *Huisha-Huisha* relied on the discretionary nature of asylum to resolve what it viewed as a "conflict" between the

asylum statute and 42 U.S.C. § 265, which it viewed as authorizing the Surgeon General to provide for *speedy* removal of noncitizens who could imminently transmit disease. 27 F.4th at 730-32. As Judge Moss recognized, Op. 92, that type of conflict does not exist here. And to the extent that preventing noncitizens from entering the United States "would be aided by denying statutory benefits, including the right to apply for asylum, … that is a consideration that Congress sought to balance in the INA." *Id.*

The government also gets nowhere with the "entry fiction." Mot. 13. While noncitizens who recently crossed unlawfully are considered for some purposes as not having entered, the *asylum statute* (as relevant) turns on whether noncitizens are "physically present in the United States" and rejects reliance on manner of entry or status. 8 U.S.C. § 1158(a)(1). Hence, as the district court noted and as *Huisha-Huisha* made clear, noncitizens in the United States are "entitled *to certain statutory protections*," like applying for asylum. Op. 83-84.

*Second*, the government offers no meaningful argument that Section 1182(f) authorizes the government to ignore the withholding statute, 8 U.S.C. § 1231(b)(3)(A). That provision "does not authorize entry into the United States but merely precludes the government from expelling noncitizens 'to a place where they will likely be persecuted.'" Op. 98. Indeed, *Huisha-Huisha*, on which the government relies so heavily, held that 42 U.S.C. § 265 *did not* displace the

withholding statute. 27 F.4th at 731-32. The suggestion that 8 U.S.C. § 1185(a)(1) authorizes the government to abrogate the withholding statute, Mot. 13, is meritless: This provision merely renders it "unlawful" to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"; it does not authorize the President to erase statutes deemed inconvenient.

*Finally*, the Guidance unlawfully abrogates regulations that asylum officers must follow to adjudicate CAT claims. Op. 100. For example, it requires noncitizens to "carry [their] burden at the initial hearing without … counsel or consultation and without the time to prepare accorded under the regulations." *Id*. at 101. Because Section 1182(f) does not authorize the President to displace those regulations, the Guidance is unlawful. The government's stay application does not argue otherwise.

### B.    The District Court Properly Granted Classwide Relief.

*First*, the class complies with Rule 23, and the government is far off-base with its claim that the decision below is an "end-run around *Trump v. CASA*" because it certified a class that includes noncitizens "not currently subject to the Proclamation." Mot. 15. The Supreme Court in *A.A.R.P.* granted "classwide relief" on an expedited basis to a class of "noncitizens in custody … who were, are, *or will be* subject to the [Alien Enemies Act Proclamation]." U.S. Opp. to Stay Mot. 12, *A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025) (No. 24A1007) (emphasis added); *see A.A.R.P. v. Trump*,

145 S. Ct. 1364, 1368-70 (2025). *CASA* did not overrule a decision seven Justices joined two months before. This Court, too, has routinely approved classes that include "future claimants," noting that the inclusion of future members *supports* certification under Rule 23 "due to the 'impracticality of counting such class members, much less joining them.'" *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (citing 1 Rubenstein, *Newberg on Class Actions* § 3:15); *see id.* at 1306; *accord D.L. v. District of Columbia*, 860 F.3d 713, 723-26 (D.C. Cir. 2017). Indeed, Rule 23(b)(2) injunctive classes *must* work that way. Courts could not desegregate schools or provide relief against an executive order unlawfully revoking birthright citizenship without classes covering future members. *Cf.* 6 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:28, Westlaw (6th ed. database updated June 2025) ("*Newberg & Rubenstein*")).

Contrary to the government's claims, the class does not sweep in individuals "anywhere in the world." Individuals are members based on becoming "subject to the Proclamation," and the class is limited to those who are or will be "present in the United States." Every person included either has or *will* suffer an injury, Op. 104, and defining a class based on this *certain* future injury is fully consistent with Article III. *E.g.*, *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (Collins, J.) (rejecting similar argument); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 886 (5th Cir. 2000) ("[T]he fact that the class includes unknown,

unnamed future members … weighs in favor of certification"); *see also* Advisory Committee's note to 1966 Am. of Rule 23(b)(2).

Nor is there anything to the claim that due process prohibits classes designed to provide relief to individuals who will be subject to an unlawful government policy in the future. An adequate class representative properly guards the rights of absent members. *E.g.*, *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897 (7th Cir. 1999); *see Newberg & Rubenstein* § 18:45. The government cites a footnote in *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2017 n.5 (2025), but that decision did not address Rule 23(b)(2) or absent class members adequately represented in a Rule 23(b)(2) class.

*Second*, the government's arguments about "commonality and typicality," Mot. 16, ignore the common injury all named class representatives face: "non-statutory repatriation or removal proceedings without the protections embodied in the INA, FARRA, and their implementing regulations." Op. 107. Although the government points to supposedly "varying factual circumstances," Mot. 16, class members' entitlement to relief "is entirely unaffected by th[ose] factual differences," *J.D.*, 925 F.3d at 1321. Like the challenged policy in *J.D.*, the Proclamation "applies on uniform grounds applicable to every member of the class, regardless of" factual circumstances. *Id.* And the common injury it inflicts extends to noncitizens "who do not claim or manifest a fear of return." Mot. 16. Moreover, and among other reasons,

absent the Proclamation and Guidance, immigration officers must follow regulations requiring them to *ask* whether noncitizens have a fear of return—questions that allow many more noncitizens to seek protection. Op. 31; *see id.* at 26. As for the government's observation that some may prove "ineligible for asylum or withholding of removal for other reasons," Mot. 16, that does not negate their shared injury—losing the right to seek such relief. *A.A.R.P.*, 145 S. Ct. at 1369 & n.1.

*Third*, the government fails with its suggestion that even if an injunction would provide common relief to each class member, a class cannot be certified if narrower relief could be "parceled out." Mot. 17. That view is foreign to Rule 23(b)(2), which allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class." And *Wal-Mart* provides no support for the government's view and instead affirms that Rule 23(b)(2) is available "when a single injunction or declaratory judgment would provide relief to each member." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The problem in *Wal-Mart* was that individual injunctions were *necessary* to redress the class members' harms and thus "each individual class member would be entitled to a *different* injunction." *Id.*; *see Garcia Ramirez v. ICE*, 338 F. Supp. 3d 1, 48 (D.D.C. 2018). That is not the case here.

*Finally*, the government fails with its cursory argument that "class-wide relief was barred by 8 U.S.C. §1252(f)(1)." Mot. 17. Section 1252(f)(1) prohibits district

courts from entering classwide injunctions against the "operation of the provisions of Part IV of [subchapter II]" of the INA (the "covered provisions"). As the government has recognized, Section 1252(f)(1) is concerned with "what provisions the injunction is *restraining*," not "*why*" the enjoined provision is unlawful; the question is thus whether the injunction "run[s] against" a covered provision. Reply Br. in Support of App. for Stay at 4, *DHS v. D.V.D.*, 145 S. Ct. 2153 (2025) (No. 24A1153) (June 5, 2025). Here, because the injunction "run[s] against" only the Proclamation—which was issued pursuant to Sections 1182(f) and 1185(a)(1), not any covered provision—Section 1252(f)(1) is irrelevant. *Id.*

The government's theory boils down to the following: Because it has relied on the Proclamation to invent a new repatriation regime, and because an injunction against that regime would leave open only the removal regime Congress created in Part IV, Section 1252(f)(1) bars classwide relief against the Proclamation. But this argument turns Section 1252(f)(1) on its head. That provision guards against judicial interference with the intricate scheme of removal procedures contained in Part IV— the very scheme Defendants have evaded by implementing the Proclamation to conduct extra-statutory repatriations. And having invoked Section 1182(f) as a sword to circumvent Part IV, the government may not raise Section 1252(f)(1), which applies only to "the Government's efforts to *enforce* or *implement*" Part IV, as a shield. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphases

added).

The injunction here does not "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the [covered] provisions." *Id.* The government retains (as it always has) discretion over whether to initiate removal proceedings and, if so, what type of proceedings to initiate. The injunction instead does only what Section 1252(f)(1) permits: it "enjoin[s] the unlawful operation of a provision that is *not* specified in § 1252(f)(1)." *Id.* at 553 n.4 (emphasis added). The fact that the injunction may have "some collateral effect on the operation of a covered provision" by precluding Defendants from implementing their non-Part IV removal scheme does not trigger Section 1252(f)(1). *Id.*; *see Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007).

## II.     The Balance of Equities and Public Interest Weigh Against A Stay.

The government's claimed injury—that the Proclamation will no longer be an "extremely effective" and "indispensable tool" in securing the border, Mot. 19—is simply an argument for ignoring the laws that Congress enacted. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (state suffers irreparable injury when it is "enjoined by a court from *effectuating statutes* enacted by representatives of its people" (emphasis added)). And the government has no plausible argument that the injunction "exceeded the authority" conferred by statute. Indeed, although the government raises a (meritless) challenge to class certification,

it does not contest the decision to vacate the Guidance. Op. 114-16. Regardless of class certification, the Executive cannot lawfully implement the Proclamation if the Guidance has been vacated.

The government's claimed injuries, moreover, are vastly overstated. For one thing, the government ignores that the decision below is tailored to people on U.S. soil. And it is nothing but fearmongering to claim the decision below will result in noncitizens "being released" due to insufficient detention capacity, Mot. 19, particularly given the government's recent statements trumpeting *increases* in capacity.[5]

Meanwhile, the government's declarations egregiously conflate asylum seekers as a class with those responsible for committing crimes or acts of terrorism. Gunduz Decl. ¶¶ 18-21, 37-41; Noem Decl. ¶¶ 4-5. In fact, "the annual chance of being murdered" in a terrorist attack "committed by an [undocumented] immigrant is zero"; it has never happened.[6] And the overwhelming majority of illegal drugs trafficked at the border, including "[m]ore than 90% of interdicted fentanyl," are

---

[5] DHS, *Secretary Noem Commends President Trump and One Big Beautiful Bill Signing into Law: Historic Win for the American People and the Rule of Law*, https://www.dhs.gov/news/2025/07/04/secretary-noem-commends-president-trump-and-one-big-beautiful-bill-signing-law.

[6] Alex Nowsrateh, *Terrorism and Immigration: A Risk Analysis*, 1975–2022 (Aug. 22, 2023), https://www.cato.org/policy-analysis/terrorism-immigration.

seized at ports of entry from "vehicles driven by U.S. citizens."[7] Although the government gestures at combatting transnational crime, Gunduz Decl. ¶¶ 38-39, organized crime benefits from harsher immigration enforcement, which increases demand for smugglers.[8] And undocumented immigrants have considerably lower arrest rates than the U.S.-born population.[9] Simply put, the government's assertions do not establish what is required—an injury that is "both certain and great" and "actual and not theoretical." *KalshiEx LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024).

By contrast, the harm from a stay will be severe and life-threatening. *Nken*, 556 U.S. at 435. Unless the decision below remains in force, countless class members will be deprived of statutory rights to seek protection. As the government's conduct in recent months shows, the "interests at stake" in avoiding unlawful removal are "particularly weighty." *A.A.R.P.*, 145 S. Ct. at 1368. Already, government officials implementing this Proclamation have torn apart asylum-

---

[7] CBP, *Frontline Against Fentanyl* (updated May 22, 2025), https://www.cbp.gov/border-security/frontline-against-fentanyl.

[8] *See* Will Freeman, *Tough New Immigration Rules Risk Empowering the Cartels*, Time (Jan. 9, 2024), https://time.com/6553516/new-immigration-rules-empowering-cartels/.

[9] Michael T. Light, Jingying He, and Jason P. Robey, *Comparing Crimes Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, Proceedings of the National Academy of Sciences, Vol. 117, No. 51 (Dec. 22, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7768760/.

seeking families and sent them to camps in third countries such as Costa Rica or Panama.[10] Many asylum seekers were forced to accede to pressure to return to likely persecution or torture in their countries of origin.[11] Others—including democracy activists from Venezuela and Christian converts from Iran—have had no chance to present their claims for asylum and face deportation to persecution and death.[12] And for much the same reasons, a stay would undermine the public interest, which lies in "preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

## CONCLUSION

The Government's motion should be denied.

---

[10] Human Rights Watch, *"The Strategy Is to Break Us," The US Expulsion of Third-Country Nationals to Costa Rica* (May 22, 2025), https://www.hrw.org/report/2025/05/22/strategy-break-us/us-expulsion-third-country-nationals-costa-rica.

[11] Associated Press, *Panama and Costa Rica Turning into a "Black Hole" for Migrants and Deportees from US, Observers Warn* (Feb. 28, 2025), https://apnews.com/article/panama-costa-rica-migrants-trump-53cb0449a29880e5e6aba8d9b7328416.

[12] Rachel Monroe, *Is Asylum Still Possible?*, The New Yorker (May 10, 2025), https://www.newyorker.com/news/letter-from-the-southwest/is-asylum-still-possible-edgarlys-castaneda-rodriguez; Farnaz Fassihi, *This Christian Convert Fled Iran, and Ran Into Trump's Deportation Policy*, N.Y. Times (Feb. 26, 2025), https://www.nytimes.com/2025/02/23/world/middleeast/this-christian-convert-fled-iran-and-ran-into-trumps-deportation-policy.html.

Dated: July 9, 2025        Respectfully submitted:

/s/ *Lee Gelernt*

Keren Zwick
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd.,
 Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister St.
San Francisco, CA
T: 415-581-8839
sanguezaedith@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES C/O GIBBS HOUSTON
PAUW
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum

Lee Gelernt
 *Counsel of Record*
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell
Cody Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris

TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

Richard Caldarone
REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: (210) 960-3206
richard.caldarone@raicestexas.org

David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
T: (713) 942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(D)(2)(A)

Pursuant to Fed. R. App. P. 27(d)(2)(A), I hereby certify that the preceding motion complies with the type-volume limitation of the Rules, containing 5,117 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Lee Gelernt*

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Lee Gelernt*