# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5243**                                    **September Term, 2024**

**1:25-cv-00306-RDM**

**Filed On:** August 1, 2025

Refugee and Immigrant Center for Education
and Legal Services, et al.,

        Appellees

    v.

Kristi Noem, Secretary of the U.S.
Department of Homeland Security, in her
official capacity, et al.,

        Appellants

**BEFORE:**   Millett, Pillard, and Katsas, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the amicus curiae briefs in support of that motion, the opposition to the motion, and the reply; and the motion to expedite, the opposition thereto, and the reply, it is

**ORDERED** that the administrative stay entered on July 11, 2025, be dissolved.  It is

**FURTHER ORDERED** that the emergency motion for stay pending appeal be denied in part and granted in part.  The motion is granted to clarify that the class definition currently applies only to all individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, see Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5243**                                      **September Term, 2024**

The motion for stay also is granted as to the district court's orders vacating the Proclamation's implementing guidance on applications for asylum, enjoining removal of any class members without complying with the asylum statute, and declaring unlawful the Proclamation insofar as it purports to suspend or to restrict access to asylum.  In all other respects, the motion is denied.[*]  It is

**FURTHER ORDERED** that this appeal be expedited and the following briefing schedule apply:

| | |
|---|---|
| Appellants' Brief | August 22, 2025 |
| Appendix | August 22, 2025 |
| Appellees' Brief | September 12, 2025 |
| Appellants' Reply Brief | September 26, 2025 |

The Clerk is directed to calendar this case for argument on the first appropriate date following the conclusion of briefing.  The parties will be informed later of the date of oral argument and the composition of the merits panel.

Due to the expedited nature of this case, the court will not entertain dispositive motions.  The parties should therefore address in their briefs any arguments otherwise properly raised in such motions.

Appellants should raise all issues and arguments in the opening brief.  The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms.  While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not

_____

[*] A concurring statement from Judge Millett, a statement concurring in part and dissenting in part from Judge Pillard, and a statement concurring in part and dissenting in part from Judge Katsas are attached.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 25-5243**                    **September Term, 2024**

widely known.  See D.C. Circuit Handbook of Practice and Internal Procedures 43–44 (2024); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due.  Filing by mail may delay the processing of the brief. Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

### <u>Per Curiam</u>

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Selena R. Gancasz
Deputy Clerk

MILLETT, *Circuit Judge*, concurring in the order granting a stay in part and denying a stay in part: On January 20, 2025, President Trump issued Proclamation 10888, which declares that "the current situation at the southern border qualifies as an invasion" because "[t]he sheer number" of noncitizens "entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border." Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333, 8,334 (Jan. 20, 2025). The Proclamation and subsequently issued agency guidance prevent any person crossing the border outside a designated port of entry, as well as any person crossing at a designated entry port without a visa and other required documentation, from seeking asylum or other removal protections.

Thirteen individuals subject to the Proclamation and its implementation, as well as three nonprofit organizations, filed a class action lawsuit. The district court granted summary judgment in their favor, declared the implementing guidance unlawful and vacated it, enjoined agency officials from perpetuating that same unlawful action under the Proclamation, and certified a class consisting of all individuals who are or will be subject to the Proclamation. The government now seeks a stay of the district court's decision pending appeal.

I would grant the stay in part and deny it in part. The government is likely to succeed in showing that the class definition should be modified. It is also likely to succeed in arguing that the Proclamation and its implementing guidance effect an upfront, categorical discretionary denial of asylum as permitted by circuit precedent. The government, however, is unlikely to show that the Proclamation or its implementing guidance otherwise lawfully allows the removal of noncitizens already present in the United States, or that the Proclamation or its implementing guidance complies with the statutorily mandatory withholding of removal provisions required by the

2

Immigration and Nationality Act and the Convention Against
Torture, as codified in federal law.

**I**

**A**

**1**

The Immigration and Nationality Act ("INA"), 8 U.S.C.
§ 1101 *et seq.*, establishes, among other things, a
comprehensive framework governing the admission or entry of
foreign persons into the United States. Section 1182 of the INA
specifically delineates the grounds of "[i]nadmissib[ility]," and
identifies predetermined classes of foreign persons who are
ineligible for admission. 8 U.S.C. § 1182(a)(1)–(10). With
respect to foreign persons, the terms "admission" and
"admitted" are defined as "the lawful entry of the alien into the
United States after inspection and authorization by an
immigration officer." *Id.* § 1101(a)(13)(A).

"Entry," as a matter of immigration law historically and in
precedent, means "any coming of an alien into the United
States, from a foreign port or place or from an outlying
possession, whether voluntarily or otherwise * * * ." Pub. L.
No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952); *see also
Barber v. Gonzales*, 347 U.S. 637, 641–642 (1954) (explaining
that this definition codified a technical and historical
understanding of the term "entry" as requiring "an arrival from
some foreign port or place").

Section 1182(f), in turn, allows the President "by
proclamation" to "suspend the entry" of any foreigners he finds
"would be detrimental to the interests of the United States." 8
U.S.C. § 1182(f). This suspension can last "for such period as

3

he shall deem necessary[.]" *Id.* Section 1182(f)'s proclamation power "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [admission] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Courts afford great deference to the President's decisions regarding "whether and when to suspend entry[,] * * * whose entry to suspend[,] * * * for how long[,] * * * and on what conditions[.]" *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Relatedly, 8 U.S.C. § 1185, entitled "Travel control of citizens and aliens," allows the President to adopt "reasonable rules, regulations, and orders" to supplement and effectuate the INA's statutory provisions governing any foreign person's "depart[ure] from or ent[ry into] * * * the United States * * * subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1). While the language of Section 1185(a)(1) expressly allows regulation of a foreigner's choice to depart from the United States, the Supreme Court has indicated that this provision also governs the involuntary removal process. *Trump v. Hawaii*, 585 U.S. at 683 n.1 ("8 U.S.C. § 1185(a) * * * grants the President authority to adopt 'reasonable rules, regulations, and orders' governing entry or removal of aliens[.]").

Congress has "plenary power" over the creation of the Nation's immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *see Trump v. Hawaii*, 585 U.S. at 683 ("[Congress] has establishe[d] numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa."); *Immigration and Nationality Service v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question[.]"); *see also Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S.

4

320, 339–340 (1909) (explaining that "over no conceivable subject is the legislative power of Congress more complete" than "over the right to bring aliens into the United States * * * [or the] impos[ition] [of] particular restrictions on the coming in of aliens"); *see generally* U.S. CONST., Art. I, § 8, cls. 4, 18.

The President also has a constitutional role in immigration law given his control over foreign affairs and duty to faithfully execute the immigration laws. *See* U.S. CONST., Art. II, §§ 2–3; *American Ins. Ass'n. v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.").

In the exercise of its legislative power over immigration, Congress has "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Trump v. Hawaii*, 585 U.S. at 683. *See generally Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[T]he power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the Government's political departments[.]") (formatting modified).

Finally, the Constitution also vests Congress with the power to "repel Invasions." U.S. CONST., Art. I, § 8, cl. 15. In

5

addition, Article IV calls upon the "United States" to "protect each [State] against Invasion[.]"  U.S. CONST., Art. IV, § 4. The same clause calls upon the "Legislature, or * * * the Executive (when the Legislature cannot be convened)" to protect each state "against domestic Violence." *Id.*  While "primarily a legislative power," these clauses empower the two branches to work together to counter invasions. *Texas v. White*, 74 U.S. (7 Wall.) 700, 701 (1868), *overruled on other grounds*, *Morgan v. United States*, 113 U.S. 476 (1885); *see Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849); *see also Refugee & Immigrant Center for Educ. & Legal Servs. v. Noem*, ("*RAICES*") No. CV 25-306 (RDM), 2025 WL 1825431, at *38 (D.D.C. July 2, 2025).

**2**

As relevant here, federal law provides three forms of removal protection for foreign individuals who have entered the United States without authorization.

First, the INA authorizes the Attorney General and Secretary of Homeland Security to grant asylum to any individual who is a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A); *see also id.* § 1103(a)(1) & (3).  A "refugee" is a person "unable or unwilling to return to" or "avail * * * herself of the protection of" her country of nationality or the last country she resided in "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" *Id.* § 1101(a)(42)(A).  Asylum confers a number of benefits, including protection from deportation or removal, *id.* § 1158(c)(1)(A), 8 C.F.R. § 208.22, a pathway to lawful permanent residence, 8 C.F.R. § 209.2, and, eventually, citizenship, 8 U.S.C. § 1429.

6

Any noncitizen can seek asylum "irrespective" of that person's legal "status[.]" 8 U.S.C. § 1158(a)(1). But the ultimate decision whether to grant asylum, even to those meeting the statutory criteria, rests in the discretion of the Attorney General or Secretary of Homeland Security. *Id.* § 1158(b)(1)(A).[1]

Second, individuals whom the government seeks to expel can obtain withholding of removal. The INA forbids the Attorney General from removing a noncitizen "to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).[2]

Third, a noncitizen can seek relief from removal under the Foreign Affairs Reform and Restructuring Act of 1998

---

[1] The asylum statute forbids individuals from applying for such relief if (1) the Attorney General determines that the applicant can be sent to a country where her life or freedom will not be threatened and she will have a full and fair opportunity to seek asylum there; (2) the applicant fails to apply within one year of arrival; or (3) the applicant was previously denied asylum. 8 U.S.C. § 1158(a)(2)(A)–(C). The government does not claim that the Proclamation or implementing guidance applies solely to individuals who meet these exceptions.

[2] The INA identifies four categories of persons who are statutorily ineligible to receive withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(B) (individuals are ineligible if they participated in the persecution, torture, or extrajudicial killing of others; were convicted of a serious crime and are a danger to the community; committed a serious nonpolitical crime outside the United States; or otherwise are a danger to the security of the United States) (citing 8 U.S.C. § 1227(a)(4)(D)). The government does not claim that the Proclamation or guidance applies only to persons in those categories.

7

("FARRA"), which implements the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note). The INA requires the agencies carrying out immigration laws to prescribe regulations to implement the Convention Against Torture, 8 U.S.C. § 1231 note (b), by forbidding the removal of individuals to countries where they are likely to be tortured, 8 C.F.R. § 208.16(c)(4); *id.* § 1208.16(c)(4).[3]

Withholding under the INA and the Convention Against Torture are mandatory, not discretionary. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 725 (D.C. Cir. 2022); *see also Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to [Convention Against Torture] relief and may not be removed to that country[.]"); *Immigration and Nationality Service v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) ("[W]ithholding is mandatory if an alien establish[es] that it is more likely than not that [he] would be subject to persecution on one of the specified grounds[.]") (formatting modified).

The withholding provisions provide more limited relief than asylum. Specifically, they ensure only that individuals will not be removed to countries where they will be threatened or tortured, but they "do not entitle [them] to any legal status in the United States" or to avoid removal to other countries where

---

[3] Individuals who are categorically ineligible for withholding of removal are also ineligible for Convention Against Torture relief. *See* 8 C.F.R. §§ 208.16(d)(2), 1208.16(d)(2) (citing the withholding of removal exceptions, 8 U.S.C. § 1231(b)(3)(B)). The government does not claim the Proclamation or guidance apply only to persons falling within these exclusions.

8

they will not face persecution or torture. *Huisha-Huisha*, 27 F.4th at 725; *see Nasrallah*, 590 U.S. at 575.

**B**

**1**

In issuing the Proclamation, the President invoked 8 U.S.C. §§ 1182(f) and 1185(a)(1) and Article II of the Constitution. *See* Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333 (Jan. 20, 2025). The Proclamation first suspends "entry into the United States" on or after January 20, 2025 of persons "engaged in the invasion across the southern border[.]" Proclamation § 1. The Proclamation further suspends the "entry into the United States" of persons who—regardless of their point of entry— "fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable" immigration officials to make statutorily required judgments about admissibility, 8 U.S.C. § 1182(a)(1)–(3). *See* Proclamation § 3. The Proclamation prohibits all persons subject to the Proclamation from invoking statutory protections "that would permit their continued presence in the United States, including but not limited to" the asylum statute, 8 U.S.C. § 1158. Proclamation §§ 2–3.

Lastly, the Proclamation directs the Secretary of the Department of Homeland Security, in coordination with the Attorney General and Secretary of State, to "take appropriate actions as may be necessary to achieve the objectives of [the Proclamation], until [the President] issue[s] a finding that the invasion at the southern border has ceased," and to "take all appropriate actions to repel, repatriate, or remove" any person "engaged in the invasion across the southern border of the

9

United States on or after the date of this order."  Proclamation
§§ 4–5.

**2**

To carry out the directives of the Proclamation, the
Department of Homeland Security issued informal guidance to
immigration enforcement officials.  *See* ECF No. 52-1.  In two
emails sent February 4, 2025, the Department directed the
immediate implementation of the Proclamation at the borders.
The first email provided "Update[d] Field Guidance" for "all
Southwest Border Sectors."  *Id.* at 5.  That email defines
"illegal alien invading the United States" to mean "an alien
who crosses between the ports of entry on the southern land
border[.]"  *Id.*  It also states that "aliens invading the United
States are not permitted to apply for asylum."  *Id.*

A second "Field Guidance" email advised that entry is
suspended at the southern, northern, and coastal borders for all
individuals who "fail[], before entering the United States, to
provide Federal officials with sufficient medical information
and reliable criminal history and background information as to
enable" immigration officials to make statutorily required
judgments about admissibility, 8 U.S.C. § 1182(a)(1)–(3).
ECF No. 52-1 at 13; Proclamation § 3.  In addition, those
persons "are restricted from invoking provisions of the INA,
including asylum, that would permit their continued presence."
ECF No. 52-1 at 13.

In addition, both guidance emails direct that noncitizens
subject to the Proclamation may now be removed either by
"212(f) Direct Repatriation" or by "212(f) Expedited
Removal[.]" ECF No. 52-1 at 5–6, 13–14. The only difference
between the two pathways is that persons subject to 212(f)
expedited removal "are served with a Notice to Alien Ordered

10

Removed[,]" while those issued a 212(f) Direct Repatriation order do not receive a removal order. ECF No. 59 at 7. The government explained that the distinction matters because "repatriations do not carry the same immigration or criminal consequences as expedited removal[.]" *Id.* at 8. Which procedure will be applied depends on the "totality of the circumstances." ECF No. 52-1 at 5, 13.

Both removal pathways displant several statutory protections from removal and their accompanying procedures. For example, existing published regulations require an immigration officer both to read a form to a person at the border or who has entered the United States saying "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country," and then to instruct the individual to advise the officer about any "fear" or "concern" about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to read Form I-867A to noncitizens); *RAICES*, 2025 WL 1825431, at *14; *see also* 9 Charles Gordon *et al.*, Immigration Law and Procedure, App'x B, Ex. 16K (2024) (reproducing the text of Form I-867A). If the individual "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the immigration officer must refer that person for an interview by an asylum officer and provide information about the credible-fear interview process, the right to consult with other persons before the interview, and the right to request review by an immigration judge of the asylum officer's credible fear determination. 8 C.F.R. § 235.3(b)(4).

The guidance provided to asylum officers under the Proclamation, however, prohibits adherence to those published regulations and, instead, provides that only those persons who of their own accord "manifest[] fear" to an immigration officer

11

will be given a "CAT [Convention Against Torture]-Only Assessment[.]" ECF No. 52-1 at 43–44. The purpose of that assessment is "to determine if it is more likely than not that the individual will be tortured" in the country to which she may be returned. *Id.* at 47. Immigration officials, however, will "not assess[] [the risk of] persecution on account of a protected ground." *Id.*; *contrast* 8 U.S.C. § 1231(b)(3)(A). As a result, the guidance extinguishes the mandatory statutory withholding required by 8 U.S.C. § 1231(b)(3)(A). In addition, contrary to existing regulations, individuals are denied the opportunity to review the asylum officer's initial determination of their eligibility for withholding and are denied access to consultants or legal representatives during the interview. *Compare* ECF No. 52-1 at 38, 46, *with* 8 C.F.R. § 208.9(a)(1)–(b).

## C

Thirteen individuals proceeding pseudonymously and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project—filed a putative class action challenging the Proclamation and its implementing guidance. ECF No. 11 at 3–8 (Am. Compl. ¶¶ 9–19). The complaint named fifteen defendants: President Trump, in his official capacity; the Departments of Homeland Security, State, and Justice; three components of the Department of Homeland Security (Customs and Border Patrol, Immigration and Customs Enforcement, and United States Citizenship Immigration Services ("USCIS")); and multiple agency officials sued in their official capacity. *Id.* at 8–10 (Am. Compl. ¶¶ 20–34).

The complaint alleges that the Proclamation and its implementation exceed the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), Article II of the Constitution,

12

and the separation of powers. ECF No. 11 at 37–39 (Am. Compl. ¶¶ 145–160). The complaint also asserts that the Proclamation and its implementation violate the INA's prescribed procedures for removal, asylum, and withholding of removal, 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229, 1158, 1231(b)(3), as well as the Convention Against Torture, 8 U.S.C. § 1231 note, and its formal regulations, 8 C.F.R. §§ 208.16, 1208.16. ECF No. 11 at 31–35 (Am. Compl. ¶¶ 112–122, 128–131). Finally, the complaint claims that the Proclamation's implementation runs afoul of the Administrative Procedure Act, 5 U.S.C. § 706. ECF No. 11 at 35–37 (Am. Compl. ¶¶ 132–143).

Plaintiffs moved for class certification, ECF No. 13, a preliminary injunction, ECF No. 14, and summary judgment, ECF No. 51. The government cross-moved for summary judgment. ECF No. 44. At the parties' joint request, the district court consolidated the preliminary injunction and summary judgment proceedings. *See* Minute Order (Feb. 26, 2023).

On July 2, 2025, the district court granted in part the Plaintiffs' motions for summary judgment and class certification. *See RAICES*, 2025 WL 1825431. First, the district court granted in part the motion for class certification. *Id.* at *46. The court certified a class of "[a]ll individuals who are or will be subject to Proclamation 10888 and/or its implementation, who are present or who will be present in the United States[.]" ECF No. 72 (internal quotation marks omitted).

Second, the court held that the President lacks statutory or constitutional authority to (1) institute the "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures, (2) categorically foreclose all asylum and withholding of removal

13

applications, and (3) short-circuit the regulatory process for
withholding under the INA and the Convention Against
Torture. *See RAICES*, 2025 WL 1825431, at *31–45.

Third, the district court vacated the Department's guidance
implementing the Proclamation as contrary to law, 5 U.S.C.
§ 706, and entered a declaratory judgment against all the
defendants except the President holding that the Proclamation
is unlawful "insofar as it purports to suspend or restrict access
to asylum, withholding of removal, or the existing regulatory
processes for obtaining CAT protection." *RAICES*, 2025 WL
1825431, at *50–51.

Fourth, the district court permanently enjoined all
defendants other than the President from "implementing the
Proclamation, including by adopting extra-statutory expulsion
procedures"; removing noncitizens without complying with the
statutorily mandated withholding procedures under the
Convention Against Torture; and comprehensively barring
asylum. *RAICES*, 2025 WL 1825431, at *55.

The district court denied the government's request for a
stay pending appeal and its order went into effect for the
individual plaintiffs immediately. *See RAICES*, 2025 WL
1825431, at *56; ECF No. 73 at 3. In so ruling, the court relied
on the government's express representation that the
Department of Homeland Security "decided, in an exercise of
its prosecutorial discretion, not to employ the Invasion
Proclamation challenged in this suit as a basis for removal of
any of the named Plaintiffs currently in the United States
during the pendency of this litigation." ECF No. 21 at 1. The
court then postponed the effective date of its order as to absent
class members and the plaintiff organizations for fourteen days
to allow the government an opportunity to seek a stay pending

14

appeal from this court. *See RAICES*, 2025 WL 1825431, at
*56; ECF No. 73 at 3.

The government appealed and moved to stay the district
court's order pending the resolution of its appeal. This court
granted an administrative stay on July 11, 2025, except as to
the individual plaintiffs for whom the district court's order
remains in effect.

## II

A stay pending appeal is an "extraordinary" remedy.
*Citizens for Resp. & Ethics in Washington v. Federal Election
Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam).
To obtain such exceptional relief, the stay applicant must (1)
make a "strong showing that [it] is likely to succeed on the
merits" of the appeal; (2) demonstrate that it will be
"irreparably injured" before the appeal concludes; (3) show
that issuing a stay will not "substantially injure the other parties
interested in the proceeding"; and (4) establish that "the public
interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434
(2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776
(1987)).

## III

I would grant the motion for a stay in part and deny it in
part. First, because the precise scope of the district court's class
definition is unclear, the government is likely to succeed in
showing that the class definition must be clarified to apply only
to "[a]ll individuals who (1) are present in the United States
while Proclamation 10888 and/or its implementation is in
effect, (2) are not statutorily ineligible for all forms of relief
from removal listed in point (3), and (3) absent the
Proclamation and/or its implementation, would seek asylum, 8

15

U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note)."

The government has failed, however, to make a strong showing of likely success on its argument that the Proclamation and its implementation lawfully authorize the removal of noncitizens already present in the United States under the guidance's truncated procedures. In particular, the government is unlikely to succeed in showing that the Proclamation and its implementing guidance comply with the statutorily mandatory withholding of removal provisions required by the INA and the Convention Against Torture for all persons present in the United States, as well as for those arriving at the borders and ports of entry without needed documentation.

As for asylum, the government has demonstrated that it is likely to succeed in showing that the Proclamation's and guidance's prohibition on asylum claims together constitute an advance and categorical discretionary denial of asylum by the President and his Attorney General or the Secretary of Homeland Security for all applicants crossing the Nation's borders.

**A**

The district court's certification of a class action is governed by Federal Rule of Civil Procedure 23. That Rule requires plaintiffs to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will

16

fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a); *see Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013).  There is no dispute in this stay proceeding that prong one's requirement of numerosity is satisfied.

Plaintiffs must also demonstrate that their proposed class falls into one of the categories listed in Rule 23(b).  As relevant here, a class may be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  FED. R. CIV. P. 23(b)(2).

Article III of the Constitution requires that plaintiffs in federal court demonstrate their standing to file suit.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  To demonstrate standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

The individual plaintiffs in this case unquestionably have standing to challenge the Proclamation and its implementing guidance.  In a suit "challenging the legality of government action[,]" if the "plaintiff is [herself] an object of the action * * * at issue[,] * * * there is ordinarily little question that the action * * * has caused [her] injury, and that a judgment preventing or requiring the action will redress it."  *Lujan*, 504 U.S. at 561–562.

17

Here, the government's Proclamation and guidance injure the individual plaintiffs by barring them from seeking asylum or withholding of removal and by making it harder for them to obtain Convention Against Torture protection. The government has not disputed that "asylum, withholding of removal, and CAT protection are valuable forms of relief[.]" *RAICES*, 2025 WL 1825431, at *17. And, as the district court found, each individual plaintiff submitted a declaration "expressing a desire to seek asylum and setting forth facts sufficient to state a plausible claim to asylum, withholding of removal, or CAT protection." *See id.* (citing ECF No. 12-1 (A.M. Decl.); ECF No. 12-4 (B.R. Decl.); ECF No. 12-5 (M.A. Decl.); ECF No. 12-6 (G.A. Decl.)). In addition, the Plaintiffs' injuries are redressable through a court order vacating the implementing guidance, declaring the Proclamation unlawful, and enjoining the agencies' enforcement of the Proclamation. As a result, there is no Article III barrier to class certification.[4]

As for class members, no showing is required that every single absent class member has standing in cases seeking only injunctive or declaratory relief. *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019); *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 (9th Cir. 2022); *see also* 1 Newberg and Rubenstein on Class Actions § 2:3 (6th ed. 2025) ("If a class representative has standing, the case is justiciable

---

[4] Because the individual plaintiffs have standing, I do not address the standing of the three association plaintiffs. *See Biden v. Nebraska*, 600 U.S. 477, 493–494 (2023); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

18

and the proponent of the class suit need not demonstrate that
each class member has standing.").[5]

Here the district court broadly included within the class
"[a]ll individuals who are or *will be* subject to Proclamation
10888 and/or its implementation, who are currently present or
who *will be* present in the United States[.]" ECF No. 72
(emphases added) (quotation marks omitted). The best and
most natural reading of the court's language is that the class
encompasses only those persons who are or will be present in the
United States during the presumably limited time period
that the Proclamation and its guidance are in effect. A fair
reading of the class certification also suggests that, in
referencing those "subject to [the] Proclamation," the district
court meant to include only those who are statutorily eligible
for the forms of relief at issue in this litigation—asylum,
statutory withholding under the INA, or Convention Against
Torture withholding.

_____

[5] The government argued before the district court that 8 U.S.C.
§ 1252(f)(1) barred the individual plaintiffs from obtaining any form
of relief, making their injuries non-redressable. The government
does not re-raise that argument in its stay motion, and for good
reason. Section 1252(f)(1) does not apply "with respect to an
individual alien against whom proceedings * * * have been
initiated[.]" 8 U.S.C. § 1252(f)(1). The Supreme Court has said that
this provision "'prohibits federal courts from granting classwide
injunctive relief' but 'does not extend to individual cases.'" *Garland
v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (quoting *Reno v.
American-Arab Anti-Discrimination Comm*., 525 U.S. 471, 481–482
(1999)). Seven of the individual plaintiffs were issued I-860 Notices
to Appear, initiating proceedings against them. *See RAICES*, 2025
WL 1825431, at *18 (citing ECF No. 43-3 at 3–5 (Hollinder Decl.
¶¶ 4–11)).

19

The government is likely to succeed in showing that those limitations are necessary to ensure the class includes only those persons who are or will be affected by the litigation.  To make those criteria more explicit, I would, to the extent necessary, stay the district court's class certification judgment in part pending appeal so that the class includes only: "All individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note)."

With the class definition clarified, the government's remaining arguments challenging the class certification are unlikely to succeed.  *See* Gov't Stay Mot. 14–17.

## B

The Proclamation and its implementation rely on Sections 1182(f) and 1185(a) of Title 8 for the asserted authority not just to prevent the entry of foreign individuals, but also to remove noncitizens already present within the United States. Essentially for the reasons provided in the district court's thorough opinion, the government is unlikely to succeed on appeal in showing that those authorities empower the government's wholesale displacement of mandatory statutory removal procedures.

20

**1**

Federal immigration law treats the entry and removal of noncitizens already present in the United States differently, and it has done so for decades. *See Zadvydas*, 533 U.S. at 693 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. * * * [O]nce an alien enters the country, the legal circumstance changes * * * whether [the noncitizen's] presence here is lawful, unlawful, temporary, or permanent."); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission * * * and those who are within the United States after an entry, irrespective of its legality."); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773–774 (9th Cir. 2018).

That difference is because, as the district court explained, the INA contains different sections with distinct provisions that specify (1) who may or may not lawfully enter or seek admission to the United States, (2) which previously admitted persons are subject to removal, (3) what protections each category of persons can claim, and (4) the procedures for removal. *See RAICES*, 2025 WL 1825431, at *4 (citing 8 U.S.C. §§ 1181, 1182, 1184, 1227, 1158, 1231, 1225(b)(1), 1229a).

As relevant here, Congress has legislated a comprehensive and carefully calibrated set of removal procedures. Regular removal procedures are provided in 8 U.S.C. § 1229a, and expedited removal in § 1225(b)(1). Section 1229a provides the "sole and exclusive procedure" for removal of noncitizens "[u]nless otherwise specified in [the INA]." 8 U.S.C. § 1229a(a)(3). Section 1225(b)(1)'s expedited removal

21

procedure is one such "otherwise specified" provision that applies to two classes of inadmissible noncitizens. *See id.* § 1182(a)(6)(C), (a)(7). These detailed procedures provide extensive guidelines for who may be removed, on what grounds, and what specific procedural safeguards are mandated. Under both ordinary removal and expedited removal, the opportunities to apply for asylum under Section 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding under the Convention Against Torture are available.

**2**

The Proclamation grounds its authority in Section 1182(f), which provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

By its plain text, Section 1182(f) authorizes a President to suspend only the "entry" of noncitizens into the United States. At the time of Section 1182(f)'s adoption, the INA defined "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise * * * ." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952). In 1996, Congress adopted the term "admission," which is defined as "the lawful

22

entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Section 1182(f) says nothing about removal of persons already present and grants the President no authority to suspend statutorily mandated removal requirements. As a result, 8 U.S.C. § 1229a remains the "sole and exclusive procedure" for the removal of noncitizens present in the United States. 8 U.S.C. § 1229a(a)(3).

Case law confirms that reading. Prior to this Proclamation, Section 1182(f) has been used only to authorize emergency measures to prevent noncitizens from entering the territorial land or waters of the United States. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993); *Trump v. Hawaii*, 585 U.S. 667; *Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017); *Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024); *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020); *East Bay Sanctuary Covenant*, 932 F.3d 742; *Sesay v. Immigration and Nationality Service*, 74 F. App'x 84 (2d Cir. 2003); *see also* Proclamation No. 5377, 50 Fed. Reg. 41,329 (1985) (President Reagan, acting pursuant to Section 1182(f), suspending the entry into the United States of officers or employees of the Cuban government or the Cuban Communist Party.).

The government cites no precedent for extending Section 1182(f) far beyond its textual limits to allow the suspension of laws governing the removal of persons already in the United States. Nor can that be inferred. Congress is fully aware of the longstanding statutory distinction in immigration law between entry on the one hand, and removal of those present on the other. Congress also knows how to authorize expedited or emergency removal procedures, and when it does so, it uses the word "removal" explicitly. *See* 8 U.S.C. §§ 1229a ("Removal

23

proceedings"), 1225(b)(1) ("[E]xpedited removal of inadmissible arriving aliens")

The government's argument also ignores that Congress authorized a President only to "suspend" entry into the United States. A *suspended* opportunity is very different from an *extinguished* one. Suspensions, by definition, are temporary measures. *Suspension*, WEBSTER'S SECOND NEW INT'L DICTIONARY 2541 (unabr. ed. 1952) ("[S]tate or period of being * * * temporarily stopped, interrupted, abrogated, etc."); *Suspension*, BLACK'S LAW DICTIONARY 1616 (4th ed. 1951) ("A temporary stop, a temporary delay, interruption, or cessation."); *Suspension of a right*, BLACK'S LAW DICTIONARY 1616 (4th ed. 1951) ("It differs from extinguishment, because a suspended right is susceptible of being revived, which is not the case where the right was extinguished."); *Suspension*, 10 OXFORD ENGLISH DICTIONARY 258 (def. 1b) (1933) ("The state of being temporarily kept *from* doing, or deprived *of*, something."); *see Trump v. Hawaii*, 585 U.S. at 687 ("We agree * * * that the word 'suspend' often connotes a 'defer[ral] till later[.]'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2303 (1966)). That is why Section 1182(f) provides that a suspension only lasts "for such period as [the President] shall deem necessary[.]" 8 U.S.C. § 1182(f). The Proclamation, in fact, acknowledges the necessarily temporary character of its provisions. *See* Proclamation Preamble ("suspending the physical entry of aliens involved in an invasion into the United States across the southern border *until* [the President] determine[s] that the invasion has concluded") (emphasis added); *see also* Gov't Stay Mot. 11 (describing the suspension power as a "narrow, time-limited authority").

By contrast, removing individuals in violation of statutory protections prohibiting their removal are, by their very nature, permanent. Once a person is removed to a place where she

24

faces persecution, likely harm, or torture, that person is fully and completely deprived of the protections of the INA's removal provisions, and she faces the very harms in the country of return that Congress said it would not permit. Nor do those removed have any right—even if they had any practical capacity—to return to reclaim those protections once the Section 1182(f) emergency ends.

In short, while the opportunity to make an "entry" can be unsuspended, the opportunity to prevent removal to a place of persecution, harm, torture, or death cannot.

The government leans heavily on *Huisha-Huisha*, 27 F.4th 718, as necessarily linking the power to exclude with the power to remove. That is incorrect.

In *Huisha-Huisha*, this court concluded that the Surgeon General's authority under a different statute, 42 U.S.C. § 265, to prohibit the "introduction of persons and property" into the United States when they pose a "serious danger of the introduction of [a communicable] disease into the United States" includes the "authority to expel" such persons. *Huisha-Huisha*, 27 F.4th at 729 (citing 42 U.S.C. § 265).

As the district court well explained, *RAICES*, 2025 WL 1825431, at *34–36, the government's equation of Section 265 and 8 U.S.C. § 1182(f) is wrong for two central reasons.

First, as noted, *Huisha-Huisha* addressed an entirely different statutory provision—a public health law and not an immigration law. *See* Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682 (codified as amended at 42 U.S.C. § 201 *et seq.*). The ability to exclude individuals or products that pose a communicable health threat to the United States

25

rests on that separate and distinct authority to contain and prevent the spread of disease.

Section 1182(f), by contrast, is part of an immigration law that has long separated the process of exclusion—of barring entry—from the process of removing persons who are already in the United States.

Second, and relatedly, the public health provision (Section 265) uses very different language. It allows the Department of Health and Human Services through the Surgeon General to prevent not the entry, but the "introduction" into the United States of persons or property posing a health risk. So Section 265 grants a broad power to prevent diseases like COVID-19 from affecting and infecting the people of the United States. The "introduction" of a disease, in other words, follows contagious persons across the border as they risk introducing the illness again and again into different populations and areas. Because germs and bacteria are impervious to border lines, the power to prevent the introduction of disease would be "nugatory" if it allowed the Surgeon General only to police the borders and not to address those who "managed to set foot on U.S. soil." *Huisha-Huisha*, 27 F.4th at 729; *see RAICES*, 2025 WL 1825431, at *35; *Suspension of Introduction of Persons Into United States from Designated Foreign Countries or Places for Public Health Purposes*, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020) (Center for Disease Control regulation defining "introduction into the United States" as "the movement of a person from a foreign country * * * *into* the United States *so as to bring the person into contact with others in the United States* * * * in a manner that the [CDC] determines to present a risk of transmission of the communicable disease[.]") (emphases added).

26

In contrast, Section 1182(f)'s plain text allows a President only to suspend "entry," and not to regulate the removal of those already present in the United States.

**3**

The Proclamation also invokes Section 1185(a), which says:

> Unless otherwise ordered by the President, it shall be unlawful * * * for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]

8 U.S.C. § 1185(a)(1).

That provision adds nothing to the government's argument. Section 1185(a)(1) outlaws a noncitizen from "enter[ing]" or attempting to "enter" the United States except as allowed by rules, regulations, or orders prescribed by the President. The Proclamation no doubt constitutes a presidential order barring noncitizens from "enter[ing]" the United States. All agree on that.

What matters here is that Section 1185(a)(1) says not a word about the power to remove those who are already present in the United States.

As for the language about regulating "depart[ures]," that allows the President to regulate a noncitizen's own "depart[ure]" or attempt to depart. By its plain terms, Section 1185(A)(1) makes it unlawful "for an alien to depart * * * or attempt to depart" except as permitted by presidential rule,

27

regulation, or order.  Yet the government points to nothing in the Proclamation or its implementing guidance that speaks to how noncitizens may choose to depart.  The Proclamation and guidance, instead, seek to force persons already in the United States to leave heedless of the threat of persecution, harm, torture, or death they face.  Limiting the freedom to leave is not the same as the forcible expulsions undertaken by the guidance here.

In any event, even if Section 1185(a)(1) reaches forced departures and I assume that forced departures means "removal," the government is still no better off.  *See Trump v. Hawaii*, 585 U.S. at 683 n.1.  That is because Section 1185(a)(1) only allows "*reasonable* rules, regulations, and orders[.]"  8 U.S.C. § 1185(a)(1).  That is common-fare statutory language used to grant an agency regulatory authority to implement the law Congress passed, not to cast it aside.  *See, e.g.*, *id.* § 1224 ("The Attorney General is authorized (1) by regulation to designate as ports of entry for aliens arriving by aircraft any of the ports of entry for civil aircraft designated as such in accordance with law; (2) by regulation to provide such reasonable requirements for aircraft in civil air navigation[.]"); *United States v. Witkovich*, 353 U.S. 194, 199–200 (1957) (interpreting 8 U.S.C. § 1231(a)(3)(D)'s language authorizing the Attorney General to make "reasonable written restrictions" on the conduct of noncitizens as a "limitation" on the Attorney General's power that must be in line with the "legislative scheme" as a whole); *see also FCC v. Consumers' Research*, No. 24-354, 2025 WL 1773630, at *13 (U.S. June 27, 2025) (describing how the Supreme Court has previously affirmed Congress's authorization to the FCC in the Communications Act to set "just and reasonable" rates, because such an authorization "was not unbridled" in light of the "broader statutory contexts, which informed [its] interpretation and supplied the content necessary to satisfy the intelligible-

28

principle test") (citing *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–226 (1943)); *Industrial Union Department, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 642–645 (1980) (discussing the Occupational Safety and Health Act's authorization for the Secretary of Labor to promulgate "reasonably necessary or appropriate" health and safety regulations).

Put more simply, like Section 1182(f), Section 1185(a)(1) empowers the President to control who may cross the Nation's borders.  It says nothing about the forcible ejection of those already present in the United States, let alone the authority to do so outside of the INA's prescribed procedures.  While the government believes that its power to prevent entry would have greater effect if it included the power to remove, that policy complaint must be directed to Congress.

To that same point, it bears emphasizing that nothing about the power to remove persons who are already present strengthens the President's exercise of his temporary power to suspend entry.  Entry and removal are distinct processes aimed at different stages of immigration control that operate on opposite sides of the border with different statutory protections.  While the government may now prefer otherwise, this court must take immigration law as the Political Branches (including the Executive) wrote it.

## C

The government's attempt to extra-textually expand Section 1182(f) through its implementing guidance also is unlikely to succeed on appeal as to the withholding provisions.  Under binding circuit precedent, though, the Proclamation combined with the guidance likely could be read as exercising

29

the Executive's discretionary authority to categorically deny asylum upfront.

**1**

The government has not demonstrated that it will likely succeed in showing that its guidance lawfully abrogated the statutorily mandated withholding obligations and procedures.

Congress has withheld from the Executive the authority to remove a noncitizen to a country where they will be persecuted on the basis of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). In those cases, withholding of removal is "mandatory[,]" *Aguirre-Aguirre*, 526 U.S. at 419; *Huisha-Huisha*, 27 F.4th at 725, and the government "must provide" it, *Huisha-Huisha*, 27 F.4th at 725. Full stop.

As a result, if it wants to remove noncitizens "to places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an exception to § 1231(b)(3)(A)." *Huisha-Huisha*, 27 F.4th at 731–732. Yet it has identified none. Nothing in Sections 1182(f) or 1185(a) mentions removal at all, let alone displaces the statutory withholding-from-removal provisions. And the word "entry" is too little to do that work given its long-established usage in immigration law. *See* pp. 2, 20–21, *supra.* Tellingly, even in *Huisha-Huisha*, where this court held that public health officials' more robust authority to prevent the "introduction" of disease covered both barriers to entry *and removal*, this court was explicit that Section 265 did *not* supplant the statutory mandate that removal to a country be withheld if the person's life or freedom would be threatened in that country based on one of the statutorily protected characteristics, 8 U.S.C. § 1231(b)(3)(A). *See Huisha-Huisha*, 27 F.4th at 732. The court explained that "we can give effect

30

to both [Sections 265 and 1231(b)(3)(A)].  And because we can, we must." *Id.*  So too here:  The government can both suspend "entry" under the Proclamation to address its declared emergency, and comply with statutory withholding-of-removal requirements.  Because it can do both, it must.

But the government has backhanded Congress's command.  The implementing guidance is explicit that "USCIS is not assessing persecution on account of a protected ground" in making removal decisions, nor is any other part of the government making the statutorily mandated assessment prior to removal.  ECF No. 52-1 at 38, 47; *see also id.* at 20, 24 (instructing Customs and Border Patrol agents to "refer[]" to USCIS any individuals "who manifest a fear of the country to which CBP intends to return them").

To put it more clearly, the guidance on its face refuses to provide persons in the United States the statutory withholding-of-removal protections that Congress has "mandat[ed.]" *Aguirre-Aguirre*, 526 U.S. at 419.

**2**

As the district court well explained, the government has equally failed to show a likelihood that its implementing guidance comports with the withholding requirements under the Convention Against Torture.  *See RAICES*, 2025 WL 1825431, at *44–45.

As with withholding of removal under 8 U.S.C. § 1231(b)(3)(A), the bar against removal to a country where the person will be tortured is "mandatory[.]"  *Huisha-Huisha*, 27 F.4th at 725; 8 C.F.R. §§ 208.16(d) ("[A]n application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for

31

withholding is established[.]"), 1208.16(d) (same); *see also
Nasrallah*, 590 U.S. at 575 ("If the noncitizen demonstrates
that he likely would be tortured if removed to the designated
country of removal, then he is entitled to CAT relief and may
not be removed to that country[.]"); *Igiebor v. Barr*, 981 F.3d
1123, 1127–1128 (10th Cir. 2020) ("Relief under the CAT is
mandatory if the convention's criteria are satisfied.") (citation
omitted); *Andrade-Garcia v. Lynch*, 828 F.3d 829, 835 (9th
Cir. 2016) ("[B]oth CAT protection and withholding of
removal are mandatory forms of relief.").

Congress provided that the Convention's resolute
protection should be implemented by agency regulations, and
the Departments of Homeland Security and Justice have
enacted notice-and-comment regulations doing just that. 8
C.F.R. §§ 208.1–30, 1208.1–33. The regulations require a two-
stage process for handling Torture Convention claims. At the
first stage, an asylum officer conducts a credible fear screening
where the applicant must demonstrate that there is "a
significant possibility" that she is eligible for the Convention's
protection. *Id.* §§ 208.30(e)(3), 1208.30(e); *see also id.*
§§ 208.1(a)(1), 1208.1(a)(1).

If the applicant clears that threshold, an asylum officer
conducts a second interview, which must take place at least
twenty-one days after the applicant receives a record of the
officer's determination from the initial screening, allowing the
individual to consult, gather evidence, and obtain
representation if desired. 8 C.F.R. § 208.9(a)(1)–(b). The
purpose of the second interview is "to elicit all relevant and
useful information" for the Convention Against Torture
determination. *Id.* § 208.9(b). The applicant "may have
counsel or a representative present, may present witnesses, and
may submit affidavits of witnesses and other evidence." *Id.* To
qualify for Convention Against Torture protection, the

32

applicant must demonstrate in the second interview that "it is more likely than not that he or she would be tortured if removed to the proposed country[.]" *Id.* §§ 208.16(c)(2), 1208.16(c)(2).

The implementing materials cast aside all that law and collapse the process into a single interview that requires the applicant when first detained to carry her ultimate burden of proving she will likely be subjected to torture, without the benefit of time to assemble evidence or to prepare a presentation. In addition, the presence of counsel or another representative is forbidden. In the now-prescribed single "CAT-Only Assessment[,]" the applicant cannot have a consultant or legal representative in the room with her and is not "entitled to" any "consultation period." ECF No. 52-1 at 44–46; *see id.* at 38 (USCIS is "unable to accommodate a consultant or attorney at the interview" because interviews are conducted in "secure facilities[.]").

Nothing in the Proclamation or other agency action purports to withdraw the published regulations or to explain why affording a person already in the United States the opportunity to obtain advice and evidence to meet her burden of proof of torture is inconsistent with preventing the "entry" of noncitizens at the border. Nowhere has Congress prescribed torture or death as a tolerable consequence for unauthorized entry. Quite the opposite, Congress has forbidden it, and so have longstanding agency regulations implementing the Convention. Circuit precedent does the same. *Huisha-Huisha* is explicit that even the emergency power to prevent the spread of plagues and epidemics does not allow the government to forgo established protections against removal to a place of torture. 27 F.4th at 732.

Tellingly, the government's stay papers make no argument that Sections 1182(f) or 1185(a) authorize it to displace the

33

Convention Against Torture or its implementing regulations. That silence falls far short of demonstrating a likelihood of success.

**3**

The Proclamation's and its implementing guidance's foreclosure of asylum applications likely will succeed on appeal, although the question is close and difficult, just as it was in *Huisha-Huisha*. There, this court explained that perhaps "the closest question" in that case was whether an emergency public-health power to prevent the introduction of persons or property that could convey disease allowed the government to preclude all asylum applications. *Huisha-Huisha*, 27 F.4th at 730.

As already explained, the power to foreclose the "entry" of noncitizens into the United States does not, by itself, provide the authority to remove persons who are already in the United States. *See* pp. 20–21, *supra*.

But the asylum statute itself likely allows such suspension of its protections. Section 1158(a)(1) authorizes persons "physically present in the United States or who arrive[] in the United States" to request asylum. 8 U.S.C. § 1158(a)(1). That right applies regardless of immigration status. *Id.*

At the same time, the asylum statute is explicit that the final decision of whether to grant or deny asylum is "committed to the [Secretary of Homeland Security or] Attorney General's discretion." *Aguirre-Aguirre*, 526 U.S. at 420; *see* 8 U.S.C. § 1158(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General may grant asylum[.]"); *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (Asylum is a "form[] of discretionary relief[.]").

34

So while Sections 1182(f) and 1185(a)(1) say nothing about the Executive's power to foreclose or preemptively deny asylum applications during an emergency, the asylum statute likely does so. To be sure, the statute seems to envision individualized grants or denials of asylum after a person has submitted an application. 8 U.S.C. § 1158(a)(1) (Any individual "physically present in" or "who arrives in the United States * * * may apply for asylum[.]"). But this court held in *Huisha-Huisha* that such categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time. 27 F.4th at 730–731. This court explained that because granting asylum is "a matter of executive 'discretion[,]'" the President could "foreclose[]" both the "grant of asylum" and "the statutorily mandated procedures that aliens use to apply for asylum." *Id.* at 731 (citation omitted). "[T]hose procedures would be futile[,]" this court reasoned, because the President's Section 265 order "already * * * made" the asylum decision. *Id.*

So the only question on appeal will be whether the Proclamation and implementing guidance similarly have already made the asylum decision, apart from the Proclamation's reliance on Sections 1182(f)'s and 1185(a)(1)'s provisions governing only entry. While it is a close call, *Huisha-Huisha* likely supports the asylum bar.

First, the Proclamation twice expressly bars noncitizens from "invoking" Section 1158. Proclamation § 2 (Noncitizens "engaged in the invasion across the southern border * * * are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including * * * 8 U.S.C. § 1158[.]"); *see also id.* § 3 ("I * * * restrict [noncitizens'] access to provisions of the INA that would permit their continued presence in the United States, including

35

\* \* \* 8 U.S.C. § 1158."). Both references cite directly to the asylum statute. *Id.* §§ 2–3. In addition, the implementing guidance from the Department of Homeland Security—an agency statutorily authorized to make discretionary asylum decisions, 8 U.S.C. § 1158(b)(1)(A)—is explicit that noncitizens "are *not permitted to apply for asylum*." ECF No. 52-1 at 5, 11 (emphasis in original).

At this very preliminary stay stage, the government appears likely to succeed in showing that those additional references to the asylum statute suffice for the Attorney General or the Secretary of Homeland Security to categorically pre-deny asylum such that allowing applications would be futile, and that invocation of that power under Section 1158 is separate and independent of the power in 8 U.S.C. § 1182(f) to suspend "entry." The Proclamation and guidance contain far more language about foreclosing asylum than the emergency order addressed in *Huisha-Huisha* did. That order, in fact, was silent on the subject. *See Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Yet this court found that such silence was sufficient to close the door on the asylum process across the board.

To be sure, *Huisha-Huisha* addressed a statute that allowed restrictions on noncitizens to apply both at the border and inside the United States. 27 F.4th at 729. That is very different from Sections 1182(f) and 1185(a)(1). That is why it may be at least sufficient, if not necessary, that the Proclamation and implementing materials reference the asylum statute itself in imposing a categorical bar. The question is close and, as in *Huisha-Huisha*, it remains open to definitive resolution by a merits panel. *See Huisha-Huisha*, 27 F.4th at 730 (Plaintiffs' argument that the Executive violates the

36

asylum statute by expelling noncitizens before they have an opportunity to seek relief "deserves attention from the District Court when it considers the merits."). But *Huisha-Huisha*'s decision on review of a preliminary injunction makes it likely at this similarly preliminary stay stage that the government will succeed.

\* \* \* \* \*

In sum, the government has failed to show that it is likely to succeed in arguing that the Proclamation complies with the INA's withholding of removal and Convention Against Torture withholding requirements. While a very close question, the government appears likely to succeed in showing that it has permissibly suspended the asylum process during the emergency period. Accordingly, I would stay that portion of the district court's permanent injunction requiring the government to allow asylum applications pending appeal while the Proclamation remains in effect.

## D

Finally, the government is unlikely to succeed in showing that 8 U.S.C. § 1252(f)(1) barred the district court from issuing class-wide injunctive relief in this case. Gov't Stay Mot. 17–18. Section 1252(f)(1) provides that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such

37

provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Part IV of the INA encompasses 8 U.S.C. §§ 1221–1232.

Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions[,]" except against an individual in proceedings. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). That bar applies even if the government's administration of a covered provision violates a federal statute or regulation. *Id.* at 552–554.[6]

It is unlikely that Section 1252(f)(1) bars the class-wide relief entered here for the simple reason that the court did not enjoin the government's operation of any provision covered by Part IV of the INA. The district court instead enjoined government officials (other than the President) from relying on the Proclamation to continue enforcing the content of the implementation guidance that the district court had separately declared unlawful and vacated. The Proclamation, of course, is grounded not in Part IV of the INA, but in 8 U.S.C. §§ 1182(f) and 1185(a), which are in Part II of the INA. *RAICES*, 2025 WL 1825431, at *52. The district court also enjoined the government to comply with the asylum statute, 8 U.S.C. § 1158(a), which is in Part I of the INA, and the Convention Against Torture provision, which is in a different statute altogether, FARRA, and was only placed at 8 U.S.C.

---

[6] As the district court's decision did not resolve any constitutional claims raised by Plaintiffs, this case, at this juncture, does not pose the question of whether Section 1252(f)(1) applies to the remediation of constitutional violations not otherwise redressable.

38

§ 1231 note by the United States Code's codifiers, not Congress. *See RAICES*, 2025 WL 1825431, at \*52; *see also United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997); *Warner v. Goltra*, 293 U.S. 155, 161 (1934) ("The compilers of the Code were not empowered by Congress to amend existing law, and doubtless had no thought of doing so.").

In addition, to comply with Section 1252(f)(1), the district court declined to enjoin the government to comply with the withholding of removal statute, 8 U.S.C. § 1231(b)(2), which is covered by Section 1252(f)(1). *RAICES*, 2025 WL 1825431, at \*54.

The government objects that the injunction could have the indirect effect of causing the government to have to adhere to the INA's Part IV withholding provisions when it undertakes removal actions, or to employ the INA's expedited removal procedures, 8 U.S.C. § 1225(b)(1), which also are in Part IV.

But nothing in the injunction requires the government to remove anyone. The injunction requires only that if the government chooses to remove individuals, it may not rely on the unlawful provisions of the Proclamation or the vacated guidance. To the extent the government chooses to undertake removals, it is the INA itself, not the injunction, that prescribes the lawful process. Said another way, the injunction requires only that, if the government chooses to remove noncitizens, it does not do so in excess of its authority under 8 U.S.C. §§ 1182(f) and 1185(a), or in violation of the asylum statute or Convention Against Torture mandate.

The government has failed to show that Section 1252(f)(1)'s bar reaches that far. Instead, it has identified at most a "collateral effect" of the injunction, which the Supreme Court says is outside Section 1252(f)(1)'s bounds. *See Aleman Gonzalez*, 596 U.S. at 553 n.4 (indicating that "a court may

39

enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision") (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)); *Al Otro Lado v. Executive Off. for Immigr. Rev.*, 138 F.4th 1102, 1126 (9th Cir. 2025) ("The Supreme Court acknowledged our collateral-effect rule in *Aleman Gonzalez* and left it undisturbed.").[7]

## IV

The remaining factors weigh against granting a stay any broader than I would provide.

As the party seeking a stay, the government bears the burden of demonstrating that it will suffer an irreparable injury during the time this appeal is pending. *Nken*, 556 U.S. at 433–434. It has not done so.

"To begin with, the Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests." *Huisha-Huisha*, 27 F.4th at 734. Whatever the effects of the Proclamation at the southern border, ECF No. 44-5 (Gunduz Decl. ¶ 43), "our system does not permit agencies to act unlawfully even in pursuit of desirable ends[,]" *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 594 U.S. 758, 766 (2021); *see also Youngstown*, 343 U.S. at 582 (The President's determination that an order "was necessary to avert a national catastrophe" did not overcome the lack of

---

[7] The government does not argue in its stay petition that 8 U.S.C. § 1252(f)(1) limits courts' ability to enter class-wide declaratory relief or to vacate the agency's implementation guidance under 5 U.S.C. § 706. Those arguments accordingly are forfeited here.

40

congressional authorization). That is especially true here because, as the district court explained, denying a stay simply requires the government to adhere to mandatory statutory procedures and standards. *See RAICES*, 2025 WL 1825431, at *55.

By contrast, a full stay would irreparably harm Plaintiffs and the class members. The government maintains that the district court lacks authority to provide relief once individuals are removed under the Proclamation and guidance. *See RAICES*, 2025 WL 1825431, at *56; *see also* ECF No. 55 at 14–15. If true, then, without a stay, class members may never be able to obtain the protections against removal that Congress mandated.

Even more pressingly, without a stay, class members will continue to be removed to countries where they face persecution, torture, and death—all of which are undoubtedly irreparable harms. *See Huisha-Huisha*, 27 F.4th at 733 (persecution and torture are irreparable harms); *Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019) (same as to death). The named plaintiffs in this case have averred, for example, that:

- "We are from Afghanistan, and we came to the United States with the intention of seeking asylum. I and my family fear persecution, torture, and death at the hands of the Taliban." ECF No. 65-1 (A.M. Supp. Decl. ¶ 3).

- "I am from Egypt, and I came to the United States with my wife with the intention of seeking asylum because I had been previously imprisoned and tortured in Egypt by the ruling military regime for my pro-democracy views. * * * * I cannot return to Egypt

41

because I will once again be imprisoned and tortured."
ECF No. 65-4 (M.A. Supp. Decl. ¶¶ 3, 13).

Notably, the government does not dispute that Plaintiffs
and class members will suffer persecution, torture, and death
should they be removed.[8]

Finally, the public interest also counsels against a stay as
"there is a public interest in preventing aliens from being
wrongfully removed, particularly to countries where they are
likely to face substantial harm." *Nken*, 556 U.S. at 436.

**V**

For the foregoing reasons, I would grant in part and deny
in part the government's motion for a stay pending appeal. I
also would grant Plaintiffs' request for expedited merits
briefing and argument.

---

[8] The district court has not yet decided whether it has authority
to provide relief to removed individuals, noting that the "question is
a difficult one[.]" *RAICES*, 2025 WL 1825431, at *56. I also do not
address that question at this stay stage. I note only that, as the district
court explained, "a substantial possibility exists that continued
implementation of the Proclamation during the pendency of an
appeal will effectively deprive tens of thousands of individuals of the
lawful processes to which they are entitled." *Id.*

PILLARD, *Circuit Judge*, concurring in part and dissenting in part:  I would grant the stay in part as to portions of the class definition, and deny the stay in all other respects.  I join Judge Millett's statement explaining why we stay portions of the class definition to the extent they are unclear, and her reasons for denying the motion to stay in all other respects but one.  I disagree with the decision to stay the district court's order to the extent it enjoins what Defendants assert is a valid, categorical determination to deny asylum and the right to apply for asylum under the Proclamation and its implementing guidance.  Largely for the reasons stated by the district court, I conclude that Defendants have failed to make a "strong showing" that the Proclamation and its implementing guidance lawfully deny Plaintiffs the right to apply for asylum and, if they establish that they qualify, to be considered for asylum under 8 U.S.C. § 1158.  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  I write separately only to explain my conclusions regarding the asylum issue.

Plaintiffs are noncitizens physically present in the United States who are entitled by section 1158(a) to apply for asylum. The Proclamation, at least as Defendants interpret and apply it, unlawfully deprives Plaintiffs of that right as well as the right under section 1158(b)(1) to be considered for a grant of asylum if they show they are eligible to receive it.

Section 208(a)(1) of the INA provides noncitizens physically present in the United States a statutory right to apply for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply

2

for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1). Noncitizen applicants within the United States may, at the unreviewable discretion of the executive, be granted asylum if they prove that they are eligible. Eligible applicants are those who establish inability or unwillingness to return to (and obtain the protection of) the country of their nationality because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A) (defining refugee), incorporated in 8 U.S.C. § 1158(b)(1)(A) (Conditions for granting asylum—In general—Eligibility).

Under the plain text of the asylum statute, noncitizens who are "physically present" in the United States are guaranteed the right to apply for asylum. *Id.* § 1158(a)(1). The statutorily mandated right to apply is reinforced by other provisions of the INA that similarly require the government to interview and consider for asylum any noncitizen who "indicates . . . an intention to apply for asylum"—even if the noncitizen is "inadmissible" under other provisions of the INA. *Id.* § 1225(b)(1)(A), (B). As the district court persuasively explained, the INA itself makes "clear that, even though asylum is itself a discretionary form of relief, providing aliens with the opportunity to apply for asylum (and the opportunity to be heard) is mandatory." Mem. Op. 91.

## I.

I do not agree with Judge Millett's conclusion that "the asylum statute itself likely allows . . . suspension" of the rights of the entire plaintiff class to apply for asylum. Millett Op. 33-34. It is of course true that the ultimate decision whether to

3

grant asylum is a matter of executive discretion. *See* 8 U.S.C. § 1158(b)(1); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987) ("Section 208(a) . . . is a discretionary mechanism which gives the Attorney General the *authority* to grant the broader relief of asylum to refugees."). Nonetheless, Defendants have not made the requisite strong showing that the executive's power under the INA to deny asylum in the exercise of discretion authorizes it to make such a categorical, *ex ante* decision via guidance.

Notably, the asylum statute delineates a process by which the executive may determine in advance that certain classes of noncitizens are ineligible to receive a grant of asylum. But that decision must be both "consistent with" the asylum statute and established "by regulation," with the attendant formalities of administrative rulemaking. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B); *see* Mem. Op. 93-94. In 2018, for instance, when the executive sought to render ineligible for asylum noncitizens who entered the country in contravention of any future presidential proclamation barring entry along the southern border with Mexico, the Attorney General issued an interim final rule to that effect. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934 (Nov. 9, 2018). The executive has not complied with the requisite rulemaking process here. Neither the Proclamation nor the implementing guidance was issued through notice and comment rulemaking or as an interim final rule under 5 U.S.C. § 553(b)(B).

Indeed, it is not at all clear that the Proclamation or guidance documents even purport to "preemptively deny asylum applications" submitted by the class members. Millett Op. 34-35. Sections 2 and 3 of the Proclamation suspend and impose restrictions on the "entry" of noncitizens attempting to come into the country across the southern border, or to come in

4

without sufficient documentation.  90 Fed. Reg. 8333, 8335
§§ 2, 3 (Jan. 20, 2025).  As one of the restrictions on entry, the
Proclamation bars noncitizens from "invoking" or "access[ing]
. . . provisions of the INA that would permit their continued
presence in the United States, including, but not limited to,
section 208 of the INA, 8 U.S.C. 1158."  *Id.*  That is the
Proclamation's only reference to the asylum statute, and it is a
restriction on *entry* into the country.

Neither the Proclamation nor the implementing guidance
says anything about ineligibility to be considered for asylum or
suspension of the right to apply for it—rights the INA generally
makes available to noncitizens who have entered the country
despite the Proclamation's entry ban.  To the contrary, section
5 of the Proclamation, which directs various executive officers
to "repatriate" and "remove" noncitizens who make it across
the border, does not mention the asylum statute at all.  Removal
is an INA-defined process, and it accommodates asylum
applications.  *See* 8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(A)(ii).

II.

Even if the executive had validly decided to deny asylum
to all migrants entering the United States unlawfully since
January 20, 2025, the INA does not authorize Defendants to
categorically deny as futile the statutorily mandated
opportunity to apply.

A.

Plaintiffs are likely to succeed in establishing that
foreclosing the opportunity to apply is contrary to the INA.
That is so despite the intuitive appeal to the conclusion that
protecting Plaintiffs' right to apply for asylum matters little if
the executive has already authoritatively announced an

5

intention to deny asylum. The INA explicitly guarantees to all noncitizens present on U.S. soil the right to apply for asylum, with only three exceptions. The right does not apply to (1) certain noncitizens who can be removed to a safe third country, (2) certain noncitizens who fail to apply for asylum within one year of arriving in the United States, and (3) certain noncitizens who have previously applied for and been denied asylum. 8 U.S.C. § 1158(a)(2). Tellingly, there is no such carveout for noncitizens who are ineligible for asylum and whose applications will ultimately be rejected. That is so even in cases governed by the INA's mandatory bar against granting asylum to certain noncitizens, such as noncitizens who have persecuted others or have been convicted of serious crimes. *See* 8 U.S.C. § 1158(b)(2)(A). The INA prohibits those noncitizens from receiving asylum. But it leaves intact the right of those noncitizens to apply for asylum in the first place.

The Department of Justice has consistently reaffirmed that same understanding of the vigor of the right to apply for asylum within the INA's statutory scheme. Recall the Attorney General's 2018 interim final rule, mentioned above, rendering ineligible for asylum noncitizens who entered the country in contravention of Presidential directives. The proposed rule emphasized that the new "restriction on eligibility to [receive] asylum is consistent with . . . 8 U.S.C. 1158(a)(1)," because the regulation "establishes a condition on asylum eligibility, not on the ability to apply for asylum." 83 Fed. Reg. at 55941. The Department's supporting citation clarified that the "exceptions and bars to granting asylum," whether identified in the INA or promulgated by the executive, are separate from and do not affect the "conditions for *applying* for asylum" described in Section 1158(a). *Id.* (emphasis added). That is why the Department's regulations specify that noncitizens who are categorically ineligible for asylum are subject only to "mandatory denial of an asylum application." 8 C.F.R.

6

§ 208.13.  They are not barred from making the application in the first place.

Importantly, the INA expresses Congress's vision for the nation's immigration system in a single comprehensive and internally coherent statute.  As the Proclamation itself acknowledges, the INA establishes a "complex and comprehensive scheme" governing immigration.  90 Fed. Reg. at 8333.  One implication of that comprehensiveness is that the outer bounds of authority delegated to the executive to make discretionary asylum eligibility and removal decisions are necessarily delimited by the statute's mandatory procedures.  Those limits include Section 1158(a)(1)'s requirement to allow noncitizens on U.S. soil to apply for asylum.

It thus squarely violates the INA to conclude that the asylum provision's mandatory protections can be overcome by the executive's need to address quintessential immigration issues.  The INA itself expresses the "balance that Congress struck" between providing asylum to those in need and facilitating efficient removals.  Mem. Op. 92-93.  The executive has no power to override that policy choice based on its own assessment that the statutory processes are unnecessary or unduly cumbersome.

B.

That the executive here bases its authority to foreclose mandatory asylum procedures on discretionary provisions contained in the same statute that establishes those mandatory procedures renders *Huisha-Huisha v. Mayorkas* inapposite.  There, we analyzed an emergency order of the Centers for Disease Control at the Department of Health and Human Services that banned introduction into the United States of certain noncitizens as a measure to limit contagion during the

7

Covid-19 pandemic.  27 F.4th 718, 725-27 (D.C. Cir. 2022).
Critically, that order was issued pursuant to the Surgeon
General's "Section 265" authority to "suspen[d] . . . the right
to introduce" persons into the United States in response to
"serious danger" of spreading a communicable disease from a
foreign country to the United States.  42 U.S.C. § 265.

In line with CDC's interpretation of its statutory power to
suspend the "introduc[tion]" of persons into the United States,
we interpreted Section 265 to authorize the executive to
prevent foreign persons from coming "into contact with
persons in the United States" or "moving into the interior" of
the country after crossing the border, including by summarily
expelling them from the country.  *Huisha-Huisha*, 27 F.4th at
725, 729.  We accordingly held that the Section 265 order
against introducing potentially infected persons into the United
States permissibly applied to authorize exclusion of persons
seeking to enter *and* summary removal, without the
opportunity to seek asylum, of persons who had managed to
enter the United States before they were detected.

We recognized in *Huisha-Huisha* that the Section 265
authority granted to the executive during a public health
emergency conflicted with Section 1185(a)'s requirement that
"aliens—even those who enter the country illegally—[be
allowed] to apply for asylum before they are expelled."  *Id*. at
730.  To "harmoniz[e]" the two statutes, we reasoned that
Section 265's express authorization of the Surgeon General to
effect "a suspension of the right to introduce such persons . . .
[as] is required in the interest of the public health" supported
the order's suspension of the INA's otherwise-required asylum
procedures when the "dangers" to the public health "are
sufficiently pronounced."  *Id*. at 730-31.

8

That reasoning is inapplicable here, where we are interpreting only the INA itself, a comprehensive and internally consistent statute that affords noncitizens—even those whose asylum applications will ultimately be denied—the opportunity to apply for asylum and to receive an "individualized decision[]." *Cardoza-Fonseca*, 480 U.S. at 444. That the INA may be "ineffective" at preventing threats to the public health, Proclamation, 90 Fed. Reg. at 8334, does not authorize the President to rewrite Congress's statute. The asylum statute includes none of the sweeping language underpinning our reading of Section 265 at issue in *Huisha-Huisha*, and Defendants do not contend that the executive has here invoked authority under that public health law. Even if it were the case that the "asylum decision has already been made" by the Proclamation, *Huisha-Huisha*, 27 F.4th at 731, Defendants have made no strong showing that they are likely to succeed in establishing that the INA itself grants the executive authority to eliminate Plaintiffs' right to apply for asylum established by that very statute.

Staying the district court's injunction based on *Huisha-Huisha* is all the more problematic in light of our explicit warning against extrapolating the holding of that case too far: "No one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case." *Id.* at 733. That warning is especially pertinent here, where the government seeks a stay pending appeal. Its burden is accordingly higher than it was on the merits appeal from the preliminary injunction in *Huisha-Huisha*, requiring not just a likelihood of success on the merits of its claims, but a "strong showing" to that effect. *Nken*, 556 U.S. at 426.

\*\*\*

9

In my view, Defendants have failed to make a strong showing that they are likely to succeed on the merits of their arguments that (1) the executive has lawfully made an *ex ante*, categorical decision to deny asylum to every person entering the United States in contravention of the Proclamation, or (2) even if it had made such a determination, such an asylum bar complies with the INA and revokes the Plaintiffs' statutory right to apply for asylum.  I respectfully dissent from that portion of the court's ruling.

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: The Immigration and Nationality Act authorizes the President to suspend the entry of aliens into the United States by proclamation. Invoking this authority, the President suspended entry of certain aliens crossing the southern border, and the Department of Homeland Security then issued informal guidance implementing the proclamation. The proclamation and guidance impose truncated procedures for effecting removal of covered aliens, bar covered aliens from applying for asylum, provide no mechanism for covered aliens to seek withholding of removal under the INA, and narrow the regulatory processes for covered aliens to seek withholding of removal under the United Nations Convention Against Torture (CAT). The district court held that the proclamation and guidance are unlawful in all of these respects, and it granted final injunctive relief to a class of aliens who are or will be affected by the proclamation or guidance. The government seeks a stay pending its appeal, which the Court grants only in part. As summarized below, I mostly agree with the disposition and the analysis set forth by Judge Millett.

*First*, the proclamation and guidance likely cannot impose truncated procedures for the removal of covered aliens. The proclamation rests on section 212(f) of the INA, which permits the President to "suspend the entry of all aliens or any class of aliens" whenever he finds the entry to be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). This provision grants the President sweeping power to control the "entry" of aliens into the United States. *See Trump v. Hawaii*, 585 U.S. 667, 684 (2018). But entry and removal are distinct concepts, in ordinary usage and under the INA. As to removal, section 240 of the INA establishes adjudicatory procedures that "shall be the sole and exclusive procedure[s] for determining whether an alien may be … removed from the United States," unless "otherwise specified" in the INA itself. 8 U.S.C. § 1229a(a)(3). And section 235(b) establishes distinct procedures for the "expedited removal" of aliens covered by

2

that provision. *Id.* § 1225(b).  The President's broad power to impose "entry" restrictions likely does not override these otherwise mandatory removal processes.

*Second*, the proclamation and guidance likely can bar covered aliens from applying for asylum.  The asylum statute provides that any alien physically present in the United States "may apply for asylum."  8 U.S.C. § 1158(a)(1).  But it confers no right to asylum, which is solely "a matter of executive 'discretion.'"  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730 (D.C. Cir. 2022) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987)).  *Huisha-Huisha* involved the exclusion of aliens under 42 U.S.C. § 265, which allows the government to prohibit the "introduction" into the United States "of persons or property" likely to spread a communicable disease.  *See* 27 F.4th at 723–24.  We held that the government, in the course of exercising that authority, likely could decide in advance to "foreclos[e] asylum" for covered aliens.  *Id.* at 731.  And once the "asylum decision ha[d] already been made," the government also likely could bar those aliens from filing "futile" asylum applications.  *See id.*  In my view, the same reasoning extends to aliens covered by a section 212(f) proclamation suspending entry.

*Third*, the proclamation and guidance likely cannot supersede statutory and treaty protections regarding withholding of removal.  The INA prohibits the government from removing an alien to any country where his life or freedom would be threatened on account of various protected characteristics.  8 U.S.C. § 1231(b)(3)(A).  Similarly, the CAT prohibits removal to any country where the alien would likely be tortured.  *See id.* § 1231 note.  Unlike asylum, these substantive protections are mandatory.  *See Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) (CAT); *Cardoza-Fonseca*, 480 U.S. at 429 (INA).  The regulations establishing procedures for

3

adjudicating CAT claims likewise are mandatory.  And these various withholding provisions have nothing to do with who may or may not lawfully enter the country.

*Fourth*, the class definition is likely overbroad.  Article III of the Constitution empowers the federal courts to provide relief only to parties "who have suffered, or will imminently suffer, actual harm."  *Lewis v. Casey,* 518 U.S. 343, 349 (1996); *see*, *e.g.*, *SBA List v. Driehaus*, 573 U.S. 149, 159 (2014); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In providing for class actions, Federal Rule of Civil Procedure 23 does not permit courts to change substantive law, much less change the constitutional law of Article III standing.  So, in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court stated that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."  *Id.* at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)).  And in *Trump v. CASA*, 145 S. Ct. 2540 (2025), the Supreme Court recently held that federal courts likely lack the power to issue "universal" injunctions that "prohibit enforcement of a law or policy against *anyone*."  *Id.* at 2548. Here, the district court granted permanent injunctive relief to "all individuals who are or will be subject to Proclamation 10888 and/or its implementation."  ECF 72 (cleaned up); *see* ECF 73.  This class appears to include aliens abroad who were not physically present in the United States when this suit was filed, or even when the injunction was entered.  On that interpretation, the injunction would extend relief to a large number of individuals who lack Article III standing.  *See Defs. of Wildlife*, 504 U.S. at 564.  In my view, this raises serious constitutional problems.

Nonetheless, at this early stage of the appeal, I would afford no relief on the class-definition point beyond what Judge

4

Millett proposes.  We have held that courts may award class-wide injunctive relief under Federal Rule of Civil Procedure 23(b)(2) if only one member of the class has standing.  *See J.D. v. Azar*, 925 F.3d 1291, 1323–24 (D.C. Cir. 2019).  In my view, this one-plaintiff rule makes sense when, but only when, the class seeks an "indivisible remedy" that courts cannot dole out plaintiff by plaintiff, or class-member by class-member.  *See CASA*, 145 S. Ct. at 2564–65 (Thomas, J., concurring); *see also id.* at 2557 & n.12 (majority).  And in my view, this case involves no such indivisible remedy because awarding complete relief to any one plaintiff or class-member would be readily feasible.  Nonetheless, the impact of *TransUnion* and *CASA* on *J.D.* is a hard question, and I do not think the Supreme Court has so clearly abrogated *J.D.* as to warrant a stay on that basis.  Moreover, the relief sought in *J.D.*—an injunction against enforcement of certain government policies regarding access to abortion for unaccompanied minors in government custody, *see* 925 F.3d at 1300—seems to me just as divisible as the relief sought here.

*Finally*, I dissent from the denial of a stay on one point regarding the remedial limitations imposed by 8 U.S.C. § 1252(f)(1).  That provision states that no court other than the Supreme Court "shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter"—*i.e.*, part IV of subchapter II of chapter 12 of Title 8, which consists of 8 U.S.C. §§ 1221 through 1232—"other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."  In *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), the Supreme Court held that section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except in "individual" cases not

5

involving "classwide injunctive relief." *Id.* at 550. The specified part IV provisions include section 1229a, which sets forth ordinary removal procedures, and section 1225(b)(1), which sets forth expedited removal procedures. The district court held that the proclamation and guidance impermissibly sought to supplant these mandatory removal procedures. As noted above, the court was likely correct on this point, so it properly enjoined application of the proclamation and guidance to the named plaintiffs to that extent. But because such an injunction commanded the government to use the part IV provisions to conduct removals, section 1252(f)(1) barred the extension of this injunctive relief to absent class members.

My colleagues describe the injunctive relief as operating on executive actions grounded in section 1182(f), which lies outside of part IV. But as the district court explained, the enjoined provisions and actions amounted to "an extra-statutory system for expelling aliens from the United States," ECF 71 at 121, which is likely unlawful precisely because it conflicts with sections 1229a and 1225(b)(1). *Aleman Gonzalez* indicated that section 1252(f)(1) does not bar class-wide injunctive relief against the operation of a provision outside part IV simply because the injunction "has some collateral effect on the operation of" provisions inside part IV. *See* 596 U.S. at 553 n.4. But in the only cited case involving such a collateral effect, the enjoined provision was held invalid for reasons having nothing to do with any part IV provision. *See Gonzales v. DHS*, 508 F.3d 1227, 1231–34 (9th Cir. 2007). That seems to me quite different from the situation here, where the court restrained the operation of statutory provisions outside part IV because they conflict with provisions inside it. In my view, the latter kind of case involves a court ordering the government to "enforce, implement, or otherwise carry out" the part IV removal provisions, thereby triggering section 1252(f)(1). *See Aleman Gonzalez*, 596 U.S. at 550. And it is

6

no answer to say that the government need not carry out any removals at all, which would be a wholesale abdication of its enforcement responsibilities under the INA.