# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, et al.,

Plaintiffs-Appellants,

v.

KRISTI NOEM, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## PUBLIC JOINT APPENDIX –
## SEALED MATERIAL IN SEPARATE SUPPLEMENT

———————————

BRIAN C. WARD
 *Acting Assistant Director*
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
 *Senior Litigation Counsel*
 *Office of Immigration Litigation*
 *General Litigation and Appeals*
 *Section*

BRETT A. SHUMATE
 *Assistant Attorney General*
YAAKOV M. ROTH
 *Principal Deputy Assistant*
 *Attorney General*
DREW C. ENSIGN
 *Deputy Assistant Attorney*
 *General*
BENJAMIN HAYES
 *Special Counsel to the Assistant*
 *Attorney General*
 *U.S. Department of Justice, Civil*
 *Division*
 *950 Pennsylvania Avenue, NW*
 *Washington, DC 20530*
 *(202) 514-2000*
 *Drew.C.Ensign@usdoj.gov*

# JOINT APPENDIX
# TABLE OF CONTENTS

| Document | Dist. Ct. Docket No. | Starting Page |
|---|---|---|
| **PUBLIC MATERIAL** | | |
| Amended Complaint | 11 | JA001 |
| Declaration of Javier Hidalgo (Feb. 19, 2025) | 14-1 | JA045 |
| Declaration of Jennifer Babaie (Feb. 19, 2025) | 14-2 | JA049 |
| Declaration of Laura St. John (Feb. 18, 2025) | 14-3 | JA057 |
| Declaration of Ihsan Gunduz (Mar. 24, 2025) | 44-5 | JA064 |
| Declaration of Tulsi Gabbard (Mar. 24, 2025) | 44-6 | JA089 |
| Agency Guidance Documents | 52-1 | JA097 |
| Supplemental Declaration of A.M. (May 22, 2025) | 65-1 | JA171 |
| Supplemental Declaration of N.S. (May 22, 2025) | 65-2 | JA174 |
| Supplemental Declaration of B.R. (May 20, 2025) | 65-3 | JA176 |
| Supplemental Declaration of M.A. (May 21, 2025) | 65-4 | JA179 |
| Supplemental Declaration of G.A. (May 20, 2025) | 65-5 | JA182 |
| Supplemental Declaration of F.A. (May 23, 2025) | 65-6 | JA184 |
| Supplemental Declaration of E.G. (May 22, 2025) | 65-7 | JA187 |
| Memorandum Opinion (July 2, 2025) | 71 | JA189 |
| Order Certifying Class (July 2, 2025) | 72 | JA317 |
| Order Entering Judgment (July 2, 2025) | 73 | JA318 |
| District Court Docket as of August 20, 2025 | N/A | JA322 |
| **SEALED MATERIAL IN SEPARATE SUPPLEMENT** | | |
| Declaration of A.M. (Feb. 18, 2025) | 12-1 | JA350 |
| Declaration of N.S. (Feb. 11, 2025) | 12-2 | JA353 |
| Declaration of D.G. (Feb. 17, 2025) | 12-3 | JA356 |
| Declaration of B.R. (Feb. 3, 2025) | 12-4 | JA359 |

| Document | Dist. Ct. Docket No. | Starting Page |
|---|---|---|
| Declaration of M.A. (Feb. 5, 2025) | 12-5 | JA362 |
| Declaration of G.A. (Feb. 18, 2025) | 12-6 | JA365 |
| Declaration of F.A. (Feb. 18, 2025) | 12-7 | JA368 |
| Declaration of E.G. (Feb. 18, 2025) | 12-8 | JA371 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES, 131
Interpark Blvd. San Antonio, TX 78216;

LAS AMERICAS IMMIGRANT ADVOCACY
CENTER, 1500 E. Yandell Dr., El Paso, TX 79902;

FLORENCE IMMIGRANT & REFUGEE RIGHTS
PROJECT, P.O. Box 86299, Tucson, AZ 85754;

A.M.,* Z.A.,* and their minor children T.A.* and
A.T.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

N.S.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

D.G.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

B.R.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

M.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

G.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

F.A.* and her minor children K.A.* and Y.A.*
c/o National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604; and

E.G.*
c/o National Immigrant Justice Center

Civil Action No. 1:25-cv-
00306

**AMENDED COMPLAINT**

111 W. Jackson Blvd., Suite 800     )
Chicago, IL 60604,     )
     )
*Plaintiffs*,     )
     )
v.     )
     )
KRISTI NOEM, Secretary of the U.S. Department of     )
Homeland Security, in her official capacity, 245     )
Murray Lane SW, Washington, DC 20528;     )
     )
U.S. DEPARTMENT OF HOMELAND SECURITY,     )
245 Murray Lane SW, Washington, DC 20528;     )
     )
PETE R. FLORES, Senior Official Performing the     )
Duties of the Commissioner for U.S. Customs and     )
Border Protection, in his official capacity, U.S.     )
Customs and Border Protection, 1300 Pennsylvania     )
Ave. NW, Washington, DC 20229;     )
     )
MICHAEL BANKS, Chief of U.S. Border Patrol, in     )
his official capacity, 1300 Pennsylvania Ave. NW,     )
Washington, DC 20229;     )
     )
DIANE SABATINO, Acting Executive Assistant     )
Commissioner, CBP Office of Field Operations, in     )
her official capacity, 1300 Pennsylvania Ave. NW,     )
Washington, DC 20229;     )
     )
U.S. CUSTOMS AND BORDER PROTECTION,     )
1300 Pennsylvania Ave. NW, Washington, DC     )
20229;     )
     )
CALEB VITELLO, Acting Director of U.S.     )
Immigration and Customs Enforcement, in his     )
official capacity, 500 12th St., SW, Washington, DC     )
20536;     )
     )
U.S. IMMIGRATION AND CUSTOMS     )
ENFORCEMENT, 500 12th St. SW, Washington,     )
DC 20536;     )
     )
KIKA SCOTT, Acting Director of U.S. Citizenship     )
and Immigration Services, in her official capacity,     )
5900 Capital Gateway Dr., Mail Stop 2120, Camp     )
Springs, MD 20588;     )
     )
     )
U.S. CITIZENSHIP AND IMMIGRATION     )
SERVICES, 5900 Capital Gateway Dr., Mail Stop     )
2120, Camp Springs, MD 20588;     )
     )

MARCO RUBIO, Secretary of the U.S. Department
of State, in his official capacity, 2201 C St. NW,
Washington, DC 20520;                                )
                                                     )
                                                     )
U.S. DEPARTMENT OF STATE, 2201 C St. NW,             )
Washington, DC 20520;                                )
                                                     )
PAMELA BONDI, Attorney General of the United         )
States, in her official capacity, 950 Pennsylvania Ave. )
NW, Washington, DC, 20530;                           )
                                                     )
U.S. DEPARTMENT OF JUSTICE, 950                      )
Pennsylvania Ave. NW, Washington, DC, 20530;         )
                                                     )
DONALD J. TRUMP, President of the United States,     )
in his official capacity, 1600 Pennsylvania Ave. NW, )
Washington, DC 20220;                                )
                                                     )
*Defendants*.                                        )
                                                     )
                                                     )
                                                     )
                                                     )
                                                     )

\* Motion for these Individual Plaintiffs to proceed under pseudonym has been concurrently filed
with this amended complaint.

## INTRODUCTION

1.      In the Immigration and Nationality Act ("INA"), Congress has created a comprehensive statutory system allowing noncitizens fleeing persecution or torture to seek protection in the United States. Congress has given these individuals statutory rights to apply for asylum and other protections. And it has prohibited the government from returning these individuals to places where they face persecution or torture. Congress has also enacted an exclusive set of procedures for removing noncitizens from the United States and adjudicating their claims for protection. In doing all this, Congress struck a careful balance between the interest in quickly removing those who cannot qualify for protection and the need to ensure that people are not wrongfully placed at risk of persecution or torture in another country.

2.      This suit concerns the Executive Branch's attempt to wipe away these statutes by fiat. On January 20, 2025, the President issued a proclamation that purports to prohibit noncitizens "from invoking [these] provisions of the INA … , including" the asylum statute, on the basis of a supposed "invasion." Proclamation No. 10888, § 2, 90 Fed. Reg. 8333 (Jan. 20, 2025) ("Proclamation"). And under the Proclamation, the government is doing just what Congress by statute decreed that the United States must *not* do. It is returning asylum seekers—not just single adults, but families too—to countries where they face persecution or torture, without allowing them to invoke the protections Congress has provided. Indeed, the Proclamation does not even exempt unaccompanied children, despite the specific protections such children receive by statute.

3.      The Proclamation is both unlawful and unprecedented. Principally, it invokes Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all [noncitizens] or any class of [noncitizens]" "as immigrants or nonimmigrants" when their entry "would be detrimental to the interests of the United States." But this authority to

1

"suspend entry" on its face does not empower the President to *summarily remove* noncitizens already physically present in the United States, much less to do so in violation of the protections and procedures Congress provided in the INA. That is why the Executive Branch for four decades has, without exception and across administrations, concluded that Section 212(f) does not authorize the President to displace rights to seek asylum or other statutory protections. That solid wall of authority includes a 1984 opinion from then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson; a 2018 regulation promulgated by the Departments of Justice and Homeland Security of then-President Trump; and a 2024 regulation promulgated by the same Departments under then-President Biden. Nor does the other statutory provision that the Proclamation invokes, INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), provide the President with authority to unilaterally override the protections Congress has afforded those fleeing danger.

4.    Insofar as the Proclamation suggests that the President has constitutional authority to declare an "invasion" and thereby displace Congress's statutes, this case presents an even more extreme example of presidential overreach than the one the Supreme Court struck down in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). Whatever the outer limits of the President's constitutional authorities, they do not confer a *preclusive* power that permits the President to dispense with the statutes relevant here. And the presence of people seeking protection from persecution is—even at elevated levels—not an "invasion."

5.    "[T]his wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). If the Proclamation may lawfully abrogate the statutory protections at issue here, then every future President may sweep away at whim the protections that Congress provided in the INA. Our separation of powers rebels at that idea.

2

## JURISDICTION AND VENUE

6.    This case arises under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

the INA, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; the Foreign Affairs Reform

and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Title XXII, § 2242, 112 Stat.

2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), and its implementing regulations;

the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232; and the

United States Constitution.

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See also* 8

U.S.C. § 1252(e)(3). Because this suit seeks relief other than money damages and instead

challenges Defendants' unlawful actions, the United States has waived sovereign immunity from

this suit. 5 U.S.C. § 702.

8.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers of

the United States acting in their official capacity and agencies of the United States, Defendants

reside in this District, and a substantial part of the events or omissions giving rise to the claim

occurred in this District. *See also* 8 U.S.C. § 1252(e)(3).

## PARTIES

### I.    Plaintiffs

#### A.    Organizational Plaintiffs

9.    Plaintiff Refugee and Immigrant Center for Education and Legal Services

("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas.

RAICES' mission is to defend the rights of immigrants and refugees; empower individuals,

families, and communities of immigrants and refugees; and advocate for liberty and justice.

RAICES provides free and low-cost immigration legal services to underserved immigrants—

including adults, families, and unaccompanied noncitizen children seeking asylum and related protections—and is the largest immigration legal services provider in Texas. A central aspect of RAICES' work is providing legal services to migrants seeking asylum and other statutory protections upon crossing the border. The summary removal of migrants under the Proclamation without access to asylum or other statutory protections significantly impedes RAICES' core work.

10.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers, in Texas and in New Mexico. An essential part of Las Americas' work is providing pro se and limited forms of legal assistance to adult immigrants detained in the Immigration and Customs Enforcement ("ICE") El Paso jurisdiction, including immigration counseling and legal services to asylum seekers. This work includes assisting asylum seekers in preparing for asylum fear interviews and representing them both during those interviews and throughout the subsequent review process. In 2024, Las Americas staff and volunteers provided approximately 197 credible fear interview orientations. Las Americas also provides direct representation to people seeking asylum and other forms of protection in immigration court. The summary removal of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes Las Americas' core work.

11.     Plaintiff Florence Immigrant & Refugee Rights Project ("Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with additional offices in Phoenix and Florence, Arizona. The Florence Project provides free legal and social services to detained adults and unaccompanied children facing removal proceedings in Arizona. The Florence Project provides direct representation to people seeking asylum and other forms of protection and also provides "Know Your Rights" trainings and other forms of pro se assistance to immigrants

detained in Arizona. In recent years, the Florence Project has served over 10,000 detained adults and children annually, many of whom are seeking asylum and other forms of protection. The summary removal of asylum seekers under the Proclamation without access to asylum or other statutory protections significantly impedes the Florence Project's core work.

### B. Individual Plaintiffs

12.    Plaintiffs A.M., Z.A., T.A., and A.T. fled Afghanistan after the Taliban retook control following threats arising from A.M.'s work with a nonprofit civil society organization. A.M. also fears that he and his family will be persecuted because of their perceived support for the United States and because they believe girls and women should receive education. A.M. and his family arrived in Mexico around October 2024 and began trying to secure a CBP One appointment. They received an appointment for January 20, 2025, but it was canceled following the change in administration. On February 3, 2025, A.M. and his family crossed into the United States and told CBP agents that they wanted to seek asylum. Neither A.M. nor any of his family members has received a credible fear interview.

13.    Plaintiff N.S. is a woman from Ecuador who was repeatedly raped, assaulted, and called anti-indigenous slurs by her former partner, an Ecuadorian police officer. The officer also held N.S. captive in an apartment and threatened to kill her if she left. N.S. escaped and fled to the United States. N.S. entered the United States on or about January 26, 2025, turned herself in to immigration officials, and asked for asylum. She remains in DHS custody and has not received a credible fear interview.

14.    Plaintiff D.G. is a Cuban man who opposes the country's ruling regime. After D.G. participated in protests against the government, he was repeatedly arrested on false charges. Following his most recent arrest, D.G. was held for four months in solitary confinement in a high-

5

security prison where he was deprived of adequate food and water. D.G. fled Cuba and arrived in Mexico in March or April 2024. He tried to secure a CBP One appointment but was not able to do so before the appointments were canceled. While in Mexico, D.G. was kidnapped and held for ransom twice and was also robbed. D.G. entered the United States on or about January 21, 2025, and pleaded with immigration officers to allow him to apply for asylum, telling them about his fear of return to both Cuba and Mexico. D.G. was instead charged with illegal entry and then deported back to Mexico without a credible fear interview.

15.    Plaintiff B.R. is a woman from Ecuador who was kidnapped, raped, and tortured by a drug cartel on two separate occasions. While waiting for a CBP One appointment that would, prior to January 20, 2025, have allowed her to present at a U.S. port of entry to seek asylum, B.R. was kidnapped and beaten by a Mexican cartel. B.R. entered the United States on January 26, 2025, and is currently detained by DHS in Texas. She has told immigration officers that she wishes to seek asylum, but she has not received a credible fear interview.

16.    Plaintiff M.A. is an Egyptian man who was jailed and tortured for years because he supports democracy and opposes the ruling dictatorship. M.A. and his wife spent months in Mexico—where they were repeatedly threatened and robbed—trying to obtain a CBP One appointment. M.A. and his pregnant wife crossed the border into the United States on or about January 25, 2025, waited for U.S. immigration officers, and asked them for asylum. After they were taken to a CBP facility, M.A. and his wife were separated; M.A. has not seen her since. M.A. has repeatedly told immigration officers that he fears return to Egypt and wants a credible fear interview, and a lawyer made the same request on his behalf. M.A. remains in DHS custody and has not received a credible fear interview.

17.     Plaintiff G.A. is a Brazilian woman fleeing severe physical and psychological abuse and death threats against her and her children, by a former partner who has continued searching for her since she fled. G.A. was extorted and kidnapped while waiting in Mexico before entering the United States. G.A. entered the United States on or about February 1, 2025. She was charged with and convicted of illegal entry and is now being held in immigration detention, where she has repeatedly stated that she is afraid of returning to Brazil and wants to seek asylum. On information and belief, though G.A. may have been interviewed on or around February 17, 2025, she is not being considered for asylum.

18.     Plaintiff F.A. and her minor children K.A. and Y.A. are from Turkey. F.A. and her husband, who is in the United States seeking asylum, joined the Gülen, or Hizmet, movement in Turkey for religious reasons and in an effort to foster non-violence. As a result, F.A. and her family faced persistent harassment, and her husband left Turkey after a warrant was issued for his arrest because of his involvement with the movement. F.A., K.A., and Y.A. fled after continued harassment, reports of women and children being tortured, and the disappearance of one of K.A. and Y.A.'s teachers. F.A. and her children entered the United States on or about February 3, 2025, and repeatedly told immigration officials that they had come to seek asylum and that F.A.'s husband was in the United States seeking asylum for the same reasons. After nine days in detention, F.A. and her children were deported on a military plane to Panama, where they are being forced to stay inside their rooms a hotel pending relocation to a detention camp and/or deportation to Turkey. F.A. and her children were never given a credible fear interview.

19.     Plaintiff E.G. fled from Peru after being raped by two men, and then persistently threatened with death, because he is bisexual. E.G. entered the United States on or about February 1, 2025, and was immediately detained. He repeatedly told immigration officials that he wished to

7

seek asylum and was scared of returning to Peru, but on or about February 13, 2025, he was removed to Peru by plane. E.G. was never given a credible fear interview.

## II.    Defendants

20.    Defendant Kristi Noem is the Secretary of the Department of Homeland Security ("DHS"). Defendant Noem is sued in her official capacity. In that capacity, Defendant Noem is responsible for overseeing enforcement and implementation of the Proclamation by all DHS personnel.

21.    Defendant DHS is a cabinet-level Department of the federal government. DHS and its components, Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS"), are the agencies of the federal government principally charged with implementing and enforcing the Proclamation.

22.    Defendant Pete R. Flores is the Acting Commissioner of CBP. Defendant Flores is sued in his official capacity. In that capacity, Defendant Flores is responsible for overseeing CBP personnel implementing and enforcing the Proclamation.

23.    Defendant Michael Banks is the Chief of U.S. Border Patrol. The Border Patrol is responsible for border security between ports of entry. Defendant Banks is sued in his official capacity. In that capacity, Defendant Banks is responsible for implementing and enforcing the Proclamation between ports of entry.

24.    Defendant Diane Sabatino is the Acting Executive Assistant Commissioner of the CBP Office of Field Operations ("OFO"). OFO is the largest component of CBP and is responsible for border security, including immigration and travel through U.S. ports of entry. Defendant Sabatino is sued in her official capacity. In that capacity, Defendant Sabatino is responsible for implementing and enforcing the Proclamation at ports of entry.

8

25.    Defendant CBP is the DHS component responsible for the initial processing and detention of noncitizens who are apprehended at or between U.S. ports of entry.

26.    Defendant Caleb Vitello is the Acting Director of ICE. Defendant Vitello is sued in his official capacity. In that capacity, Defendant Vitello is responsible for ICE's implementation and enforcement of the Proclamation.

27.    Defendant ICE is the DHS component responsible for carrying out removal orders and overseeing immigration detention.

28.    Defendant Kika Scott is the Acting Director of USCIS. Defendant Scott is sued in her official capacity. In that capacity, Defendant Scott is responsible for overseeing the asylum officers who are charged by statute with carrying out credible fear interviews.

29.    Defendant USCIS is the DHS component that oversees the asylum officers who are charged by statute with carrying out credible fear interviews.

30.    Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity. In that capacity, Defendant Rubio is responsible for working alongside Defendant Noem to implement and enforce the Proclamation.

31.    Defendant United States Department of State ("State Department" or "State") is a cabinet-level Department of the federal government. The State Department is charged with assisting DHS in implementing and enforcing the Proclamation.

32.    Defendant Pamela Bondi is the Attorney General of the United States, the principal officer in charge of DOJ. She is sued in her official capacity. In that capacity, Defendant Bondi is charged with assisting DHS in implementing and enforcing the Proclamation.

33.    Defendant United States Department of Justice ("DOJ") is a cabinet-level Department of the federal government. DOJ is charged with assisting DHS in implementing and

enforce the Proclamation.

34.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Proclamation challenged in this lawsuit and oversees its implementation and enforcement.

35.    The Defendants other than President Trump are referred to as the Non-President Defendants.

## FACTS

### I.  Legal Background

36.    The United States has long sheltered refugees seeking a haven from persecution, and the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, enshrined that national commitment in the general asylum statute. The Refugee Act, as modified over time, reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns…." S. Rep. No. 96-256, at 1 (1979), *reprinted in* 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle that individuals may not be returned to countries where they face persecution or torture. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

### A.    Congress's Three Forms of Protection for Individuals Fleeing Persecution or Torture.

37.    Federal law provides three primary forms of protection for individuals fleeing persecution or torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* 8 U.S.C. § 1231 note. All three forms of protection are available to noncitizens who are inadmissible under the INA. Indeed, withholding of removal and CAT protection are available *only* to individuals who

receive orders of removal—and they are mandatory for individuals who qualify.

38.    *First*, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," may apply for asylum. 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing this provision. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ). To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

39.    Section 1158 contains a handful of narrow bars to asylum eligibility. *See* 8 U.S.C. § 1158(a)(2), (b)(2)(A). The Secretary of Homeland Security and the Attorney General "may by regulation establish additional limitations and conditions" on asylum eligibility, but only if those limitations and conditions are "consistent with" the asylum statute. *Id.* § 1158(b)(2)(C); *see id.* § 1158(d)(5)(B) (the Secretary and the Attorney General "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter"); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (transferring many functions relating to federal immigration law to the Secretary of Homeland Security).

40.    *Second*, via the withholding of removal statute, Congress has prohibited the government from removing a noncitizen "to a country if … the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). This form of relief requires the applicant to meet a higher burden on the likelihood of harm—showing that it is more likely than not to occur. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). But where the applicant makes this showing, protection is mandatory. This mandatory protection is required by

11

treaty obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees. *See Cardoza-Fonseca*, 480 U.S. at 429, 432-35, 436-38.

41.     *Third*, the CAT, implemented by FARRA, prohibits the government from returning a noncitizen "to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. Both DHS and DOJ have promulgated implementing regulations under which applicants carry their burden to show an entitlement to relief if they establish "that it is more likely than not that [they] … would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c) (DHS); *see* 8 C.F.R. § 1208.16(c) (DOJ); *see also* 8 C.F.R. § 208.18(a)(2) (defining "torture" for purposes of the CAT).

**B.     Congress's Procedures For Removing Noncitizens.**

42.     Congress has also carefully specified the procedures by which noncitizens may be removed from the United States. These procedures are designed to ensure that noncitizens have a fair chance to present claims for asylum, withholding of removal, and CAT protection.

43.     "Unless otherwise specified" in the INA, a removal proceeding before an immigration judge ("IJ") under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual. 8 U.S.C. § 1229a(a)(3). Noncitizens in these proceedings receive full hearings in immigration court and have a host of procedural rights, including the right to adversarial hearings before immigration judges and the right to retain and be represented by counsel. Noncitizens can contest the factual and legal allegations against them and apply for relief from removal. They also receive the opportunity for appellate review before the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229a, 1252(a) *et seq*.

44.     In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents.

JA015

*Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1).

Expedited removal by statute applies only to a limited class of noncitizens who are inadmissible because they lack valid entry documents (such as visas) or attempt to enter by fraud or misrepresentation. 8 U.S.C. § 1225(b)(1)(A); *id.* § 1182(a)(6)(C), (a)(7). Historically, these expedited removal procedures have been applied to certain noncitizens who arrive at a port of entry or are apprehended near the border after entering without inspection.

45.    When Congress created the expedited removal system, it balanced its desire to facilitate "efficient removal" against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin. Specifically, if a noncitizen expresses the intention to seek asylum or a fear of removal, they are entitled to an interview with an asylum officer, the outcome of which is subject to review by an immigration judge. Additionally, the statute requires the Attorney General to "provide information concerning the asylum interview described in this subparagraph to [noncitizens] who may be eligible." 8 U.S.C. § 1225(b)(1)(B)(iv). And a noncitizen "who is eligible for such interview may consult with a person or persons of the [noncitizen]'s choosing prior to the interview or any review thereof." *Id.* The purpose of the interview is to screen fear claims. Noncitizens pass the screening standard if they establish a "credible fear" of returning to their country of origin, defined by statute as a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *Id.* § 1225(b)(1)(A)(ii), (b)(1)(B)(v). Once the noncitizen shows a credible fear—a "low screening standard," 142 Cong. Rec. 25,347 (1996)—they are entitled to a full removal hearing (with

administrative and judicial review) in which to attempt to make out their asylum claim.

46.     By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision by an immigration judge. If the IJ disagrees with the asylum officer and finds a credible fear, the noncitizen is then placed in regular removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 1208.30(g)(2)(iv)(B). If, however, the IJ affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e).

47.     The credible fear interview is also used to screen claims for withholding of removal and CAT relief.

48.     Unaccompanied noncitizen children, whom the Proclamation does not exempt, have special statutory protections under the INA and the TVPRA. Under those laws, unaccompanied noncitizen children, except those from Mexico and Canada, may not be placed into expedited removal proceedings and instead "shall" be placed in full removal proceedings in immigration court where they may seek various forms of relief, including protection from persecution or torture. 8 U.S.C. § 1232(a)(5)(D).

49.     Over the past decade, the federal government has repeatedly sought to limit eligibility for asylum and to limit the procedural protections for individuals seeking asylum and other forms of protection, invoking the statutory authority of the DHS Secretary and the Attorney General to create additional limitations and conditions on asylum and applications for asylum. Overwhelmingly, courts have invalidated those attempts. *See, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-70 (9th Cir. 2021). And none of those attempts have gone nearly as far as the Proclamation.

50.     In 2024, a bipartisan group of lawmakers crafted legislation that would have

14

provided "border emergency authority" to limit access to asylum and streamline removal procedures when encounters at the southern border exceeded certain thresholds. *See* Border Act of 2024, S. 118-4361 (May 16, 2024). That legislation never became law.

   **C.     Sections 212(f) and 215(a)(1) of the Immigration and Nationality Act.**

   51.     The Proclamation relies principally on Section 212(f) of the INA. That section provides as follows: "Whenever the President finds that the entry of any [noncitizens] or of any class of [noncitizens] into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants, or impose on the entry of [noncitizens] any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

   52.     Congress first enacted Section 212(f) in the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(e), 66 Stat. 163, 188 ("1952 Act"). The 1952 Act long predates Congress's creation of the comprehensive set of protections from removal that exist today.

   53.     Section 212(f) does not empower the President to remove noncitizens from the United States, much less to do so in a manner that contradicts the specific restrictions on the removal of noncitizens that Congress imposed elsewhere in the INA, including the asylum statute, the withholding of removal statute, FARRA, the TVPRA, and the expedited removal statute.

   54.     Noncitizens who are "physically present" or "arrive[] in" the United States have a statutory right to apply for asylum. 8 U.S.C. § 1158(a)(1). So while Section 212(f) authorizes the President to suspend "entry," it does not authorize the President to override the asylum rights of noncitizens who are already physically present in the United States. Likewise, even if the President can suspend the entry of certain noncitizens, Section 212(f) does not authorize the removal of noncitizens in contravention of Congress's direction that the government "may not remove [a

noncitizen] to a country if … [their] life or freedom would be threatened in that country" on protected grounds, 8 U.S.C. § 1231(b)(3)(A), or to a country in which "it is more likely than not that he or she would be tortured" upon removal, 8 C.F.R. § 208.16(c)(2).

55.      Not until 1981 did a President invoke Section 212(f). *See* Kelsy Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)*, at 22 (2024) ("CRS Report"). Ever since, Presidents have invoked Section 212(f) to render noncitizens inadmissible. *See id.* at 4-22. Never has a President invoked Section 212(f) to remove individuals who are already physically present in the United States or to bar such individuals from seeking relief from removal.

56.      Since 1981, the Executive Branch has expressly and repeatedly recognized that Section 212(f) does not permit the President to alter the asylum rights and procedures that Congress enacted elsewhere in the INA.

57.      In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, considered whether Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States."  89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 1984, the 1980 Refugee Act provided only that the "Attorney General shall establish a procedure for [noncitizens] physically present in the United States or at a land border or port of entry, irrespective of such [noncitizen's] status, to apply for asylum." Pub. L. No. 96-212, § 208(a), 94 Stat. 102, 105 (1980). Even so, Assistant Attorney General Olson determined that Section 212(f) did not permit the President to displace the asylum statute. 89 Fed. Reg. at 81163 n.53.

58.      Congress subsequently amended the asylum statute to its present form, expressly providing that "[a]ny [noncitizen] who is physically present in the United States or who arrives in

the United States (whether or not at a designated port of arrival and including a [noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) [of this title]." Act of 1996, Pub L. No. 104-208, Div. C, Title VI, § 604(a), 110 Stat. 3009-690 (1996). In 1996, Congress comprehensively overhauled the immigration laws, including by creating the expedited removal system. Congress never, however, amended Section 212(f) to permit the President to abrogate the rights Congress had provided via the asylum statute and other forms of protection.

59.    "Although Presidents have invoked section 212(f) at least 90 times since 1981 … none of those proclamations were understood to affect the right of noncitizens to apply for, or noncitizens' statutory eligibility to receive, asylum." 89 Fed. Reg. at 81163 n.53 (*Securing the Border* rule discussing the history of presidential invocations of Section 212(f)).

60.    In 2018, during President Trump's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. President Trump had issued a Section 212(f) proclamation suspending the entry of noncitizens between southern border ports of entry. Proclamation 9822, *Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661, 57663 (Nov. 9, 2018). DHS and DOJ, however, conceded that a noncitizen "whose entry is suspended or restricted under … a [Section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the [noncitizen] should not be in the United States, would remain subject to various procedures under immigration laws[,]" including ''expedited-removal proceedings'' in which they could "raise any claims for protection[.]" *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934, 55940(Nov. 9, 2018). The Departments

therefore invoked separate regulatory authority under the asylum statute itself to promulgate regulations that purported to deem ineligible for asylum noncitizens who entered in violation of the proclamation. *Id.* at 55952 (codified at 8 C.F.R. § 208.13(c)(3) (DHS) and 8 C.F.R. § 1208.13(c)(3) (DOJ)). Those regulations were enjoined and ultimately vacated as violating Congress's directive that any "additional limitations and conditions" on asylum eligibility must be "consistent with" the remainder of the asylum statute. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 771-73 (9th Cir. 2018) (affirming injunction of regulations); *see OA v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating regulations).

61.    In 2024, DHS and DOJ reaffirmed what had "been the Executive Branch's consistent position for four decades" and recognized that a proclamation under Section 212(f) "cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures." 89 Fed. Reg. at 81163. This "longstanding understanding," the government explained, "follow[ed] from the text and structure of the governing statutes." *Id.*

62.    In *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court considered a proclamation that imposed a "travel ban" on noncitizens from certain countries, issued pursuant to Section 212(f). That proclamation rendered the impacted noncitizens inadmissible but did not override their right to seek asylum or other forms of protection that Congress has protected by statute. And while the Supreme Court, in upholding that proclamation, noted the "broad discretion" that Section 212(f) conferred, the Court "assume[d]"—consistent with the Executive Branch's longstanding position—that Section 212(f) "does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689.

63.    The other provision on which the Proclamation relies, INA Section 215(a)(1), 8 U.S.C § 1185(a)(1), likewise does not authorize the President to abrogate the protections that the

18

INA provides to noncitizens present in the United States. Section 215(a)(1) provides that, "[u]nless otherwise ordered by the President, it shall be unlawful … for any [noncitizen] to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

64.    As with Section 212(f), the authority under Section 215(a)(1) to condition entry on "such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe" does not authorize the President to abrogate limitations that Congress elsewhere provided in the INA. This provision has typically been invoked in conjunction with Section 212(f). And consistent with the Executive Branch's recognition that "this provision 'substantially overlap[s]' with" Section 212(f), *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33), the Executive Branch has never before claimed—and indeed has expressly disavowed—that it empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.

**D.    The President's Constitutional Authority.**

65.    The Proclamation also invokes Article II and Article IV, Section 4 of the U.S. Constitution.

66.    Article II vests in the President "[t]he executive Power," U.S. Const. art. II, § 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* § 34.

67.    Article IV, Section 4 states that the United States "shall guarantee to every State in this Union a Republican Form of Government" and "shall protect each of them against Invasion."

68.    Whatever the outer limits of these authorities, they do not authorize a preclusive power that permits the President to abrogate Congress's exclusive procedures for removing

19

noncitizens, *see* 8 U.S.C. §§ 1229a, 1225(b), or the statutory protections that Congress has granted to noncitizens in the United States, *see* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3) (withholding of removal); 8 U.S.C. § 1231 note (CAT protection).

69.     The presence of people seeking protection from persecution, even at heightened levels, does not constitute an "invasion" within the meaning of Article IV, Section 4 or any other part of the Constitution.

**II. The Proclamation and Its Implementation.**

70.     In November and December 2024, encounters at the Southwest border—including both at and in between ports of entry—fell to the "lowest level since August 2020 and lower than the monthly average for 2019." CBP, *CBP Releases December 2024 Monthly Update*, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update (Jan. 14, 2025).

71.     Nonetheless, on January 20, 2025, the President issued the Proclamation. 90 Fed. Reg. 8333. This Proclamation marks the first time that any President has asserted that 8 U.S.C. §§ 1182(f) or 1185(a)(1), or the Constitution, permits the Executive Branch to unilaterally override the immigration laws Congress enacted for the protection of people who face persecution or torture if removed from the United States.

72.     The preamble states that the President "ha[s] determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States."

73.     The preamble states that "[t]he INA provides the President with certain emergency tools"—specifically, 8 U.S.C. §§ 1182(f) and 1185(a)(1). The preamble recognizes that, "[h]istorically, Presidents have used these statutory authorities [only] to deny entry of designated classes and categories of [noncitizens] into the United States through ports of entry." But the

preamble asserts, without citation to authority, that "if the President has the power to deny entry of any [noncitizen] into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of [noncitizens] into the United States and impose restrictions on access to portions of the immigration system." And the preamble further asserts that, notwithstanding the INA, "[t]he President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of [noncitizens] involved in an invasion into the United States, and to rapidly repatriate them to an alternative location."

74.    Section 1 of the Proclamation states that, pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), "the entry into the United States" of noncitizens engaged in the purported "invasion across the southern border is detrimental to the interests of the United States" and that entry into the United States "shall be suspended" until the President issues a "finding that the invasion at the border has ceased." Section 2 states that these same noncitizens "are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, [the asylum statute], 8 U.S.C. 1158, until [the President] issue[s] a finding that the invasion at the southern border has ceased."

75.    Neither Section 1 nor Section 2 defines the class of noncitizens it covers, stating only that the provisions apply to noncitizens engaged in the purported "invasion across the southern border." Sections 1 and 2 do not distinguish between individuals who cross between ports of entry and those who present at ports of entry and, accordingly, appear to cover both groups.

76.    Section 3, also issued pursuant to 8 U.S.C. §§ 1182(f) and 1185(a), asserts that the entry of noncitizens who do not provide federal officials "with sufficient medical information and

21

reliable criminal history and background information as to enable fulfillment of the requirements of … 8 U.S.C. 1182(a)(1)-(3)[] is detrimental to the United States." These provisions of the INA set forth grounds of inadmissibility related to health, crimes, and national security. Section 3 of the Proclamation then suspends entry of noncitizens who do not provide such information and restricts their access to the asylum and other INA provisions "that would permit their continued presence in the United States." The Proclamation does not acknowledge that the INA makes those protections available to noncitizens who are inadmissible on these or other grounds.

77.     Section 4 of the Proclamation, relying on purported "authorities provided to the [President] under Article II of the Constitution" and "the guarantee of protection against invasion required by Article IV," "suspend[s] the physical entry of any [noncitizen] engaged in the invasion across the southern border of the United States." Section 4 further directs the DHS Secretary "to take appropriate actions … to achieve the objectives of this proclamation." Section 4 does not expressly state whether the President has invoked these constitutional powers only to prevent noncitizens from physically entering the United States, as opposed to removing them from the United States. Nor, unlike Sections 2 and 3, does Section 4 state that it restricts access to statutory protections under the immigration laws concerning the removal of noncitizens already within the United States. The preamble, however, asserts that the President's constitutional powers include the ability "to rapidly repatriate [noncitizens] to an alternative location."

78.     Section 5 of the Proclamation directs the DHS Secretary, "in coordination with the Secretary of State and the Attorney General," to "take all appropriate action to repel, repatriate, or remove" all noncitizens engaged in the purported "invasion across the southern border" until the President "issue[s] a finding that the invasion at the southern border has ceased." The Proclamation does not explain why current levels of border encounters constitute an "invasion," identify the

22

point at which encounter levels would no longer constitute an invasion, or provide a timetable for that review.

79.   The Non-President Defendants have made a final decision to enforce the Proclamation.

80.   On information and belief, the Non-President Defendants have issued written guidance documents to implement the Proclamation.

81.   Pursuant to the Proclamation and implementing guidance, Defendants are summarily removing noncitizens who are physically present in the United States without allowing them an opportunity to seek asylum or withholding of removal and without complying with the procedures required for regular removal proceedings under 8 U.S.C. § 1229a or expedited removal proceedings under Section 1225(b). On information and belief, people are being removed not only to their home countries, but to third countries as well, including Mexico and Asylum seekers are also being systematically removed from the United States without even being provided credible fear interviews—the absolute minimum that Congress required to ensure that people subjected to expedited removal would not be returned to persecution or torture.

82.   On information and belief, Defendants are also relying upon the Proclamation to deny migrants at the Southern border a meaningful opportunity to apply for CAT protection.

83.   None of the sources of law on which the Proclamation relies—Section 212(f), Section 215(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in the asylum statute, the withholding of removal statute, FARRA, TVPRA, the expedited removal statute, or the other provisions of the INA.

84.   Even under the standards articulated in *Trump v. Hawaii*, the Proclamation does not satisfy the predicate requirements for invoking Section 212(f). First, the Proclamation fails to

JA026

define the "class of [noncitizens]" whose entry is suspended, as Section 212(f) requires, insofar as it purports to apply to noncitizens "engaged in the invasion across the southern border" without further defining which noncitizens it covers. Second, the Proclamation does not satisfy Section 212(f)'s predicate requirement that the President must adequately "find" that the entries it restricts "would be detrimental to the interests of the United States." Third, insofar as the Proclamation rests on a finding that it would be detrimental to the interests of the United States to apply Congress's statutes providing access to asylum and other forms of protection to individuals covered by the Proclamation, this finding cannot sustain the Proclamation. Congress via statute has determined that noncitizens must be able to access asylum and other forms of protection.

## CLASS ACTION ALLEGATIONS

85.    Individual Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

86.    Individual Plaintiffs seek to represent the following Proposed Class: All noncitizens who were, are, or will be subject to the Proclamation and/or its implementation within the United States.

87.    The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Thousands of asylum seekers are already being subjected to summary removal under the Proclamation and its implementation by Defendants. The proposed class also includes numerous future noncitizens who will enter the United States and will be subjected to the Proclamation.

88.    The class meets the commonality requirements of Rule 23(a)(2). The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the statutory protections Congress has enacted. The suit also raises questions of law common to

members of the proposed class, including whether the Proclamation and its implementation violate statutory protections for asylum seekers and whether Section 212(f), Section 215(a)(1), or the Constitution authorize the President to abrogate the statutory protections.

89.    The proposed class meets the typicality requirements of Rule 23(a)(3), because the claims of the representative Individual Plaintiffs are typical of the claims of the class. Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal without an opportunity to pursue protection from removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the immigration laws, the APA, and the separation of powers.

90.    The proposed class meets the adequacy requirements of Rule 23(a)(4). The representative Individual Plaintiffs seek the same relief as the other members of the class—among other things, an order declaring the Proclamation and Defendants' implementing guidance documents unlawful and an injunction preventing enforcement of the Proclamation and the implementing guidance. In defending their rights, Individual Plaintiffs will defend the rights of all proposed class members fairly and adequately.

91.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project, the National Immigrant Justice Center, the Center for Gender and Refugee Studies, the Texas Civil Rights Project, the American Civil Liberties Foundation of the District of Columbia, and the American Civil Liberties Foundation of Texas. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

92.     The proposed class also satisfies Rule 23(b)(2). Defendants have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under the Proclamation and its implementing guidance rather than affording them the protections of the immigration laws. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## HARMS TO PLAINTIFFS

93.     RAICES' core work includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the immigration courts and the Board of Immigration Appeals. In regular removal proceedings RAICES represents people seeking asylum, withholding of removal, and protection under CAT, among other forms of relief. RAICES is also one of the very few organizations that provides telephonic counseling to individuals detained in CBP custody. Representing noncitizens in accessing and navigating the credible fear process is a central component of RAICES' work.

94.     The Proclamation seriously impedes RAICES' core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates RAICES' ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward. With the Proclamation in effect, RAICES has stopped receiving calls from individuals and families in CBP custody seeking assistance with the credible fear process.

95.     In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular

26

removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates RAICES' ability to represent noncitizens with protection needs both in regular removal proceedings as well. The Proclamation therefore seriously impairs RAICES' ability to carry out its core work and organizational activities.

96.    RAICES is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, RAICES must expend resources studying the Proclamation and attempting to ascertain its full scope and impact, about which Defendants have provided no public guidance; searching for alternate ways to contact detained individuals and families to provide information and legal services; updating "know your rights" materials; and training staff on the Proclamation and these other operational changes.

97.    Las Americas' core work includes representing asylum seekers and noncitizens detained by the U.S. government in both expedited removal proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In regular removal proceedings, Las Americas represents detained people seeking asylum, withholding of removal, and protection under the CAT, among other forms of relief from removal. In expedited removal proceedings, Las Americas provides consultation and legal representation to asylum seekers throughout the credible fear interview process, including assistance in seeking immigration judge review of negative credible fear determinations by asylum officers. In addition, Las Americas provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

98.    The Proclamation seriously impedes Las Americas' core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and

the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates Las Americas' ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward.

99.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore effectively eliminates Las Americas' ability to represent noncitizens with protection needs in regular removal proceedings as well. The Proclamation therefore seriously impairs Las Americas' ability to carry out its core work and organizational activities.

100.    Las Americas is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it must expend resources studying the Proclamation and seeking to ascertain its full scope, about which Defendants have provided no public guidance, in order to provide appropriate counsel to noncitizens; divert resources to respond to questions about the Proclamation and present emergency "know your rights" sessions; and revise the materials its staff use to provide guidance to people in Mexico planning to seek protection in the United States.

101.    The Florence Project's core work includes providing free legal services to detained adults and unaccompanied children throughout Arizona. This includes providing services to people seeking asylum, withholding of removal, and CAT protection, in both expedited removal proceedings under 8 U.S.C. § 1225(b) and regular removal proceedings under 8 U.S.C. § 1229a. In addition, the Florence Project provides services on the Mexico side of the border, educating people who intend to seek asylum about the process that they will face.

102.    The Proclamation seriously impedes the Florence Project's core work and activities. The Proclamation provides for the summary removal of noncitizens without the ability to raise claims for asylum, withholding of removal, and CAT protection pursuant to the credible fear process and the other safeguards of the immigration statutes. As a result, the Proclamation effectively eliminates the Florence Project's ability to engage in its core work of representing noncitizens with protection needs in expedited removal proceedings going forward.

103.    In addition, the Proclamation prevents noncitizens from passing credible fear interviews and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. The Proclamation therefore eliminates the Florence Project's ability to represent newly arriving noncitizens with protection needs in regular removal proceedings as well as in the credible fear process. The Proclamation therefore seriously impairs the Florence Project's ability to carry out its core work and organizational activities. The Florence Project has not been able to serve a single noncitizen who entered the United States since the Proclamation took effect and it has been denied access to detention facilities where these noncitizens are being held.

104.    The Florence Project is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, it has had to quickly update materials explaining asylum law and the procedures to seek asylum; spend additional time educating the community on these changes, including at a single event that had more than 100 participants; add hotline hours; change signage for posting in jails; and expend time and resources seeking to identify new ways to try to provide people with information about their rights.

105.    In addition, the Organizational Plaintiffs face a risk of lost funding. Because these organizations receive funding that is meant, in large part, to be spent serving asylum seekers and

29

people who have recently arrived in the United States, the indefinite block on access to the U.S. immigration system is likely to reduce each organization's asylum-seeking client base, which will in turn influence funding that is based on the number of individuals served.

106.    Absent relief, the Individual Plaintiffs will also be severely and irreparably harmed by the Proclamation and its implementation. Individual Plaintiffs are all asylum seekers. A.M. and his family, Z.A., T.A, and A.T. face persecution by the Taliban because of their political opinions. M.A. and D.G. were imprisoned in Egypt and Cuba respectively, and have asylum claims based on their political opinions. N.S. and G.A. suffered severe domestic violence in Ecuador and Brazil respectively and were unable to receive protection from police despite multiple attempts. B.R. fears harm based on her Indigenous background and her family membership, and E.G. fled Peru after being raped and threatened based on his sexual orientation. F.A. and her children K.A. and Y.A. fled Turkey after enduring political oppression at the hands of the government there for their membership in a group that is perceived to be in opposition to the government. But because of the Proclamation, these Individual Plaintiffs are being barred from seeking asylum or other protection.

107.    Many Individual Plaintiffs are presently detained by Defendants and face irreparable harm if they are removed to their home countries or to a third country. This group includes A.M., Z.A., T.A., A.T., N.S., B.R., M.A., and G.A. Having crossed the southern border after the Proclamation went into effect on January 20, 2025, they face summary removal without being permitted to raise their protection claims.

108.    Other Individual Plaintiffs are experiencing ongoing harm because they have already been removed due to the Proclamation. Individual Plaintiff D.G. fled Cuba, his country of origin, but has been unlawfully removed to Mexico—a country where he was kidnapped twice while waiting to enter the United States—without an opportunity to raise his protection claims.

There can be no question that D.G. remains in danger in Mexico; as DHS has acknowledged, nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers expelled from the United States to Mexico were documented in 2021 and 2022.

109.    Plaintiff E.G. fled Peru because of his sexual orientation but after being detained for nine days, he was unlawfully removed to Peru without the opportunity to raise his protection claims.

110.    And Plaintiffs F.A., K.A., and Y.A. fled political persecution in Turkey, crossed into the United States on or about February 3, 2025, and were unlawfully removed to Panama without the opportunity to raise their protection claims. F.A., K.A., and Y.A. are detained in Panama pending their removal to Turkey.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE ASYLUM STATUTE, 8 U.S.C. § 1158(a)(1))

111.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

112.    The INA provides that, with certain exceptions not applicable here, "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] § 1225(b)." 8 U.S.C. § 1158(a)(1). Both DHS and DOJ have promulgated regulations implementing the asylum statute. *See, e.g.*, 8 C.F.R. § 208.13 (DHS); 8 C.F.R. § 1208.13 (DOJ).

113.    The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1158(a)(1) and its implementing regulations by barring noncitizens in the United States from applying for or receiving asylum.

31

114.   None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1158(a)(1) and its implementing regulations.

## SECOND CLAIM FOR RELIEF
## (VIOLATION OF THE WITHHOLDING OF REMOVAL STATUTE, 8 U.S.C. § 1231(b)(3))

115.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.   The withholding of removal statute, 8 U.S.C. § 1231(b)(3), precludes the removal of noncitizens to countries where it is more likely than not that their "life or freedom would be threatened … because of [their] race, religion, nationality, membership in a particular social group, or political opinion." Both DHS and DOJ have promulgated regulations implementing this provision. *See* 8 C.F.R. § 208.16(b) (DHS); 8 C.F.R. § 1208.16(b) (DOJ).

117.   The Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing regulations by barring withholding of removal for noncitizens in the United States.

118.   None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the protections set out in Section 1231(b)(3) and its implementing regulations.

## THIRD CLAIM FOR RELIEF
## (VIOLATION OF THE FOREIGN AFFAIRS REFORM AND RESTRUCTURING ACT OF 1998, CODIFIED AT 8 U.S.C. § 1231 NOTE)

119.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.   FARRA, 8 U.S.C. § 1231 note, and applicable DHS and DOJ regulations implement the CAT and prohibit the government from returning a noncitizen to a country in which

"it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2) (DHS); 8 C.F.R. § 1208.16(c)(2) (DOJ)

121.    The Proclamation and Defendants' actions to implement and enforce the Proclamation violate FARRA and its implementing regulations by depriving noncitizens of a meaningful opportunity to present CAT claims.

122.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the Convention Against Torture and FARRA.

**FOURTH CLAIM FOR RELIEF**
**(VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION**
**REAUTHORIZATION ACT, 8 U.S.C. § 1232(a)(5)(D))**

123.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

124.    The TVPRA, 8 U.S.C. § 1232(a)(5)(D), mandates that "[a]ny unaccompanied [noncitizen] child sought to be removed by [DHS]," except certain unaccompanied children from Canada or Mexico, "shall be … placed in [regular] removal proceedings" in immigration court under 8 U.S.C. § 1229a.

125.    Insofar as the Proclamation and implementation deprive unaccompanied children from non-contiguous countries of the right to a hearing in regular removal proceedings, or to seek asylum, withholding or CAT protection, they violate the TVPRA.

126.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace or undermine the protections set out in the TVPRA.

JA036

## FIFTH CLAIM FOR RELIEF
### (VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1101, *ET SEQ.*)

127.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

128.    The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

129.    The INA provides that removal proceedings before an immigration judge under 8 U.S.C. § 1229a are "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA. 8 U.S.C. § 1229a(a)(3). One mechanism otherwise specified in the INA is the expedited removal system, including its credible fear screening process. *Id.* § 1225(b)(1). The expedited removal statute states that if a noncitizen "indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the [noncitizen] for an interview by an asylum officer," and the noncitizen may not be removed pending that interview and, if requested, review by an immigration judge. *Id.* § 1225(b)(1)(A)(i)-(ii). The expedited removal statute further provides that a noncitizen "who may be eligible" for "the asylum interview [just] described" has a right to be provided "information concerning the asylum interview" and to "consult with a person or persons of the [noncitizen]'s choosing prior to the interview." *Id.* § 1225(b)(1)(B)(iv). And the expedited removal statute provides that the government "shall provide by regulation and upon the [noncitizen's] request for prompt review by an immigration judge of a determination … that the [noncitizen] does not have a credible fear of persecution," including "an opportunity for the [noncitizen] to be heard and questioned by the immigration judge, either in person or by telephonic or video connection." *Id.* § 1225(b)(1)(B)(iii)(III).

130.    The Proclamation and Defendants' actions to implement and enforce the

Proclamation are unlawful because they result in removals without compliance with the procedures required by the INA and its implementing regulations, including the requirements to refer for credible fear interviews noncitizens who indicate an intention to apply for asylum or a fear of persecution; to provide information about credible fear interviews to noncitizens who may be eligible; and to provide for review of adverse credible fear determinations by immigration judges.

131.    None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the procedures required by the INA and its implementing regulations.

### SIXTH CLAIM FOR RELIEF
### (SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A))

### (Applicable to the Non-President Defendants)

132.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

133.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134.    The Departments of Homeland Security, State, and Justice and DHS's components and subcomponents including ICE, CBP, USCIS, U.S. Border Patrol, and OFO are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

135.    The Non-President Defendants have made a final decision to enforce the Proclamation. In addition, the Non-President Defendants have issued written guidance documents to implement the Proclamation. These actions implementing the Proclamation mark the consummation of the non-President Defendants' decision-making processes because they announce the non-President Defendants' decision to immediately implement a policy cutting off

access to asylum, withholding of removal, CAT protection, and other provisions of the INA.

136.     In taking final action to implement the Proclamation, as set out above, the non-President Defendants have acted contrary to 8 U.S.C. §§ 1158, 1225, 1229a, 1231(b)(3), 1231 note, and 1232(a)(5)(D), as well as their implementing regulations.

137.     None of the sources of law on which the Proclamation relies—Section 1182(f), Section 1185(a)(1), or the Constitution—applies here or can lawfully displace the provisions of law described in the prior paragraph.

138.     Further, in taking final action to implement and enforce the Proclamation, the non-President Defendants have acted arbitrarily and capriciously. Among other arbitrary actions and omissions, the non-President Defendants have failed to provide reasoned explanations for their actions; failed to consider relevant factors; relied on factors Congress did not intend to be considered; and departed from past practices and policies without reasoned explanations for doing so.

### SEVENTH CLAIM FOR RELIEF
**(PROCEDURAL VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(D))**

**(Applicable to the Non-President Defendants)**

139.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

140.     The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

141.     The Departments of Homeland Security, State, and Justice are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

142.     The Non-President Defendants have made a final decision to enforce the Proclamation. In addition, the Non-President Defendants have issued written guidance documents

to implement the Proclamation. These actions implementing the Proclamation mark the consummation of the non-President Defendants' decision-making processes because they announce the non-President Defendants' decision to immediately implement a policy cutting off access to asylum, withholding of removal, CAT protection, and other provisions of the INA.

143.    In taking final action to implement and enforce the Proclamation, the Non-President Defendants have changed the substantive rights of noncitizens physically present within the United States to seek asylum, withholding of removal, and protection under the CAT, and to invoke other provisions of the INA, and have departed from the procedural and substantive standards set forth in their regulations implementing the INA, without following the rulemaking procedures required by the APA, *see* 5 U.S.C. § 553.

**EIGHTH CLAIM FOR RELIEF**
**(ULTRA VIRES: ACTION UNAUTHORIZED BY STATUTE,**
**8 U.S.C. §§ 1182(f) and 1185(a))**

144.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

145.    The INA gives the President the authority to suspend the entry of "all [noncitizens] or any class of [noncitizens] as immigrants or nonimmigrants" when the President has found that such entry "would be detrimental to the interests of the United States." INA § 212(f), 8 U.S.C. § 1182(f).

146.    The Proclamation exceeds the President's authority under INA Section 212(f), 8 U.S.C. § 1182(f), and Defendants' actions in implementing the Proclamation are unauthorized by Section 212(f).

147.    Among other defects, the Proclamation fails to define the noncitizens or "class of [noncitizens]" whose entry is suspended, as Section 212(f) requires, insofar as it purports to apply to noncitizens "engaged in the invasion across the southern border."

148.    The Proclamation also fails to make adequate findings as to why the entry of the noncitizens whose entry it restricts "would be detrimental to the interests of the United States."

149.    Insofar as the Proclamation rests on a finding that it would be detrimental to the interests of the United States to apply Congress's statutes providing access to asylum and other forms of protection, this finding cannot sustain the Proclamation. Congress via statute has determined that noncitizens must be able to access asylum and other forms of protection.

150.    Accordingly, the predicate conditions for exercise of the President's authority under Section 212(f) have not been met.

151.    The INA makes it unlawful for noncitizens "to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).

152.    The Proclamation exceeds the President's authority under 8 U.S.C. § 1185(a)(1), and Defendants' actions in implementing the Proclamation are unauthorized by 8 U.S.C. § 1185(a)(1).

## NINTH CLAIM FOR RELIEF
### (ULTRA VIRES: ACTION UNAUTHORIZED BY THE UNITED STATES CONSTITUTION)

153.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

154.    The Proclamation exceeds the President's authority under Article II of the United States Constitution.

155.    Article IV, Section 4 of the Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the

38

Legislature cannot be convened) against domestic Violence."

156.    The Proclamation exceeds the President's constitutional authority under Article IV, Section 4 of the Constitution because, among other reasons, there is no "[i]nvasion" within the meaning of that section.

157.    Accordingly, the measures directed by the Proclamation are unauthorized by the United States Constitution.

**TENTH CLAIM FOR RELIEF**
**(VIOLATION OF SEPARATION OF POWERS)**

158.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

159.    Under fundamental separation-of-powers principles, the President cannot ignore or override Congress's careful and longstanding decisions to provide protections for noncitizens fleeing danger.

160.    The Proclamation and Defendants' actions to implement the Proclamation violate these separation-of-power principles and exceed the President's constitutional authority.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs request that the Court grant the following relief:

a.    Declare that the Proclamation and all implementing agency guidance documents and other agency actions implementing the Proclamation are unlawful in their entirety;

b.    Enjoin Defendants from (1) implementing or enforcing the Proclamation and all agency guidance documents and other agency actions issued to implement the Proclamation; and (2) relying on removal orders issued pursuant to the Proclamation;

c.    Vacate all agency guidance documents and other agency actions implementing the Proclamation;

39

d.    For any Individual Plaintiffs who have been removed from the United States, an order requiring Defendants to facilitate those Individual Plaintiffs' return to the United States at no expense to Plaintiffs;

e.    Require Defendants to pay Plaintiffs reasonable attorneys' fees and costs;

f.    Grant any other and further relief that this Court may deem just and proper.

Dated: February 19, 2025                           Respectfully submitted,

/s/ Lee Gelernt                                    /s/ Lindsay C. Harrison
Lee Gelernt (D.D.C. Bar No. NY0408)                Lindsay C. Harrison (D.C. Bar #977407)
Omar C. Jadwat*                                    Zachary C. Schauf (D.C. Bar #1021638)
American Civil Liberties Union Foundation          Logan C. Wren (D.C. Bar #1780385)*
Immigrants' Rights Project                         Mary-Claire Spurgin (D.C. Bar #90029537)*
125 Broad Street, 18th Floor                       Jenner & Block LLP
New York, NY 10004                                 1099 New York Avenue, NW
T: 212-549-2660                                    Suite 900
lgelernt@aclu.org                                  Washington, DC 20001
ojadwat@aclu.org                                   T: 202-639-6000
                                                   lharrison@jenner.com
Simon A. de Carvalho*                              zschauf@jenner.com
Jenner & Block LLP                                 lwren@jenner.com
353 N. Clark St.                                   mspurgin@jenner.com
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654                  Keren Zwick (D.D.C. Bar. No. IL0055)
T: 312-222-9350                                    Richard Caldarone (D.C. Bar No. 989575)*
sdecarvalho@jenner.com                             Mary Georgevich*
                                                   National Immigrant Justice Center
Morgan Russell*                                    111 W. Jackson Blvd., Suite 800
Katrina Eiland*                                    Chicago, IL 60604
Cody Wofsy (D.D.C. Bar No. CA00103)                T: 312-660-1370
Spencer Amdur*                                     kzwick@immigrantjustice.org
American Civil Liberties Union Foundation          rcaldarone@immigrantjustice.org
Immigrants' Rights Project                         mgeorgevich@immigrantjustice.org
425 California Street, Suite 700
San Francisco, CA 94104                            Melissa Crow (D.C. Bar. No. 453487)
T: 415-343-0770                                    Center for Gender & Refugee Studies
mrussell@aclu.org                                  1121 14th Street, NW, Suite 200
keiland@aclu.org                                   Washington, D.C. 20005
cwofsy@aclu.org                                    T: 202-355-4471
samdur@aclu.org                                    crowmelissa@uclawsf.edu

Arthur B. Spitzer (D.C. Bar No. 235960)

40

Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris*
David A. Donatti*
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
TEL: (713) 942-8146
FAX: (713) 942-8966
aharris@aclutx.org
ddonatti@aclutx.org

Robert Pauw*
Center for Gender & Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Tamara Goodlette (D.C. Bar. No.
TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
tami@texascivilrightsproject.org

Edith Sangueza*
Center for Gender & Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
sanguezaedith@uclawsf.edu


*Attorneys for Plaintiffs*

*\*Certificate of pro bono representation or pro
hac vice forthcoming*

41

**DECLARATION OF JAVIER HIDALGO,**
**THE REFUGEE AND IMMIGRANT CENTER FOR**
**EDUCATION AND LEGAL SERVICES (RAICES)**

I, Javier Hidalgo, make the following statement on behalf of the Refugee and Immigrant Center for Education and Legal Services (RAICES). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a Legal Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES). I joined RAICES in 2018 and have served in my current role since 2023. Before I assumed my current position, I worked as a unit director, before that as a supervisor, and previously as a staff attorney. In my role as Legal Director, I work closely with and oversee the work of our Asylum Access Services program, which (among other things) serves people facing expedited removal from the United States.

3. RAICES is a 50l(c)(3) nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. This mission encompasses striving to ensure access to asylum and protection for noncitizens, including those arriving at the border and subject to expedited removal. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from the custody of the Department of Homeland Security (DHS). To execute our mission, we strive to serve as many noncitizens as possible through our various avenues of work.

4. As discussed in detail below, RAICES has and will continue to experience substantive harm under the Proclamation 10888, Fed. Reg. 8143 ("the Proclamation"), issued by President Trump and its implementation by the other Defendants in this suit. The Proclamation directly impacts and interferes with RAICES' core work. Most notably, the process of summarily expelling noncitizens without the opportunity for credible fear interviews frustrates and impedes RAICES from our fundamental day-to-day work of representing noncitizens with protection needs.

**RAICES' Mission and Work**

5. Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to become the largest immigration legal services provider in Texas. With offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio, RAICES is a frontline organization that combines expertise developed from the daily practice of immigration law with a deep commitment to advocacy. Its staff includes nearly 300 people, including attorneys, legal assistants, social workers, advocates, and support staff.

JA045

6.  Since RAICES' founding, its staff, volunteers, and pro bono attorneys have counseled and represented thousands of noncitizens throughout Texas.  RAICES offers a wide array of legal services.  The scope of RAICES' services includes filing "affirmative" asylum applications, which can be submitted to U.S. Citizenship and Immigration Services (USCIS) by noncitizens who are not in removal proceedings.  It also includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the Executive Office for Immigration Review (EOIR) immigration courts; and before the Board of Immigration Appeals (BIA).  In regular removal proceedings, also known as defensive proceedings, we represent people seeking asylum, withholding of removal, and protection under the Convention Against Torture (CAT), among other forms of relief from removal.  RAICES' defensive legal representation also extends to the federal courts, where we represent clients before the United States Court of Appeals for the Fifth Circuit and the Supreme Court, where appropriate.

7.  RAICES also provides services to hundreds of people in expedited removal proceedings, including those screened through the credible fear process.  Our Asylum Access Services team is most involved in our work serving individuals facing expedited removal.  The team represents detained individuals in the expedited removal process.  As of the date this declaration is executed, that team currently consists of one senior attorney, two staff attorneys, a DOJ accredited representative, four legal assistants, and three data entry clerks.  When fully staffed, the team also includes a supervising attorney and a managing attorney.  We currently operate hotlines specifically for individuals detained at the South Texas Detention Center, in Pearsall, Texas; Laredo Detention Center in Laredo, Texas; and the Karnes County Immigration Processing Center in Karnes, Texas, as well as individuals detained in CBP facilities who are subject to enhanced expedited removal.

8.  Last year, we added our hotline number to a list distributed by EOIR to asylum seekers who are required to undergo their credible fear interviews while in CBP custody.  We also post signup sheets in ICE detention centers and receive referrals from both the family members of detained people and other nongovernmental organizations.

9.  In 2024, the Asylum Access Services team provided legal services, including direct representation, to at least 825 individuals in expedited removal proceedings: an average of at least 15 different people served each week.

**The Proclamation Harms RAICES and Interferes With Our Ability to Continue Our Work**

10.  The Proclamation challenged in this suit and its implementation have directly impacted and interfered with RAICES' ability to provide its core services—including serving noncitizen clients subjected to removal proceedings—and will continue to have these effects.

11.  Thus far, these changes have forced us to divert our limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the Proclamation.  We have devoted internal resources to training staff on the Proclamation and related policies, as well as on how to advocate for clients impacted by these changes.

12. We have also had to redirect staff resources. Even with these reallocations of staff resources, we are not able to fully support people impacted by the Proclamation because, based on my and other RAICES staff members' observations since the Proclamation took effect, immigration officials are expelling and removing people without the opportunity to consult with us or to seek protection.

13. The Proclamation has caused and will continue to cause significant disruption to our work on behalf of individuals facing expedited removal, making it nearly impossible for us to serve our client population.

14. Defendants' enforcement of the Proclamation has led to a denial of noncitizens' statutory rights, which frustrates our core purpose as an organization. Because enforcement of the Proclamation has led to a summary removal process, most noncitizens no longer have the ability to raise claims for asylum and other protection. As a result, the Proclamation has already greatly diminished RAICES's ability to engage in its core work of representing noncitizens in obtaining the protections to which they are entitled by statute. Since the Proclamation took effect on January 20, 2025, we have only been able to represent people in credible fear interviews who entered before the Proclamation took effect. Since January 20, we have made contact with only a few people in DHS custody who entered on or after that date, and none of those people have been permitted to seek protection despite having expressed fear of persecution. By contrast, as noted above, in 2024 we represented approximately 15 different people navigating the credible fear process each week. Moreover, the number of people with protection needs who crossed the border before January 20 but have not been processed will quickly run out. At that point—with most people who crossed on or after January 20 no longer being permitted to seek relief due to the Proclamation—our ability to serve people seeking these statutorily-required protections will effectively be eliminated.

15. With the Proclamation in effect, RAICES has stopped receiving calls from individuals and families in CBP custody who recently entered the country and seek assistance obtaining protection.

16. In addition, since going into effect, the Proclamation has prevented noncitizens from establishing eligibility for asylum and other forms of protection and being referred to regular removal proceedings, or otherwise being placed in regular removal proceedings, where they would have the chance to have full hearings on the merits of their claims for protection. As a result, we will not be able to represent asylum seekers who crossed the border on or after January 20 in regular removal proceedings either.

17. RAICES is being required to divert resources to respond to the Proclamation's impact on its operations. Among other things, RAICES must expend resources on studying the Proclamation and attempting to ascertain its full scope and impact, about which Defendants have provided no public guidance; searching for alternative ways to contact detained individuals and families to provide information and legal services; updating "know your rights" materials; and training staff on the Proclamation and other operational changes.

18. RAICES has had to expend additional resources to advocate with ICE and USCIS on behalf of noncitizens in ICE custody to try to ensure that those noncitizens have access to asylum and other protections from removal. Since the Proclamation took effect, we have been successful in advocating with the agencies to refer a very small number of asylum seekers for credible fear interviews—all of whom were people who entered before January 20. Even that advocacy concerning people not subject to the Proclamation has been more time- and resource-intensive than it was prior to January 20. And as explained above, we have not been able to obtain the ability to seek protection for a single person who crossed the border on or after January 20.

19. RAICES has also needed to divert funding to provide trainings on working with children. The Proclamation does not expressly exempt unaccompanied children from its suspension of access to statutory protections at the southern border, and children often do not know the precise date that they entered the country. The government has not issued any public guidance or other information clarifying whether unaccompanied children are being exempted from the Proclamation in practice. As such, we continue to be concerned that border officers may wrongly be denying unaccompanied children access to asylum and processing under the Trafficking Victims Protection Reauthorization Act based on the Proclamation. We are expending time and resources to research and understand border-wide trends on how unaccompanied children are being treated and to prepare our staff to provide services to this vulnerable population.

20. In addition to the substantive additional time that doing this extra work entails, we have also been forced to divert resources to reshape our training materials, both for our own staff and for pro bono attorneys and other volunteers. We have needed to scramble to determine what is happening with people who have been detained at Karnes, especially with some of them having been promptly transferred elsewhere. This has led to burnout among our staff.

## Conclusion

21. The Proclamation severely restricts RAICES' ability to perform its core work of representing noncitizens seeking asylum or other protection from removal. If the Proclamation remains in place, it will effectively eliminate our ability to provide any services going forward to people seeking asylum or other protection who cross the border on or after January 20, 2025. Instead, those people will be unlawfully removed to face persecution and torture. The Proclamation is dangerous and sends the message that the United States is not welcoming of asylum seekers. The Proclamation is fundamentally contrary to RAICES' mission and vision, and it is devastating our ability to serve asylum seekers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of February, 2025 in San Antonio, Texas.

Javier Hidalgo

4

## DECLARATION OF JENNIFER BABAIE
## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, make the following statement on behalf of Las Americas Immigrant Advocacy Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully.

2. I am an attorney licensed to practice law in California and focused on immigration practice. Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas).  Prior to joining Las Americas, I worked in various related positions.  Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3. Las Americas is a nonprofit legal services organization based in El Paso, Texas.  Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights.  We provide immigration counseling and representation to immigrants seeking asylum and other forms of humanitarian relief, including by representing individuals facing expedited removal who are referred for credible fear interviews ("CFIs"). We principally represent people detained by the U.S. government in and around West Texas and New Mexico.  Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

### Las Americas' Mission & Programs

4. Las Americas has served people in our community from over 80 countries since 1987.  We are dedicated to serving the legal and informational needs of low-income asylum seekers and other noncitizens in West Texas, New Mexico, and Ciudad Juárez, Mexico.  We assist individuals who express a desire to seek protection in the United States by providing legal information, legal screenings, and translation and referral support, which helps these individuals understand eligibility for asylum and other humanitarian pathways, as well as the rules applicable to them.  We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon or after crossing the border.

5. Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture in violation of U.S. immigration law.  It is essential to our mission that all asylum seekers have a meaningful chance to fully develop and present their claims, as well as a meaningful

JA049

opportunity to consult with an immigration attorney during the pendency of their proceedings. To advance this mission, we serve asylum seekers with our limited resources using various forms of legal assistance.

6. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating to, or in removal proceedings in, West Texas and New Mexico. We receive a significant number of referrals from and play a critical role in local migrant communities. Whenever we are suddenly forced to significantly limit or change our services, which has been necessary to respond to the Proclamation, it has a palpable and adverse impact on our ability to serve these communities. In order to fulfill our mission, we also require up-to-date, complete information about government procedures, including those of the Executive Office for Immigration Review and the Department of Homeland Security, which are currently being withheld from us and the rest of the public.

7. Las Americas' total budget in the fiscal year ending 2024 was about $1.7 million.[1] The grants we receive make up approximately 85% of our revenues, and some of those grants have requirements regarding the number of people we serve as well as caveats on the geography and types of services provided. For example, one grant requires us to serve 650 persons per year while another requires us to provide direct representation to 60 persons and pro se support to an additional 120 persons in ICE custody in New Mexico. "Low bono" client fees and other individual contributions make up the remainder of our income sources, but all of our detention-related services, including CFI services, and our services in Mexico are provided at no cost to the individual.

8. Las Americas' U.S. staff consists of 18 people, including attorneys, accredited representatives, and paralegals. Two additional staff members work in Mexico. In addition, we have one full-time volunteer attorney specializing in immigrant survivors of crime, and a cohort of student and community volunteers. We have several programmatic areas; those most relevant to the Proclamation are detailed here.

9. Las Americas' asylum work straddles the U.S.-Mexico border as well as west Texas and southern New Mexico. Our legal programs cover individuals and families who have entered the United States, migrant families residing in the U.S. for several years, as well as people who are or have been stranded in Mexico due to U.S. policies.

10. Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico. The central purpose of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention.

---

[1] As of the time of filing this declaration, this number had not been finalized and is therefore approximate.

JA050

11. For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more. Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* assistance. For *pro se* individuals, we also provide assistance with document preparation and translation.

12. In early 2019, Las Americas created the Las Americas Mexico Program (LAMX). LAMX was created as a temporary measure to assist noncitizens who were subject to the Migrant Protection Protocols (MPP) or "Remain in Mexico" Program and thus required to wait in Mexico for their immigration court hearings. As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico. While Title 42 was in place and prevented asylum seekers from presenting at the ports of entry to seek asylum, we helped people seeking exemptions to that policy as well as parole. LAMX also assists individuals who are awaiting a CBP One appointment in Mexico with preparing for CFIs. Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces. In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate these processes.

13. In 2024, Las Americas served approximately 5,500 people. We helped over 1,500 people navigate the CBP One application in order to make an appointment to request asylum at a port of entry. We also served about 200 individuals in Immigration and Customs Enforcement (ICE) custody. This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts. Across programs, we opened more than 800 new cases in 2024. More than half of the people that Las Americas serves are asylum seekers, and at present, we have about 166 open cases in our Detained Program. [2] Additionally, we serve hundreds of people each month (on average) with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

14. For several years now, Las Americas has been focused on helping people on both sides of the U.S.-Mexico border prepare for CFIs. From May 12, 2023, to September 20, 2023, our cross-border program assisted more than 2,500 people in this manner and over 400 in the first half of 2024.

15. As set forth in more detail below, however, because of Proclamation 10888 and its enforcement, that work is now immensely more complex and time consuming. For example, our team in Mexico must now educate people on ways in which Proclamation

---

[2] We collected information for 2024 calendar year data on in early February 2025. Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

JA051

10888 impedes access to asylum and other protection. Additionally, we must expend resources to determine whether and how CAT screening is taking place and to differentiate between torture and persecution while advising noncitizens.

## Proclamation 10888 and Its Implementation

16. Proclamation 10888, Fed. Reg. 8143, issued by the President on January 20, 2025 ("Proclamation"), explicitly restricts access to asylum and other forms of protection. Among other things, the Proclamation purports to suspend the entry of all noncitizens across the U.S.-Mexico border and calls on the Department of Homeland Security to remove noncitizens without regard to the asylum statute or other protections in the INA.

17. Pursuant to the Proclamation, Defendants are now summarily expelling noncitizens who enter the United States without allowing them an opportunity to seek asylum or other protections from removal.

18. Asylum seekers are systematically being expelled from the United States without being permitted to seek asylum or other forms of protection from removal—the absolute minimum that the law requires to ensure that people subjected to expedited removal are not returned to persecution or torture. We know this first because of the text of the Proclamation itself.

19. Accordingly, we have not received calls for CFI consultation from anyone who entered the country on or after January 20, 2025. I have also received first-hand reports from contacts in Ciudad Juarez that individuals removed at the ports of entry are placed on buses immediately after being forced to cross the bridge into Mexico and driven to southern parts of the country, including Mexico City and Tapachula, Mexico. These removals happen so quickly that the noncitizens never receive access to CFIs.

20. Nor are we seeing anyone in our visits to ICE facilities who entered on or after January 20, 2025. On the U.S. side of the border, our team has continued to make regular visits to detention centers. In the past we would routinely encounter people who had entered one or two weeks before our visit. Now, however, with one exception, we have not seen anyone who entered after January 20, 2025. And both before January 20 and now, we lack access to people while they are in CBP custody. This change means that, unlike before the Proclamation took effect, we do not have access to asylum seekers in U.S. detention centers who are in need of our support but likely to be harmed by the Proclamation.

21. The experience of a Honduran man who got in contact with us only after having been removed to Mexico and then transferred to Villahermosa in southern Mexico is consistent with what I understand to be happening: that people who are expelled from the United States into Mexico are not remaining at the border and are not being permitted speak to us or other organizations like us at the U.S.-Mexico border and are instead being immediately transferred to the interior of Mexico or onward.

JA052

22. Because of the Proclamation, Defendants also appear to be denying migrants at the southern border a meaningful opportunity to apply for protection from being returned to countries other than their home countries where they face likely persecution or torture.

23. The lack of transparency regarding new procedures implemented by immigration enforcement agencies since the release of the Proclamation has caused mass confusion and fear and directly undermines our ability to provide adequate, up-to-date information on legal processes in the U.S. Several family members and advocates for people seeking asylum at the border have contacted our office seeking information on how to find their loved ones and how to help them seek protection from return to their country of origin, which they fear. Despite our mission requiring us to provide accurate information to these individuals, we cannot do so under the current border situation created by the Proclamation.

**The Proclamation Harms Las Americas' Representation of Noncitizens**

24. In response to the enforcement of the Proclamation, it is fair to say that *all* of Las Americas' work has been forced to change.

25. All of these aspects of the Proclamation are significantly interfering with Las Americas' work and are requiring us to spend significant amounts of time and resources in attempting to counteract that harm. At the same time, while we scramble to find means of learning what is actually taking place once individuals cross the border, our asylum program— which allows us to provide pro se, limited, and full representation to individuals seeking asylum in a defensive posture—has faltered because we are unable to make contact with noncitizens who, but for the Proclamation, would have the statutory right to pursue claims for protection.

26. Though nearly a month has passed since January 20, 2025, we still are not seeing people in ICE custody who have arrived since that date, and we continue to have no access whatsoever to anyone in CBP custody. This is a steep decline from the previous six-month period, and it is at odds with the number of asylum seekers whom we have interviewed in Ciudad Juarez and other parts of Mexico. There is simply no means of reaching and educating asylum seekers at the border under this new regime.

27. For example, asylum seekers who previously had CBP One appointments that were canceled—as well as others who were waiting for appointments—remain trapped in Mexico. They are looking for information about how they can seek safety, but they are terrified that if they attempt to present themselves now to state their claims, they will be held in prolonged detention and summarily deported to their countries of origin.

28. Additionally, our staff has needed to call partners nearly daily to determine whether anyone has been able to ascertain what process CBP is implementing at the border. We have also been attempting port observations and shelter and detention visits on both sides of the border. This has taken staff time away from case work and interfered with our ability to provide accurate legal information to asylum seekers still in Mexico who are trapped and do not know how to seek safety. All we can tell them is that, based on what little we know,

they are unlikely to have a fair opportunity to claim fear and have their asylum claims heard.

29. We have also seen a significant drop in attendance at our Know Your Rights events since the issuance of the Proclamation, especially in El Paso, limiting our ability to fulfill our educational mission.

30. Since noncitizens cannot access asylum or other statutory protections, we cannot carry out much of our core work. We will have to shift our work in a way that counteracts the changes imposed by the Proclamation in this new expedited removal landscape.

### The Proclamation Threatens Las Americas' Funding and Resources

31. The Proclamation has forced us to divert limited resources away from individual representation to continue to meet the most urgent needs of the community, which currently means attempting various means of contacting DHS agencies to obtain information, contacting immigration authorities in Mexico to see if they have information to share, and assisting families trying to find the location of loved ones who attempted to seek protection at the border. In an effort to locate such individuals, we are currently spending an inordinate amount of time visiting detention facilities, checking in on a daily basis with U.S. and Mexican partners, and trying to arrange meetings with local ICE and CBP representatives—all of which have been cancelled.

32. I am also concerned about our ability to maintain grant awards going into our next fiscal year, which begins in July 2025. We receive only private funding, and most awards are heavily metrics based. We are having to spend time to account for this by communicating with donors as to the legal updates, including those who are in the midst of their renewal and/or new applicant cycles.

33. The combined impact of the Proclamation's changes have functionally cut off access to asylum at the U.S.-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more attorneys and coordinators to try to meet the demands of our community inside and outside of detention. While we strive to increase *pro bono* representation and provide high quality legal representation, we are not publicly funded, and none of our grants are guaranteed beyond two or three years. Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* services, especially because we do not have a law school in this region. The number of hours, months, or years it takes to complete a full asylum proceeding scares away the majority of potential pro bono partners. Many I've spoken to are afraid to work on an asylum case because they believe the law changes too often and without enough transparency for them to feel confident that they could meet all their ethical obligations to zealously represent the client and take steps in their best interests.

34. Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes undermine our ability to rely on

JA054

volunteers because the pace and complexity of the issues presented at the border continue to increase. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

35. Additionally, many funders are interested in funding work that reaches the greatest number of people possible. Because the Proclamation cuts off access to asylum and access to individuals attempting to seek asylum who are in federal immigration custody, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served. This Proclamation has the opposite effect on our work.

### The Proclamation Frustrates Las Americas' Mission and General Operations

36. Because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Proclamation fundamentally frustrates our organization's purpose by cutting off the right to seek asylum and other forms of protection in the United States.

37. Las Americas has already diverted, and will continue to have to divert, significant resources to understanding the Proclamation and its impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients, and immigrant communities. In addition, we will need to continue to spend resources developing educational materials, including internal training materials, external training materials, and pro se materials designed to help impacted communities. We also need to reroute resources to give our non-legal partners on both sides of the border a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals.

38. In essence, the Proclamation and related border policies force Las Americas into full-time triage mode. The lack of information from the government means that week by week, we have to utilize staff capacity to investigate where recent arrivals are being placed, whether they are in custody, how long they've been there, and whether we can utilize our limited resources to attempt to reach them before they are ordered removed. It also means we risk providing less than accurate information about the current state of access to asylum as a pathway.

39. Finally, Las Americas' staff has experienced a mental and physical toll as a result of the Proclamation and the harm to Las Americas' mission. Living and working on the border, our staff are closely connected to the communities we serve. We witness firsthand the harmful effects of asylum bans and related enforcement-focused policies. Attempting to lead a team that is already inundated with work through more tumult is having a serious, detrimental impact. Since the Proclamation went into effect, I have observed many staff members foregoing their paid leave because of the volume of work. And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot put their energy into work that

JA055

meaningfully advances Las Americas' mission has already generated a sense of frustration and burnout.  These harms will persist as time goes on.

## Conclusion

40. It is difficult for me to overstate the detrimental impact that this Proclamation has had, and will continue to have, on Las Americas' operations, mission, clients, and staff.  These changes will do nothing to improve the functioning of our immigration courts and will instead strain our resources, force us to cut back on our services, impose insurmountable obstacles on people with legitimate asylum claims seeking refuge from persecution and torture, and deprive our clients of their right to seek asylum.


Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center


Executed this 19th day of February 2025 in El Paso, Texas.

8

## DECLARATION OF LAURA ST. JOHN FOR THE
## FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Laura St. John, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Laura St. John. I am a licensed attorney and a member in good standing in the California bar. I am currently employed as Legal Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project in March 2011 and have served in my current role since 2015. Before I assumed my current position, I previously served as Managing Attorney of the Adult Program and as a staff attorney with the Florence Project's Adult Program serving adults detained in Immigration and Customs Enforcement ("ICE") custody in Arizona. During my time at the Florence Project, I have personally provided free legal services, both direct representation and pro se orientation services, to hundreds of individuals in custody in the various ICE detention facilities in Arizona, many of whom were people seeking asylum or other fear-based claims for relief. Additionally, as Managing Attorney and Legal Director I have supervised attorneys, legal assistants, and social workers providing free legal services, both direct representation and pro se services, to thousands of individuals detained in ICE custody in Arizona.

## Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained in ICE custody in rural detention centers in Eloy and Florence, Arizona. With no public defender structure in immigration removal proceedings, the vast majority of people who are detained in ICE custody and facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel. The Florence Project strives to address this inequality through direct services through our legal and social service programs as well as through both local and national advocacy and outreach efforts, which are led by our advocacy program, informed by our direct services work, and done in partnerships with the broader immigrant rights community. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to unaccompanied children in Arizona and adults in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representative, legal assistants, and network of pro bono attorneys, the Florence Project provides free legal education and high quality free immigration representation to thousands of people who are detained in immigration custody and face removal in Arizona.

4. The Florence Project provides free legal services in all three ICE detention centers currently in operation in Arizona: the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. Together these facilities have bedspace to house more than 2,000 people on any given day. In those facilities, we provide detailed legal orientation and technical support to thousands of detained *pro se* respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. Florence Project attorneys also represent hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals ("BIA") each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Florence Project attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings and, working with support from our legal assistants and social workers, maintain a caseload of approximately one hundred such clients throughout Arizona under the National Qualified Representative Program ("NQRP") and pursuant to court order in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013). In our experience, a significant number of clients appointed under the NQRP and *Franco-Gonzalez* passed through or were otherwise amenable to expedited removal at the outset of their cases and the majority of clients appointed under the NQRP and *Franco-Gonzalez* have fear-based claims for relief from removal.

5. The Florence Project also provides high quality immigration legal services and education to the thousands of unaccompanied children ("UC") who come into Office of Refugee Resettlement ("ORR") custody in Arizona in any given year. This includes providing age-appropriate "Know Your Rights" presentations to children in ORR shelters to help them understand what is happening to them and their legal process, as required by law under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). We also ensure that no unaccompanied child in ORR custody in Arizona goes to court alone, providing friend of court support and representation in hundreds of cases to children seeking humanitarian protection and other relief in Immigration Court or before the United States Citizenship and Immigration Service ("USCIS").

6. In addition to our free in-house representation, Florence Project also has a robust *pro bono* program that receives case referrals from teams providing education and legal screenings and then connect unrepresented noncitizens, both adults and unaccompanied children, with *pro bono* counsel from law firms or *pro bono* private immigration practitioners. Each year, our *pro bono* program places dozens of new cases with volunteer attorneys before the immigration court, USCIS, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases.

7. Finally, since 2017 FIRRP has provided legal orientation and community education services as well as limited accompaniment and representation to asylum seekers and other migrants at the U.S.-Mexico border in Heroica Nogales, Sonora, Mexico. Florence Project staff at the border assist thousands of people seeking safety every year understand their rights and the processes at the border and they have witnessed firsthand the harmful effects of restrictive asylum policies.

**Florence Project's Services To People Seeking Protection in the United States**

8.  Since its founding, serving asylum seekers has been at the heart of the Florence Project's work. Indeed, Florence Project was originally known as the Florence Asylum Project. The Florence Asylum Project started after Immigration Judge John McCarrick made a call to action to the Phoenix legal community expressing concern about how immigration proceedings for people detained in Florence, Arizona—the vast majority of whom were Central American asylum seekers—violated due process.

9.  The Florence Project's core work is providing free legal services, including both legal education and information about asylum and other forms of humanitarian protection from removal, among other forms of relief, to thousands of people each year. Florence Project staff routinely provide individualized legal education and direct representation to noncitizens who are seeking asylum and/or other fear-based humanitarian protection, such as withholding of removal or protection under the CAT. The Florence Project's work also spans various types of removal procedures: we represent and advise people seeking protection both in regular removal proceedings under 8 U.S.C. § 1229a and in expedited removal proceedings under 8 U.S.C. § 1225(b)(1), which include the credible fear process before USCIS asylum officers and review hearings before immigration judges. Our Children's Program represents unaccompanied children in regular removal proceedings under 8 U.S.C. § 1229a as well as in affirmative asylum applications before USCIS and the asylum officer under the TVPRA. We also represent and advise individuals in bond hearings before the Immigration Courts, and in release requests to ICE. Our border team, meanwhile, routinely encounters people who are likely to be subjected to expedited removal and the credible fear process and help explain those processes to them. In 2023, Florence Project staff provided individualized legal support to at least one thousand adults in ICE custody who specifically were seeking some fear-based form of protection.

10. In total, the Florence Project currently has a staff of 208 people. Just over 75% of all Florence Project employees, 157 people, work in some form of direct services routinely serving people who are seeking asylum or other fear-based protections. The Florence Project operates two large direct legal service programs, one serving unaccompanied children, and one serving primarily detained adults, and a smaller advocacy program, which directly serves both adults and children in other federal court advocacy. Florence Project's Border Action Team operates as part of the larger Adult Legal Program. Across these two large legal programs and the smaller advocacy program, the Florence Project employs 72 attorneys and law graduates, 4 BIA accredited representatives, 66 legal assistants, and 15 social workers, who are integrated to our legal teams through our integrated social services program. All of these programs and, thus, all of these staff routinely serve asylum seekers and people pursuing fear-based protections under United States and international law. As such, the changes in law created by the Proclamation undermines the efforts of nearly all of our staff to engage in our core work of serving people seeking asylum or other humanitarian claims for protection.

**<u>Issuance and Immediate Impact of the Proclamation</u>**

11. On January 20, 2025, President Trump signed a sweeping proclamation alleging an "invasion" at the southern border and asserting broad executive power to functionally close

the border to all asylum seekers. The proclamation eliminated individuals' ability to invoke provisions of U.S. law regarding asylum and other forms of protection that Congress specifically provided by statute. The proclamation also created new requirements for asylum seekers to submit information regarding criminal and medical background prior to entry, without creating any mechanism for doing so.

12. Immediately upon issuance of the Proclamation, the Florence Project had to divert experienced attorney resources to break down the Proclamation for staff and, specifically, to help our Border Action Team study the Proclamation and ascertain the likely impacts for migrants in Mexico who had been waiting for their opportunity to present to seek asylum. We had to amend and create new educational materials and plain language informational packets for people who were at the border and seeking asylum. Given the significant confusion and uncertainty within the community, our team also had to divert resources to conduct a "town hall" style presentation, which is much larger than our normal know your rights presentations, for migrants who were seeking to understand their options given the Proclamation. On January 23, 2025, Florence Project staff gave a town hall presentation to over 170 people, many of whom had been waiting in Mexico for an opportunity to apply for asylum for weeks or months, but now were left with no access to asylum whatsoever under the Proclamation.

13. In the context of our work with detained adults, this Proclamation impedes Florence Project's core work in a number of crucial ways. First and most importantly, by providing for summary removal of non-citizens without any ability to raise or pursue claims for asylum or other protection, this Proclamation has effectively eliminated Florence Project's ability to serve individuals who are in the United States and seeking their statutory right to asylum or other fear-based humanitarian protection. This frustrates our mission of providing legal services to people facing removal in Arizona and eliminates our ability to ensure that noncitizens facing removal have access to counsel, understand their rights, and are treated fairly and humanely. And it essentially eliminates our core practice of representing asylum seekers in seeking this protection. Indeed, in sharp contrast to years of experience and migration and detention trends, as of February 18, 2025, Florence Project has still not been able to identify or meet with any asylum seekers in ICE custody who entered the United States, whether by entering without inspection or presenting at a port of entry, after the Proclamation took effect on January 20, 2025. Communication with partner legal and humanitarian service organizations throughout the border region confirm a similar pattern and inform my understanding that the reason we have not seen asylum seekers in our facilities since January 20, 2025 is because people are being expelled to Mexico or other countries under the Proclamation without being given the opportunity to seek protection.

14. The Proclamation also substantially interferes with another core aspect of the Florence Project's work, connecting individuals with fear-based claims for relief with *pro bono* legal representation. Florence Project has yet to be able to identify any potential pro bono placements who were processed to seek asylum or other forms of humanitarian protection since January 20, 2025. The Proclamation eliminates Florence Project's ability to identify for *pro bono* representation newly arriving noncitizens with protection needs.

15. Florence Project staff have also had to divert resources to trying to understand how systems that used to be well-understood and relatively clear are now functioning under

the Proclamation. This includes both outreach to partner organizations across the border and to legal service providers in detention centers across the country to learn whether people anywhere have been able to seek asylum or other protection at the border, either after presenting at a port-of-entry or after entering without inspection and, if so, what the procedure was for gaining that access. Historically, Florence Project staff would often learn about processing patterns from government partners or from migrants themselves. However, since the Proclamation, very little information has been forthcoming from government stakeholders and Florence Project staff at the border have struggled to contact individuals who have been expelled under the Proclamation. Indeed, Florence Project staff have observed a notable shift in longstanding past patterns and practices since the Proclamation with regard to recently deported individuals. In the past many people who were recently deported or expelled through Nogales would be released at or near the port of entry and make their way to the shelter where the Florence Project provides legal services or another of several shelters in the area to receive education and humanitarian support. By contrast, since the Proclamation the shelter where the Florence Project works has received essentially no recently removed individuals, and upon information and belief, neither have the other shelters that have historically housed such individuals. This shift in pattern is so notable that Florence Project staff have attempted to communicate with both United States and Mexican government officials in an attempt to better understand how removals under the Proclamation are currently occurring, where people are being removed to, and what countries are currently subject to rapid expulsion and/or removal under the new policies. Having access to accurate information on these topics is necessary for Florence Project to be able to provide meaningful legal education services. Yet, while we have been able to confirm through the Mexican Consulate that removals are still occurring through Nogales, we have not gotten any further clarity or explanation about processing that explains the significant change in longstanding patterns involving shelter and humanitarian needs for recently deported individuals.

16. Florence Project staff themselves also are not immune to the sense of chaos and confusion created by the Proclamation and its incompatibility with the language of relevant immigration statutes on asylum and other protections. Senior Florence Project staff and managers have had to divert significant time towards developing legal explainers and guidance to support staff and *pro bono* attorney understanding of the impact of the Proclamation among other changes in law. This is a task made more difficult at this moment given that, at this stage, there is very little clarity regarding which version of the law, the Proclamation or the INA, should be followed or what that practice will look like on the ground. As such, Florence Project managers and senior staff attorneys have also diverted resources to develop new systems to update staff regarding the myriad changes to immigration law done via Executive Order since January 20, 2025 as well as share out potential legal arguments to counter-act anti-asylum measures like the Proclamation, should we begin to encounter clients in this situation. Moreover, while this particular change in law is still new, we at the Florence Project know that the stress caused by the uncertainty and chaos regarding asylum access wears down staff, undermines morale, and contributes to burn-out and turn over, which has significant financial and brain-drain impacts on the Florence Project as an organization. Like many non-profits, our staff are deeply dedicated and personally connected to our organizational mission and vision; they are motivated by their desire to help people in need. The fact that we are unable to even find and speak to asylum seekers whose rights are very likely

being violated by new practices under the Proclamation is emotionally disturbing and undermines morale for Florence Project staff.

17. Additionally, the Proclamation is significantly hampering Florence Project's core work of explaining and educating immigrants as to their legal rights under U.S. immigration law. The language of the Proclamation is at odds with the text of immigration laws regarding asylum, withholding, and CAT in that the Proclamation claims to unilaterally suspend any and all rights guaranteed under those sections without exception. As a result, Florence Project staff—including those working at the border and in ICE detention centers—must try to explain legal provisions that are inherently in conflict. We can explain what the immigration law says, as well as what the Proclamation says and what is actually happening on the ground, but because the Proclamation is inconsistent with rights protected under law, it creates a great deal of confusion and angst for the people we serve. This, in turn, impedes our ability to effectively help people understand their rights and legal situation. This level of uncertainty is also likely to adversely impact trust that we develop with clients and community stakeholders. That is because we are currently forced to explain a situation that is at odds with what the law says and with the experiences of many clients' family members who entered the United States and sought asylum before the Proclamation was issued. Also, the government has not yet made public any information about how the Proclamation is being implemented, which both undermines our ability as a legal service provider to give clear and accurate information while also making it much more difficult for us to gain the trust of the clients we serve, who are often survivors of acute trauma and inherently distrustful.

18. The uncertainty with respect to how the Proclamation is being applied is also harming our efforts to serve unaccompanied children at the border. The Proclamation does not expressly exempt unaccompanied children from the suspension of legal processing at the southern border. While we have seen some children who it seems may have entered the United States since the Proclamation has been in effect, children often do not know or remember the precise date or manner of entry, and it can be challenging to confirm the alleged date of entry. As such, we continue to be concerned that border officers may wrongly be denying unaccompanied children access to asylum and processing under the TVPRA based on the Proclamation. We are expending time and resources in an effort to understand the application of the Proclamation to this particularly vulnerable population and, particularly, how unaccompanied children are being treated at ports of entry. We need this information both to provide accurate information in our educational outreach, as well as to plan and prepare for the impact on our program providing services to this vulnerable population.

19. Financially speaking, the Proclamation could well have serious long-term financial consequences for the Florence Project given the ways in which it fundamentally prevents us from being able to access or assist people seeking asylum or other humanitarian protection, which is and has long been central to our organizational mission. If the proclamation remains in effect for any substantial period of time, then the number of people who can be helped with asylum and related forms of relief will inevitably decrease and, so too will our ability to be paid to do that mission-driven work.

20. In the nearer term, the Proclamation is likely to undermine the Florence Project's funding in at least one significant way. As noted above, Florence Project staff serve as appointed

legal counsel under the NQRP and *Franco-Gonzalez* for individuals who are deemed to be mentally incompetent to represent themselves in removal proceedings while detained in ICE custody. The Florence Project receives funding through the NQRP prime contractor on a flat rate based on the number of cases we have open and the number of net new cases we agree to accept in a given option year. Historically, a significant portion of our NQRP/*Franco-Gonzalez* clients initially entered proceedings after either seeking asylum at the border or being otherwise placed into the expedited removal process wherein they were identified as individuals experiencing serious mental health conditions and referred to full removal proceedings. A random sampling suggests that at least 5% and perhaps nearly 25% of our current NQRP cases fit this profile. Under the Proclamation, because people are summarily removed without any fear screening or opportunity to be identified as seriously mentally ill, the Florence Project stands to lose tens, if not hundreds of thousands of dollars in funding to represent individuals seeking protection who are also suffering from serious mental health conditions because such vulnerable individuals will simply never make it into full removal proceedings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of February, 2025 in Flagstaff, Arizona.

Laura St. John

Exhibit E

JA064

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Refugee and Immigrant Center for Education and Legal Services, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Kristi Noem, Secretary, U.S. Department of Homeland Security, *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-00306 |

## DECLARATION OF IHSAN GUNDUZ

I, Ihsan Gunduz, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.      I am the Acting Deputy Assistant Secretary for Border and Immigration Policy for the U.S. Department of Homeland Security ("DHS") and have served in this role since February 16, 2025.  Prior to this acting role, I served as the Director for Border Policy for DHS since December 4, 2023.  I previously served as Senior Policy Analyst for Border and Immigration Policy from April 12, 2021 to December 3, 2023.  I also served as Policy Analyst for Border and Immigration Policy from June 9, 2019 to April 11, 2021. Prior to my roles at DHS the Office of Strategy, Policy, and Plans, I served as an Asylum Officer at the U. S. Citizenship and Immigration Services from November 26, 2017 to June 8, 2019.

1

I.    **The Necessity of the Proclamation**

2.      Over the last four years, at least 8 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States.  Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 FR 8333 (Jan. 20, 2025) (the "Proclamation").  The sheer number of aliens entering the United States has overwhelmed Congress's complex scheme, the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, to protect United States sovereignty and prevent entry of aliens who pose threats to public health, safety, or national security.  *Id.*  As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide, placing substantial costs and constraints on the States.  *Id.*

3.      In response to this unprecedented influx of aliens, on January 20, 2025, the President issued a Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States."  Proclamation 10888, 90 FR at 8334–35.  The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum at section 208 of the INA, 8 U.S.C. § 1158.  *Id.* at 8335.  The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA."  *Id.*

4.      In the first 39 days after it was issued, the Proclamation has had a significant impact on illegal border crossings and restoring operational control at the southern border.  Encounters by the U.S. Border Patrol ("USBP") at the southern border decreased by 80 percent, to the lowest level they have been since the 1960s.  The success of the Proclamation is further demonstrated by

JA066

the removal or return of more than 24,000 aliens encountered at the southwest border (SWB). The number of SWB enforcement actions resulting in releases has dropped from over 1,500 per day to fewer than one per day.  If enjoined for any period of time, however, DHS anticipates that circumstances at the southern border would quickly deteriorate to pre-Proclamation conditions or worse, exacerbating the threats to national security and public safety that the federal government is obligated to guard against.[1]

## II.    The Problem of the Influx of Illegal Aliens Crossing the Southern Border.

5.    In routine circumstances, the provisions of the INA work to prevent the admission of aliens who do not serve the national interest, such as those who pose threats to public health, INA § 212(a)(1), 8 U.S.C. § 1182(a)(1); safety, § 212(a)(2) (8 U.S.C. § 1182(a)(2)); and national security, § 212(a)(3) (8 U.S.C. § 1182(a)(3)).  *See* Proclamation, 90 FR 8333.  But in circumstances where the volume of illegal entries into the United States overwhelms the system, and access to necessary screening information is limited for aliens who have traveled from around the world to enter the United States illegally, these provisions may be rendered wholly ineffective.  *Id.*

6.    The sheer number of aliens who have entered the country between ports of entry (POEs) at the southern border and who have been released into the United States over the last four years have created exactly these circumstances.  As detailed below, these conditions demonstrate that the Proclamation's provisions—suspending and restricting entry, making asylum protections unavailable to certain aliens, and requiring medical and criminal history documentation—are critical to national security and public safety.

7.    In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s, with USBP making over 1.6 million encounters.  In FY 2022, the Department of

---

[1] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

Homeland Security ("DHS") reached a record high number of encounters at the SWB, with total USBP encounters at the SWB exceeding 2.2 million.  And in FY 2023, DHS yet again reached another record year of encounters, totaling over 2 million encounters between SWB POEs.  In FY 2024 through June 4, 2024, there were approximately 1.3 million USBP encounters at the SWB. From June 5, 2024 to January 20, 2025, despite the proclamations and rules instituted by the prior administration in June 2024 and October 2024, there were over 408,000 USBP encounters at the SWB.[2]

8.      Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009-546, Congress created an expedited removal system for removing certain inadmissible aliens arriving in the United States and certain aliens who entered illegally and were apprehended within two years of their entry.  Those procedures were aimed at facilitating the swift removal of inadmissible aliens while also expeditiously resolving any asylum claims.

9.      When it was first implemented approximately three decades ago, expedited removal worked well, but its utility has been diminished by the substantial increase in aliens crossing the southern border and the increased rates at which they claim fear, invoking the credible fear process.  Additionally, in recent years, a significant percentage of aliens who are amenable to expedited removal but are not processed through expedited removal due to resource constraints, are instead released into the United States and placed into removal proceedings under INA § 240,

---

[2] OHSS analysis of February 2025 OHSS Persist.

8 U.S.C. § 1229a ("section 240 removal proceedings"), without any pre-screening to determine a potential eligibility for asylum or related protection.

10.    Specifically, over 1.5 million aliens were encountered by USBP at the SWB between POEs in FY 2024, and about 378,900 were processed for expedited removal, just 25 percent of aliens encountered during that year.[3]  Instead, DHS released the majority of these aliens into the United States with notices to appear ("NTAs") for removal proceedings pursuant to section 240 removal proceedings[4]—a process that in some cases can take years to resolve.

11.    While challenges to fully utilizing expedited removal are not new, the problem has worsened dramatically over the last four years.  During FY 2014 through FY 2019, DHS released only 10 percent of aliens apprehended by USBP at the SWB into the United States pending section 240 removal proceedings.[5]  In contrast, from March 20, 2021, through May 11, 2023, DHS released 30 percent of aliens apprehended by USBP into the United States, and the percentage of encounters resulting in such releases increased to 64 percent between May 12, 2023, and June 4, 2024.[6]  The vast majority of these releases involved aliens who were amenable to expedited

---

[3] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025.  Most remaining encounters were released with NTAs (924,900, 60 percent of the total), with an additional 140,800 (9 percent) voluntary returning to Mexico and 84,500 (6 percent) subject to reinstatement of a removal order.

[4] OHSS, analysis of December 2024 OHSS Persist and data downloaded from UIP Jan. 27, 2025.

[5] OHSS, Analysis of July 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, "SWB Encounter Book‑Outs," *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book‑Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

[6] OHSS analysis of CBP data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on Sept. 3, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book‑Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

removal but were instead placed directly into section 240 removal proceedings and released into the United States.

12.    Moreover, aliens encountered at the SWB between POEs who were processed for expedited removal have been more likely to indicate an intent to apply for asylum or some other form of protection in recent years, which prevents their immediate removal.[7]  From FY 2014 to FY 2024, the overall percentage of aliens encountered at the SWB between POEs and processed for expedited removal who indicated an intention to apply for asylum, or expressed a fear of persecution or torture, or a fear of return to their country, and were referred for a credible fear interview increased from approximately 21 percent to 45 percent; similarly, the total number of credible fear referrals for interviews increased from about 41,000 in FY 2014 to about 153,000 in FY 2024.[8]

13.    DHS's inability to process most inadmissible aliens through expedited removal in recent years due to the sheer number of aliens who have entered the United States unlawfully, combined with the increase in the number of aliens in expedited removal making fear claims and being referred to section 240 removal proceedings, has had serious consequences for immigration enforcement and adjudication, border security, and communities across the country.

14.    Such large-scale releases have created further incentives for aliens to cross illegally into the United States with the belief that, even if initially apprehended and detained, they will ultimately be released to live and work in the United States during their removal proceedings,

---

[7] Fifty percent of aliens encountered at the SWB processed for expedited removal in the post-title 42 period (after the end of implementation of the Center for Disease Control and Prevention's public health Order pursuant to Title 42 of the U.S. Code on May 11, 2023) through the end of FY 2024 made fear claims, up from thirty-four percent in the pre-pandemic period from FY 2014 through FY 2019.  OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset.

[8] OHSS, analysis of December 2024 OHSS Enforcement Lifecycle Dataset. *See also* USCIS, *Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions*, *https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions*.

JA070

which, as exacerbated by the drastic increases in initial case receipts of aliens who are subject to but unable to be processed via expedited removal, may take years to resolve. *See Securing the Border*, 89 FR 81156, 81158 (Oct. 7, 2024). This period of time, in addition to the length of time it can take before a removal occurs after a removal order is final, creates a strong incentive for some number of aliens without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. *Id.* at 81182.

15.    As a result of these circumstances, screening for public health, safety, and national security has been compromised—further worsening the costs to and constraints on the States and communities absorbing these large-scale releases of illegal aliens.

16.    Notably, DHS lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by INA § 212(a)(1), 8 U.S.C. § 1182(a)(1). Proclamation, 90 FR at 8333. And effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as aliens who are admitted lawfully would. *Id.* As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States. *Id.*

17.    Moreover, due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by INA § 212(a)(2)–(3), 8 U.S.C. § 1182(a)(2)–(3). *Id.*

JA071

Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials. *Id.*

18.    The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other Transnational Criminal Organizations (TCOs) on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. *Id.* And the risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border. *Id.*

19.    Critically, not only have overall encounters at the SWB increased over the last four years, but so have encounters with aliens that pose threats to national security and public safety. USBP encountered 385 aliens on the terrorist watchlist from FY 2021 to FY 2024 between POEs at the SWB, a 3,400 percent increase from the previous years (FY 2017 through FY 2020).[9] Further, in FY 23 and FY 24, respectively, there were 639 and 523 USBP encounters with individuals with known gang affiliations between the POEs, compared to 363 in FY 20 and 348 in FY 21.[10]

20.    TCOs and Foreign Terrorist Organizations (FTOs) have capitalized on the invasion at the SWB. When USBP agents are pulled away from their patrol duties along the borders to detention-related activities, and to the processing of individualized large groups that characterize the heavy migration flow through the borders, TCOs and FTOs take advantage, utilizing

---

[9] *See* CBP, *CBP Enforcement Statistics*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on Feb. 12, 2025) ("CBP TSDS Encounters at and Between Land Ports of Entry" table); *see*, CBP, *Terrorist Screening Data Set Encounters*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on March 22, 2025).

[10] *See* CBP, *Gang Affiliated Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on March 22, 2025).

JA072

diversionary tactics to circumvent USBP deployment posture and technologies to move illicit contraband and criminal aliens into the interior of the United States. Cartels, for example, operate with substantial financial resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting.

21.    TCOs and FTOs have also taken advantage of the influx of crossing at the southern border to illegally enter the United States between POEs or fraudulently through parole at POEs. In 2023 and 2024, for example, eight individuals from Tajikistan entered the United States through various means, including at and between POEs. Some of these individuals claimed asylum after making an appointment on the now-terminated CBP One application. At the time of entry or encounter, none of the individuals were determined to have any information in their background that impacted their ability to be paroled into the United States; however, after entry, they were arrested and suspected of having ties to the Islamic State (ISIS) group, according to public news sources.[11] Separately, as reported by the Department of Justice, on February 26, 2025, another Tajik who was illegally present in the United States was arrested after facilitating the payment of tens of thousands of dollars to ISIS-linked extremists overseas, possessing assault rifles, and declaring himself "ready" in a video sent to such individuals. The Tajik national traveled to the United States in June 2016 on a non-immigrant tourist visa, overstayed his visa,

---

[11] *See* CNN, *Feds arrested 8 Tajik nationals on immigration charges after probe found potential ties to terrorism, sources say* (last updated June 12, 2024), https://www.cnn.com/2024/06/11/us/tajik-nationals-arrested-terror-ties-probe/index.html (last visited on March 22, 2025).

then attempted to enter into a sham marriage to an American citizen, which was never recognized.[12]

### III.    The Impact and Limitations of the Securing the Border Proclamations and Rule.

22.    On June 3, 2024, in response to circumstances at the southern border and a projected increase in illegal immigration absent policy charges, President Biden issued Presidential Proclamation 10773, 89 FR 48487 (June 3, 2024) ("June STB Proclamation"),[13] invoking INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), finding that the entry into the United States of certain aliens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those aliens. *Id.* at 48491. The June STB Proclamation established thresholds based on the number of encounters between POEs for when the suspension and limitation on entry would be discontinued, continued, or reactivated. *Id.* It also directed DHS and DOJ ("Departments") to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492.

23.    Shortly thereafter, the Departments issued a corresponding IFR, Securing the Border, 89 FR 48710 (June 7, 2024) ("STB IFR"). The STB IFR effectuated three key changes to the process for those aliens described in the June STB Proclamation who are encountered at the

---

[12]*See* United States Attorney's Office, Eastern District of New York, *Tajik National Arrested in Brooklyn for Conspiring to Provide Material Support to ISIS* (last updated Feb. 26, 2025), https://www.justice.gov/usao-edny/pr/tajik-national-arrested-brooklyn-conspiring-provide-material-support-isis (last visited on March 22, 2025).
[13]On September 27, 2024, President Biden issued a proclamation amending the June STB Proclamation. *See* Presidential Proclamation 10817, 89 FR 80351 (Oct. 7, 2024). That proclamation amended the June STB Proclamation in two ways to change the way that southern border encounters are calculated for purposes of discontinuing or reactivating the June STB Proclamation's suspension and limitation on entry of certain aliens at the southern border. First, previously the suspension and limitation on entry would be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters. *See* 89 FR at 48491. Under the revised Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive calendar days before the 14-day waiting period is triggered. *See* 89 FR at 80353. Second, the revised Proclamation now counts encounters of unaccompanied alien children from non-contiguous countries as encounters factored into the aforementioned calculation. *See id.*

JA074

southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June STB Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances; (2) rather than asking specific questions of every alien encountered and processed for expedited removal, providing general notice on credible fear and referring an alien for a credible fear interview only if the alien manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because of the STB IFR's limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and protection under the CAT regulations under a "reasonable probability" standard, defined as "substantially more than a 'reasonable possibility' but somewhat less than more likely than not."  STB IFR, 89 FR at 48718; *see also* 8 C.F.R.  §§ 208.35(b)(2)(i), (iii).

24.    Following the June STB Proclamation, STB IFR, and later final rule, Securing the Border, 89 FR 81156 (Oct. 7, 2024) ("STB final rule"), encounter numbers between POEs decreased from an average of 4,910 per day in the six months prior to the rule to an average of 1,880 per day between June and December 2024.[14]  However, the STB Proclamations and rules did not go far enough to ensure that the immigration system operates in the manner intended by Congress and with the rigor directed by the President via his presidential authority.  Critically, the

---

[14] OHSS, analysis of December 2024 OHHS Persist Dataset.

STB Proclamations and rule contain exceptions and thresholds for deactivation that prevent them from fully achieving these goals.

25.    Most prominently, the STB Proclamations contain exceptions to accommodate the Biden Administration's use of the CBP One mobile application[15] ("CBP One app") for aliens who sought appointments to be processed at a POE.  Almost all aliens who used the application were then issued NTAs for section 240 removal proceedings and released into the United States rather than being placed in expedited removal.  In FY 23 and FY 24, there were 266,840 and 505,720 NTA releases, respectively, for aliens using the application.  In FY 25 through January 20, 2025, there were 153,570.[16]

26.    Further, the STB rule itself also contained an exception for exceptionally compelling circumstances.  8 C.F.R. § 208.35(a)(2)(i), 8 C.F.R. § 1208.35(a)(2)(i).  Over 7,800 aliens who were apprehended by USBP between the POEs at the southern border between June 5, 2024, and January 20, 2025, were able to establish this exception to the STB rule's asylum eligibility limitation during their credible fear screening, and USCIS returned positive fear determinations in about 5,900 (83 percent) of these cases, despite these aliens having entered in contravention of the STB Proclamations' suspension and limitation on entry.[17]  In comparison, for the approximately 55,000 aliens who were found to be subject to the STB rule's asylum eligibility

---

[15] In January 2023, the Biden administration announced a new functionality for the CBP One app, which was originally intended to provide a wide variety of services to legitimate travelers and the trade community.  *See* CBP, CBP/DHS/PIA-068, *Privacy Impact Assessment for the CBP One™*, at 1, July 25, 2024), https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application.  Aliens scheduled about 978,000 appointments through the CBP One app from the scheduling functionality's release through January 2024.  *See* OHSS analysis of data provided by CBP Passenger Systems Program Directorate Jan. 22, 2025. Each appointment represents an alien or traveling group who scheduled an appointment, showed proof of the appointment to a U.S. official at the physical boundary between the United States and Mexico, and was permitted to enter a POE for inspection and processing.

[16] Fiscal Years 2019 to January 31, 2025 data from Office of Homeland Security Statistics January 2025 Persist Dataset. February 2025 data from OHSS analysis of CBP data downloaded from UIP on March 5, 2025.

[17] OHSS analysis of data downloaded from UIP Jan. 21, 2025.

JA076

limitation during their credible fear screening and therefore screened at the "reasonable probability" standard, USCIS returned positive fear determinations in 28,400 cases, or just 52 percent of the time.[18]

27.    Therefore, although the STB Proclamations and rules were aimed at deterring aliens from illegally entering the United States and delivering timely consequences to those who do, the CBP One app exception and the rule's exceptionally compelling circumstances exception instead failed to fully secure the border by allowing a large number of aliens to be released into the United States.

28.    The impact of STB was also undercut by other prior administration's policies that granted parole into the United States to large numbers of aliens, including for certain Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals and their immediate family members. In FY 23 and FY 24, approximately 532,000 Cuban, Haitian, Nicaraguan, and Venezuelan aliens and their immediate family members were processed and released into the United States pursuant to CHNV parole processes.[19]

## IV.    The Proclamation is Critical to Address the Influx of Illegal Migration at the Southern Border.

29.    As detailed above, the public health and national security risks posed by the influx of innumerable aliens into the United States, and the insufficient actions of the prior administration, requires the federal government to take measures to uphold its obligations to the States. Accordingly, the President proclaimed, pursuant to INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States on or after January 20, 2025, of

---

[18] OHSS analysis of data downloaded from UIP Jan. 21, 2025.
[19] OHSS analysis of February 2025 OHSS Persist Dataset.

aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. *See* Proclamation, 90 FR 8333. The President took and directed a range of actions in the Proclamation, including:

- Directing that entry of aliens engaged in the invasion across the southern border into the United States is suspended until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 1);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that aliens engaged in the invasion across the southern border of the United States on or after January 20, 2025, are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 2);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States, on or after January 20, 2025, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. §§ 1182(a)(1)–(3), is detrimental to the interests of the United States, and directing that entry into the United States of such aliens be suspended and restricting their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, *see* 90 FR 8335, (§ 3);

- Invoking the authorities provided to the President under Article II of the Constitution

14

of the United States, including the President's control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4 of the Constitution, to suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and directing the Secretary, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of the Proclamation, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335–36, (§ 4); and

- Directing the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after January 20, 2025, whether as an exercise of the suspension power in section 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), or as an exercise of the President's delegated authority under the Constitution of the United States, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 at FR 8336 (§ 5).

30.    USBP implements the Proclamation on the southern border in two ways.  First, certain aliens may be processed for INA § 212(f) repatriation.  Second, aliens who cannot be directly repatriated under INA § 212(f) are generally processed for expedited removal.  Aliens subject to the Proclamation—either INA § 212(f) repatriation or expedited removal—who manifest a fear are referred to USCIS for an assessment under the CAT.

31.    At the northern and coastal borders, USBP implements Section 3 of the Proclamation only.  This means that an alien encountered between POEs on the northern or coastal

borders is only subject to the Proclamation if he or she lacks sufficient documentation showing medical, criminal history, and background information.

32.    The Proclamation does not impact USBP's processing of unaccompanied alien children (UACs), who continue to be processed consistent with the requirements of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement Agreement.

33.    In any case, if an alien cannot be removed or repatriated directly to his or her country of citizenship—which is mostly applicable to countries that DHS has deemed "hard to remove"—USBP will notify the alien of the country to which he or she will be transferred and will provide the alien with a tear sheet identifying the destination country.  Aliens, who manifest a fear of the country to which USBP intends to transport them to, will be referred for a CAT assessment to USCIS, which interviews the aliens and makes a determination.  If the determination is negative, USBP continues to transport the alien to the designated country.  If the determination is positive, USBP may designate another third country for removal or repatriation or USBP may place the alien into proceedings with the Executive Office for Immigration Review (EOIR).

34.    Aliens subject to the Proclamation whom CBP does not directly remove or repatriate to a designated country are taken into ICE custody.  Aliens who manifest fear while in ICE custody are referred to USCIS for a CAT assessment.  If the CAT assessment is negative, ICE will effectuate removal or repatriation.  If the CAT assessment is positive, another country may be designated.

35.    CBP Office of Field Operations ("OFO") implements Section 3 of Proclamation at the land border ports of entry and at air and seaports.  At land border ports of entry on both the southern and northern border, aliens who lack valid entry documents or who otherwise fail to provide sufficient medical information or reliable criminal history and background information are

16

prevented from entering the United States at the physical border. Similarly, an alien who arrives at an air or seaport who is determined to be subject to Section 3 of the Proclamation is generally processed for an expedited removal or a withdrawal of their application for admission.

**V.       The Proclamation is Working and is Critical to National Security and Public Safety.**

36.      The Proclamation, which complemented other executive orders and actions, has been highly effective thus far. SWB encounters between POEs fell from an average of about 1,170 aliens per day in the two-week period ending on January 20, 2025, to an average of about 240 per day in the two-week period from February 15 to February 28, 2025.[20] SWB releases from USBP custody fell from an average of about 130 per day to an average of less than 1 per day in the same two time periods. Further, illegal aliens encountered since the Proclamation was implemented generally have been quickly repatriated or removed.[21]

37.      By reducing the number of encounters and the number of aliens in custody, the Proclamation has freed up CBP resources to address national security and public safety threats and to secure the border. The immediate savings on facilities alone are significant. In mid-March, in response to the lower encounter numbers, CBP began reducing the number of soft-sided facilities along the southwest land border, which will save between $5 and $30 million per month for each facility. But facilities are only one component of the substantial costs of illegal border crossings. Processing aliens at the border is also resource- and personnel-intensive—and as the number of aliens apprehended and in custody increases, USBP must assign additional agents to processing duties. But any reassignment of agents to processing duties takes them away from other activities, including law enforcement priorities like addressing criminal activity at the border. For example,

---

[20] OHSS analysis of CBP data downloaded from UIP on Feb. 5, 2025.
[21] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

based on data pulled by USBP on March 21, 2025, as of that day, approximately 6 percent of agents along the SWB were assigned to processing tasks, down from approximately 9 percent on January 30, 2025, 16 percent on December 1, 2024, and nearly 14 percent on June 3, 2024.

38.     Criminal activity at the border is a persistent problem during both periods of high and low encounters.  But when border encounters are lower, CBP is better positioned to focus its resources on addressing and responding to criminal activity.  In February 2025, USBP and OFO encountered 393 criminal aliens; OFO made 645 criminal arrests; USBP had 12 gang apprehensions; USBP referred 169 smuggling events for prosecution; and OFO referred 110 events for criminal prosecution.  Officers and agents also seized 104 firearms and 13,822 rounds of ammunition, as well as $1,535,228,67 in currency.  If encounters increase again, criminal activity also can be expected to increase, while CBP's available resources to respond to criminal activity would, once again, be diminished.

39.     For the same reasons, lower border encounters allow CBP to allocate more resources to national security.  For example, in late January 2025, at POEs, OFO commenced enhanced inspections of flights, private aircraft, and cargo to and from Colombia.  CBP denied boarding to flagged visa holders and, in coordination with the Department of State, enforced the travel ban on Colombian officials.[22]  In late February 2025, Tucson Sector Border Patrol agents

---

[22] *See* CBP, *CBP is taking decisive measures under President Trump's orders in response to Colombia* (last updated Jan. 27, 2025), https://www.cbp.gov/newsroom/announcements/cbp-taking-decisive-measures-under-president-trumps-orders-response (last visited on March 22, 2025).

arrested three suspected cartel scouts, and one foot guide associated with the Los Memos transnational criminal organization, a faction of the Cártel de Sinaloa, in southern Arizona.[23]

40.    TCOs have also felt the effects of the Proclamation, most notably in reduced income streams from migrant and drug smuggling.  From December 2024 (FY 25) to January 2025, there was 61.9 percent reduction in fentanyl dosages seized by CBP.[24]  Between mid-January and the end of February, CBP participated in strategic enforcement operations in California, Arizona, and the Pacific Northwest alongside its federal, state, local, tribal, territorial (FSLTT) and international partners.  The operations focused on illicit fentanyl, its analogues, precursor chemicals, and other synthetics like methamphetamine, in addition to other emerging threats like xylazine and nitazenes.  During these operations, CBP seized over 10,900 pounds of drugs, consisting of 2,584 pounds of cocaine, 1,266 pounds of fentanyl, 5,683 pounds of methamphetamine, 135 pounds of heroin, 664 pounds of marijuana, and 640 pounds of other illicit substances such as amphetamine, ecstasy, ketamine, hashish, steroids, and xylazine.  Additionally, CBP intercepted 140 weapons and seized over $1.3 million in illicit U.S. currency.  In total, these joint efforts with FSLTT partners resulted in the cumulative seizure of over 13,348 pounds of illegal drugs, over $1.97 million in illicit U.S. currency, over 180 weapons, and CBP arrests of 317 individuals affiliated with and/or connected to those with direct ties to TCOs.  Through strategic intelligence, collaborative operations, and relentless vigilance, CBP continues to disrupt and

---

[23]  *See* CBP, *Cartel Scouts, Foot Guide Arrested in Arizona* (last updated March 4, 2025), https://www.cbp.gov/newsroom/local-media-release/cartel-scouts-foot-guide-arrested-arizona (last visited on March 22, 2025).
[24] *See* CBP, *CBP Drug Dosage Value and Weight*, https://www.cbp.gov/newsroom/stats/cbp-drugs-dosage-value-and-weight (last visited on March 22, 2025).

dismantle cartels that threaten public safety and national security.[25]  Cartels are reportedly selling property and firing personnel to account for loss in fentanyl income[26] that supports their operations.

41.    Additionally, even while encounter numbers were lower than average in February 2025, risks to officers and agents and others who operate near the U.S. borders are always present. In February 2025 alone, CBP records indicate that 30 CBP officers/agents were assaulted.  In late January 2025, a U.S. citizen and a Canadian citizen were robbed and attacked by armed suspected Mexican cartel terrorists in the Jacumba Wilderness in southern California. CBP agents tracked the assailants back to the border where they returned to Mexico.[27]  If border crossing numbers increase again, CBP resources will likely be diverted and these risks to CBP personnel and others on the border will likewise increase.

## VI.    If the Proclamation is Enjoined, DHS's Operational Capabilities will be Severely Taxed and Large-Scale Releases of Illegal Aliens will Resume.

42.    As detailed above, the Proclamation is necessary and is working.  Any injunction against the Proclamation would likely undo these effects, imperiling operational control of the border and subjecting the States to further large-scale releases of illegal aliens.

43.    In addition to removing the most effective tool for managing the emergency at the southern border, news of an injunction against implementation of the Proclamation would likely

---

[25]  *See* CBP, *CBP Releases February 2025 Monthly Update* (last updated March 12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update (last visited on March 22, 2025).
[26]  *See* New York Times, *Trumps Threats and Mexico's Crackdown Hit Mexican Cartel*, https://www.nytimes.com/2025/03/02/world/americas/mexico-cartel-fentanyl-trump-tariffs.html.
[27]  *See* CBP, *American citizen shot in Jacumba Wilderness north of the U.S.-Mexico Border* (last updated January 23, 2025), https://www.cbp.gov/newsroom/local-media-release/american-citizen-shot-jacumba-wilderness-north-us-mexico-border (last visited on March 22, 2025).

JA084

lead to a surge of aliens seeking to cross at and between POEs, as has happened after other court orders.

44.     On February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), a programmatic implementation of the Secretary of Homeland Security's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C).  STB final rule, 89 FR at 48764–65.  Almost immediately, hundreds of aliens began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.  *Id.* at 48765.  Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.  *Id.*  Absent immediate and resource-intensive action taken by CBP, the number of aliens gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 aliens who were in section 240 removal proceedings and had been returned to Mexico under MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.  *Id.*  And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so, they diverted resources away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.  *Id.*

45.     This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that aliens, who arrived before the Order ended and the Circumvention of Lawful Pathways rule took effect, would be allowed to remain in the United States.  *Id.* at 48765.  This

21

surge culminated with what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border. *Id.* Encounters between POEs (which excludes arrival of inadmissible aliens with scheduled appointments through the CBP One app who appeared at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11). *Id.* The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.

46.     If the Proclamation is enjoined for any amount of time, the result will likely be similar: substantial numbers of illegal aliens will be incentivized to unlawfully enter the United States between POEs and DHS will be without the most effective tool for managing the emergency at the southern border.

47.     Since the Proclamation has been in place (through February 28, 2025), USBP encountered on average 183 aliens per day between POEs and OFO has encountered on average 67 at POEs, who were generally quickly repatriated or removed based on section 212(f).[28] Without this ability to quickly repatriate or remove them, DHS must instead rely on less efficient procedures, such as section 240 removal proceedings, INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A). In the absence of the Proclamation, DHS does not have the resources to ensure that all aliens who enter illegally between POEs are detained and processed for expeditious removal from the United States. As described above, when more aliens enter between POEs than

---

[28] OHSS analysis of February 2025 OHSS Persist Dataset based on data provided by CBP and ICE.

JA086

DHS has resources to process and detain, DHS may be forced to release aliens into the United States to await section 240 removal proceedings, which may in some cases take years to conclude, further straining local, State, and Federal resources that have been strained for years.

48.    The damages caused by a reversion to pre-Proclamation conditions at the southern border, and another, ongoing large-scale release of illegal aliens into communities nationwide, would be far-reaching.  As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries."  Proclamation, 90 FR at 8334.  And this is to say nothing of the boon to TCOs and smugglers that would result by the lifting of the suspension and restrictions at the southern border or the dire consequences of releasing illegal aliens who may pose a threat to national security, public safety, or health.

## VII.    Conclusion.

49.    The Proclamation is an appropriate and necessary response to the unprecedented influx of illegal immigration over the last four years.  During times of historically high levels of encounters that adversely impact operational control of the border and result in the large-scale release of aliens, the President has authorized extraordinary measures in order to reduce unlawful migration.  The measures are designed to address the invasion at the border, the challenges those conditions pose for screening for security and safety, and the impact on communities strained by the influx of aliens over the last four years.  Should the Court prevent DHS from implementing the Proclamation, DHS anticipates that encounters will increase sharply—placing even more stress on our operations at the border, and on communities throughout the country.

JA087

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge,

information, and belief.  Executed on this 24th day of March, 2025.

IHSAN
GUNDUZ
Digitally signed by
IHSAN GUNDUZ
Date: 2025.03.24
18:46:42 -04'00'

Ihsan Gunduz
Acting Deputy Assistant Secretary for Border and Immigration Policy
U.S. Department of Homeland Security

# Exhibit F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REFUGEE AND IMMIGRANT                  )
CENTER FOR EDUCATION AND LEGAL         )
SERVICES, *et al.*,                    )
      Plaintiffs,             )
    v.                              )    Case No. 1:25-cv-00306-RDM
                                    )
KRISTI NOEM, Secretary of the U.S.     )
Department of Homeland Security, in her )
official capacity, *et al.*,           )
      Defendants.            )
_____ )

**DECLARATION OF TULSI GABBARD, DIRECTOR OF NATIONAL INTELLIGENCE**

### I.    INTRODUCTION

1.    I am the Director of National Intelligence ("DNI") and have held this position since February 12, 2025. I was appointed to this position by the President with the advice and consent of the United States Senate. As the DNI, I oversee the United States Intelligence Community ("IC") and serve as the principal intelligence adviser to the President. I have served in uniform since 2003, and am a combat veteran with three deployments to the Middle East and Africa during my military career. I previously served four terms as an elected Representative for the State of Hawaii in the United States Congress, where I served on the Armed Services, Homeland Security, and Foreign Affairs Committees.

### II.    PURPOSE OF THIS DECLARATION

2.    The purpose of this declaration is to describe the national security threats posed by the current border crisis.

3.      I understand the nature and extent of the border crisis, as well as the importance of the President's policies in response to that crisis, will be described in an accompanying declaration from the U.S. Department of Homeland Security.

4.      I make the following statements based upon my personal knowledge, background, training, and experience, as well as information made available to me in my official capacity, including the coordinated assessments of the Intelligence Community.

## III.    DESCRIPTION OF THE NATIONAL SECURITY THREATS TO THE UNITED STATES POSED BY THE BORDER CRISIS

*Transnational Criminal Organizations and Gangs*

5.      Transnational criminal organizations (TCOs) and other nonstate actors are threatening and impacting the lives of U.S. persons, the security and prosperity of the U.S. Homeland, and U.S. strength at home and abroad, including through vulnerabilities they can exploit in our southern border and in the processing and vetting of material and individuals moving through it.

6.      Western Hemisphere-based TCOs and transnational gangs, some of whom are involved in illicit drug production and trafficking bound for the United States, endanger the health and safety of millions of Americans. Mexico-based TCOs, in particular, are producing and trafficking large amounts of illicit drugs that are imperiling American lives and livelihoods. As the President recently explained, Mexico-based drug trafficking organizations "cultivate, process, and distribute massive quantities of narcotics," including fentanyl, "that fuel addiction and violence in communities across the United States." Executive Order 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 7, 2025).  To take one example of the terrible harms to which these TCOs contribute, over fifty thousand drug overdose

2

deaths in the United States have been attributed to fentanyl on an annual basis in recent years, according to the Centers for Disease Control. TCOs are also conducting other illegal activities that challenge U.S. national security, such as human trafficking, human smuggling, weapons trafficking, and money laundering.

7.    Mexico-based TCOs remain the dominant producers and suppliers of illicit drugs to the U.S. market, including fentanyl, heroin, methamphetamine, and South American-sourced cocaine. The U.S.-Mexico border is the main entry point for illicit drugs, most commonly concealed in passenger vehicles and tractor trailers traveling through official U.S. ports of entry. Mexico-based TCOs oversee the sale and distribution of wholesale amounts of illicit drugs to U.S.-based drug traffickers and may maintain visibility into regionally based U.S.-based distribution networks; however, street-level retail sales within the United States are most likely controlled by local gangs.

8.    Mexico-based TCOs exploit multiple channels at the Southwest border to transport illicit drugs into the United States. For example, they are actively recruiting drivers with authorization through the U.S. Customs and Border Protection Secure Electronic Network Travelers Rapid Inspection program, some of whom are U.S. citizens, to transport illicit drugs across the border.

9.    Mexico-based TCOs are also using cross-border tunnels to transport illicit drugs into the United States, as well as commercially available unmanned aerial vehicles (UAVs) to smuggle small amounts of drugs, including fentanyl, into the United States through the U.S.-Mexico border. TCOs also closely monitor U.S. law enforcement activities using UAVs and

human scouts placed in strategic overwatch positions to determine the optimal time to move drugs across the border.

10.     TCOs also exploit migrants transiting the Western Hemisphere to the United States through extortion, kidnapping for ransom, forced labor, and sex trafficking. TCOs view human smuggling and human trafficking as highly profitable, low risk crimes of opportunity. Some TCOs exploit migrant flows to enter the United States themselves and commit crimes.

11.     Mexico-based TCOs have taken advantage of the large volume of migrants seeking to enter the United States illegally by extorting fees for organizing and facilitating their travel to the United States, and target some migrants in kidnapping for ransom schemes. Mexico-based TCOs direct illegal migrants' movements across the U.S.-Mexico border using human scouts and UAVs that surveil U.S. law enforcement patrolling the border, while other illegal migrants are smuggled across the border in tunnels.

12.     TCOs, human smugglers, gangs, and lone criminal actors have all taken advantage of elevated U.S.-bound migration in recent years, with arrivals at the U.S. Southwest border having exceeded 2 million per year since 2022, the highest levels in at least two decades. Some illegal migrants are trafficked by TCOs and other criminal actors upon entering the United States to repay smuggling fees, commonly known as debt bondage. These illegal migrants are forced to work as prostitutes, or in low paying jobs in the United States, including in agriculture and meat packing industries, or are forced to work in illegal marijuana grow houses.

***Sunni Violent Extremists, Inspired Lone Attackers, and Iran-Backed Threats***

13.     The United States and U.S. citizens at home—as well as U.S. citizens abroad—face a diverse and persistent foreign terrorist threat from Sunni violent extremist groups,

4

including the Islamic State of Iraq and ash-Sham (ISIS) and al-Qaida, violent extremists acting alone or in small cells who draw inspiration from foreign terrorists, and actors backed by states, such as Iran. These groups continue to seek to attack the West, including the United States and U.S. persons, with outreach, messaging, and other operations aimed at directing, enabling, or inspiring attacks, and could exploit vulnerable travel routes and activity.

14.     Large flows of migrants and illegal migrants across borders strain local and national infrastructure and resources, making screening and vetting of foreign nationals for potential derogatory information more challenging. Foreign nationals with potential terrorism connections continue to attempt to enter the U.S. Homeland at both the U.S.-Mexico and U.S.-Canada borders and also through the immigration system.

15.     The IC is aware of instances in the past two years where foreign nationals connected to foreign terror groups have facilitated the entry of other foreign nationals into the United States via the Southwest border. We assess there is a persistent risk that groups such as ISIS will try to assist supporters in the future who seek to exploit perceived border vulnerabilities to advance or facilitate operations in the United States. The Canadian border also has presented opportunities for violent extremists to attempt to enter the United States using lawful entry methods or unlawful access between ports of entry.

16.     In June 2024, U.S. law enforcement officers arrested several foreign nationals from Tajikistan suspected of having ties to ISIS, pursuant to immigration authorities. The arrests were closely coordinated with the Federal Bureau of Investigation's Joint Terrorism Task Forces.

JA094

17.     In September 2024, Canadian authorities arrested a Pakistani national and ISIS supporter, who was planning to be smuggled into the United States to attack a New York-based Jewish institution on or around the anniversary of the 7 October HAMAS attack.

18.     The IC also assesses there is a risk from individuals lacking ties to terrorist organizations who unlawfully crossed U.S. borders in recent years and subsequently become radicalized to use violence based on their exposure to violent extremist messaging once here. At the same time, many terrorists are exploiting new technologies and techniques on secure platforms, complicating intelligence and law enforcement efforts to understand their location, connectivity, and financing.

***Other National Security Threats Posed by the Border Crisis***

19.     In addition to threats posed by individuals who cross the border, other foreign actors, including rival states, are exploiting the border crisis to further their own aims. For example, China and Russia are likely to continue to use the border, immigration issues, and U.S. policies toward the border in their influence narratives that seek to divide Americans and weaken Washington, highlighting other types of threats to the United States from debate and concerns over the border. China and Russia both conducted influence operations using these themes in the run-up to the U.S. general election in 2024.

## IV.     <u>CONCLUSION</u>

20.     The current border crisis presents persistent, serious national security threats and challenges, both known and unknown, and the IC remains concerned about keeping the U.S. Homeland borders secure to protect U.S. persons and interests from these threats.

JA095

I declare under penalty of perjury that the foregoing is true and correct. Executed this _21_ day of March, 2025.

_____

Tulsi Gabbard
Director of National Intelligence

7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Refugee and Immigrant Center For Education and Legal Services, *et al.*, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-00306 |
| Kristi Noem, Secretary, U.S. Department of Homeland Security, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) ) | |

JA097

The following guidance documents are being produced in *Refugee and Immigrant Center for Education and Legal Services, et al., v. Kristi Noem, et al.*, No. 1:25-cv-00306 (D.D.C.), in accordance with the parties' agreement set forth in the Joint Status Report, ECF No. 24, and subsequent Court order.

### INDEX

| DOCUMENT | PAGE |
|---|---|
| CBP, U.S. Border Patrol, *Field Guidance for Southern Border Re: 212(F)Presidential Proclamation*, Feb. 4, 2025 | USA00001 |
| CBP, U.S. Border Patrol, *Field Guidance for Northern and Central Borders Re: 212(F)Presidential Proclamation*, Feb. 4, 2025 | USA00009 |
| CBP, U.S. Border Patrol, *Update 212F Third Country*, Feb. 19, 2025 | USA00016 |
| CBP, Office of Field Operations, *Implementation of Active Executive Orders – February 28, 2025* | USA00022 |
| USCIS, *CAT Assessment Instructions and Implementation Guidance*, Jan. 31, 2025 | USA00034 |
| USCIS, *CAT Assessment Training*, Jan. 31, 2025 | USA00036 |
| USCIS, *CAT Assessment Worksheet*, Jan. 31, 2025 | USA00048 |
| USCIS, *CAT Assessment Notice*, Jan. 31, 2025 | USA00051 |
| USCIS, *Guidance on Implementation of Executive Order Guaranteeing the States Protection Against Invasion*, Feb. 7, 2025 | USA00052 |
| USCIS, *LAS CAT Assessment Guide*, Draft, Feb. 17, 2025 | USA00055 |
| USCIS, *CAT Assessment SharePoint Go-By*, Feb. 7, 2025 | USA00066 |

Dated: March 17, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         *Assistant Attorney General*

                                         DREW C. ENSIGN
                                         *Deputy Assistant Attorney General*

                                         AUGUST FLENTJE
                                         *Acting Director*

                                         EREZ REUVENI
                                         *Assistant Director*

                                         PATRICK GLEN
                                         DAVID KIM
                                         KATHERINE J. SHINNERS
                                         BRIAN C. WARD
                                         *Senior Litigation Counsel*

                                         ELISSA FUDIM
                                         *Trial Attorney*

                                         /s/ *Joseph A. Darrow*
                                         JOSEPH A. DARROW
                                         *Trial Attorney*
                                         U.S. Department of Justice, Civil Division
                                         Office of Immigration Litigation
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, DC 20044
                                         Tel: (202) 598-7537
                                         Email: joseph.a.darrow@usdoj.gov

                                         *Counsel for Defendants*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2025, I electronically served the foregoing and the documents referenced therein on counsel of record for Plaintiffs via email.

<u>/s/ *Joseph A. Darrow*</u>
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

| From: | ████████ |
|---|---|
| **To:** | OPS WEST SECTORS; OPSCENTRALSECTORS; OPS EAST SECTOR |
| **Cc:** | Immigration Prosecution & Custody OPS |
| **Subject:** | Update Field Guidance for Southern Border RE: 212(F) Presidential Proclamation Guaranteeing the States Protection Against Invasion |
| **Date:** | Tuesday, February 4, 2025 2:37:00 PM |
| **Attachments:** | CAT Field Gudance.docx |
| | USBP Southern Border Field Guidance 212(f).docx |

Corridors,

Please disseminate the guidance below to all Southwest Border Sectors.

**BLUF:** **Proclamation 10888,** *Guaranteeing the States Protection against Invasion,* **suspends and limits entry of all illegal aliens encountered by U.S. Border Patrol between the ports of entry at the southern land border.**

- This applies to all illegal aliens who entered the United States after 1800 hours EST January 20, 2025.

The entry of any illegal alien invading the United States (which is defined as an alien who crosses between the ports of entry on the southern land border) is suspended pursuant to section 212(f) and 215(a) of the INA.

Aliens participating in this invasion are also restricted from invoking INA provisions that would permit their continued presence in the United States, including discretionary relief. The Proclamation specifically identified section 208 of the INA, and directs that aliens invading the United States are **not permitted to apply for asylum.**

An alien subject to the Proclamation may be processed as a 212(f) Direct Repatriation (**if able to be repatriated to Mexico)** or an Expedited Removal.



Although the appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances. This includes family units and family groups, as appropriate. In all cases, the appropriate processing disposition should be determined on a case-by-case basis, considering the totality of the circumstances.

In accordance with TVPRA, continue to process Unaccompanied Alien Children (UAC) under normal processing procedures.

The below workflows describe the steps and processes to be followed when processing an illegal alien for 212(f) repatriation or expedited removal. For all such illegal aliens, agents **should not use Form I-867A, Form I-867B, or Form M-444,** or ask specific fear questions. These forms are not available in either e3 disposition described below. ==Agents will refer any alien who manifests fear to U.S. Citizenship and Immigration Services (USCIS) for a Convention against Torture (CAT) screening. (See attached CAT screening guidance)==

Illegal aliens who entered before the Proclamation's suspension and limitation on entry was active, or those encountered after the suspension and limitation on entry is discontinued, should be processed via the preexisting ER and ER/CF dispositions, which include the above listed forms. This is determined by the entry date and time, including the full scope ER authority.

**212(f) Direct Repatriations to Mexico**



- ○ Agents will be required to book all subjects under 1182f, from whom DNA is collected ████████████████████████████ . These subjects should be booked under 8 USC 1182 (Inadmissible Aliens).

**Expedited Removal - Per 212(F)** ████████

- For all illegal aliens who are subject to the Proclamation, process them consistent with the steps below.



- ○ El Salvadorans must be provided with all advisals consistent with *Orantes*.

Respectfully,

████████
(A) Assistant Chief
U.S. Border Patrol Headquarters
LEOD/Immigration Prosecutions and Custody
GOV: ████████

C: ███████

**BLUF:** **All Illegal Aliens (IA) subject to the Presidential Proclamation,** *Guaranteeing the states protection against invasion,* **are eligible for Convention Against Torture (CAT) claims under 212(f).**

The following guidance provides additional information and describes the processing and referral actions necessary to document any CAT claims under 212(f).

Under the CAT process there is **no consultation period or right to counsel**. IAs are required to have a private screening area during their interview.

IA's apprehended by USBP that are subject to the Proclamation who manifests or expresses fear of the country where USBP would like to return them, (e.g. Mexico, Canada, or their home country) should be processed according to the instructions below:

For direct repatriations to Mexico:

- ▮ ███████████████████████████
- ▮ ███████████████
- ▮ ████████████████ the intake page to stamp the file for USCIS.
- • Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- ▮ ███████████████████████████
- ▮ ██████████████████
- • Once USCIS accepts the interview referral, schedule the IA for a CAT interview using the USCIS SharePoint site.

For IA's processes under the ████████████ removal pathway that can be easily removed to their home country or Mexico:

- • ██████████████████████
- ▮ ████████████████
- ▮ ██████████████
- ▮ ███████████████████████████████
- • Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- • ██████████████████████
- ▮ ██████████████████
- • Once USCIS accepts the interview referral, schedule the IA for a CAT interview using the USCIS SharePoint site.

For IA's from hard to remove countries:

- • ██████████████
- ▮ ██████████████████

- ▪ ██████████████████████
- ▪ ████████████████████████████████████
- Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- Refer to ERO for detention and CAT interview.

If for any reason the designated country of removal changes, and the IA manifest fear for the newly designated country they must be re-screened for the newly designated country.

Once USCIS adjudicates the claim, they will issue a determination.
- If negative, USCIS will issue the determination and USBP should continue with the process of repatriation or removal.
- If positive reprocess as a ████████ and submit to CAS for ERO detention.

<mark>If Electronic Referrals or the USCIS Scheduling SharePoint is unavailable, please refer to the emails below to refer and schedule the CAT interview.</mark>

<mark>Automated referral system will be updated on 2/13/2025</mark>

<mark>USCIS SharePoint link: CAT Scheduling Tool App</mark>

| Inbox | Purpose |
|---|---|
| ██████████████████████ | Public-facing inbox for inquiries and for attorneys to provide G-28s |
| ██████████████████ | Public-facing inbox to receive and communicate about RFRs |
| ██████████████ | Reserved for communications between ████████ and ████ |
| ██████████████ | Reserved for communications between ████████ ████ and ████ |
| ██████████████ | Reserved for communications between ████████ and ████ |
| ██████████████ | Reserved for communications between ████████ and ████ |
| ████████████████ | Reserved for communications between ████████ and ████ |
| ██████████████ | Reserved for communications between ████████ and ████ |
| ██████████████ | Reserved for communications between ████████ and ████ |

| | |
|---|---|
| ███████████████ | Reserved for communications between ███████ █████ and ████ |
| ████████████████ | Reserved for communications between ██████ ██ and ████ |
| █████████████████ | General BP mailbox for all other Sectors |

**BLUF:  Proclamation 10888,** *Guaranteeing the States Protection against Invasion*, **suspends and limits entry of all illegal aliens encountered by U.S. Border Patrol between the ports of entry at the southern land border.**

- This applies to all illegal aliens who entered the United States after 1800 hours EST January 20, 2025.

The entry of any illegal alien invading the United States (which is defined as an alien who crosses between the ports of entry on the southern land border) is suspended pursuant to section 212(f) and 215(a) of the INA.

Aliens participating in this invasion are also restricted from invoking INA provisions that would permit their continued presence in the United States, including discretionary relief. The Proclamation specifically identified section 208 of the INA, and directs that aliens invading the United States are **not permitted to apply for asylum.**

An alien subject to the Proclamation may be processed as a 212(f) Direct Repatriation (**if able to be repatriated to Mexico**) or an Expedited Removal.



Although the appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances. This includes family units and family groups, as appropriate. In all cases, the appropriate processing disposition should be determined on a case-by-case basis, considering the totality of the circumstances.

In accordance with TVPRA, continue to process Unaccompanied Alien Children (UAC) under normal processing procedures.

The below workflows describe the steps and processes to be followed when processing an illegal alien for 212(f) repatriation or expedited removal. For all such illegal aliens, agents **should not use Form I-867A, Form I-867B,** or Form M-444, or ask specific fear questions. These forms are not available in either e3 disposition described below. ==Agents will refer any alien who manifests fear to U.S. Citizenship and Immigration Services (USCIS) for a Convention against Torture (CAT) screening. (See attached CAT screening guidance)==

Illegal aliens who entered before the Proclamation's suspension and limitation on entry was active, or those encountered after the suspension and limitation on entry is discontinued, should be processed via the preexisting ER and ER/CF dispositions, which include the above listed forms. This is determined by the entry date and time, including the full scope ER authority.

**212(f) Direct Repatriations to Mexico**



- o Agents will be required to book all subjects under 1182f, from whom DNA is collected ███████████████████████████████. These subjects should be booked under 8 USC 1182 (Inadmissible Aliens).

**Expedited Removal - Per 212(F)** ████████

- For all illegal aliens who are subject to the Proclamation, process them consistent with the steps below.



- o El Salvadorans must be provided with all advisals consistent with *Orantes*.

| From: | ▮▮▮▮▮▮ |
|---|---|
| To: | OPS WEST SECTORS; OPSCENTRALSECTORS; OPS EAST SECTOR |
| Cc: | Immigration Prosecution & Custody OPS |
| Subject: | Field Guidance for Northern and Coastal Borders RE: 212(F) Presidential Proclamation Guaranteeing the States Protection Against Invasion |
| Date: | Tuesday, February 4, 2025 3:04:00 PM |
| Attachments: | USBP Northern and Coastal 212(f) Section 3 Field Guidance (2).docx |
| | CAT Field Gudance Northern and Coastal Border.docx |

Corridors,

Please disseminate the guidance below to all Northern and Coastal Border Sectors.

-

-

-

**BLUF:** **Section 3 of Proclamation 10888,** *Guaranteeing the States Protection against Invasion***, suspends and limits entry of certain illegal aliens encountered by U.S. Border Patrol between the ports of entry at the southern, northern, and coastal border.**

- This applies to certain illegal aliens who entered the United States after 1800 hours EST January 20, 2025.

Aliens seeking to enter the United States must provide Federal officials with sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(l)-(3) of the INA. Under Section 3 of the Proclamation, the entry of aliens who failed to provide such information is suspended, and they are restricted from invoking provisions of the INA, **including asylum**, that would permit their continued presence. Presumptively, any alien with valid travel documents has already fulfilled these requirements.

An alien subject to the Proclamation may be processed as a 212(f) Direct Repatriation (**if able to be repatriated to their country of last transit)** or an Expedited Removal (ER).

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances. This includes family units and family groups, as appropriate. In all cases, the appropriate processing disposition should be determined on a case-by-case basis, considering the totality of the circumstances.

Unaccompanied Alien Children (UAC) shall continue to be processed under normal processing procedures consistent with the TVPRA. Family units shall continue to be processed consistent with the requirements of *Flores* and the *Ms. L v. ICE* Settlement Agreement

The below workflows describe the steps and processes to be followed when processing an illegal alien for 212(f) Direct Repatriation or Expedited Removal. For all such illegal aliens, agents **should not use Form I-867A, Form I-867B**, or Form M-444, or ask specific fear questions. These forms are not available in either e3 disposition described below. <mark>Agents will refer any alien who manifests fear to U.S. Citizenship and Immigration Services (USCIS) for a</mark>

<mark>Convention against Torture (CAT) screening. (See attached CAT screening guidance)</mark>

Illegal aliens who entered before the Proclamation's suspension and limitation on entry was active, or those encountered after the suspension and limitation on entry is discontinued, should be processed via the preexisting ER and ER/Credible Fear dispositions, which include the above listed forms. This is determined by the entry date and time, including the full scope ER authority.

**212(f) Direct Repatriations to Country of Last Transit**



- Agents will be required to book all subjects under 1182f, from whom DNA is collected ██████████████████████████. These subjects should be booked under 8 USC 1182 (Inadmissible Aliens).

**212(f) Expedited Removal** ██████████

- For all illegal aliens who are subject to the Proclamation, but who cannot be directly repatriated to their country of last transit, process them consistent with the steps below.



- Salvadorans must be provided with all advisals consistent with *Orantes*.


Respectfully,

████████
(A) Assistant Chief
U.S. Border Patrol Headquarters
LEOD/Immigration Prosecutions and Custody

GOV: 
C:

**BLUF:** All Illegal Aliens (IA) subject to the Presidential Proclamation, *Guaranteeing the states protection against invasion,* are eligible for Convention Against Torture (CAT) claims under 212(f).

The following guidance provides additional information and describes the processing and referral actions necessary to document any CAT claims under 212(f).

Under the CAT process there is **no consultation period or right to counsel**.  IAs are required to have a private screening area during their interview.

IA's apprehended by USBP that are subject to the Proclamation who manifests or expresses fear of the country where USBP would like to return them, (e.g. Mexico, Canada, or their home country) should be processed according to the instructions below:

For direct repatriations to Mexico:

- ██████████████████████████████
- ██████████████████
- ███████████████████
- ██████████████████████████████████████
- Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- ███████████████████████████
- Once USCIS accepts the interview referral, schedule the IA for a CAT interview using the USCIS SharePoint site.

For IA's processes under the ████████████ removal pathway that can be easily removed to their home country or Mexico:

- ████████████████████████
- █████████████████
- ████████████████
- ████████████████████████████████
- Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- ██████████████████████
- Once USCIS accepts the interview referral, schedule the IA for a CAT interview using the USCIS SharePoint site.

For IA's from hard to remove countries:

- █████████████
- ██████████████████████

▮ ▬▬▬▬▬▬▬▬
▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

- Annotate in the I-213 narrative that the subject will be referred to USCIS for a CAT interview and **include the country of return** so that USCIS can determine fear of torture to that country.
- Refer to ERO for detention and CAT interview.

If for any reason the designated country of removal changes, and the IA manifest fear for the newly designated country they must be re-screened for the newly designated country.

Once USCIS adjudicates the claim, they will issue a determination.
- If negative, USCIS will issue the determination and USBP should continue with the process of repatriation or removal.
- If positive reprocess as a ▮▬▬▬▬ and submit to CAS for ERO detention.

If Electronic Referrals or the USCIS Scheduling SharePoint is unavailable, please refer to the emails below to refer and schedule the CAT interview.

Automated referral system will be updated on 2/13/2025

USCIS SharePoint link: CAT Scheduling Tool App

| Inbox | Purpose |
|---|---|
| ▬▬▬▬▬▬▬▬▬▬▬ | General BP mailbox for all Northern and Coastal Sectors |

**BLUF:** **Section 3 of Proclamation 10888,** *Guaranteeing the States Protection against Invasion***, suspends and limits entry of certain illegal aliens encountered by U.S. Border Patrol between the ports of entry at the southern, northern, and coastal border.**

- This applies to certain illegal aliens who entered the United States after 1800 hours EST January 20, 2025.

Aliens seeking to enter the United States must provide Federal officials with sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(l)-(3) of the INA. Under Section 3 of the Proclamation, the entry of aliens who failed to provide such information is suspended, and they are restricted from invoking provisions of the INA, **including asylum**, that would permit their continued presence. Presumptively, any alien with valid travel documents has already fulfilled these requirements.

An alien subject to the Proclamation may be processed as a 212(f) Direct Repatriation (**if able to be repatriated to their country of last transit)** or an Expedited Removal (ER).



The appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances. This includes family units and family groups, as appropriate. In all cases, the appropriate processing disposition should be determined on a case-by-case basis, considering the totality of the circumstances.

Unaccompanied Alien Children (UAC) shall continue to be processed under normal processing procedures consistent with the TVPRA.  Family units shall continue to be processed consistent with the requirements of *Flores* and the *Ms. L v. ICE* Settlement Agreement

The below workflows describe the steps and processes to be followed when processing an illegal alien for 212(f) Direct Repatriation or Expedited Removal. For all such illegal aliens, agents **should not use Form I-867A, Form I-867B**, or Form M-444, or ask specific fear questions. These forms are not available in either e3 disposition described below. ==Agents will refer any alien who manifests fear to U.S. Citizenship and Immigration Services (USCIS) for a Convention against Torture (CAT) screening. (See attached CAT screening guidance)==

Illegal aliens who entered before the Proclamation's suspension and limitation on entry was active, or those encountered after the suspension and limitation on entry is discontinued, should be processed via the preexisting ER and ER/Credible Fear dispositions, which include the above listed forms. This is determined by the entry date and time, including the full scope ER authority.

**212(f) Direct Repatriations to Country of Last Transit**





- ████████████████████████████████████████
  - ████████████████
  - ████████████████████████
  - ██████████████████████████████████
  - ██████████████████
  - ███
    - Agents will be required to book all subjects under 1182f, from whom DNA is collected ████████████████████████████████████████. These subjects should be booked under 8 USC 1182 (Inadmissible Aliens).

**212(f) Expedited Removal** ███████

- ████████████████████████████████████████
  ██████████████████████████████████████████████
  - ████████████████████████
  - ██████████████████
  - ██████████████████████████████████████
    - ████████████████████████████████████
    - ████████████████████
    - ██████████████████████████████
    - ██████████████████
    - ██████████████
    - ████████████████████
    - ████████████████
  - Salvadorans must be provided with all advisals consistent with *Orantes*.

| From: | ██████████████ |
|---|---|
| To: | OPS EAST SECTOR; OPS WEST SECTORS; OPSCENTRALSECTORS |
| Cc: | Immigration Prosecution & Custody OPS; ████████; I██████████ |
| Subject: | Update 212F Third Country |
| Date: | Wednesday, February 19, 2025 5:31:48 PM |
| Attachments: | 212 Tear Sheet FINAL.docx |
| | 212(f) process model FINAL.docx |

Corridors,

BLUF: The United States (U.S.) has enacted agreements with several Central American countries to receive third country nationals who have illegally entered the U.S. These aliens are primarily citizens of countries that the Department of Homeland Security (DHS) has identified as "Hard to Remove." DHS is implementing the below process to document the encounter and transfer of these aliens out of custody.

**DHS PROCESS:**

- All illegal aliens subject to Presidential Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, will be processed pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act.
- Customs and Border Protection (CBP) will notify illegal aliens not being directly transferred to their country of citizenship or nationality to which country they will be sent.
    - Verification and status of countries currently accepting third country nationals from the United States will be confirmed with DHS OIA prior to movement.
    - Aliens will be presented with the 212(f) Tear Sheet noting the country of designation.
    - In accordance with Presidential Proclamation 10888, the alien will not be asked fear questions.
- Illegal aliens who manifest a fear of the country to which CBP intends to return them, will be referred to United States Citizenship and Immigration Services (USCIS) for a Convention Against Torture (CAT) screening.
- CBP will include on the I-213 the designated country of return and provide this to USCIS so that USCIS can screen the alien for the appropriate country.
    - USCIS will interview the alien and issue a determination:
        - Negative: CBP will continue with transfer of the alien to the designated country.
        - Positive: CBP may designate another third country for removal or CBP may place the alien into proceedings with the Executive Office of Immigration Review (EOIR) for final adjudication of their CAT claim.
    - If for any reason the designated country changes after USCIS has issued a determination and the alien manifests a fear for the newly designated country, CBP will again refer the case to USCIS for another CAT screening relative to the newly designated country.
        - 
- Once DHS processing is complete, including a finding of no fear by USCIS or if the

alien has not manifested a fear, the alien can be transferred to the designated country on the next scheduled movement.

**Border Patrol**

**212(f) Direct Repatriations to Third Country**

- 
-
-
-
-
-
-
  - Agents will be required to book all subjects under 1182f, from whom DNA is collected ███████████ These subjects should be booked under 8 USC 1182 (Inadmissible Aliens).
- Document the issuance of the Tear Sheet within the I-213 Narrative.
- Alien will be provided the Tear Sheet. (b) (5) ███████████████████

████████
Division Chief
USBP Headquarters, LEOD
Immigration, Prosecution, and Custody Operations
U.S. Border Patrol Headquarters
C: ███████████

**Transportation to [Insert Country]**

**<u>Presidential Proclamation 10888 -- Guaranteeing the States Protection Against Invasion</u>**

You are being transported from the United States to _____, under Presidential Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, as an alien whose entry to the United States has been suspended pursuant to sections 212(f) and 215(a) of the Immigration and Naturalization Act, as well as the powers of the President under the Constitution of the United States. The United States has arrangements with countries, including the country noted above, that allow for aliens to be transported there.


By my signature, I acknowledge that this information has been provided to me and I have read and understood the statement contained above.


_____-_____        _____-_____

Print Name [A- Number]                                 Signature [DATE/TIME]



[If translated] - I, _____, read this form to the alien whose signature appears above, in _____ language, which the alien understands.



**U.S. Department of Homeland Security**
**National Security Incident Command Center**
**Washington, D.C.**

**ISSUE / BRIEFING TOPIC:**

The United States (U.S.) has enacted agreements with several Central American countries to receive third country nationals who have illegally entered the U.S. These aliens are primarily citizens of countries that the Department of Homeland Security (DHS) has identified as "Hard to Remove." DHS is implementing the below process to document the encounter and transfer of these aliens out of custody.

**DHS PROCESS:**

- All illegal aliens subject to Presidential Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, will be processed pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act.
- Customs and Border Protection (CBP) will notify illegal aliens not being directly transferred to their country of citizenship or nationality to which country they will be sent.
  - Verification and status of countries currently accepting third country nationals from the United States will be confirmed with DHS OIA prior to movement.
  - Aliens will be presented with the 212(f) Tear Sheet noting the country of designation.
  - In accordance with Presidential Proclamation 10888, the alien will not be asked fear questions.
- Illegal aliens who manifest a fear of the country to which CBP intends to return them, will be referred to United States Citizenship and Immigration Services (USCIS) for a Convention Against Torture (CAT) screening.
- CBP will include on the I-213 the designated country of return and provide this to USCIS so that USCIS can screen the alien for the appropriate country.
  - USCIS will interview the alien and issue a determination:
    - Negative: CBP will continue with transfer of the alien to the designated country.
    - Positive: CBP may designate another third country for removal or CBP may place the alien into proceedings with the Executive Office of Immigration Review (EOIR) for final adjudication of their CAT claim.
  - If for any reason the designated country changes after USCIS has issued a determination and the alien manifests a fear for the newly designated country, CBP will again refer the case to USCIS for another CAT screening relative to the newly designated country.
    - 
- Once DHS processing is complete, including a finding of no fear by USCIS or if the alien has not manifested a fear, the alien can be transferred to the designated country on the next scheduled movement.

**FOR OFFICIAL USE ONLY**

**212(f) Tear Sheet**:

**Transportation to [Insert Country]**

**Presidential Proclamation 10888 -- Guaranteeing the States Protection Against Invasion**

You are being transported from the United States to _____, under Presidential Proclamation 10888, Guaranteeing the States Protection Against Invasion, as an alien whose entry to the United States has been suspended pursuant to sections 212(f) and 215(a) of the Immigration and Naturalization Act, as well as the powers of the President under the Constitution of the United States.  The United States has arrangements with countries, including the country noted above, that allow for aliens to be transported there.

By my signature, I acknowledge that this information has been provided to me and I have read and understood the statement contained above.

_____ - _____
Signature
[DATE/TIME]

[If translated] - I, _____, read this form to the alien whose signature appears above, in _____ language, which the alien understands.

**FOR OFFICIAL USE ONLY**

2



1300 Pennsylvania Avenue, NW
Washington, DC 20229

February 28, 2025

MEMORANDUM FOR:    Executive Directors
Directors, Field Operations
Office of Field Operations

FROM:    Ray Provencio
Acting Executive Director, Admissibility and Passenger Programs
Office of Field Operations

SUBJECT:    Implementation of Active Executive Orders – February 28, 2025

This memorandum and accompanying muster update the guidance package of the same title, issued on February 7, 2025. There are multiple active Executive Orders/Presidential Proclamations as of February 28, 2025, including:

- *Guaranteeing the States Protection Against Invasion* (January 2025)
- *Securing Our Borders* (January 2025)
- *Securing the Border* (September 2024)

Among other authorities, the *Guaranteeing the States Protection Against Invasion* and the *Securing the Border* Proclamations leverage INA 212(f) authorities. This authority provides the ability for U.S. Customs and Border Protection (CBP) personnel to immediately and efficiently repatriate undocumented aliens that are not excepted at all U.S. ports of entry. ███████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████ .

Updates regarding certain non-arriving aliens can be found in the attached muster, in addition to updated refugee processing guidance due to a recent preliminary injunction. Active executive actions do not change existing policies on the identification and processing of unaccompanied alien children (UACs), the processing of children consistent with the *Flores* Settlement Agreement, requirements under *Orantes*, or requirements under the *Ms. L* Settlement Agreement.

Please ensure this memorandum and the attached muster are distributed to port personnel. Should you require additional information, please contact ████████████ Director, Enforcement Programs Division.

For Official Use Only
Law Enforcement Sensitive

USA00022    JA122

## **Muster**

**Date**:                         February 28, 2025

**Topic**:                        Update:  Implementation of Active Executive Orders –
                                  February 28, 2025

**Headquarters POCs**:            Admissibility Policy Concerns: Enforcement Programs Division
                                  (████████████████████@cbp.dhs.gov)

                                  Secondary Processing Systems: HQ USEC Team
                                  (█████████@cbp.dhs.gov)

                                  Operational Concerns: Law Enforcement Operations Division
                                  (████████████████@cbp.dhs.gov)

***This guidance updates the muster, Implementation of Active Executive Orders, issued on
February 7, 2025.***

Overview:
- There are multiple active executive actions as of February 28, 2025, such as:
  - *Guaranteeing the States Protection Against Invasion* (January 2025), specifically,
    Section 3 of Presidential Proclamation 10888, suspends entry to the U.S. at all ports of
    entry (POEs) for aliens who fail to provide sufficient medical information and reliable
    criminal history and background information to enable fulfillment of the requirements
    of sections 212(a)(l)-(3) of the Immigration and Nationality Act (INA), pursuant to
    sections 212(f) and 215(a) of the INA, and restricts access to provisions of immigration
    law that would permit an alien's continued presence in the United States, including, but
    not limited to, Section 208 of the INA.
  - *Securing Our Borders* (January 2025) strengthens immigration response requirements
    and border security measures, ending "Catch and Release" practices, and reiterates the
    appropriate discretionary use of parole on a case-by-case basis.
  - *Realigning the United States Refugee Admissions Program* (January 2025) suspends the
    entry of refugees under the U.S. Refugee Admission Program (USRAP) pursuant to
    sections 212(f) and 215(a) of the INA.
  - *Securing the Border* (September 2024) suspends and limits the entry of certain aliens
    into the United States across the southern border with Mexico, maritime borders
    approximate to the southern border and the Gulf, the Virgin Islands, and Puerto Rico and
    does so during emergency border circumstances pursuant to sections 212(f) and 215(a) of
    the INA.
- Changes in the operational landscape due to the Executive Orders and the Proclamation will
  be addressed by Office of Field Operations (OFO) through strategic resource leveraging in
  the following areas of consideration: pre-processing steps, port security, inspecting aliens in
  the appropriate manner.

For Official Use Only
Law Enforcement Sensitive

Implementation of Active EOs
Page **2** of **11**

Scope:

- The following are not subject to the Proclamation *Guaranteeing the States Protection Against Invasion* (January 2025):
  - U.S. citizens (USCs) and Lawful Permanent Residents (LPRs);
  - Unaccompanied alien children (UAC); and
  - Aliens with valid entry documents or authorizations (e.g., visa, ESTA, or who otherwise provide sufficient medical information or reliable criminal history information).
- Aliens subject to the Proclamation shall not be permitted to cross the international boundary.
  - 
- An undocumented alien who claims or manifests a fear at the international boundary line to CBP personnel is not excepted from the Proclamation.
- Undocumented aliens who have evaded international boundary line operations, via vehicle or other means such as on foot or by rail, are not excepted from the Proclamation.
  - 
- Undocumented aliens using force against CBP personnel to evade international boundary line operations should be referred for prosecution.
- Once present in the United States, all applicants for admission must be inspected and processed by CBP officers.

Processing:

- 
- CBP officers will not provide Forms I-867A and I-867B and will not provide individualized advisals on asylum.
- CBP officers will refer any alien who manifests fear to U.S. Citizenship and Immigration Services (USCIS) for a Convention Against Torture (CAT) screening; USCIS should be contacted at the following address to facilitate CAT screenings: ███████████@uscis.dhs.gov.
  - CAT screening facilitation should occur while subjects are in CBP custody at POEs, when possible.
  -

Implementation of Active EOs
Page **3** of **11**



- When a CAT screening is completed, CBP officers must answer the corresponding "closeout" questions to document the outcome of the interview.
- Should times in custody or detention capacity become an operational concern, transfer to U.S. Immigration and Customs Enforcement (ICE) – Enforcement Removal Operations (ERO) may be required.
- ██████████████████████████████████████████████.

- Aliens who are not subject to the Proclamation because they present valid entry documents (e.g., nonimmigrant visa) or who otherwise provide sufficient medical information or reliable criminal history information during their application for admission and are found to be inadmissible, should still be processed under existing policies and procedures, including sworn statements.

- ████████████████████████████████████████



For Official Use Only
Law Enforcement Sensitive

Implementation of Active EOs
Page **4** of **11**

      o  Event Disposition (Summary)



      o  I-213



      o  I-862



      o

- In all cases, the appropriate processing disposition should be determined on a case-by-case basis, considering the totality of the circumstances; if there are indicators of fraudulent documents or fraudulent activity,

  - Aliens not subject to the Proclamation will be processed in accordance with current policy and practices under Title 8.
- The Proclamation does not change existing policies on the identification and processing of UAC, the processing of children consistent with the *Flores* Settlement Agreement, requirements under *Orantes*, or requirements under the *Ms. L* Settlement.

For Official Use Only
Law Enforcement Sensitive

USA00026    JA126

Implementation of Active EOs
Page **5** of **11**

Port Security:
- POEs will take active, preventative measures when necessary, including the suspension of operations when required due to security concerns.
  - The use of ████████████████████ should be leveraged where available and appropriate.
  - Available law enforcement assets such as ████████████ ████████████████████████ should be deployed where available and appropriate.
  - 
  - 
- When necessary to respond to a specific threat to human life, and when time and circumstances reasonably preclude the exercise of such authority by the Senior Official Performing the Duties of the Commissioner (SOPDOC), the authority to close temporarily any CBP office or POE along the southwest border between the United States and Mexico, or to temporarily take any other lesser action that may be necessary to respond to the specific threat to human life, is delegated (See *Delegation Order 23-026* dated December 07, 2023) to Senior Executive Leadership.

Processing of Refugees:
- On February 25, 2025, the U.S. District Court for the Western District of Washington (State) granted a preliminary injunction on enforcing implementing Sections 3(a), (b), and (c) and Section 4 of Presidential Executive Order 141063, *Realigning the United States Refugee Admissions Program*, issued on January 20, 2025; as such, processing first-time refugees and returning refugees will revert back to guidance in place prior to Executive Order 14163:
  - CBP officers encountering aliens seeking admission to the United States under Section 207 of the Immigration and Nationality Act (INA) with documentation issued by the U.S. Government (i.e., ZZ visa foils) are authorized to admit the aliens under the provisions of INA Section 207.
  - CBP officers encountering aliens who are returning from a foreign visit with documentation authorizing travel (i.e., Form I-571 Refugee Travel Document endorsed as a "Refugee") are authorized to permit such aliens to resume refugee status in the United States.
  - Refugees who appear to be inadmissible for one or more grounds listed in INA Section 212(a) (other than (7)(A)(i)(I)), may be processed for removal proceedings under INA Section 240 or permitted to withdraw their application for admission under INA Section 235(a)(4).

For Official Use Only
Law Enforcement Sensitive

Implementation of Active EOs
Page **6** of **11**

Cessation of "Catch and Release" and Use of Parole:

- The cessation of "Catch and Release" policies do not change any of the requirements of the *Ms. L* Settlement Agreement or CBP policies governing the processing and separation of family units. Families may only be separated in accordance with the *Ms. L* Settlement Agreement. Similarly, the cessation of "Catch and Release" policies does not change any procedures governing the processing of UAC as codified in the Trafficking Victims Protection Reauthorization Act (TVPRA).
  - o 
  - o

- CBP officers inspecting applicants for admission to the United States are reminded that aliens who are charged as inadmissible are expected to be detained until the conclusion of proceedings, pursuant to Section 235(b)(1) and (2) of the INA.
- 
  - o CBP retains discretion under Section 235(a)(4) of the INA to permit an alien to withdraw their application for admission.
- If an inadmissible applicant for admission is not able to immediately depart foreign, then port leadership must take every reasonable action to detain the alien pending removal.
  - o

- Title 6, United States Code Section 211(m) designates CBP POEs as short-term processing locations and defines short term as 72 hours or less.
  - o Long term custody of inadmissible or removable aliens is the statutory responsibility of ICE-ERO.



- o Reporting must be completed in alignment with Operations Directorate (OPS). guidance.
- The following uses of parole may continue with DFO awareness and approval:



- o
- o
- o
- o
- o

- This muster and the requirements herein may apply similarly to certain CBP encounters of non-arriving aliens who are inadmissible or removable including encounters of aliens returned to the U.S. under a Safe Third Country Agreement (STCA).
  - o OFO, in the interest of the recent memorandum, "Operational Priority – Safeguard America by Securing Our Border," should remain steadfast in their duty to protect the public and leverage all methods of enforcement and authorities available to CBP under federal law, especially when new derogatory information is identified for an alien.

- 



  - o (Non-arriving) Presently approved TPS:



  - o (Non-arriving) Presently pending application adjudication for an immigration benefit filed with USCIS:
    - ▪

For Official Use Only
Law Enforcement Sensitive

Implementation of Active EOs
Page **8** of **11**



- o (Non-arriving) Presently in lawful parole status:



- o (Non-arriving) Presently in removal proceedings:



- If ICE-ERO declines custody for any alien requiring detention, DFOs should directly consult with their local ICE-ERO counterparts.
  - o



- Please see the supplemental guidance, attached, regarding those with newly identified derogatory information.

Expansion of Use of Expedited Removal:
- On January 24, 2025, the Acting Secretary of Homeland Security issued a Federal Register notice (90 FR 8139) expanding the authority for CBP to process the following aliens for ER:
  - Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and
  - Aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years.
- Prior to this Federal Register notice, CBP officers were limited to processing ER cases for aliens who were found within 100 air miles of the U.S. border and who had been present in the United States for less than 14 days; and applicants for admission encountered at a POE.
- Inadmissible alien applicants for admission encountered at POEs and who meet the conditions listed in 8 CFR 235.3(b)(2) will not be affected by this notice, and processed in alignment with pre-existing guidance on ER.
- Notwithstanding the processes and procedures applicable to the active executive actions discussed in this muster, the process of referring claims of fear of return or intentions to apply for asylum are not changed by this notice, and such instances should continue to be referred for a Credible Fear screening by USCIS and detained by ICE-ERO.
- CBP officers assigned to task forces with other Department of Homeland Security (DHS) components or conducting outbound operations may encounter aliens subject to the expansion of ER.
  - If serving an Order of Expedited Removal based upon this notice and expansion, CBP officers must clearly articulate upon Form I-213 how CBP determined the alien was amenable to ER.
- (b) (5)

Return or Transfer to Law Enforcement Partners:
- OFO only provides short-term holding of inadmissible aliens for processing, repatriation, and transfer to other partner agencies.
- OFO turns inadmissible aliens not amenable to immediate removal or repatriation, over to law enforcement partners, such as ICE-ERO.
-

Implementation of Active EOs
Page **10** of **11**

**SUPPLEMENTAL GUIDANCE**
**Processing Arriving Aliens in Various Scenarios**



Implementation of Active EOs
Page **11** of **11**



For Official Use Only
Law Enforcement Sensitive

FOUO

**CAT Assessment Instructions and Implementation Guidance
For Alien(s) Whose Entry Has Been Suspended and/or Restricted
Pursuant to INA §§ 212(f) and 215(a)**

Pursuant to INA §§ 212(f) and 215(a), the President has ordered the suspension and/or restriction of entry for certain aliens.

On January 20, 2025, the President issued an Executive Order Guaranteeing the States Protection Against Invasion ("EO"). This EO provides for the suspension and restriction of certain aliens at the southern land border. Aliens whose entry is suspended or restricted pursuant to the EO who manifests fear in relation to the Convention Against Torture (CAT) will be referred to USCIS for a CAT assessment.

**Intake:**
Aliens who manifest fear of torture to a DHS officer or agent will be referred to USCIS for CAT assessment. Families will be referred together.

The DHS referring entity (CBP or ICE) will provide USCIS with an I-213 for each alien referred. The I-213 will include:
- A notation that the alien is being processed pursuant to INA §§ 212(f) or 215(a) and has claimed fear of torture, and
- The designated country of return or removal.

**Interview and Assessment:**

The purpose of the interview is to determine if it is more likely than not that the alien will be tortured in the designated country of return or removal. USCIS is not assessing persecution on account of a protected ground nor is USCIS assessing fear for country of nationality unless the country of nationality is also the proposed country of return or removal.

Interviews must be conducted separate and apart from the general public, and USCIS will provide an interpreter as needed. As these non-adversarial interviews are conducted in secure facilities, the alien is not afforded a consultation period, and we are unable to accommodate a consultant or attorney at the interview.

The Asylum Officer (AO) should review the CAT Assessment Worksheet with the alien. The AO must create a summary of the material facts as stated by the alien. At the end of the interview, the AO must review the summary with the individual and give him or her an opportunity to correct errors.

**Family Units:**

The alien's accompanying spouse and children will be processed together with the individual. No separate assessment worksheet or separate assessment notice is required.

- If an officer determines a family member is more likely than not to be tortured in the designated country of return or removal, that family member becomes the main alien for the CAT Assessment Worksheet and the CAT Assessment Notice. The accompanying family

USA00034    JA134

FOUO

members should be included in the family section. The assessment and analysis should be for the family member who establishes a fear of torture.

- When an officer determines no family member is more likely than not to be tortured in the designated country of return or removal, the officer must fully develop the record for all family members. A parent is listed as the primary alien for the CAT Assessment Worksheet and CAT Assessment Notice. If the analysis is the same for other family members, officers may note that in the additional information section. If any family member's analysis is different from that of the parent, the officer inserts and completes an additional analysis section for that family member.

After completing the interview and analyzing the facts, AOs should complete the CAT Assessment Worksheet and CAT Assessment Notice. These documents should be saved as PDFs, electronically signed, and e-mailed to a supervisory asylum officer for review. Supervisory review is required in all cases. When the supervisor concurs in the decision, the supervisor should sign the document electronically.

**Service:**

Asylum Office staff will provide the CAT Assessment Worksheet and CAT Assessment Notice to the DHS referring entity (CBP or ICE) to include in the A-file. The DHS referring entity will provide a copy of the CAT Assessment Notice to the alien.



# CAT Assessments for Aliens Whose Entry Has Been Suspended and/or Restricted



## Guidance for Asylum Officers and Asylum Office Staff

01/31/2025

# Roadmap



- Background/Legal Framework
- Process Overview
- Standard of Proof
- Eliciting Evidence to Support Determination
- Post-Decision and Service

FOUO                                                                                          2

USA00037    JA137

2

# Background/Legal Framework



- On January 20, 2025, the President issued an Executive Order Guaranteeing the States Protection Against Invasion ("EO").  This EO provides for the suspension and restriction of certain aliens at the southern land border.

- DHS has committed that it will not return persons that are likely to be tortured in the designated country of return or removal.

- As such, aliens whose entry is suspended or restricted pursuant to the EO who manifests fear in relation to the Convention Against Torture (CAT) will be referred to USCIS for a CAT assessment.

USA00038    JA138

3

# Overview of Referral to USCIS



- Aliens who manifest fear of torture to a DHS officer or agent will be referred to USCIS for CAT assessment.

- Families will be referred together.

- CBP or ICE will provide USCIS with an I-213 for each alien being referred. The I-213 will include:

  - A notation that the alien is being processed pursuant to INA §§ 212(f) or 215(a) and has claimed fear of torture, and

  - The designated country of return or removal.

USA00039 JA139

4

# Overview of CAT-Only Assessment



- No mandatory bars to asylum or statutory withholding of removal apply.

- The alien's spouse and children are processed together.

- No opportunity for withdrawal or dissolution.

- Aliens who establish CAT will not be returned or removed to the designated country of removal

USA00040   JA140

5

# Interview Procedures



- **The following interview procedures apply:**
  - Officer may reschedule if the individual is unable to participate effectively in the interview due to illness, fatigue, or other impediments
  - Individual is <u>not entitled</u> to a consultant, legal representative, or a consultation period.
  - Asylum Division will provide interpreter as needed
  - AO must create a summary of material facts as stated by the individual and at the end of the interview the AO must review the summary with the **individual** and give him or her an opportunity to correct errors

FOUO                                                                 6

USA00041    JA141

6

# Standard of Proof



- Aliens referred to USCIS must show it is <u>more likely than not</u> that they will be tortured in the country to which they may be returned.

- Article 3 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)
  - Substantial grounds for believing the alien would be subject to torture
  - Comparable to more likely than not standard

Article 3: No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

# Fear of Return



- Asylum officers assess fear of return to designated country of return or removal
- Burden is on alien to establish credibility and meet standard of proof
- More likely than not standard – standard is higher than "well-founded fear" but lower than "beyond a reasonable doubt"

The purpose of the interview is to determine if it is more likely than not that the individual will be tortured in **[country]**. USCIS is not assessing persecution on account of a protected ground.

# Convention Against Torture (CAT)



**Refresher – Elements:**

- Severe physical or mental pain or suffering

- Specific intent

- Infliction or instigation by, or consent or acquiescence of, a public official acting in an official capacity

- Custody or control

- Lawful sanctions

- The act must cause severe physical or mental pain or suffering
- The act must be specifically intended to cause such pain or suffering
- The act must be inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity
- The applicant must be in the offender's custody or physical control
- The act cannot arise from lawful sanctions

# Convention Against Torture (CAT)



**Refresher:**

- Evidence to Consider

    1. Past Torture

    2. Internal Relocation

    3. Gross, Flagrant, Mass Human Rights Violations

    4. Other Relevant Information

- Standard is more likely than not

- No presumption of future torture if past torture established

- No nexus to a protected ground required

FOUO                                                                                                                    10

When analyzing the elements of CAT per prior guidance, please remember to take into account the factors on this slide.

# Post-Interview and Service



- AO prepares CAT Worksheet and CAT Assessment Notice
- SAO reviews CAT Worksheet and CAT Assessment Notice
- CBP or ICE receives:
  - CAT Assessment Worksheet
  - CAT Assessment Notice
- No IJ review
- CBP or ICE will serve the Assessment Notice to the individual and determine next steps

FOUO                                                                                           11

Guidance on electronically signing PDFs is available here:
https://helpx.adobe.com/acrobat/11/using/signing-pdfs.html.

# Processing Families



- **If an officer determines a family member is more likely than not to be tortured in the designated country of return or removal:**
  - That family member becomes the main alien for the CAT Assessment Worksheet and the CAT Assessment Notice
  - The accompanying family members should be included in the family section. The assessment and analysis should be for the family member who establishes a fear of torture.

- **When an officer determines no family member is more likely than not to be tortured in the designated country of return or removal:**
  - The officer must fully develop the record for all family members.
  - A parent is listed as the primary alien for the CAT Assessment Worksheet and CAT Assessment Notice.
  - If the analysis is the same for other family members, officers may note that in the additional information section. I
  - f any family member's analysis is different from that of the parent, the officer inserts and completes an additional analysis section for that family member.

USA00047

## Convention Against Torture Assessment Worksheet
## For Alien(s) Whose Entry Has Been Suspended and/or Restricted
## Pursuant to INA §§ 212(f) or 215(a)

_____

*Referral Information*

| | |
|---|---|
| Referral date: | |
| Date of Encounter/Apprehension: | |
| Port of Arrival or Border Patrol Station: | |
| Designated Country of Return or Removal: | |

*Interview Data*

| | |
|---|---|
| Interview date: | Interview location:<br>☐ Telephonic<br>☐ In person |
| Language used: | Interpreter used? ☐ Yes  ☐ No |

*Individual Biographic Information*

| | |
|---|---|
| A Number: | |
| Last Name: | First Name: |
| Aliases: | Country of Citizenship: |
| Country of Birth: | Date of Birth: |

*Accompanying Family Members (Delete if Not Applicable)*

| | |
|---|---|
| Last Name: | First Name: |
| Aliases: | Country of Citizenship: |
| Country of Birth: | Date of Birth: |
| Relationship: | |

| | |
|---|---|
| Last Name: | First Name: |
| Aliases: | Country of Citizenship: |
| Country of Birth: | Date of Birth: |
| Relationship: | |

| | |
|---|---|
| Last Name: | First Name: |
| Aliases: | Country of Citizenship: |
| Country of Birth: | Date of Birth: |
| Relationship: | |

☐ Asylum officer read the following paragraph to the individual at the beginning of the screening:

*The President of the United States has invoked U.S. law to suspend or restrict the entry of certain aliens. Aliens may not be returned to a country where it is more likely than not they will be tortured. The purpose of this interview is to determine whether it is more likely than not that you will be tortured in* **[Country]**. *We understand that you have expressed a fear of torture in* **[Country]**. *I am an asylum officer and I am going to ask you questions about why you fear you will be tortured in* **[Country]**.

Rev. 01/31/2025
USA00048    JA148

*It is very important to tell the truth during this interview and that you respond to all of my questions. This may be your only opportunity to give such information. Please feel comfortable telling me why you fear harm. U.S. law has strict rules to prevent the disclosure of what you tell me today about the reasons you fear harm. The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is very important that we understand each other. If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you. If at any time you tell me something I do not understand, I will ask you to explain. Do you understand everything that I have read to you?* ☐ Yes ☐ No

☐ AO placed individual and interpreter under oath

**Part I:** *Notes* (Officer should add additional cells as needed using tab button on keyboard)

| Asylum Officer Question | Individual Response |
|---|---|
| [AO proceed with CAT interview under the "more likely than not" standard.] | |
| | |

***Summary of Material Facts*** *(Officer must create a summary of the material facts as stated by the individual. At the conclusion of the interview, the officer must review the summary with the individual and provide the individual with an opportunity to correct any errors).*

| |
|---|
| |

| **Additional facts relied upon when making determination (COI, family processing notes, etc.):** |
|---|
| |

**Part II:** *Analysis*

| **A. Credibility** *−Select the appropriate box.* | |
|---|---|
| **Individual's testimony was credible** | ☐ |
| **Individual's testimony was not credible:** Considering the identified credibility issues, the absence of reasonable explanations for those issues, and taking into consideration the applicant's individual circumstances and all other relevant evidence, the individual's testimony is found not credible. | ☐ |

| **B. Torture –** *If finding it **more likely than not** that the individual will experience torture in **[Country]**, boxes 1-5 in Part B must be checked "yes". If finding it **not more likely than not** that applicant will experience torture in **[Country]**, only check "no" for the element in Part B on which the claim fails. Any additional facts relied upon that are not in the notes section of this assessment worksheet should be included in the box above.* | |
|---|---|
| 1. Would the individual be subjected to severe physical or mental pain or suffering? | Yes ☐  No ☐ |
| 2. Would the severe pain or suffering in **[Country]** be inflicted by, instigated by, consented to or acquiesced to, by a public official or other person acting in an official capacity? | Yes ☐  No ☐ |
| 3. Would the severe pain or suffering in **[Country]** be specifically intended to inflict severe pain or suffering on the individual? | Yes ☐  No ☐ |
| 4. Would the individual be in the offender's custody or physical control? | Yes ☐  No ☐ |

| 5. Would the severe pain or suffering not arise only from or be inherent in or incidental to lawful sanctions? | Yes ☐   No ☐ |
|---|---|

**Part III:** *Determination. Complete in all cases.*

☐  Individual established it is more likely than not that he or she will be tortured in **[Country]**.

☐  Individual did not establish it is more likely than not that he or she will be tortured in **[Country]**.

*Asylum Officer/Supervisory Asylum Officer Names and Signatures*

| Asylum Officer Name | |
|---|---|
| Asylum Officer Signature | |
| Determination Date | |

| Supervisory Asylum Officer Name | |
|---|---|
| Supervisory Asylum Officer Signature | |
| Approval Date | |

Rev. 01/31/2025
USA00050    JA150

## Convention Against Torture Assessment Notice
## For Alien(s) Whose Entry Has Been Suspended and/or Restricted
## Pursuant to INA §§ 212(f) or 215(a)

| A-Number: | |
|---|---|
| Last Name: | First Name: |
| Interview Date: | Determination Date: |

You were interviewed by a DHS asylum officer to determine whether it is more likely than not that you will be tortured in **[Country]**. The assessment made by the DHS asylum officer, indicated below, will be considered by DHS in determining whether you may be sent to **[Country]**. DHS will provide you with additional information regarding how you will be processed.

☐  You established it is more likely than not that you will be tortured in **[Country].**

☐  You did not establish it is more likely than not that you will be tortured in **[Country]**.

**The following family members are included in this assessment:** *[Delete if Not Applicable]*

| Last Name: | First Name: |
|---|---|

| Last Name: | First Name: |
|---|---|

| Last Name: | First Name: |
|---|---|

| Last Name: | First Name: |
|---|---|

Rev. 01/31/2025

| | |
|---|---|
| **From:** | Asylum Chief |
| **To:** | ▮▮▮▮▮▮▮▮▮ ; ▮▮▮▮ ; ▮▮▮▮▮ ; ▮▮▮▮▮▮ ; ▮▮▮▮▮▮▮▮ ; |
| | ▮▮ ? ▮▮ ? ▮▮▮▮ ? |
| **Cc:** | ▮▮▮ ? ▮▮▮▮▮ ; ▮▮▮▮▮▮ ; ▮▮▮▮▮▮▮ ; |
| **Subject:** | Guidance on Implementation of Executive Order Guaranteeing the States Protection Against Invasion |
| **Date:** | Friday, February 7, 2025 12:18:00 PM |

**FOR INTERNAL USE ONLY**

Asylum Division Colleagues,

Below please find instructions on how to proceed with pending Credible Fear cases in light of the Executive Order Guaranteeing the States Protection Against Invasion ("EO").

*CREDIBLE FEAR CASES NOT YET INTERVIEWED:*

- Please identify any credible fear cases pending interview where the alien entered **on or after** January 20, 2025.
  - If the alien did not apply for admission with valid documents, proceed with the instructions below.
  - If the alien presented a valid visa when applying for admission, please reach out to Asylum HQ for further guidance.

- Identify the corresponding ICE facility using EARM and email that facility's POC(s), cc'ing ▮▮▮▮▮▮▮▮ @uscis.dhs.gov. The email should read as follows:

  **Subject:** USCIS Request for I-213 Update to Reflect 212(f)

  USCIS is requesting that ICE update the I-213 for A#XXX to reflect that the alien is currently being processed in accordance with the *Guaranteeing the States Protection Against Invasion*, 90 FR 8333 (Jan. 20, 2025) Executive Order. The I-213 should:

  - Contain a notation that the alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) and/or 215(a);
  - State that the alien has manifested a fear of torture or is being referred to USCIS for a CAT assessment; and
  - Specify the designated country of return or removal.
    - Please note: The designated country of removal or return must be listed on the I-213 or in an addendum (not in the body of the email)

  Please submit the updated I-213 to ▮▮▮▮▮▮▮ @uscis.dhs.gov by COB Friday, February 7, 2025.

USCIS will begin completing CAT assessments for these cases staring Saturday, February 8, 2025.

Any case specific questions related to CAT assessments should be directed to ███████████ @uscis.dhs.gov.

- ZAP will complete CAT assessment for all corrected I-213s. If ICE does not update the I-213 as requested, ZAP will proceed with completing the CAT assessment using the current I-213 and will assume that the country of removal or return is the alien's country of nationality.

- When the CAT assessment is completed and returned to ICE, ZAP will notify ICE that a CAT assessment was conducted only for the country of nationality and affirmatively remind them to re-refer the alien to USCIS if they designate a different county of removal/return and the individual expresses a fear of torture in that country.

- Any referrals that were erroneously input into Global as CF cases must be deleted from Global. ZAP will track these cases until Global is updated to include CAT assessments.

*CREDIBLE FEAR CASES INTERVIEWED, BUT NOT YET SERVED:*

- Please review all credible fear cases pending service, including those pending decision and SAO review, where the alien entered **on or after** January 20, 2025.
  - If the alien did not apply for admission with valid documents, proceed with the instructions below.
  - If the alien presented a valid visa when applying for admission, please reach out to Asylum HQ for further guidance.

- Please send a list of all cases that fall into this category to ZAP at ███████████ @uscis.dhs.gov.

If you have any questions regarding the implementation of this EO and the processing of CAT assessments, please route them to the appropriate Asylum Headquarters branch through your chain of command.

Thank you,

███████████

Chief, Asylum Division

**FOR INTERNAL USE ONLY**

USA00054    JA154

**[DRAFT] LAS CAT Assessment Guide:**

**Purpose:** This purpose of this guide is to provide an overview of LAS duties (i.e., intake, service, and inbox procedures) with regards to CAT Assessment cases.

# Table of Contents

Background and processing timelines ......................................................................................2

Workflow..............................................................................................................................2

Case Acceptance Steps and Guidelines...................................................................................3

    Step 1: Review submission documents (I-213) .....................................................................3

    *Note on (1): Notation of INA §§ 212(f) or 215(a) ..............................................................3

    **Note on (2): Manifestation of fear language on the I-213 ..................................................3

    ***Note on (3):  Designated country of return or removal ...................................................4

    Step 2: Confirm acknowledgement of acceptance/ request updated documents/ reject referral..........4

    Step 3: Create new case on SharePoint .............................................................................7

    Important reminders for CAT assessment intake/acceptance..............................................7

Inbox procedures..................................................................................................................8

Serving CAT assessment cases ...............................................................................................9

Addendum A: General information to provide to facilities about CAT assessment referrals...................10

## Background and processing timelines

Currently, Asylum District 3 (D3) is responsible for all CAT assessment cases nationwide. This includes Immigration and Customs Enforcement (ICE), Border Patrol (BP) and CBP Office of Field Operations (OFO) facilities

**CAT screenings for BP and OFO cases have a timeline goal of 4 hours from intake to service.** ICE cases should be generally scheduled for the following day, facility-specific procedures permitting.

## Workflow

1. Case referral is received to respective email inbox.
   - ██████████████ @uscis.dhs.gov (for ICE facilities)
   - ██████████████ @uscis.dhs.gov (for OFO facilities)
   - ██████████████ @uscis.dhs.gov (for BP facilities)

2. LAS (or opening SAO for BP/CBP OFO cases) reviews the submission for accuracy (see acceptance steps and guidelines section on page 3) and inputs case into the SharePoint.  The guidance for the CAT Assessment SharePoint is to be used in the interim until Global is ready for use. Please see CAT Assessment SharePoint Go-By (rev. 2.7.2025) for additional guidance on SharePoint.

The SharePoint will automatically notify the MPAs that the case is ready for scheduling.

3. MPAs assign the case to an available AO and updates the SharePoint to reflect which AO is assigned and schedules the case with the facility; The MPA also updates the Rapid Roster in ROSS; The SharePoint will automatically notify the AO that they have been assigned a case;

4. AO completes interview, and with interviewee still on the line, notifies the working SAOs via the respective Teams subchannel that the notes are ready to be reviewed and sends the notes directly to whichever SAO indicates they are available;

5. An SAO reviews the notes in real time for legal sufficiency of the interview in the respective Teams subchannel. If more questions need to be asked, the AO will continue the interview. Otherwise, the AO will complete the case documents, enter the name of the SAO who reviewed the notes in the SharePoint, and indicate in the SharePoint that their casework is complete. The SharePoint will automatically notify the same SAO who reviewed the notes that the documents are ready. At this point the AO will be ready for additional case scheduling;

6. The SAO completes case review and finalizes the documents, uploads the completed documents to the SharePoint, and indicates that SAO review is complete. The SharePoint will notify the LAS team that the case is ready for service; and

7. The LAS team serves the finalized case documents back from the same inbox through which the referral was received by reply to the referral email and indicates on the SharePoint that the case is closed.

USA00056    JA156

## Case Acceptance Steps and Guidelines

### Step 1: Review submission documents (I-213)

Only an I-213 is required for CAT Assessment cases. For FAMUs, there should be one I-213 per FAMU. No orientation docs or other documents are required. The I-213 should include the following information:

1. Contain a notation that the alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) and/or 215(a)*;

2. State that the alien has manifested a fear of torture or is being referred to USCIS for a CAT assessment**; and

3. Specify the designated country of return or removal***.

   o  Please note: The designated country of removal or return must be listed on the I-213 or in an addendum (not in the body of the email)

   **\*Note on (1): Notation of INA §§ 212(f) or 215(a)**

   - Some cases may reference 212F generally or Securing the Borders, with no mention of the 1/20 Executive Order Guaranteeing the States Protection Against Invasion. USCIS should make a reasonable effort for OFO/ICE/BP to provide updated I-213s when the I-213 does not contain this language. A reasonable effort constitutes USCIS requesting an updated I-213 with the requested information and specifying we are requesting this information by COB the day the correspondence is sent. Should the information not be received by COB, we can proceed with the current I-213 provided that:

     ▪ The alien entered on or after 1/20/2025;

     ▪ If the alien did not apply for admission with valid documents. If the alien presented a valid documents (e.g., a valid visa or boarding foil for advanced parole when applying for admission, please reach out to a Section Chief for guidance prior to accepting the referral; and

     ▪ 212(f) was not initiated as the result of an anterior ICE/HSI apprehension. If you are reviewing the I-213 for a case and the alien was apprehended in the interior of the USA, please reach out to a Section Chief for guidance prior to accepting the referral.

   **\*\*Note on (2): Manifestation of fear language on the I-213**

   - Although District 3 is encouraging ICE/BP/OFO to include language in the I-213 referencing the alien's manifestation of a fear of torture, we are not

USA00057  JA157

requiring that this language be present on the I-213 to accept CAT assessment cases. As such, LAS should not reject cases or follow up requesting an updated I-213 for this reason. *(Background: referring offices have received guidance to only refer cases for aliens who have affirmatively expressed a fear of torture, so USCIS honors that the case has met this referral threshold by the act of referring the case to USCIS for a CAT assessment).*

### ***Note on (3): Designated country of return or removal

- One country of return or removal should be listed on the I-213. If the I-213 lists multiple countries of return or removal or does not include a country of return or removal, we should respond requesting they ICE/BP/OFO resubmit the I-213 by COB that day. If we do not receive the updated I-213 by COB that day, we will proceed with the case and screen for the alien's country of nationality as the country of return or removal.

- Provided that the language is clear in I-213 to which country the alien would be returned, there is no required standardized format for this language on the I-213.

- As FAMUs are processed together, provided that the PA has a designated country of removal listed on the I-213, we do not need to reject the case based on this criteria and can accept the case using the PA's country of removal for all family members.

- ICE/OFO/BP can resubmit a CAT assessment request for a different country of return or removal, even if USCIS has already served a positive or negative determination. Cases that could initially appear to be a duplicate submission may actually be a resubmission for a different country of return or removal.

### Step 2: Confirm acknowledgement of acceptance/ request updated documents/ reject referral

**Acceptances:**

- When District 3 accepts the case and uploads the case to SharePoint (see document CAT Assessment SharePoint Go-by rev. 2.7. 2025), we should respond to ICE/OFO/BP with the following language:

    - "Thank you for the CAT assessment submission. We have accepted the case, and we will be reaching out soon to schedule an interview."

- When District 3 accepts a case after we have previously requested resubmission for an updated I-213 (for designated country of removal or 212(f)/215(a) language), we should respond with the following message:

> ■ "Thank you again for the submission. As we have not received an updated I-213 with the designated country of removal and/or updated 212(f)/ 215(a) language with the designated time frame, USCIS has accepted the case and will proceed to schedule an interview for the alien's nationality as the designated country of return or removal.  If DHS plans to return or remove the alien to different country for which the alien has affirmatively expressed a fear of torture, a new CAT assessment must be conducted by USCIS prior to removal/return to that country."

**Resubmission required:**

- ○ When the I-213 does not reference include the 212(f) or 215(a) language, or does not reference the Executive Order Guaranteeing the States Protection Against Invasion, we should respond with the following message (provided that the case otherwise meets CAT assessment acceptance criteria):

  > ■ "Thank you for the submission. Upon reviewing the I-213, there is no notation that the alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) and/or 215(a). Please submit an updated I-213 or I-213 amendment (i.e., G-166C) by COB today. Below is an example of language that USCIS would accept on a G-166C to meet this requirement:

  > **[Alien Axxx xxx xxx]** made an unlawful entry into the United States during the suspension of and limitation on entry described in the Presidential Proclamation, Guaranteeing the States Against Invasion under INA 212(f).  The alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) **[or 215(a), if applicable - delete if not applicable]**. The alien has manifested a fear of torture and is being referred to USCIS for a CAT assessment. The alien's designated country of removal is: **[insert country of return or removal - only one country]**."

  > ***Note (do not include in email to ICE/OFO/BP)****: If we do not receive the updated I-213 by COB that day, we will proceed with the case and screen for the alien's country of nationality as the country of return or removal.*

- ○ When a case does not include a designated country of return or removal, OR contains multiple designated countries of return or removal, we should respond with the following message:

  > ■ No Designated Country of Removal: "Thank you for the submission. Upon reviewing the I-213, there is no designated country of return or removal listed. Please submit an updated I-213 or I-213 amendment (i.e., G-166C) COB today with the country of return or removal listed. Below is an example of language that USCIS would accept on a G-166C to meet this requirement:

USA00059

**[Alien Axxx xxx xxx]** made an unlawful entry into the United States during the suspension of and limitation on entry described in the Presidential Proclamation, Guaranteeing the States Against Invasion under INA 212(f).  The alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) **[or 215(a), if applicable - delete if not applicable]**.The alien has manifested a fear of torture and is being referred to USCIS for a CAT assessment. The alien's designated country of removal is: **[insert country of return or removal - only one country]**."

*Note (do not include in email to ICE/OFO/BP): If we do not receive the updated I-213 by COB that day, we will proceed with the case and screen for the alien's country of nationality as the country of return or removal.*

- ▪ Multiple Designated Countries of Removal: "Thank you for the submission. Upon reviewing the I-213, there are multiple designated countries of return or removal listed. Please submit an updated I-213 or I-213 amendment (i.e., G-166C) by COB today with only ONE designated country of return or removal listed. Below is an example of language that USCIS would accept on a G-166C to meet this requirement:

    **[Alien Axxx xxx xxx]** made an unlawful entry into the United States during the suspension of and limitation on entry described in the Presidential Proclamation, Guaranteeing the States Against Invasion under INA 212(f).  The alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) **[or 215(a), if applicable - delete if not applicable]**.The alien has manifested a fear of torture and is being referred to USCIS for a CAT assessment. The alien's designated country of removal is: **[insert country of return or removal - only one country]**."

    *Note (do not include in email to ICE/OFO/BP): If we do not receive the updated I-213 by COB that day, we will proceed with the case and screen for the alien's country of nationality as the country of return or removal.*

**Rejections:**

- o If the alien's date of entry was prior to 1/20/2025, the case cannot be processed as a CAT Assessment. we should respond to ICE/OFO/BP with the following language:

    - ▪ "Thank you for the email. Per our instructions, we cannot accept this case because the alien entered prior to the 1/20/25 Proclamation. USCIS cannot conduct a CAT assessment for aliens who entered prior to 1/20. Aliens who entered prior to 1/20/25 should be referred as ERCF, SB FR, or RF cases, as appropriate."

Step 3: Create new case on SharePoint

- o Once the cases is accepted, LAS should create a new case for the CAT assessment on the CAT Assessment SharePoint. FAMUs should only be one entry in SharePoint (dependents should be listed in the respective location). Please see CAT Assessment SharePoint Go-By (rev. 2.7.2025) for additional guidance on inputting cases in SharePoint.

Important reminders for CAT assessment intake/acceptance

- o For FAMUs, each family member should have their own I-213. FAMUs should be referred together.

- o If you receive a referral for an unaccompanied minor (UAC), please do not accept and reach out to Section Chiefs for additional guidance.

- o Our OFO/ICE/BP inboxes are not intended for the public. We can respond the following:

  - ▪ "This is not a public-facing inbox. For Asylum District 3's public inbox, please reach out to ██████████████ @uscis.dhs.gov."

- o CAT Assessment Cases are <u>not</u> entitled to a legal representative or consultant. If we receive inquiries about a CAT Assessment case from a legal representative or consultant to our ██████████████ @uscis.dhs.gov inbox, reach out to SLAS and Section Chiefs for additional guidance.

- o Please remember the following for the inboxes re: language referring to our CBP/BP/ICE partners

  - ▪ The OFO inbox has cases coming in from CBP POEs or processing centers. Officers sending District 3 referrals from the OFO inbox are CBP officers, not BP agents.
  - ▪ The BP inbox has cases coming in from BP facilities. Officers sending District 3 referrals from the BP inbox are BP agents, not CBP officers.
  - ▪ The ICE inboxes have cases coming in from ICE facilities. If we receive a referral from ICE to the OFO or BP inboxes, please refer them to the ICE212f inbox.

- o DHS no longer uses the terminology "noncitizens." Going forward, we use the terminology "aliens." Please do not use "noncitizens" in written communications through the inbox.

- o If you see a submission where the alien crossed from the northern border (i.e., entered from Canada to the United States), please reach out to a Section Chief or ADD for guidance prior to accepting the case.

## Inbox procedures

- o Flagging system: when managing the inbox, please note that D3 uses a flagging system to appropriately track cases. Please play close attention to the flags and mark accordingly.  Please see below the relevant flags and mark accordingly. This flagging system enables the LAS managing the inbox to view by category.

  - Pending resubmission
  - Pending intake
  - Accepted (should only mark this when case is created on SharePoint)
  - Inquiry
  - Rejected – not 212F
  - SC Follow-up (i.e., Section Chief Follow-up)
  - Served (should only mark this when the service email is sent to the facility)

- o Signature: For signature on the emails, you can include 'Asylum Division | District 3' as the sender at the bottom of the email. Please also include your initials under the signature (first and last initial)

- o Cc'ing inbox to track conversation: Any time we are sending an email through the inbox, you should cc the inbox itself in the message. This ensures that our communications become part of the tracked conversation, and inbox users do not need to search in 'sent items' to see what the last action taken on the case was.

- o Inbox/completed folder: Once all cases on a particular email string have been served, the emails should be dragged to the 'completed' folder. Rejected cases and inquiries that have been addressed should also be dragged to 'completed' folder. This is important for all of the inboxes, but especially important for the OFO/BP inboxes. All inboxes should only show in the 'inbox' any case or inquiry that is pending. Completed cases should only appear in the 'completed' folder.

## Serving CAT assessment cases

**Step 1:** Upon receipt of a case to serve, confirm that the assessment notice and worksheet correspond to the correct alien.

**Step 2:** Find the email string for the referral in the appropriate box and 'reply all' to that string. Attach the CAT assessment notice and worksheet as attachments. Ensure that each file includes the appropriate language in the file (i.e., CAT assessment notice and CAT assessment worksheet). This is important because the body of the email references the documents as such.

- ▪ The CAT assessment worksheet and notice should be sent as PDFs.
- ▪ ███████████████████████████████████████████████████████████████████████████████████████████████████████
- ▪  Make sure the inbox from which you are sending the email is cc'ed in the email.

**Step 3:** Include and fill out the **required** template language in the email (below):

"Please see the attached CAT **[negative/positive]** assessment determination. Please acknowledge receipt of this email.

The alien was screened for **[country]**. Please note that if DHS plans to remove or return the alien to different country for which the alien has affirmatively expressed a fear of torture, a new CAT assessment must be conducted by USCIS prior to removal/return to that country.

Please note the following for CAT Assessments:

- • The CAT Assessment Notice should be included in the A-file and served on the alien(s).
- • The CAT Assessment Worksheet should be included in the A-file but should not be provided to the alien.
- • No IJ review is afforded for CAT Screenings.

For CAT Screenings, aliens are not entitled to a consultant or legal representative. Consequently, CAT Assessment Notices and CAT Assessment notices should not be provided to an alien's consultant or legal representative without first consulting with USCIS."

**Step 4:**  Update SharePoint to ensure the case is showing as 'completed' and the service email is uploaded as a PDF. That is, LAS should save the sent email as a PDF from outlook and upload as an attachment to SharePoint.

## Addendum A: General information to provide to facilities about CAT assessment referrals

If you receive inquiries for additional information on submitting CAT assessments, you can provide the following information by email:

**Submitting CAT Assessment referrals to Asylum District 3**

The CAT assessments USCIS will be conducting are only for aliens who are subject to the Executive Order Guaranteeing the States Protection Against Invasion, and it only applies to aliens who manifested of fear of torture to a DHS officer or agent. Families should be referred together.  The only document required to submit a CAT assessment referral is an I-213 (one I-213 per family member for FAMUs). ICE/OFO/BP should send the I-213 sent to one of the following inboxes, respectively. If possible, please only submit I-213s for only one single adult or FAMU per email.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮@uscis.dhs.gov (for ICE facilities)
- ▮▮▮▮▮▮▮▮▮▮▮▮▮ @uscis.dhs.gov (for OFO facilities)
- ▮▮▮▮▮▮▮▮▮▮▮▮▮ @uscis.dhs.gov (for BP facilities)

I-213s should include:

- Contain a notation that the alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) and/or 215(a);

- State that the alien has manifested a fear of torture or is being referred to USCIS for a CAT assessment; and

- Specify the designated country of return or removal.

**NOTE***:* T**he designated country of removal or return must be listed on the I-213 or in an addendum (not in the body of the email). For an addendum, USCIS accepts a G-166C with the updated information. Below is an example of language that can be included in the G-166C:

**[Alien Axxx xxx xxx]** made an unlawful entry into the United States during the suspension of and limitation on entry described in the Presidential Proclamation, Guaranteeing the States Against Invasion under INA 212(f).  The alien is being processed pursuant to the Jan. 20, 2025 proclamation implementing INA §§ 212(f) **[or 215(a), if applicable - delete if not applicable]**. The alien has manifested a fear of torture and is being referred to USCIS for a CAT assessment. The alien's designated country of removal is: **[insert country of return or removal - only one country]**.

**Serving CAT assessment Determinations**

As far as decision documents, USCIS will send by email the following documents once a determination has been made. We do not need a signature on the documents, but do require an acknowledgment that the email was received:

USA00064    JA164

- CAT Assessment Worksheet (Goes in A file and is not served on the alien)

- CAT Assessment Notice (Goes in A file and ICE/OFO/BP will serve on the alien)

**<u>Important considerations about CAT Assessment Cases</u>**

- No mandatory bars to asylum or statutory withholding of removal apply. Consequently, we will not be providing USCIS security checks or adverse memos with the decision documents.

- The alien's spouse and children are processed together.

- No opportunity for withdrawal or dissolution.

- Aliens who establish a positive CAT determination will not be returned or removed to the designated country of removal.

- Alien is not entitled to a consultant, legal representative, or a consultation period. Consequently, CAT Assessment Notices and CAT Assessment notices should not be provided to an alien's consultant or legal representative without first consulting with USCIS.

- CBP does not need to provide an orientation prior to the interview (e.g., M-444 or provide credible fear information sheet) – the orientation will be conducted by USCIS at the time of interview.

- If DHS plans to remove or return the alien to different country for which the alien has affirmatively expressed a fear of torture, a new CAT assessment must be conducted by USCIS prior to removal/return to that country.

- Asylum Division will provide interpreter as needed.

- No IJ review is afforded for CAT assessments.

Thank you and feel free to reach out if you have any additional questions.

USA00065    JA165

# ZAP 212 CAT Go-By
## For Internal Use Only

ZAP CAT SharePoint

| Referral | Inboxes |
|----------|---------|
| POE | ████████████ @uscis.dhs.gov |
| BP | ████████████ @uscis.dhs.gov |
| ICE | ████████████ @uscis.dhs.gov |

CAT screenings for cases detained by BP have a timeline goal referral to service of 4 hours. Please ensure the SharePoint is updated timely upon each processing step completion.

The below guidance is to be used in the interim until GLOBAL is utilized.  All substantive questions should be directed to your supervisor or CAT Duty SAO.

**Work Flow**

1. Case referral is received to email inbox;

2. LAS inputs case into the SharePoint and indicates that the case if ready for scheduling in the SharePoint. The SharePoint will automatically notify the MPAs that the case is ready for scheduling;

3. MPAs assign the case to an available AO and updates the SharePoint to reflect which AO is assigned; The MPA also updates the Rapid Roster in ROSS; The SharePoint will automatically notify the AO that they have been assigned a case;

4. AO completes interview, and with interviewee still on the line, notifies the working SAOs via a group Teams chat that the notes are ready to be reviewed and sends the notes directly to whichever SAO indicates they are available; a duty SAO should create a group Teams chat with all AOs and SAOs assigned to the 212(f) caseload at the beginning of each day;

5. An SAO reviews the notes in real time for legal sufficiency of the interview. If more questions need to be asked, the AO will continue the interview. Otherwise, the AO will complete the case documents, enter the name of the SAO who reviewed the notes in the SharePoint, and indicate in the SharePoint that their casework is complete. The SharePoint will automatically notify the same SAO who reviewed the notes that the documents are ready. At this point the AO will be ready for additional case scheduling;

6. The SAO completes case review and finalizes the documents, uploads the completed documents to the SharePoint, and indicates that SAO review is complete. The SharePoint will notify the LAS team that the case is ready for service;

1

USA00066    JA166

# ZAP 212 CAT Go-By

### For Internal Use Only

7. The LAS team serves the finalized case documents back from the same inbox through which the referral was received by reply to the referral email and indicates on the SharePoint that the case is closed.

## <u>Ops - Intake</u>

Upon receipt of emailed referral review I-213 for required 212f or 212a language and a listed designated country of removal. If a family is referred ensure that each member has an I-213 included in the referral email.

### **212(f) PROCLAMATION**

Reply all to the referring email to confirm receipt of referral. If the referring email was forwarded from another Asylum Office, ensure that the confirmation email is sent to the originating referring source (BP/ICE).

[ZAP CAT SharePoint](#)

Click Add new item. Enter the required fields 

- A#
  - o If dependents add A#s
- Alien's Full Name
  - o If dependents add names
- Country of Citizenship
- Country of Removal, found on I-213
- Identify referral source
  - o ICE
  - o OFO (POE)
  - o BP
- Date of referral received
- Date of Encounter
- POE or Encounter Location, found on I-213

Upload the I-213 to the case created in SharePoint. Copy and paste emails from referral email in Case comment box.

Click Save



---

> Ops Work Flow
>
> 1. Review referral
> 2. Add new referral to SharePoint
> 3. Prep Documents for service upon automated notification email
> 4. Reply All to receipt of referral email with service documents

&#128206; **Attachments**

Add or remove attachments



≡ Case Comments

Enter value here

---

# ZAP 212 CAT Go-By
## For Internal Use Only

## Scheduling MPAs

Once a referral has been added to the SharePoint ███████████████ ███ @uscis.dhs.gov will receive an automated email notification.

MPAs should immediately assign an AO to the interview.

- Double click on the A#

📅 **Interview Date and Time**                    👤 **Officer Assigned**

Enter value here                                   Enter a name or email address

- Enter today's date
- Enter AO assigned to interview
- Click Save

**Save**   **Cancel**

## Adjudication – AO

An automated email will be sent when a CAT interview has been assigned. After the CAT Duty SAO has completed the initial review of the notes and confirmed a legally sufficient interview, the AO will upload the completed Worksheet and Assessment Notice to the case in ZAP CAT SharePoint.

- Double Click on the A#
- Enter Case Outcome [Negative, Positive]
  - If the positive is being issued based on the claim of a dependent, enter the A# of the dependent
- Enter name of the SAO who completed the initial review
- Check box Ready for Review
- Upload finalized Worksheet and Assessment Notice, in word document
  - Worksheet XXX_
  - Assessment Notice_ XXX
  - Note: FAMU will only have 1 Worksheet & 1 Assessment Notice for the entire family
  - Do not use digital signature that locks the document



✅ Case Outcome

—

🔲 Ready for Review

✅ Yes

👤 Reviewing SAO

Enter a name or email address

3

# ZAP 212 CAT Go-By
## For Internal Use Only

- Click Save

If the SAO returns the case for additional edits, the AO will receive a subsequent automated email.



## **Adjudications – SAO**

When the AO has finalized and uploaded the Worksheet and Assessment Notice an automated email will be sent confirming the case is ready for final SAO review.

- If additional edits are required by the AO, update Review outcome to Returned to AO

Once documents are SAO reviewed and ready for service
- Ensure final service documents are uploaded, saved as PDF
    - SAO Reviewed_ Worksheet _XXX
    - SAO Reviewed_ Assessment Notice_ XXX
    - After final SAO review concurred uploaded, delete previous AO version documents from SharePoint
- Update Review Outcome to Complete
- Click Save



## **Ops – Service**

After the SAO has completed final review and the case is ready for service to BP/ICE the case will move to the Served queue and an automated email will be sent to ▉▉▉ ▉▉▉ @uscis.dhs.gov.




- Confirm documents uploaded by SAO correspond to the A# listed in SharePoint
- Download the SAO review finalized service documents (Worksheet & Notice Assessment)
    - Note: FAMU will only have 1 Worksheet & 1 Assessment Notice for entire family
- Reply all to the receipt confirmation email, attach finalized service documents, cc'ing the inbox from which you're sending the email.
- Upload a PDF copy of the service email as an attachment to SharePoint.

4

# ZAP 212 CAT Go-By

**For Internal Use Only**

- o If referrals were forwarded from another Asylum Office, ensure that the original BP/ICE referring site is included on the service email
- o If ".com" emails are included on the ICE email ensure no PII is included in the email and attachments are password protected
- o Use the template language outlined in the CAT Operational Guide - Intake/Inbox/ Service for LAS and Opening/Closing SAOs

Last Updated: 2/7/2025

USA00070  JA170

**SUPPLEMENTAL DECLARATION OF** ███████████

I, ███████████████, make the following statement under penalty of perjury:

1. My name is ███████████, and I submit this declaration on behalf of myself, my wife ████████, and our two children ███████████████, as part of our ongoing effort to seek asylum in the United States.

2. We are plaintiffs in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case we are referred to by the initials A.M., Z.A. T.A., and A.T., respectively.

3. We are from Afghanistan, and we came to the United States with the intention of seeking asylum. I and my family fear persecution, torture, and death at the hands of the Taliban.

4. When we crossed the U.S. border with our children on or about February 3, 2025, my wife and I did not know there was any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. We also did not know of any system for submitting that kind of information.

5. We also did not apply for U.S. visas before we crossed the border to seek asylum. We did not think we were eligible for any visa to immigrate to the United States. As far as I know, we were not and still are not eligible for any U.S. visa.

6. But we had previously submitted some information about ourselves and our children to U.S. immigration authorities using the one method we knew of to do that, which was the CBP One phone application. We registered on the CBP One app after we arrived in Mexico around October 2024.

7. We answered all the questions in the CBP One app truthfully and honestly. I do not remember if we had to provide any health or medical information or information about criminal records to register with the CBP One app, but we answered whatever questions that we were asked. Apart from CBP One, I did not know of any other way to provide advance information to the U.S. government before seeking asylum.

8. After we completed the information on CBP One, we received an appointment. We were scheduled to enter the United States with that appointment on the afternoon of January 20, 2025. But when we went to the border crossing for our appointment that day, we were turned back by Mexican officials. We learned that the CBP One appointments had been cancelled, I believe because of the change in presidency.

9. We remained in Mexico for about two additional weeks after that, trying to figure out what we were supposed to do. During those two weeks, I contacted the U.S. consulate in Mexico but I did not receive any guidance or response regarding a path forward. No one from the consulate informed me about any new requirement to submit health or other background information before seeking asylum or about any way for people who want to seek asylum to submit that kind of information.

10. Without knowing what else to do, and fearing for our lives, we decided to enter the United States and ask for protection, which we did on approximately February 3, 2025. At the time we entered, we did not know that the Proclamation existed, and we did not know about any requirements that it imposed. I did not know I needed to provide medical records, and I did not have any medical records in my possession. I do not have a criminal record anywhere, so I do not know what kind of evidence I could have provided on that issue, and regardless I did not have any information about how to do so.

11. For about two months, my family and I were detained by the Department of Homeland Security. While in detention, no U.S. officials mentioned any requirement to provide health or other background information to the U.S. government to seek asylum. Our family did, however, receive a medical exam and at least one vaccine while we were detained. We agreed to receive this vaccine and to the medical exam that we received.

12. As this case has been pending, we were released from custody. I have filed an application for asylum with my wife and children included in the application as my family members. In that application, there are questions about what, if any, criminal background I or my family members have. I truthfully answered those questions, explaining that I have no criminal record in the United States, Afghanistan, or any other country. The same is true for my family.

13. Since filing my application, I have received an appointment notice instructing me to present myself and my family for biometrics. I received the notice on May 13, 2025, and the biometrics appointment is for June 2, 2025. I have every intention of providing all the information that is requested of me at that time, and I intend to comply with all other aspects of the asylum process as is required of me.

DECLARATION SIGNATURE ON THE FOLLOWING PAGE.



May 22, 2025
DATE

## CERTIFICATE OF TRANSLATION

I, ███████, swear under penalty of perjury that I speak English and Pashto and that I have translated this document to the best of my ability. I reviewed this document with ███████ ███ and have incorporated changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated and executed to the best of my knowledge, memory, and belief.



May 22, 2025
DATE

JA173

**SUPPLEMENTAL DECLARATION OF** █████████████████████

I, █████████████████████, make the following statement under penalty of perjury:

1. My name is █████████████████████, and I submit this declaration as part of my ongoing effort to receive an opportunity to seek asylum in the United States.

2. I am a plaintiff in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case I am referred to by the initials N.S.

3. I am from Ecuador, and I came to the United States to seek asylum because of persecution including rapes and kidnapping by my ex-partner, a police officer. I did not bring health records or any kind of criminal background check information with me when I fled Ecuador fearing for my life.

4. When I crossed the U.S. border to seek asylum on or about January 26, 2025, I did not know there was any new requirement to submit health information or other background information to U.S. officials before asking for asylum. I also did not know of any system for submitting that kind of information.

5. I did not apply for U.S. visas before I crossed the border to seek asylum. I did not think I was eligible for any visa to immigrate to the United States. As far as I know, I still am not eligible for any U.S. visa.

6. I also did not try to register for an appointment using the CBP One phone app before I crossed the U.S. border. I did not arrive in Mexico by bus from Guatemala until approximately January 19, 2025. By the time I reached the U.S.-Mexico border, the CBP One appointment system had already been cancelled by President Trump.

7. After I arrived in the United States, I was detained primarily at a detention center in Texas. While I was detained there, none of the officers mentioned anything about a requirement to submit information in advance before seeking asylum or a system for submitting that kind of information.

8. On approximately February 20, 2025, I was deported from the United States to Ecuador. While I was in the United States, no one ever gave me any opportunity to seek protection, even though I told officials that I wanted to seek asylum.

9. I hope that I will get the chance to seek asylum in the United States because I am not safe here in Ecuador. Since I was deported back here in February, my ex-partner has learned that I tried to flee and that I am now back in Ecuador. Because of this, I am trying as best I can to keep a low profile and not go out in public more than necessary.

DECLARATION SIGNATURE ON THE FOLLOWING PAGE.

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on the 22 day of May 2025 in Ecuador

_____                            05/22/2025
                                         _____
                                         Date


CERTIFICATE OF TRANSLATION

I, ████████████████ , swear under penalty of perjury that I speak English and Spanish and that I have translated this document to the best of my ability.  I reviewed this document with ████████████████ and have incorporated any changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated/executed to the best of my knowledge, memory, and belief.

                                         05/22/2025
                                         _____
                                         Date

## SUPPLEMENTAL DECLARATION OF ██████████████

I, ██████████████████, make the following statement under penalty of perjury:

1. My name is ████████████████████, and I submit this declaration as part of my ongoing effort to seek asylum in the United States.

2. I am a plaintiff in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case I am referred to by the initials B.R.

3. I am from Ecuador, and I came to the United States with the intention of seeking asylum. I fear persecution and torture from organized crime in my home country.

4. When I crossed the U.S. border on or about January 26, 2025, I did not know there was any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. I also did not know of any system for submitting that kind of information.

5. I also did not apply for a U.S. visa before I crossed the border to seek asylum. I had to leave the country quickly due to the danger I was in, and I did not have time to go through a visa process. I also did not think I was eligible for any visa to immigrate to the United States. As far as I know, I was not and still am not eligible for any U.S. visa.

6. I did, however, submit some information about myself to the U.S. immigration authorities using the one method I had to do that, which was the CBP One phone application. I registered on the CBP One app after I arrived in Mexico in around January 2025.

7. I answered all the questions in the CBP One app truthfully and honestly. I do not remember if I had to provide any health or medical information, other than things like my height and weight, or information about criminal records, but I answered whatever questions that I was asked. Apart from CBP One, I did not know of any other way to provide advance information to the U.S. government before seeking asylum.

8. Although I completed the information on CBP One, I never received an appointment. I could not keep waiting in Mexico for an appointment because it was not safe for me there.

9. I decided to enter the United States and ask for protection, which I did on approximately January 26, 2025.  At the time I entered, I did not know that the Proclamation existed, and I did not know about any requirements that it imposed. I did not know I needed to provide medical records, and I did not have any medical records in my possession. Although I had brought some medical records with me from home, they were stolen on my journey. I do not have a criminal record anywhere, so I do not know what kind of evidence I could have provided on that issue, and regardless I did not have any information.

10. I have been detained by the Department of Homeland Security since I entered the country in January, so for nearly four months. No U.S. officials have ever mentioned any requirement to provide health or other background information to the U.S. government to seek asylum.

11. I hope that I am able to proceed with an application for asylum.

**DECLARATION SIGNATURE ON THE FOLLOWING PAGE.**

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on the _20th_ day of _May_____ 2025 in Laredo, TX.

05/20/2025
_____
Date

## CERTIFICATE OF TRANSLATION

I, _____, swear under penalty of perjury that I speak English and Spanish and that I have translated this document to the best of my ability. I reviewed this document with _____ and have incorporated any changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated/executed to the best of my knowledge, memory, and belief.

05/20/2025
_____
Date

JA178

**SUPPLEMENTAL DECLARATION OF** ███████████████████████

I, ███████████████████, make the following statement under penalty of perjury:

1. My name is ███████████████████████, and I submit this declaration as part of my ongoing effort to receive an opportunity to seek asylum in the United States.

2. I am a plaintiff in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case, I am referenced by the initials M.A.

3. I am from Egypt, and I came to the United States with my wife with the intention of seeking asylum because I had been previously imprisoned and tortured in Egypt by the ruling military regime for my pro-democracy views.

4. When my wife and I crossed the southern U.S. border on or about January 24, 2025, we did not know there was any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. We also did not know of any system for submitting that kind of information.

5. We also did not apply for U.S. visas before we crossed the border to seek asylum. We did not think we were eligible for any visa to immigrate to the United States. As far as I know, we were not and still are not eligible for any U.S. visa.

6. However, before we finally crossed the border, we used the CBP One appointment system to try to get an appointment for four and a half months. This was the one way we knew about to submit some information in advance before entering the United States to seek asylum.

7. We answered all the questions posed to us in the CBP One application truthfully and honestly. I do not recall what exact questions were posed on the application, but I did try to provide all the information requested that way.

8. Unfortunately, we never got an appointment using CBP One. My wife was pregnant and also very ill. Because we were frequently targeted for robbing, and actually got robbed once and feared for our life, I became worried for her safety and mine. We decided to enter the United States without an appointment and request protection. We did that on approximately January 24, 2025.

9. While this case has been pending, I have remained in detention. My wife has since been released into the United States and delivered our child. I am devastated to have missed the birth of my daughter, who is my first child and also because my wife had a difficult birth and there is no one to help or support her.

10. Since I have been detained, no U.S. immigration officers have ever mentioned anything about any system for submitting health and other information in advance of crossing the border to seek asylum.

11. From detention both I and my attorney have repeatedly tried to explain that I fear persecution and torture and that I would like to be considered for protection. I have made requests along these lines numerous times. I also know that my attorney has done so too, both while I was in CBP custody in late January and since I have been transferred to ICE custody.

12. For many weeks, nothing happened in response to my requests. But then, on May 2, 2025, a security officer at the detention center informed me was being summoned for an interview. There was no advance notice, I could not even ask for my attorney to be present, and I was confused as to where I was going. I was informed by the officer that this was CAT screening interview, and it lasted more than three hours.

13. I asked the officer at the end if I was allowed to file for asylum. The officer told me that the President decreed that I am not allowed to file for asylum. I pleaded to him that I cannot return to Egypt because I will once again be imprisoned and tortured. The Officer said that this was why I was getting a CAT screening. I do not know exactly what that means, but it seems like I am still not being considered for asylum.

14. I have not heard anything from anyone since May 2. I have not yet heard the results of my interview. I am afraid that even though I have a strong claim that I will be tortured in Egypt, the U.S. government will decide to deport there anyway or that they will send me to a third country and that I will not have the ability to contest that decision. Immigration officials have told me that I am not being considered for asylum even though I have also asked for that and even though I came here with the intention of seeking asylum.

DECLARATION SIGNATURE ON THE FOLLOWING PAGE.

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on the 21st Day of May, 2025.



May 21, 2025
DATE

### CERTIFICATE OF TRANSLATION

I, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮., swear under penalty of perjury that I speak English and Arabic and that I have translated this document to the best of my ability. I reviewed this document with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ have incorporated changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated and executed to the best of my knowledge, memory, and belief.

May 21, 2025
DATE

JA181

**SUPPLEMENTAL DECLARATION OF** ███████████████

I, ██████████████, make the following statement under penalty of perjury:

1. My name is ████████████████, and I submit this declaration as part of my ongoing effort to seek asylum in the United States.

2. I am a plaintiff in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case, I am referenced by the initials G.A.

3. I am from Brazil, and I came to the United States fleeing my partner who had abused me for more than three years.

4. When I crossed the southern U.S. border on or about February 1, 2025, I did not know there was any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. I also did not know of any system for submitting that kind of information. In addition, I did not carry with me any medical records because I did not take the time to gather such them before fleeing Brazil.

5. I also did not bring any information with me that might be useful for a background check. I have no criminal record in Brazil, and so I am not sure what kind of information I could have brought that would be relevant for that purpose.

6. Similarly, I did not apply for a U.S. visa before I crossed the border to seek asylum. I did not think I was eligible for any visa to immigrate to the United States, and I did not feel safe spending additional time in Brazil or Mexico to sort that out. As far as I know, I am not eligible for any U.S. visa.

7. On or about February 1, 2025, I crossed into the United States and waited for immigration. Afterward, I was taken into criminal custody and convicted of illegal entry. That criminal case was ████████████████████████████████

8. After my criminal case was completed, I was taken to a different detention center where I have been for a few months. Particularly without any guarantee that I am going to be able to seek protection, this detention has been very hard.

9. Since I have been detained, no U.S. immigration officers have ever mentioned anything about any system for submitting health and other information in advance of crossing the border to seek asylum.

10. Since being detained, I have been working with an immigration attorney so that I can seek protection. The asylum application form contains numerous questions relating to past activity, and I intend to answer all those questions truthfully and completely. I hope to have a chance to seek asylum, especially because I hope to be able to bring my daughter to join me in the United States.

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and ██████████████ d belief.

█████████████████████████████████ Laredo, TX.

05/20/2025
_____
Date

## CERTIFICATE OF TRANSLATION

I, ████████_____, swear under penalty of perjury that I speak English and Portuguese and that I have translated this document to the best of my ability. I reviewed this document with ████████████████ and have incorporated any changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated/executed to the best of my knowledge, memory, and belief.

05/22/2025
_____
Date

**SUPPLEMENTAL DECLARATION OF** ▮▮▮▮▮

I, ▮▮▮▮▮, make the following statement under penalty of perjury:

1. My name is ▮▮▮▮▮, and I submit this declaration on behalf of myself and my two children, ▮▮▮▮▮ as part of our ongoing effort to receive an opportunity to seek asylum in the United States. My husband, ▮▮▮▮, is currently seeking asylum in the United States.

2. We are plaintiffs in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case we are referred to by the initials F.A., K.A., and Y.A., respectively.

3. We are from Turkey, and we came to the United States with the intention of seeking asylum. I and my family fear persecution, torture, and death at the hands of the Turkish government. My family left Turkey with the intention to apply for a CBP One appointment once we arrived in Mexico.

4. My husband came to the United States ahead of us, in October 2024, and he is currently in the United States and has an asylum application pending in immigration court. While he was in Mexico, he tried multiple times to get a CBP One appointment, but he was unable to. So, he crossed the border without an appointment.

5. Right before my husband fled to the United States, our family submitted applications for diversity lottery visas to immigrate to the United States. My husband filled out the application for us, and, to the best of my knowledge, he answered the questions completely and truthfully and submitted all the information required. We did not hear about that application before my husband had to flee Turkey and our application was still pending when I fled with our children. In early May 2025, we learned that we had not been granted visas through the lottery.

6. When my children and I fled, we intended to try and use CBP One. But by the time we got to Mexico, the CBP One app was no longer available. We thought that, because my husband was allowed to pursue asylum, we would also be able to if we entered like my husband did.

7. When we crossed the U.S. border on or about February 3, 2025, I did not know there was any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. I also did not know of any system for submitting that kind of information.

8. I entered the United States with my children after spending as little time in Mexico as we could. We did not feel safe there and stayed inside as much as possible to avoid any danger.

9. Without knowing what else to do, and fearing for our lives, we decided to enter the United States and ask for protection, which we did on approximately February 3, 2025.

At the time we entered, we did not know that the Proclamation existed, and we did not know about any requirements that it imposed. I did not know I needed to provide medical records, though I did arrive to the United States with medical information for myself and my elder son. I was not allowed to give this information to anyone while detained in the United States. I do not have a criminal record anywhere, so I do not know what kind of evidence I could have provided on that issue, and regardless I did not have that information.

10. For about nine days, my children and I were detained by the Department of Homeland Security. While in detention, no one spoke to us in Turkish or gave us any information in Turkish, which is the only language we speak. I don't believe any U.S. officials mentioned any requirement to provide health or other background information to the U.S. government to seek asylum. I did try to provide documents about my husband's asylum case, but no one who I encountered in detention would accept them from me.

11. We were then put on a military airplane and sent to Panama with a bunch of other asylum seekers, where everyone spoke Spanish, which is another language we do not speak. While we were in Panama, we were held in a hotel in Panama City. We were not allowed to use the phone or communicate with the outside world while we were there. I did manage to make one call to some attorneys, which is how I was able to join this case, but that call was also not officially permitted. In fact the attorney I was speaking to had to speak to someone in the hotel in Spanish to convince them to let me keep talking in the one conversation I managed to have.

12. While this case has been pending, we were pressured to accept a flight back to Turkey. While we were at the hotel in Panama City, some government officials came to tell us that if we wanted to stay in Panama, we would have to go to a detention camp in the jungle. This terrified me. I did not know where that camp would be or what it would be like. By the way they talked about it, I was fearful that we would not survive if we got sent there. For that reason, I felt pressured to accept a return to Turkey for myself and my kids.

13. We are now in hiding in Turkey, and I am unable to find a job because of my affiliation with the Gülen religious and political group. Recently, I have grown more fearful that I could be arrested because we have heard of the government arresting people who have traveled abroad recently. So I live in fear every day. I pray that we can reunite with my husband soon.

**DECLARATION SIGNATURE ON THE FOLLOWING PAGE.**

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on the 23 Day of May, 2025 in Turkey.

███████████████                    May 23, 2025
                                   DATE


## CERTIFICATE OF TRANSLATION

I, ███████████ swear under penalty of perjury that I speak English and Turkish and that I have translated this document to the best of my ability. I reviewed this document with ██████ ████ and have incorporated changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated and executed to the best of my knowledge, memory, and belief.

Executed on the 22 Day of May, 2025 in ___Boulder, CO_____.

███████████████                    May 22, 2025
                                   DATE

**SUPPLEMENTAL DECLARATION OF** █████████████████

I, █████████████████████, make the following statement under penalty of perjury:

1. My name is █████████████████████, and I submit this declaration as part of an ongoing effort to receive an opportunity to seek asylum in the United States.

2. I am a plaintiff in the case *RAICES v. Noem*, No. 1:25-cv-306-RDM. In that case, I am referenced by the initials E.G.

3. I am from Peru, and I went to the United Stated to seek asylum because I experienced rape and other persecution for being bisexual.

4. When I crossed the U.S border on or about February 1, 2025, I did not know there were any new requirement to submit health information or other background information to U.S. officials in advance of seeking asylum. I also did not know of any system for submitting that kind of information.

5. I also did not apply for a U.S. visa before I crossed the border to seek asylum. I did not think I was eligible for any visa to immigrate to the United States. As far as I know, I was not and still am not eligible for any U.S. visa.

6. I also did not try to register for an appointment using the CBP One app before I crossed the U.S. border. I did not arrive in Mexico from Guatemala until approximately January 6, 2025. By the time I reached the U.S. southern border later in January, the CBP One appointment system had already been cancelled by President Trump.

7. As soon as I entered the U.S., immigration officials detained me. Almost instantly, they said I was going to be deported. On about February 13, I was deported by plane to Peru. I never got any opportunity to seek any form of protection in the United States even though I tried to express my fear of being sent back to Peru.

8. I am currently living in hiding in Peru. I live every day in fear that my previous attackers will find me and cause me further harm.

9. While I was detained in the United States, no U.S. immigration officer ever mentioned anything about any system for submitting health and other information in advance of crossing the border to seek asylum.

10. Since being deported, I have remained in contact with my attorneys. If I am successful in this case I plan to return to the United States to seek asylum because I am not safe in Peru.

DECLARATION SIGNATURE ON THE FOLLOWING PAGE.

Thank you for considering my statement.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, memory, and belief.

Executed on the 22nd Day of May, 2025.

_____          May 22, 2025
                                                                    _____
                                                                    DATE


CERTIFICATE OF TRANSLATION

I, ▮▮▮▮▮▮▮, swear under penalty of perjury that I speak English and Spanish and that I have translated this document to the best of my ability. I reviewed this document with ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ and have incorporated changes or corrections provided. I declare under penalty of perjury that the foregoing statement has been faithfully translated and executed to the best of my knowledge, memory, and belief.

_____          May 22, 2025
                                                                    _____
                                                                    DATE

JA188

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,

    *Plaintiffs*,

  v.

KRISTI NOEM, *Secretary of Homeland*
*Security, in her official capacity*, *et al.*,

    *Defendants*.

Civil Action No. 25-306 (RDM)

**MEMORANDUM OPINION**

  On January 20, 2025, the President issued a proclamation declaring that "the current

situation at the southern border qualifies as an invasion" because "the sheer number of aliens

entering the United States has overwhelmed the system" and is "prevent[ing] the Federal

Government from obtaining operational control of the border."  Proclamation 10888,

Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333, 8334–35 (Jan. 20,

2025) (the "Proclamation").  The Proclamation, in effect, prevents anyone who crosses the

southern border of the United States at any place other than a designated port of entry, as well as

anyone who enters anywhere else (including at a designated port of entry) without a visa or

without extensive medical information, criminal history records, and other background records,

from applying for asylum or withholding of removal.  On Defendants' telling, this dramatic step

was necessary to restore order to an immigration system that has become overrun by those who

enter the United States without authorization and then seek to stay here by applying for asylum

or withholding of removal.  On Plaintiffs' telling, in contrast, the Proclamation and

implementing guidance ignore the governing statutes and regulations and purport to rely on statutory and constitutional provisions that neither contemplate nor permit such a wholesale rewriting of the Nation's immigration laws.

The Proclamation contains five operative sections, all of which—along with the Department of Homeland Security's implementing guidance—are at issue in this case:

The first and second sections operate together. The first "direct[s] that entry into the United States" on or after January 20, 2025, of "aliens engaged in the invasion across the southern border" is "suspended until [the President] issue[s] a finding that the invasion . . . has ceased." Proclamation, § 1. The implementing guidance clarifies that this group includes aliens who enter the United States "between the ports of entry on the southern land border." Dkt. 52-1 at 5. The second, in turn, restricts those individuals from invoking any provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., "that would permit their continued presence in the United States, including but not limited to" the asylum statute, 8 U.S.C. § 1158. Proclamation, § 2. Sections 1 and 2 of the Proclamation are premised on two statutory sources of authority:  8 U.S.C. § 1182(f), which authorizes the President to suspend or to restrict entry into the United States of any class of aliens if he finds that their entry "would be detrimental to the interests of the United States," and 8 U.S.C. § 1185(a), which makes it "unlawful . . . for any alien to . . . enter the United States, except under such reasonable rules, regulations, and orders and subject to such limitations and exceptions as the President may prescribe."

The third section relies on the same two sources of statutory authority but cuts a broader geographic swath. It applies regardless of the point of entry, and it suspends "entry into the United States of" any alien who, after January 20, 2025, "fails, before entering the United States,

to provide Federal officials with sufficient medical information and reliable criminal history and background information" to permit the government to determine, among other things, whether the alien has "received vaccination against vaccine-preventable diseases," has a communicable disease or dangerous physical or mental disorder, is a drug abuser, has a disqualifying conviction, or poses a threat to national security or public safety, *see* 8 U.S.C. § 1182(a). Proclamation, § 3.  Like Section 2, Section 3 also directs immigration authorities to "restrict" these aliens from obtaining "access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to," the right to apply for asylum.  *Id.*

The fourth section does not rely on any statutory authority but, rather, invokes Article II and Article IV, Section 4 of the Constitution.  Proclamation, § 4.  As relevant here, Article II vests "[t]he Executive Power" of the United States in the President, while Article IV, Section 4 guarantees that "[t]he United States . . . shall protect each [State in the Union] against Invasion." Relying on these constitutional provisions, the Proclamation "suspend[s] physical entry of any alien engaged in the invasion across the southern border of the United States" and "direct[s] the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, to take appropriate actions . . . to achieve the objectives of" the Proclamation. Proclamation, § 4.

Finally, the fifth section directs "[t]he Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, [to] take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border" after January 20, 2025.  Proclamation, § 5.  That provision relies on both the statutory and the constitutional authorities invoked in support of the preceding sections, and "delegate[s]" the President's

relevant constitutional authority to the Secretaries of Homeland Security and State and the Attorney General for purposes of effectuating the Proclamation. *Id.*

Plaintiffs are thirteen individuals—A.M., Z.A., T.A., A.T., N.S., D.G., B.R., M.A., G.A., F.A., K.A., Y.A., and E.G—and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services ("RAICES"), Las Americas Immigrant Advocacy Center ("Las Americas"), and the Florence Immigrant & Refugee Rights Project ("Florence Project"). The thirteen individual plaintiffs, all of whom are or were subject to the Proclamation, have allegedly "suffered past persecution and/or fear future persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion[s]," or have allegedly "suffered or fear torture." Dkt. 12 at 1. They allege that they have fled persecution in Afghanistan, Ecuador, Cuba, Egypt, Brazil, Turkey, and Peru. Dkt. 11 at 9–10 (Am. Compl. ¶¶ 12–19). Some of the individual plaintiffs (N.S., D.G., F.A., K.A., Y.A., and E.G.) have already been removed from the United States—or, as Defendants sometimes call it, "repatriated"—pursuant to the Proclamation, either to their own country or to third countries like Panama. *See* Dkt. 43-3 at 4–5 (Hollinder Decl. ¶¶ 6, 10); Dkt. 43-7 at 4, 6 (Huettl Decl. ¶¶ 8, 21). Other individual plaintiffs (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) are still in the United States. *See* Dkt. 43-3 at 3 (Hollinder Decl. ¶ 4); Dkt. 43-7 at 4–5 (Huettl Decl. ¶¶ 10, 14, 16). The individual plaintiffs seek to proceed both individually and on behalf of a putative class of all others who "were, are, or will be subject to" the Proclamation. *Id.* at 27 (Am. Compl. ¶ 86). The three organizational plaintiffs provide legal services to individuals seeking asylum in the United States and other forms of relief from immigration proceedings. *Id.* at 6–8 (Am. Compl. ¶¶ 9–11).

The fifteen defendants include President Trump, along with three cabinet-level

Departments (the Departments of Homeland Security, State, and Justice); three components of

the Department of Homeland Security (Customs and Border Patrol ("CBP"), Immigration and

Customs Enforcement ("ICE"), and United States Citizenship and Immigration Services

("USCIS")); and multiple agency officials sued in their official capacities (collectively, the

"Agency Defendants").  Dkt. 11 at 11–13 (Am. Compl. ¶¶ 20–35).

Plaintiffs allege that the Proclamation and its implementation are unlawful and mark a

dramatic break with decades of Executive Branch precedent.  Dkt. 11 at 4 (Am. Compl. ¶ 3).

Among other things, they allege that the Proclamation and its implementation supplant the INA

with a non-statutory immigration regime, which violates (1) the asylum statute, which gives

aliens "physically present in the United States" the right to apply for asylum, "irrespective of

such alien's status," 8 U.S.C. § 1158(a)(1); (2) the withholding of removal statute, which

prohibits the Secretary of Homeland Security from "remov[ing] an alien to a country if the

Attorney General [or the Secretary] decides that the alien's life or freedom would be threatened

in that country because of the alien's race, religion, nationality, membership in a particular social

group, or political opinion," 8 U.S.C. § 1231(b)(3); (3) the Foreign Affairs Reform and

Restructuring Act of 1998 ("FARRA"), which implements the United Nations Convention

against Torture and Other Curel, Inhuman, or Degrading Treatment or Punishment ("Convention

Against Torture" or "CAT"), 8 U.S.C. § 1231 note, and the Department of Justice and

Department of Homeland Security regulations implementing FARRA, *see* 8 C.F.R. §§ 208.16,

1208.16, which require immigration officials to process applications for protection under CAT in

a prescribed manner; and (4) the INA generally, which establishes the exclusive procedures for

determining whether and how to remove an alien from the United States.[1]   Dkt. 11 at 34–38
(Am. Compl. ¶¶ 128–31).

Most fundamentally, Plaintiffs posit that the authorities that Defendants invoke in support
of the Proclamation and implementing guidance do not authorize Defendants' actions.   They
challenge Defendants' reliance on 8 U.S.C. § 1182(f), which permits the President to "suspend"
or "restrict[]" entry into the United States, and 8 U.S.C. § 1185(a), which makes it unlawful for
aliens to enter the United States "except under such reasonable rules . . . as the President may
prescribe," to justify the denial of "access to asylum and other forms of protection," Dkt. 11 at 41
(Am. Compl. ¶ 149).   They also allege that the Proclamation exceeds the President's authority
under Article II of the Constitution and his authority, if any, under Article IV, Section 4.   *Id.* at
41–42 (Am. Compl. ¶¶ 155–56).   And they allege that the Proclamation and implementing
guidance violate "fundamental separation-of-powers principles" by purporting to "override
Congress's careful and longstanding decisions to provide protections for noncitizens fleeing
danger."   *Id.* at 42 (Am. Compl. ¶¶ 158–60).

Finally, Plaintiffs assert a series of claims under the Administrative Procedure Act
("APA"), 5 U.S.C. §§ 701 *et seq.*, against the Agency Defendants, alleging that the
implementing guidance is contrary to law, 5 U.S.C. § 706(2)(A).   Dkt. 11 at 38–39 (Am. Compl.
¶¶ 132–37).   Plaintiffs have also raised three APA claims that rely on the administrative record:
two arbitrary-and-capricious claims and a claim that the guidance was adopted without
observance of procedures required by law in violation of 5 U.S.C. § 706(2)(D).   *Id.* at 38–40

---

[1] The Amended Complaint also alleged that the Proclamation violates the Trafficking Victims
Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(a)(5)(D), which provides specific
protection to unaccompanied minors.   Relying on Defendants' representations that they are not
applying the Proclamation to unaccompanied minors, however, Plaintiffs are not currently
pursuing that claim.   Dkt. 52 at 25 n.7.

(Am. Compl. ¶¶ 132–43).  At the joint request of the parties, the Court is holding those claims in abeyance.  Min. Entry (Feb. 26, 2025).  But the Court, nonetheless, required Defendants to produce the complete administrative record, *see* Min. Entry (May 13, 2025), which they did on June 3, 2025, *see* Dkt. 68.

Before the Court are Plaintiffs' motion to certify a class, Dkt. 13; Plaintiffs' motion for a preliminary injunction, Dkt. 14; Plaintiffs' motion for summary judgment, Dkt. 51, which the Court consolidated with the motion for preliminary relief, *see* Min. Order (Feb. 26, 2025); and Defendants' cross-motion for summary judgment, Dkt. 44.  Given the time-sensitive nature of Plaintiffs' challenges to impending "repatriations" and removals, and given the difficult questions posed by Plaintiffs' request that the Court grant relief to those who have already been removed from the United States, the Court will address the claims of those Plaintiffs and putative class members who are currently in the United States in this decision and will, after providing an opportunity for further briefing, address the claims of those who have already been removed in a subsequent decision.

For the reasons that follow, the Court concludes that neither the INA nor the Constitution grants the President or the Agency Defendants authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals from the United States, without an opportunity to apply for asylum or withholding of removal and without complying with the regulations governing CAT protection.  The Court recognizes that the Executive Branch faces enormous challenges in preventing and deterring unlawful entry into the United States and in adjudicating the overwhelming backlog of asylum claims of those who have entered the country.  But the INA, by its terms, provides the sole and exclusive means for removing people already

present in the country, and, as the Department of Justice correctly concluded less than nine months ago, neither § 1182(f) nor § 1185(a) provides the President with the unilateral authority to limit the rights of aliens present in the United States to apply for asylum.  Nor can Article II's Vesting Clause or Article IV's Invasion Clause be read to grant the President or his delegees authority to adopt an alternative immigration system, which supplants the statutes that Congress has enacted and the regulations that the responsible agencies have promulgated.  As the Framers understood, "every breach of the fundamental laws," even when "dictated by necessity," undermines respect for the rule of law and "forms a precedent for other breaches where the same plea of necessity does not exist at all, or is less urgent or palpable." *The Federalist No. 25*, at 167 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Here, nothing in the INA or the Constitution grants the President or his delegees the sweeping authority asserted in the Proclamation and implementing guidance.  An appeal to necessity cannot fill that void.

The Court will, accordingly, **GRANT** in part Plaintiffs' motion for summary judgment, Dkt. 51; will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, and will **DEFER** ruling on the remaining portions of the parties' cross-motions.  The Court will also **DIRECT** that the parties submit a joint status report proposing a schedule for further briefing on whether the Court can and should grant relief to those Plaintiffs and putative class members who are no longer present in the United States.

JA196

# TABLE OF CONTENTS

I. BACKGROUND ................................................................................................. 10

    A.   Statutory and Regulatory Background ............................................................ 10

        1.   Admissibility and Inadmissibility ............................................................ 10

        2.   Statutory Protections: Asylum, Withholding of Removal, and CAT Protection .......... 12

        3.   Formal and Expedited Removal Procedures ................................................... 16

    B.   Prior Administrative Actions ....................................................................... 19

    C.   Challenged Actions ................................................................................... 26

        1.   The Proclamation ................................................................................ 27

        2.   Implementing Guidance ......................................................................... 28

II. LEGAL STANDARD ......................................................................................... 37

III. ANALYSIS ...................................................................................................... 38

    A.   Threshold Issues ...................................................................................... 38

        1.   Article III Standing ............................................................................. 38

        2.   Statutory Jurisdiction .......................................................................... 56

        3.   Causes of Action ................................................................................ 61

    B.   Merits .................................................................................................. 70

        1.   "212(f) Direct Repatriation" and "212(f) Expedited Removal" ............................. 72

        2.   Suspension of Asylum .......................................................................... 89

        3.   Suspension of Withholding of Removal ...................................................... 98

        4.   Extra-Regulatory CAT Protection Procedures ............................................. 100

    C.   Class Certification .................................................................................. 103

        1.   Rule 23(a) ...................................................................................... 105

        2.   Rule 23(b)(2) ................................................................................... 112

    D.   Remedy .............................................................................................. 113

        1.   Vacatur .......................................................................................... 114

        2.   Declaratory Judgment ......................................................................... 117

        3.   Injunction ....................................................................................... 117

    E.   Request for Stay Pending Appeal ................................................................ 125

CONCLUSION .................................................................................................... 128

JA197

## I.  BACKGROUND

**A.**      **Statutory and Regulatory Background**

The INA sets out a comprehensive scheme that governs entry and removal of aliens from the United States.  Among other things, it specifies which aliens may lawfully enter the United States, *see, e.g.*, 8 U.S.C. §§ 1181, 1184; which aliens are inadmissible, *see, e.g.*, *id.* § 1182; which previously admitted aliens are subject to removal, *see, e.g.*, *id.* § 1227; what protections aliens can claim, *see, e.g.*, *id.* §§ 1158, 1231; and the procedures for removing aliens, *see, e.g.*, *id.* §§ 1225(b)(1), 1229a.

1.      *Admissibility and Inadmissibility*

The INA sets forth criteria for determining whether an alien seeking admission is admissible or inadmissible.  Under the INA, no "immigrant"—other than a refugee admitted at the discretion of the Attorney General and certain returning resident immigrants, *see* 8 U.S.C. § 1181(c)—may be admitted into the United States "unless at the time of application for admission he" or she "has a valid unexpired immigrant visa."  *Id.* § 1181(a).  Congress has also specified "[c]lasses of aliens" who are "inadmissible"—*i.e.*, those who are ineligible to receive a visa and ineligible for admission into the United States.  *Id.* § 1182.  An alien is inadmissible, for example, if he or she is "determined . . . to have a communicable disease of public health significance" or fails "to present documentation of having received" specified vaccinations, *id.* § 1182(a)(1) ("Health-Related Grounds"); if he or she has been convicted of "a crime involving moral turpitude," has been convicted of two or more non-political offenses with an aggregate sentence of five years or more, or has "been an illicit trafficker in any controlled substance," *id.* § 1182(a)(2) ("Criminal and Related Grounds"); or if a consular officer has reasonable grounds to believe that he or she is entering the United States to engage in espionage or sabotage or terrorist activity, or "the Secretary of State has reasonable ground[s] to believe" permitting his or

10

her entry "would have potentially serious adverse foreign policy consequences for the United States," *id.* § 1182(a)(3) ("Security and Related Grounds"). "An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General" is also "inadmissible," *id.* § 1182(a)(6), but is deemed "an applicant for admission," *id.* § 1225(a).

Aliens are also inadmissible if they were previously ordered removed or if they were previously unlawfully present in the United States for an extended period. With certain exceptions, an alien who has previously been ordered removed is inadmissible for five years after the date of removal if he or she was removed upon arrival or by means of expedited removal, or ten years after removal otherwise. *Id.* § 1182(a)(9)(A). If an alien has been ordered removed twice or has been convicted of an aggravated felony, that bar increases to 20 years. *Id.* Moreover, even if an alien voluntarily departs from the United States, he or she is deemed "inadmissible" for three years if he or she was "unlawfully present . . . for a period of more than 180 days but less than 1 year," and he or she is deemed inadmissible for ten years if he or she was unlawfully present for a year or longer. *Id.* § 1182(a)(9)(B)(i). But, notably, "[n]o period of time in which an alien has a bona fide application for asylum pending under section 1158 . . . shall be taken into account in determining the period of unlawful presence in the United States" for purposes of this latter provision. *Id.* § 1182(a)(9)(B)(iii).

In addition to the statutory limitations, "Congress has also delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Trump v. Hawaii*, 585 U.S. 667, 683 (2018). "The principal source of that authority, § 1182(f), enables the President to 'suspend the entry of all aliens or any class of aliens' whenever he 'finds' that their entry 'would be detrimental to the interests of the United States.'" *Id.* (quoting 8 U.S.C.

11

§ 1182(f)).  This provision "entrusts to the President the decisions whether and when to suspend

entry . . . and on what conditions."  *Id.* at 684.  A second source of that authority, § 1185(a)(1),

"'substantially overlaps' with § 1182(f)."  *Id.* at 683 n.1 (alteration omitted).  It provides that,

"[u]nless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter

. . . the United States except under such reasonable rules, regulations, and orders, and subject to

such limitations and exceptions as the President may prescribe."  8 U.S.C. § 1185(a)(1).

Inevitably, some aliens gain entry to the United States without being lawfully admitted.

Aliens who enter without being admitted are usually "remov[able]" upon the order of "an

immigration officer," *id.* § 1225(b)(1)(A), or an immigration judge, *id.* § 1229a.  Several

statutory provisions, however, allow otherwise removable aliens to remain in the United States

or restrict the countries to which those aliens may be removed.  Three of these types of relief are

relevant for present purposes: asylum, withholding of removal, and Convention Against

Torture—or CAT—protection.

2.    *Statutory Protections*: *Asylum, Withholding of Removal, and CAT Protection*

Asylum is the most protective of these types of relief.  The INA authorizes the Attorney

General and Secretary of Homeland Security ("Secretary") to grant asylum to any "alien who has

applied for asylum in accordance with the requirements and procedures established by the"

Attorney General or Secretary if "such alien is a refugee within the meaning of" the INA.  8

U.S.C. § 1158(b)(1)(A); *see also id.* § 1103(a)(1) & (3).  An alien qualifies as a "refugee" for

purposes of the INA if he or she is "unable or unwilling to return to, and is unable or unwilling to

avail himself or herself of the protection of" his or her country of nationality (or, in the case of a

person with no nationality, his or her most recent country of residence) "because of persecution

or a well-founded fear of persecution on account of race, religion, nationality, membership in a

particular social group, or political opinion."  *Id.* § 1101(a)(42).  Asylum creates a path to lawful

permanent resident status and citizenship and confers other benefits, including the right to work

in the United States and to receive certain forms of financial assistance from the federal

government.  *See id.* § 1158(c); *see also* Aliens Subject to a Bar on Entry Under Certain

Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55936 (Nov.

9, 2018).

Asylum applications are governed by the INA and its implementing regulations.  Under

the INA, any alien "physically present" or "who arrives in the United States" "may apply for

asylum," regardless of "whether or not" the alien arrived "at a designated port of arrival" and

"irrespective of such alien's status." 8 U.S.C. § 1158(a).  There are, however, exceptions to this

"general" rule.  *Id.*  An alien may not apply for asylum, for example, (1) "if the Attorney General

[or Secretary] determines that the alien may be removed, pursuant to a bilateral or multilateral

agreement, to a country (other than the country of the alien's nationality . . .) in which the alien's

life or freedom would not be threatened," *id*. § 1158(a)(2)(A); (2) if the alien cannot

"demonstrate[] by clear and convincing evidence" that he or she filed his or her asylum

application within one year after arriving in the United States, subject to certain exceptions, *id.*

§ 1158(a)(2)(B); or (3) if the alien, again subject to certain exceptions, "previously applied for

asylum and had such application denied," *id.* § 1158(a)(2)(C).  The INA requires the Attorney

General and the Secretary to "establish a procedure for consideration of asylum applications"

and requires immigration officials to "advise the alien of the privilege of being represented by

counsel and of the consequences . . . of knowingly filing a frivolous asylum application."  *Id.*

§ 1158(d)(1) & (4); *see also id.* § 1103(a)(3).  Aliens may apply for asylum affirmatively or

defensively.  Aliens who are not in any kind of removal proceeding may file an affirmative

application for asylum.  *See id.* § 1158(a)(1); 8 C.F.R. § 208.1(a)(1).  In contrast, aliens who are

subject to regular removal proceedings under 8 U.S.C. § 1229a or expedited removal

proceedings under 8 U.S.C. § 1225(b)(1) may file an asylum application as a defense to removal,

*see* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R.

§ 208.30(f).

     The Attorney General and the Secretary are tasked with determining whether an alien

qualifies for asylum, and their authority to grant or to deny asylum is, for the most part,

discretionary. *See* 8 U.S.C. § 1158(b)(1)(A). There are, however, certain statutory limitations

on their discretion to grant asylum. *See id.* § 1158(b)(2). Neither the Attorney General nor the

Secretary may, for example, grant asylum to an alien who "participated in the persecution of any

person," who has "been convicted by a final judgment of a particularly serious crime," or who

poses "a danger to the security of the United States." *Id.* § 1158(b)(2)(A)(i)–(ii), (iv). In

addition to those statutory limitations, the INA authorizes the Attorney General and Secretary to

issue regulations "establish[ing] additional limitations and conditions, consistent with [8 U.S.C.

§ 1158,] under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see also id.*

§ 1103(a)(3); 6 U.S.C. § 202. The existing regulatory limitations are set forth at 8 C.F.R.

§§ 208.13(c) and 208.35(a).

     An alien who is ineligible for asylum or who is denied asylum may still apply for

withholding of removal and CAT protection. An alien is eligible for withholding of removal if

he or she can show "that it is more likely than not that he or she would be persecuted on account

of" a protected ground if removed from the United States. 8 C.F.R. § 1208.16(b)(2); *see also* 8

U.S.C. § 1231(b)(3). Withholding of removal, accordingly, requires a more substantial showing

than the "well-founded fear of persecution" standard applicable in asylum cases. *See Kouljinski*

*v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007). Unlike asylum, however, withholding of removal

is not discretionary; the INA "*requires* the Attorney General [or the Secretary of Homeland Security] to withhold deportation of an alien who demonstrates that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is deported." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (emphasis added); *see also* 8 U.S.C. § 1231(b)(3) ("[T]he Attorney General *may not* remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.") (emphasis added).  Although withholding is thus mandatory, the relief that it provides is more circumscribed than asylum; withholding does not preclude the government from removing the alien to a third country where the alien would not face persecution, does not establish a pathway to lawful permanent resident status and citizenship, and does not afford derivative protection for the alien's family members. *See* 83 Fed. Reg. at 55939.

The Convention Against Torture, as implemented in the United States, provides another avenue of protection for aliens facing removal.  It is the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."  8 U.S.C. § 1231 note (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture).  Congress has implemented this policy by instructing "the heads of the appropriate agencies" to prescribe regulations to effectuate Article 3 of the United Nations Convention Against Torture.  *See id.*  Under the existing implementing regulations, an alien may establish entitlement to CAT protection by demonstrating "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R.

§ 208.16(c)(2).  Like withholding of removal, CAT protection does not preclude the government

from removing the alien to a third country where he or she would not be tortured.

> 3.    *Formal and Expedited Removal Procedures*

Before 1996, "an individual in the United States without proper documentation could be

considered 'deportable,' 8 U.S.C. § 1251(a) (1995), if, among other things, that person had

'entered the United States without inspection or at any time or place other than as designated by

the Attorney General[,]' *see id*. § 1251(a)(1)(B) (1995)."  *Make The Road New York v. Wolf*, 962

F.3d 612, 618 (D.C. Cir. 2020).  Deportation proceedings involved "a hearing before a special

inquiry officer [at] which the individual had the right to be represented, to examine the

government's evidence, and to present evidence on his or her behalf," and "[a]n officer's

determination that an individual was deportable was subject to judicial review."  *Id.*  Since

enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),

Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), in 1996, however, removal proceedings have

followed two alternative routes, the second of which requires far less process.

Under the first route, which follows the pre-IIRIRA approach, "formal" or "regular"

removal proceedings are conducted before an immigration judge within the Department of

Justice's Executive Office of Immigration Review ("EOIR").  *See* 8 U.S.C. § 1229a.  Under this

route, the alien is entitled to various procedural guarantees, including the rights to written notice

of the charge of removability, to counsel of the alien's choice (at no expense to the government),

to appear at a hearing before an immigration judge and to examine and to present evidence, to

appeal an adverse decision to the Board of Immigration Appeals ("BIA"), and to seek judicial

review.  *Id.* §§ 1229(a)(1), 1229a(b)(4), 1229a(c)(5), 1252(a); 8 C.F.R. §§ 1003.1(b),

1240.11(a)(2), 1240.15.  An alien placed in formal removal proceedings may avoid removal by

establishing, through this adversarial process, that he or she is eligible for asylum, withholding of removal, CAT protection, or some other form of relief. *See* 8 U.S.C. § 1229a(c)(4).

The second type of proceedings, known as "expedited removal," affords considerably less process to a subset of aliens. The INA mandates the use of expedited removal for aliens who are arriving in the United States without valid entry documents. *See id.* § 1225(b)(1)(A)(i). It also authorizes the use of expedited removal for aliens who have "not been admitted or paroled into the United States, and who ha[ve] not affirmatively shown, to the satisfaction of an immigration officer, that [they have] been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Id.* § 1225(b)(1)(A)(iii). With respect to the second category, however, the Secretary has "sole and unreviewable discretion" to apply expedited removal to some, none, or all of the aliens in that group. *Id.* Initially, the Secretary only applied expedited removal to aliens "arriving" at a point of entry or "'interdicted in international or United States waters and brought into the United States.'" *Make The Road New York*, 962 F.3d at 619–20 (citation omitted). Currently, however, the Secretary uses expedited removal to the maximum extent permitted by the statute—that is, for anyone who was not admitted or paroled into the United States and who cannot satisfy the two-year physical presence requirement, regardless of whether that person is found at the border or anywhere else in the United States.[2]

---

[2]  In 2002, the Commissioner of the Immigration and Naturalization Service ("INS") expanded the subclass of those eligible for expedited removal to include "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by a[n] [INS] officer." Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002). In 2004, the Secretary of Homeland Security expanded the subclass once again, this time reaching inadmissible aliens "who [were] physically

Under expedited removal procedures, the Secretary may remove an alien from the United States "without further hearing or review[,] unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" supporting a claim to withholding of removal or CAT protection.  8 U.S.C. § 1225(b)(1)(A)(i).  If "the alien indicates either an intention to apply for asylum . . . or a fear of persecution, the [immigration] officer [is required to] refer the alien for an interview by an asylum officer," who must determine whether the alien has a credible "fear of persecution."  *Id.* § 1225(b)(1)(A)(ii).  For purposes of the asylum officer's assessment, a credible fear of persecution means "that there is a significant possibility . . . that the alien could establish eligibility for asylum."  *Id.* § 1225(b)(1)(B)(v).[3]  If the asylum

---

present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who ha[d] not established to the satisfaction of an immigration officer that they ha[d] been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter."  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48880 (Aug. 11, 2004).

That designation applied until 2019, when the Secretary expressed his intent to "exercise the full remaining scope of its statutory authority" to apply expedited removal procedures to all aliens determined inadmissible under 8 U.S.C. § 1182(a)(6)(C) or 8 U.S.C. § 1182(a)(7).  *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409, 35409 (Jul. 23, 2019).  That designation remained in place until March 2022, when the Secretary returned to the pre-2019 designation.  *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).  Finally, on January 24, 2025, the Acting Secretary rescinded the rescission to again "apply expedited removal to the fullest extent authorized by statute."  Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).

[3]  The standard for establishing a "credible fear" is lower than the standard for obtaining asylum itself.  The Supreme Court has indicated that to prevail on an asylum claim, applicants must establish that there is roughly a 10% chance that they will be persecuted on account of a protected ground if they are returned to their country of origin.  *See Cardoza-Fonseca*, 480 U.S. at 431–32, 440.  In contrast, to prevail at the initial credible fear interview, applicants usually need only show "a significant possibility" that they could establish eligibility for asylum, withholding of removal, or CAT protection.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2).  There is one exception: a 2024 rule created a separate credible fear regime for most aliens who enter the southern border during periods when border crossings are high, which

18

officer determines that the alien has a credible fear, "the alien [is] detained for further

consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically placed in

formal removal proceedings. If, on the other hand, the asylum officer determines that the alien

does not have a credible fear of persecution, "the officer shall order the alien removed from the

United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

**B.    Prior Administrative Actions**

The Proclamation at issue in this case is not the first executive action adopted to restrict

access to asylum for those crossing the southern border, although the two most analogous actions

differ from the present approach in important respects.

In 2018, President Trump issued a proclamation that, like the Proclamation at issue here,

relied on § 1182(f) and § 1185(a) to declare that "[t]he entry of any alien into the United States

across the international boundary between the United States and Mexico," at any point other than

a designated port of entry, "is hereby suspended and limited" for a period of ninety days or until

"an agreement permits the United States to remove aliens to Mexico" pursuant to 8 U.S.C.

§ 1158(a)(2)(A).[4]  Proclamation 9822, Addressing Mass Migration Through the Southern Border

of the United States, 83 Fed. Reg. 57661, 57663 (Nov. 15, 2018) ("2018 Proclamation"). The

2018 Proclamation was unlike the Proclamation at issue today, however, in two respects. First, it

expressly reserved the right of any alien to be "considered for withholding of removal." *Id.*

---

requires aliens to demonstrate a "reasonable probability" that they will be persecuted. *See*
Securing the Border, 89 Fed. Reg. 81156, 81168 (Oct. 7, 2024); *see also infra* at 22–26. That
component of the rule was recently upheld. *See Las Americas Immigrant Advoc. Ctr. v. U.S.
Dep't of Homeland Sec.*, ___ F. Supp. 3d ___, 2025 WL 1403811, at *19 (D.D.C. May 9, 2025).

[4] 8 U.S.C. § 1158(a)(2)(A) provides that an alien may not apply for asylum in the United States
"if the Attorney General determines that the alien may be removed, pursuant to a bilateral or
multilateral agreement, to a country (other than the country of the alien's nationality . . .) in
which the alien's life or freedom would not be threatened."

Second, it did not purport to have any stand-alone effect.  It was, of course, already unlawful to enter the United States outside of a designated port of entry, and so the suspension of entry alone had no separate legal effect on the status of any of the aliens it covered.  8 U.S.C. § 1325(a).  The 2018 Proclamation was given teeth only through an interim final rule promulgated by the Attorney General and the Secretary the same day the President issued the proclamation.

Relying on their authority under 8 U.S.C. § 1158(b)(2)(C) to "establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," the Attorney General and Secretary amended the governing regulations to add the following:

> *Additional limitation on eligibility for asylum*.  For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order.  This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

8 C.F.R. § 208.13(c)(3) (2018); *see also* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934, 55935 (Nov. 9, 2018) (the "2018 Rule").  The 2018 Rule also amended the regulation governing credible fear determinations in expedited removal proceedings, 8 C.F.R. § 208.30, by directing asylum officers to make a "negative credible fear determination" if the alien was in the class of aliens that the rule rendered ineligible for asylum.  *Id*. § 208.30(e)(5) (2018).  Thus, operating in conjunction, the 2018 Proclamation and the joint Department of Justice–Department of Homeland Security rule barred anyone who unlawfully entered the United States across the

southern border after November 9, 2018, from obtaining asylum, but continued to allow qualified applicants to obtain withholding of removal.

The 2018 Rule was short lived. Ten days after the rule was promulgated, a district court issued a temporary restraining order barring its implementation, *see E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018); that court subsequently issued a preliminary injunction further barring implementation, *see E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018); and the Court of Appeals for the Ninth Circuit affirmed that decision, *see E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020), as modified by *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021).

While the Ninth Circuit litigation addressed the plaintiffs' motion for preliminary relief, this Court considered the lawfulness of the 2018 Rule on the merits in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019). After extensive briefing and oral argument, the Court concluded that the interim final rule was unlawful, and it, accordingly, vacated the rule. *Id.* at 147–54. As the Court explained, § 1158(b)(2)(C) permits the Attorney General and Secretary to "establish additional limitations and conditions" of eligibility for asylum, but only to the extent those limitations are "consistent with" § 1158. *Id.* at 148. Section 1158, in turn, provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, *may apply* for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). The parties agreed, moreover, "that a regulation barring all aliens who enter the United States from Mexico outside a designated port of entry from *applying* for asylum would be 'inconsistent with' § 1158(a)(1) and, thus, *ultra vires*." 404 F. Supp. 3d at 148. The only question, then, was whether the rule could survive scrutiny merely because it made all aliens entering from Mexico outside a port of entry *ineligible*

for asylum, rather than barring those individuals from *applying*.  As the Court explained,

common usage, the manner in which asylum claims are considered, and other immigration

regulations made clear that, at least in the relevant context, there was no meaningful difference

between a rule barring the covered aliens from applying for asylum and a rule treating them as

ineligible.  *Id.* at 148–50.  Finally, the Court observed:

> Even assuming that the phrases "may not apply" and "are ineligible" reflect
> some subtle distinction in meaning, the relevant question is not whether the Rule
> uses the exact same words as in the statutory prohibition.  The question, instead,
> is whether the Rule is "consistent with," 8 U.S.C. § 1158(b)(2)(C), the statutory
> mandate that any alien present in the United States "may apply for asylum,"
> regardless of "whether or not" the alien entered the United States "at a
> designated port of arrival," 8 U.S.C. § 1158(a)(1).  Defendants do not even
> attempt to satisfy that test, nor could they.

*Id.* at 149.  Although Defendants initially appealed the Court's decision in *O.A.*, the parties later

agreed to dismiss the appeal.  *See O.A. v. Biden*, 2023 WL 7228024 (D.C. Cir. Nov. 1, 2023).

That is how things stood until June 2024, when President Biden issued a proclamation,

which, like the 2018 Proclamation, invoked § 1182(f) and § 1185(a) to suspend and limit entry of

certain aliens across the southern border.  Proclamation 10773, Securing the Border, 89 Fed.

Reg. 48487 (June 7, 2024) (the "2024 Proclamation").  Unlike the 2018 Proclamation, however,

this proclamation was keyed to the average number of aliens (over a period of 7 consecutive

calendar days, which was later extended to 28 consecutive days) who were either physically

apprehended by U.S. immigration authorities at or near the border within 14 days of their entry

between ports of entry or determined to be inadmissible at a southwest border of entry.  2024

Proclamation, 89 Fed. Reg. at 48491–92, §§ 2, 4; *see also* Proclamation 10817, Amending

Proclamation 10773, 89 Fed. Reg. 80351, 80352 (Oct. 2, 2024).  When the number of

"encounters" fell below a designated number, the suspension was discontinued after a 14-day

waiting period, but it would be reinstated if the 7-consecutive-day average reached a designated

number.  2024 Proclamation, 89 Fed. Reg. at 48491, § 2.

Like the 2018 Proclamation, the 2024 Proclamation was given operative effect through

an interim final—and, later, a final—rule promulgated by the Attorney General and the

Secretary.  And like the 2018 Rule, the 2024 interim final rule, *see* Securing the Border, 89 Fed.

Reg. 48710 (June 7, 2024), and the 2024 final rule, *see* Securing the Border, 89 Fed. Reg. 81156

(Oct. 7, 2024) (together, "2024 Rule"), were premised on the Attorney General and Secretary's

authority to promulgate regulations "establish[ing] additional limitations and conditions,

consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum," 8 U.S.C.

§ 1158(b)(2)(C).  Under both versions of the 2024 Rule, when a suspension of entry is in

effect—referred to as "emergency border circumstances"—a covered alien who enters the United

States across the southern border is ineligible for asylum, except under "exceptionally

compelling circumstances."  8 C.F.R. § 208.35(a); 2024 Rule, 89 Fed. Reg. at 81164; *see also*

2024 Proclamation, § 3(b) (defining covered aliens and excluding, for example, visa holders,

members of the U.S. Armed Forces, and permanent resident aliens).  "Exceptionally compelling

circumstances," include, for example, those facing "an acute medical emergency," facing "an

imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping,

torture, or murder," or who satisfy the definition of a "victim of a severe form of trafficking in

persons" under 8 U.S.C. § 214.201.  8 C.F.R. § 208.35(a)(2).  Beyond this change in asylum

eligibility, the 2024 Rule made a host of additional changes that would apply during "emergency

border circumstances."  Asylum officers would no longer ask specific fear questions to elicit

whether an alien might have a credible fear and, instead, would refer aliens for a credible fear

interview only if they affirmatively manifested fear.  89 Fed. Reg. at 81168, 81232–45.  In

addition, the screening standard in credible-fear interviews was increased from "significant possibility" to "reasonable probability."  *Id.* at 81245–50.

In adopting this rule, the Attorney General and Secretary acknowledged certain limitations contained in the relevant statutory authorities.  First and foremost, they observed that "the [2024] Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures."  *Id.* at 81163.  As they explained, this "recognition that" 8 U.S.C. § 1182(f) does not authorize the President to "affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades." *Id.*  Rather, as the Attorney General and Secretary further explained, although the President's authority under § 1182(f) is broad, it operates only "within its 'sphere,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 683–84), and it "does not authorize the President to override the asylum statute," *id.*  That is because § 1182(f) delegates authority to the President to "'supplement the other grounds of inadmissibility in the INA,'" *id.* (quoting *Trump v. Hawaii*, 585 U.S. at 684)— that is, to specify who may "enter" the United States.  In contrast, "[t]he right to apply for asylum" contained in 8 U.S.C. § 1158(a) "turns on whether a noncitizen is 'physically present' or has 'arrive[d] in the United States," *id.* at 81164 (quoting 8 U.S.C. § 1158(a)(1)).  "As a result, the power under [§ 1182(f)] to suspend 'entry' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States."  *Id.*

Second, the Attorney General and Secretary recognized that their statutory authority to set "additional limitations and conditions" on eligibility for asylum pursuant to § 1158(b)(2)(C) does not extend to withholding of removal (or CAT protection).  Although the 2024 Rule modified certain procedures relating to withholding of removal, the Attorney General and Secretary stressed that the "rule's limitation on asylum eligibility does not affect a noncitizen's

ultimate eligibility for statutory withholding of removal" under § 1231(b)(3). 89 Fed. Reg. at

81253.

Finally, while reserving their objections to the decision, the Attorney General and

Secretary recognized that the Ninth Circuit had concluded that the 2018 Rule was invalid

because any regulation adding limitations to asylum eligibility that do not appear in the statute

must be "consistent with" the statute, 8 U.S.C. § 1158(b)(2)(C), and the statute permits "[a]ny

alien who is physically present in the United States" to apply for asylum, "whether or not" the

alien entered at "a designated port of arrival" and "irrespective of such alien's status," 8 U.S.C.

§ 1158(a)(1). *See* 89 Fed. Reg. at 48735 (citing *E. Bay*, 993 F.3d. at 670). The 2024 Rule sought

to distinguish *East Bay* on the ground that the 2024 Proclamation and 2024 Rule "differ

significantly from the prior categorical bar on 'manner of entry' because they do not treat the

manner of entry as dispositive in determining eligibility." *Id.* Rather, the limitation contained in

the 2024 Rule applied only "during emergency border circumstances" and, even then, the rule

provided asylum officers and immigration judges with authority "to except noncitizens from the

rule's asylum limitation where the noncitizens establish that an exceptionally compelling

circumstance exists." *Id.* As a result, the Attorney General and Secretary took the position that:

> The [2024 Rule] is within the scope of the Departments' authority and does not
> conflict with the statutory requirement that noncitizens "physically present in
> the United States" be permitted to apply for asylum because it adds a limitation
> on asylum eligibility as permitted under . . . 8 U.S.C. 1158(b)(2)(C) and
> (d)(5)(B). The limitation is not a sweeping categorical bar that would preclude
> a grant of asylum solely based on manner of entry, which some courts have
> found to conflict with . . . 8 U.S.C. 1158(a)(1). *E.g.*, *East Bay Sanctuary*
> *Covenant v. Biden* (*East Bay III*), 993 F.3d 640, 669–70 (9th Cir. 2021)
> (concluding that a prior regulation that enacted a bar on asylum eligibility for
> those who entered the United States between designated POEs was "effectively
> a categorical ban" on migrants based on their method of entering the United
> States, in conflict with . . . 8 U.S.C. 1158(a)(1)).

89 Fed. Reg. at 81169–70.

In May 2025, this Court (Contreras, J.) struck down portions of the 2024 Rule.  *See Las Americas Immigrant Advoc. Center v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d __, 2025 WL 1403811 (D.D.C. May 9, 2025).  First, the Court held that the rule's "limitation on asylum eligibility" for aliens who arrive in the United States outside a port of entry "exceed[ed] the authority that Congress conferred on the Secretary of Homeland Security to 'establish additional limitations and conditions' on asylum that are 'consistent with' section 1158 of the INA" because "place-of-entry-based bans" are inconsistent with § 1158's instruction that "asylum is available 'whether or not' a noncitizen arrives 'at a designated port of entry.'"  *Id.* at *14–15 (quoting 8 U.S.C. § 1158).  Second, the Court held that the Secretary's decision to no longer ask specific fear questions and, instead, to refer aliens for a credible fear interview only if they manifested fear was arbitrary and capricious because it "risk[ed] different results for identically situated" aliens.  *Id.* at *15.  It therefore struck down that portion of the regulation as well.  The Court, however, upheld the 2024 Rule's change to the screening standard in credible-fear interviews—the shift from a "significant possibility" to a "reasonable probability" standard— because the Secretary had "reasonably explained why changed circumstances" justified the heightened standard.  *Id.* at *18.

## C.    Challenged Actions

The challenged actions in this case differ from the 2018 and 2024 Proclamations and Rules in several significant respects.  Most notably, unlike the 2018 and 2024 Rules, which relied on the statutory delegation to the Attorney General and the Secretary of authority to establish, "by regulation," "additional limitations and conditions" on *eligibility for asylum*, 8 U.S.C. § 1158(b)(2)(C), the Proclamation at issue here relies exclusively on the President's statutory authority to suspend or restrict *entry into the United States*, 8 U.S.C. §§ 1182(f), 1185(a)(1), and his constitutional authority.  Moreover, rather than engage in a rulemaking, the

Secretary has implemented the Proclamation at issue here through informal guidance, consisting primarily of purely internal email communications with agency personnel.

1.    *The Proclamation*

After describing the difficulties posed by the "ongoing influx" of millions of aliens across the southern border of the United States," the Proclamation contains five operative sections. Proclamation, 90 Fed. Reg. 8333–36.  The first two sections apply to aliens who are "engaged in the invasion across the southern border."  Proclamation, §§ 1–2.  The first, entitled "Suspension of Entry," proclaims that "the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interest of the United States" and invokes § 1182(f) to "direct that entry into the United States of such aliens be suspended" until the President issues an order declaring the invasion over.  Proclamation, § 1.  The second section then directs that "aliens engaged in the invasion . . . are restricted from invoking provisions of the INA that would permit their continued presence in the United States," including the right to apply for asylum under 8 U.S.C. § 1158(a).  Proclamation, § 2.

The third section imposes similar restrictions for "any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements" in 8 U.S.C. § 1182(a)(1)–(3), which, as described above, impose a series of limitations on admissibility on "health-related grounds," "criminal and related grounds," and "security and related grounds."  Proclamation, § 3; *see also* 8 U.S.C. § 1182(a) & (1)–(3).  The Proclamation declares that entry of these individuals into the United States "is detrimental to the interests of the United States" and, once again invoking § 1182(f) and § 1185(a), it "direct[s] that entry into the United States of such aliens be suspended."  Proclamation, § 3.  Those who fall into this category, like those "engaged in the invasion," are also precluded from invoking "provisions of

27

the INA that would permit their continued presence in the United States," including the right to

apply for asylum under 8 U.S.C. § 1158(a).  Proclamation, § 3.

The fourth section take a different approach to the same problem.  It also suspends the

entry of those "engaged in the invasion across the southern border," but rather than rely on any

statutory authority to do so, this section relies on "the authorities provided to [the President]

under Article II of the Constitution of the United States, including [the President's] control over

foreign affairs, and [his authority] to effectuate the guarantee of protection against invasion

required by Article IV, Section 4."  Proclamation, § 4.  The fourth section also "direct[s] the

Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney

General, to take appropriate actions as may be necessary to achieve the objectives of [the

Proclamation], until [the President] issue[s] a finding that the invasion at the southern border has

ceased."  Proclamation, § 4.

Finally, the fifth section directs the Secretary of Homeland Security, acting in

coordination with the Secretary of State and the Attorney General, to "take all appropriate

actions to repel, repatriate, or remove any alien engaged in the invasion across the southern

border of the United States on or after the date of this order."  Proclamation, § 5.  Combining the

sources of authority invoked in support of the preceding sections, this section relies on § 1182(f)

and § 1185(a), as well as a "delegat[ion]" of the President's constitutional authority.  *Id.*

2.    *Implementing Guidance*

In response to the directive that the Secretary "take all appropriate action" to implement

the Proclamation, *id.* § 5, the Department of Homeland Security has issued implementing

guidance regarding the procedures to follow with respect to "alien[s] subject to the

Proclamation," Dkt. 52-1 at 13.  That guidance includes emails sent to U.S. Border Patrol

("USBP") personnel explaining how to process aliens subject to the Proclamation; an Office of

28

Field Operations memorandum describing how to implement active executive orders, including

the Proclamation; and USCIS training materials instructing asylum officers on how to conduct

credible fear interviews for aliens subject to the Proclamation.

    a.  <u>U.S. Border Patrol Emails</u>

The administrative record includes three emails containing USBP guidance.  The first

email has the subject line "Update Field Guidance for Southern Border RE: 212(F) Presidential

Proclamation Guaranteeing the States Protection Against Invasion" and was sent on February 4,

2025, for "disseminat[ion] . . . to all Southwest Border Sectors."  Dkt. 52-1 at 5.  As one might

expect from guidance directed at border agents on the southern border, it is concerned primarily

with the first category of aliens identified in the Proclamation: those "engaged in the invasion

across the southern border."  *See* Dkt. 52-1 at 5; *see also* Proclamation, § 2.  For purposes of

implementing the 2025 Proclamation, the guidance defines an "illegal alien invading the United

States" to mean "an alien who crosses between the ports of entry on the southern land border."

*Id.*  The guidance directs that "aliens invading the United States"—*i.e*., those subject to the

Proclamation—"are **not permitted to apply for asylum**."  *Id.* (emphasis in original).

The second email, also sent on February 4, 2025, has the subject line "Field Guidance for

Northern and Coastal Borders RE: 212(F) Presidential Proclamation Guaranteeing the States

Protection Against Invasion" and was sent "to all Northern and Coastal Border Sectors."  Dkt.

52-1 at 13.  This guidance, in contrast, focuses on the second category of aliens identified in the

Proclamation: those "who fail[], before entering the United States, to provide Federal officials

with sufficient medical information and reliable criminal history and background information,"

Proclamation, § 3.  *See* Dkt. 52-1 at 13.  The guidance provides that "the entry of aliens who

[have] failed to provide such information is suspended, and they are restricted from invoking

provisions of the INA, **including asylum**, that would permit their continued presence."  *Id.*

(emphasis in original).  The guidance also provides that aliens with valid travel documents have "[p]resumptively" provided sufficient information such that they do not fall within the Proclamation's ambit.  *Id.*

Both February 4 emails then describe the procedures to be used when processing individuals subject to the Proclamation.  Those subject to the Proclamation "may be processed" in one of two ways: "as a 212(f) Direct Repatriation" or by "212(f) Expedited Removal" (which is sometimes referred to as "Expedited Removal – Per 212(F)").  *Id.* at 5–6, 13–14.  According to Defendants, the difference between the two pathways is that "[a]liens subject to expedited removal procedures are served with a Notice to Alien Ordered Removed and issued an Expedited Removal Order (Form I-860)," while "[a]liens processed for repatriation are not issued a removal order."  Dkt. 59 at 7.  Beyond the issuance of a notice and order, however, Defendants fail to identify any difference between the two "212(f)" procedures.  According to Defendants, issuance of a removal order matters only because "repatriations do not carry the same immigration or criminal consequences as expedited removal."  *Id.* at 8; *see also* 8 U.S.C. § 1182(a)(9)(A) (aliens "ordered removed" in expedited removal or formal removal proceedings initiated upon the alien's arrival are inadmissible for periods of at least five years); *id.* § 1231(a)(5) (aliens with prior orders of removal can have those orders reinstated if they again enter illegally); *id.* § 1326 (aliens who are removed while "an order of . . . removal is outstanding" and later reenter are subject to criminal penalties).  The February 4 emails instruct that the "appropriate processing pathway for a particular alien should be determined based on the totality of the circumstances," Dkt. 52-1 at 5, 13, subject to the constraint that only aliens "able to be repatriated to their country of last transit" (or, in the case of the Southwest border, to Mexico, *see* Dkt. 52-1 at 5) could be processed by means of a "212(f) Direct Repatriation," *id.*

JA218

The February 4 emails also instruct officers to omit several steps from the INA's

§ 1225(b)(1) expedited removal procedure, regardless of which pathway is followed.  Under

Department of Homeland Security regulations, immigration officers overseeing a § 1225(b)(1)

expedited removal are required to follow precise procedures:  First, the immigration officer

"read[s] (or ha[s] read) to the alien all information contained on Form I-867A," which among

other things, informs the alien that "U.S. law provides protection to certain persons who face

persecution, harm or torture upon return to their home country" and instructs the alien to tell the

officer about any "fear" or "concern" about "being removed from the United States or about

being sent home."  *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867A (*available in* 9 Charles

Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16K (2024)).  Second, the

immigration officer uses Form I-867B to ask the alien specific questions designed to elicit

whether the alien fears persecution or return to their home country and records the answers to

those questions on the form.[5]  *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Form I-867B (*available in*

9 Charles Gordon, *et al.*, Immigration Law and Procedure, App'x B, Ex. 16L (2024)).  Then,

"[i]f an alien subject to the expedited removal provisions indicates an intention to apply for

asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the

officer refers the alien for an interview by an asylum officer and "provide[s] the alien with a

written disclosure on Form M-444," which provides aliens with information about the credible

fear interview process and informs them of their rights to consult with someone prior to the

interview and the right to request review by an immigration judge of an officer's determination.

---

[5] Form I-867B questions include: (1) "Why did you leave your home country or country of last residence?" (2) "Do you have any fear or concern about being returned to your home country or being removed from the United States?" and (3) "Would you be harmed if you are returned to your home country or country of last residence?"

JA219

*Id.* § 235.3(b)(4)(i).  The February 4 emails, however, direct that immigration officers processing aliens subject to the Proclamation "should not use" Form I-867A, Form I-867B, or Form M-444 and should not "ask specific fear questions" at all.  Dkt. 52-1 at 5, 13.  If, however, an alien spontaneously "manifests fear" regarding the country where USBP intends to return him or her to, the immigration officer is instructed to "refer [the] alien" to USCIS for a "Convention against Torture (CAT) screening."  Dkt. 52-1 at 5–6; 13–14.  If the screening comes back negative, meaning that USCIS determined that the alien had not shown it was more likely than not that he or she would be tortured in the relevant country, "USBP should continue with the process of repatriation or removal."  *Id.* at 9.  If it comes back positive, the individual is reprocessed and detained.  *Id.*

The final email included in the administrative record was sent on February 19, 2025, seemingly to all border sectors, to provide them with the "update" that aliens could now be sent to "several Central American countries" with which the United States "has enacted agreements" pursuant to which those countries have agreed "to receive third country nationals who have illegally entered" the United States.  Dkt. 52-1 at 20.  To take advantage of those agreements, the February 19 email advises immigration officers that individuals subject to the Proclamation can be removed by means of "212(f) Direct Repatriations to Third Countr[ies]."  *Id.* at 21.  Before removal, CBP "will notify" anyone who is not being transferred to his or her country of nationality of the "country [to which he or she] will be sent" by giving that person a "212(f) Tear Sheet."  *Id.* at 20, 25.  Aliens "who manifest a fear of the country to which CBP intends to [remove] them" will be referred for CAT screening with respect to that country.  *Id.* at 20.  If the CAT screening is negative, CBP will "continue with transfer of the alien to the designated country."  *Id.*  If the CAT screening is positive, CBP can either "designate another third country

for removal" or place the person into full EOIR proceedings for adjudication of his or her CAT claim.  *Id.*  If another third country is designated, and "the alien manifests a fear for the newly designated country, CBP will again refer the case to USCIS for another CAT screening relative to the newly designated country," and the process starts again.  *Id.*

b.  Office of Field Operations memorandum

The administrative record also includes a February 28, 2025 memorandum sent to various officials in the Office of Field Operations from Ray Provencio, the Acting Executive Director of Admissibility and Passenger Programs in the Office of Field Operations.  Dkt. 52-1 at 26. According to the memorandum, the Proclamation "leverage[s] INA 212(f) authorities" to "provide[] the ability for U.S. Customs and Border Protection . . . personnel to immediately and efficiently repatriate undocumented aliens that are not excepted at all U.S. ports of entry."  *Id.*  It also includes a "Muster" with "[u]pdates regarding certain non-arriving aliens" that reiterates many of the instructions in the emails discussed above and affirms that CAT screening will remain available for those who affirmatively manifest a fear to the immigration officer.  *See, e.g.*, *id.* at 28 ("CBP officers will not provide Forms I-867A and I-867B and will not provide individualized advisals on asylum."); *id.* ("CBP officers will refer any alien who manifests fear to [USCIS] for a [CAT] screening.").  The Muster further directs that a covered "alien[] who claims or manifests a fear at the international boundary line to CBP personnel is not excepted from the Proclamation."  *Id.*

c.  USCIS training materials

The administrative record also contains training materials provided to USCIS personnel, instructing them on the new procedures for CAT assessments.  *See* Dkt. 52-1 at 38–74.  Those documents contain details about specific CAT screening procedures—including which forms to use and how to fill them out.  Essentially, the guidance instructs USCIS asylum officers to use a

much higher screening standard for CAT claims, which departs from the standard set forth in the governing regulations.

Under the governing regulations, asylum officers conduct a credible fear screening, at which the standard of proof asks whether there is "a significant possibility" that it is more likely than not that the individual will be tortured. 8 C.F.R. § 208.30(e)(3). If the alien can carry that burden, he receives notice and moves on to the next stage of the process, where he can be represented by counsel and present witnesses and evidence, and where he must show that it is "more likely than not" that he would be tortured if removed to the proposed country. *Id.* §§ 208.9(b), 208.16(c)(2). The guidance instructs asylum officers to perform CAT "assessments" rather than credible fear screenings. According to the guidance, CBP or ICE will refer an individual who claims a fear of torture to USCIS "for CAT assessment." Dkt. 52-1 at 43. An asylum officer will then conduct a "CAT-Only assessment," *id.* at 44, at which the applicant "must show that it is more likely than not that [the applicant] will be tortured in the country to which [the applicant] may be returned," *id.* at 46. Aliens in CAT-Only assessments are "not entitled to a consultant, legal representative, or a consultation period." *Id.* at 45. In essence, the new procedures require that an alien carry his burden at the initial hearing without the benefit of counsel or consultation. The guidance also makes clear that the assessment is CAT-Only—that is, the applicant is not considered for asylum or withholding of removal.

**D.    Procedural History**

The organizational plaintiffs filed this action on February 3, 2025, *see* Dkt. 1, and promptly amended their complaint to add the individual plaintiffs, *see* Dkt. 11. Plaintiffs also promptly filed a motion for class certification, Dkt. 13; a motion for a preliminary injunction,

Dkt. 14; and an emergency motion to stay the removal of the individual plaintiffs who still remained in the United States, Dkt. 15.

The Court scheduled a hearing for the next day, February 20, 2025. Min. Entry (Feb. 20, 2025). At the hearing, the parties informed the Court that "it appear[ed]" that one of the individual plaintiffs—N.S.—had likely been removed from the United States that morning. Dkt. 19 at 15 (Feb. 20, 2025 Hrg. Tr. 15:5–6). To "preserve the Court's jurisdiction" while the parties briefed the emergency motion, the Court entered an administrative stay prohibiting the government from removing any individual plaintiffs still in the United States pending a hearing on the emergency motion. *Id.* (Feb. 20, 2025 Hrg. Tr. 13:14–19). Defendants subsequently filed a response representing that they will not remove any of the individual plaintiffs pursuant to the Proclamation during the pendency of this case, *see* Dkt. 21 at 2, and the Court, relying on that representation, denied Plaintiffs' emergency motion as moot, Dkt. 23 at 2. The Court also ordered Defendants to "provide the Court and Plaintiffs' counsel with at least seven days' notice before removing any of the individual plaintiffs from the United States during the pendency of this action" to "permit the parties to have the opportunity to be heard, if necessary" before removal. *Id.* at 3. Finally, the Court ordered the parties to file a joint status report addressing "whether the Court should consolidate the hearing on Plaintiffs' Motion for a Preliminary Injunction with the merits, pursuant to Fed. R. Civ. P. 65(a)(2)." *Id.*

The parties agreed to consolidation under Rule 65(a)(2), Dkt. 24, and the Court, accordingly, consolidated the hearing on the preliminary injunction motion with the merits, Min. Entry (Feb. 26, 2025). The parties also proposed that "the Court hold in abeyance any claims based on the administrative record, namely portions of the Sixth Claim for Relief raising arbitrary-and-capricious arguments under the Administrative Procedure Act" to "avoid the need

to set aside additional time in the schedule for Defendants to assemble, review, certify, and

produce the administrative record." Dkt. 24 at 2. In lieu of an administrative record, Defendants

"agree[d] to provide the relevant guidance documents." *Id.* The Court adopted the parties'

proposal and set a briefing schedule for the motion for class certification and for cross-motions

for summary judgment. Min. Entry (Feb. 26, 2025).

The Court held a hearing on those motions on April 29, 2025. *See* Min. Entry. At the

hearing, the Court ordered supplemental briefing from Defendants on two issues: first, whether

an alien subject to the Proclamation could file an affirmative asylum application outside the

context of any removal proceedings and whether doing so would prevent his or her removal or

repatriation, and, second, what the differences were between expedited removal under the

Proclamation ("212(f) Expedited Removal") and repatriation under the Proclamation ("212(f)

Direct Repatriation"). *See* Dkt. 59. The Court also, at Plaintiffs' request, granted leave to file a

supplemental brief on whether 8 U.S.C. § 1252(f)(1) barred class-wide relief and whether, in any

event, class-wide relief was necessary in this case, Dkt. 58, and the Court provided the parties

with an opportunity to respond to each other's supplemental briefs, Dkt. 60; Dkt. 61.

Finally, after the close of briefing, the Court concluded that it required additional

information from both Plaintiffs and Defendants to resolve the pending motions and to ensure

that the record is complete for purposes of any appeal. The Court ordered Plaintiffs to file

supplemental declarations from each individual plaintiff "indicating whether he or she provided

Federal officials with the medical information, criminal history, and other background

information required by the Proclamation," Min. Entry (May 13, 2025), and gave Defendants an

opportunity to respond to those declarations, Min. Entry (May 20, 2025). The Court also ordered

Defendants to compile and produce the complete administrative record. *See id.* The additional

materials have now been filed, *see* Dkt. 64; Dkt. 65; Dkt. 67, and the case is now ripe for

decision as to persons who have not yet been removed from the United States.

## II. LEGAL STANDARD

In the normal course, summary judgment may be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air

Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010),

*aff'd*, 663 F.3d 476 (D.C. Cir. 2011).   On the other hand, "[i]n a case involving review of a final

agency action under the Administrative Procedure Act, . . . the Court's role is limited to

reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Id.*

at 32.   Instead, summary judgment serves as "the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review." *Cath. Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117

(D.D.C. 2009) (internal quotations omitted).

Under the APA, "agency actions will be set aside if they are contrary to law—if, in other

words, they are not 'authorized by the statutory text,'" *Fisher v. Pension Benefit Guar. Corp.*,

151 F. Supp. 3d 159, 165 (D.D.C. 2016) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255

(2006)), or some other source of lawful authority.   In reviewing the executive's reliance on

statutory authority, the Court should pay "[c]areful attention to the judgment of the Executive

Branch" to the extent it "help[s] inform that inquiry" and should "respect" lawful delegations of

"authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).   But the

meaning of the relevant statutory text is ultimately a question for the Court, which "must

exercise [its] independent judgment" in interpreting the law. *Id.* at 412.

JA225

Nor does the fact that "the 'executive's' action . . . is essentially that of the President . . . insulate the entire executive branch from judicial review." *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("*Reich*").  To the contrary, "it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id*. (citing *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment)); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  It is well-settled, moreover, that even though the President is not an "agency" subject to suit under the APA, his "actions may still be reviewed for constitutionality," *Franklin*, 505 U.S. at 801 (citing *Youngstown*, 343 U.S. at 579); *see also Dalton v. Specter*, 511 U.S. 462, 469 (1992).

### III.  ANALYSIS

**A.    Threshold Issues**

1.    *Article III Standing*

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority" to resolve disputes unless the plaintiff has standing—that is, "'a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction.'" *Chamber of Com. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  This limitation "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Summers*, 555 U.S. at 492–93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  To establish Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  At least one plaintiff, moreover, must have standing "for each claim" the plaintiffs "seek[] to press," *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006), and for "each form of relief requested," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  The plaintiffs "bear[] the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.

> a.   Individual Plaintiffs in the United States

The individual plaintiffs still present in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) have established standing to challenge the bar on asylum and withholding of removal contained in the Proclamation and implementing guidance, as well as the guidance's extra-regulatory procedures for those seeking CAT protection.  They have standing because the Proclamation and implementing guidance make it more difficult for them to access these forms of relief.  Defendants do not dispute that asylum, withholding of removal, and CAT protection are valuable forms of relief that protect non-U.S. citizens from removal to countries where they may face persecution or torture.  Asylum is particularly valuable because it affords the asylee benefits above and beyond avoiding removal, including a path to lawful permanent resident status and citizenship.  As a result, the bars on asylum and withholding of removal and the extra-regulatory procedures for adjudicating CAT claims each injure the individual plaintiffs still in the United States because they make it more difficult (or, with respect to asylum and withholding of removal, impossible) for those plaintiffs to access these valuable forms of relief.[6]  *See Lujan*,

---

[6] The Proclamation applies under two sets of circumstances.  The first, second, fourth, and fifth sections of the Proclamation are directed at those "engaged in the invasion across the southern border of the United States," Proclamation, §§ 1, 2, 4, 5, which, according to the guidance, includes all aliens "who crosse[d] between the points of entry on the southern land border," Dkt. 52-1 at 5.  The third section of the Proclamation is directed at those who "fail[], before entering

504 U.S. at 561–62 (holding that "there is ordinarily little question" that a plaintiff has standing

if she herself is "an object of the action . . . at issue").  Each individual plaintiff, moreover, has

submitted a declaration expressing a desire to seek asylum and setting forth facts sufficient to

state a plausible claim to asylum, withholding of removal, or CAT protection.  *See, e.g.*, Dkt. 12-

1 (A.M. Decl.); Dkt. 12-4 (B.R. Decl.); Dkt. 12-5 (M.A. Decl.); Dkt. 12-6 (G.A. Decl.).  That is

enough to establish an injury in fact that is fairly traceable to the challenged actions.  *See Lujan*,

504 U.S. at 560–61.

Defendants do not dispute that the individual plaintiffs still in the United States are

suffering a cognizable injury caused by the Proclamation and the implementing guidance.

Instead, they argue that the individual plaintiffs' injuries are non-redressable based on 8 U.S.C.

§ 1252(f)(1).  Dkt. 44 at 26.  On Defendants' telling, § 1252(f)(1) forecloses any equitable relief

that would undermine the operation of the Proclamation (including declaratory relief or vacatur

of the implementing guidance) because it prohibits courts, other than the Supreme Court, from

"enjoin[ing] or restrain[ing] the operation of the provisions" of part IV of the INA, which

includes the provisions that govern regular removal proceedings, 8 U.S.C. § 1229a; expedited

---

the United States, to provide Federal officials with sufficient medical information and reliable
criminal history and background information as to enable fulfillment of the requirements of" 8
U.S.C. § 1182(a)(1)–(3).  Proclamation, § 3.  Both sets of circumstances can apply to the same
person, and, here, the Court is persuaded by Plaintiffs' supplemental declarations, filed at the
Court's request, that there is at least one individual plaintiff in the United States who is a covered
alien in both relevant respects, *see* Dkt. 64-5 at 1 (G.A. Decl. ¶¶ 4, 9) (declaring that G.A.
crossed the border "on or about February 1, 2025" without submitting any health or other
background information).  After Plaintiffs filed their supplemental declarations, Defendants—for
the first time—argued that Plaintiffs lack standing to challenge Section 3 of the Proclamation
because "[w]here Sections 1 and 2 of the Proclamation apply, there is no need to apply Section
3" and so it "has no practical applicability."  Dkt. 66 at 3, 6.  But that argument ignores the fact
that, if Plaintiffs prevail on their challenges to Sections 1 and 2 of the Proclamation, Section 3
will still stand as a bar to obtaining access to asylum and withholding of removal and will still
impose additional barriers to obtaining CAT protection.  Thus, at least one of the individual
plaintiffs has standing to challenge the restrictions as applied to both classes of covered aliens.

removal proceedings, *id.* § 1225(b)(1); and withholding of removal, *id.* § 1231, *see* Dkt. 44 at 68

n.7.  *See* Dkt. 55 at 9–13.  For several reasons, the Court is unpersuaded.

      To start, Defendants' redressability argument ignores the fact that § 1252(f)(1) contains a

carve-out for claims by "individual alien[s] against whom proceedings under such part have been

initiated."  8 U.S.C. § 1252(f)(1).  Thus, even if the provision might limit the Court's ability to

provide injunctive relief to individuals who are not yet in immigration proceedings, it has no

bearing on the redressability of the individual plaintiffs' claims to the extent that immigration

proceedings have been initiated against each of them "under" part IV of the INA, *see* Dkt. 43-3

at 3–5 (Hollinder Decl. ¶¶ 4–11) (attesting that A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.

were all issued I-860 Notices to Appear).  And, to the extent the new "212(f) Expedited

Removal" and "212(f) Direct Repatriation" proceedings are not brought "under" part IV of the

INA but, instead, are brought pursuant to the Proclamation, as Defendants assert, § 1252(f)(1)

has no bearing on Plaintiffs' challenges to those extra-statutory proceedings.

      Defendants' redressability argument also fails because § 1252(f)(1) does not, in any

event, limit the Court's authority to vacate unlawful agency action under the APA, 5 U.S.C.

§ 706(2), or its authority to issue declaratory relief under the Declaratory Judgment Act, 28

U.S.C. § 2201, and the availability of those remedies alone establishes redressability.

      Starting with the availability of APA vacatur, Defendants' contention that § 1252(f)(1)

precludes courts from setting aside unlawful agency action under the APA is meritless.  Two

well-established principles guide the Court's understanding of the interplay between § 1252(f)(1)

and the APA.  First, the courts recognize a "'stron[g] presum[ption]' that repeals by implication

are 'disfavored,'" and, thus, "[a] party seeking to suggest that two statutes cannot be harmonized,

and that one displaces the other, bears the heavy burden of showing 'a clearly expressed

41

congressional intention' that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S.

497, 510 (2018) (internal citation omitted).  This rule, as the Supreme Court has explained, is

premised on a "respect for the separation of powers" and "an appreciation that it's the job of

Congress by legislation, not th[e] Court by supposition, both to write the laws and to repeal

them."  *Id.* at 511.  Second, courts apply a "presumption favoring judicial review of

administrative action" and, thus, "when a statutory provision is reasonably susceptible to

divergent interpretation, [courts] adopt the reading that accords with [the] traditional

understanding[] and basic principle[] that executive determinations generally are subject to

judicial review."  *Make the Road*, 962 F.3d at 623–24 (internal quotation marks and citation

omitted).  This "presumption can be overcome only by clear and convincing evidence of

congressional intent to preclude judicial review."  *Id.* at 624 (internal quotation marks and

citation omitted).

      Here, Defendants' argument fails even before the Court applies either presumption.  The

APA mandates that a "reviewing court *shall* . . . set aside agency action . . . found to be . . . not in

accordance with law [or] contrary to constitutional . . . power," 5 U.S.C. § 706(2) (emphasis

added), and nothing in § 1252(f)(1) conflicts with or otherwise limits that mandate.  Section

1252(f)(1) provides that:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to *enjoin or restrain the operation* of the provisions of
> part IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application
> of such provisions to an individual alien against whom proceedings under such
> part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added).  Thus, by its own terms, § 1252(f)(1) limits only the

lower courts' jurisdiction "to enjoin or restrain the operation" of specific statutory provisions; it

JA230

neither expressly nor implicitly repeals or supersedes the APA's mandate that reviewing courts

shall "set aside" unlawful agency action.

Section 1252(f)(1) says nothing about vacatur and, instead, "prohibits lower courts from

*entering injunctions* that order federal officials to take or to refrain from taking actions to

enforce, implement, or otherwise carry out" statutory provisions in part IV of the INA, *Garland*

*v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (emphasis added). There is a meaningful

difference, moreover, between an injunction and an order vacating a rule or administrative

guidance. "An injunction is a drastic and extraordinary remedy, which should not be granted as

a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)), while

vacatur is the ordinary and presumptive remedy for substantive violations of the APA, *see, e.g.*,

*Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (noting that "both the

Supreme Court and the D.C. Circuit have held that . . . vacatur[] is the presumptively appropriate

remedy for a violation of the APA"); *see also Allina Health Serv. v. Sebelius*, 746 F.3d 1102,

1110 (D.C. Cir. 2014) ("[V]acatur is the normal remedy."); *Ill. Pub. Telecomms. Ass'n v. FCC*,

123 F.3d 693, 693 (D.C. Cir. 1997) ("[T]he practice of the court is ordinarily to vacate [an

unlawful] rule."). Understood in this light, the limitation found in § 1252(f)(1) is consistent with

established precedent, which distinguishes between the typical APA remedy of "vacating an

agency action" and the more dramatic remedy of enjoining future agency action, which courts

should refrain from doing unless necessary to effectuate the court's decision. *L.M.-M. v.*

*Cuccinelli*, 442 F. Supp. 3d 1, 36 (D.D.C. 2020).

Defendants respond by noting that § 1252(f)(1) not only restricts the authority of lower

courts "to enjoin" the operation of the provisions of part IV but also precludes lower courts from

"restrain[ing]" the operation of those provisions. Dkt. 55 at 12. The parties debate whether "the

term 'restrain' in [§] 1252(f)(1)" merely forms the second half of "a 'common doublet'" or

whether it imposes a distinct limitation more sweeping than the bar on class-wide injunctive

relief. *Id.* For present purposes, however, the Court need not join this debate, because regardless

of whether the words "enjoin" and "restrain" are synonyms or merely close cousins, "restrain"

does not mean "vacate." The word "restrain" means "to hold (as a person) back from some

action, procedure, or course." *Restrain*, Webster's Third New International Dictionary at 1936

(1993); *see also Aleman Gonzalez*, 596 U.S. at 549 (quoting Oxford English Dictionary). It is, in

other words, concerned with barring future action. A "vacatur" order, in contrast, "annul[s]" an

action already taken. *Vacatur*, Black's Law Dictionary at 1782 (10th ed. 2014).

      To be sure, the word "restrain" is, at times, given a broader meaning, which "captures

orders that merely inhibit acts," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12–13 (2015) (emphasis

omitted); *see also Aleman Gonzalez*, 596 U.S. at 549. But statutory terms are best construed in

light of the company that they keep, *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008),

and, here, § 1252(f)—which is entitled "Limit on Injunctive Relief"—refers to the "authority to

*enjoin* or restrain," 8 U.S.C. § 1252(f)(1) (emphasis added). It follows that § 1252(f)(1) is best

construed to give the word "restrain" a meaning that is similar in kind to the commonly

understood meaning of "enjoin." Both refer to a court order that bars the party that is the subject

of the order from taking a future action, on pain of contempt. Yet, even if the Court were to

accept Defendants' dubious premise and were to assume that "restrain" simply means to

"inhibit," their argument would still fail. Simply put, the word "restrain," even if so broadly

construed, cannot plausibly be read to encompass a judicial order that affects future agency

action only by vacating some past action. Had Congress intended the prohibition to sweep that

broadly, it could easily "have said so in words far simpler than those that it wrote." *Biden v.*

*Texas*, 597 U.S. 785, 798 (2022). It could have, for example, barred lower courts from entering any order "respecting the operation of the provisions of part IV" of the INA. Congress is presumed to have chosen its words with care, and this Court is bound by that choice.

The Court, accordingly, concludes that § 1252(f)(1) cannot plausibly be read to supersede the APA and to bar lower courts from granting the traditional form of APA relief in cases that are otherwise properly brought under the APA and that challenge agency action taken under (or relating to) part IV of the INA.

The same is true of declaratory relief. Here, Defendants candidly concede that the D.C. Circuit rejected their capacious reading of § 1252(f)(1) in *Make the Road New York*, where the court held that § 1252(f)(1) "prohibits only injunctions" and "does not proscribe the issuance of a declaratory judgment," 962 F.3d at 635. *See* Dkt. 55 at 13 n.2. Defendants, nonetheless, contend that the Supreme Court's decision in *Aleman Gonzalez*, 596 U.S. at 543, has somehow called that holding into question. Dkt. 55 at 13 n.2. But—far from it—*Aleman Gonzalez* expressed no view on the question, merely observing: "Because only injunctive relief was entered here, we have no occasion to address" the Government's argument that "§ 1252(f)(1) not only bars class-wide injunctive relief but also prohibits . . . class-wide declaratory relief." 596 U.S. at 551 n.2. This Court, accordingly, must follow binding D.C. Circuit precedent. *See Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979).

That resolves the question. It bears note, however, that six Supreme Court justices have expressed the same view, albeit in separate opinions in different cases. Most recently, Justice Alito wrote for the plurality in *Nielsen v. Preap* that the district courts have "jurisdiction to entertain . . . request[s] for declaratory relief," notwithstanding § 1252(f)(1). 586 U.S. 392, 402 (2019) (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.). And, in *Jennings v. Rodriguez*,

Justices Breyer, Ginsburg, and Sotomayor reached the same conclusion. *See* 583 U.S. 281, 355 (Breyer, J., joined by Ginsburg, J., and Sotomayor, J., dissenting); *see also Aleman Gonzalez*, 596 U.S. at 572 n.9 (Sotomayor, J., joined by Kagan, J., and Breyer, J., concurring in part) (expressing skepticism that § 1252(f)(1) limits class-wide declaratory relief). As a matter of plain language, that conclusion is well-founded.

Although the Supreme Court has not had occasion to address the application of § 1252(f)(1) to claims for vacatur or declaratory relief in a controlling opinion, the Court's recent opinion in *Biden v. Texas* further supports this reading of the statute. In that case, the Court had no reason to decide whether § 1252(f)(1) applies to "declaratory relief and relief under [§] 706 of the APA," 597 U.S. at 801 n.4, but the Court stressed that the "scope" of § 1252(f)(1) is "narrow[]" and that it "deprives courts of the power to issue a *specific* category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." 597 U.S. 785, 798 (2022) (emphasis added). The Court also cited to its prior observation in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), that, "[b]y its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Biden v. Texas*, 597 U.S. at 801 (citing *Reno*, 525 U.S. at 481).

In reaching these conclusions, the Court relied on two features of the statutory text that bear on Defendants' argument here. First, the Court noted that nothing in the language of § 1252(f)(1) "strips the lower courts of subject matter jurisdiction over" claims brought under the INA or the APA. *Id.* at 798. As the Court explained, "[a] limitation on subject matter jurisdiction . . . restricts a court's 'power to adjudicate a case,'" *id.* (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)), whereas § 1252(f)(1) "bears no indication that lower courts lack power to hear any claim brought under" part IV of the INA. *Id.* It simply limits the

authority of the lower courts to order a particular form of relief.  *Id.*  Second, a "parenthetical"

contained in § 1252(f)(1) "explicitly preserves [the Supreme] Court's power to enter injunctive

relief," which shows that Congress intended to preserve the Supreme Court's authority to grant

even that drastic form of relief.  *Id.* at 786.  But because the Supreme Court's original

jurisdiction does not extend to adjudicating claims under the INA and the APA, *see* U.S. Const.,

art. III, § 2, the only way that parenthetical can be given meaning is by preserving the authority

of the lower courts to grant *some* form of relief in these cases.  *Id*. at 799.

Given the plain language of § 1252(f), the "strong presumption favoring judicial review

of administrative action," *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021), and existing

precedent, it is thus unsurprising that other courts have held that § 1252(f)(1) does not strip lower

courts of authority to grant declaratory relief and to vacate agency action that is not in

accordance with law.  *See, e.g.*, *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D.

Fla. 2023); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022).  This

Court concurs in that reading of the statute.

At this point, it is worth pausing to note that the Supreme Court not only read

§ 1252(f)(1) narrowly in *Biden v. Texas*, but the Court also held that there is "no basis for . . .

conclu[ding] that [§] 1252(f)(1) concerns subject matter jurisdiction" at all.  597 U.S. at 801.

Thus, to the extent Defendants raise a jurisdictional argument, one might reasonably conclude

that they run head on into binding Supreme Court precedent holding that § 1252(f)(1) merely

limits the form of relief a court may grant and does not limit a court's subject-matter jurisdiction.

Defendants answer this difficulty by framing their argument as one of redressability.  If

§ 1252(f)(1) bars *every* form of relief that this Court might grant to a plaintiff with respect to a

particular claim, that claim is non-redressable, and the plaintiff lacks standing.  But even

47

assuming that a merits defense can so easily be transformed into a jurisdictional bar, *cf.*

*Sandpiper Residents Ass'n v. U.S. Dep't of Hous. & Urb. Dev.*, 106 F.4th 1134, 1141 (D.C. Cir.

2024) (so long as claim to relief remains "facially plausible," "nothing more is required to

preserve jurisdiction"), Defendants' non-redressability defense faces a high hurdle, which

Defendants cannot clear.  For the reasons discussed above, § 1252(f)(1) does not limit the

Court's authority to order vacatur of an unlawful rule or guidance or to grant declaratory relief.

In other words, it leaves in place significant, alternative forms of redress.

Defendants raise one, final redressability argument, which merits only brief discussion.

They argue that the Court lacks authority to enjoin the President, Dkt. 55 at 19 (citing *Mississippi

v. Johnson*, 71 U.S. 475, 501 (1867)), and that, as a result, setting aside the implementing

guidance will not redress the Plaintiffs' asserted injuries.  On Defendants' telling, no matter what

the Court does, the Proclamation will remain in effect and, even if the implementing guidance is

enjoined or vacated, the Proclamation will continue to preclude immigration officials from

considering Plaintiffs' requests for asylum or withholding of removal.  Justice Scalia spoke

directly to this issue in his concurring opinion in *Franklin v. Massachusetts*.  He wrote:

> None of these conclusions, of course, in any way suggests that Presidential action is *unreviewable*.  Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 572 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)—just as unlawful legislative action can be reviewed, not by suing Members of Congress for the performance of their legislative duties, *see, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 503–06 (1969); *Dombrowski v. Eastland*, 387 U.S. 82 (1967); *Kilbourn v. Thompson*, 103 U.S. 168 (1881), but by enjoining those congressional (or executive) agents who carry out Congress's directive.  Unless the other branches are to be entirely subordinated to the Judiciary, we cannot direct the President to take a specified executive act or the Congress to perform particular legislative duties.

505 U.S. at 828–29 (Scalia, J., concurring in part and concurring in the judgment).  D.C. Circuit precedent, moreover, is to the same effect.  As the D.C. Circuit observed in *Reich*: "Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality'" of the action and "'to compel subordinate executive officials to disobey illegal Presidential commands.'"  74 F.3d at 1328 (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)).  Because the President does not personally take "the final step necessary" to reject a request for asylum or withholding of removal, much less to repatriate or to remove an individual from the United States, this is not one of those rare cases in which the courts are powerless to review executive action.  *Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993).  As a result, the question of how most appropriately to effectuate the Court's decision is a question of remedy and not redressability.

      b.  <u>Organizational Plaintiffs</u>

The organizational plaintiffs also have standing to challenge the Proclamation and implementing guidance, including the restrictions on asylum and withholding of removal, the use of "212(f) Direct Repatriations" and "212(f) Expedited Removal," and the extra-regulatory procedures for adjudicating CAT protection claims.

An organization "can assert standing on its own behalf, on behalf of its members or both." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  Here, the organizational plaintiffs rely on the first approach, which requires that they, "like an individual plaintiff, . . . show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  To meet this burden, Plaintiffs rely on the framework recognized in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).  In that case, a fair housing organization claimed that the defendant's discriminatory housing practices "perceptibly impaired" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices.  *Id*.  The Supreme Court held that the organization had standing to challenge the housing practices.  As the Court explained, "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests."  *Id*.

The D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances."  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases); *see also* 13A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 3531.9.5 (3d ed. 2018) (same).  But *Havens* is not without limits.  When "a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)

(emphasis in original) (quoting *Lujan*, 504 U.S. at 562). An organization that seeks to establish *Havens* standing must show more than a mere "setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, a "'self-inflicted' budgetary choice,'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("*ASPCA*") (quoting *Equal Rights Ctr.*, 633 F.3d at 1139), or an effect on the "organization['s] lobbying activities," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005). Rather, it must show that the challenged action "directly affected and interfered with" the organizations' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, and that "the [organization] used its resources to counteract that injury" or incurred other tangible losses, *ASPCA*, 659 F.3d at 25.[7]

    Here, the organizational plaintiffs have satisfied this burden. RAICES, Las Americas, and Florence Project have each identified various ways that the Proclamation and implementing guidance have interfered with their core business activity of providing direct legal services to individuals at risk of removal, including asylum seekers. The declaration submitted by RAICES' legal director, for example, attests that the organization "provides free and low-cost immigration legal services to underserved immigrant children, families and individuals" in support of its mission to "defend the rights of immigrants and refugees." Dkt. 14-1 at 1 (Hidalgo Decl. ¶ 3). The Proclamation and guidance interfere with that work because "the process of summarily expelling noncitizens without the opportunity for credible fear interviews frustrates and impedes RAICES from [its] fundamental day-to-day work of representing noncitizens with protection needs." *Id.* (Hidalgo Decl. ¶ 4). The Proclamation, for example, has greatly diminished

---

[7] It is unclear whether *ASPCA*'s separate use-of-resources inquiry is still required after *Alliance of Hippocratic Medicine*, but the Court will, out of an abundance of caution, consider whether Plaintiffs could satisfy the requirement, if it still exists.

RAICES' ability to provide legal services to those who would ordinarily proceed through the

expedited removal process.  Last year, RAICES provided legal services to about 15 such people

every week.  *See id.* at 2 (Hidalgo Decl. ¶ 9).  Since the Proclamation went into effect on January

20, those opportunities have vanished.  RAICES has "made contact with" only a few aliens who

entered the country after that date, and "none of those people have been permitted to seek

protection."  *Id.* at 3 (Hidalgo Decl. ¶ 14).  RAICES has had to "divert resources" to respond to

the Proclamation and guidance by, among other things, "searching for alternative ways to contact

detained individuals and families" and "training staff."  *Id.* at 3 (Hidalgo Decl. ¶ 17).  As a result,

the organization has incurred additional expenses and has faced new obstacles in pursuing its

core business activity.  *Id.* at 4 (Hidalgo Decl. ¶ 18).

      Similarly, Las Americas has shown that the Proclamation and guidance have frustrated

and will continue to frustrate its ability to provide legal services to immigrants and will impose

tangible burdens on the organization.  The declaration submitted by Las Americas' legal services

director describes the organization's mission and the activities that it pursues to support that

mission.  *See generally* Dkt. 14-2 (Babaie Decl.).  Las Americas' mission is "to provide high-

quality legal services to low-income immigrants, and to advocate for human rights."  *Id.* at 1

(Babaie Decl. ¶ 3).  To that end, the organization "provide[s] immigration counseling and

representation to immigrants seeking asylum and other forms of humanitarian relief, including

by representing individuals facing expedited removal who are referred for credible fear

interviews."  *Id*.  The organization "cannot carry out much of [its] core work" if "noncitizens

cannot access asylum or other statutory protections."  *Id.* at 6 (Babaie Decl. ¶ 30).  As the Babaie

declaration explains, Las Americas "opened more than 800 new cases in 2024" and "[m]ore than

half of the people that Las Americas serves are asylum seekers."  *Id.* at 3 (Babaie Decl. ¶ 13).

JA240

Yet, since the Proclamation was issued, the organization has "not received calls for [a credible fear interview] consultation from anyone who entered the country." *Id.* at 4 (Babaie Decl. ¶ 19). Indeed, "[i]n response to the enforcement of the Proclamation, it is fair to say that *all* of Las Americas' work has been forced to change." *Id.* at 5 (Babaie Decl. ¶ 24). The Proclamation has also "forced [the organization] to divert limited resources away from individual representation" to find alternative ways to serve its missions, including, for example, "assisting families trying to find the location of loved ones who attempt[] to seek protection at the border." *Id.* at 6 (Babaie Decl. ¶ 31). Finally, the Babaie declaration explains that 85% of the organization's revenue comes from grants, some of which "have requirements regarding the number of people [the organization] serve[s] as well as caveats on the geography and types of services provided." *Id.* at 2 (Babaie Decl. ¶ 7). Because Las Americas' grants, most of which "are heavily metrics based," *id.* at 6 (Babaie Decl. ¶ 32), and because "many funders are interested in funding work that reaches the greatest number of people possible," *id.* at 7 (Babaie Decl. ¶ 35), the organization will incur expenses working to shore up its donor relationships and risks "losing out on grants" aimed at reaching the greatest number of people, since the Proclamation has undermined, and will continue to undermine, Las Americas' ability to connect with clients, *id.*

Finally, the Florence Project has also shown that the Proclamation and guidance have frustrated, and will continue to frustrate, its activities and will impair its ability to provide legal services to those seeking asylum, withholding of removal, and CAT protection. The Florence Project "is a 501(c)(3) non-profit legal services organization" whose "mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona." Dkt. 14-3 at 1 (St. John Decl. ¶ 2). Its goal is to "ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and

humanely." *Id.* The organization "represent[s] hundreds of adult clients before the asylum office, immigration courts, and the Board of Immigration Appeals . . . each year, including many who are seeking humanitarian relief, such as asylum, withholding of removal, and protection under the Convention Against Torture." *Id.* at 2 (St. John Decl. ¶ 4). "In 2023, Florence Project staff provided individualized legal support to at least one thousand adults in ICE custody who specifically were seeking some fear-based form of protection." *Id.* at 3 (St. John Decl. ¶ 9). Yet, "in sharp contrast to years of experience and migration and detention trends, as of February 18, 2025, Florence Project has still not been able to identify or [to] meet with any asylum seekers in ICE custody who entered the United States, whether by entering without inspection or presenting at a port of entry, after the Proclamation took effect on January 20, 2025." *Id.* at 4 (St. John Decl. ¶ 13). The Proclamation and guidance have, as a result, "substantially interfere[d] with" the organization's "core" activity of providing legal services to those seeking "fear-based humanitarian protection" or connecting those individuals "with *pro bono* legal representation." *Id*. (St. John Decl. ¶¶ 13–14). Like the other organizations, these hurdles have also required the Florence Project to divert resources to responding to the changed landscape and threaten "serious long-term financial consequences." *Id*. at 4–7 (St. John Decl. ¶¶ 15–20). As "the number of people who can be helped with asylum and related forms of relief will inevitably decrease[,] . . . so too will [the organization's] ability to be paid to do that mission-driven work." *Id.* at 6 (St John Decl. ¶ 19). Indeed, "[t]he Florence Project receives funding through the [National Qualified Representative Program] prime contractor on a flat rate based on the number of cases [it has] open and the number of net new cases [it] agree[s] to accept in a given option year," and, given the restrictions imposed in the Proclamation and guidance, the organization "stands to lose tens, if not hundreds of thousands of dollars[,] in funding." *Id.* at 6–7 (St. John Decl. ¶ 20).

These uncontested declarations demonstrate that the Proclamation and implementing guidance have had—and will continue to have—a significant and direct detrimental effect on the organizational plaintiffs' "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395; have required—and will continue to require—the organizational plaintiffs to expend substantial "resources to counteract that injury," *ASPCA*, 659 F.3d at 25; and will likely result in either a large loss of funding to the organizations or require the expenditure of resources to renegotiate or to amend grants or contracts or to find alternative sources of funding. In *Alliance for Hippocratic Medicine*, the Supreme Court noted that the effect on the "core business activities" of the organizational plaintiff in *Havens* was "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." 602 U.S. at 395. By the same token, the "core business activities" of the organizational plaintiffs in this case are not dissimilar to the interests of a "vendor who is prevented from selling his product to third parties by [an] unlawful regulation" and who "may challenge that regulation 'on the basis of the vendor-vendee relationship alone.'" *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999) (emphasis and citation omitted). No more is required to establish standing under *Havens* and *Alliance for Hippocratic Medicine*.

Defendants disagree, arguing that a "less demanding case load" does not injure the organizations' "ability to carry out" their existing activities: they can still provide services to aliens who do end up in the "expedited removal credible fear process or in removal proceedings." Dkt. 44 at 29–30 (emphasis omitted). But there is no requirement that an organization prove that the challenged agency actions absolutely foreclose it from pursuing its core business activities. A defendant's actions need only cause a "perceptibl[e] impair[ment],"

*Havens*, 455 U.S. at 379, and some attendant expenditure or loss of resources, *ASPCA*, 659 F.3d at 25.  The organizational plaintiffs have made that showing—and then some.

      2.     *Statutory Jurisdiction*

Defendants also contend that the Court lacks statutory jurisdiction to consider the organizational plaintiffs' claims that (1) "challenge the Proclamation" on the ground that "it 'contradicts the specific restrictions' found in the expedited removal statute;" (2) allege that "agency actions are leading to 'removals without compliance with the procedures required by the INA,' including procedures related to expedited removal;" or (3) "seek relief from any expedited removal orders entered pursuant to the Proclamation."  Dkt. 55 at 23 (citations omitted).  Defendants' argument fails for several reasons.

Most fundamentally, Defendants' argument misconstrues Plaintiffs' claims and misconceives the nature of the challenged governmental action.  Before turning to those difficulties, however, the Court pauses to note Defendants' concession that § 1252 allows "claim[s] that can be asserted . . . by an individual alien."  *Id.*  Their argument, in other words, applies only to the organizational plaintiffs, and the Court agrees that Defendants' § 1252 argument does not extend to the claims of the individual plaintiffs.  Given the Court's conclusion that the individual plaintiffs have Article III standing as well, and because only one plaintiff needs standing to maintain each claim asserted in a case, *see Town of Chester*, 581 U.S. at 439, it seems unlikely that the Court even needs to reach Defendants' challenge to the Court's statutory jurisdiction to consider the organizational plaintiffs' claims.  *See L.M.-M.*, 442 F. Supp. 3d at 22–23.  But, in any event, that challenge is unfounded.

The Court starts, as it must, with the statutory text.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).  Section 1252(a)(2) provides, in relevant part, as follows:

**(A)  Review relating to section 1225(b)(1)**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

(i)  except as provided in subsection (e), any *individual determination* or to entertain any other cause or *claim arising from or relating* to the implementation or operation of an order of removal *pursuant to section 1225(b)(1)* of [Title 8],

(ii)  except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of *such section*,

(iii)  the application of *such section* to individual aliens, including the determination made *under section 1225(b)(1)(B)* of [Title 8], or

(iv)  except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement *the provisions of section 1225(b)(1)* of [Title 8].

8 U.S.C. § 1252(a)(2)(A) (emphasis added).  Boiling these subparagraphs down to their operative terms, § 1252(a)(2)(A) divests the courts of habeas, mandamus, all writs, or any other jurisdiction to "review" any action taken pursuant to—or taken to invoke, to apply, or to implement—the expedited removal statute, § 1225(b)(1), except as authorized in § 1252(e). When it came to the application and implementation of the expedited removal statute, Congress covered the waterfront: § 1252(e) provides the sole avenue of review for expedited removal "determination[s]" and the "implementation or operation of" expedited removal orders, 8 U.S.C. § 1252(a)(2)(A)(i); decisions made by the Attorney General (or the Secretary) "to invoke" the expedited removal procedure, *id.* § 1252(a)(2)(A)(ii); "the application of" the expedited removal provision "to individual aliens," *id.* § 1252(a)(2)(A)(iii); or the adoption "by the Attorney

General" or the Secretary of "procedures and policies" to implement the expedited removal statute, *id*. § 1252(a)(2)(A)(iv).

Here, however, Plaintiffs do not challenge any expedited removal order entered pursuant to § 1225(b)(1) or the implementation of any such order. Nor do they challenge the Attorney General or the Secretary's decision to invoke § 1225(b)(1), their application of § 1225(b)(1) to any individual alien, or their adoption of any procedures or policies "to implement" § 1225(b)(1). Rather, Plaintiffs challenge the lawfulness of the Proclamation—raising the question whether the President is authorized under 8 U.S.C. § 1182(f) and § 1185(a) or the Constitution to restrict and suspend access to each and every provision "of the INA that would permit" the covered individuals to remain in the United States, Proclamation, §§ 2, 3—and the lawfulness of the agency guidance that implements the Proclamation—including by "repatriat[ing]" or "remov[ing]" individuals pursuant to the Proclamation, Proclamation § 5, rather than under the usual INA procedures.

Although the Court must avoid conflating jurisdiction with the merits, Plaintiffs' contention that they are challenging the Proclamation and its implementation (and not the Attorney General or the Secretary's implementation of § 1225(b)(1)) finds support in the administrative record. To start, the Proclamation itself purports to authorize "repatriation" and "removal" of "any alien engaged in the invasion across the southern border," not as an exercise of the Attorney General or the Secretary's authority under § 1225(b)(1), but, rather, "as an exercise of the [President's] suspension power in [8 U.S.C. § 1182(f) and § 1185(a)] of the INA . . . or as an exercise of [the President's] delegated authority under the Constitution of the United States." Proclamation, § 5. Consistent with that command, the implementing guidance directs that "[a]ll illegal aliens subject to Presidential Proclamation 10888 . . . will be processed pursuant

to sections 212(f) [8 U.S.C. § 1182(f)] and 215(a) [8 U.S.C. § 1185(a)] of the Immigration and

Nationality Act." Dkt. 52-1 at 20. The documentation provided to covered individuals is to the

same effect. The "212(f) Tear Sheet" included in the administrative record informs the affected

individual that he or she is "being transported from the United States . . . *under Presidential*

*Proclamation 10888* . . . as an alien whose entry to the United States has been suspended

*pursuant to sections 212(f) and 215(a)* of the Immigration and Naturalization Act, as well as the

power of the President under the Constitution of the United States." *Id.* at 25 (emphases added).

Other portions of the administrative record refer to "212(f) Direct Repatriations" and

"212(f) Expedited Removal" or "Expedited Removal – Per 212(F)." *See, e.g.*, *id*. at 6, 11–14,

18–19, 21. When asked to explain the difference between a "212(f) Direct Repatriation" and a

"212(f) Expedited Removal," Defendants identified only one difference: An individual subject to

"212(f) Expedited Removal" receives "a Notice to Alien Ordered Removed and [is] issued an

Expedited Removal Order," while an individual subject to a "212(f) Direct Repatriation" does

not. Dkt. 59 at 7–8. As Defendants further explained, *id.* at 8, this difference has collateral

immigration consequences, given the temporary inadmissibility of those previously subject to

removal orders and the risk of criminal liability for reentry, *see* 8 U.S.C. §§ 1182(a)(9)(A),

1231(a)(5), 1326, but it is otherwise inconsequential.

Two things stand out about this approach. First, there is no such thing as "direct

repatriation" under the INA. Second, "212(f) Expedited Removal" is not the same thing as

expedited removal under 8 U.S.C. § 1225(b)(1). Section 1225(b)(1) permits "an immigration

officer" to order the immediate removal of an inadmissible alien, "*unless* the alien indicates

either an intention to apply for asylum under section 1158 of [Title 8] or a fear of persecution."

8 U.S.C. § 1225(b)(1) (emphasis added). The provision then goes on to describe, in detail, the

procedures for conducting the required asylum and credible fear interviews, reviewing the initial

determinations made by asylum officers, and referring matters for full removal proceedings.  *Id.*

And all of that—that is, the defining characteristics of a § 1225(b)(1) expedited removal

proceeding—is precisely what the Proclamation and guidance do not allow.  Notably,

Defendants are not even purporting to implement § 1225(b)(1); they are, on their own telling,

implementing the Proclamation.  *See infra* at 107–10.  The Proclamation is premised on a

distinct set of statutory and constitutional provisions, and, by its own terms, the Proclamation

operates separate and apart from "provisions of the INA that would permit [an alien's] continued

presence in the United States."  Proclamation, §§ 2, 3.  Nothing in § 1252(a)(2)(A) limits the

Court's jurisdiction to consider the lawfulness of a proclamation (or the implementation of a

proclamation) issued pursuant to § 1182(f) and § 1185(a) and the President's non-INA "authority

to protect the sovereignty of the United States," *see* Proclamation, preamble.

Finally, the Court notes an important difference between § 1252(a)(2)(A)(i) and

§ 1252(f)(1).  In *Aleman Gonzalez*, the Supreme Court read § 1252(f)(1)—and, in particular, the

limitation on class-wide court orders enjoining or restraining "the operation of the provisions of

part IV"—to deprive the lower courts of authority to issue "injunctions that order federal

officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out

the specified statutory provisions."  596 U.S. at 548, 550 (emphasis omitted).  Section

1252(a)(2)(A)(i), in contrast, does not refer to the "operation" of any statutory provision but,

rather, refers to the "operation of *an order of removal pursuant to [§] 1225(b)(1)*."  8 U.S.C.

§ 1252(a)(2)(A)(i) (emphasis added).  That matters because this case does not involve "an order

of removal [entered] pursuant to [§] 1225(b)(1)."  *Id.*  To the contrary, by Defendants' own

account, all of the "212(f) Direct Repatriations" and all of the "212(f) Expedited Removal"

orders are undertaken "per" § 1182(f) (INA § 212(f))—not § 1225(b)(1).  *See, e.g.*, Dkt. 52-1 at 12; *see also* Dkt. 44 at 20, 58; Dkt. 55 at 28–29 (asserting that covered aliens "do not fall within the bounds of" § 1225(b)(1)).

Accordingly, even if the Court did not have statutory jurisdiction based on the individual plaintiffs' claims, the Court would have both Article III and statutory jurisdiction based on the organizational plaintiffs' claims.[8]

3.     *Causes of Action*

Defendants' final set of threshold arguments posit that Plaintiffs lack an APA or a non-statutory cause of action.  They are incorrect on both counts.

a.     APA Cause of Action

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  At times, the APA merely provides the required waiver of sovereign immunity necessary to bring suit under another statute, while, at other times,

---

[8] Although the Court need not reach the issue, the Court's conclusion would, in any event, likely remain the same, even if § 1252(a)(2)(A) applied to the organizational plaintiffs' claims.  That is because § 1252(a)(2)(A) permits challenges under § 1252(e)(3), and that provision authorizes timely challenges to "written policy guideline[s]" implementing § 1225(b)(1).  Defendants' sole counterargument posits that § 1252(e)(3) only permits claims by "*individuals* subject to . . . expedited removal."  Dkt. 44 at 35–36.  But that misreads both the statute and is inconsistent with recent precedent from this Court.  Most notably, nothing in the text of § 1252(e)(3) limits review to individuals.  Although Defendants invoke *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA*"), in support of their reading of the statute, recent precedent from this Court reads *AILA* to address only third-party standing—a theory that the organizational plaintiffs do not advance in this case and that, accordingly, Defendants do not challenge.  *See Las Americas Immigrant Advocacy Center*, 2025 WL 1403811, at *9 n.8.  And although Defendants also invoke the D.C. Circuit's decision in *Make the Road New York*, 962 F.3d at 627, that decision also read *AILA* to address only third-party standing.  When it came to resolving the jurisdictional question that was before it, moreover, the *Make the Road New York* court held that Make the Road New York *had standing*, albeit on a theory of associational standing.  *Id.* at 623–28.

the APA provides both the waiver of sovereign immunity and the cause of action. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–91 (D.C. Cir. 2006). The APA cause of action, however, is available only to review "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. The APA's scope of review provision, in turn, authorizes a reviewing court to, among other things, "set aside agency action . . . found to be . . . not in accordance with law." *Id.* § 706(2)(A). Here, Defendants contend that APA review is unavailable to the Plaintiffs for a variety of reasons, none of which are ultimately persuasive.

*First*, Defendants argue that the Proclamation does not constitute "agency action" and that the implementing guidance does not constitute "final agency action distinct from the Proclamation." Dkt. 44 at 39. Although they are correct that the Proclamation is not itself subject to APA review, their characterization of the implementing guidance misses the mark. An agency action is deemed final if two conditions are met. First, the action "must mark the consummation of the agency's decisionmaking process" and "must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citation omitted). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks omitted). Both conditions are satisfied here. The guidance "consummates" the Department of Homeland Security's decision regarding the implementation of the Proclamation; there is nothing preliminary, tentative, or inchoate about it. It is equally clear, moreover, that the guidance has real "legal consequences" for those subject to the Proclamation, including the individual plaintiffs in this case, some of whom have already been removed from the United States pursuant to the guidance.

Nor is the guidance "indistinct" from the Proclamation.  To be sure, the guidance implements the Proclamation, but it also adds both detail and real-world consequences.  The guidance—not the Proclamation—sets out two types of removal procedures that will apply to aliens subject to the Proclamation, instructs officers and agents not to ask aliens specific fear questions or to use forms otherwise required under the agencies' regulations, and instructs immigration officers to use a heightened standard when screening covered aliens for CAT protection.  *See, e.g.*, Dkt. 52-1 at 13.  This is not a case of guidance that is "purely informational in nature" or that merely "'restate[s]' legal requirements derived from independent sources of law."  Dkt. 55 at 21 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004)).  Defendants maintain that "[t]o the extent aliens are removed or repatriated because they entered in violation of the Proclamation, that is a direct legal consequence of the President's suspension order."  Dkt. 55 at 21–22.  But as the D.C. Circuit observed in response to a similar argument in *Reich*, the fact that the agency is implementing a presidential directive "hardly seems to insulate" the agency action "from judicial review under the APA, even if the validity of the" presidential directive is "thereby drawn into question."  74 F.3d at 1327.  If this were a case in which the President had "final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties," the implementing guidance might be disregarded.  *Pub. Citizen*, 5 F.3d at 552.  But it is not.  Indeed, in recognition of that fact, the Proclamation directs "[t]he Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General" to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion."  Proclamation, § 5.

*Second*, Defendants argue that APA review is precluded here because of "other limitations on judicial review" that the APA leaves intact.  Dkt. 44 at 41 (quoting 5 U.S.C.

63

§ 702(1)).  In particular, Defendants maintain that "the longstanding limitation on review of Executive decisions to deny entry to aliens" bars review.  *Id.*  If that were all that was at issue, this would be a far different case, and it might raise the question regarding the President's independent constitutional authority to protect the borders of the United States, which was left unanswered in *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).  But this case, unlike *Trump v. Hawaii* and *Sale*, turns on whether the President's authority to limit "entry" carries with it the authority to close the avenues of humanitarian relief that are available to those who have already entered the United States and whether that authority can supersede or displace the INA.  None of the language in § 1182(f) that "exudes deference to the President," such as "'[w]henever [the President] finds that the entry' of aliens 'would be detrimental' to the national interest,'" he may suspend or limit entry "'for such period as he shall deem necessary,'" *Trump v. Hawaii*, 585 U.S. at 684 (quoting 8 U.S.C. § 1182(f)), is at issue here.

*Third*, Defendants argue that APA review is unavailable because the decision at issue— the President's decision to invoke § 1182(f) and § 1185(a)—is "committed to agency discretion by law."  Dkt. 44 at 41 (quoting 5 U.S.C. § 701(a)(2)).  The Court does not doubt that the President is entitled to substantial deference in deciding whether to "suspend the entry of all aliens or any class of aliens" to promote "the interests of the United States."  8 U.S.C. § 1182(f); *see also Trump v. Hawaii*, 585 U.S. at 684.  The deference that the President receives *within the realm* of § 1182(f)—that is, when deciding whether and when to suspend or limit "entry" into the United States and whom to include in the excluded class—does not mean, however, that he is entitled to the same level of deference *outside that realm*—that is, when attempting to deny those

64

who have already entered the United States access to "portions of the immigration system," to those who have already entered the United States, *see* Proclamation, preamble.

*Fourth*, Defendants argue that the organizational plaintiffs lack zone-of-interests standing. Dkt. 44 at 36–38. Zone-of-interests standing is a non-jurisdictional doctrine that asks whether a "plaintiff's complaint fall[s] within the zone of interests protected by the law invoked." *Lexmark Int'l*, *Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (internal quotation marks and citation omitted). The zone-of-interests test is, in other words, a "tool for determining who may invoke the cause of action" created in the statute at issue. *Id.* at 130. "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" the test, at least in the APA context, "'is not meant to be especially demanding.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). "The interest [the plaintiff] asserts must be 'arguably within the zone of interests to be protected or regulated by the [underlying] statute' that [the plaintiff] says was violated." *Id.* at 224 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). Courts "do not require any 'indication of congressional purpose to benefit the would-be plaintiff,'" and the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* at 225 (quoting *Clarke*, 479 U.S. at 399–400). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

The organizational plaintiffs satisfy this permissive test. Notably, their interests in providing legal assistance to asylum seekers is consistent with the INA's purpose to "establish[]

. . . [the] statutory procedure for granting asylum to refugees." *Cardoza-Fonseca*, 480 U.S. at 427.  As in *O.A.*, the organizational plaintiffs' "interest in representing asylum seekers furthers the purposes of the INA," *see* 404 F. Supp. 3d at 144, which instructs the government to advise aliens filing an application for asylum "of the privilege of being represented by counsel" and to "provide the alien a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis," 8 U.S.C. § 1158(d)(4).

Defendants argue that *O.A.* relied on a "more lenient version" of the zone-of-interests test that "no longer survives the Supreme Court's more recent decision in *United States v. Texas*, 599 U.S. 670 (2023)."  Dkt. 44 at 38.  According to Defendants, *Texas* "clarified . . . that third parties like Plaintiffs have no cognizable interest in the way the Executive enforces the immigration laws against others."  *Id.* (citing *United States v. Texas*, 599 U.S. at 674, 677).  But the Supreme Court has made clear that Article III standing and zone-of-interests standing are entirely different concepts, and *United States v. Texas* addressed only Article III standing.  Nothing in that decision calls into question the zone-of-interests test set forth in *Lexmark*, 572 U.S. at 126, and *Patchak,* 567 U.S. at 225, which is the standard that the Court applied in *O.A.*, 404 F. Supp. 3d at 144.  Nor did the Supreme Court announce a new understanding of Article III standing in *United States v. Texas*.  To the contrary, the Court merely applied the well-established rule that the executive's exercise of prosecutorial discretion is, by and large, unreviewable.  *United States v. Texas*, 599 U.S. at 674 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)).[9]

---

[9]  Neither *INS v. Legalization Assistance Project of the Los Angeles County Federation of Labor* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) nor *Federation for American Immigration Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897, 900–04 (D.C. Cir. 1996), supports a contrary conclusion.  *See* Dkt. 44 at 37.  Justice O'Connor's in-chambers opinion in *LAP* reflects the views of a single Justice relating to a different statute, the Immigration Reform and Control Act of 1986 ("IRCA").  *FAIR*, too, is inapposite.  The organization at issue in that case was

b.  Non-Statutory Cause of Action

Plaintiffs also bring a non-statutory—or equitable—cause of action challenging the Proclamation itself.  Defendants argue that no such cause of action is cognizable for a hodgepodge of reasons, most of which receive little more than a sentence in Defendants' briefs. They argue that the Proclamation itself "unambiguously forecloses judicial review," Dkt. 44 at 43; that, in any event, "proclamations are [simply] management tools for implementing the President's policies, not legally binding documents that may be enforced against the Executive Branch," *id.*; that § 1182(f) and § 1185(a) vest the President with discretion that is not subject to "judicial second-guessing," *id*. at 43–45; that the President's authority to exclude or expel aliens "remains largely immune from judicial control," *id.* at 45 (citation omitted); that the President's authority "stems not [only] from legislative power but is inherent in the executive power to control the foreign affairs of the nation," *id.* (citation and emphasis omitted); that "the power over aliens is of a political character and therefore subject only to narrow judicial review," *id.* at 46 (citation and emphasis omitted); that the "courts are categorically barred from issuing injunctions that would purport to enjoin or otherwise constrain the President in the performance of his official duties," Dkt. 55 at 19 (citation omitted); that Plaintiffs' claims here are statutory, "even if dressed in separation-of-powers garb," *id*.; and, finally, that Plaintiffs' claims fail to

---

"dedicated to ensuring that levels of legal immigration are consistent with the absorptive capacity of the local areas where immigrants are likely to settle," and it brought suit challenging the INA's scheme for "parole and adjustment of status of Cuban nationals" into the United States.  *FAIR*, 93 F.3d at 899 (internal quotation omitted).  The D.C. Circuit held that the organization's mission bore no more than a "marginal[] rela[tionship]" to the statutory purposes of the INA, because it pointed to no language of congressional intent that "even hint[ed] at a concern about [the] regional impact" of immigration.  *Id*. at 900–01 (internal quotation marks omitted).

allege a violation sufficiently egregious to support "an *ultra vires* claim," *id.* at 20 n.4 (emphasis added).

To the extent this litany of arguments either rehashes arguments addressed above or anticipates the merits, which are addressed below, the Court will not repeat itself here. A couple of points, however, warrant at least brief mention. To start, non-statutory review of unlawful executive action existed long before the APA was enacted, and "[n]othing in the subsequent enactment of the APA altered" the understanding that, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *see also Reich*, 74 F.3d at 1328. Nor is there any merit to Defendants' suggestion that *ultra vires* review is available only in cases alleging a constitutional claim. To be sure, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015), involved a claim premised on the Supremacy Clause. But the Supreme Court did not limit its recognition of a right to sue to enjoin "violations of federal law by federal officials" to constitutional claims. *Id.* As the D.C. Circuit explains in *Reich*, moreover, the long history of the non-statutory cause of action started with a statutory claim in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), in which the Supreme Court assumed the constitutionality of the statutes at issue and addressed, instead, whether the Postmaster General acted in accordance with those statutes, and has been applied on numerous occasions to statutory claims. 74 F.3d at 1327–28 (citing leading cases).

Nor is there any merit to Defendants' suggestion that presidential actions lie beyond the scope of review, even when the relief is limited to enjoining the actions of subordinate government officials. To the contrary, the D.C. Circuit engaged in precisely that form of review in *Reich*, 74 F.3d at 1328; it is the approach that Justice Scalia endorsed in his concurrence in

*Franklin v. Massachusetts*, 505 U.S. at 823–29; and it is what happened in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). As the D.C. Circuit wrote in *Soucie v. David*: "The fact that the President may have ordered" the subordinate official to engage in the challenged conduct "does not leave the courts without power to review the legality of" that conduct, "for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971). In this respect, Defendants' unsupported contention that federal courts not only lack the power to enjoin the President, but also lack the power to "otherwise constrain" how he discharges his "official duties," Dkt. 55 at 19, is not only wrong, but at odds with the fundamental tenet that ours is "a government of laws and not of men," *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (internal quotation marks omitted); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 575 (D.D.C. 1952). And their argument that the substance of the Proclamation is unreviewable merely because it recites the usual boilerplate disclaiming the creation of "any right or benefit, substantive or procedural, enforceable at law or in equity," Proclamation, § 6, requires only the briefest of responses; putting aside Defendants' misreading of the Proclamation, the Executive Branch, in any event, cannot avoid judicial review by simply declaring that its actions are unreviewable.

There are, of course, limits on the availability of *ultra vires* or non-statutory review. Congress (unlike the Executive Branch) may "preclude[] non-statutory judicial review," *Reich*, 74 F.3d at 1328, and certain exercises of presidential authority are committed to the President's exclusive discretion. The Court, however, has already addressed the relevant statutory limits on its jurisdiction and authority, and, in the field of immigration, the President shares authority with Congress. *See* U.S. Const. art. I, § 8 ("The Congress shall have Power To . . . establish an

uniform Rule of Naturalization.").  As precedent reflects, in areas of shared presidential and

congressional authority, the courts have presumptive authority to determine whether the

President has usurped an authority that Congress neither delegated to him nor left for him to

exercise unimpeded by statute.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981);

*Youngstown*, 343 U.S. 579; *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993).[10]

## B.    Merits

Plaintiffs challenge the Proclamation and implementing guidance as an unlawful effort to

supplant the detailed provisions of the INA with an alternative set of immigration laws

established by executive "fiat."  Dkt. 52 at 11.  They argue that the Proclamation and guidance

purport to establish an alternative extra-statutory system for removing or repatriating aliens in

"212(f) Expedited Removals" and "212(f) Direct Repatriations," rather than under the rules and

procedures that Congress has enacted.  And they argue that, under this alternative system, the

right to apply for asylum, 8 U.S.C. § 1158, the right to withholding of removal, 8 U.S.C.

§ 1231(b)(3), 8 C.F.R. §§ 208.16, 1208.16, and the procedural protections ordinarily available to

CAT applicants, 8 U.S.C. § 1231 note (head of agency must implement CAT by "prescrib[ing]

regulations"); 8 C.F.R. §§ 208.9, 208.30, 1208.30, are abrogated for those aliens subject to the

Proclamation.

Plaintiffs further argue that none of the authorities that Defendants invoke in support of

the Proclamation and guidance authorize such a wholesale rewriting of the INA and the

governing regulations.  Plaintiffs stress that, even if § 1182(f) and § 1185(a) confer broad

---

[10] Defendants also contend that the determination of what constitutes an "invasion" is a
nonjusticiable political question.  *See* Dkt. 44 at 47–48.  But because the Invasion Clause of
Article IV does not provide authority for the challenged actions that is not found elsewhere, *see
infra* at 84–89, the Court need not make any such determination.

discretion on the President to suspend or to restrict "entry" into the United States, those

provisions do not authorize the President or the Secretary to suspend access to asylum and

withholding of removal or to disregard the regulations governing CAT determinations. Nor, on

Plaintiffs' telling, do those provisions permit the President or the Secretary to supplant the INA's

detailed procedures for removal of aliens who are unlawfully present in the United States with

non-statutory, non-regulatory, and less protective "212(f) Expedited Removals" and "212(f)

Direct Repatriations." And, Plaintiffs continue, neither the President's Article II authority nor

whatever independent authority he might have under Article IV, Section 4 allows him or those

acting at his direction to take any of these actions. As the Supreme Court recently observed,

Congress maintains "plenary power over immigration," and the President's exercise of delegated

authority cannot exceed the bounds that Congress has set. *SEC v. Jarkesy*, 603 U.S. 109, 129

(2024). Yet, according to Plaintiffs, that is precisely what the Proclamation and implementing

guidance purport to do.

Defendants disagree with each of these arguments, and they maintain that the

Proclamation and implementing guidance constitute a permissible, albeit novel, use of § 1182(f)

and § 1185(a), and that the President's constitutional authority both bolsters that conclusion and

provides an independent basis for the Proclamation and guidance. Their arguments, for the most

part, turn on an appeal to efficacy and an implied (albeit not express) authority to take all steps

necessary to stop unauthorized individuals from crossing the southern border, Proclamation, § 2,

or entering the United States elsewhere, without "sufficient medical information and reliable

criminal history and background information," Proclamation, § 3.

For the reasons explained below, the Court concludes that Plaintiffs have the better of the

arguments and that neither the INA nor the Constitution authorizes the changes in immigration

law embodied in the Proclamation and implementing guidance. The Court will first address the

creation of the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms

and will then consider the suspension of the rights to apply for asylum and to obtain withholding

of removal and the changes made to the procedures for seeking CAT protection.

    1.      *"212(f) Direct Repatriation" and "212(f) Expedited Removal"*

        a.  <u>Statutory Authority</u>

The first question is whether the INA authorizes the use of the new "212(f) Direct

Repatriation" and "212(f) Expedited Removal" mechanisms in lieu of traditional removal

procedures. The parties agree that the regular removal procedures set forth in § 1229a constitute

"'the sole and exclusive procedure[s]' for ordering the removal of noncitizens" from the United

States, Dkt. 52 at 16 (quoting 8 U.S.C. § 1229a(a)(3)), "[u]nless otherwise specified in [the

INA]," Dkt. 55 (quoting same).[11] They also agree that expedited removal under § 1225(b)(1)

constitutes an "otherwise specified" procedure, thereby establishing at least two routes to

removal: regular removal and expedited removal. Their disagreement, instead, turns on whether

"§ 1182(f) is an INA provision that 'otherwise specifie[s]' that an alien may be repatriated" or

---

[11] This reading of the statute most naturally starts with § 1225(a), which provides that any "alien present in the United States who has not been admitted . . . shall be deemed for purposes of [Chapter 12 of the INA] an applicant for admission." 8 U.S.C. § 1225(a)(1). Section 1229a(a)(3), in turn, provides that, "[u]nless otherwise specified in [Chapter 12], a proceeding under [§ 1229a] shall be the sole and exclusive procedure for determining whether an alien may be admitted," 8 U.S.C. § 1229a(a)(3). Section 1225(b)(1) qualifies under the "otherwise specified" exception because it provides for expedited removal of certain aliens. Absent some other authorization found in Chapter 12, these provisions provide the "sole and exclusive procedure[s]" for removal of an alien who enters the United States without documentation. *See United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021); *cf. Marcello v. Bonds*, 349 U.S. 302, 309–10 (1955) (holding that Congress intended the pre-IIRIRA removal procedures to be the sole and exclusive means for deportation of aliens). Finally, even without § 1229a(a)(3)'s exclusivity provision, the same conclusion would apply. Congress has crafted detailed rules and procedures that would be rendered meaningless if an agency were free to adopt its own rules and procedures in place of those that Congress enacted.

removed without complying with the procedures set forth in § 1229a (regular removal) or

§ 1225(b)(1) (expedited removal).  Dkt. 55 at 24 (describing "[t]he government's claim here").

In Defendants' view, the President's authority to suspend or limit "entry" into the United States

necessarily carries with it the authority to "repatriate" those who enter the United States in

violation of the Proclamation.  In other words, according to Defendants, "212(f) Direct

Repatriation" (and, presumably, "212(f) Expedited Removal") is a necessary byproduct of the

right to deny entry, and that implied authority is sufficient to bring the President's exercise of his

§ 1182(f) authority within the "otherwise specified" exception to the exclusive-procedures

clause.  *Id.* at 24–26.  The Court is unpersuaded for several reasons.

At the outset, it bears note that the Proclamation does not purport to establish a new

"212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism in lieu of the existing

statutory procedures.  Rather, the word "repatriate" appears only twice in the Proclamation—

once in the preamble, where the President describes his constitutional (rather than statutory)

authority, and once in Section 5 of the Proclamation, where the President directs the Secretary to

"take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion

across the southern border of the United States."  It was only in the implementing guidance

issued by USCIS and U.S. Customs and Border Protection that the concepts of "212(f) Direct

Repatriation" and "212(f) Expedited Removal" emerge.  *See* Dkt. 52-1 at 5–6, 13–14.  As a

result, to the extent Defendants' argument is premised on an exercise of the President's authority

under § 1182(f), the President did not purport to create a new mechanism for expelling those

unlawfully in the United States—"otherwise" than as specified in § 1225(b)(1) and § 1229a.  Nor

do Defendants cite any authority indicating that the President's authority under § 1182(f) is

delegable to USCIS and U.S. Customs and Border Protection.

But, in any event, even if it were possible to read the INA to permit such a delegation of implied § 1182(f) authority, § 1182(f) cannot plausibly be read to authorize the President, the Secretary, or their subordinates to supplant the § 1225(b)(1) and § 1229a removal procedures with the new "212(f) Direct Repatriation" and "212(f) Expedited Removal" mechanisms. The Court, once again, starts with the statutory text, which grants the President discretion to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants" or to "impose on the entry of aliens any restrictions he may deem appropriate." 8 U.S.C. § 1182(f). "By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. at 683–84. But that is all that it does.

Putting aside for the moment Defendants' claim of implied authority, it is safe to conclude that § 1182(f) does not, by its terms, authorize the President, the Secretary, or any of their subordinates to replace the regular, 8 U.S.C. § 1229a, or expedited, *id.* § 1225(b)(1), removal procedures set forth in the INA with a new, non-statutory "212(f) Direct Repatriation" or "212(f) Expedited Removal" mechanism. At the time § 1182(f) was enacted, "entry" was defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." INA, Pub. L. No. 414, § 101(a)(13), 66 Stat. 163, 167 (1952). Section 1182(f), accordingly, authorizes the President to prohibit "all aliens or any class of aliens" from "coming . . . into" the United States for a designated period of time; it does not grant him the power to "repatriate" or to peremptorily remove those who have already entered without utilizing the statutory procedures for doing so.

Nor does the President's authority under § 1182(f) to impose "restrictions" "on the entry of aliens" suffice to trigger the "otherwise specified" exception to the "sole and exclusive procedure[s]" for removing those who have entered the United States. 8 U.S.C. § 1229a(a)(3).

74

As the Supreme Court explained in *Trump v. Hawaii*, "[f]airly read, [§ 1182(f)] vests authority in the President to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA—including in response to circumstances that might affect the vetting system or other 'interests of the United States.'"  585 U.S. at 691.  In other words, § 1182(f) is best read to permit the President to impose non-statutory restrictions on "the entry of aliens."  But the authority to "impose on the *entry* of aliens any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f) (emphasis added), does not mean that the President has the authority to alter the rules that apply to those who have already entered.[12]

Defendants' attempts to sidestep the statutory text are unavailing.  *First*, Defendants maintain that "[n]othing in Section 1182(f) forecloses repatriation of illegal immigrants who manage to gain physical entry into the United States notwithstanding a Proclamation barring such entry."  Dkt. 44 at 49.  That is true but unhelpful.  A failure to forbid is not a grant of authority, and the authority granted here, as discussed above, is limited to the sphere of "entry."  *See INS v. Chadha*, 462 U.S. 919, 953 n.16 ("Executive action [under legislatively delegated authority] is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review . . . .");  *see also Trump v. Hawaii*, 585 U.S. at 688 (finding that the § 1182(f) proclamation at issue in that case did "not exceed any textual

---

[12] Defendants do not argue that aliens subject to the Proclamation have not "entered" the United States, presumably because Plaintiffs do not raise a due process challenge, *see infra* at 83–84, and because the Proclamation and guidance seek to govern the expulsion of covered aliens, regardless of how long (after January 20, 2025) they have been in the United States, where they are located, or whether they are detained.  A blurring of the meaning of the word "entry" as used in the INA would also complicate the enforcement of other provisions of the statute.  For example, 8 U.S.C. § 1326 provides that any alien who "enters" after having previously been denied admission or removed is subject to a fine or imprisonment.  It is hard to imagine the government taking the position that those criminal penalties would not attach to an alien who had only succeeded in making it a short way past the border before being apprehended.

limit on the President's authority"); *cf. La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

("An agency may not confer power upon itself.").

    *Second*, Defendants contend that a "[s]uspension on entry must necessarily encompass

the ability to expel" because, otherwise, "the statute's authority to prohibit physical entry" would

be "render[ed] . . . ineffective."  Dkt. 44 at 49.  This is not a textual argument but, rather, posits

that § 1182(f) includes an implied authority to take whatever actions are necessary to give effect

(or, more aptly, to give maximum effect) to a suspension of entry.  As an initial matter, the Court

notes that Defendants' implied-authority argument is a peculiar one under the present

circumstances, since the President has suspended "entry" of individuals who were already

forbidden from entering, only then to argue that he has the implied authority to take whatever

actions he (or his subordinates) deems necessary to give effect to his (redundant) suspension of

entry.  There is an impressive bootstrapping element to that argument.

    In other contexts, moreover, the authority to suspend entry is undoubtedly meaningful.

That is, for example, what spurred the litigation leading to the Supreme Court's decision in

*Trump v. Hawaii*, 585 U.S. 667 (2018).  Presidents have also used § 1182(f) to exclude aliens

whose actions "threaten[ed] the peace, security, or stability of Libya," Executive Order 13726,

81 Fed. Reg. 23559, 23559 (Apr. 21, 2016), or to exclude "members of the military junta in

Sierra Leone and members of their families," Proclamation 7062, 63 Fed. Reg. 2871, 2871 (Jan.

16, 1998).  In general, statutory grants of authority to the Executive Branch do not carry with

them a sweeping, implied authority analogous to Congress's power under the Necessary and

Proper Clause, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).  Just as the courts

will not "rewrite [a] statute . . . as if it" pursued "a single policy at all costs," *Advoc. Christ*

*Medical Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025), so too the President may not assert an

authority not found in the text of a statute merely because that additional authority would render his statutorily authorized actions more effective.

In this respect, Defendants' appeal to an implied authority runs headlong into the aphorism about hiding elephants in mouseholes. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). To be sure, § 1182(f) confers a broad authority on the President to suspend or restrict the entry of aliens when doing so, in his view, is in the "interests of the United States." 8 U.S.C. § 1182(f). But it is a different matter altogether to read § 1182(f) in a manner that is unmoored to the statutory text and, instead, to authorize the President (or his subordinates) to use a § 1182(f) suspension on entry as a springboard to take whatever enforcement actions deemed necessary to give effect to the suspension. That assertion of implied authority is particularly striking, moreover, when used to replace the statutorily prescribed procedures with non-statutory mechanisms—to permit immigration authorities, for example, to pack any covered aliens onto a bus or airplane and to expel them from the country, without complying with § 1225(b)(1) or § 1229a. It is also striking when used to enforce a presidential prohibition on entry that merely echoes the prohibition that Congress itself included in the INA. Indeed, if § 1182(f) could be read that capaciously, Congress could have altogether dispensed with enacting IIRIRA and creating the expedited removal procedure, since the President would have already had the unilateral authority to deploy a version of the expedited removal rules (or a truncated version of those rules or no rules at all) based on nothing more than his authority to suspend or restrict the entry of any class of aliens into the United States (including those who are already barred from entry). Neither the plain language of § 1182(f) nor history nor common sense permits cramming such a large elephant into even the most spacious of mouseholes.

Defendants assert, however, that two cases—the Supreme Court's decision in *Sale v. Haitian Centers Council Inc.*, 509 U.S. 155 (1993), and the D.C. Circuit's decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)—support their view that § 1182(f) must be read to grant the President (or his subordinates) an implied repatriation authority. The Court is unpersuaded on both counts. In *Sale*, the Supreme Court held, without any explanation, that it was "perfectly clear" that § 1182(f) authorized the President to place a naval blockade *outside* U.S. territorial waters to *turn back* Haitian migrants whose entry had been suspended. 509 U.S. at 187. On Defendants' telling, the power to repatriate is "simply the other side of the *Sale* coin;" just as the President can take "preventative action to ensure that aliens subject to the Proclamation do not reach the border," so too can he take remedial action if a covered alien enters anyway. Dkt. 44 at 50. But *Sale*'s observation that a President could take an action to prevent aliens whose entry was suspended from ever reaching U.S. soil—that is, to prevent their "entry"—does not imply that he also enjoys the power to use extra-statutory methods to expel those aliens after they have already entered the United States. Indeed, if anything, *Sale* suggests that once someone has physically entered the United States, the protections of the INA attach. As the *Sale* Court observed, the naval blockade was intended to "prevent[] Haitians . . . from reaching our shores *and invoking* [*the INA's*] *protections*." *Id.* at 160 (emphasis added).

Defendants' reliance on *Huisha-Huisha* is also misplaced. *Huisha-Huisha* said nothing about 8 U.S.C. § 1182(f) and, instead, addressed a statute found in Title 42 that is designed to protect the public health. 27 F.4th at 721. That provision, 42 U.S.C. § 265, authorizes the Surgeon General—and the Centers for Disease Control and Prevention ("CDC"), by delegation—to issue an order that "prohibit[s], in whole or in part, the introduction of persons and property from such countries or places as [the CDC] shall designate in order to avert" a

"serious danger" to the public health posed by "the danger of introduction" of a communicable

disease "into the United States."  In 2020, during the onset of the COVID-19 pandemic, the CDC

issued implementing interim regulations that defined "introduction into the United States of

person from a foreign country" to mean "the movement of a person from a foreign country . . .

into the United States so as to bring the person in contact with others in the United States, or so

as to cause the contamination of property in the United States . . . in a manner that the [CDC]

determines to present a risk of transmission of a communicable disease."  Suspension of

Introduction of Persons Into United States from Designated Foreign Countries or Places for

Public Health Purposes, 85 Fed. Reg. 16559, 16563 (Mar. 24, 2020).  The interim regulations

further defined "'serious danger of the introduction of such communicable disease into the

United States' to mean the potential for introduction of vectors of the communicable disease into

the United States, even if persons or property in the United States are already infected or

contaminated with the communicable disease."  *Id.*

Acting pursuant to this statutory and regulatory authority and in light of the threat to

public health posed by the COVID-19 pandemic, the CDC issued an order in March 2020

suspending "the introduction of all covered aliens"—defined to include those "traveling from

Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into

the congregate settings in land [Ports of Entry] or Border Patrol stations"—"into the United

States" for a designated period of time.  Notice of Order Under Sections 362 and 365 of the

Public Health Service Act, 85 Fed. Reg. 17060, 17061 (March 26, 2020).  The CDC

subsequently extended the designated period of time on several occasions, and took the position

that the "'suspension' clause in § 265 grants the CDC the 'authority to temporarily suspend the

effect of any law, rule, degree, or order by which a person would otherwise have the right to be

introduced or [to] seek introduction into the U.S.'" *Huisha-Huisha*, 718 F.4th at 726 (quoting 85

Fed. Reg. 56424, 56426 (Sept. 11, 2020)).  The rights subject to suspension under a § 265 order,

on the CDC's view, included the right to apply for asylum and the right to seek withholding of

removal or CAT protection.

   Among other challenges, which are discussed below, the *Huisha-Huisha* plaintiffs argued

that 42 U.S.C. § 265 permits the CDC only to bar "introduction" of an alien into the United

States and that it does not authorize the CDC or the Department of Homeland Security to "expel"

those who have already been "introduced into the United States."  *Id.* at 728.  In the preliminary

posture of a motion for a preliminary injunction, the D.C. Circuit was unpersuaded, but for

reasons that have little bearing on this case.  First and foremost, the court stressed that § 265

provides public health officials with authority to bar the introduction of persons into the United

States "during a public-health emergency."  *Id.* at 729.  The COVID-19 pandemic and the spread

of the virus throughout the United States was precisely the type of emergency that § 265 was

designed to address.  The court, accordingly, observed that the authority provided in § 265

"could be rendered largely nugatory if the Executive could not take any action against a covered

alien who disregarded the prohibition and managed to set foot on U.S. soil."  *Id.*  That reading of

a different statute than the statute at issue here, of course, made perfect sense, and it cohered with

the governing regulations.  As the statutory text makes clear, the purpose of § 265 is not to

control immigration but, rather, to control "the introduction of [a dangerous communicable

disease] into the United States."  42 U.S.C. § 265.  And as the governing regulations made clear,

a communicable disease is "introduced" into the United States when "vectors" of the disease

reach into the country.  85 Fed. Reg. at 16563.  If those potential "vectors" were allowed to

remain in place while removal proceedings played out, the disease would spread, and the goal of

preventing spread of the disease in the United States would not be achieved.  In short, the D.C. Circuit reasoned that § 265 must read in light of its purpose, and that purpose can be served only through prompt expulsion.

Section 1182(f) shares none of those unique characteristics.  To start with the obvious, § 1182(f) is not a public health statute, and it is not concerned with the vectors by which a communicable disease can be spread.  Rather, it is located in § 1182, a provision within the INA entitled "Inadmissible aliens."  As the Supreme Court explained in *Trump v. Hawaii*, § 1182 "establishes numerous grounds on which an alien abroad may be inadmissible to the United States," and, in § 1182(f) "Congress has also delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances."  585 U.S. at 683.  By providing authority to suspend "entry" into the United States, § 1182(f) is of a piece with rest of § 1182.  *Id.* at 695 n.4. There is no textual or other reason, moreover, to conclude that a proclamation suspending entry of a class of aliens pursuant to § 1182(f) confers greater enforcement authority—or better justifies a reason to resort to extra-statutory enforcement mechanisms—that any other limitation on entry or admissibility found in § 1182.

By Defendants' reasoning, one of two things must be true:  Either those federal agencies engaged in enforcing the immigration laws should be allowed to "repatriate" anyone who is inadmissible pursuant to any of the provisions of § 1182, including any "alien present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i).  Or there is something unique about those barred entry pursuant to § 1182(f).  But the first proposition proves too much and would render the detailed provisions found in § 1225(b)(1) (expedited removal) and § 1229a (regular removal)—as well as the "exclusive procedures" provision, 8 U.S.C. § 1229a(a)(3)—meaningless.  Use of those provisions would be optional, and

enforcement authorities would be free to craft their own rules and procedures (or, indeed, simply to dispense with any rules and procedures) for expelling aliens from the United States.  That, of course, is not the system that Congress has prescribed.  That, then, leaves the second proposition, which fares no better.  Congress could have provided the President with the authority, not only to suspend or restrict "entry," but also to "suspend" the normal removal procedures when operating pursuant to § 1182(f).  Unlike with respect to 42 U.S.C. § 265, however, there is no reason—and certainly no reason that can be coherently cabined—to read § 1182(f) to confer such additional implicit authority on the President.  Indeed, if that were the case, § 1225(b)(1) and § 1229a would, again, be dead letters (or at least optional processes that the enforcement agencies could disregard), since the President could always do as he has done here and bar entry to a class of aliens who are already barred entry under any of the other provisions of § 1182, and then declare that the only way to give that proclamation meaning is to permit non-statutory expulsions.

*Huisha-Huisha* is unhelpful to Defendants for a second reason as well.  Section 1182(f) and 42 U.S.C. § 265 not only appear in different titles of the U.S. Code (titles that are focused on very different substantive fields), but the controlling statutory text is different.  As noted above, the governing CDC regulations defined "introduction into the United States" to mean "the movement of a person from a foreign country . . . into the United States *so as to bring the person in contact with others in the United States* . . . in a manner that the [CDC] determines to present a risk of transmission of the communicable disease." 85 Fed. Reg. at 16563 (emphasis added). That is a reasonable interpretation of the phrase "introduction of persons . . . in order to avert" the danger of a communicable disease, as that phrase is used in § 265.  But that is not what the word "entry" means, as used in the INA; rather, as explained above, since the time § 1182(f) was enacted, and consistent with common usage, "entry" has referred to "any coming of an alien into

the United States, from a foreign port of place or from an outlying possession, whether

voluntarily or otherwise."  INA, Pub. L. No. 414 § 101(a)(13), 66 Stat. 163, 167 (1952); *see also*

*Entry*, *Entrance*, *Enter* Webster's New Collegiate Dictionary at 274–75 (1953) (defining "enter"

as "entrance" and "entrance" as "the act of entering," which, in turn, is defined as "go[ing] or

com[ing] in").  Thus, while § 265 can be read to cover the continuing "introduction" of a

disease-causing "vector" into the interior of the United States, even after the individual has

crossed the border, the same is not true of the word "entry," as used in § 1182(f).

    That, then, leads to one final question posed by *Huisha-Huisha*'s analysis of the CDC's

authorization to expel aliens pursuant to § 265.  In that case, the plaintiffs argued "that aliens

finish introducing themselves once they cross the border."  27 F.4th at 729.  In response, the

D.C. Circuit first observed that the concept of entry into the United States is not fixed and that,

*for purposes of the due process clause*, the Supreme Court has held that an alien who merely "set

foot on U.S. soil"—in that case, the plaintiff "succeeded in making it 25 yards into U.S. territory

before he was caught"—"cannot be a said to have 'effected an entry.'"  *DHS v. Thuraissigiam*,

591 U.S. 103, 139–40 (2020); *Huisha-Huisha*, 27 F.4th at 729.  But far from calling into

question the longstanding understanding of "entry" for purposes of construing § 1182(f), the

D.C. Circuit reaffirmed that "aliens who make it one foot over the border are on U.S. soil and *are*

*thus entitled to certain statutory protections*."  *Huisha-Huisha*, 27 F.4th at 729 (emphasis added).

And, notably, the Supreme Court decision the court cited in support of that proposition counted

"the right to a 'determin[ation]' whether [the plaintiff] had 'a significant possibility' of

'establish[ing] eligibility for asylum,'" as among those statutory protections that attach upon entry.[13] *Thuraissigiam*, 591 U.S. at 140.

The Court, accordingly, concludes that Defendants lack statutory authority to supplant the usual removal procedures set forth in § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with new, non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures.

    b.  <u>Constitutional Authority</u>

Nor is the Court persuaded by Defendants' contention that, "[e]ven without . . . Section 1182(f), the President's action here would be supported by the inherent authority of the Execuve over admission decisions." Dkt. 44 at 52. Defendants' argument involves two steps. They first argue that "the power of excluding aliens from U.S. territory is an inherent attribute of sovereignty exercised by the political branches of government." *Id.* And they then argue that, even though "the Executive's inherent authority over expulsion is not likely as broad as its authority over exclusion," "mandating the repatriation of aliens whose entry was barred at the time they entered the United States on account of a Presidential Proclamation under Section

---

[13] Although *Huisha-Huisha* also notes that an alien "'who is present in the United States in violation of . . . any . . . law of the United States . . . is deportable,'" 27 F.4th at 729 (quoting 8 U.S.C. § 1227(a)(1)(B)), that provision has no bearing on the question presented here. Section 1227 addresses whether aliens who have been "admitted to the United States" are "deportable"— or, to use the language of IIRIRA, "removable." It does not, however, address the separate question of what process immigration authorities must follow to effectuate that deportation or removal. Nor does § 1227(a)(1)(B) otherwise apply to the individual plaintiffs and putative class members in this case, none of whom have been "admitted to the United States." *See* 8 U.S.C. § 1101(a)(13) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Rather, as described above, aliens like the individual plaintiffs and putative class members who are "present in the United States" but who "have not been admitted" are deemed "applicant[s] for admission," *id.* § 1225(a)(1), and the "sole and exclusive procedure for determining whether an alien may be admitted" is a full removal proceeding under § 1229a, unless "otherwise specified" in Title 8, *id.* § 1229a(a)(3).

1182(f) is a permissible Executive Branch exercise of inherent authority, [which] is also

consistent with the broad parameters Congress" has specified. *Id.* at 53. In Defendants' view,

the President is therefore permissibly operating in *Youngstown* Category Two. *Id.* at 53–54

(citing *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)).

The argument fails for several reasons. As an initial matter, the Court once again notes

that the President did not establish the new "212(f) Direct Repatriation" and "212(f) Expedited

Removal" procedures as an exercise of his constitutional authority; at best, he delegated

authority to the Secretary to "take all appropriate action to repel, repatriate, or remove any alien

engaged in the invasion across the southern border." Proclamation, § 5. Accordingly, the Court

is not called upon to review a presidential decree in this respect but, rather, decisions made by

U.S. Border Patrol and USCIS officials regarding how to implement the Proclamation. But even

had the President directed that immigration enforcement authorities supplant the detailed

procedures for removing inadmissible aliens set forth in § 1225(b)(1) (expedited removal) and

§ 1229a (regular removal) with the new "212(f) Direct Repatriation" and "212(f) Expedited

Removal" procedures, the argument would fail.

The principal authority that Defendants invoke, *U.S. ex rel. Knauff v. Shaughnessy*, 338

U.S. 537 (1950), does more harm than good to their argument. That case, of course, preceded

enactment of the INA in 1952, but much of the Court's reasoning remains illuminating today.

What is perhaps most notable about *U.S. ex rel. Knauff* is that it recognizes the shared

responsibilities of the legislative and executive branches "concerning the admissibility of aliens,"

but it—appropriately—casts Congress as the lead when it comes to prescribing the rules. *Id.* at

542; *see also Jarkesy*, 603 U.S. at 129 (referring to Congress's "plenary power over

immigration"); *Demore v. Kim*, 538 U.S. 510, 521 (2003) (referring to Congress's "broad power

over naturalization and immigration"). In *U.S. ex rel. Knauff*, the Court rejected a nondelegation

challenge and upheld Congress's authority to "place[]" "the decision to admit or to exclude an

alien . . . with the President." *U.S. ex rel. Knauff*, 338 U.S. at 543. The Supreme Court

explained its reasoning as follows:

> Normally Congress supplies the conditions of the privilege of entry into the
> United States. But because the power of exclusion of aliens is also inherent in
> the executive department of the sovereign, *Congress may* in broad terms
> authorize the executive to exercise the power, *e.g.*, as was done here, for the best
> interests of the country during a time of national emergency. Executive officers
> may be entrusted with the duty of specifying the procedures for carrying out the
> congressional intent.

*Id.* (emphasis added). In other words, although the legislature typically sets the conditions on

entry by legislation, Congress may authorize the Executive Branch to exercise the authority to

limit entry when it is in "the best interests" of the United States to do so, and it may "entrust[]"

the Executive Branch to set appropriate "procedures for carrying out . . . congressional intent."

*Id.*

Nowhere in *U.S. ex rel. Knauff* or in any other decision has the Supreme Court ever

suggested that the President's inherent authority to protect the borders of the United States

permits him to supplant rules proscribed by Congress. In this respect, the present case is the

polar opposite of *U.S. ex rel. Knauff*. In *U.S. ex rel. Knauff*, the question was whether Congress

could authorize the President or his delegee to exclude certain aliens and to "specify the

procedures for carrying out th[at] congressional intent." 338 U.S. at 542–43. Here, the question

is whether the President or his delegees may disregard the rules that Congress has specified and

expel individuals who are already in the United States without complying with the "exclusive

procedure[s]" set by statute, *see* 8 U.S.C. § 1229a(a)(3); *see also id.* § 1225(b)(1) (expedited

removal); *id.* § 1229a (regular removal). Except in circumstances, not present here, where the

President exercises an exclusive authority, *Youngstown*, 343 U.S. at 637–38 (Jackson, J.,

concurring), neither he nor his delegees are "free from the ordinary controls and checks of

Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576

U.S. 1, 21 (2015), and they must abide by the law as Congress has prescribed it.  If military

exigencies provided insufficient basis for President Truman to seize the steel mills, *Youngstown*,

343 U.S. at 587–88, the crisis at the southern border does not provide the President or his

delegees with sufficient basis to ignore the removal procedures that Congress enacted in the INA

and IIRIRA.

    That conclusion carries particular force here, moreover, because, unlike in *U.S. ex rel.*

*Knauff*, the present dispute is not about the power to exclude but, rather, about the power to

expel.  *U.S. ex rel. Knauff* gestures at the importance of this difference, noting: "Whatever the

rule may be concerning *deportation of persons who have gained entry into the United States*, it is

not within the province of any court, unless expressly authorized by law, to review the

determination of the political branches of the Government *to exclude* a given alien."  338 U.S. at

543 (emphasis added).  Even more importantly, Defendants themselves candidly acknowledge

that "the Executive's inherent authority over expulsion is not likely as broad as its authority over

exclusion."  Dkt. 44 at 53.  That concession makes sense given the limited rights that aliens

typically possess before entering the United States and the unique authority that the political

branches maintain over who is permitted to enter the country.  *See, e.g.*, *U.S. ex rel. Knauff*, 338

U.S. at 542–43; *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).  But once an alien

has entered the United States, the INA and decades of historical practice, *see, e.g.*, *NLRB v. Noel*

*Canning*, 573 U.S. 513, 524 (2014) ("[L]ong settled and established practice is a consideration of

great weight in proper interpretation of constitutional provisions regarding the relationship

between Congress and the President."), establish that the Executive Branch is bound to follow the will of Congress in expelling inadmissible aliens.

Defendants' reliance on the Constitution's guarantee that the "United States . . . shall protect each [state] against Invasion," U.S. Const., art. IV, § 4 (the "Invasion Clause"), fails for the same reasons. Defendants themselves place little or no independent reliance on the Invasion Clause and, instead, merely suggest that the President plays *some* role in protecting the States "against Invasion." Dkt. 44 at 65. But even assuming that is correct, Defendants do not dispute that Congress plays the primary role in crafting the governing rules and that, under the *Youngstown* framework, *see Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring), the President may not act in derogation of the laws that Congress has enacted. Although relevant precedent is sparse, the Supreme Court has opined that the responsibility for "carry[ing] into effect" the Guarantee Clause "is primarily a legislative power," *Texas v. White*, 74 U.S. 700, 701 (1868), *overruled on other grounds by Morgan v. United States*, 113 U.S. 476 (1885), and that it "rest[s] with Congress . . . to determine . . . the means proper to be adopted to fulfill th[e] guarantee" against "domestic violence," *Luther v. Borden*, 48 U.S. 1, 43 (1849). There is no reason to believe that the Invasion Clause, which appears in the very same sentence of Article IV as these provisions, allocates responsibility any differently. That conclusion finds further support in Article I of the Constitution, moreover, which grants Congress the power to "provide for calling forth the Militia to . . . repel Invasions," U.S. Const., art. I, § 8, cl. 15, leaving little doubt that responsibility under the Invasion Clause is, at the very least, shared between the political branches. Finally, it is far from clear that the Invasion Clause confers any power to act that is not found elsewhere in Articles I and II of the Constitution. Unlike Article IV, Section 4, which speaks in terms of the *responsibility* of "[t]he United States" to protect the States, Articles

I and II speak in terms of the "*Power*[s]" vested in the Congress and the President to perform their constitutional responsibilities.[14]  If the President lacks authority under the Vesting Clause of Article II to supplant the INA with an alternative set of immigration laws, that power cannot be found in Article IV, Section 4.

The Court, accordingly, concludes that the President lacks the inherent constitutional authority to supplant § 1225(b)(1) (expedited removal) and § 1229a (regular removal) with non-statutory repatriation or removal rules.  To hold otherwise would render much, if not most, of the INA simply optional.

    2.    *Suspension of Asylum*

Plaintiffs further argue that the Proclamation runs afoul of the asylum statute, 8 U.S.C. § 1158, by "restrict[ing]" covered aliens from "invoking" the asylum provisions of the INA. Proclamation, §§ 2, 3.  The Court agrees.

---

[14] Although the Court need not reach the issue, it is telling that Defendants have offered no support whatsoever for the dubious proposition that the Framers understood or used the word "Invasion" to include illegal immigration.  *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government.") (citing *The Federalist No. 43*, at 167 (James Madison) (Clinton Rossiter ed., 1961)).  To be sure, many questions relating to the implementation of Article IV, Section 4 may be nonjusticiable.  *But see New York v. United States*, 505 U.S. 144, 185 (1992).  "It is emphatically the province and duty of the judicial department," however, "to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 137 (1803); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting same).  Illegal immigration undoubtedly poses serious challenges, but Defendants do not suggest that it involves "armed hostility," threatened or effectuated, by "another political entity" against a "State in th[e] Union."  *Padavan*, 82 F.3d at 28.  Defendants' Invasion Clause argument, accordingly, fails for this reason as well.

The Court, once again, starts with the statutory text and "must enforce plain and unambiguous statutory language according to its terms," *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).  The words of the statute, moreover, must be "placed in context," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), and must be read "with a view to their place in the overall statutory scheme," *id.* at 133 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Here, the relevant text provides as follows:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added).  Although the word "may" is, of course, permissive, the choice of whether to apply for asylum is left to the applicant; the statute requires the government to provide the applicant with that opportunity.  In other words, under the plain language of § 1158(a)(1), the government *must* provide an alien present in the United States with the *option* of applying for asylum.  That requirement is then echoed in other provisions of the INA.  Under § 1225(b)(1), for example, if an "alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of persecution, the officer *shall* refer the alien for an interview by an asylum officer," the "asylum officer *shall* conduct interviews of [those] aliens referred" to her, and, "[i]f the officer determines . . . that an alien has a credible fear of persecution . . . , the alien

*shall* be detained for further consideration of the application for asylum." 8 U.S.C.

§ 1225(b)(1)(A), (B) (emphases added). Read in this context, it is clear that, even though asylum

is itself a discretionary form of relief, providing aliens with the opportunity to apply for asylum

(and the opportunity to be heard) is mandatory.

Defendants offer two nontextual responses to this logic: they first argue that a bar on

applying for asylum is necessary to give effect (or, at least, maximum effect) to the

Proclamation's bar on entry, and, second, they argue that asylum is a discretionary form of relief

that the Attorney General is free to deny and that, as a result, permitting aliens to apply for

asylum would be futile if the Attorney General has already decided that their applications will be

denied. Dkt. 44 at 56–57. Defendants invoke the D.C. Circuit's opinion in *Huisha-Huisha* in

support of both contentions. A comparison of this case and *Huisha-Huisha*, however, merely

highlights why Defendants' argument fails here.

### a.

Defendants' first argument regarding the right to apply for asylum tracks their argument

regarding repatriation. In both contexts, Defendants rely on *Huisha-Huisha*'s observation that

the statutory authority conferred in § 265 to "prohibit . . . the introduction of persons . . . in order

to avert" the spread of a communicable disease in the United States, 42 U.S.C. § 265, "could be

rendered largely nugatory if the Executive could not take any action against a covered alien who

[has] disregarded the prohibition and managed to set foot on U.S. soil," *Huisha-Huisha*, 27 F.4th

at 729. The flaws with extending that argument to § 1182(f), which are discussed above, apply

equally here, and the Court will not repeat itself. But two additional difficulties warrant mention.

First, the conflict that the D.C. Circuit confronted in *Huisha-Huisha* was both direct and

irreconcilable. Although the initial screening for asylum can take place quickly, for those who

91

establish a "credible fear of persecution," the process can take years to complete.  8 U.S.C.

§ 1225(b)(1)(B)(ii).  Permitting aliens who pose a "serious danger" of introducing a hazardous,

communicable disease into the United States, 42 U.S.C. § 265, to remain in the United States for

months or years while their asylum applications are finally adjudicated cannot be reconciled with

the "public health" imperative served by a § 265 order.  Despite this direct and clear conflict, the

D.C. Circuit nonetheless treated the § 265 order's "foreclose[ure] [of] the statutorily mandated

procedures that aliens use to apply for asylum" as "the closest question in [the] case" and a

question that "deserve[d] attention from the District Court . . . [on] the merits."  27 F.4th at 730.

And the court strove to "harmoniz[e]" the two statutory commands, as "best" it could, by relying

on the discretionary nature of asylum and by noting that "§ 265's text" might be read to allude

"to the suspension of [the asylum] procedures with its reference to the 'suspension of the right to

introduce such persons and property' as 'is required in the interest of the public health.'"  *Id.* at

730–31 (quoting 42 U.S.C. § 265).  That is, unlike § 1182(f), § 265 can plausibly be construed

not just to bar entry, but also to bar the continuing introduction of disease "vectors" into the

United States by permitting aliens to remain here while their asylum applications were

adjudicated, which would place it in direct conflict with the current asylum adjudication process.

Here, in contrast, the asserted conflict is far less direct and far less clear.  To be sure,

efforts to keep aliens from unlawfully entering the United States would be aided by denying

statutory benefits, including the right to apply for asylum, to those who have managed to cross

the border.  But that is a consideration that Congress sought to balance in the INA, when it—

even without a presidential proclamation—barred the admission of undocumented aliens, and

when it, nonetheless, mandated that "[*a*]*ny* alien who is physically present in the United States

. . . , *irrespective of such alien's status*, may apply for asylum in accordance with [§ 1158] or,

92

where applicable, section 1225(b)."  8 U.S.C. § 1158(a) (emphases added).  One can agree or

disagree with the balance that Congress struck, but there is little doubt that Congress considered

the question when it enacted IIRIRA in 1996, *see O.A. v. Trump*, 404 F. Supp. 3d at 148, and it is

that balance that the Court must apply.

      Defendants' necessity argument confronts a second difficulty, which was not addressed

in *Huisha-Huisha*, presumably because the order at issue in that case was issued pursuant to Title

42, while the proclamation at issue here was issued under the INA.  In any event, the INA—as

opposed to Title 42—provides the Executive Branch with substantial authority, which if

exercised in accordance with law, allows the Secretary and the Attorney General to impose

additional, non-statutory limitations on eligibility for asylum.  That is the mechanism that the

Executive Branch invoked to support the 2018 and 2024 Proclamations, discussed above, *see*

*supra* at 19–26.  Although those prior efforts were, in large part, unsuccessful for reasons not at

issue here, *see id.*, Defendants fail even to gesture at the possibility that they could have, but

have not, used the authority that Congress provided to curtail the right to asylum.

      In particular, § 1158(b)(2)(C) provides that the Attorney General—and, now, the

Secretary as well, *see* 6 U.S.C. §§ 251, 271(b)(3), (5), 557—"may by regulation establish

additional limitations and conditions, consistent with this section, under which an alien shall be

eligible for asylum."  8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) ("The Attorney

General may provide by regulation for any other conditions or limitations on the consideration of

an application for asylum not inconsistent with this chapter.").  That authority is sufficient to

avoid a conflict of the type at issue in *Huisha-Huisha*, since the Secretary and the Attorney

General are authorized to issue regulations that limit eligibility for asylum, and immigration

officials can promptly resolve "mandatory denials" of asylum.  *See* 8 C.F.R. § 208.13(c).  To be

sure, those regulations must be "consistent with" the asylum statute, 8 U.S.C. § 1158(b)(2)(C),

and an applicant who is ineligible for asylum is still eligible to considered for withholding of

removal and CAT protection, *see* 8 C.F.R. § 208.13(c).  But Congress has enacted those

limitations on prompt removal, and neither the President nor this Court is free to disregard those

statutory mandates.  What matters for present purposes is that Defendants' necessity argument

does not support the ban on asylum contained in the Proclamation.  To the extent that availability

of asylum is the issue, Congress provided a mechanism—the adoption of regulations

promulgated by the Attorney General and the Secretary—to alleviate that issue, and Defendants

may not circumvent that statutorily prescribed means of adopting "additional limitations" on

asylum.  8 U.S.C. § 1158(b)(2)(C).

 Notably, this conclusion is not a new one, and, indeed, the Department of Justice itself

has long held this view of the law.  As the Department explained in the 2024 final rule, although

the Attorney General and Secretary have broad rulemaking authority, a presidential

proclamation—standing alone—"cannot affect noncitizens' right to apply for asylum, their

eligibility for asylum, or asylum procedures."  89 Fed. Reg. at 81163.  Indeed, "[t]his recognition

that [§ 1182(f)] does not affect the right to pursue a claim for asylum has been the Executive

Branch's consistent position for four decades."  *Id.*  That recognition started with Assistant

Attorney General Theodore Olson's 1984 opinion concluding that § 1182(f) "did not permit the

President to eliminate the asylum rights of noncitizens who had hijacked a plane," and it

continued with the Department's 2018 reaffirmation—during the first Trump administration—

that "'[a]n alien whose entry is suspended or restricted under [a § 1182(f)] proclamation, but who

nonetheless reaches U.S. soil contrary to the President's determination that the alien should not

be in the United States, would remain subject to various procedures under immigration law[,]'

94

including 'expedited-removal proceedings' where they could 'raise any claims for protection.'"

*Id.* at 81163 n.53 (quoting 2018 Rule).  According to the Department of Justice, the President has

invoked § 1182(f) more than 90 times since 1981, but, prior to the Proclamation at issue here, no

president has ever sought to use that provision "to affect the right of noncitizens on U.S. soil to

apply for, or noncitizens' statutory eligibility to receive, asylum."  *Id.*

The Department of Justice is not typically in the business of construing presidential

authority narrowly.  *See* Jack Goldsmith, *The Terror Presidency* 36 (2007) ("Not surprisingly,

OLCs of both parties have always held robust conceptions of presidential power.")  Yet the

Department rejected the precise assertion of congressionally delegated authority asserted in the

Proclamation.  Its analysis is persuasive and bears quoting at length:

> That longstanding understanding follows from the text and structure of the
> governing statutes.  Section [1182(f)] provides that under certain circumstances,
> the President may "suspend the entry of all aliens or any class of aliens as
> immigrants or nonimmigrants, or impose on the entry of aliens any restrictions
> he may deem to be appropriate."  [ ] 8 U.S.C. 1182(f). Although this provision—
> first enacted in 1952—"grants the President broad discretion," it "operate[s]"
> only within its "sphere."  *Trump v. Hawaii*, 585 U.S. 667, 683–84, 695 (2018).
> Section [1182] (entitled "Inadmissible aliens"), generally "defines the universe
> of aliens who are admissible" and "sets the boundaries of admissibility into the
> United States."  *Id.* at 695.  Hence, when section [1182(f)] authorizes the
> President to suspend "entry," it "enabl[es] the President to supplement the other
> grounds of inadmissibility in the INA," *id*. at 684 (citing *Abourezk v. Reagan*,
> 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry
> into the United States.
>
> This authority, though broad, does not authorize the President to override the
> asylum statute.  First enacted in the Refugee Act, the asylum statute today
> provides that "[a]ny alien who is physically present in the United States or who
> arrives in the United States[,]. . . irrespective of such alien's status, may apply
> for asylum." . . . 8 U.S.C. 1158(a)(1).  The right to apply for asylum thus turns
> on whether a noncitizen is "physically present" or has "arrive[d] in the United
> States."  *Id.*  As a result, the power under [§ 1182(f)] to suspend "entry" does
> not authorize the President to override the asylum rights of noncitizens who have
> already physically entered the United States and who are entitled to an
> adjudication of eligibility under the applicable statutory and regulatory rules and
> standards.

89 Fed. Reg. at 81163–64 (footnotes omitted).

Finally, it is noteworthy that the same Department of Justice that litigated the *Huisha-Huisha* case in the D.C. Circuit distinguished 42 U.S.C. § 265 and *Huisha-Huisha* from the present circumstances.  Quoting the CDC final rule at issue in *Huisha-Huisha*, the Department explained that, unlike § 1182(f), § 265 "originates in a 'broad public health statue' that Congress intended to 'operate[] separately and independently of the immigration power' and authorizes the CDC 'to temporarily suspend the effect of any law[] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,' . . . including the immigration laws."  89 Fed. Reg. at 81164 n.55 (quoting Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56424, 56426, 56442 (Sept. 11, 2020)).  At least as of October 2024, the Department of Justice held the view that *Huisha-Huisha* dealt solely with an emergency public health statute that "has no relevance to the interpretation of [§ 1182(f)], which is in title 8."  *Id.*

The Court, for all these reasons, is unpersuaded by Defendants' necessity argument.

**b.**

Defendants' futility argument fares no better.  As the D.C. Circuit observed in *Huisha-Huisha*, the § 265 order at issue in that case did more than foreclose a "grant of asylum; it also foreclose[d] the statutorily mandated procedures that aliens use to apply for asylum."  27 F.4th at 731.  At least at the preliminary injunction stage, however, the court was unpersuaded that the loss of those procedures provided sufficient basis to enjoin the order.  *Id.*  That was because, as the court explained, "the asylum decision ha[d] already been made" in the § 265 order, and, as

result, foreclosing the procedures required by statute was harmless. As the court wrote, "those procedures would be futile." *Id.*

For the reasons explained above, however, that analysis does not hold here. Rather, as the Department of Justice observed in the 2024 final rule, and consistent with four decades of Executive Branch interpretation, § 1182(f) does not authorize the President to restrict aliens from invoking protection under the asylum statute. In short, the authority to suspend or restrict "entry" into the United States does not constitute—or carry with it—the authority to adopt "additional limitations" on eligibility for asylum. And, if the Proclamation did not—and could not—alter the eligibility requirements for asylum, then the further suspension of "the statutorily mandated procedures that aliens use to apply for asylum," cannot "be futile." *Huisha-Huisha*, 27 F.4th at 731.[15]

*    *    *

Finally, Defendants fail to advance any constitutional arguments that differ from those addressed and rejected above. The Court, accordingly, concludes that the Proclamation and guidance are contrary to law to the extent that they prohibit covered aliens from applying for asylum or implement new limitations on asylum that have not been adopted by regulation.

---

[15] It is a closer question whether the President can, under § 1182(f), prohibit covered aliens from applying for asylum upon arrival at a port of entry. Section 1158(a)(1) and § 1182(f) are at least arguably in greater tension with respect to aliens arriving at the border. Pursuant to § 1158(a)(1), an alien "who arrives in the United States" may apply for asylum, which would provide such aliens a path to entry. The President's authority to suspend entry pursuant to § 1182(f) thus might arguably extend to preventing aliens from applying for asylum prior to entry. *Cf. Sale*, 509 U.S. at 160, 187 (stating that § 1182(f) gave the President the authority to set up a naval blockade to prevent covered aliens from reaching U.S. soil). Because Plaintiffs do not press this theory or seek to limit operation of the Proclamation in this manner, the Court need not resolve the question.

JA285

3.      *Suspension of Withholding of Removal*

Plaintiffs also contend that the guidance violates the withholding of removal statute, 8

U.S.C. § 1231(b)(3)(A), because it instructs asylum officers that withholding of removal is not

available for aliens subject to the Proclamation.  Withholding of removal, unlike asylum, is

"mandatory;" it leaves "the Executive [with] no discretion" to deny the protection to those who

can satisfy the statutory requirements.  *Huisha-Huisha*, 27 F.4th at 731.  Thus, "to expel aliens to

places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an

exception to § 1231(b)(3)(A)."  *Id.* at 731–32.  Neither § 1182(f) nor § 1185(a) is such a statute:

those statutes make no mention of withholding of removal or § 1231(b)(3)(A), and they say

nothing about the removal of aliens who have already entered the United States, much less about

where the Executive Branch may send aliens subject to removal.  *Cf. Huisha-Huisha*, 27 F.4th at

732.  It is also plainly possible to "give effect . . . both" to § 1182(f) and § 1185(a) and to

§ 1231(b)(3)(A).  *Id.*  The President may suspend or restrict entry into the United States under

§ 1182(f) and § 1185(a), while still respecting § 1231(b)(3)(A), which does not authorize entry

into the United States but merely precludes the government from expelling those who do enter

"to a place where they will likely be persecuted."  *Id.*  In other words, the government can,

consistent with the withholding of removal statute, still expel covered aliens so long as it does

not send them to countries where they will likely face persecution.

Defendants respond that the withholding of removal statute constrains the Secretary and

the Attorney General, not the President.  *See* Dkt. 55 at 28.  But that contention ignores two

important facts.  *First*, the Proclamation says nothing about withholding of removal.  Rather, it

says that covered aliens "are restricted from invoking provisions of the INA that would permit

their continued presence in the United States."  Proclamation, §§ 2, 3.  And, as the D.C. Circuit

observed in *Huisha-Huisha*, § 1231(b)(3)(A) "does not prohibit the Executive from immediately

expelling aliens;" it simply limits where an inadmissible alien may be sent.  27 F.4th at 732.

Presumably for this reason, the Proclamation includes an express reference to asylum (which

allows an eligible person to remain in the United States) but makes no mention of withholding

(which does not).

Second, Defendants' argument ignores the fact that the removals and repatriations at

issue are, in fact, being carried out under the direction of the Secretary.  All of the relevant

guidance was issued by components of the Department of Homeland Security, and the USCIS

and U.S. Border Patrol officials and employees engaged in those processes operate under the

direction of the Secretary.  As a result, Defendants cannot escape the operation of

§ 1231(b)(3)(A), which declares that the Secretary "may not remove an alien to a country if the

[Secretary] decides that the alien's life or freedom would be threatened in that country because

of the alien's race, religion, nationality, membership in a particular social group, or political

opinion."  8 U.S.C. § 1231(b)(3)(A); see also 6 U.S.C. §§ 251, 271(b)(3), (5), 557.  That

provision does not include an exception for occasions when the President exercises his authority

under § 1182(f) and § 1185(a) to suspend or restrict entry.

Defendants also suggest that § 1231(b)(3)(A) does not apply because covered aliens are

not subject to "removal" under the INA but, rather, to non-statutory "212(f) Direct Repatriation"

or "212(f) Expedited Removal."  That argument fails for the reasons given above, including the

fact that neither the President nor the Secretary possesses the authority to supplant the carefully

crafted INA removal procedures with less protective, non-statutory procedures.  The argument

also fails for the reasons given in Huisha-Huisha.  In that case, the covered aliens were subject to

the Title 42 procedures, instead of the INA procedures.  But the D.C. Circuit nonetheless

concluded that the plaintiffs were likely to prevail on the merits of their challenge to the CDC's

effort to restrict access to withholding of removal. 27 F.4th at 731–32. Finally, to the extent this argument turns on an asserted presidential authority to disregard—or to direct his subordinates to disregard—a clear statutory stricture, Defendants fail to argue—much less to carry their burden of showing—that the President may exercise a shared constitutional authority that runs counter to congressional mandate. *See id.*; *see also Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *Zivotofsky ex rel. Zivotofsky*, 576 U.S. at 10.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and contrary to law to the extent it instructs asylum officers or others that withholding of removal is not available for aliens subject to the Proclamation. Except as Congress has specified, 8 U.S.C. § 1231(b)(3)(B), all aliens present in the United States are entitled to protection under § 1231(b)(3)(A).

### 4.  *Extra-Regulatory CAT Protection Procedures*

Finally, Plaintiffs contend that the guidance's extra-regulatory CAT protection procedures violate FARRA. FARRA instructed "the heads of the appropriate agencies" to issue regulations to implement the protections included in the Convention Against Torture. 8 U.S.C. § 1231 note (b). To comply with that directive, the Attorney General and Secretary have issued regulations that instruct asylum officers on the procedures for adjudicating CAT protection claims. *See, e.g.*, 8 C.F.R. § 208.16(c). Under those regulations, asylum officers first conduct a credible fear screening, at which aliens must demonstrate that there is "a significant possibility" that it is more likely than not that they will be tortured if returned to the country at issue. *Id.* § 208.30(e)(3). If the asylum officer makes a positive credible fear determination, USCIS can then send the applicant to full removal proceedings or can "retain jurisdiction over the application . . . for further consideration in a hearing pursuant to § 208.9." *Id.* § 208.30(f). If USCIS retains jurisdiction, an asylum officer will conduct a second interview to adjudicate the

individual's CAT protection claim. *Id.* § 208.9. That interview must be scheduled at least 21

days after the applicant has received the record of his positive credible fear determination. *Id.*

§ 208.9(a)(1). At the second interview, the applicant "may have counsel or a representative

present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.*

§ 208.9(b). To qualify for CAT protection, an applicant must demonstrate in the interview that

"it is more likely than not that he or she would be tortured if removed to the proposed country."

*Id.* § 208.16(c)(2).

The guidance that Plaintiffs challenge changes this process by instructing asylum officers

to require that an alien carry his ultimate burden at the first interview. Instead of starting with a

credible fear screening and then moving to an adjudication interview, the asylum officer

conducts a "CAT-Only assessment," Dkt. 52-1 at 44, at which the applicant "must show that it is

more likely than not that [the applicant] will be tortured in the country to which [the applicant]

may be returned," *id.* at 46. Aliens in CAT-Only assessments are "not entitled to a consultant,

legal representative, or a consultation period." *Id.* at 45. In essence, the new procedures require

that an alien carry his burden at the initial hearing without the benefit of counsel or consultation

and without the time to prepare accorded under the regulations.

Agencies are, of course, bound to follow their own regulations, even when the procedures

therein are "possibly more rigorous than otherwise would be required," *Morton v. Ruiz*, 415 U.S.

199, 235 (1974), and they may not adopt guidance or other procedures that conflict with or

disregard duly promulgated regulations, *see U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35–36

(D.C. Cir. 2005) (holding that substantive changes to regulations must be promulgated through

notice and comment rulemaking); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260,

267–68 (1954) (holding that regulations are binding "as long as [they] remain operative"). Here,

Defendants do not dispute that the guidance at issue is inconsistent with the regulations. The

guidance is, as a result, arbitrary and capricious and contrary to law. *See Nat'l Environ. Dev.*

*Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009–11 (D.C. Cir. 2014).

Defendants offer two responses, which are in tension with one another. In their opening

brief, they argued that the Proclamation applies only to those benefits found in the INA, and

since "CAT protection is not provided by the INA," it "is not subject to the Proclamation's

limitations." Dkt. 44 at 62. But if the Proclamation does not limit or modify the rules relating to

CAT protection, Defendants are left without any justification for discarding the CAT regulations

in the guidance. Defendants then shift gears in their reply brief and argue that because "the

covered aliens do not fall within the bounds of the regulatory provisions cited by Plaintiffs,"

Defendants are not required to apply the CAT regulations in adjudicating their claims. Dkt. 55 at

28–29. Although not crystal clear, Defendants appear to argue that because the Proclamation

supplants the expedited (§ 1225(b)(1)) and regular (§ 1229a) removal procedures set forth in the

INA with the non-statutory "212(f) Direct Repatriation" and "212(f) Expedited Removal"

procedures, the CAT regulations—which take the INA removal procedures as a given—are

inapplicable. But that argument has it exactly backwards. As the Court has explained above,

nothing in § 1182(f) or § 1185(a) authorizes the President (or his subordinates) to supplant the

statutory removal procedures with alternative, less protective procedures. The fact that the

Secretary and Attorney General complied with their statutory obligation to issue regulations to

implement the CAT protections, 8 U.S.C. § 1231 note (b), in the context of the INA-mandated

removal procedures does not imply that the CAT regulations apply only sometimes, but, rather,

confirms that no one—including the Secretary and the Attorney General—ever contemplated

that the Executive Branch could simply sidestep § 1225(b)(1) and § 1229a.

The Court, accordingly, concludes that the guidance is arbitrary and capricious and contrary to law to the extent it purports to replace the CAT procedures set forth in the existing regulations with less protective "§§ 212(f) and 215(a)" "CAT Assessment Instructions and Implementation Guidance."  Dkt. 52-1 at 38–39.

## C.    Class Certification

The Court must next consider whether to grant Plaintiffs' motion for class certification.[16] To proceed on behalf of a class, a plaintiff or group of plaintiffs must clear two hurdles.  First, the putative class representatives must demonstrate that "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  These four "prerequisites," *DL v. District of Columbia*, 860 F.3d 713, 723 (D.C. Cir. 2017), are referred to as numerosity, commonality, typicality, and adequacy of representation, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 460 (2013). Second, the "plaintiffs must then demonstrate that their proposed class falls into one of the categories of class actions listed in Rule 23(b)."  *DL*, 860 F.3d at 723.  Here, Plaintiffs rely on

---

[16]  As in *O.A.*, "[t]he question of class certification arises in an unusual posture in this case because the Court directed that the parties brief the merits on an expedited basis (to obviate the need for further litigation on Plaintiffs' motions for preliminary relief) and because the parties consolidated their briefing on class certification with the merits."  404 F. Supp. 3d at 154. Although mindful of the fact that Rule 23(c)(1) directs courts to resolve class certification motions "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1)(A), the Court notes that the rule grants district courts "great discretion in determining the appropriate timing for such a ruling," *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997); *see also* 7A Charles Alan Wright & Aruther R. Miller, *Federal Practice & Procedure* § 1785.3 (3d ed. 2018) ("The time at which the court finds it appropriate to make its class-action determination may vary with the circumstances of the particular case.").  Thus, district courts are not required to decide class certification issues before ruling on the merits.

Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2). Because "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)), the party seeking class treatment "must affirmatively demonstrate . . . compliance" with Rule 23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

As explained below, the Court is persuaded that, with one modification to the class definition, Plaintiffs are entitled to proceed on behalf of the proposed class.  The Court will, accordingly, certify a class (or subclass) consisting of all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States.  The Court will postpone addressing whether it is also appropriate to certify a class (or subclass) of individuals who were subject to the Proclamation and guidance and have already been repatriated or removed from the United States because those individuals stand in a markedly different posture than those who have yet to be repatriated or removed, because their claims implicate distinct questions of law, and because the relief that they seek is different.  *See Wagner v. Taylor*, 836 F.2d 578, 589–90 (D.C. Cir. 1987) (noting a court's "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23"); 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1759 (4th ed. 2025) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may . . . redefine the class to bring it within the scope of Rule 23 . . . .").

The Court will appoint Plaintiffs' counsel to represent the class of individuals who are or will be subject to the Proclamation and the guidance within the United States and will appoint the Individual Plaintiffs who still remain in the United States (A.M., Z.A., T.A., A.T., B.R., M.A., and G.A.) as the class (or subclass) representatives.

    1.    *Rule 23(a)*

The proposed class, as modified, satisfies the four "prerequisites" set forth in Rule 23(a). First, the proposed class satisfies the numerosity requirement. Although the numerosity requirement does not set a "specific threshold," "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). Plaintiffs may satisfy the requirement, moreover, by supplying estimates of putative class members*, see Pigford v. Glickman*, 182 F.R.D. 341, 347–48 (D.D.C. 1998), "so long as there is a reasonable basis for the estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999). Relying on information shared on social media by U.S. Border Patrol officials, Plaintiffs estimate that "hundreds of noncitizens are being apprehended at the border each day and subjected to the Proclamation," Dkt. 13 at 5 & n.3, and Defendants' data supports that estimate, *see* Dkt. 43-2 at 18 (Gunduz Decl. ¶ 36) (reporting 240 encounters per day during a two-week period in February). That is more than sufficient to satisfy the numerosity requirement.

The second and third requirements, commonality and typicality, often overlap. The commonality requirement is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and the typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3). For commonality, class members' claims must "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Dukes*, 564 U.S. at 350.  For typicality, the proposed representative plaintiffs must "possess the

same interest and suffer the same injury" as the members of the putative class.  *Gen. Tel. Co. of

Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks and citations omitted).

"While commonality requires a showing that the *members* of the class suffered an injury

resulting from the defendant's conduct, the typicality requirement focuses on whether the

*representatives* of the class suffered a similar injury from the same course of conduct."  *Bynum v.

D.C.*, 214 F.R.D. 27, 34 (D.D.C. 2003).  Here, both requirements are satisfied by the proposed

class, as modified above.  All members of that class, including the proposed class

representatives, face the same threat of injury: (1) loss of the protections afforded to aliens under

§ 1225(b)(1) (expedited removal) or § 1229a (regular removal); (2) loss of the right to seek

asylum and the right to seek, and where appropriate to obtain, withholding of removal as set

forth in the INA and the extant regulations; and (3) loss of the right to apply for CAT protection

pursuant to regulations adopted pursuant to FARRA.  "Not only do all class members present the

same challenge[s] to the [Proclamation and guidance], but there is also no evident variation

among them concerning their ultimate entitlement to [the] relief [they seek]: if any person in the

class has a meritorious claim, they all do."  *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019).

Defendants disagree, arguing that the class is "overbroad" for several reasons.[17]  Some of

those reasons fall aside in light of the Court's decision to modify the proposed class to include, at

least for present purposes, only those individuals subject to the Proclamation and guidance who

---

[17] Defendants raise these arguments both to challenge the breadth of the proposed class and to
challenge Plaintiffs' efforts to satisfy the commonality and typicality requirements.  *See* Dkt. 43
at 25–32; *id.* at 32–36.  The Court will address the arguments together.

are still in the United States.  Defendants' remaining arguments remain relevant but are

nonetheless unavailing.

     *First*, Defendants argue that the proposed class is improper because "it includes those

who lack entitlement to the claimed statutory protections;" that is, they object to the proposed

class because not every proposed member has or will claim or manifest a fear of persecution and

because some of the proposed class members are or will be "statutorily ineligible for protection."

Dkt. 43 at 10–11.  The Court is unpersuaded.  Unlike in *Dukes*, where the Supreme Court

reasoned that no "glue" held together each of the purported acts of discrimination alleged by a

class of women, 564 U.S. at 352, Plaintiffs and the putative class members share an interest in

some or all of the relief sought.  Commonality is satisfied where there is "a uniform policy or

practice that affects all class members," *DL*, 713 F.3d at 128, and that principle applies with

equal force to the typicality requirement.  Here, the Proclamation and guidance apply equally

to—and they affect the legal rights of—all of the members of the proposed, modified class.

Because all putative class members will, absent relief, face non-statutory repatriation or removal

proceedings without the protections embodied in the INA, FARRA, and their implementing

regulations, Defendants' first argument is unavailing.

     *Second*, Defendants argue that the "procedures for implementing the Proclamation could

change in the future in ways that are material to the proposed class members' claims and claimed

injuries." Dkt. 43 at 29.  But the relief Plaintiffs seek—vacatur of the current guidance and a

declaration that the Proclamation is unlawful to the extent it prohibits them from seeking

statutory and regulatory protections—does not depend on hypothetical future procedures that are

not before the Court.

*Third*, Defendants argue that "[t]hose class members who have received, or will receive, § 1225(b)(1) expedited removal orders under the Proclamation can only obtain limited habeas review and relief with respect to their expedited removal orders" and that such review is ineligible for class treatment under § 1252(e)(1)(B). Dkt. 43 at 35; *see also id*. at 30–31. But § 1252(e)(1)(B) applies only to the extent that Plaintiffs seek "judicial review under" § 1252(e)—that is, if a plaintiff seeks "[j]udicial review of [(1)] determinations under section 1225(b)" or (2) the "implementation" of § 1225(b), 8 U.S.C. § 1252(e)(3)(A). Here, Plaintiffs do not seek judicial review of either a determination rendered under § 1225(b) or the Secretary or Attorney General's implementation of that provision.

Significantly, Plaintiffs do not seek judicial review of a determination entered pursuant to § 1225(b). As explained above, the "212(f) Expedited Removal" orders at issue in this case were issued under the auspices of the President's § 1182(f) authority, not under the Secretary or Attorney General's authority under § 1225(b). *See supra* at 57–61; *see also Tabatabaeifar v. Scott*, 2025 WL 1397114, at *2 (D. Ariz. May 14, 2025) (concluding that an alien being processed under the Proclamation for "Expedited Removal – Section 212(f)" was not being removed "pursuant to Seton 1225(b)"). Defendants themselves concede as much. They argue, for example, that the "212(f) Direct Repatriations" and "212(f) Expedited Removals" at issue are not subject to the rules set forth in § 1225(b) (or § 1229a) because "[t]he Proclamation does not speak to removal proceedings" and, instead, constitutes an exercise of the President's authority under § 1182(f), § 1185(a), and the Constitution, *see, e.g.*, Dkt. 44 at 43, 58; *see also id.* at 60; Dkt. 55 at 24–25, 27–30. They cannot have it both ways. Defendants cannot in some places argue that the removals at issue are governed solely by the Proclamation and the President's authority under § 1182(f), § 1185(a), and the Constitution, while arguing in others that many

108

(and perhaps most) of the removals at issue are, in fact, governed by § 1225(b) and are thus subject to the limitations found in § 1252(e)(1)(B).  Simply put:  If § 1225(b) does apply, Plaintiffs are entitled to apply for asylum and withholding of removal, which are the fundamental procedural protections that exists in expedited removal.  And, if it does not apply, § 1252(e)(1)(B) has no bearing on Plaintiffs' motion for class certification.

Even putting this concession aside, Defendants offer no plausible basis to conclude that the "212(f) Expedited Removal" orders constitute "determinations under section 1225(b)." Calling the process "expedited removal"—or, more precisely, "212(f) Expedited Removal"— does not, of course, mean that the resulting order qualifies as a "determination under section 1225(b)."  As the Supreme Court has observed, "calling a thing by a name does not make it so," *City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Relations Comm'n*, 429 U.S. 167, 174 (1976), and thus merely incorporating the words "expedited removal" into the label at issue here is of no moment.  But even more to the point, the "212(f) Expedited Removal" process lacks *any* of the hallmarks of a § 1225(b) removal.  Under § 1225(b), the immigration officer must "order the alien removed from the United States . . . unless the alien indicates either an intention to apply for asylum under section 1158 . . . or a fear of prosecution."  8 U.S.C. § 1225(b)(1)(A)(i). If the alien expresses "an intention to apply for asylum . . . or a fear of prosecution, the officer shall refer the alien for an interview by an asylum officer."  *Id.* § 1225(b)(1)(A)(ii).  The asylum officer then conducts the required interview and, if she "determines . . . that [the] alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and if the officer determines that the "alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review," *id.* § 1225(b)(1)(B)(iii)(I).  None of that occurs under a

"212(f) Expedited Removal."  To the contrary, when asked to explain the difference between

"212(f) Direct Repatriation" (which involves, as far as the Court can discern, nothing more than

the physical expulsion of the individual at issue) and "212(f) Expedited Removal," Defendants

identified only one thing: aliens processed pursuant to the latter receive Form I-860: Notice and

Order of Expedited Removal, which is a form used in § 1225(b) proceedings.  Dkt. 59 at 7.

Without attempting to chronicle the essential elements of a § 1225(b) removal determination, it

is safe to conclude that a single form—which is not mentioned in the statute and simply informs

the recipient that the Secretary has determined that she is inadmissible and has ordered her

removal—does not suffice.  The Court, accordingly, is unpersuaded that a "212(f) Expedited

Removal" order qualifies as a "determination[] under section 1225(b)(1)."

Defendants do not even suggest that Plaintiffs' challenge is directed at the Secretary or

Attorney General's "implementation" of § 1225(b)—and for good reason.  As explained above,

Plaintiffs challenge the Proclamation and its implementation.  *See, e.g.*, Dkt. 11 at 4 (Am.

Compl. ¶ 3) ("The Proclamation is both unlawful and unprecedented."); *id.* at 34 (Am. Compl.

¶ 113) ("The Proclamation and Defendants' actions to implement and enforce the Proclamation

violate 8 U.S.C. § 1158(a)(1)."); *see also id.* at 37–38 (Am. Compl. ¶¶ 128–31).  The

Proclamation, in turn, is not premised on any authority assertedly found in § 1225(b)(1) or on the

Attorney General's (and now the Secretary's) authority to interpret and to implement IIRIRA.

To the contrary, all agree that the challenged actions rise or fall based on the President's asserted

110

authorities under § 1182(f), § 1185(a), and the Constitution.  In short, this case does not

implicate the "implementation" of IIRIRA.[18]

Finally, Plaintiffs also satisfy Rule 23(a)'s adequacy of representation requirement.  This

requirement imposes two conditions on plaintiffs seeking to represent a class: first, "the named

representative must not have antagonistic or conflicting interests with the unnamed members of

the class," and second, "the representative must appear able to vigorously prosecute the interests

of the class through qualified counsel."  *Twelve John Does v. District of Columbia*, 117 F.3d

571, 575 (D.C. Cir. 1997).  Defendants do not dispute that the proposed class representatives

share interests with the members of the class, and the Court has no reason to conclude otherwise.

Nor do Defendants dispute that Plaintiffs' counsel are qualified to represent the class, and, in any

event, the Court has considered that question *sua sponte* and concludes that current counsel are

well-qualified.  The declarations submitted in support of class certification demonstrate that

current counsel are willing and able to vigorously litigate this case and to protect the interests of

absent class members.  *See* Dkt. 13-1 (Crow Decl.); Dkt. 13-2 (Michelman Decl.); Dkt. 13-3

(Russell Decl.); Dkt. 13-4 (Zwick Decl.).  The Court, accordingly, concludes that the adequacy

of representation requirement is satisfied.

---

[18] Although Defendants do not raise the issue, the Court concludes for these same reasons that
judicial review of this case is not proscribed by 8 U.S.C. § 1252(b)(9), often referred to as the
"zipper clause."  That provision provides that:

> Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, arising from any action
> taken or proceeding brought to remove an alien from the United States *under
> this subchapter* shall be available only in judicial review of a final order under
> this section.

8 U.S.C. § 1252(b)(9) (emphasis added).  Because the actions taken to remove the individual
plaintiffs and putative class members were taken outside the procedures set forth in the INA, the
zipper clause does not bar review of those actions prior to the issuance of a final order of
removal.

2.      *Rule 23(b)(2)*

Plaintiffs have also carried their burden under Rule 23(b).  As Plaintiffs explain, they ask

the Court to certify the class under Rule 23(b)(2), which applies if "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or

declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or

declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at

360 (internal quotation marks and citations omitted).  Rule 23(b)(2) imposes "two requirements:

(1) that defendant's actions or refusal to act are generally applicable to the class and (2) that

plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class."

*Bynum*, 214 F.R.D. at 37.  "To certify a class under this provision, a single injunction must be

able to 'provide relief to each member of the class.'"  *DL*, 860 F.3d at 726 (quoting *Dukes*, 564

U.S. at 360).

Both requirements of Rule 23(b)(2) are satisfied.  The Proclamation and guidance

preclude all putative class members from seeking asylum or withholding of removal and will

make it more difficult to secure CAT protection.  These actions are generally applicable to the

individual plaintiffs and the class they seek to represent.  The relief Plaintiffs seek, moreover—

vacatur of the guidance, a declaration that the challenged aspects of the Proclamation are

unlawful, and an injunction prohibiting Defendants from implementing the Proclamation would,

"in one stroke," prevent Defendants from employing non-statutory procedures to remove or

repatriate those subject to the Proclamation and would require Defendants to provide all covered

individuals with access to the forms of humanitarian relief set forth in § 1158, § 1231(b)(3),

FARRA, and the implementing regulations.  *Dukes*, 564 U.S. at 350.

In response, Defendants argue that the proposed class does not qualify under Rule 23(b)(2) because no "single injunction" can provide complete relief to all Plaintiffs. Dkt. 43 at 36–37. They argue, in particular, that a prospective injunction would not redress the claims of class members who were already removed. *Id.* at 37. But the Court is not yet prepared to certify a class that includes those who have already been repatriated or removed pursuant to the Proclamation and guidance. This is, accordingly, a question for another day.

*   *   *

The Court, accordingly, concludes that Plaintiffs have carried their burden of demonstrating that class treatment is warranted under Rule 23(b)(2). The Court will enter a separate order certifying the proposed class, designating the individual plaintiffs who are still present in the United States as class representatives, and appointing Plaintiffs' counsel to serve as class counsel.

## D.    Remedy

This brings the Court to the question of remedy. Plaintiffs urge the Court (1) to "[v]acate the guidance insofar as it permits Defendants" to engage in non-statutory removals, restricts covered individuals from invoking the INA's protections, and departs from the regulatory CAT screening standards; (2) to "[d]eclare that Defendants [] cannot lawfully implement or enforce the Proclamation or [the implementing guidance]" to take any of those actions; and (3) to "[e]njoin Defendants from implementing or enforcing the Proclamation" to take any of those three actions. Dkt. 52 at 42–43.[19] Defendants disagree, countering that "the Court may not issue

---

[19] Plaintiffs also ask that the Court restrict Defendants from relying on removal orders issued pursuant to the Proclamation and order Defendants to facilitate the return of individual plaintiffs and other class members who were removed or repatriated under the Proclamation. *See* Dkt. 52 at 42–43. As explained above, the Court requires further briefing before it can resolve whether it

relief that is broader than necessary to remedy actual harm shown by specific Plaintiffs;" that the

Court lacks jurisdiction to enter a class-wide injunction under § 1252(f)(1); and that, even if the

Court could issue broad injunctive relief, it should decline to do so because "[t]he balance of the

equities weighs heavily against issuing injunctive relief because the Proclamation is critical for

combating a sustained surge of illegal migration across the southern border."  Dkt. 55 at 30–31.

     The Court will consider each form of relief in turn.

     1.    *Vacatur*

     As explained above, the Court has concluded that the implementing guidance is "not in

accordance with law," 5 U.S.C. § 706(2)(A).  When a court reaches that conclusion, the APA

typically mandates that the Court "shall" "set aside" the challenged "agency action."  *Id.* § 706.

That is, under the plain language of the APA, the Court must "annul or vacate" the unlawful

agency action.  *See Set Aside*, Black's Law Dictionary (10th ed. 2014).  That reading of the APA,

moreover, is consistent with longstanding and consistent practice in this circuit.  *See, e.g.*,

*Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common

remedy when we find a rule is invalid is to vacate."); *Blue Water Navy Viet. Veterans Ass'n, Inc.

v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("[V]acatur is the 'normal remedy.'") (quoting

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)); *Sugar Cane Growers

Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally when an agency . . .

clearly violates the APA we would vacate its action.").  To be sure, decisions in this circuit have,

on occasion, remanded a rule without vacatur*, see Allied–Signal, Inc. v. U.S. Nuclear Regul.

Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), but Defendants cite no authority suggesting

---

has the authority to—and whether it should—grant relief to aliens no longer present in the
United States.

JA302

that any remedy short of vacatur is appropriate here.  *Cf. Milk Train, Inc. v. Veneman*, 310 F.3d

747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (positing that vacatur is always required);

*Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., concurring) (same).

To the extent Defendants argue that the vacatur remedy should be limited to the

individual plaintiffs, that contention is both at odds with settled precedent and difficult to square

with the statutory text of the APA, which offers no such limitation.  The D.C. Circuit has "made

clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the

ordinary result is that the rules are vacated—*not that their application to the individual*

*petitioners is proscribed*.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir.

1989)) (emphasis added).

In explaining its basis for reaching that conclusion, the D.C. Circuit invoked Justice

Blackmun's opinion in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), which,

although a dissent, "apparently express[ed] the view of all nine Justices on th[e] question." *Nat'l*

*Mining Ass'n*, 145 F.3d at 1409.  Justice Blackmun wrote:

> The Administrative Procedure Act permits suit to be brought by any person
> "adversely affected or aggrieved by agency action."  In some cases the "agency
> action" will consist of a rule of broad applicability; and if the plaintiff prevails,
> the result is that the rule is invalidated, not simply that the court forbids its
> application to a particular individual.  Under these circumstances a single
> plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief
> that affects the rights of parties not before the court.  On the other hand, if a
> generally lawful policy is applied in an illegal manner on a particular occasion,
> one who is injured is not thereby entitled to challenge other applications of the
> rule.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting).  As explained by the D.C. Circuit in *National*

*Mining Association*, this view was shared by the three Justices who joined Justice Blackmun's

dissent and by the majority, which observed that a final agency action may "be challenged under

the APA by a person adversely affected—and the entire [agency program], insofar as the content of that particular action is concerned, would thereby be affected." *Id.* at 890 n.2; *see also Nat'l Mining Ass'n*, 145 F.3d at 1409 (citing same). This Court is, of course, bound by the D.C. Circuit's decision in *National Mining Association* and the "countless" Supreme Court and D.C. Circuit opinions that have "vacated agency actions . . . rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs," *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 830–31 (2024) (Kavanaugh, J., concurring) (collecting cases); *see also, e.g.*, *Trump v. Casa, Inc*., No. 24A886, 606 U.S. ___, ___, 25 WL 1773631, at *19 (June 27, 2025) (Kavanaugh, J., concurring) (noting that "in cases under the Administrative Procedure Act, plaintiffs may ask a court to . . . 'set aside' a new agency rule"); *Thornburgh*, 878 F.2d at 495 n. 21.

Even without this controlling precedent, moreover, the Court would follow the plain language of the APA, which provides that "[t]he reviewing court *shall . . . set aside* agency actions . . . found to be . . . not in accordance with law." 5 U.S.C. § 706 (emphasis added). Defendants, moreover, have failed to identify any plausible manner in which the Court could set the guidance aside as to the individual plaintiffs and the organizational plaintiffs, while leaving it in place as to all others. Fortunately, however, the Court need not engage in such gymnastics because the language of the APA, the controlling D.C. Circuit precedent, and decades of Supreme Court and D.C. Circuit practice leave little doubt that, if unlawful, the guidance must be "set aside"—that is, cancelled, annulled, or revoked, *see Corner Post, Inc*., 603 U.S. at 829 (Kavanaugh, concurring) (quoting Black's Law Dictionary 1612 (3d ed. 1933)).

The Court, accordingly, concludes that the proper remedy includes vacatur of the challenged guidance. This remedy is appropriate with or without a class action and with or

without the organizational plaintiffs, *See Nat'l Mining Ass'n*, 145 F.3d at 1409, and it will afford

much—although not all—of the relief that Plaintiffs seek in this case.

    2.    *Declaratory Judgment*

The Court will also enter a declaratory judgment as to all Defendants other than the

President declaring that the Proclamation is unlawful insofar as it purports to suspend or restrict

access to asylum, withholding of removal, or the existing regulatory processes for obtaining

CAT protection. The Court will not, however, enter declaratory relief against the President.

Although "the possibility" that declaratory relief "*might* be available against the President in

extraordinary cases" appears to have been "le[ft] open" by the D.C. Circuit, such relief would be

appropriate only if "the conduct at issue . . . involve[s] a ministerial duty" or if "relief is

[un]available against other executive officials and so the President" must be "sued as a last

resort." *McCray v. Biden*, 574 F. Supp. 3d 1, 10–11 (D.D.C. 2021). Neither of those two

circumstances is present here. Plaintiffs, however, argue that declaratory relief against the

President is available under the D.C. Circuit's decision in *National Treasury Employees Union v.*

*Nixon (NTEU)*, 492 F.2d 587 (D.C. Cir. 1974). But that case involved a "ministerial duty," *id.* at

616, and Plaintiffs do not argue—nor could they—that the conduct at issue here is ministerial in

nature. More importantly, declaratory relief that runs against the executive officials responsible

for carrying out the Proclamation suffices to clarify which aspects of the Proclamation cannot be

lawfully implemented by those officials.

    3.    *Injunction*

Plaintiffs also seek an injunction prohibiting the Agency Defendants from implementing

the Proclamation to take any of the challenged actions. According to Defendants, 8 U.S.C.

§ 1252(f)(1) deprives the Court of "authority to issue an injunction against the implementation of

the Proclamation." Dkt. 44 at 67. Although § 1252(f)(1) does not bear on Plaintiffs' core claims

JA305

or the core relief that they seek both individually and on behalf of class, it does limit the scope of

any class-wide relief that the Court might grant.

> Section 1252(f)(1) provides as follows:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of
> part IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application
> of such provisions to an individual alien against whom proceedings under such
> part have been initiated.

8 U.S.C. § 1252(f)(1).  The Supreme Court construed § 1252(f)(1) in *Garland v. Aleman*

*Gonzalez*, 596 U.S. 543 (2022), and that decision and its progeny guide the Court's analysis.

The principal question addressed in *Aleman Gonzalez* was how best to read the phrase "to

enjoin or restrain the operation of the provisions of part IV of this subchapter."  8 U.S.C.

§ 1252(f)(1).  The respondents in *Aleman Gonzalez* brought two suits—one in the Western

District of Washington and the other in the Northern District of California—seeking to compel

the government to comply with its obligation under 8 U.S.C. § 1231(a)(6) "to provide bond

hearings in cases like theirs." 596 U.S. at 546.  The district courts "certified classes, agreed with

respondents' claims on the merits, and entered class-wide injunctive relief," and the Ninth

Circuit affirmed in relevant respects.  *Id.*  The question before the Supreme Court was whether

that injunction enjoined or restrained "the operation of" § 1231(a)(6) or, instead, merely

compelled compliance with that provision.

The Supreme Court concluded that § 1252(f)(1) not only bars class-wide injunctive relief

limiting the "operation" of a covered provision but also bars injunctive relief compelling officials

to comply with the covered provisions.  As the Court construed § 1252(f)(1), it "generally

prohibits lower courts from entering injunctions that order federal officials to take or to refrain

118

from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. Applying *Aleman Gonzalez* here, Defendants correctly observe that § 1252(f)(1) would preclude the Court from granting a class-wide injunction compelling the Secretary "to provide aliens with credible fear interviews under Section 1225 or [full] removal proceedings under Section 1229a," since both of those provisions are found in part IV of the INA. Dkt. 43 at 38. But, with one exception discussed below, that is not the relief that Plaintiffs seek, nor does it accurately reflect the nature of their claims.

What Plaintiffs do seek, and what is not subject to § 1252(f)(1), is an order enjoining the Agency Defendants from implementing the Proclamation. *See, e.g.*, Dkt. 70 at 1. No portion of the Proclamation is premised on any provision found in part IV of the INA, nor (except as discussed below) do Plaintiffs challenge the Proclamation on the ground that it fails to comply with any provision found in that part. Instead, they argue that neither § 1182(f) and § 1185(a), which are located in part II of the INA, nor the Constitution provide the authority asserted in the Proclamation, and they ask that the Court enjoin the implementation of the Proclamation on the ground that it lacks any statutory or constitutional basis. The asylum statute, 8 U.S.C. § 1158(a), which provides Plaintiffs with the right to apply for asylum and which is the only statutory right expressly suspended in the Proclamation, is also found in part II of the INA, and the CAT provision is found in FARRA, which is an entirely different statute. To the extent Plaintiffs seek class-wide injunctive relief (running against the Agency Defendants) relating to the operation or implementation of *these* provisions, Defendants' reliance on § 1252(f)(1) is unavailing. The Court can grant effective injunctive relief without ordering any federal official "to take or to refrain from taking actions to enforce, implement, or otherwise carry out" any provision found in part IV. *Aleman Gonzalez*, 596 U.S. at 550.

To be sure, but-for the Proclamation and guidance, the putative class members' claims for asylum and withholding of removal would, in all likelihood, be processed pursuant to the provisions of the INA governing expedited removal, 8 U.S.C. § 1225(b)(1), or regular removal, *id.* § 1229a. Although those provisions are found in part IV, Plaintiffs are not asserting a class-wide right to participate in any particular form of removal proceeding and, indeed, they are not asking to be placed in any specific type of removal proceedings. Rather, they are asking the Court to bar Agency Defendants' non-statutory, Proclamation-based efforts to expel them from the United States without providing them with the right to apply for asylum under § 1158(a), without complying with the requirements contained in § 1158(b)(2)(C) for adopting additional limitations on eligibility for asylum, and without complying with the established CAT procedures, as required by FARRA. To the extent the relief that Plaintiffs seek—enjoining implementation of the Proclamation—might have downstream effects on removal proceedings, those effects are merely incidental to Plaintiffs' permissible challenges to the Proclamation and guidance, and such "collateral effect[s]" do not trigger § 1252(f)(1). *Aleman Gonzalez*, 596 U.S. at 553 n.4 (distinguishing circumstances in which "a court may enjoin unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision") (emphasis in original); *see also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement proceeding [under part IV] may be a collateral consequence of an unsuccessful adjustment application."). In this respect, Plaintiffs' claims are unlike those raised in *N.S. v. Dixon*, No. 21-5275, __ F.4th __, 2025 WL 1775150, at *8 (D.C. Cir. June 27, 2025), where the injunction at issue "directly and

JA308

substantially restricted the ability of . . . federal officials to 'carry out'" the arrest and detention

of deportable aliens pursuant to 8 U.S.C. § 1226, which is located in part IV of the INA.

Although Plaintiffs do not seek an order requiring Defendants to institute removal

proceedings under § 1225(b)(1) or § 1229a or to "enforce, implement, or otherwise carry out

[those] statutory provisions," *Aleman Gonzalez*, 596 U.S. at 550, they do invoke the exclusive-

procedure provision found in § 1229a(a)(3), which is located in part IV of the INA.  They do so,

however, only to support their contention that § 1182(f) and § 1185(a) do not authorize the

President to establish a non-statutory removal regime and to show that, under the *Youngstown*

framework, the President lacks the independent constitutional authority to do so.  But neither of

those arguments seeks to "enjoin or restrain the operation of" § 1229a(a)(3); rather, they merely

bolster Plaintiffs' contention that neither § 1182(f) and § 1185(a), nor the Constitution, authorize

the President (or his subordinates) to adopt and to implement an extra-statutory system for

expelling aliens from the United States.

The relevant question for purposes of § 1252(f)(1), however, is whether the "the plaintiff

seeks to "enjoin or restrain" a "provision" located in part IV, not whether the plaintiff cites to

authority found in part IV to support his request to enjoin or restrain a federal official's

enforcement or implementation of a distinct statutory or constitutional provision.  In seeking a

stay in *U.S Department of Homeland Security v. D.V.D*, the Solicitor General made precisely this

point.  He stressed that courts must avoid

> conflat[ing] the question of what provisions the injunction is *enforcing* with the
> question of what provisions the injunction is *restraining*.  Section 1252(f)(1)
> does not address *why* an injunction may issue; it addresses *what* that injunction
> may run against.

*U.S. Department of Homeland Security v. D.V.D*, No. 24A1153, Reply Br. in Support of

Application for Stay of Injunction (June 5, 2025), at 4 (emphasis in original); *see also* Dkt. 70-1

at 6.  That describes the current circumstances to a tee.  Plaintiffs do not seek an order compelling Defendants to comply with § 1229a(a)(3)—or § 1229a or § 1225(b) more generally—but discuss those provisions merely to show that neither § 1182(f) and § 1185(a) nor the Constitution authorize the President (or his subordinates) to adopt extra-statutory procedures for expelling aliens and to support their request that the Court enjoin the Agency Defendants from implementing the Proclamation.

One of Plaintiffs' claims does, however, implicate § 1252(f)(1).  In particular, in Count Two of the Amended Complaint, Plaintiffs allege that § 1231(b)(3) "precludes the removal of noncitizens to countries where it is more likely than not that their 'life or freedom would be threatened . . . because of [their] race, religion, nationality, membership in a particular social group or political opposition,'" and they allege that "[t]he Proclamation and Defendants' actions to implement and enforce the Proclamation violate 8 U.S.C. § 1231(b)(3) and its implementing regulations by barring withholding of removal for noncitizens in the United States."  Dkt. 11 at 35 (Am. Compl. ¶¶ 116–17) (quoting 8 U.S.C. § 1231(b)(3)).  Because this provision—which codifies the right to withholding of removal—is found in part IV of the INA, the Court must consider whether § 1252(f)(1), as construed in *Aleman Gonzalez*, precludes the Court from granting class-wide injunctive relief with respect to that claim.

The question is a close one because Plaintiffs' principal challenge is directed at the Proclamation and its implementation, and they do not ask that the Court enter an injunction compelling Defendants to comply with § 1231(b)(3).  *See* Dkt. 51-1 at 1–3.  Instead, they challenge the wholesale displacement of § 1231(b)(3) and a host of other portions of the INA with a presidentially decreed, alternative immigration system, and they challenge the President's authority under § 1182(f) and § 1185(a) and the Constitution to effect such a change in the law.

Dkt. 11 at 35 (Am. Compl. ¶ 118). But Plaintiffs' complaint turns, at least in part, on the

contention that § 1231(b)(3) establishes a statutory right to withholding of removal and that

Defendants should be required to comply with that statutory mandate, and *Aleman Gonzalez*

holds that § 1252(f)(1) "is not limited to the covered provisions 'as *properly* interpreted.'" *N.S.*,

2025 WL 1775150, at *7 (quoting *Aleman Gonzalez*, 596 U.S. at 552–54) (emphasis in original).

In any event, the Court is persuaded that it lacks authority to issue a class-wide injunction

requiring the Agency Defendants to comply with § 1231(b)(3), and the Court, accordingly, will

not do so. But that does not mean that the Court must deny the principal injunctive relief that

Plaintiffs seek—that is, an order precluding the Agency Defendants from implementing the

Proclamation. Among other things, as noted above, the Proclamation expressly refers to asylum,

but it says nothing about withholding of removal, and although the Proclamation purports to

suspend "access to provisions of the INA that would permit continued presence in the United

States," Proclamation, §§ 2–3, withholding of removal does not permit aliens to remain in the

United States—it merely specifies to where an alien may be removed. As a result, enjoining the

Agency Defendants from implementing the Proclamation would not "enjoin or restrain" the

operation of § 1231(b)(3).

It is one thing to read the phrase "authority to enjoin or restrain the operation of the

provisions of part IV" to prevent lower courts from issuing class-wide injunctions directing how

the Secretary and Attorney General should implement the covered provisions. *Aleman Gonzalez*,

596 U.S. at 550. It would be a different matter altogether to read that phase to preclude a court

from enjoining the implementation of the Proclamation, which contains no mention of

§ 1231(b)(3). The Court, accordingly, concludes that it has jurisdiction to enter a class-wide

injunction that enjoins implementation of the Proclamation, notwithstanding the prohibition in

§ 1252(f)(1), but the Court clarifies that the class-wide injunction does not compel compliance with § 1231(b)(3).  In this limited respect, the class will need to rely on the Court's vacatur order and declaratory judgment.

* * *

Having concluded that an injunction is available, the Court must decide, as a matter of its equitable discretion, whether to exercise that authority?

Notably, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury.  *Id.*  When addressing a similar question in the past, this Court declined to issue an injunction for just this reason.  *See O.A.*, 404 F. Supp. 3d at 154.

The present circumstances, however, differ in an important respect.  In *O.A.*, the Court relied on the defendants' representation "that they w[ould] abide by the Court's order, . . . and Department of Justice guidance regarding vacatur under the APA provide[d] that the 'Department litigators should' comply 'with circuit precedent,' including the D.C. Circuit's decision in *National Mining Association*," which instructs that the legal consequences of vacatur under the APA extend beyond the parties to a case.  *Id.*  Here, in contrast, Defendants have themselves expressed doubt that an order merely setting aside the guidance would be effective.  They assert that, "if the guidance alone were . . . vacated . . . , the Plaintiffs would still be able to be repatriated under the Proclamation's authority."  Dkt. 55 at 22.  When asked about this at oral argument, moreover, Defendants doubled down, asserting that all of the actions that Plaintiffs

challenge "flow from the Proclamation itself, which is the only final action at issue." Dkt. 56 at

51 (Hrg. Tr. 51:7–10). The Court has, of course, rejected that proposition, *see supra* 62–63, but

Defendants' suggestion that the Proclamation will continue to compel immigration officials to

operate outside the ordinary bounds of the INA, even if the implementing guidance is set aside,

is enough to distinguish this case from *O.A.* and to raise doubts about whether an order setting

aside the implementing guidance will suffice.

The Court, accordingly, concludes that this is one of the rare cases in which injunctive

relief is required. The injunction, of course, will not run against the President. Moreover, the

Court will narrowly tailor the injunction to prohibit defendants from implementing the

Proclamation, including by adopting extra-statutory expulsion procedures pursuant to § 1182(f)

and § 1185(a) and the President's residual constitutional authority; removing aliens without

complying with § 1158(a); narrowing eligibility for asylum without complying with

§ 1158(b)(2)(C); or altering the CAT procedures in violation of FARRA.

### E.        Request for Stay Pending Appeal

Finally, Defendants "ask for a stay pending appeal" or for "a 14-day delay of the

effective date of any order" to "seek a stay from the D.C. Circuit in an orderly manner" and to

address the "significant operational concerns involved in turning . . . off the proclamation." Dkt.

56 at 65–66 (Hrg. Tr. 65:23–66:6). The Court appreciates those concerns but must also weigh

the fact that thousands of individuals will be repatriated or removed from the United States

pursuant to an unlawful assertion of extra-statutory authority and the risk that, once repatriated or

removed, their likelihood of obtaining meaningful relief will suffer a significant, if not

insurmountable, setback.

The Court concludes that Defendants have failed to carry their burden of satisfying "the

stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*,

JA313

904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066

(D.C. Cir. 2017).  In deciding whether to grant a stay pending appeal, the Court must consider

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance

of the stay will substantially injure the other parties interested in the proceeding; and (4) where

the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*,

481 U.S. 770, 779 (1987)); *see also Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974

(D.C. Cir. 1985).  "The first two factors of the traditional standard are the most critical," and they

require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some

'possibility of irreparable injury.'" *Nken*, 556 U.S. at 434 (citations omitted).  Here, Defendants

have failed to carry their burden with respect to any of the four factors.

First, for all the reasons given above, the Court is unpersuaded that Defendants are likely

to succeed on the merits on appeal.  Defendants have offered no separate argument that "casts

doubt on the Court's decision." *TECO Guatemala Holdings, LLC v. Rep. of Guatemala*, No. 17-

102, 2020 WL 13612440, at *2 (D.D.C. Mar. 6, 2020).

Second, although the Court recognizes that the judiciary should not lightly intervene in

the affairs of the Executive Branch and that implementing the immigration laws presents

supreme challenges, the Court is unpersuaded that requiring Defendants to return to the

processes that Congress required and that applied just a few months ago would cause Defendants

irreparable harm.  Although enjoining the President from exercising an exclusive constitutional

prerogative might, standing alone, give rise to irreparable injury, requiring the Agency

Defendants to comply with the law as Congress enacted pursuant to its "plenary power over

immigration," *Jarkesy*, 603 U.S. at 129 (2024), would not.  For decades, courts have, where

appropriate, set aside or enjoined agency action that is contrary to law without any suggestion that such orders inflict *per se* irreparable injury on the government.

The final two factors weigh heavily in favor of denying Defendants' request for a stay. A stay would allow Defendants to continue removing class members using extra-statutory procedures, and Defendants have taken the position that this Court lacks the authority to provide relief to any aliens once they are removed. *See, e.g.*, Dkt. 44 at 25–26; Dkt. 55 at 14. Although the Court has yet to address the merits of that contention, the question is a difficult one, and a substantial possibility exists that continued implementation of the Proclamation during the pendency of an appeal will effectively deprive tens of thousands of individuals of the lawful processes to which they are entitled. The Court recognizes that timing is crucial—both for Defendants and Plaintiffs—and that the question whether to grant a stay can, at times, matter as much as the underlying merits of a case. But where the Court is persuaded that the government is acting unlawfully; where that unlawful activity may well cause irreparable injury to the plaintiffs; and where the government may continue to enforce the law using lawful means, the balance of harms and public interest weigh against granting a stay.

Although the Court is unpersuaded that it should stay its decision pending appeal, the Court agrees with Defendants that they should have the opportunity to seek a stay from the court of appeals and that it will take some time to effectuate the Court's class-wide order. The Court will, accordingly, postpone the effective date of its class-wide order by fourteen days. During that period, however, Defendants shall take steps to ensure that they will are fully prepared to implement the Court's order without further delay. The Court's order granting relief to the individual plaintiffs who remain in the United States will take immediate effect.

**CONCLUSION**

For all these reasons, the Court will **GRANT** in part Plaintiffs' motion for summary

judgment, Dkt. 51, will **GRANT** in part Plaintiffs' motion to certify a class, Dkt. 13, will **DENY**

as moot Plaintiffs' motion for a preliminary injunction, Dkt. 14, and will **DEFER** ruling on the

remaining portions of the parties' cross-motions.  The Court will postpone the effective date of

its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from

the Court of Appeals and to prepare to implement the Court's order.  Pursuant to Rule 54(b), the

Court determines that there is no just reason for delaying entry of final judgment with respect to

the individual and class claims of those Plaintiffs and class members who are present in the

United States or will be in the United States, with the exception of their two APA arbitrary-and-

capricious claims and their APA claim that the guidance was adopted without observance of

procedures required by law in violation of 5 U.S.C. § 706(2)(D), *see* Dkt. 11 at 38–40 (Am.

Compl. ¶¶ 132–43).  The Court will, accordingly, **ENTER** partial final judgment.  Finally, the

Court will **DIRECT** that the parties promptly submit a joint status report proposing a schedule

for further briefing on whether the Court can and should grant relief to those Plaintiffs and

putative class members who are no longer present in the United States.

Separate orders will issue.

 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 2, 2025

JA316

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,

      *Plaintiffs*,

  v.

KRISTI NOEM, *et al.*,

      *Defendants*.

Civil Action No. 25-306 (RDM)

**ORDER**

      For the reasons stated in the Court's Memorandum Opinion, Dkt. 71, it is hereby

**ORDERED** that (1) a class consisting of "[a]ll individuals who are or will be subject to

Proclamation 10888 and/or its implementation," who are currently present or who will be present

in the United States," is hereby **CERTIFIED** pursuant to Fed. R. Civ. P. 23(b)(2); (2) named

Plaintiffs A.M., Z.A., T.A., A.T., B.R., M.A., and G.A. are hereby **DESIGNATED** to serve as

class representatives; and (3) counsel for Plaintiffs in this case is **DESIGNATED** to serve as

counsel for the class.

      **SO ORDERED**.

                /s/ Randolph D. Moss
                RANDOLPH D. MOSS
                United States District Judge

Date:  July 2, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICES, *et al.*,

        *Plaintiffs*,

   v.

KRISTI NOEM, *et al.*,

        *Defendants*.

Civil Action No. 25-306 (RDM)

## ORDER

For the reasons set forth in the Court's Memorandum Opinion, Dkt. 71, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment, Dkt. 51, is **GRANTED** in part, **DENIED** in part, and **DEFERRED** in part; and it is further

**ORDERED** that Plaintiffs' motion to certify a class, Dkt. 13, is **GRANTED** in part and **DEFERRED** in part; and it is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction, Dkt. 14, is **DENIED** as moot in light of the Court's merits decisions; and it is further

**ORDERED** that the agency guidance implementing Proclamation 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025), is **VACATED** pursuant to 5 U.S.C. § 706(2) to the extent that it authorizes extra-statutory and extra-regulatory removals or repatriations of covered individuals; precludes the individual plaintiffs and class members from accessing their statutory rights to apply for asylum; precludes the individual plaintiffs and class members from applying for and, where appropriate, obtaining withholding of removal; and departs from the Convention Against Torture

("CAT") protection screening standards set forth in the Department of Justice and Department of Homeland Security CAT regulations; and it is further

**DECLARED** as to the Agency Defendants that Proclamation 10888 is unlawful insofar as it purports to suspend or to restrict access to asylum, withholding of removal, or the existing regulatory processes for obtaining CAT protection or authorizes the Agency Defendants to adopt or to implement extra-statutory or extra-regulatory removal or repatriation procedures; and it is further

**DECLARED** as to the Agency Defendants that neither 8 U.S.C. §§ 1182(f) & 1185(a) nor the President's authority under the Vesting Clause or Article IV, Section 4 of the Constitution authorizes the President or his subordinates to suspend or to restrict access to the provisions of the Immigration and Nationality Act that permit the continued presence in the United States of individuals, irrespective of their status, who have entered and who are present in the United States; and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from implementing the Proclamation to remove individual plaintiffs or class members using non-statutory repatriation or removal proceedings; and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from removing any individual plaintiffs or class members without complying with the asylum statute, 8 U.S.C. § 1158(a); and it is further

2

JA319

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from narrowing the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C); and it is further

**ORDERED** that the Agency Defendants (including their officers, agents, servants, employees, and attorneys and those who are in active concert or participation with any of those individuals) are **ENJOINED** from using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' CAT protection claims; and it is further

**ORDERED** that the parties shall meet and confer and submit to the Court a joint status report proposing next steps for the case on or before July 11, 2025; and it is further

**ORDERED** that the parties shall appear for a status conference on July 15, 2025, at 10:00 a.m., in Courtroom 8; and it is further

**ORDERED** that this Order shall not take effect with respect to the absent class members until July 16, 2025, to allow Defendants the opportunity to seek a stay in the court of appeals and to implement the Court's decision in an orderly fashion, but shall take immediate effect with respect to the named individual plaintiffs who are currently present in the United States; and it is further

**ORDERED** that partial final judgment is hereby entered pursuant to Federal Rule of Civil Procedure 54(b) as to the claims of those individual plaintiffs and class members who are or will be present in the United States, with the exception of the portions of the Sixth Claim for Relief raising arbitrary-and-capricious arguments under the Administrative Procedure Act, *see*

3

Dkt. 11 at 39 (Am. Compl. ¶ 138), and all of the Seventh Claim for Relief, *see id.* at 39–40 (Am.

Compl. ¶¶ 139–43), all of which have been held in abeyance pending further order of the Court.

This Order constitutes a final, appealable judgment of the Court within the meaning of

Rule 58(a) of the Federal Rules of Civil Procedure.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 2, 2025

4

JA321

APPEAL,PSEUDO-GR,TYPE-C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00306-RDM

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION
AND LEGAL SERVICES et al v. NOEM et al
Assigned to: Judge Randolph D. Moss
Case in other court: USCA, 25-05243
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 02/03/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES**

represented by **Edith Sangueza**
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister St
San Francisco, CA 94102
415-581-8839
Email: sanguezaedith@uclawsf.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Keren Hart Zwick**
NATIONAL IMMIGRANT JUSTICE
CENTER
111 West Jackson Blvd.
Suite 800
Chicago, IL 60604
312-660-1364
Email: kzwick@immigrantjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
GIBBS HOUSTON PAUW
1000 Second Avenue
Suite 1600
Seattle, WA 98104
(206) 682-1080
Fax: (206) 689-2270
Email: rpauw@ghp-law.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
ACLU OF THE DISTRICT OF
COLUMBIA
529 14th Street, NW
Suite 722
Washington, DC 20045
202-601-4266

JA322

Email: aspitzer@acludc.org
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
TEXAS CIVIL RIGHTS PROJECT
PO Box 219
Alamo, TX 78516
956-787-8171
Email: daniel@texascivilrightsproject.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
18th Floor
New York, NY 10004
212-549-2616
Fax: 212-549-2654
Email: lgelernt@aclu.org
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W Jackson Blvd.
Ste 800
Chicago, IL 60604
312-660-1615
Fax: 312-660-1615
Email: mgeorgevich@immigrantjustice.org
*ATTORNEY TO BE NOTICED*

**Melissa E. Crow**
CENTER FOR GENDER AND REFUGEE
STUDIES
1121 14th Street, NW
Suite 200
Washington, DC 20005
202-355-4471
Email: crowmelissa@uclawsf.edu
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415-343-0776
Email: mrussell@aclu.org
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL
SERVICE
P.O. Box 786100
San Antonio, TX 78278
717-870-2267
Email: richard.caldarone@raicestexas.org
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
ACLU FOUNDATION OF THE DISTRICT
OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202-601-4267
Email: smichelman@acludc.org
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6865
Email: LHarrison@jenner.com
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**LAS AMERICAS IMMIGRANT
ADVOCACY CENTER**

represented by  **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Keren Hart Zwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa E. Crow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FLORENCE IMMIGRANT &**
**REFUGEE RIGHTS PROJECT**

represented by   **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Keren Hart Zwick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arthur B. Spitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa E. Crow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Michelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lindsay C. Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**N.S.**                    represented by    **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**D.G.**                                    represented by **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**E.G.**                                    represented by **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA327

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**G.A.**                                represented by   **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M.A.**                                represented by   **Edith Sangueza**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**F.A.**                              represented by    **Edith Sangueza**
*and her minor children K.A. and Y.A.*                 (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Robert Pauw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Georgevich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Morgan Russell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**A.M., Z.A.**                    represented by    **Edith Sangueza**
*and their minor children T.A. and A.T.*            (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Robert Pauw**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Daniel Hatoum**
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Mary Georgevich**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Morgan Russell**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Richard P. Caldarone**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Lee Gelernt**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**B.R.**                          represented by    **Edith Sangueza**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Robert Pauw**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Daniel Hatoum**
                                                   (See above for address)
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Mary Georgevich**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Morgan Russell**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P. Caldarone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KRISTI NOEM**
*Secretary of the U.S. Department of Homeland Security, in her official capacity*

represented by **Brian Christopher Ward**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 868
Washington, DC 20044
(202) 616-9121
Email: brian.c.ward@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 868
Washington, DC 20044
202-598-7537
Email: joseph.a.darrow@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
U.S. DEPARTMENT OF JUSTICE, CIVIL
DIVISION
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
(202) 598-8259
Fax: (202) 305-7000
Email: Katherine.J.Shinners@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HOMELAND
SECURITY**

represented by **Brian Christopher Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA331

Katherine J. Shinners
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE R. FLORES**                    represented by    **Brian Christopher Ward**
*Senior Official Performing the Duties of the*                  (See above for address)
*Commissioner for U.S. Customs and Border*                  *LEAD ATTORNEY*
*Protection, in his official capacity*                  *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL BANKS**                    represented by    **Brian Christopher Ward**
*Chief of U.S. Border Patrol, in his official*                  (See above for address)
*capacity*                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DIANE SABATINO**                    represented by    **Brian Christopher Ward**
*Acting Executive Assistant Commissioner,*                  (See above for address)
*CBP Office of Field Operations, in her*                  *LEAD ATTORNEY*
*official capacity*                  *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. CUSTOMS AND BORDER**                    represented by    **Brian Christopher Ward**
**PROTECTION**                  (See above for address)

JA332

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**CALEB VITELLO**                    represented by    **Brian Christopher Ward**
*Acting Director of U.S. Immigration and*              (See above for address)
*Customs Enforcement, in his official*                 *LEAD ATTORNEY*
*capacity*                                             *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. IMMIGRATION AND CUSTOMS**     represented by    **Brian Christopher Ward**
**ENFORCEMENT**                                        (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**                   represented by    **Brian Christopher Ward**
*Secretary of the U.S. Department of State, in*        (See above for address)
*his official capacity*                                *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF STATE**                represented by    **Brian Christopher Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES MCHENRY**                          represented by    **Brian Christopher Ward**
*Acting Attorney General of the United*                    (See above for address)
*States, in his official capacity*                         *LEAD ATTORNEY*
*TERMINATED: 02/19/2025*                                    *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**             represented by    **Brian Christopher Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**                        represented by    **Brian Christopher Ward**
*President of the United States, in his official*          (See above for address)
*capacity*                                                 *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. CITIZENSHIP AND
IMMIGRATION SERVICES**                represented by   **Brian Christopher Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KIKA SCOTT**                        represented by   **Brian Christopher Ward**
*Acting Director of U.S. Citizenship and*             (See above for address)
*Immigration Services, in her official*               *LEAD ATTORNEY*
*capacity*                                            *ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

JA335

**PAMELA J. BONDI**
*Attorney General of the United States, in her official capacity*

represented by **Brian Christopher Ward**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Anton Darrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine J. Shinners**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**IMMIGRATION REFORM LAW INSTITUTE**

represented by **Christopher Joseph Hajec**
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
(202) 232-5590
Fax: (202) 464-3590
Email: chajec@irli.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matt A. Crapo**
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Avenue, NW
Suite 335
Washington, DC 20001
571-435-3582
Email: mcrapo@irli.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF TEXAS**

represented by **Garrett Mitchell Greene**
OFFICE OF THE TEXAS ATTORNEY GENERAL
209 W 14th Street
Austin, TX 78711
512-936-2917
Email: ggreene@americafirstpolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2025 | 1 | COMPLAINT against MICHAEL BANKS, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO RUBIO, DIANE SABATINO, DONALD J. TRUMP, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND |

| | | SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO ( Filing fee $ 405 receipt number ADCDC-11452356) filed by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons)(Harrison, Lindsay) (Entered: 02/03/2025) |
|---|---|---|
| 02/03/2025 | 2 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 02/03/2025) |
| 02/03/2025 | 3 | NOTICE of Appearance by Keren Hart Zwick on behalf of All Plaintiffs (Zwick, Keren) (Entered: 02/03/2025) |
| 02/03/2025 | 4 | NOTICE of Appearance by Lee Gelernt on behalf of All Plaintiffs (Gelernt, Lee) (Entered: 02/03/2025) |
| 02/04/2025 | | Case Assigned to Judge Randolph D. Moss. (zmtm) (Entered: 02/04/2025) |
| 02/04/2025 | 5 | SUMMONS(15) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 02/04/2025) |
| 02/04/2025 | 6 | STANDING ORDER: The parties are hereby ORDERED to comply with the directives set forth in the attached Standing Order. See document for details. Signed by Judge Randolph D. Moss on 2/4/2025. (lcrdm2) (Entered: 02/04/2025) |
| 02/04/2025 | 7 | NOTICE of Appearance by Scott Michelman on behalf of All Plaintiffs (Michelman, Scott) (Entered: 02/04/2025) |
| 02/05/2025 | 8 | NOTICE of Appearance by Melissa E. Crow on behalf of All Plaintiffs (Crow, Melissa) (Main Document 8 replaced on 2/6/2025) (zjm). (Entered: 02/05/2025) |
| 02/05/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 8 NOTICE of Appearance by Melissa E. Crow on behalf of All Plaintiffs (Crow, Melissa) (Main Document 8 replaced on 2/6/2025) (zjm).. Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/12/2025. (zhcn) Modified on 2/7/2025 (zhcn). (Entered: 02/06/2025) |
| 02/11/2025 | 9 | NOTICE of Appearance by Brian Christopher Ward on behalf of All Defendants (Ward, Brian) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | MOTION to Dismiss by CALEB VITELLO, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CUSTOMS AND BORDER PROTECTION. (Ward, Brian) (Entered: 02/11/2025) |

| 02/19/2025 | 11 | AMENDED COMPLAINT against MICHAEL BANKS, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO RUBIO, DIANE SABATINO, DONALD J. TRUMP, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT filed by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R. (Attachments: # 1 Amended Complaint Redline)(Gelernt, Lee) Modified docket text on 2/20/2025 (mg). (Entered: 02/19/2025) |
|---|---|---|
| 02/19/2025 | 12 | SEALED MOTION to Proceed Under Pseudonym filed by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R. (Attachments: # 1 Declaration of A.M., # 2 Declaration of N.S., # 3 Declaration of D.G., # 4 Declaration of B.R., # 5 Declaration of M.A., # 6 Declaration of G.A., # 7 Declaration of F.A., # 8 Declaration of E.G., # 9 Text of Proposed Order)(Gelernt, Lee) (Entered: 02/19/2025) |
| 02/19/2025 | 13 | MOTION to Certify Class *Plaintiffs' Motion for Class Certification With Supporting Points and Authorities* by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Declaration of Melissa Crow, # 2 Declaration of Scott Michelman, # 3 Declaration of Morgan Russell, # 4 Declaration of Keren Zwick, # 5 Text of Proposed Order)(Gelernt, Lee) (Entered: 02/19/2025) |
| 02/19/2025 | 14 | MOTION for Preliminary Injunction by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Declaration of Javier Hidalgo, # 2 Declaration of Jennifer Babaie, # 3 Declaration of Laura St. John, # 4 Text of Proposed Order)(Gelernt, Lee) (Entered: 02/19/2025) |
| 02/19/2025 | 15 | Emergency MOTION to Stay *Removal of Individual Plaintiffs Currently Within the United States With Supporting Points and Authorities* by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Text of Proposed Order - Granting Plaintiffs' Emergency Motion for Stay of Removal, # 2 Text of Proposed Order - Granting Temporary Stay of Removal Pending Resolution of Plaintiffs' Emergency Motion for Stay of Removal)(Gelernt, Lee) (Entered: 02/19/2025) |
| 02/20/2025 | | MINUTE ORDER: In light of Plaintiffs' Emergency Motion to Stay Removal, Dkt. 15 , it is hereby ORDERED that the parties shall appear for a hearing on February 20, 2025, at 10:30 a.m. in Courtroom 8. Members of the public may access the proceeding via telephone using the following information: Toll Free Number 833-990-9400; Meeting ID: 043781081. Signed by Judge Randolph D. Moss on 2/20/2025. (lcrdm2) (Entered: 02/20/2025) |
| 02/20/2025 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing held on 2/20/2025 re 15 Emergency MOTION to Stay *Removal of Individual Plaintiffs Currently Within the United States. Oral Argument heard. Defendant to file a Response by* |

| | | |
|---|---|---|
| | | *2/21/2025 midnight. Plaintiff to file it's Reply by 2/22/2025 midnight. Further Motion Hearing set for 2/24/2025 at 09:00 AM in Courtroom 8- In Person before Judge Randolph D. Moss (Public Line Available at 833-990-9400; Meeting ID: 043781081). Minute Order to follow. (Court Reporter Sherry Lindsay) (zglw) (Entered: 02/20/2025)* |
| 02/20/2025 | 16 | ORDER: For the reasons stated on the record at the February 20, 2025 hearing, and for the reasons contained herein, it is hereby ORDERED that an ADMINISTRATIVE STAY is entered until 12:00 p.m. on Monday, February 24, 2025. See document for details. Signed by Judge Randolph D. Moss on 2/20/2025. (lcrdm2) (Entered: 02/20/2025) |
| 02/20/2025 | 17 | ORDER: For the reasons contained herein, it is hereby ORDERED that Plaintiffs' motion for leave to proceed under pseudonyms and to file supporting exhibits under seal, Dkt. 12 , is GRANTED. It is further ORDERED that the supporting exhibits to Dkt. 12 are DEEMED sealed. See document for details. Signed by Judge Randolph D. Moss on 2/20/2025. (lcrdm1) (Entered: 02/20/2025) |
| 02/20/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Ashley A. Harris, Filing fee $ 100, receipt number ADCDC-11493789. Fee Status: Fee Paid. by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Declaration in Support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Gelernt, Lee) (Entered: 02/20/2025) |
| 02/20/2025 | 19 | TRANSCRIPT OF PROCEEDINGS before Judge Randolph D. Moss held on 2/20/25; Page Numbers: 1-18. Date of Issuance:2/20/25. Court Reporter Sherry Lindsay, Telephone number 202-354-3053, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/13/2025. Redacted Transcript Deadline set for 3/23/2025. Release of Transcript Restriction set for 5/21/2025.(stl) (Entered: 02/20/2025) |
| 02/20/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- David A. Donatti, Filing fee $ 100, receipt number ADCDC-11493826. Fee Status: Fee Paid. by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Declaration in Support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Gelernt, Lee) (Attachment 1 replaced on 2/21/2025) (zjm). (Entered: 02/20/2025) |
| 02/21/2025 | 21 | RESPONSE re 15 Emergency MOTION to Stay *Removal of Individual Plaintiffs Currently Within the United States With Supporting Points and Authorities And Suggestion of Mootness* filed by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, |

| | | |
|---|---|---|
| | | MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Ward, Brian) (Entered: 02/21/2025) |
| 02/21/2025 | 22 | REPLY to opposition to motion re 15 Motion to Stay,, filed by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Gelernt, Lee) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER: Upon consideration of Plaintiffs' Motion for Admission *Pro Hac Vice* 18 , it is hereby ORDERED that the motion is GRANTED. Ashley A. Harris is hereby granted leave to appear *pro hac vice* in this case.<br><br>Upon consideration of Plaintiffs' Motion for Admission *Pro Hac Vice* 20 , it is hereby ORDERED that the motion is GRANTED. David A. Donatti is hereby granted leave to appear *pro hac vice* in this case.<br><br>**Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)/LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Moss on 2/21/2025. (lcrdm2) (Entered: 02/21/2025) |
| 02/22/2025 | 23 | ORDER: For the reasons contained herein, it is hereby ORDERED that Plaintiffs' Emergency Motion to Stay Removal, Dkt. 15 , is DENIED as MOOT. It is further ORDERED that Defendants shall provide the Court and Plaintiffs' counsel with at least seven days' notice before removing any of the Individual Plaintiffs from the United States during the pendency of this action. It is further ORDERED that the briefing schedule on the motion to stay removal and the hearing currently set for Monday, February 24, 2025, are VACATED. It is further ORDERED that the parties shall file a joint status report on or before February 26, 2025, at 12:00 p.m. See document for details. Signed by Judge Randolph D. Moss on 2/22/2025. (lcrdm2) (Entered: 02/22/2025) |
| 02/22/2025 | | MINUTE ORDER: In light of Plaintiffs' Amended Complaint, Dkt. 11 , it is hereby ORDERED that Defendants' Motion to Dismiss, Dkt. 10 , is DENIED as MOOT. Signed by Judge Randolph D. Moss on 2/22/2025. (lcrdm2) (Entered: 02/22/2025) |
| 02/26/2025 | 24 | Joint STATUS REPORT by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Ward, Brian) (Entered: 02/26/2025) |
| 02/26/2025 | | MINUTE ORDER: In light of the parties' joint status report, Dkt. 24 , it is hereby ORDERED that the parties' proposal is adopted. The Court will, at the parties' request, treat Plaintiffs' Motion for a Preliminary Injunction, Dkt. 14 , as a motion for summary judgment and will consolidate the hearing on Plaintiffs' Motion for a Preliminary Injunction with the merits under Rule 65(a)(2). Going forward, parties shall abide by the following schedule:<br><br>March 17, 2025: Defendants produce all operative guidance documents implementing the Proclamation<br><br>March 24, 2025: Defendants file combined Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment; Defendants file Response to Plaintiffs' Motion for Class Certification |

April 7, 2025: Plaintiffs file combined Response to Defendants' Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment; Plaintiffs file Reply in support of Plaintiffs' Motion for Class Certification

April 21, 2025: Defendants file Reply in support of Defendants' Motion for Summary Judgment

It is further ORDERED that (1) Plaintiffs' claims based on the administrative record (the portions of the Sixth Claim for Relief that raise arbitrary-and-capricious arguments under the APA and all of the Seventh Claim for Relief); (2) the deadline to provide a certified list of the contents of the administrative record under Local Civ. R. 7(n)(1); and (3) the deadline for Defendants to answer or otherwise respond to the amended complaint are held in ABEYANCE pending further order of the Court. Signed by Judge Randolph D. Moss on 2/26/2025. (lcrdm2) (Entered: 02/26/2025)

| | | |
|---|---|---|
| 02/28/2025 | 25 | NOTICE of Appearance- Pro Bono by Edith Sangueza on behalf of All Plaintiffs (Sangueza, Edith) (Entered: 02/28/2025) |
| 02/28/2025 | 26 | NOTICE of Appearance- Pro Bono by Robert Pauw on behalf of All Plaintiffs (Pauw, Robert) Modified on 3/6/2025 to correct docket text (zjm). (Entered: 02/28/2025) |
| 03/01/2025 | 27 | NOTICE of Appearance- Pro Bono by Morgan Russell on behalf of All Plaintiffs (Russell, Morgan) (Entered: 03/01/2025) |
| 03/03/2025 | 28 | NOTICE of Appearance- Pro Bono by Richard P. Caldarone on behalf of All Plaintiffs (Caldarone, Richard) (Entered: 03/03/2025) |
| 03/04/2025 | 29 | NOTICE of Appearance- Pro Bono by Mary Georgevich on behalf of All Plaintiffs (Georgevich, Mary) (Entered: 03/04/2025) |
| 03/07/2025 | 30 | REQUEST FOR SUMMONS TO ISSUE filed by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, E.G., A.M., Z.A., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, D.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., M.A., G.A., B.R.. (Attachments: # 1 Summons - U.S. Citizenship and Immigration Services, # 2 Summons - U.S. Department of State) (Gelernt, Lee) (Entered: 03/07/2025) |
| 03/10/2025 | 31 | SUMMONS (2) Issued Electronically as to KIKA SCOTT, U.S. CITIZENSHIP AND IMMIGRATION SERVICES. (znmw) (Entered: 03/10/2025) |
| 03/10/2025 | | NOTICE OF ERROR regarding 30 Request for Summons to Issue,. The following error(s) need correction: Third summons does not specify defendant to be served. Please refile. (znmw) (Entered: 03/10/2025) |
| 03/10/2025 | 32 | REQUEST FOR SUMMONS TO ISSUE filed by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, E.G., A.M., Z.A., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, D.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., M.A., G.A., B.R..(Gelernt, Lee) (Entered: 03/10/2025) |
| 03/10/2025 | 33 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Daniel Hatoum, Filing fee $ 100, receipt number ADCDC-11529814. Fee Status: Fee Paid. by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Attachments: # 1 Declaration in Support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Gelernt, Lee) (Attachment 1 replaced on 3/11/2025) (zjm). (Entered: 03/10/2025) |

| 03/10/2025 | | MINUTE ORDER: Upon consideration of Plaintiffs' Motion for Leave to Appear Pro Hac Vice, Dkt. 33 , it is hereby ORDERED that the motion is GRANTED. Daniel Hatoum is hereby granted leave to appear *pro hac vice* in this case. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)/LCrR 44.5(a). Click for Instructions**. Signed by Judge Randolph D. Moss on 3/10/2025. (lcrdm2) (Entered: 03/10/2025) |
| --- | --- | --- |
| 03/11/2025 | 34 | SUMMONS (1) Issued Electronically as to U.S. DEPARTMENT OF STATE. (Attachment: # 1 Notice and Consent)(zjm) (Entered: 03/11/2025) |
| 03/12/2025 | 35 | NOTICE of Appearance by Daniel Hatoum on behalf of All Plaintiffs (Hatoum, Daniel) (Main Document 35 replaced on 3/16/2025) (zjm). (Entered: 03/12/2025) |
| 03/13/2025 | 36 | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Hatoum, Daniel) Modified on 3/14/2025 at the request of counsel (zjm). (Entered: 03/13/2025) |
| 03/14/2025 | 37 | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, N.S., D.G., E.G., G.A., M.A., F.A., A.M., Z.A., B.R.. (Hatoum, Daniel) Modified on 3/17/2025 (zjm). (Entered: 03/14/2025) |
| 03/14/2025 | 38 | NOTICE of Appearance by Joseph Anton Darrow on behalf of All Defendants (Darrow, Joseph) (Entered: 03/14/2025) |
| 03/14/2025 | 39 | Joint MOTION for Protective Order by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Attachments: # 1 Text of Proposed Order Joint Stipulated Protective Order)(Darrow, Joseph) (Entered: 03/14/2025) |
| 03/17/2025 | | NOTICE OF ERROR regarding 37 Notice of Withdrawal of Appearance,. The following error(s) need correction: Notice of withdrawal must be signed and filed by the withdrawing attorney and signed by the party/parties represented (LCvR 83.6(b)). (zjm) (Entered: 03/17/2025) |
| 03/18/2025 | 40 | ORDER: Upon consideration of the Joint Motion for Protective Order, Dkt. 39 , it is hereby ORDERED that the motion is GRANTED. See documents for details. Signed by Judge Randolph D. Moss on 3/18/2025. (lcrdm2) (Entered: 03/18/2025) |
| 03/24/2025 | 41 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit UNDER SEAL - Exhibit G to Defendants' Opposition to Plaintiffs' Motion for Class Certification, # 2 Certificate of Service, # 3 Text of Proposed Order)(Darrow, Joseph) (Entered: 03/24/2025) |

| 03/24/2025 | 42 | NOTICE of Appearance by Katherine J. Shinners on behalf of All Defendants (Shinners, Katherine) (Entered: 03/24/2025) |
|---|---|---|
| 03/24/2025 | 43 | Memorandum in opposition to re 13 Motion to Certify Class,, filed by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G (Redacted))(Shinners, Katherine) (Entered: 03/24/2025) |
| 03/24/2025 | 44 | MOTION for Summary Judgment *And Opposition to Plaintiffs' Motion for Summary Judgment* by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Attachments: # 1 Exhibit A - Updated Field Guidance for Southern Border, # 2 Exhibit B - Updated 212F Third Country, # 3 Exhibit C - CAT Assessment Instructions and Implementation Guidance, # 4 Exhibit D - Implementation of Active Executive Orders, # 5 Exhibit E - Declaration of Ihsan Gunduz, # 6 Exhibit F - Declaration of Tulsi Gabbard, # 7 Text of Proposed Order)(Darrow, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | 45 | Memorandum in opposition to re 14 Motion for Preliminary Injunction, filed by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Attachments: # 1 Exhibit A - Updated Field Guidance for Southern Border, # 2 Exhibit B - Updated 212F Third Country, # 3 Exhibit C - CAT Assessment Instructions and Implementation Guidance, # 4 Exhibit D - Implementation of Active Executive Orders, # 5 Exhibit E - Declaration of Ihsan Gunduz, # 6 Exhibit F - Declaration of Tulsi Gabbard)(Darrow, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 43 Memorandum in opposition to re 13 Motion to Certify Class,, filed by CALEB VITELLO, PAMELA BONDI, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARCO RUBIO, U.S. DEPARTMENT OF STATE, JAMES MCHENRY, U.S. DEPARTMENT OF JUSTICE, DONALD J. TRUMP, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY, PETE R. FLORES, MICHAEL BANKS, DIANE SABATINO, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, KIKA SCOTT, U.S. CUSTOMS AND BORDER PROTECTION. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G (Redacted))(Shinners, Katherine).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. |

| | | |
|---|---|---|
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 3/31/2025. (zhcn) 3/25/2025 (zapb). (Entered: 03/25/2025) |
| 03/25/2025 | | MINUTE ORDER: Upon consideration of Defendants' Motion for Leave to File Under Seal, Dkt. 41 , is hereby ORDERED that the motion is GRANTED. The document attached thereto is DEEMED FILED and shall remain SEALED. Signed by Judge Randolph D. Moss on 3/25/2025. (lcrdm2) (Entered: 03/25/2025) |
| 03/28/2025 | | MINUTE ORDER: The parties are hereby ORDERED to appear for a hearing on the cross-motions for summary judgment on April 29, 2025, at 2:00 p.m. in Courtroom 8. Signed by Judge Randolph D. Moss on 3/28/2025. (lcrdm2) (Entered: 03/28/2025) |
| 03/28/2025 | 46 | NOTICE of Appearance by Christopher Joseph Hajec on behalf of Immigration Reform Law Institute (Hajec, Christopher) (Entered: 03/28/2025) |
| 03/28/2025 | 47 | Unopposed MOTION for Leave to File Amicus Brief by IMMIGRATION REFORM LAW INSTITUTE. (Attachments: # 1 Amicus Brief, # 2 Proposed Order)(Hajec, Christopher) (Entered: 03/28/2025) |
| 03/28/2025 | 48 | NOTICE of Appearance by Matt A. Crapo on behalf of IMMIGRATION REFORM LAW INSTITUTE (Crapo, Matt) (Entered: 03/28/2025) |
| 03/28/2025 | | MINUTE ORDER: Upon consideration of Immigration Reform Law Institute's unopposed motion for leave to file amicus brief, Dkt. 47 , it is hereby ORDERED that the motion is GRANTED. Signed by Judge Randolph D. Moss on 3/28/2025. (lcrdm2) (Entered: 03/28/2025) |
| 03/28/2025 | 49 | AMICUS BRIEF by IMMIGRATION REFORM LAW INSTITUTE. (zjm) (Entered: 03/31/2025) |
| 03/31/2025 | 50 | AMICUS BRIEF in Support of Defendants by STATE OF TEXAS. (Greene, Garrett) (Entered: 03/31/2025) |
| 04/07/2025 | 51 | MOTION for Summary Judgment by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Attachments: # 1 Exhibit 1 - Proposed Order Granting Plaintiffs' Motion for Summary Judgment and Permanent Injunctive Relief) (Gelernt, Lee) (Entered: 04/07/2025) |
| 04/07/2025 | 52 | Memorandum in opposition to re 44 Motion for Summary Judgment,,, *Reply in Support of Plaintiffs' Motion for Summary Judgment 51* filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Attachments: # 1 Exhibit 1 - Redacted 212(f) Guidance)(Gelernt, Lee) (Entered: 04/07/2025) |
| 04/07/2025 | 53 | REPLY to opposition to motion re 13 Motion to Certify Class,, *in Support* filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Gelernt, Lee) (Entered: 04/07/2025) |
| 04/07/2025 | 54 | REPLY to opposition to motion re 14 Motion for Preliminary Injunction, filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., M.A.. (See Docket Entry 52 to view document) (zjm) (Entered: 04/15/2025) |

| | | |
|---|---|---|
| 04/21/2025 | 55 | REPLY to opposition to motion re 44 Motion for Summary Judgment,,, filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO A. RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Shinners, Katherine) (Entered: 04/21/2025) |
| 04/29/2025 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing held on 4/29/2025 re 51 MOTION for Summary Judgment; 14 MOTION for Preliminary Injunction ; 44 MOTION for Summary Judgment and 13 MOTION to Certify Class. Oral Argument heard. For the reasons stated on the record Briefs shall be due on or before 5/6/2025 and Responses shall be filed on or before 5/9/2025. (Court Reporter Sherry Lindsay) (zglw) Modified on 4/30/2025 to correct the date from 5/16/25 to 5/6/25(zglw). (Entered: 04/29/2025) |
| 04/30/2025 | | Set/Reset Deadlines: Brief due by 5/6/2025. (zglw) (Entered: 04/30/2025) |
| 05/02/2025 | 56 | TRANSCRIPT OF PROCEEDINGS before Judge Randolph D. Moss held on 4/29/25; Page Numbers: 1-101. Date of Issuance:5/2/25. Court Reporter Sherry Lindsay, Email: Sherry_Lindsay@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 5/23/2025. Redacted Transcript Deadline set for 6/2/2025. Release of Transcript Restriction set for 7/31/2025.(stl) (Entered: 05/02/2025) |
| 05/06/2025 | 57 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, KRISTI NOEM, MARCO A. RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Ex. A to Defendants' Supplemental Brief Concerning Mots. for Summary Judgment and Class Certification, # 2 Exhibit Ex. B to Defendants' Supplemental Brief, # 3 Exhibit Ex. C to Defendants' Supplemental Brief, # 4 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/06/2025) |
| 05/06/2025 | 58 | SUPPLEMENTAL MEMORANDUM to *Motion for Summary Judgment [ECF 51]* filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Gelernt, Lee) (Entered: 05/06/2025) |

| 05/06/2025 | 59 | SUPPLEMENTAL MEMORANDUM to re 44 MOTION for Summary Judgment *And Opposition to Plaintiffs' Motion for Summary Judgment (Exhibits Filed Provisionally Under Seal)* filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO A. RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Shinners, Katherine) (Entered: 05/06/2025) |
|---|---|---|
| 05/07/2025 | | MINUTE ORDER: Upon consideration of Defendants' Sealed Motion for Leave to File Under Seal, Dkt. 57 , it is hereby ORDERED that the motion is GRANTED. The documents attached thereto are DEEMED FILED and shall remain SEALED. Signed by Judge Randolph D. Moss on 5/7/2025. (lcrdm2) (Entered: 05/07/2025) |
| 05/07/2025 | 62 | SEALED Exhibits filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, KRISTI NOEM, MARCO A. RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. re 44 Motion for Summary Judgment,,,. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit B, # 2 Exhibit C)(zjm) (Entered: 05/15/2025) |
| 05/09/2025 | 60 | RESPONSE re 59 Supplemental Memorandum,, filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Attachments: # 1 Exhibit 1 - Declaration of Keren Zwick, # 2 Exhibit A)(Gelernt, Lee) (Entered: 05/09/2025) |
| 05/09/2025 | 61 | RESPONSE re 58 Supplemental Memorandum, filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO A. RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Shinners, Katherine) (Entered: 05/09/2025) |
| 05/13/2025 | | MINUTE ORDER: In light of D.C. Circuit precedent instructing that APA review "must be based on the full administrative record that was before the [agency] at the time [it] made its decision," *American Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (citation and quotation marks omitted), it is hereby ORDERED that defendants shall produce the full administrative record on or before May 23, 2025.

It is further ORDERED that Plaintiffs shall, on or before May 23, 2025, to the extent possible, file a supplemental declaration from each individual plaintiff indicating whether he or she provided Federal officials with the medical information, criminal history, and other background information required by the Proclamation and, if he or she did not do so, why. Signed by Judge Randolph D. Moss on 5/13/2025. (lcrdm2) (Entered: 05/13/2025) |
| 05/19/2025 | 63 | Unopposed MOTION for Extension of Time to *Produce Administrative Record*, Unopposed MOTION to Clarify re Order,,,, Set Deadlines,,, , MOTION for Leave to File *Response to Plaintiffs' Declarations* by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND |

| | | |
|---|---|---|
| | | IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Attachments: # 1 Text of Proposed Order)(Shinners, Katherine) (Entered: 05/19/2025) |
| 05/20/2025 | | MINUTE ORDER: In light of Defendants' Unopposed Motion for Extension of Time, Dkt. 63 , the parties are hereby ORDERED to appear for a scheduling conference on May 20, 2025, at 3:30 p.m. via Zoom. Signed by Judge Randolph D. Moss on 5/20/2025. (lcrdm2) (Entered: 05/20/2025) |
| 05/20/2025 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Scheduling Conference held on 5/20/2025 via Zoom. Plaintiff shall file a Supplemental Declaration on or before 5/23/2025. Defendant shall file its response on or before 5/30/2025. Defendant shall file a complete Administrative Record on or before 6/3/2025. Court grants defendants' oral request to file confidential information under seal. Court further grants plaintiffs oral request for leave to file under seal with redacted versions to be filed promptly. (Court Reporter Sherry Lindsay) (zglw) (Entered: 05/21/2025) |
| 05/23/2025 | 64 | SEALED DOCUMENT filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES(This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration of A.M., # 2 Declaration of N.S., # 3 Declaration of B.R., # 4 Declaration of M.A., # 5 Declaration of G.A., # 6 Declaration F.A., # 7 Declaration E.G.)(Gelernt, Lee) (Entered: 05/23/2025) |
| 05/23/2025 | 65 | NOTICE of Supplemental Declarations by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Attachments: # 1 Declaration of A.M., # 2 Declaration of N.S., # 3 Declaration of B.R., # 4 Declaration of M.A., # 5 Declaration of G.A., # 6 Declaration of F.A., # 7 Declaration of E.G.)(Gelernt, Lee) (Entered: 05/23/2025) |
| 05/30/2025 | 66 | RESPONSE re 65 Notice (Other), filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, JAMES MCHENRY, KRISTI NOEM, MARCO RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Attachments: # 1 Exhibit A - CBP One User Guide)(Shinners, Katherine) (Entered: 05/30/2025) |
| 06/02/2025 | 67 | MOTION for Leave to File Reply to Defendants' Response to Plaintiffs' Supplemental Declarations by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Attachments: # 1 Reply to Defendants' Response to Plaintiffs' Supplemental Declarations)(Gelernt, Lee) (Entered: 06/02/2025) |
| 06/03/2025 | 68 | SEALED DOCUMENT filed by MICHAEL BANKS, PAMELA J. BONDI, PETE R. FLORES, KRISTI NOEM, MARCO RUBIO, DIANE SABATINO, KIKA SCOTT, DONALD J. TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF STATE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO(This document |

| | | is SEALED and only available to authorized persons.) (Attachments: # 1 USCIS Administrative Record, # 2 USBP Administrative Record, # 3 OFO Administrative Record) (Shinners, Katherine) (Entered: 06/03/2025) |
| --- | --- | --- |
| 06/04/2025 | | MINUTE ORDER: Upon consideration of Plaintiffs' Motion for Leave to File Reply, Dkt. 67 , it is hereby ORDERED that the motion is GRANTED and the reply attached thereto DEEMED FILED. Signed by Judge Randolph D. Moss on 6/4/2025. (lcrdm2) (Entered: 06/04/2025) |
| 06/04/2025 | 69 | REPLY re 65 Notice (Other), filed by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (zdp) (Entered: 06/09/2025) |
| 06/27/2025 | 70 | NOTICE of Supplemental Authority by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., IMMIGRATION REFORM LAW INSTITUTE, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, STATE OF TEXAS (Attachments: # 1 Exhibit A)(Gelernt, Lee) (Entered: 06/27/2025) |
| 07/02/2025 | 71 | MEMORANDUM OPINION: For the reasons contained herein, the Court will GRANT in part Plaintiffs' motion for summary judgment, Dkt. 51 ; will GRANT in part Plaintiffs' motion to certify a class, Dkt. 13 ; will DENY Plaintiffs' motion for a preliminary injunction, Dkt. 14 , as moot; and will DEFER ruling on the remaining portions of the parties cross-motions. See document for details. Signed by Judge Randolph D. Moss on 7/2/2025. (lcrdm2) (Entered: 07/02/2025) |
| 07/02/2025 | 72 | ORDER: It is hereby ORDERED that (1) a class consisting of "[a]ll individuals who are or will be subject to Proclamation 10888 and/or its implementation within the United States," is certified pursuant to Fed. R. Civ. P. 23(b)(2); (2) named Plaintiffs A.M., Z.A., T.A., A.T., B.R., M.A., and G.A. are designated as class representatives; and (3) counsel for Plaintiffs in this case is designated as counsel for the class. See document for details. Signed by Judge Randolph D. Moss on 7/2/2025. (lcrdm2) (Entered: 07/02/2025) |
| 07/02/2025 | 73 | ORDER: It is hereby ORDERED that Plaintiffs' motion for summary judgment, Dkt. 51 , is GRANTED in part; that Plaintiffs' motion to certify a class, Dkt. 13 , is GRANTED in part; and that Plaintiffs' motion for a preliminary injunction, Dkt. 14 , is DENIED as moot. The Court will DEFER ruling on the remaining portions of the parties' cross-motions.<br><br>It is further ORDERED that the parties shall meet and confer and submit to the Court a joint status report proposing next steps for the case on or before July 11, 2025, and that the parties shall appear for a status conference on July 15, 2025, at 10:00 a.m., in Courtroom 8. See document for details. Signed by Judge Randolph D. Moss on 7/2/2025. (lcrdm2) (Entered: 07/02/2025) |
| 07/02/2025 | 74 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 71 Memorandum & Opinion, 73 Order,,, Set Deadlines/Hearings,, 72 Order,, by U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MICHAEL BANKS, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PAMELA J. BONDI, U.S. DEPARTMENT OF STATE, DONALD J. TRUMP, PETE R. FLORES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF JUSTICE, DIANE SABATINO, KIKA SCOTT, KRISTI NOEM, CALEB VITELLO, U.S. DEPARTMENT OF HOMELAND SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Shinners, Katherine) (Entered: 07/02/2025) |
| 07/03/2025 | 75 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid |

| | | |
|---|---|---|
| | | because the appeal was filed by the government re [74] Notice of Appeal to DC Circuit Court,,. (zjm) (Entered: 07/03/2025) |
| 07/03/2025 | | USCA Case Number 25-5243 for [74] Notice of Appeal to DC Circuit Court,, filed by KIKA SCOTT, DONALD J. TRUMP, CALEB VITELLO, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, PAMELA J. BONDI, PETE R. FLORES, U.S. DEPARTMENT OF STATE, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, DIANE SABATINO, MICHAEL BANKS. (mg) (Entered: 07/03/2025) |
| 07/11/2025 | 76 | Joint STATUS REPORT by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Gelernt, Lee) (Entered: 07/11/2025) |
| 07/11/2025 | | MINUTE ORDER: In light of the parties' joint status report, Dkt. 76 , it is hereby ORDERED that the status conference currently set for July 15, 2025, is VACATED; and it is further ORDERED that the parties shall file a further status report on or before July 25, 2025, and, if necessary, shall file another joint status report on or before August 8, 2025, updating the Court regarding proposed next steps. Signed by Judge Randolph D. Moss on 7/11/2025. (lcrdm2) (Entered: 07/11/2025) |
| 07/25/2025 | 77 | Joint STATUS REPORT by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Gelernt, Lee) (Entered: 07/25/2025) |
| 08/08/2025 | 78 | Joint STATUS REPORT by A.M., Z.A., B.R., D.G., E.G., F.A., FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, G.A., IMMIGRATION REFORM LAW INSTITUTE, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.A., N.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Gelernt, Lee) (Entered: 08/08/2025) |
| 08/11/2025 | | MINUTE ORDER: In light of the joint status report, Dkt. 78 , it is hereby ORDERED that further briefing is HELD IN ABEYANCE, pending a decision from the D.C. Circuit on the appeal. It is further ORDERED that the parties shall file a joint status report within five days of the D.C. Circuit's opinion, proposing next steps in the litigation. Signed by Judge Randolph D. Moss on 08/11/2025. (lcrdm2) (Entered: 08/11/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/20/2025 09:55:21 | | |
| **PACER Login:** | kshinners | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-00306-RDM |
| **Billable Pages:** | 29 | **Cost:** | 2.90 |

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, I filed the foregoing public appendix through the ECF system, which will provide electronic service to the registered participants as identified on the Notice of Electronic Filing (NEF). I also certify that a copy of the separate supplement was served on this date by email to the following counsel for Plaintiffs-Appellees: Richard Caldarone, Richard.caldarone@raices.texas.org; Lee Gelernt, lgelernt@aclu.org; Melissa Crow, crowmelissa@uclawsf.edu; Lindsay Harrison, lharrison@jenner.com; Omar Jadwat, oJadwat@aclu.org; Scott Matthew Michelman, smichelman@acludc.org; Arthur B. Spitzer, aspitzer@acludc.org; Cody Wofsy, cwofsy@aclu.org; Keren Hart Zwick, kzwick@immigrantjustice.org

A copy of the public appendix and sealed supplement will also be mailed by first-class mail to counsel for Plaintiffs at the following address:

Lee Gelernt
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400

> /s/ Drew C. Ensign
> Drew C. Ensign