**ORAL ARGUMENT NOT SCHEDULED**
**No. 25-5243**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES,
et al.,

Plaintiffs-Appellants,

v.

KRISTI NOEM, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

———————————

### BRIEF FOR APPELLANTS

———————————

BRIAN C. WARD
  *Acting Assistant Director*
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
  *Senior Litigation Counsel*
  *Office of Immigration Litigation*
  *General Litigation and Appeals*
    *Section*

BRETT A. SHUMATE
  *Assistant Attorney General*
YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*
DREW C. ENSIGN
  *Deputy Assistant Attorney*
    *General*
BENJAMIN HAYES
  *Special Counsel to the Assistant*
    *Attorney General*
  *U.S. Department of Justice, Civil*
    *Division*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 514-2000*
  *Drew.C.Ensign@usdoj.gov*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs are Refugee and Immigrant Center for Education and Legal Services; Las Americas Immigrant Advocacy Center; Florence Immigrant & Refugee Rights Project; N.S.; D.G.; E.G.; G.A.; M.A.; F.A., and her minor children K.A. and Y.A.; A.M., Z.A., and their minor children T.A. and A.T.; and B.R.

Defendants are Kristi Noem, in her official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; Michael Banks, in his official capacity as Chief of U.S. Border Patrol; Diane Sabatino, in her official capacity as Acting Executive Assistant Commissioner, CPB Office of Field Operations; Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. Immigration and Customs Enforcement; Marco Rubio, in his official capacity as Secretary of State; U.S. Department of State; Pamela J.

i

Bondi, in her official capacity as Attorney General of the United States;
U.S. Department of Justice; Joseph B. Edlow, in his official capacity as
Director of U.S. Citizenship and Immigration Services[1]; U.S. Citizenship
and Immigration Services; Donald J. Trump, in his official capacity as
President of the United States.

*Amici* are Immigration Reform Law Institute, State of Texas, and
America's Future.

No intervenors participated in the district court.

### B.    Rulings Under Review

The ruling under review consists of an opinion (JA189-316) and
orders (JA317-321) on cross-motions for summary judgment and a motion
for class certification, which the district court, Judge Randolph D. Moss,
issued on July 2, 2025.

### C.    Related Cases

This case has not previously been before this Court.  Overlapping
issues are present in the following pending cases: *Tabatabaeifar v. Scott*,
No. 2:25-cv-1238 (D. Ariz.); *Kniazev v. Kline*, No. 25-cv-2036 (D. Ariz.);

---

[1] Director Edlow is automatically substituted for his predecessor,
Acting Director Angelica Alfonso-Royals, under Fed. R. App. P. 43(c).

ii

*S.E. v. Bondi*, No. 1:25-cv-01108 (D.D.C.); *Guselnikov v. Noem*, No. 1:25-cv-2630 (D.D.C.); *Z.N. v. Olson*, No. 1:25-cv-7284 (N.D. Ill.).

                              */s/ Drew C. Ensign*
                              Drew C. Ensign

iii

# TABLE OF CONTENTS

**Page**

GLOSSARY

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 4

STATEMENT OF THE ISSUES ............................................................... 4

PERTINENT STATUTES AND REGULATIONS ..................................... 5

STATEMENT OF THE CASE ................................................................. 5

    A.    The President's Power to Exclude Illegal Aliens from the United States ........................................................ 5

    B.    The Crisis at the Southern Border ........................................ 7

    C.    The President issued the Proclamation to Combat the Border Crisis ...................................................................... 11

    D.    The District Court Enjoined the Proclamation and Certified a Universal Class ................................................. 16

    E.    Stay Proceedings Before this Court ..................................... 20

SUMMARY OF ARGUMENT ................................................................. 22

STANDARD OF REVIEW ...................................................................... 27

ARGUMENT ......................................................................................... 27

I.    The Proclamation is a Lawful Exercise of the President's Authority under the INA and the Constitution. ............................. 27

iv

A.    Sections 1182(f) and 1185(a) authorize immediate repatriation or removals of aliens who violate the entry suspensions...............................................28

B.    The District Court's cramped reading of § 1182(f) does not withstand scrutiny..........................................35

C.    The Entry Fiction Confirms the Proclamation's Legality. ...............................................41

II.    The Proclamation Lawfully Suspends Asylum for Aliens Who Enter the United States in Violation of the Suspension. .............43

III.    The Guidance is Lawful ...............................................47

A.    The Guidance does not Violate the Withholding Statute. ...............................................48

B.    The Guidance Does Not Violate CAT Regulations. .............49

III.    The District Court Certified a Universal Class in Circumvention of the Prohibition on Nationwide Injunctions and the INA. ...............................................51

A.    The Sprawling Universal Class Violates Rule 23.................52

B.    Section 1252(f)(1) Bars the Classwide Injunction and Universal Vacatur of Agency Guidance. ...............................................59

CONCLUSION ...............................................66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

v

# TABLE OF AUTHORITIES

## CASES

*Abramski v. United States,*
  573 U.S. 169 (2014) ............................................................... 32

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) .............................................................. 55

*American Broadcasting Cos. v. Aereo, Inc.,*
  573 U.S. 431 (2014) .............................................................. 31

*American Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ............................................................... 7

*American Paper Inst. Inc. v. American Elec. Power Serv. Corp.,*
  461 U.S. 402 (1983) .............................................................. 31

*Biden v. Texas,*
  597 U.S. 785 (2022) .............................................................. 61

*California v. Grace Brethren Church,*
  457 U.S. 393 (1982) .............................................................. 64

*County of Maui* v. *Hawaii Wildlife Fund,*
  590 U.S. 165 (2020) .............................................................. 31

*DHS* v. *Thuraissigiam,*
  591 U.S. 103 (2020) ......................................................... 41, 46

*Direct Mktg. Ass'n v. Brohl,*
  575 U.S. 1 (2015) ................................................................ 64

*The Emily,*
  9 Wheat. 381 (1824)......................................................... 23, 30

vi

*Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs,*
   892 F.3d 348 (D.C. Cir. 2018)..............................................................27

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) .....................................................60, 61, 63, 64, 65

*Gonzales v. DHS,*
   508 F.3d 1227 (9th Cir. 2007) ...........................................................63

*Harris v. Med. Transportation Mgmt., Inc.,*
   77 F.4th 746 (D.C. Cir. 2023) ............................................................27

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022) ......2, 17, 23, 25, 29, 30, 32, 38, 40, 44, 45

*In re Nexium Antitrust Litigation,*
   777 F.3d 9 (1st Cir. 2015)..................................................................54

*INS v. Aguirre-Aguirre,*
   526 U.S. 415 (1999) .....................................................................43, 46

*J.D. v. Azar,*
   925 F.3d 1291 (D.C. Cir. 2019) .........................................................54

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018) ...........................................................................64

*King* v. *Burwell,*
   576 U.S. 473 (2015) ...........................................................................32

*Make The Rd. New York v. Wolf,*
   962 F.3d 612 (D.C. Cir. 2020)............................................................64

*Matter of E-R-M & L-R-M,*
   25 I & N Dec. 520, 523 (BIA 2011)....................................................40

*McLaughlin Chiropractic Assocs. v. McKesson Corp.,*
   606 U.S. 146 (2025) ...........................................................................54

vii

*Moncrieffe v. Holder,*
    569 U.S. 184 (2013) ................................................................ 43

*Moreno Galvez v. Jaddou,*
    52 F. 4th 821 (9th Cir. 2022) ................................................ 60

*N.S. v. Dixon,*
    141 F.4th 279 (D.C. Cir. 2025) ............................................. 63

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ............................................ 64

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ............................................................... 55

*Sale* v. *Haitian Centers Council, Inc,*
    509 U.S. 155 (1993) ......................................... 23, 32, 39, 42

*Shaughnessy* v. *United States ex rel. Mezei,*
    345 U.S. 206 (1953) ............................................................... 41

*Spencer v. Kemna,*
    523 U.S. 1 (1998) .................................................................. 55

*Stoe v. Barr,*
    960 F.3d 627 (D.C. Cir. 2020) ............................................. 27

*TransUnion LLC v. Ramirez,*
    594 U.S. 4133 (2021 ...................................................... 53, 54

*Trump v. CASA, Inc.,*
    606 U.S.—, 145 S. Ct. 2540 (June 27, 2025) ................. 52, 53

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ...................................... 6, 28, 33, 34

viii

*United States ex rel. Knauff* v. *Shaughnessy*,
  338 U.S. 537 (1950) ....................................................... 7, 34, 38

*United States v. SCRAP*,
  412 U.S. 669 (1973) ............................................................... 53

*USDA* v. *Kirtz*,
  601 U.S. 42 (2024) ........................................................... 40, 41

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................... 26, 56, 57, 58

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................. 34

## STATUTES

8 U.S.C. § 1158 ..................................................................... 13

8 U.S.C. § 1158(a) ................................................................ 24

8 U.S.C. § 1158(a)(1) .......................................................... 46

8 U.S.C. § 1158(a)(2) .......................................................... 57

8 U.S.C. § 1158(b)(1)(A) ..................................................... 43

8 U.S.C. § 1158(b)(2)(C) ................................................. 19, 46

8 U.S.C. § 1158(d)(5)(B) ..................................................... 46

8 U.S.C. § 1182(a)(1)-(3) .................................................. 5, 13

8 U.S.C. § 1182(d)(5)(A) ..................................................... 42

8 U.S.C. § 1182(f) . 1, 4, 6, 11, 12, 17, 18, 22, 23, 24, 25, 28, 29, 32, 33, 34,
  35, 36, 37, 38, 39, 40, 41, 42, 43, 46, 47, 49, 51

ix

8 U.S.C. § 1185(a) .... 4, 6, 11, 12, 17, 18, 22, 23, 24, 25, 28, 33, 34, 41, 43, 47, 48, 49, 51

8 U.S.C. § 1185(a)(1) .................................................................. 6, 33, 34 48

8 U.S.C. § 1225 ............................................... 17, 25, 27, 47, 51, 60, 62

8 U.S.C. § 1225(a)(2) ................................................................................ 51

8 U.S.C. § 1225(b) ............................................................................... 61, 62

8 U.S.C. § 1225(b)(1) ....................... 8, 16, 18, 39, 41, 47, 49, 51, 61, 64, 65

8 U.S.C. § 1225(b)(1)(B) ........................................................................ 57

8 U.S.C. § 1229a ............ 8, 16, 17, 18, 25, 27, 39, 41, 47, 60, 61, 62, 64, 65

8 U.S.C. § 1231(a)(5) ................................................................................ 57

8 U.S.C. § 1231(b)(3) ......................................................................... 13, 49

8 U.S.C. § 1231(b)(3)(A) ......................................................................... 48

8 U.S.C. § 1231(b)(3)(B) ......................................................................... 57

8 U.S.C. § 1231(h) ................................................................................... 49

8 U.S.C. § 1252(f)(1) ............................. 5, 22, 27, 59, 60, 61, 62, 63, 64, 65

8 U.S.C. § 1326 ........................................................................................ 42

8 U.S.C. § 1326(a)(2) ............................................................................... 42

8 U.S.C. § 1326(c) .................................................................................... 42

8 U.S.C. § 1357 ........................................................................................ 63

x

28 U.S.C. § 1291.................................................................................4

28 U.S.C. § 1331.................................................................................4

42 U.S.C. § 265...............................................................................30

## FEDERAL REGULATIONS

8 C.F.R. § 208.30...............................................................25, 50, 51

8 C.F.R. § 208.30(a) ........................................................................51

8 C.F.R. § 208.30(e)(3) ...................................................................50

8 C.F.R. § 208.30(f) .........................................................................50

8 C.F.R. § 208.9................................................................................50

## EXCUTIVE ORDERS AND PROCLAMATIONS

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992)..................................6

Proclamation No. 4865, 46 Fed. Reg. 48,107 (1981). ..............................6

Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) ...............................6

Proclamation No. 7524, 67 Fed. Reg. 8,857 (2002) .................................6

Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011) ...............................6

Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017) ...............................6

Proclamation No. 10,773, 89 Fed. Reg. 48,487 (2024) ............................6

Proclamation No. 10,888, 90 Fed. Reg. 8333 (2025) .......12, 13, 29, 36, 44

xi

# FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. P. 43(c) .................................................................ii

# FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 23 .....................................................................52

Fed. R. Civ. P. 23(a)(2)-(3).........................................................56

Fed. R. Civ. P. 23(b)(2) ....................................................... 4, 58, 59

Fed. R. Civ. P. 23(a)(4) ..............................................................54

Fed. R. Civ. P. 54(b).................................................................4

(Page 13 of Total)

## GLOSSARY

| | |
|---|---|
| CAT | Convention Against Torture |
| ECF | Electronic Case Files |
| INA | Immigration and Nationality Act |

## INTRODUCTION

Just five days after the Supreme Court forbade sweeping universal injunctions, the district court certified a planet-wide class and enjoined the President's most successful measure to combat the crisis at the southern border.  That decision is fundamentally wrong, and its consequences are profoundly dangerous.  This Court previously granted a stay of significant parts of that decision and should now reverse it entirely.

On the day he took office, the President issued a Proclamation declaring an invasion at the southern border.  To combat that invasion, the Proclamation suspended the entry into the United States of aliens from its southern border and ordered that those who enter in violation of that bar are restricted from accessing provisions of the Immigration and Nationality Act ("INA") that would permit their continued presence in the United States, including asylum or withholding of removal.  The legality of that entry bar itself is unchallenged.

The President's suspension on entry is authorized by Section 212(f) of the INA, 8 U.S.C. § 1182(f), which supplements the President's Article II authority and authorizes him to suspend the entry of aliens if he

1

determines (as he did) that their entry would be detrimental to the interests of the United States. As this Court has held in an analogous context, such a power to suspend the entry of aliens necessarily includes the power to expel those aliens that enter in violation of that bar, lest the power to deny entry be rendered "nugatory." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022). Likewise, the Proclamation's restriction on access to asylum is a lawful exercise of the Executive's discretion to deny asylum applications, even to those who are otherwise eligible—as *Huisha-Huisha* also held (*id.* at 731) and as two members of the stay panel concluded.

Despite those common-sense rationales, the district court held that the President lacks authority to implement the uncontested entry bar by repatriating or removing those who violate it. Instead, the court ruled, he must resort to ordinary removal procedures, including access to asylum and withholding of removal—as if the Proclamation did not exist. The court did not even acknowledge the President's discretionary authority to deny asylum applications; it thought the Proclamation's preemptive denial of asylum was unlawful because changes to the asylum *eligibility* criteria (a completely different issue) requires rulemaking. On

2

these grounds, the court enjoined the Proclamation's directive coast-to-coast. That perverse decision renders the President's § 1182(f) authority toothless and flouts the Executive's discretionary power to deny asylum. Neither holding can be squared with this Court's *Huisha-Huisha* decision or the INA.

Making matters worse, the district court certified a sweeping planet-wide class in a transparent effort to evade the Supreme Court's limits on nationwide injunctions. In doing so, the court failed to grapple with material differences among class members; embraced an indeterminate and unidentifiable set of people around the world; and swept up aliens who are not yet suffering any injury due to the Proclamation and thus plainly lack Article III standing. Worse, the district court entered that classwide injunctive relief—compelling the Government to utilize the INA's default removal provisions—in the face of a clear statutory bar prohibiting district court's from entering precisely that relief.

The district court's order threatens to unwind the great progress this Administration has made in securing the southern border. The Proclamation has proven to be "the most effective tool for managing the

3

emergency at the southern border." JA084. Stripping the Government of that critical power will trigger yet another wave of illegal mass migration, embolden the criminal cartels who exploit such crises, divert resources away from combatting those threats, and ultimately endanger American citizens.

The Court should reverse.

## STATEMENT OF JURISDICTION

The district court asserted jurisdiction under 28 U.S.C. § 1331. On July 2, 2025, the district court certified a class under Federal Rule of Civil Procedure 23(b)(2), granted summary judgment for Plaintiffs on a subset of their claims, entered partial final judgment as to those claims under Federal Rule of Civil Procedure 54(b). JA317-321. The Government timely appealed on July 2, 2025. *See* JA348. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether 8 U.S.C. §§ 1182(f) and 1185(a) authorize the President to order the repatriation or removal of aliens who have entered the United States in violation of the Proclamation.

4

2.      Whether the Proclamation is a lawful exercise of the Executive's discretion to deny asylum applications.

3.      Whether the guidance implementing the Proclamation violates the withholding-of-removal statute or regulations implementing the Convention Against Torture.

4.      Whether the district court abused its discretion in certifying a universal class of all aliens who are or will be subject to the Proclamation at some indeterminate time in the future.

5.      Whether the district court's class certification order and classwide relief violated 8 U.S.C. § 1252(f)(1).

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.      The President's Power to Exclude Illegal Aliens from the United States

Federal law grants the President broad authority to control the entry of aliens into the United States.  Beyond the many grounds on which an alien may be inadmissible under the Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1182(a), Congress has given the

5

President expansive powers to suspend or restrict the entry of aliens whose presence in the country would be detrimental to the interests of the United States.  Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).  This provision "exudes deference to the President in every clause."  *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Section 1185(a) also grants the President authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).  Past Presidents have routinely invoked both these authorities to restrict entry of aliens from abroad to advance domestic, foreign, and national-security policy objectives.[2]

---

[2] *See, e.g.*, Proclamation No. 10,773, 89 Fed. Reg. 48,487 (2024) (Biden); Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017) (Trump); Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011) (Obama); Proclamation No. 7524, 67 Fed. Reg. 8857 (2002) (G.W. Bush); Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) (Clinton); Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) (G.H.W. Bush); Proclamation No. 4865, 46 Fed. Reg. 48,107 (1981) (Reagan).

These statutory authorities supplement the President's Article II power to exclude aliens from the United States. As the Supreme Court has acknowledged, "[t]he exclusion of aliens is a fundamental act of sovereignty" that "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 542 (1950); *see American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations." (quotation marks omitted)).

## B.    The Crisis at the Southern Border

On Inauguration Day, the country faced an unprecedented crisis at the southern border. Over the preceding four years, federal agents had encountered some 8 million illegal aliens along the border; untold millions more illegally entered after evading detection. JA066, JA067-68. By the end of the last administration, agents were encountering and releasing 1,700 illegal aliens per day just at the southwest border. Gov't Mot. for Stay, Ex. C, Gunduz Decl. ¶ 4 (Doc. No. 2124061 at 166-167); *see also* JA067.

7

This unprecedented influx of aliens vitiated many of the INA's provisions governing the removal of aliens. The INA has long authorized the expedited removal of illegal aliens who are apprehended within two years of entry, *see* 8 U.S.C. § 1225(b)(1), but the sheer volume of illegal aliens flooding across the border made it impossible for officials to detain and process all illegal aliens eligible for expedited removal. JA068-70. Instead, officials were forced to place aliens eligible for expedited removal into *non*-expedited (Section 240, or 8 U.S.C. § 1229a) proceedings—resulting in their release into the United States, often for years before their scheduled hearing date. JA069. During fiscal year 2024, for example, over 1.5 million aliens were encountered between ports of entry along the southwest border, but only a quarter of them (378,900) were processed for expedited removal. *Id.* Most of the rest were released into the United States. *Id.* "The vast majority of these releases involved aliens who were amenable to expedited removal." JA069-70. That is in contrast to prior years, where only 10% of aliens apprehended at the southern border were placed into Section 240 proceedings and released into the interior. *Id.* (from 2014 to 2019, 10% of aliens encountered along

8

the southwest border were released pending Section 240 removal proceedings, compared to 64% from 2023 to 2024).

This dynamic was only exacerbated by the substantial increase in aliens claiming fear of persecution or torture, or expressing an intent to apply for asylum. JA068, JA070 (percentage of aliens referred for credible-fear interviews went from 21% to 45% between 2014 and 2024). Most aliens who claimed fear or an intent to apply for asylum—no matter how meritless—could not be removed from the United States; they were instead placed in Section 240 removal proceedings and released into the country to await a hearing perhaps years away. JA070-71. This dynamic, in turn, created a perverse incentive—leading millions more aliens "with potentially meritless asylum or other claims" to cross the border illegally with the (well-founded) belief that, even if arrested, they would be released to live in the United States. JA069-71. To illustrate: "61% of aliens processed under expedited removal at the [southwest border] made fear claims," but "only 17% of aliens whose cases are completed … are granted asylum or other form of relief from removal." Gov't Mot. For Stay, Ex. C, Gunduz Decl. ¶ 14 (Doc. No. 2124061 at 173).

9

This wave of aliens arriving in the United States brought with it significant national security and public safety threats. "Screening for public health, safety, and national security [was] compromised." JA071. "[I]nnumerable aliens potentially carrying communicable diseases of public health significance illegally cross[ed] the southern border and enter[ed] communities across the United States. *Id.* At the same time, federal officials were unable to "verify with certainty the criminal record or national security risks" of the aliens entering illegally. *Id.*

These national security and public safety threats were supercharged by the international cartels, transnational criminal organizations, and foreign terrorist organizations that sought to leverage the chaos at the border to perpetrate their illegal activities, including smuggling in fentanyl, weapons, and people. JA072-74, JA082-84, JA091-93; *see also* Gov't Mot. for Stay, Ex. C, Gunduz Decl. ¶¶ 38, 40 & Ex. D, Noem Decl. ¶ 4 (Doc. No. 2124061 at 190, 193-195, 203-204). These criminal organizations "operate with substantial financial resources"— using "advanced technology including drones, night vision equipment, and radios to track and monitor [U.S. Border Patrol] in efforts to exploit its vulnerabilities, as well as arms and ammunition that empower their

10

sophisticated guerilla warfighting." JA073.  Border officials encountered nearly 400 individuals on the terror watchlist between ports of entry between FY 2021 and FY 2024—a 3,400% increase from prior years. JA072.    As Secretary Noem concluded:    "In this sort of border environment, DHS can have no confidence that it is preventing entry of dangerous criminal and terrorists, contraband like fentanyl, and even weapons of mass destruction."  Gov't Mot. for Stay, Ex. D, Noem Decl. ¶ 5 (Doc. No. 2124061 at 204).

All this took a devastating toll on Americans living along the southern border.  As the Governor of Texas described: "[r]anches are being ripped apart"; "homes are vulnerable to intrusion"; "border communities are regularly disrupted by human traffickers and bailouts"; and "[d]eadly fentanyl is crossing the porous border to such a degree that it is now the leading cause of death for citizens between the ages of 18 and 45."  Letter from Governor Abbott to President Biden (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf.

### C.    The President issued the Proclamation to Combat the Border Crisis

On Inauguration Day, President Trump exercised his authority under §§ 1182(f) and 1185(a) to issue Proclamation 10888, *Guaranteeing*

11

*the States Protection Against Invasion*. *See* 90 Fed. Reg. 8333 (Jan. 29, 2025) (the "Proclamation"). The Proclamation explained that over the last four years, "at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States." 90 Fed. Reg. at 8334. The "sheer number of illegal aliens entering" the country had "overwhelmed the system," and "millions of aliens who potentially pose significant threats to health, safety, and national security" remained undetected. *Id.*; *see also* JA066-74; Gov't Mot. for Stay, Ex. D, Noem Decl. ¶ 3 (Doc. No. 2124061 at 203).

1.      Faced with this crisis, the President invoked his delegated authority under §§ 1182(f) and 1185(a), as well his inherent constitutional authority over foreign affairs and immigration, to proclaim that "the entry into the United States … of aliens engaged in the invasion across the southern border is detrimental to the interest of the United States," and to suspend the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased." 90 Fed. Reg. at 8335. In addition, the Proclamation determined that entry of "any alien who fails, before entering the United States, to provide

12

federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of [8 U.S.C. § 1182(a)(1)-(3)]" likewise is "detrimental to the interests of the United States." *Id.*

To give teeth to the suspension on entry, the Proclamation orders the immediate repatriation or removal of aliens who enter the United States in violation of the suspension. To that end, the Proclamation directs the Secretary of Homeland Security to coordinate with the Secretary of State and the Attorney General to "take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border." 90 Fed. Reg. at 8336. And it prohibits aliens who violate the entry bar from "invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" the asylum statute, 8 U.S.C. § 1158, while the Proclamation is in effect. *Id.*

**2.** The Department of Homeland Security issued internal guidance to implement the Proclamation's directives. *See* JA097-170. The guidance instructs agents that aliens who violate the entry suspension may not apply for asylum, *cf.* 8 U.S.C. § 1158, and are not

13

eligible for statutory withholding of removal, *cf.* 8 U.S.C. § 1231(b)(3), because both are INA provisions that would permit the aliens' continued presence in the United States. *See*, *e.g.*, JA101-102. However, the guidance makes clear that aliens who manifest a fear continue to be eligible for protection under the Convention Against Torture ("CAT"). *See*, *e.g.*, JA104-105. The guidance also makes clear that the Proclamation does not apply to unaccompanied alien children, and that orders issued in previous litigation continue to govern the handling of family units and certain other aliens. *See, e.g.*, JA109-110.

**3.** The Proclamation has been "the most effective tool for managing the emergency at the southern border," JA084; *see also* JA066-67; Gov't Mot. for Stay, Ex. D, Noem Decl. ¶¶ 7, 11 (Doc. No. 2124061 at 205, 209) (describing the Proclamation as an "extremely effective" and "indispensable tool" for securing the border). From January to June 2025, alien encounters at the southern border plummeted by 82 percent, to the lowest levels since the 1960s. Gov't Mot. for Stay, Ex. C, Gunduz Decl. ¶¶ 4, 36 (Doc. No. 2124061 at 166-167, 187); *see also* JA066-67, JA081. The reduced strain on the immigration system and resources has, in turn, allowed border officials to refocus their efforts to combat the

14

cartels and other national security and public safety threats that had exploited the border crisis. *See* JA072-73, JA081-84; *see also* Gov't Mot. for Stay, Ex. C, Gunduz Decl. ¶¶ 37–41 (Doc. No. 2124061 at 187-195).

Those efforts are paying dividends. Border officials have confiscated thousands of weapons and explosives, *id*. at ¶ 38, seized thousands of pounds of drugs, *id*. at ¶ 40, and disrupted human trafficking rings, *id*. at ¶ 39. *See also* JA081-84. They have further cut off major revenue streams for the cartels and other criminal enterprises, which "are reportedly selling property and firing personnel to account for loss in fentanyl income that supports their operations." JA084; *see also* Gov't Mot. for Stay, Ex. C, Gunduz Decl. ¶ 40 & Ex. D, Noem Decl. ¶ 8 (Doc. No. 2124061 at 194, 205-207).

Nonetheless, criminal organizations continue to control territory on the south side of the border and remain poised to resume their criminal activities in earnest if the Proclamation is blocked. *See* JA072; Gov't Mot. for Stay, Ex. D, Noem Decl. ¶ 10 (Doc. No. 2124061 at 208). As the government's declarants explained, continued operation of the Proclamation is essential as the United States and foreign partners work to address the underlying dynamics that have precipitated waves of

15

illegal entry, smuggling, and infiltration of national-security threats whenever the United States lessens its efforts at the border. *See* JA066-67, JA077-87; JA090-95; *see also* Gov't Mot. for Stay, Ex. C, Gunduz Decl. & Ex. D, Noem Decl. (Doc. No. 2124061 at 163-209).

### D. The District Court Enjoined the Proclamation and Certified a Universal Class

Plaintiffs are 13 individuals and three nonprofit organizations that filed a putative class action challenging the Proclamation and guidance. Plaintiffs moved for summary judgment and for certification of a class under Rule 23(b)(2). On July 2, the district court granted plaintiffs' motions in substantial part. Relevant here, the court concluded that the Proclamation and guidance were unlawful. *Id.* at JA258-290. It then certified a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." JA292.

1. The district court concluded that the Proclamation violated the INA on the theory that any repatriations or removals pursuant to the Proclamation's directives must be effectuated using the generally applicable removal procedures in the INA: namely, 8 U.S.C. § 1225(b)(1), describing expedited removal proceedings, or 8 U.S.C. § 1229a,

16

describing Section 240 removal proceedings. *See* JA260-277. The court rejected the government's argument that §§ 1182(f) and 1185(a) supplied independent and parallel sources of authority to repel, repatriate, or remove aliens who violate an entry suspension, reasoning that those provisions address only entry and that reading them to implicitly authorize repatriations or removals would render the INA's removal authorities in §§ 1225 and 1229a "meaningless." JA269.

The district court further concluded that the Proclamation violated the INA by precluding aliens who violate the entry bar from applying for asylum. JA0277-285. Relying on *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), the government had argued that because asylum is a discretionary benefit, it would be pointless to accept futile applications when the Proclamation requires that asylum claims by aliens subject to the Proclamation be denied. JA284-85. The court distinguished *Huisha-Huisha* on the theory that it did not address 8 U.S.C. § 1182(f), and concluded that §§ 1182(f) and 1185(a) do not authorize the Executive Branch to modify the asylum eligibility criteria. *See* JA281, JA285.

**2.** The district court then held that the guidance violated the INA with respect to statutory withholding of removal and CAT

17

protection.  JA286-291.  The court reasoned that every alien is entitled to seek statutory withholding of removal unless the INA contains an exception, and rejected the government's argument that §§ 1182(f) and 1185(a) qualify.  JA286.  In addition, the district court held the guidance unlawful because it instructs asylum officers to follow procedures for evaluating CAT claims that vary from the procedures that would be followed in § 1225(b)(1) expedited removal proceedings.  JA288-290.

3.    The district court then certified a universal class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." JA292; *see also* JA291-301.  The court held that the class satisfies Rule 23(a)'s commonality and typicality requirements because "[a]ll members of that class" "face the same threat of injury," namely, the inability to seek asylum or withholding of removal, and the modification of procedures that govern requests for CAT protection and that otherwise would apply in § 1225(b)(1) or § 1229a removal proceedings.  JA294.  The court rejected the government's argument that the class was overbroad because not every member would be entitled to any of the various forms of protection from removal.  JA295.  The court also held that the class

18

satisfies Rule 23(b)(2) because the Proclamation and guidance "are generally applicable to the individual plaintiffs and the class they seek to represent" and a classwide injunction and other relief "would, 'in one stroke,' prevent [the government] from" enforcing their terms.  JA300 (citation omitted).

**4.**    As a remedy, the court issued a classwide injunction prohibiting the government from repatriating or removing individual plaintiffs or absent class members "using non-statutory repatriation or removal proceedings" and "without complying with the asylum statute." JA319.  And the court enjoined, on a classwide basis, the government from "narrowing the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C)" and from "using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' CAT protection claims."  JA320.

The district court also issued a classwide declaration that the Proclamation is unlawful "insofar as it purports to suspend or restrict access to asylum [or] withholding of removal" or "implement[s] extra-statutory or extra-regulatory removal or repatriation procedures." JA319.  Finally, the court issued a universal vacatur of the guidance to

19

the extent it authorized what the court had found to be unlawful. JA318-319.

5.    The district court denied a stay pending appeal and directed that its order take effect immediately as to the named individual plaintiffs. JA315. But the court delayed the effective date of its order as to absent class members until July 16, 2025, "to allow [the government] the opportunity to seek a stay in the court of appeals and to implement the Court's decision in an orderly fashion." *Id*.

### E.    Stay Proceedings Before this Court

This Court issued an administrative stay of the district court's July 2 order. Order, No. 2124940 (July 11, 2025). On August 1, 2025, a motions' panel (Millett, Pillard, Katsas, JJ.) issued an order dissolving the administrative stay and granting in part and denying in part a stay pending appeal. Order on Mot. for Stay, No. 2128457, at 1-3 (Aug. 1, 2025) ("Stay Op.").[3] The panel granted a stay of the district court's order as it relates to the scope of the class definition and the treatment of

---

[3] In its citations to the stay order and accompanying opinions (collectively, "Stay Op."), the government uses the ECF pagination at the upper right-hand corner of Document 2128457.

asylum claims under the Proclamation and its implementing guidance. The panel denied a stay on the remaining issues.

First, the panel unanimously concluded that the government was likely to succeed in its argument that the class definition should "be clarified to apply only to '[a]ll individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementation, would seek asylum, withholding of removal [], or" protection under the Convention Against Torture. Stay Op. at 1; *see also id.* at pp. 21-22 (Millett, J., concurring); *see id.* at 45 (Pillard, J., concurring in part, dissenting in part); *id.* at 56-57 (Katsas, J., concurring in part, dissenting in part).

Judge Millett and Judge Katsas additionally concluded that "the government has demonstrated that it is likely to succeed in showing that the Proclamation's and guidance's prohibition on asylum claims together constitute an advance and categorical discretionary denial of asylum" as permitted under Circuit precedent. *See* Stay Op. at 18 (Millett, J.); *see also id.* at 55 (Katsas, J.); *but see id.* at 48 (Pillard, J.) ("Plaintiffs are

21

likely to succeed in establishing that foreclosing the opportunity to apply [for asylum] is contrary to the INA.").

The panel otherwise denied a stay, including on whether §§ 1182(f) and 1185(a) authorize the President to order the repatriation or removal of aliens outside the procedures contemplated by the INA, *see* Stay Op. at 22-28 (Millett, J.), whether the Proclamation and implementing guidance are consistent with statutory and treaty-based forms of protection from removal, *see id.* at 29-33 (Millett, J.), and whether § 1252(f)(1) bars classwide injunctive relief in this case, *see id.* at 36-39 (Millett, J.).  Judge Katsas dissented from the denial of a stay based on § 1252(f)(1); he believed that statute barred class-wide injunctive relief as to absent class members. *See* Stay Op. at 57-59 (Katsas, J.).

## SUMMARY OF ARGUMENT

The Proclamation is a lawful exercise of the President's authority to suspend the entry of aliens into the United States and deny their access to relief that would enable them to remain in the United States, including asylum.  The district court's order holding the Proclamation unlawful and certifying a planet-wide class should be reversed.

22

**I.** The President exercised his authority under Article II and 8 U.S.C. §§ 1182(f) and 1185(a) to suspend the entry of aliens into the United States across the southern border. That uncontested power to exclude necessarily includes the power to expel aliens who violate the entry bar. Indeed, that is what this Court held in approving the expulsion of aliens who violated the Center for Disease Control's Title 42 orders. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). There, as here, a power to exclude without the power to expel is "rendered largely nugatory." *Id*. at 729. That is consistent with bedrock rules of interpretation that prohibit statutes from being read to undermine their fundamental purpose. *See, e.g.*, *The Emily*, 9 Wheat. 381, 389, 390 (1824). That same principle underlies the Supreme Court's holding that § 1182(f) authorizes the President to take prophylactic actions to prevent aliens from violating an entry bar. *See Sale* v. *Haitian Centers Council, Inc*, 509 U.S. 155 (1993). The Proclamation is the flip side of that same power. That authority is reinforced by § 1185(a), which authorizes the President to set "reasonable rules, regulations, and orders" governing the "ent[ry]" of aliens into the United States.

23

The district court refused to apply this Court's precedent in *Huisha-Huisha* based on immaterial differences between the Title 42 statute and § 1182(f). But while the statutes use different terminology to refer to what the President may prohibit—"introduction" v. "entry"—the power to expel is necessary for either a prohibition on either "introduction" or "entry" to have any force. The logic of *Huisha-Huisha* applies fully here. Moreover, reading § 1182(f) to authorize the repatriation of aliens who violate the entry bar does not conflict with the INA's other provisions governing expedited and non-expedited removal. Those provisions are the default method of removal; § 1182(f) is an emergency provision designed to authorize repatriation for a limited period. The provisions work in harmony, not conflict.

**II.**    The Proclamation lawfully denies access to asylum for those aliens who violate the Proclamation's entry bar. The grant of asylum is solely a matter of executive discretion, *see* 8 U.S.C. § 1158(a), and the Proclamation exercised that discretion to suspend access to asylum during its duration. That is indistinguishable from the preemptive denial of asylum that this Court upheld in *Huisha-Huisha*. Because the Proclamation has predetermined that any asylum application should be

24

denied, the Executive has no obligation to allow aliens to nonetheless apply for asylum: "[I]f the asylum decision has already been made," recourse to "those procedures would be futile." *Huisha*-Huisha, 27 F.4th at 731. It makes no difference that the criteria for asylum *eligibility* may only be changed through rulemaking, as the district court reasoned; the Executive retains discretion to deny asylum even to eligible aliens.

**III.** The guidance issued to implement the Proclamation with respect to withholding of removal and CAT relief are equally lawful. The Proclamation is self-executing and precludes withholding of removal under the INA, so vacating the guidance would simply leave agents to implement the Proclamation directly. More fundamentally, repatriation under §§ 1182(f) and 1185(a) is independent of standard removal proceedings under § 1225 or 1229a, which govern withholding of removal. Similarly, while the guidance sets out certain CAT assessment procedures for aliens covered by the Proclamation, it does not implement 8 C.F.R. § 208.30, which provides for an expedited-removal screening regime and has no relevance for the § 1182(f) restrictions at bar.

**IV.** The district court erred in certifying a universal injunctive class of all aliens who are *or may be* subject to the Proclamation, either

25

now *or anytime in the future*, and whether present in the United States or *anywhere else on Earth*.  That sweeping class circumvents the Supreme Court's recently imposed restriction on nationwide injunctive relief.

The certified class sweeps in vast numbers of nonparties with no concrete or imminent injury—for instance, aliens abroad who may someday attempt entry, as well as individuals who may never seek or are statutorily barred from seeking relief.  Such an amorphous class cannot meet the requirements of Article III standing.

For many of the same reasons, moreover, it also fails the requirements of Rule 23(a) and (b)(2).  Members and future members of the certified class are and will be differently situated.  For example, some are statutory eligible to pursue asylum or other relief; some are not.  Aliens with such divergent circumstances cannot be said to have suffered "the same injury."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  And those same differences bar certification under Rule 23(b)(2), which requires that conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Id*. at 360.

26

Separately, the district court's classwide injunction and vacatur violates 8 U.S.C. § 1252(f)(1), which prohibits injunctions that compel use of § 1225 or § 1229a removal procedures. The district court's decision does exactly; by forbidding the Government from repatriating aliens under the authority of the Proclamation, the court's injunction necessarily compels the Government to resort to the INA's other statutory provisions.

## STANDARD OF REVIEW

The Court reviews the grant of summary judgment *de novo*. *Stoe v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020). The Court reviews a class certification decision for an abuse of discretion. *Harris v. Med. Transportation Mgmt., Inc.*, 77 F.4th 746, 757 (D.C. Cir. 2023). A district court abuses its discretion if its decision is based on an error of law. *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs*, 892 F.3d 348, 356 (D.C. Cir. 2018).

## ARGUMENT

## I. The Proclamation is a Lawful Exercise of the President's Authority under the INA and the Constitution.

The Proclamation is a lawful exercise of the President's authority under the INA and his inherent Article II authority. The district court

27

acknowledged that §§ 1182(f) and 1185(a) grant the President sweeping authority to suspend the *entry* of any class of aliens he deems "detrimental to the interests of the United States." JA262. Nonetheless, it invalidated the Proclamation's additional directive that those who violate the uncontested bar on entry be immediately repatriated or removed. In so doing, the court deprived the entry suspension of any independent mechanism of enforcement and rendered §§ 1182(f) and 1185(a) dead letters.

The Supreme Court has questioned whether a § 1182(f) proclamation is reviewable for statutory claims at all. *Trump* v. *Hawaii*, 585 U.S. 667, 682-683 (2018). But if such review is to occur, it must at a minimum be highly deferential and eschew unduly constrictive interpretations. *See id*. at 684 (noting that § 1182(f) "exudes deference to the President in every clause"). The district court's cramped interpretations flout this principle.

## A.    Sections 1182(f) and 1185(a) authorize immediate repatriation or removals of aliens who violate the entry suspensions.

The President has ample authority—both statutory and constitutional—to require the repatriation or removal of aliens who enter

28

the United States in violation of the Proclamation's suspension on entry. Any one these authorities is sufficient to sustain the Proclamation.

**1.** Section 1182(f) authorizes the President "to suspend the entry of all aliens or any class of aliens" he deems to be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). That express grant of authority necessarily includes the power to effectuate such an entry ban, including by immediately repatriating or removing those who enter the country in violation of the suspension. After all, the whole point of the entry suspension is to prevent the immigration system from being "overwhelmed" by a tidal wave of illegal aliens who "pose significant threats to health, safety, and national security." 90 Fed. Reg. at 8334. Absent a power to repel, the President's exclusion power would be toothless: aliens barred from entry could simply disregard the bar and enter anyway—as if the bar did not exist.

This Court's decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), makes clear that the authority to prohibit the entry of aliens includes the concomitant authority to expel those aliens who illegally evade that prohibition. That case involved "Title 42" public-health orders issued during the COVID-19 pandemic, which were issued

29

under statutory authority that empowers the Centers for Disease Control ("CDC") to "prohibit, in whole or in part, the introduction of persons" from countries posing a risk of communicable diseases.  42 U.S.C. § 265. Exercising that authority, CDC issued orders that prohibited covered aliens from entering the United States by land from Canada or Mexico *and* authorized the prompt expulsion of aliens who evaded that prohibition. *Huisha-Huisha*, 27 F.4th at 721.

This Court upheld CDC's use of Section 265 to expel aliens who evaded the entry bar.  In particular, the Court held that the authority to prohibit "the introduction of persons" into the country carried the concomitant power to expel those who evade that prohibition. *Id*. at 729. Otherwise, the prohibition would "be rendered largely nugatory if the Executive could not take any action against a[n otherwise] covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *Id*.

*Huisha-Huisha* broke no new ground; it merely applied the longstanding principle that statutes should not be interpreted in a manner that would facilitate "evasion of the law" or "enable offenders to elude its provisions in the most easy manner." *The Emily*, 9 Wheat. 381,

30

389, 390 (1824). Congress does not, in other words, "paralyze with one hand what it sought to promote with the other." *American Paper Inst. Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 421 (1983). That principle "follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness." Antonin Scalia & Bryan A. Garner, *Reading Law* 63.

Take, for example, *County of Maui* v. *Hawaii Wildlife Fund*, 590 U.S. 165 (2020), in which the Supreme Court refused to interpret a statute that required a permit to operate "a pipe that spews pollution directly into coastal waters" to not require a permit for the same conduct if the polluter "move[d] the pipe back, perhaps only a few yards." *Id.* at 178. The Court found it implausible that Congress would have left "such a large and obvious loophole." *Id.*

Similarly, *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014), declined to read a statute that forbade using a single antenna to capture broadcasts of copyrighted works for retransmission to the public as permitting the same behavior using "thousands of dime-size antennas" instead of a single large one. *Id.* at 436; *see also id*. at 446. And in

31

*Abramski v. United States*, 573 U.S. 169 (2014), read a statutory prohibition on transferring firearms between particular people to include transfers that simply went through a straw purchaser or middleman so as to avoid ready "evasion." *Id.* at 177-189; see *id.* at 181 ("render meaningless"); *id.* ("defeat the point"); *id.* at 182 ("easily bypass the scheme"); *see also King* v. *Burwell*, 576 U.S. 473, 492 (2015) (rejecting interpretation that would lead to result "that Congress designed the Act to avoid").

Here too, § 1182(f) is best read to include the authority to repatriate or remove; absent the power to expel, the authority to prohibit entry would be "rendered largely nugatory." *Huisha-Huisha*, 27 F.4th at 729.

*Sale v. Haitian Centers Council, Inc*, 509 U.S. 155 (1993), reinforces that conclusion. There, the Court opined that § 1182(f) would authorize a naval blockade outside U.S. territorial waters to "deny illegal Haitian migrants the ability to disembark on our shores." *Id.* at 187. Thus, the Court recognized, § 1182(f)'s authority to "suspend the entry" of aliens necessarily encompasses the authority to take steps to render that suspension effective. Here, the Proclamation is merely the flip side of the *Sale* coin: it seeks to ensure that aliens who manage to physically cross

32

the border *despite* the suspension of entry can be repatriated or removed.
That falls equally within the INA's scope.

2.      Section 1185(a), on which the Proclamation explicitly relies,
further supports the Proclamation.   Section 1185(a) states:   "Unless
otherwise ordered by the President, it shall be unlawful ... for any alien
to depart from or enter or attempt to depart from or enter the United
States except under such reasonable rules, regulations, and orders, and
subject to such limitations and exceptions as the President may
prescribe."  8 U.S.C. § 1185(a)(1).  Section 1185(a)'s application to entry
"substantially overlaps" with § 1182(f), *Hawaii*, 585 U.S. at 683 n.1
(brackets and citation omitted), and reinforces the President's power to
immediately repatriate or remove those who evade the Proclamation's
entry suspension.   Indeed, repatriation or removal constitutes both a
"limitation[]" and an "exception[]" that the President has "prescribe[d],"
and the Proclamation constitutes an "order[]" of the President.  8 U.S.C.
§ 1185(a)(1).

Likewise,   § 1185(a)'s   application   to   "depart[ures]"   plainly
authorizes the President to prescribe "limitations and exceptions" to the
"rules" and "regulations" governing how aliens must depart, making clear

33

that repatriation or removal is permissible without recourse to Section 240 or expedited removal proceedings.  8 U.S.C. § 1185(a)(1).  Section 1185(a) thus independently supports the President's authority to repatriate or remove aliens who evade the Proclamation's entry suspension under § 1182(f). *Cf. Knauff*, 338 U.S. at 540-45 (affirming Attorney General's authority to exclude and deport an arriving alien under regulations promulgated pursuant to Presidential Proclamation No. 2523, issued under the precursor to 8 U.S.C. § 1185(a)(1)).

**3.**     This reading of § 1182(f) and § 1185(a) is further reinforced by the President's inherent authority to exclude aliens.  "The exclusion of aliens ... stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542.   In enacting § 1182(f), Congress supplemented the President's inherent authority by conferring broad statutory authority to exclude classes of aliens.  *See Hawaii*, 585 U.S. at 684.  Thus, when the President exercises his suspension authority under §§ 1182(f) and 1185(a), he "acts pursuant to an express or implied authorization of Congress," and "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."

34

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).  His actions are "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Id.* at 637.

### B.    The District Court's cramped reading of § 1182(f) does not withstand scrutiny.

The district court held that § 1182(f) merely governs the "'*entry* of aliens'" and does not confer authority to *repatriate or remove*, leaving the President powerless to "alter the rules to apply to those who have already entered," even in violation of a § 1182(f) entry suspension.   JA263 (citation omitted).  That conclusion is refuted by this Court's precedent and the statute.

**1.**    The district court offered no cogent ground on which to distinguish this Court's precedent in *Huisha-Huisha*.  The court reasoned that an implied power to expel under Section 265 "made perfect sense" because if aliens who defied Title 42 orders were permitted to "remain in place while removal proceedings played out, the disease would spread, and the goal of preventing spread of the disease in the United States would not be achieved."  JA268-269.  But the exact same logic applies here.  Section 1182(f)'s objective is to empower the President to prevent

35

the "entry of any aliens … into the United States" when their entry "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  Just as Section 265's goal of preventing the spread of infectious disease in the United States would be nullified absent the authority to expel aliens carrying that disease, so too § 1182(f)'s goal of preventing the entry of aliens "detrimental to the interests of the United States" would be nullified absent the power to expel those aliens from the United States.

Besides, even if the fact that Section 265 is "a public health statute" were relevant, the district court's analysis ignores that the Proclamation is directed, in part, at preventing the entry of "illegal aliens crossing the southern border" with "communicable diseases."  90 Fed. Reg. at 8334. The entry of those with "communicable diseases" is plainly "detrimental to the interests of the United States," 8 U.S.C. § 1182(f), and there is no reason why *the President's* power to suspend the entry of such aliens—as well as dozens of other classes of aliens equally detrimental to the United States—should be subject to a lesser enforcement power than the CDC.

The district court tried to justify its differential treatment on the theory that Section 265 authorizes prohibitions on the "introduction" of

36

covered persons (which the court viewed as encompassing a continuous state), whereas § 1182(f) authorizes suspending the "entry" of covered aliens (which the court viewed as a one-time action). JA270-271. That is a false distinction—there is no difference between the "introduction" and the "entry" of an alien into the country; if anything, in immigration law "entry" evokes a continuing state to a far greater degree than mere "introduction." *Infra*, Part I.C.

More fundamentally, § 1182(f) cannot rationally be read to be concerned only with the alien's split-second act of crossing the border, and entirely agnostic to the alien's continued presence in the country thereafter. The mere, momentary act of illegally crossing the border is hardly the only conduct "detrimental to the interests" of the United States. 8 U.S.C. § 1182(f)—it is not even the *most* detrimental conduct. Rather, the detriment arises from the *continuing* consequences of that illegal crossing—including the overwhelming of the immigration system; the resulting release of millions of aliens (including *thousands* of criminals) into the country; the perverse incentives that dynamic creates to spur even greater numbers of aliens to enter illegally; and the chaos that allows malign organizations to smuggle in criminals, contraband,

37

and weapons that threaten national security and public safety. *Supra*, pp. 7-11.

If anything, the case for immediate repatriation or removal under § 1182(f) is even stronger than under Title 42, given that § 1182(f) supplements the President's inherent authority to manage foreign relations and immigration, *see Knauff*, 338 U.S. at 542—authorities the CDC obviously lacks.

2. The district court argued that § 1182(f) cannot be read to authorize "whatever actions are necessary to give ... maximum effect[] to a suspension of entry" or to grant any "additional authority [that] would render [the President's] authorized actions more effective."  JA264-265. Those are strawmen.  The Government's argument is *only* that § 1182(f)'s power to *exclude* must include the power to *expel* if the former is to have any meaningful force.  That is hardly the all-encompassing power the district court imagined.  Besides, the same criticism could have been leveled against the CDC's Title 42 Orders—yet this Court unanimously held that Section 265's explicit power to exclude included the implicit power to expel, lest the former be rendered "nugatory." *Huisha-Huisha*, 27 F.4th at 729.

38

That is the same rationale the Supreme Court applied in *Sale*. *Supra*, p. 23. The district court tried to distinguish *Sale* because there, "the naval blockade was intended to 'prevent Haitians from reaching our shores *and invoking the INA's protections*,'" whereas this case involves aliens who have "physically entered the United States." JA266 (brackets, citation, and ellipsis omitted). That misses the fundamental point of *Sale*—that § 1182(f) empowers the President to take action necessary to ensure that a suspension on entry is not rendered ineffective. The Proclamation here does exactly that.

**3.** Repatriation and removal are thus squarely authorized by § 1182(f) and no other provision of the INA cabins their scope. The district court thought that interpreting § 1182(f) to allow repatriation or removal would effectively negate the removal provisions in 8 U.S.C. § 1225(b)(1) (expedited removal) and 8 U.S.C. § 1229a (Section 240 removal). JA269; *see also* JA265. That is incorrect. Sections 1225(b)(1) and 1229a provide the *default* means for removing illegal aliens from the country; the latter can take years. In contrast, § 1182(f) authorizes the President to *immediately*—but *temporarily*—"suspen[d]" the entry of classes of aliens whose entry would be "detrimental to the interests of the

39

United States," 8 U.S.C. § 1182(f), including to address emergencies. Section 1182(f) is thus directed at a different problem and offers a different solution.

The time-limited authority in § 1182(f) thus supplements, rather than supplants, the INA's general removal provisions, which continue to have full force. For example, the Proclamation has no application to aliens unlawfully in the United States because they overstayed a visa. Removal of such aliens continues to be governed by the INA's provisions for removal. And the Executive Branch retains discretion to remove even aliens subject to the Proclamation using expedited removal or Section 240 proceedings—just as it retains discretion to remove aliens eligible for expedited removal using Section 240 proceedings instead. *See Matter of E-R-M & L-R-M*, 25 I & N Dec. 520, 523 (BIA 2011).

Ultimately, the district court's rationale rests on the false premise that different statutory authorities do not overlap. Overlapping statutory provisions are not "an unusual feature of contemporary American life for the government any more than … for the governed." *USDA* v. *Kirtz*, 601 U.S. 42, 63 (2024); *see also Huisha-Huisha*, 27 F.4th at 730-31. And when faced with "multiple and sometimes overlapping

40

legal" provisions, a court's "duty lies not in preferring one over another but in giving effect to both." *Kirtz*, 601 U.S. at 63. Here, § 1182(f) provides an independent basis for suspending the entry of covered aliens, along with the concomitant power to repatriate or remove those who evade the suspension. Those authorities and the processes for implementing them are in addition to—and neither displace nor are displaced by—other parallel authorities under the INA. The district court thus got the INA backwards by curtailing the repatriation or removal of aliens under § 1182(f) simply because of the existence of parallel removal authorities in §§ 1225(b)(1) and 1229a.

## C. The Entry Fiction Confirms the Proclamation's Legality.

Even if the district court's narrow reading of §§ 1182(f) and 1185(a) were correct, the Proclamation still would be lawful under the longstanding "entry fiction" principle, which dictates that an alien who has not been inspected remains an applicant for admission who has not yet "entered" the country. *Cf. DHS* v. *Thuraissigiam*, 591 U.S. 103, 139-140 (2020); *Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206, 215 (1953). Removing or repatriating aliens who evade an entry suspension imposed pursuant to § 1182(f) is equivalent to preventing their "entry" in

41

the first place.  Immediate removal is thus no different from the blockade in *Sale*; both aim to prevent the covered alien from "entering" the country.

The district court seemed to view the entry-fiction principle as applicable only for due-process purposes.  *Cf.* JA263 n.12, JA271.  But aliens often are treated as if they have not entered for various purposes under the immigration laws, including determining admissibility and removability, *cf., e.g.*, 8 U.S.C. § 1182(d)(5)(A) (treating parolees like "any other applicant for admission" once parole is terminated).  The court suggested (JA263 n.12) that applying the entry fiction for non-due-process purposes would "complicate enforcement" of the INA, citing 8 U.S.C. § 1326, which addresses the reentry of previously removed aliens.  That is a non sequitur:  statutory interpretation is context-dependent, so whether the entry fiction applies to § 1326 does not dictate whether it applies to § 1182(f).  In any event, § 1326 covers any previously removed alien who "enters, attempts to enter, *or is at any time found in*" the country, 8 U.S.C. § 1326(a)(2) and (c) (emphasis added), so it would apply to "an alien who had only succeeded in making it a short way past the border" even if the entry fiction applied, JA263 n.12.

42

\*      \*      \*

The power to exclude includes the power to expel.  That is the lesson from this Court's decision in *Huisha-Huisha* and longstanding principles of statutory construction.  The district court erred in holding otherwise.

## II.  The Proclamation Lawfully Suspends Asylum for Aliens Who Enter the United States in Violation of the Suspension.

Even if §§ 1182(f) and 1185(a) do not authorize the President to *repatriate or remove* aliens who violate the Proclamation's entry bar, the President remains empowered to preemptively deny access to asylum for those who enter the United States in violation of the Proclamation's suspension on entry.  So even if aliens who violate the suspension must be removed through expedited removal or Section 240 proceedings, the Proclamation withdrew from them any recourse to asylum.

A.    A grant of asylum is purely a matter of Executive discretion: the "Secretary of Homeland Security or the Attorney General *may* grant asylum" to an eligible alien.  8 U.S.C. § 1158(b)(1)(A) (emphasis added).  As the Supreme Court has recognized, "the decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion."  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999);

43

*see Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (stating that asylum is a "form[] of discretionary relief").

The Proclamation reflects an exercise of that discretion:  It provides (repeatedly) that aliens who evade the entry bar "are restricted from invoking the provisions of the INA that would permit their continued presence in the United States, *including*, but not limited to, … [the asylum statute]."  90 Fed. Reg. at 8335 (emphasis added); *see also* JA101, JA107 (guidance providing that noncitizens "are not permitted to apply for asylum").  These "references to the asylum statute suffice for the Attorney General or the Secretary of Homeland Security to categorically pre-deny asylum such that applications would be futile."  Stay Op. at 37-38 (Millett, J.).  And because the ultimate disposition of any asylum application is foreordained—denial—the Proclamation and guidance disallow aliens from even filing such futile applications.  *See, e.g.*, JA101, JA107.

*Huisha-Huisha* approved a nearly identical pre-denial of asylum applications of those who entered the country in violation of the Title 42 orders.  As the Court explained, asylum "is a matter of executive 'discretion,'" and the Title 42 orders reflected an "exercise [of] that

44

'discretion' by foreclosing asylum for the specific subset of border crossers covered by [it]." 27 F.4th at 731. To be sure, this Court acknowledged that by preemptively denying asylum applications the Executive was depriving aliens of an "opportunity to apply for asylum." *Id.* at 730. But it did not find that problematic: "[I]f the asylum decision has already been made," recourse to "those procedures would be futile." *Id.* at 731; *See* Stay Op. at 37 (Millett, J.) ("[T]his court held in *Huisha-Huisha* that such categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time"); *id.* at 55 (Katsas, J.).

So too here: The Proclamation is an "exercise" of the President's "'discretion' [to] foreclose[e] asylum for the specific subset of border crossers covered by [it]." *Huisha-Huisha*, 27 F.4th at 731. In fact, the Proclamation is an even clearer exercise of the Executive's discretion to pre-deny asylum applications: *Huisha-Huisha* found that the Title 42 orders foreclosed asylum even though the order at issue did not even *mention* asylum; "such silence was sufficient to close the door on the asylum process across the board." Stay Op. at 38 (Millett, J.). The Proclamation, by contrast, "twice expressly bars noncitizens from 'invoking' Section 1158 [the asylum statute]." *Id.* at 37.

45

**B.**   The district court refused to apply *Huisha-Huisha* and its commonsense reasoning based on the fact that the Executive may modify the asylum *eligibility criteria* only by notice-and-comment rulemaking. JA281-282 (citing 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B)).   That confuses *eligibility* for asylum with *being granted* asylum.   An alien may be eligible for asylum, but the Executive still has full discretion to deny that alien asylum.   As the Supreme Court has repeatedly recognized, "even if an applicant qualifies [for asylum], an actual grant of asylum is discretionary." *Thuraissigiam*, 591 U.S. at 110 n.4; *see Aguirre-Aguirre*, 526 U.S. at 420.   When, as here, the President announces a policy that asylum will not be granted to a category of aliens, any asylum application from aliens in that category would be pointless.   The district court's critique entirely misses the point.

Underscoring the perversity of its ruling, the district court recognized that, notwithstanding § 1158(a)(1), a § 1182(f) entry suspension might well prohibit covered aliens seeking to arrive at a port of entry from applying for asylum—just not aliens entering illegally between ports of entry.   JA285 n.15.   It makes no sense to treat lawbreaking aliens more favorably than those who seek to present

46

themselves at a port of entry. Quite the contrary, neither an alien who has managed to evade an entry suspension nor one who presents at a port of entry is deemed to have "entered" the country. *Supra*, Part I.C. And both may be preemptively precluded from *applying* for asylum because both may be preemptively *denied* asylum.

## III.    The Guidance is Lawful

The district court further erred in enjoining and vacating the guidance because it forecloses statutory withholding of removal and modifies the screening procedures for CAT claims. Even assuming that the guidance—in reality, a collection of internal agency memoranda and emails produced in response to a court order—constitutes final agency action reviewable under the APA (which it does not), invalidating the guidance would not provide any benefit to respondents. The Proclamation itself is self-executing and precludes withholding of removal under the INA, so vacating the guidance would simply leave agents to implement the Proclamation directly. More fundamentally, repatriation or removal under §§ 1182(f) and 1185(a) is independent of standard removal proceedings under § 1225(b)(1) or 1229a, so the modification of screening procedures does not violate any INA provision.

47

### A. The Guidance does not Violate the Withholding Statute.

The district court erred in holding that, by precluding covered aliens from seeking statutory withholding of removal, the guidance conflicts with the INA and is thus arbitrary and capricious. *See* JA286-288. The withholding statute provides that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

But as noted above, § 1185(a) provides that entry into the United States is "subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). For aliens who violate the entry bar, the Proclamation permissibly creates such "limitations and exceptions" to withholding of removal. Section 1185(a) thus expressly authorizes the President to prescribe *different* terms and conditions than just § 1231(b)(3)(A), refuting the district court's mistaken conception that such procedures are exclusive.

In addition, as the text and its placement in § 1231 (which governs removal) indicate, the withholding provision speaks solely to *removal*—

48

*i.e.*, removal from the country pursuant to a removal order issued in removal proceedings under a statutory removal authority. But §§ 1182(f) and 1185(a) authorize repatriation or removal as an incident to the suspension of entry; as explained, those are parallel authorities independent from Section 240 or expedited removal proceedings. *Supra*, pp. 39-41. By its terms, therefore, the withholding-of-removal provision is inapplicable to such repatriations.

Finally, § 1231(h) provides that "[n]othing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h). Statutory withholding of removal is "in this section," *see* 8 U.S.C. § 1231(b)(3), and therefore aliens have no legally enforceable substantive or procedural right to that benefit. So even if the guidance violated § 1231(b)(3), § 1231(h) would preclude any judicially ordered relief for such a violation.

## B.    The Guidance Does Not Violate CAT Regulations.

The district court likewise erred in holding that the guidance's procedures for covered aliens to raise CAT claims are arbitrary and capricious because they violate the CAT implementing regulations.

49

JA288-291.  The guidance provides that covered aliens who "manifest[]
or express[] fear" will be referred to an asylum officer to assess their CAT
claim.  *E.g.*, JA104; *see also* JA116.  There, consistent with the ultimate
standard for CAT protection, aliens must show it is more likely than not
that they will be tortured in the country to which they would be returned.
See JA142.  Aliens are not entitled to "a consultant, legal representative,
or a consultation period."  JA141.

The district court held that those procedures unlawfully departed
from the procedures in 8 C.F.R. 208.30, JA288-289, which provide that
when aliens assert a fear of persecution or torture, a fear of return, or an
intention to apply for asylum, asylum officers conduct initial screenings
where aliens need show only "'a significant possibility' that it is more
likely than not that they will be tortured if returned to the country at
issue."  JA288 (quoting 8 C.F.R. § 208.30(e)(3)).  Aliens who make that
showing are either placed in Section 240 removal proceedings or are
given second interviews at which they "may have counsel or a
representative present," and must satisfy the "more likely than not"
standard.  JA289 (citations omitted); *see* 8 C.F.R. § 208.30(f) (instructing

50

that a second interview must follow the procedures set forth in 8 C.F.R. § 208.9).

The district court overlooked, however, that 8 C.F.R. § 208.30 applies only "to aliens subject to sections 235(a)(2) and 235(b)(1) of the [INA]," that is, 8 U.S.C. § 1225(a)(2) and (b)(1), which describe stowaways and aliens in expedited-removal proceedings. 8 C.F.R. § 208.30(a). Again, aliens subject to the Proclamation are *not* subject to § 1225; rather, §§ 1182(f) and 1185(a) govern them. By its terms, 8 C.F.R. § 208.30—and the procedures it contains—are inapplicable. Any variance between those procedures and the ones in the guidance thus does not render the latter unlawful. Nor did the court identify any provision of the INA or the statute implementing CAT that contradicts the procedures set forth in the guidance.

## III. The District Court Certified a Universal Class in Circumvention of the Prohibition on Nationwide Injunctions and the INA.

The district court's order should be reversed for the independent reason that the court entered injunctive relief across a sweeping and inchoate global class in defiance of Rule 23 and the INA's prohibitions on classwide relief in this context.

51

**A.    The Sprawling Universal Class Violates Rule 23.**

The district court certified a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." JA292; *see also* JA317.  That is astoundingly broad.  Indeed, it is universal—encompassing any alien anywhere in the world who may at some indeterminate future time be subject to the Proclamation within the United States, regardless of the relief or protection he might seek or for which he might be eligible.  That violates Rule 23.  It is also a transparent end-run around *Trump v. CASA, Inc.*, 606 U.S.—, 145 S. Ct. 2540 (June 27, 2025), which held that universal injunctions exceed federal courts' equitable authority.  One problem with universal injunctions is that they offer relief to absent parties while bypassing the stringent requirements of Rule 23.  *See id.* at 2555-56.  Rather than heed the lesson of *CASA*, the district court took it as "an invitation to certify nationwide classes without scrupulous adherence to the rigors of Rule 23."  *Id.* at 2566 (Alito, J., concurring).

1.    The district court erred in certifying a class that includes aliens who are not currently subject to the Proclamation or even within the United States, but who may be at some unknown future time.  A

52

person may sue in federal court—whether as an individual or a class member—only if he has standing, which requires an "injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *cf. CASA*, 145 S. Ct. at 2562-63 (requiring that injunctions be no "broader than necessary to provide complete relief to each plaintiff *with standing to sue*" (emphasis added)). By definition, aliens who are not currently or imminently subject to the Proclamation within the United States have suffered no actual or imminent injury. *See United States v. SCRAP*, 412 U.S. 669, 688-89 (1973) (plaintiff must allege "that he has been perceptibly harmed by the challenged action," "not that he can imagine circumstances in which he could be affected by agency action"). Therefore, a court may not certify a class that would sweep in such uninjured absent class members: "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion*, 594 U.S. at 431; *see* Stay Op. at 57 (Katsas, J.) (noting the "serious constitutional problems" of an "injunction [that] would extend relief to a large number of individuals who lack Article III standing"). Those "serious constitutional problems" are only exacerbated given that those absent class members who are

53

currently *uninjured*, but *may* be affected in the future, will inevitably outnumber—probably vastly—the known class members who have actually suffered an injury. *Cf. In re Nexium Antitrust Litigation*, 777 F.3d 9, 21 (1st Cir. 2015) (class cannot be certified if more than a *de minimis* number of absent class members lack a cognizable injury).[4]

Moreover, a judicial order resolving the rights of "parties that ... had no good or reasonably foreseeable reason to sue" at the time of the decision would raise "significant questions under the Due Process Clause." *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 158 n.5 (2025). The interests of persons who have no reason to sue or intervene also cannot be "fairly and adequately protect[ed]," Fed. R. Civ. P. 23(a)(4), given their inability and lack of incentive to monitor or participate in the litigation.

All that cuts against the district court's certification of an indeterminate prospective class of anyone who might be subject to

---

[4] The Court's decision in *J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019), predated the Supreme Court's decision in *TransUnion*, which makes clear that Article III fully applies in the class context. *See* 594 U.S. at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, *class action or not.*" (emphasis added)).

54

government action somewhere, sometime.  Indeed, courts have rejected classes with even less severe infirmities.

Take, for example, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  There, the Supreme Court held that even a group of plaintiffs currently suffering illnesses caused by exposure to the defendant's asbestos-containing products could not adequately represent a class of individuals who were only at *risk* of future harm—they had been exposed to the defendant's asbestos-containing products but were not yet sick. *See id.* at 626.  This class is worse: the yet-to-be-injured class members cannot claim a plausible basis for future harm akin to the exposure of the yet-to-be-injured *Amchem* class members.  And those aliens will become future class members here only if they choose to illegally enter the country.  The Supreme Court has often refused to entertain claims for prospective relief in equity by those whose injuries would arise only from their own lawbreaking.  *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 498 (1974); *Spencer v. Kemna*, 523 U.S. 1, 15 (1998).  Such individuals should not be permitted to obtain prospective equitable relief as absent members of an ill-defined class.

**2.**     Separately, the varying factual circumstances of the absent class members are incompatible with Rule 23(a)'s commonality and typicality requirements, which require that "the class members have suffered *the same injury*." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted); *see* Fed. R. Civ. P. 23(a)(2)-(3).

The district court reasoned that the class satisfied those requirements because all members "face the same threat" of being subject to the Proclamation and losing the opportunity to seek certain protections under the INA.  JA294.  But that is akin to saying that all class members "have … suffered a violation of the same provision of law"—which is not enough under Rule 23.  *See Wal-Mart*, 564 U.S. at 350.  That forbidden logic would justify certifying virtually any proposed class that challenges government action, but automatic certification is incompatible with the "rigorous analysis" Rule 23 requires.  *Wal-Mart*, 564 U.S. at 350-51 (2011).

In fact, members and future members of the certified class are and will be differently situated.  For example, by its terms the class definition encompasses aliens who do *not* claim or manifest fear of return, and so could not pursue asylum, withholding of removal, or relief under CAT

56

under background expedited removal procedures. *See* 8 U.S.C. § 1225(b)(1)(B) (providing that, in expedited removal, only aliens who indicate an intention to seek asylum or a fear of persecution are referred for a credible fear screening). Still more aliens are ineligible for asylum or withholding of removal for other reasons. *See* 8 U.S.C. §§ 1231(a)(5), (b)(3)(B), 1158(a)(2), (b)(2). Whatever the reason, aliens who cannot pursue this relief or protection cannot claim harm from the Proclamation. At most, the Proclamation serves only to expedite those aliens' repatriation or removal; it does not deprive them of relief or even the *possibility* of relief. Aliens in those circumstances cannot possibly be thought to be suffering "the same injury" as aliens who are eligible for a form of relief from removal. *Wal-Mart*, 564 U.S. at 350.

The stay panel acknowledged this fundamental flaw in the class definition and so stayed the district court's injunction includes only aliens who are (1) "present in the United States while [the Proclamation] is in effect"; (2) "are not statutorily ineligible for" asylum, withholding of removal, or withholding under CAT; and (3) who "absent the Proclamation," would seek any of those forms of relief or protection. *See* Stay Op. at 2; *see also id.* at 22 (Millett, J.); *id.* at 56-57 (Katsas, J.). The

57

district court erred in certifying a class that swept far beyond these bounds.

**3.** For similar reasons, the class does not meet the standards for certifying a Rule 23(b)(2) injunctive class. A Rule 23(b)(2) class is appropriate only where the defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360.

The district court concluded that the class satisfied Rule 23(b)(2) because "the Proclamation and guidance apply equally to—and they affect the legal rights of—all" class members. JA295. That is disproved by the divergent factual and legal issues among class members— including whether each class member seeks or is statutorily eligible for protection or relief from removal. *See* Stay Op. at 2; *see also id.* at 22 (Millett., J.); *id.* at 56 (Katsas, J.). "[A]warding complete relief to any one

58

plaintiff or class member would be readily feasible." *Id.* at 57 (Katsas, J.). The relief sought by the class members must therefore be parceled out based on class members' particular circumstances in the form of party-specific injunctions. *Id.* And because injunctive relief is not appropriate on a classwide basis under Rule 23(b)(2), neither is declaratory relief. *See* Fed. R. Civ. P. 23(b)(2) (asking whether "final injunctive relief *or corresponding* declaratory relief is appropriate respecting the class as a whole").

For all these reasons, the district court abused its discretion in certifying a universal injunctive class.[5]

## B. Section 1252(f)(1) Bars the Classwide Injunction and Universal Vacatur of Agency Guidance.

At minimum, the universal injunctive relief the district court ordered was barred by 8 U.S.C. § 1252(f)(1). The district court held that

---

[5] Given the district court's certification of a class of aliens subject to the Proclamation within the United States, the Government does not here challenge the district court's findings that the Plaintiff organizations had Article III and statutory standing to challenge the Proclamation or that they fall within the zone of interests of the relevant statutes. JA237-249, JA253-254. The Government preserves its objections concerning these rulings, as well as the proper scope of relief for organizational harms, however, in the event the government succeeds in obtaining reversal of the class certification ruling.

59

removals or repatriations under the Proclamation had to proceed under the INA's ordinary removal and expedited-removal procedures. That was wrong for the reasons explained above. But accepting that premise, the consequence is that no classwide relief mandating compliance with those removal and expedited-removal procedures is permissible.

1.    Congress enacted § 1252(f)(1) to ensure that, with the exception of the Supreme Court, no court may "enjoin or restrain the operation of the provisions of part IV of this subchapter"—generally, 8 U.S.C. §§ 1221–1232[6]—"other than with respect to the application of such provisions to an individual alien." 8 U.S.C. § 1252(f)(1). That prohibition "generally" bars lower courts from issuing injunctions "that order federal officials to take or to refrain from taking actions to enforce, implement,

---

[6] The statute's reference to "the provisions of part IV of this subchapter, as amended by [IIRIRA]" is often cited as referring to 8 U.S.C. §§ 1221-1232. *See, e.g.*, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549 (2022). However, the text of the statute as enacted referred to "chapter 4 of title II" of the INA, which is not completely coextensive with "part IV of this subchapter" as set forth in the codified version of the statute. *See Moreno Galvez v. Jaddou,* 52 F. 4th 821, 830 (9th Cir. 2022)). The statutory provisions at issue here—8 U.S.C. §§ 1225, 1229a, and 1231 (INA §§ 235, 240, and 241)—are all contained in "chapter 4 of title II" of the INA and thus covered by § 1252.

60

or otherwise carry out the specified statutory provisions" on a classwide basis. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).[7]

The statutory provisions governing expedited removal and regular removal proceedings are covered by § 1252(f)(1)'s bar on injunctive relief. Section 1225(b), which governs expedited removal and sets out the statutory procedures for credible-fear screenings and further consideration of asylum claims, is part of chapter 4 of title II of the INA and thus falls within § 1252(f)(1)'s ambit. So, too, is § 1229a, the provision governing regular removal proceedings. Therefore, § 1252(f)(1) barred the district court from ordering the Government to apply those removal provisions to the class members. But it did precisely that: it prohibited the Government from repatriating or removing aliens under the authority of the Proclamation, *see* JA319, which has the necessary consequence of "requiring [the Government] to return to the processes that Congress required" for removal under §§ 1225(b)(1) and 1229a,

---

[7] The Supreme Court has emphasized that § 1252(f)(1) is narrow in scope, addressing only the availability of injunctive relief and not the jurisdiction of the courts. *Biden v. Texas*, 597 U.S. 785, 797–801 (2022). That narrowness only reinforces the point here: while lower courts retain authority to grant other forms of relief, Congress withdrew their power to enter universal relief compelling the Executive Branch to comply with Part IV procedures or operate those procedures in particular ways.

61

JA314.  That is forbidden by § 1252(f)(1).  Indeed, the district court conceded that "a class-wide injunction compelling the Secretary to provide aliens with credible fear interviews under Section 1225 or [full] removal proceedings under Section 1229a" would be precluded by § 1252(f)(1).  JA306-307 (internal quotation marks omitted).

Nonetheless, the district court thought its injunction permissible because it enjoins the Government "from implementing the Proclamation," which is not "premised on any provision" covered by § 1252(f)(1).  JA307.  That is false distinction:  The only way the Government can comply with the court's injunction is to afford class members the procedures set out in §§ 1225(b) or 1229a before removal.  The injunction thus compels compliance with §§ 1225(b) and 1229a— there is no other option.[8]  And that effect is not merely "incidental" to, or a "downstream effect[]" of, the court's injunction.  *Cf.* JA308.  It is the entire point of the Court's injunction—to compel Defendants "to comply with the law as Congress enacted."  JA314.  As Judge Katsas noted, by "restrain[ing] the operation of statutory provisions outside part IV

---

[8] "[I]t is no answer to say that the government need not carry out any removals at all, which would be a wholesale abdication of its enforcement responsibilities under the INA."  Stay Op. at 58-59 (opinion of Katsas, J.).

62

because they conflict with provisions inside it," the district court "order[ed] the government to 'enforce, implement, or otherwise carry out' the part IV removal provisions." Stay Op. at 58 (Katsas, J.). That is unlike *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007), in which "the enjoined provision was held invalid for reasons having nothing to do with any part IV provision." Stay Op. at 58; *see also Gonzales*, 508 F.3d at 1231-34.

At bottom, the district court's attempt (JA308) to distinguish between the Proclamation as the "object" of the injunction and the covered statutory provisions as affected in a "merely incidental" way cannot mask the reality that once the injunction dictates how removals must operate for a class, § 1252(f)(1) applies. *See Aleman Gonzalez*, 596 U.S. at 549; *N.S. v. Dixon*, 141 F.4th 279, 286-90 (D.C. Cir. 2025) (holding that § 1252(f)(1) barred injunction that restrained immigration arrests governed by covered statutory detention provisions, although injunction was based on claim that officers lacked authority to arrest under non-covered provision, 8 U.S.C. § 1357). And so, regardless of how the issue is framed, only one of two conclusions can obtain: (1) if removals and repatriations under the Proclamation are legally independent of

63

§§ 1225(b)(1) and 1229a, there is no basis for any injunction directing the Government—even implicitly—to provide those procedures to the class; or (2) if they must proceed under §§ 1225(b)(1) and 1229a, Congress has barred compelling those procedures for anyone beyond the named Plaintiffs. Either way, the classwide injunction cannot stand.[9]

2.    The district court's universal vacatur of the guidance implementing the Proclamation also violates § 1252(f)(1).    Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review.  And the plain language of § 1252(f)(1) does not limit itself to injunctions.  Instead, it prohibits lower-court orders that "enjoin *or restrain*" the Executive Branch's operation of the

---

[9] It remains the government's view that § 1252(f)(1) also bars declaratory relief. *See Aleman Gonzalez*, 596 U.S. at 551 n.2; *cf. California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) (Tax Injunction act barred declaratory relief as well as injunctive relief); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010). The government recognizes, however, that the D.C. Circuit has held otherwise in an opinion pre-dating *Aleman Gonzalez*.  *See Make The Rd. New York v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020); *Cf. Jennings v. Rodriguez*, 583 U.S. 281, 313 (2018) (remanding for consideration of whether declaratory relief is permissible under § 1252(f)(1) and for decision 'whether that remedy can sustain the class on its own" in light of Rule' 23(b)(2)'s language concerning "corresponding" relief) (emphasis in original).

64

covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). Together, these terms indicate that a court may not impose coercive relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 596 U.S. at 551; *see* Black's Law Dictionary 529 (6th ed. 1990) ("[e]njoin" means to "require," "command," or "positively direct" (emphasis omitted)); *id.* at 1314 ("[r]estrain" means to "limit" or "put compulsion upon" (emphasis omitted)).

Vacatur falls squarely within those terms. Thus, to the extent vacatur of the agency guidance requires the agencies to conduct expedited removal and removal under §§ 1225(b)(1) and 1229a, it contravenes § 1252(f)(1).

65

## CONCLUSION

The judgment of the district court should be reversed.

August 22, 2025                                    Respectfully submitted,

BRIAN C. WARD                              BRETT A. SHUMATE
  *Acting Assistant Director*                *Assistant Attorney General*
PATRICK GLEN                              YAAKOV M. ROTH
DAVID KIM                                    *Principal Deputy Assistant*
KATHERINE J. SHINNERS                      *Attorney General*
  *Senior Litigation Counsel*              DREW C. ENSIGN
  *Office of Immigration Litigation*         *Deputy Assistant Attorney*
  *General Litigation and Appeals*           *General*
    *Section*                                BENJAMIN HAYES
                                             *Special Counsel to the Assistant*
                                             *Attorney General*

                                            */s/ Drew C. Ensign*
                                           DREW C. ENSIGN
                                             *Deputy Assistant Attorney*
                                             *General*

                                           *U.S. Department of Justice,*
                                             *Civil Division*
                                           *950 Pennsylvania Avenue, NW*
                                           *Washington, DC 20530*
                                           *(202) 514-2000*
                                           *Drew.C.Ensign@usdoj.gov*

66

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,991 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Drew C. Ensign*
Drew C. Ensign

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, I electronically filed the foregoing brief and accompanying addendum with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Drew C. Ensign*

Drew C. Ensign