# In the United States Court of Appeals for the District of Columbia

Refugee and Immigrant Center for Education and Legal Services, *et al.*,

*Plaintiffs-Appellees*,

v.

Kristi Noem, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
Case No. 1:25-cv-00306 (Moss, J.)

**BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS-APPELLANTS AND FOR REVERSAL**

CHRISTOPHER J. HAJEC
*Counsel of Record*
MATT A. CRAPO
*On the Brief*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 232-5590
chajec@irli.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

# DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case: Federation for American Immigration Reform.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF *AMICUS CURIAE* ........................................................................1

INTRODUCTION .................................................................................................2

SUMMARY OF ARGUMENT ..............................................................................4

ARGUMENT .........................................................................................................6

I. The President's Declaration that there has been an Invasion and the Measures He has Taken to Protect Against Invasion are not Justiciable Questions ...................................................................................................6

II. In any Event, the President's Suspension of the Entry of Aliens Deemed Part of an Invasion is Lawful ...............................................................11

CONCLUSION ...................................................................................................14

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Baker v. Carr*,
 369 U.S. 186 (1962)..................................................................................................7

*California v. United States*,
 104 F.3d 1086 (9th Cir. 1997) ...................................................................................8

*Chiles v. United States*,
 874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995)............8

*J.G.G. v. Trump*,
 2025 U.S. App. LEXIS 7131, (D.C. Cir. Mar. 26, 2025).......................................8

*Huisha-Huisha v. Mayorkas*,
 27 F.4th 718 (D.C. Cir. 2022)..........................................................................12, 13

*Leng May Ma v. Barber*,
 357 U.S. 185 (1958)................................................................................................11

*Lichter v. United States*,
 334 U. S. 742 (1948)...............................................................................................10

*Mendoza-Linares v. Garland*,
 51 F.4th 1146 (9th Cir. 2022) ................................................................................13

*New Jersey v. United States*,
 91 F.3d 463 (3d Cir. 1996) ......................................................................................8

*Nishimura Ekiu v. United States*,
 142 U.S. 651 (1892)..................................................................................................6

*Sidhu v. Ashcroft*,
 368 F.3d 1160 (9th Cir. 2004) ...............................................................................12

*Trump v. Hawaii*,
 585 U.S. 667 (2018).....................................................................................6, 11, 13

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)................................................................................6, 7, 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).............................................................................................9

## STATUTES

8 U.S.C. § 1158...................................................................................................3

8 U.S.C. § 1182(f)..............................................................................3, 11, 12, 13

8 U.S.C. § 1225(b)(1)........................................................................................12

8 U.S.C. § 1231(c)(1).........................................................................................12

## CONSTITUTION

U.S. CONST. art. II, § 1, cl. 1 ..............................................................................9

U.S. CONST. art. IV, § 4 ..................................................................................2, 6

## MISCELLANEOUS

8 C.F.R. § 235.3 ................................................................................................12

9 Nicolay and Hay, Works of Abraham Lincoln (1894) .........................................10

Fed. R. App. P. 29(a)(2).......................................................................................1

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) ............................10

Proclamation 10888, *Guaranteeing the States Protection Against Invasion*,
    90 Fed. Reg. 8333 (Jan. 20, 2025)...................................................2, 3, 7, 12

# INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to inform the public about the effects of both unlawful and lawful immigration, and to defend American citizens, American workers, and the nation's environment by limiting overall immigration, enhancing border security, and ending illegal immigration. In short, FAIR seeks to protect all Americans against the substantial harms of mass migration by attaining strongly-enforced, patriotic immigration reform. To that end, FAIR has been involved in more 100 legal cases since 1980, either as a party or as *amicus curiae*, in which it has consistently defended American interests against illegal immigration into the United States.

The decision in this case will likely have a substantial impact on the tools available to the executive branch of the federal government in dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this amicus brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

people in the United States. Amicus FAIR has direct and vital interests in defending the executive branch's authority to address the current illegal alien crisis.

## INTRODUCTION

On January 20, 2025, President Trump issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025), in which he declared that "an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its [constitutional] obligation" to "protect each of [the States] against Invasion." *Id.* at 8334; U.S. CONST. art. IV, § 4. In order to protect the States against invasion, President Trump invoked his "express and inherent powers in Article II of the Constitution of the United States," including "control over foreign affairs," to "suspend the physical entry of any alien engaged in the invasion across the southern border of the United States" until the President issues "a finding that the invasion at the southern border has ceased." *Id.* at 8335-36 (Proclamation § 4).

In addition to his constitutional executive powers,[2] President Trump invoked his authority described in section 212(f) of the Immigration and Nationality Act

---

[2] The Proclamation further describes the President's constitutional powers as follows:
> The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location.

("INA"), 8 U.S.C. § 1182(f), to suspend the entry of aliens "engaged in the invasion across the southern border." Section 1182(f), provides, in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

The President made the determination that the entry of such aliens is detrimental to the interests of the United States. 90 Fed. Reg. at 8335 (Proclamation § 1). The President further restricted such aliens "from invoking provisions of the INA that would permit their continued presence in the United States," including, but not limited to 8 U.S.C. § 1158. *Id.* (Proclamation § 2).

Below, the District Court vacated agency guidance "to the extent it authorizes extra-statutory and extra-regulatory removals or repatriations" of covered aliens and to the extent it precludes Plaintiffs "from accessing their statutory rights" to apply for asylum, withholding of removal, and protection under the Convention Against Torture. JA318. The District Court also enjoined the government from implementing the Proclamation directly to similar effect. JA319-20. In other words, the District

---

Only through such measures can the President guarantee the right of each State to be protected against invasion.
*Id.* at 8335.

Court ordered the government to give Plaintiffs the benefit of regular removal procedures as though the Proclamation had never been issued.

## SUMMARY OF ARGUMENT

As several courts of appeals have held, whether the states are suffering an invasion for purposes of Article IV, section 4, of the Constitution is a nonjusticiable political question. There is a clear lack of judicially discoverable and manageable standards for resolving whether a given influx or incursion of foreigners into the country constitutes an invasion, and impossible to decide whether it does so without an initial policy determination of a kind clearly for nonjudicial discretion. Likewise, what steps are to be taken to protect the states from an invasion is nonjusticiable; how to wage war is not to be decided in courtrooms, but by the people's representatives. The power to wage war is the power to wage war successfully, and the judiciary is obviously ill-suited to evaluate the effectiveness of a given measure. Because these questions of invasion and protection therefrom are not amenable to judicial resolution, and the President has inherent power as Commander in Chief to exclude aliens and to conduct war and foreign policy, the Constitution commits these questions to his discretion.

In any event, the President has also invoked his statutory and inherent power to suspend the entry of classes of aliens whose entry he deems detrimental to the national interest, including a class of aliens he deems to be part of an invasion,

however he might define "invasion." It follows from his suspension of the entry of aliens in that class that, even if they have made themselves physically present in the country by crossing the border in violation of his Proclamation, they have not effected entry into the country in the legal sense. As with travelers from abroad who have not passed through customs, a consequence of these aliens' failure to have effected entry is that they may be immediately repatriated or removed. Aliens whose entry has been suspended by the Proclamation may be immediately repatriated or removed even if they seek asylum, since the Proclamation's denial of access to asylum should be upheld, under this Court's precedent, as a blanket denial of asylum that is within executive discretion.

Furthermore, in the statute codifying the President's power to suspend the entry of aliens, Congress did not give the President an empty form of words; rather, it intended to implement his inherent power to exclude aliens. As this Court has held in the similar context of health-related expulsions, such a power would be nugatory without the power quickly to repatriate or remove aliens who violate a Proclamation suspending their entry.

# ARGUMENT

## I. The President's Declaration that there has been an Invasion and the Measures He has Taken to Protect Against Invasion are not Justiciable Questions.

The Constitution confers upon the federal government the primary responsibility to protect the various States from invasion. U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion") ("the Invasion Clause"). In making this guarantee, the Constitution presupposed the sovereignty of the United States. "It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).

The power to exclude aliens from the country, moreover, is an inherent executive power under the Constitution. "The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). *See also Trump v. Hawaii*, 585 U.S. 667, 712 (2018) (Thomas, J., concurring) ("[T]he

President has *inherent* authority to exclude aliens from the country.") (emphasis in original) (citing *Knauff*, 338 U.S. at 542-43).

In the Proclamation, President Trump declared that there was an invasion at the southern border and invoked his inherent constitutional power to protect the states from it. 90 Fed. Reg. at 8334-36. The District Court suggested that the influx of illegal immigrants does not constitute an invasion and that the President does not have the authority to invoke the Invasion Clause. JA277 n.14. But the President's determinations that an invasion is ongoing and of what steps to take to protect the states from it are both political questions that courts cannot second-guess.

In *Baker v. Carr*, the Supreme Court set forth the standard for determining whether a question raises a non-justiciable political question as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, as several courts of appeals have held, the question of whether an invasion has occurred within the meaning of the Invasion Clause is non-justiciable and committed to the political branches of the federal government. For example, the Ninth Circuit has held that "to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government, and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). From this holding, it follows that the court may not second-guess a determination that the political branches have actually made, either, if only because a failure to make a determination that an invasion has occurred is tantamount to a determination that an invasion has not occurred. *But see J.G.G. v. Trump*, Nos. 25-5067, 25-5068, 2025 U.S. App. LEXIS 7131, at *22-24 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (suggesting that nothing in *California* precludes judicial review of whether the Executive has properly invoked a wartime authority). And the Third Circuit (quoting *Baker, supra*) has held this question non-justiciable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D.

Fla. 1994) (finding the invasion question non-justiciable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places the responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

Similarly, whatever actions constitute a permissible response to an invasion are non-justiciable and are committed by the Constitution to the political branches of the federal government. "The executive Power" of the United States is vested in the President. U.S. CONST. art. II, § 1, cl. 1. Inherent in that power is the President's "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring). The exclusion of aliens is a fundamental act of sovereignty, and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Knauff*, 338 U.S. at 542. "When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." *Id.*

As the Supreme Court has recognized, "'[t]he power to wage war is the power to wage war successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). In *Lichter*, the Supreme Court quoted President Lincoln's reflection on the power of Congress to pass a Conscription Act as follows:

> The Constitution gives Congress the power [to raise and support armies], but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative . . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an "if."

334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77 (1894)). Likewise, there is no "if" in the Invasion Clause pertaining to the federal government's obligation to protect the States. On the contrary, Article II, in making the President the head of the Executive Branch and the Commander in Chief, vests him with broad power over military and foreign affairs.

In sum, what constitutes an invasion under the Constitution is committed to the political branches, and (at least within broad parameters) neither this question nor the question of which actions the government should take in response to such an invasion is amenable to judicial resolution. This Court should hold that whether an invasion is occurring and whether the President has chosen an appropriate response

10

to such an invasion are both non-justiciable political questions, to be decided by the President.

## II. In any Event, the President's Suspension of the Entry of Aliens Deemed Part of an Invasion is Lawful.

Even if the District Court had jurisdiction to annul the President's determination that an invasion is taking place under the Invasion Clause, the President, exercising either his inherent constitutional power to exclude aliens or his statutory authority to suspend entry, may suspend the entry of all or any class of aliens, including those who are part of an invasion, however he may define "invasion," if he finds that the entry of this class would be detrimental to the national interest. 8 U.S.C. § 1182(f); *Hawaii*, 585 U.S. at 691 (setting no bounds to a President's definition of classes of aliens or determinations of the national interest). Further, the President is empowered to "impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

It follows from the "suspen[sion of] the entry" of a class of aliens who have crossed the border in violation of a Proclamation that such aliens, though physically present in the United States, have not entered the country in a legal sense, just as travelers from abroad who are physically present in the United States but have not passed through customs have not legally entered the country. *See Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958) (noting that "the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry

though the alien is physically within the United States"); *Sidhu v. Ashcroft*, 368 F.3d 1160, 1165 (9th Cir. 2004) (holding that an alien taken into custody in the customs area of an airport did not enter the United States). In the latter case, the aliens, because they have not effected entry, are subject to immediate repatriation and removal, unless they claim asylum. 8 U.S.C. §§ 1225(b)(1), 1231(c)(1); 8 C.F.R. § 235.3. By the same token, aliens whose entry has been suspended by the Proclamation, because they thereby have also not effected entry, are subject to immediate repatriation and removal. They are so subject even if they claim asylum, since the Proclamation's denial of access to asylum should be upheld under this Court's precedent as a blanket denial of asylum that is within executive discretion. 90 Fed. Reg. at 8335 (Proclamation § 2); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 731 (D.C. Cir. 2022). By providing for such immediate repatriation and removal, the Proclamation recognizes the consequences of the legal reality that aliens whose entry has been suspended, but who have made themselves physically present in the country by crossing the border, have not effected entry into the United States.

In any event, the District Court was wrong to suggest that § 1182(f) cannot be read either to authorize "whatever actions are necessary to give ... maximum effect[] to a suspension of entry" or to grant any "additional authority [that] would render [the President's] authorized actions more effective." JA264-265. It is a basic canon of statutory construction that courts should favor an interpretation that furthers,

rather than obstructs, a statute's purpose. *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1166 (9th Cir. 2022). In enacting § 1182(f), Congress's purpose was to codify the President's inherent authority to exclude or impose restrictions on the entry of any class of aliens whose presence he deemed detrimental to the interests of the United States. *Hawaii*, 585 U.S. at 712 (Thomas, J., concurring) (observing that § 1182(f) cannot "set forth any judicially enforceable limits that constrain the President" because "the President has *inherent* authority to exclude aliens from the country") (emphasis in original). In codifying this power, Congress's purpose was not to give the President an empty form of words.

In order to further the purpose of § 1182(f), this Court should follow *Huisha-Huisha*, 27 F.4th at 729, where it recognized that the statutory power to "prohibit" "the introduction of persons" would be "rendered largely nugatory" if the government could not expel aliens who entered the country in violation of such a prohibition. Just as in *Huisha-Huisha*, the power to suspend the entry of certain aliens would be "largely nugatory" without a concomitant power quickly to repatriate, expel, or remove those who enter the country in violation of a Proclamation that suspends their entry.

# **CONCLUSION**

For the foregoing reasons, the Court should reverse the judgment of the district court.

Date: August 29, 2025

Respectfully submitted,

/s/ Christopher J. Hajec
CHRISTOPHER J. HAJEC
D.C. Bar No. 492551
*Counsel of Record*
MATT A. CRAPO
D.C. Bar No. 473355
*On the Brief*
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 232-5590
chajec@irli.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2) because it contains 3,214 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

Date: August 29, 2025            Respectfully submitted,

                                          /s/ Christopher J. Hajec