# United States Court of Appeals
# for the District of Columbia Circuit

---

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, et al.,
*Plaintiffs-Appellees*

v.

KRISTI NOEM, et al.,
*Defendants-Appellants*

---

From the United States District Court for the District of Columbia
Case No. 1:25-cv-00306-RDM (Hon. Randolph D. Moss)

---

## BRIEF FOR APPELLEES

---

Keren Zwick
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd.,
Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES

Lee Gelernt
    *Counsel of Record*
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell
Cody Wofsy

1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8839
sanguezaedith@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

Richard Caldarone
REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: (210) 960-3206
richard.caldarone@raicestexas.org

Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris
David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
T: (713) 942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

# CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants.

I certify under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 that Organizational Plaintiffs Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project have no parent corporations, and no publicly held company owns 10% or more of the Organizational Plaintiffs.

### B. Rulings Under Review

References to the ruling under review appear in the Brief for Appellants.

### C. Related Cases

This case has not previously been before this or any other court.

*/s/ Lee Gelernt*

# TABLE OF CONTENTS

CERTIFICATES AS TO PARTIES, RULINGS, AND RELATED CASES ..........i

    A. Parties and Amici ...............................................................................i

    B. Rulings Under Review .......................................................................i

    C. Related Cases ....................................................................................i

TABLE OF CONTENTS ..............................................................................ii

TABLE OF AUTHORITIES .......................................................................iv

GLOSSARY OF TERMS ............................................................................x

INTRODUCTION ........................................................................................1

BACKGROUND ..........................................................................................5

    A. Congress's Comprehensive Scheme Regulating Entry and Removal ............................................................................................................5

    B. The Executive Branch Has Long Understood Section 1182(f) To Grant The President Power Only With Respect To Entry, Not Removal. .........................................................................................11

    C. The Proclamation And Guidance Claim A Novel Power To Invent A New Repatriation Scheme That Overrides Statutory Protections .......13

    D. The Proclamation And Guidance Have Caused Irreparable Harm. .......16

    E. District Court Proceedings ...............................................................18

    F. The Government's Request for a Stay Pending Appeal .......................19

SUMMARY OF ARGUMENT ...................................................................22

ARGUMENT ..............................................................................................23

I.  The District Court Correctly Ruled That Neither The INA Nor the Constitution Authorize The Proclamation And Guidance ........................23

    A. Sections 1182(f) And 1185(a)(1) Do Not Provide Repatriation Authority ..........................................................................................24

B. Sections 1182(f) And 1185(a)(1) Do Not Allow Abrogation Of Statutory Protections........................................................................ 32

1. The Proclamation And Guidance Unlawfully Eliminate Asylum. ................................................................................................ 33

2. Sections 1182(f) And 1185(a)(1) Do Not Allow Abrogation of Withholding of Removal Or Protection Under The Convention Against Torture. ........................................................................ 43

II. The Clarified Class Definition Is Permissible, And Classwide Injunctive Relief Is Available. ............................................................ 47

A. The Clarified Class Definition Comports With Rule 23. ..................... 47

B. Section 1252(f)(1) Does Not Bar Classwide Injunctive Relief Or Vacatur Of The Guidance................................................................ 48

1. The Injunction Complies With Section 1252(f)(1). ........................ 49

2. Section 1252(f)(1) Does Not Bar Vacatur Of The Guidance........... 54

CONCLUSION ........................................................................................ 56

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(d)(2)(A) .......... 58

CERTIFICATE OF SERVICE ...................................................................... 59

# TABLE OF AUTHORITIES[*]

**CASES**

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987).................................................................................. 38

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ........................ 26

*Boutilier v. INS*, 387 U.S. 118 (1967) .............................................. 5

*California v. Arizona*, 452 U.S. 431 (1981) .................................... 55

*County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020) ......... 30

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ............... 13

*East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018), *stay denied*, 586 U.S. 1062 (2018)........................................ 4, 36

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), *superseded by statute as stated in FDA v. Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898 (2025)................................ 38

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893) ....................... 7

*Fort Bend County v. Davis*, 587 U.S. 541 (2019)............................ 45

*Galvan v. Press*, 347 U.S. 522 (1954)............................................ 5

*Garcia v. Garland*, 73 F.4th 219 (4th Cir. 2023) .......................... 35

*Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022)................49, 50, 51, 52, 55

*Gonzalez v. DHS*, 508 F.3d 1227 (9th Cir. 2007)........................... 53

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)................................. 8

*Healthy Gulf v. FERC*, 107 F.4th 1033 (D.C. Cir. 2024)................. 34

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)....4, 21, 29, 41, 44, 45

---

[*] Authorities upon which we chiefly rely are marked with asterisk.

*Immigrant Defenders Law Center v. Noem*, 145 F.4th 972 (9th Cir. 2025) ....................................................................... 36

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .................................... 10, 43, 44

*Las Americas Immigrant Advocacy Center v. DHS*, No. CV 24-1702, __ F. Supp. 3d __, 2025 WL 1403811 (D.D.C. May 9, 2025), *appeal docketed*, No. 25-5313 (D.C. Cir. Sept. 2, 2025) ............................ 13, 15, 46

*Make the Road New York v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ....................... 8

*National Ass'n of Manufacturers v. Department of Defense*, 583 U.S. 109 (2018) ................................................................. 24

*Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025) ............................... 45

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ......................... 13

*Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987) ....................... 9, 35

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ................................................................. 44, 45

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ................................................................. 54

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) ...................... 28, 30

*SEC v. Jarkesy*, 603 U.S. 109 (2024) ........................................ 1, 5

*Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005) ................................ 37

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ......................... 54

*Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ......................... 55

*Thamotar v. United States Attorney General*, 1 F.4th 958 (11th Cir. 2021) ................................................................. 35

**Trump v. Hawaii*, 585 U.S. 667 (2018) .............................. 6, 25, 26, 28, 29, 31

*Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017) ................................................................. 26

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)...................45

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), *superseded by statute as stated in DHS v. Thuraissigiam*, 591 U.S. 103 (2020)...................31

*United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007) .......................38

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................4, 26, 39

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......................................................45

**STATUTES**

8 U.S.C. § 1101(a)(42) ....................................................................................9

8 U.S.C. § 1158 ........................................................................................25, 34

*8 U.S.C. § 1158(a)(1) ...................................................... 3, 9, 32, 33, 35

8 U.S.C. § 1158(a)(2) .......................................................................................9

8 U.S.C. § 1158(b)(1) .......................................................................................9

8 U.S.C. § 1158(b)(2) ..............................................................................9, 10, 38

8 U.S.C. § 1158(d)(5) ...........................................................................10, 38, 39

8 U.S.C. § 1181 ..............................................................................................24

8 U.S.C. § 1182 ......................................................................................6, 24, 25

8 U.S.C. § 1182(a) ........................................................................................6, 7

8 U.S.C. § 1182(a)(2) .......................................................................................6

8 U.S.C. § 1182(a)(3) .......................................................................................6

*8 U.S.C. § 1182(f)..................................................................... 1, 6, 24, 25

8 U.S.C. § 1184 ..............................................................................................24

*8 U.S.C. § 1185(a)(1) .............................................................................33, 44

8 U.S.C. § 1225(a)(1) ......................................................................................32

8 U.S.C. § 1225(a)(2) ................................................................ 8, 26

*8 U.S.C. § 1225(b)(1) ........................................ 7, 8, 25, 26, 40

8 U.S.C. § 1225(c) ....................................................................... 26

8 U.S.C. § 1227 ........................................................................... 25

8 U.S.C. § 1227(a)(2) .................................................................. 31

8 U.S.C. § 1229a .................................................................... 7, 25

*8 U.S.C. § 1229a(a)(3) ............................................. 2, 7, 24, 32

8 U.S.C. § 1229a(b)(4) ................................................................. 7

8 U.S.C. § 1231 ........................................................................... 25

8 U.S.C. § 1231 note .................................................................. 10

8 U.S.C. § 1231(b)(3) ............................................................ 10, 43

8 U.S.C. § 1231(h) ...................................................................... 45

8 U.S.C. § 1252(a)(1) .................................................................... 7

8 U.S.C. § 1252(a)(2) .............................................................. 8, 40

8 U.S.C. § 1252(b)(4) .............................................................. 9, 40

8 U.S.C. § 1252(e) ........................................................................ 8

8 U.S.C. § 1252(f)(1) ............................................. 5, 20, 49, 54, 55

42 U.S.C. § 265 ........................................................................... 29

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 2681-822 (codified at 8 U.S.C. § 1231 n.) .................. 10, 45

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ................. 9

INA, ch. 477, § 212(e), 66 Stat. 163, 188 (1952) ................................. 6

**LEGISLATIVE MATERIALS**

142 Cong. Rec. 25,347 (1996) ............................................................. 8

**OTHER AUTHORITIES**

8 C.F.R. § 208.16(c) ........................................................................ 10

8 C.F.R. § 208.30(e)(1) .................................................................... 46

8 C.F.R. § 208.30(e)(2) ............................................................... 8, 46

8 C.F.R. § 208.30(e)(3) ........................................................... 8, 16, 46

8 C.F.R. § 208.30(f) .............................................................. 8, 16, 46

8 C.F.R. § 235.3(b)(2) ....................................................... 8, 15, 45, 46

8 C.F.R. § 235.3(b)(4) ........................................................... 15, 46

8 C.F.R. § 1003.1(b)(3) ...................................................................... 7

8 C.F.R. § 1208.16(c) ..................................................................... 10

*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934 (Nov. 9, 2018) ................................................................... 12

Application for Stay Pending Appeal, *Trump v. East Bay*, No.18A615 (U.S. Dec. 11, 2018) .................................................................... 37

Cecilia Barría, et al., *"Help Us": Hundreds Deported from US Held in Panama Hotel*, BBC News (Feb. 19, 2025), https://www.bbc.com/news/articles/c3rndygqll7o [https://perma.cc/U96F-TL9V] ......................... 17

CBP, *CBP Releases December 2024 Monthly Update* (Jan. 14, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update [https://perma.cc/DA96-6WWG] ............................................................................... 14

*Entry*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/entry ......................................................................... 24

Bryan A. Garner, *Garner's Dictionary of Legal Usage* (3d ed. 2011) ................. 55

Government's Brief, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), 2021 WL 4935466 ................................................................ 41

Human Rights Watch, *The Strategy Is to Break Us: The US Expulsion of Third-Country Nationals to Costa Rica* (May 22, 2025), https://www.hrw.org/report/2025/05/22/the-strategy-is-to-break-us/ the-us-expulsion-of-third-country-nationals-to-costa [https://perma. cc/4C4L-3WPF]............................................................................... 17

Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (1997) ........................................................... 15

Proclamation No. 5377, 50 Fed. Reg. 41329 (Oct. 4, 1985) ............................ 26

Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017) .......................... 12

Proclamation No. 9822, 83 Fed. Reg. 57661 (Nov. 9, 2018) ............................ 12

Proclamation No. 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025)..................1, 13, 14

Reply Brief in Support of Application for Stay of Injunction, *DHS v. D.V.D.*, No. 24A1153 (U.S. June 5, 2025), 2025 WL 1605330 .............. 51, 53

Kelsey Y. Santamaria, et al., Cong. Rsch. Serv. LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (updated Feb. 21, 2024) ............................................................. 11

*\*Securing the Border*, 89 Fed. Reg. 81156 (Oct. 7, 2024)...........11, 13, 33, 34, 42

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CAT | Convention Against Torture |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| ECF | Electronic Case Files |
| FARRA | Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note) |
| Guidance | DHS's guidance implementing the Proclamation (JA97-170) |
| INA | Immigration and Nationality Act |
| Proclamation | Proclamation No. 10888, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) |

## INTRODUCTION

This is a separation of powers case. Congress has exercised its "plenary power over immigration," *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024), to create a comprehensive removal system and protect noncitizens from removal to persecution and torture. In January 2025, the President announced he was creating his own repatriation system, one eliminating the protections Congress provided, based on his finding that following Congress's statutes "would be detrimental to the interests of the United States." Proclamation No. 10888, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (the "Proclamation"). That reversed the Executive Branch's unbroken position, which—from then-Assistant Attorney General Theodore Olson in 1984 to President Trump's first term in 2018—has rejected similar theories that the President may unilaterally abrogate Congress's removal protections. As a result of that reversal, the United States has denied thousands of people the opportunities the law requires to seek asylum, withholding of removal, or protection under the Convention Against Torture ("CAT"), instead returning them to face persecution and torture. The question is whether the President possesses the dispensing powers he claims.

The answer is no. The government discovered these unprecedented powers in a 73-year-old statute, 8 U.S.C. § 1182(f). Nestled deep within the section of the Immigration and Nationality Act ("INA") governing inadmissibility, this provision authorizes the President to "suspend the entry" of additional noncitizens. 8 U.S.C.

§ 1182(f). Since President Reagan first exercised this power—and consistent with the statutory text—Presidents have used it consistently and only to deny *entry*. The text of this statute quite obviously does not convey the new powers the President has conjured. "[E]ntry and removal are distinct concepts," and "[t]he President's broad power to impose 'entry' restrictions" does not permit him to dispense with Congress's "mandatory removal processes." Order Granting Stay Pending Appeal In Part and Denying In Part, *RAICES v. Noem*, No. 25-5243, at 54-55 (D.C. Cir. Aug. 1, 2025) (Katsas, J., concurring in part and dissenting in part) ("Katsas Stay Op." at 1-2).

With no aid from text, the government rests on claims of implied authority and appeals to necessity. It asserts that the "power to suspend … entry … necessarily includes the power to expel," Br. 2, that the authority to suspend entry would become "nugatory" unless the President can wipe away the protections Congress provided, *id.*, and that "the INA's provisions governing … removal" no longer suffice following an "unprecedented influx" of migrants, *id.* at 8. But these implied-authority arguments are wrong: Congress has *already provided* a removal authority to accompany Section 1182's entry bars, via the INA's "exclusive" removal procedures. 8 U.S.C. § 1229a(a)(3). As for necessity, the answer is obvious: If the President believes Congress's statutes no longer meet the moment, it is for Congress to change them. That is why Judges Moss, Millett, Pillard, and Katsas unanimously

rejected the government's arguments that the President may invent a non-statutory repatriation regime and eliminate the protections of the withholding statute and CAT.

The result must be the same as to the elimination of asylum, as Judges Moss and Pillard found and as the Executive Branch had consistently concluded. The authority to "suspend … entry," again, conveys no authority to eliminate asylum. Nor can the government's novel claims that it can simply wipe away asylum by fiat be squared with the statutory structure—which expressly defines exactly who may seek protection from persecution and torture, and exactly when and how the Executive Branch can limit those protections.

Indeed, the government no longer appears to contend that Section 1182(f) provides authority to override asylum. It presses an even more boundless argument. It contends that because the Attorney General and the DHS Secretary have discretion to deny asylum on the merits—albeit after a rigorous process—the President can simply declare up front that *no* noncitizen can apply for or receive asylum. But Congress has directed otherwise, specifying that noncitizens physically present in the United States can apply for asylum regardless of "status" and whether or not they enter at a "designated port of arrival." 8 U.S.C. § 1158(a)(1). As Judge Bybee remarked about a similar (if less extreme) rule, it would be "the hollowest of rights that [a noncitizen] must be allowed to apply for asylum regardless of whether she

arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 771 (9th Cir. 2018), *stay denied*, 586 U.S. 1062 (2018).

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), does not help the government either. That tentative, preliminary decision rested on a conflict the panel found between the INA and a public health statute—a conflict "reconcile[d]" by finding that the public health statute could displace the right to seek asylum. *Id.* at 730-31. But no such conflict exists between Section 1182(f) and the asylum statute, both of which are in the INA. *Huisha-Huisha* certainly did not endorse the unmoored theory the government now presses, which would render irrelevant all the restrictions Congress placed in the INA on the Executive's authority to deny asylum.

This Court should not grant the Executive an unprecedented and atextual power that every President since Reagan has disclaimed. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (citation omitted).

Moreover, it is critical to get asylum right, as Judge Millett reiterated in emphasizing that the question "remains open to definitive resolution by a merits panel." *RAICES*, No. 25-5243, at 38 (Millett, J., concurring in part and dissenting in

part) ("Millett Stay Op." at 35). Only asylum gives a pathway for those facing persecution and torture to remain *in the United States*, as Congress provided. Only asylum provides protection for families. And without asylum, the Executive will remove noncitizens to all manner of third countries, notwithstanding the protections of withholding and CAT, which—significant though they are—fail to provide same level of protection.

The government's remedial complaints lack merit. The stay panel clarified the district court's class definition, and the government does not contend that, as clarified, the class is improper. Nor does 8 U.S.C. § 1252(f)(1) bar the classwide injunction. It insulates the removal procedures specified by Congress from the interference of classwide injunctions that would require those procedures to be implemented in a particular way. Here, by contrast, the Executive Branch has invented its own extra-statutory repatriation procedures. Having done so, the government cannot invoke Section 1252(f)(1) as a shield to protect their blatant illegality.

## BACKGROUND

### A. Congress's Comprehensive Scheme Regulating Entry and Removal

Setting policies governing "the entry of [noncitizens]" and "their right to remain" is "entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see Jarkesy*, 603 U.S. at 129; *Boutilier v. INS*, 387 U.S. 118, 123 (1967).

Congress has exercised that power via the INA, which creates a comprehensive scheme governing the rights of noncitizens present in the United States and the removal of noncitizens who do not qualify for statutory protections.

### 1. The INA Specifies Who May Lawfully Enter The United States.

Congress via 8 U.S.C. § 1182—titled "Inadmissible aliens"—has specified numerous categories of noncitizens who are "inadmissible," thus also "defin[ing] the universe of [noncitizens] who *are* admissible." *Trump v. Hawaii*, 585 U.S. 667, 695 (2018) (emphasis added). Among other things, individuals are inadmissible if they have been convicted of certain crimes, found to have engaged in terrorism, or are seeking entry to engage in unlawful activity. *E.g.*, 8 U.S.C. § 1182(a)(2)-(3). These individuals "are ineligible to receive visas and [thus] ineligible to be admitted to the United States." *Id.* § 1182(a).

This case concerns 8 U.S.C. § 1182(f), one of 20 provisions that "operate[s]" within the "sphere[]" of entry criteria. *Hawaii*, 585 U.S. at 695. Enacted in 1952, Section 1182(f) authorizes the President to add to the list of inadmissible noncitizens by "suspend[ing]" or imposing "restrictions" on "the entry" of noncitizens whose entry he finds "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); INA, ch. 477, § 212(e), 66 Stat. 163, 188 (1952). As with Section 1182's other entry restrictions, noncitizens subject to a Section 1182(f) proclamation are,

"for such period as [the President] shall deem necessary," 8 U.S.C. § 1182(f),

"ineligible to be admitted," *id.* § 1182(a).

### 2. The INA Separately Specifies How Noncitizens Who May Not Lawfully Enter Must Be Removed.

Congress also possesses power to "expel or deport [noncitizens]" not lawfully present. *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893). Congress has enacted a comprehensive set of removal procedures and substantive protections.

*Procedures.* "Unless otherwise specified" in the INA, removal proceedings in immigration court under 8 U.S.C. § 1229a (known as "Section 240" proceedings) are "the sole and exclusive procedure" for removal. 8 U.S.C. § 1229a(a)(3). Section 240 proceedings provide noncitizens with adversarial hearings before immigration judges, with attendant procedural rights—including rights to contest allegations; to present evidence; to be represented by counsel; to apply for relief from removal including asylum, withholding of removal, and CAT protection; and to appeal adverse decisions to the Board of Immigration Appeals and courts of appeals. 8 U.S.C. § 1229a(b)(4)(A)-(B), (c)(5); *id.* § 1252(a)(1); 8 C.F.R. § 1003.1(b)(3).

Congress has "otherwise specified," 8 U.S.C. § 1229a(a)(3), that certain noncitizens may be removed through "expedited removal." 8 U.S.C. § 1225(b)(1). Enacted in 1996 to "speed up the removal process" for a limited class of noncitizens who arrive without immigration documents or attempt to enter by fraud, *Make the*

*Road N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020), expedited removal nevertheless has its own careful procedures.

Noncitizens must be asked whether they fear removal and, if they do, screened to determine whether they have a "credible fear of persecution" or torture, meaning a "significant possibility" that they "could establish eligibility for asylum," withholding of removal, or CAT protection in full removal proceedings. 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(v); 8 C.F.R. §§ 235.3(b)(2), 208.30(e)(2)-(3). Noncitizens have a right to "consult with … persons of [their] choosing prior to" these credible-fear interviews, 8 U.S.C. § 1225(b)(1)(B)(iv), and the interview's results are subject to review by an immigration judge, *see id* § 1225(b)(1)(B)(i), (B)(iii)(III). The credible-fear standard is a "low screening standard." 142 Cong. Rec. 25,347 (1996); *see Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020) (Congress balanced "efficient removal" with "ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution."). An applicant who fails to satisfy the credible-fear standard may, following an opportunity for immigration judge review, be removed "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e). Noncitizens who *do* clear that low bar are placed in full Section 240 proceedings. *See* 8 C.F.R. § 208.30(f).

***Substantive Protections.*** The asylum statute provides that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival … ), irrespective of such [noncitizen's] status," "may apply" for asylum. 8 U.S.C. § 1158(a)(1). Asylum eligibility requires showing "a well-founded fear" that, if returned to their home country, the noncitizen would suffer persecution on account of a protected ground. *Id.* § 1101(a)(42). Although the Attorney General and DHS Secretary have discretion to grant or deny asylum to eligible applicants, *id.* § 1158(b)(1)(A),[1] a denial on discretionary grounds is subject to judicial review to determine whether it is "manifestly contrary to law and an abuse of discretion," *id.* § 1252(b)(4)(D). The discretionary determination must balance numerous factors that "may vary depending on the facts of a particular case"—and even a "serious adverse factor" "should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987).

Congress has barred certain categories of noncitizens from asylum. 8 U.S.C. § 1158(a)(2), (b)(2)(A). Congress has also granted DHS and DOJ authority to "establish additional limitations and conditions" on asylum. But that authority is

---

[1] Many references in the INA to the Attorney General are now understood to also refer to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

carefully limited: The agencies must act "by regulation," *i.e.*, following the APA's procedural requirements, and limits must be "consistent with [Section 1158]" as a whole. *Id.* § 1158(b)(2)(C), (d)(5)(B).

Congress has also enacted two nondiscretionary forms of protection. *First*, the withholding of removal statute provides that a noncitizen may not be removed to a country where they will likely be persecuted. 8 U.S.C. § 1231(b)(3)(A). The Supreme Court has noted that this provision implements the United States' "nonrefoulement" obligations under the 1967 U.N. Protocol Relating to the Status of Refugees. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 432-38, 440 (1987).

*Second*, Congress required the Executive Branch to adhere to the United States' commitments under the CAT. Via the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note), Congress directed agencies to "prescribe regulations" implementing the United States' CAT obligations, *id.* § 2242(b). Those obligations prohibit the government from returning a noncitizen "to a country in which there are substantial grounds for believing [they] would be in danger of being subjected to torture." 8 U.S.C. § 1231 note. By regulation, a noncitizen must be granted CAT protection if they show "that it is more likely than not that [they] … would be tortured if removed." 8 C.F.R. §§ 208.16(c), 1208.16(c).

**B. The Executive Branch Has Long Understood Section 1182(f) To Grant The President Power Only With Respect To Entry, Not Removal.**

Consistent with "the text and structure of the governing statutes," it was the Executive Branch's "consistent position for four decades" that while Section 1182(f) grants the President broad power to supplement Congress's laws restricting the *entry* of noncitizens, the President lacks authority to abrogate or modify the separate laws governing *removal* of noncitizens, either the rights to certain statutory process or to seek humanitarian protections. *Securing the Border*, 89 Fed. Reg. 81156, 81163 & n.53 (Oct. 7, 2024). In 1984, Assistant Attorney General Theodore Olson concluded that Section 1182(f) did not permit the President to "eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States." *See id.* at 81163 n.53. Until now, the Executive has never wavered from that view: "Although Presidents have invoked section [1182(f)] at least 90 times since 1981 … none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum." *Id.*; *see* Kelsey Y. Santamaria, et al., Cong. Rsch. Serv., LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (2024) (listing all prior Section 1182(f) proclamations).

The first Trump administration maintained that view. When the Trump administration implemented the travel ban that reached the Supreme Court in *Hawaii*, it left untouched rights to seek asylum and other forms of protection,

expressly stating that "[n]othing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States." Proclamation No. 9645, 82 Fed. Reg. 45161, 45171 (Sept. 24, 2017).

In 2018, President Trump invoked Section 1182(f) to deny "entry" to noncitizens who crossed the southern border outside ports of entry. Proclamation No. 9822, 83 Fed. Reg. 57661 (Nov. 9, 2018). But that proclamation likewise did not claim that Section 1182(f) authorized the President to prevent noncitizens physically present in the United States from seeking asylum, withholding of removal, or CAT protection. When DHS and DOJ sought to bar asylum to those subject to the 2018 proclamation, they instead invoked their distinct authority to promulgate asylum limitations by regulation. The administration explicitly reaffirmed the Executive Branch's longstanding position that a noncitizen "whose entry is suspended or restricted under … a [Section 1182(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the [noncitizen] should not be in the United States, would remain subject to various procedures under immigration laws[,]" including the right "to raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018).

Even so, courts held those regulations unlawful because such categorical bars to asylum are not "consistent with" the asylum statute. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669-71 (9th Cir. 2021); *O.A. v. Trump*, 404 F. Supp. 3d 109, 147-50 (D.D.C. 2019). Courts rejected similar efforts to limit asylum eligibility under the Biden administration. *E.g.*, *Las Americas Immigrant Advoc. Ctr. v. DHS*, No. CV 24-1702, __ F. Supp. 3d __, 2025 WL 1403811, at *15 (D.D.C. May 9, 2025), *appeal docketed*, No. 25-5313 (D.C. Cir. Sept. 2, 2025).

## C. The Proclamation And Guidance Claim A Novel Power To Invent A New Repatriation Scheme That Overrides Statutory Protections.

President Trump sharply departed from this "longstanding understanding," 89 Fed. Reg. at 81163 & n.53, by issuing Proclamation No. 10888. 90 Fed. Reg. 8333. He asserted, for the first time, that both Section 1182(f) and "the President's inherent powers to control the borders of the United States … necessarily include the ability [both] to prevent the physical entry of [noncitizens] … and to rapidly repatriate them." 90 Fed. Reg. at 8335.

The Proclamation asserted this power in response to a purported "invasion" at the southern border. *Id.* It did so even though in November and December 2024, encounters between ports of entry at the southern border were at the "lowest level

since August 2020 and lower than the monthly average for 2019."[2] The Proclamation nonetheless took several measures to combat this purported "invasion."

*First*, invoking Sections 1182(f) and 1185(a), it purported to suspend the entry of an undefined group of people "engaged in the invasion"—a group appearing to consist entirely of people who were already inadmissible and thus barred from entering the United States.

*Next*, again citing Sections 1182(f) and 1185(a), the Proclamation stated that noncitizens engaged in the supposed invasion were "restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, [the asylum statute]." Proclamation, 90 Fed. Reg. at 8335.

*Finally*, the Proclamation invoked "Article II of the Constitution … including [the President's] control over foreign affairs" as support for its suspension of "physical entry" of noncitizens at the southern border. *Id.*[3]

DHS's implementing guidance (the "Guidance") invented new, non-statutory mechanisms for summarily repatriating noncitizens subject to the Proclamation and

---

[2] CBP, *CBP Releases December 2024 Monthly Update* (Jan. 14, 2025), https://www. cbp.gov/newsroom/national-media-release/cbp-releases-december-2024-monthly-update [https://perma.cc/DA96-6WWG].

[3] The government invokes Article II only atmospherically, Br. 34; it does not argue that Article II could independently sustain the Proclamation or Guidance.

eliminated the protections Congress had provided. JA97-170. The agency called the new expulsion mechanisms "212(f) Direct Repatriation" and "212(f) Expedited Removal." JA101-02. Plaintiffs refer to these non-statutory measures collectively as "repatriation" to distinguish them from the INA's statutory scheme.

This repatriation scheme jettisons the statutory procedures and protections Congress has enacted. Noncitizens are barred from applying for both asylum and withholding. JA101, 140. And while the Guidance states that noncitizens "who manifest fear of torture" will be referred for "CAT assessment" interviews, JA139, the procedure it creates does not follow the CAT regulations. While the CAT regulations require DHS officers to ask noncitizens whether they fear return using questions listed on "Form I-867AB," 8 C.F.R. §§ 235.3(b)(2)(i), 253.3(b)(4), the Guidance implementing the Proclamation prohibits officers from asking any such "fear questions," JA101, and instead requires the applicant to spontaneously manifest such a fear. Noncitizens who arrive at the border traumatized from their experiences may not spontaneously declare their fear to a government functionary. The Guidance thus eliminates this "safeguard[]," which ensures that "bona fide … claimants are given every opportunity to assert their claim." *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10312, 10318-19 (Mar. 6, 1997); *cf. Las Americas*, 2025 WL 1403811, at *16 (invalidating similar manifestation

requirement in Biden-era rule "given that [it] has virtually no guardrails to ensure consistency").

Moreover, under the regulations, noncitizens who demonstrate a "significant possibility" of obtaining protection are referred to full Section 240 removal proceedings where they have the rights to submit evidence, present witnesses, and be represented by counsel. 8 C.F.R. § 208.30(e)(3)-(f). In contrast, the Guidance requires that noncitizens must carry their final burden of proof *in their initial interview* by "show[ing] it is more likely than not that they will be tortured in the country to which they may be returned"—without being afforded "a consultation period or right to counsel" or an opportunity to present evidence or witness testimony in support. JA141-42.

**D. The Proclamation And Guidance Have Caused Irreparable Harm.**

Some individual plaintiffs and thousands of other noncitizens have already been returned to likely persecution or torture pursuant to the Proclamation.

For example, Plaintiff F.A. and her two minor children came to the United States to seek asylum from political persecution in Turkey. JA184. The government sent them on a military plane to Panama, where they were held incommunicado. JA185. Faced with the terrifying prospect of being sent to a detention camp in the Panamanian jungle, F.A felt that she had no choice but to accede to being returned to Turkey, where she and her children are now living in hiding. JA185.

Plaintiff M.A. fled torture and imprisonment in Egypt based on his political views and has been detained by DHS since January 2025. JA179. In detention, he missed the birth of his daughter. *Id.* He repeatedly requested a fear screening, and when he learned of the Proclamation, both he and his immigration attorney expressly stated that he feared being tortured in Egypt. JA179-80. For weeks, the government denied that he had manifested a fear of torture and so denied him even the CAT assessment contemplated by the Guidance, until on May 2, 2025—three days after the district court heard oral argument—he received word that he would be screened for CAT. JA180.

These are just two examples among many. Approximately 500 people were sent to Panama and Costa Rica in the Proclamation's first weeks, and many felt compelled to accept removal to their home countries because of the conditions of confinement and uncertain legal process they faced.[4] Thousands of others have been "repatriated" to their countries of origins without any opportunity to seek protection.

---

[4] *See, e.g.*, Cecilia Barría, et al., *"Help Us": Hundreds Deported from US Held in Panama Hotel*, BBC News, (Feb. 19, 2025), https://www.bbc.com/news/articles/c3rndygqll7o [https://perma.cc/U96F-TL9V]; Human Rights Watch, *The Strategy Is to Break Us: The US Expulsion of Third-Country Nationals to Costa Rica* (May 22, 2025), https://www.hrw.org/report/2025/05/22/the-strategy-is-to-break-us/the-us-expulsion-of-third-country-nationals-to-costa [https://perma.cc/4C4L-3WPF].

### E. District Court Proceedings

Plaintiffs challenged the Proclamation and Guidance in February 2025 and moved for class certification and summary judgment, seeking a declaration that the Proclamation was unlawful, an injunction, and vacatur of the Guidance. JA336, 338. Plaintiffs have not challenged the Proclamation's application to prevent noncitizens from reaching U.S. soil. *See RAICES v. Noem*, No. 25-cv-306, 2025 WL 1825431 (D.D.C. July 2, 2025), ECF No. 52 at 32-33.

On July 2, Judge Moss issued a 128-page decision granting in part Plaintiffs' motion for summary judgment and motion for class certification. The court concluded that the government's "appeal[s] to necessity" did not permit the President to "supplant[] the statutes that Congress has enacted." JA195-96. The court held that "neither the INA nor the Constitution grants the [government] authority to replace the comprehensive rules and procedures set forth in the INA and the governing regulations with an extra-statutory, extra-regulatory regime for repatriating or removing individuals ...." JA195. And the court emphasized that, "as the Department of Justice correctly concluded less than nine months ago, neither Section 1182(f) nor Section 1185(a) provides the President with the unilateral authority to limit the rights of [noncitizens] present in the United States to apply for asylum" or other forms of protection. JA195-96. The court certified a class of "all

individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." JA292.

The district court vacated the Guidance and entered a declaratory judgment as to all Defendants other than the President, declaring the Proclamation unlawful insofar as it circumvents statutory removal procedures and restricts access to asylum, withholding, and CAT. JA305. The court granted "narrowly tailor[ed]" classwide injunctive relief precluding DHS and DOJ from implementing the Proclamation. JA313. The injunction "prohibit[s] defendants from implementing the Proclamation, including by adopting extra-statutory expulsion procedures pursuant to § 1182(f) and § 1185(a) and the President's residual constitutional authority; removing [noncitizens] without complying with § 1158(a); narrowing eligibility for asylum without complying with § 1158(b)(2)(C); or altering the CAT procedures in violation of FARRA." JA313. The court deferred ruling on "Plaintiffs' request that the Court grant relief to those who have already been removed" under the Proclamation. JA195.

**F. The Government's Request for a Stay Pending Appeal**

On August 1, the stay panel issued an order denying the stay in large part but granting it in two respects.

On the merits, the panel unanimously rejected the bulk of the government's arguments. *First*, the panel agreed that Section 1182(f) does not provide repatriation

authority. As Judge Katsas explained, although Section 1182(f) "grants the President sweeping power to control the 'entry' of [noncitizens] into the United States," "entry and removal are distinct concepts…." Katsas Stay Op. 1 (citing *Hawaii*, 585 U.S. at 684). And the President's entry power "likely does not override" the INA's removal procedures. *Id.* at 1-2 (citing 8 U.S.C. §§ 1229a(a)(3), 1225(b)); *see* Millett Stay Op. 22-28 (similar).

*Second*, the panel unanimously agreed that the President lacks authority to "supersede statutory and treaty protections regarding withholding of removal." Katsas Stay Op. 2. Judge Katsas explained that these protections are "mandatory" and "have nothing to do with who may or may not lawfully enter the country." *Id.* 2-3 (citations omitted). The panel further agreed that the Guidance violates the withholding and CAT regulations, which mandate certain procedural protections and processes. *See* Millett Stay Op. 30-32.

*Third*, the panel agreed that Defendants are "unlikely to succeed in showing that 8 U.S.C. § 1252(f)(1) barred the district court from issuing class-wide injunctive relief…." Millett Stay Op. 36. That provision bars class-wide relief that "enjoin[s] or restrain[s] the operation of" certain specified provisions of the INA—*i.e.*, those located in Chapter 4 of Title II. 8 U.S.C. § 1252(f)(1). Because the Proclamation and Guidance were issued pursuant to 8 U.S.C. §§ 1182(f) and 1185(a)(1)—two

provisions not located in the specified provisions in Chapter 4—Section 1252(f)(1)'s classwide relief bar did not apply. Millett Stay Op. 37.

The panel granted a stay in two respects. *First,* the majority stayed the district court's determination that the Proclamation and Guidance unlawfully restrict asylum, reasoning that this Court's preliminary-stage opinion in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), merited similar interim relief here. Judge Millett emphasized that "[t]he question is close and, as in *Huisha-Huisha*, it remains open to definitive resolution by a merits panel." Millett Stay Op. 35. Judge Pillard dissented, agreeing with the district court that several features of *Huisha-Huisha* make its reasoning "inapplicable." *RAICES*, No. 25-5243, at 52 (Pillard, J., concurring in part and dissenting in part) ("Pillard Stay Op." at 8); *see id.* at 6-9.

*Second*, the stay panel "clarif[ied]" the district court's class definition as reaching "all individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementating, would seek asylum, … withholding of removal…, or withholding under [CAT]…." Stay Order 1. The panel concluded that the government was unlikely to succeed on its remaining class-certification arguments. *See* Millett Stay Op. 19.

## SUMMARY OF ARGUMENT

The district court correctly held that Sections 1182(f) and 1185(a)(1) do not authorize the President to create new repatriation procedures that conflict with the exclusive statutory removal regime Congress created or to override the substantive humanitarian protections Congress afforded noncitizens via those statutes. The court also chose measured and lawful remedies to address those clear statutory violations.

**I.** The Proclamation and Guidance are unlawful, as the INA's text, structure, and history all confirm.

*First*, Sections 1182(f) and 1185(a) do not authorize the President to create a new "repatriation" regime. Congress provided the "sole and exclusive" regime governing removal in the INA, and it did not create an invisible backdoor authorizing the President to repatriate certain classes of noncitizens. The government's response—that it simply *needs* more removal power to protect its authority over entry—concedes the lack of textual authorization to create a new removal regime. And its pleas of necessity fail on their own terms: as every administration until this one recognized, Section 1182's entry bars are properly enforced via the removal procedures Congress created.

*Second*, the Proclamation and Guidance independently violate the INA's humanitarian protections. The right to apply for asylum is mandatory, and, consistent with U.S. international law obligations, Congress ensured that right was meaningful

and subject to procedural protections. The government's argument that the President has unfettered discretion to turn off asylum at will is unprecedented, misreads the asylum statute, and contravenes multiple well-reasoned decisions rejecting similar (if less extreme) arguments. The Proclamation and Guidance also unlawfully abrogate the mandatory protections from removal Congress provided via withholding of removal and CAT.

**II.** On class remedies, the government does not challenge the stay panel's clarification of the class definition, and because Plaintiffs accept the panel's clarification, the Court need not address the government's arguments concerning the original definition. The government's separate claim that Section 1252(f)(1) bars classwide injunctive relief is inconsistent with the position it took in the Supreme Court just months ago and is wrong, too.

## ARGUMENT

### I. The District Court Correctly Ruled That Neither The INA Nor the Constitution Authorize The Proclamation And Guidance.

The district court correctly held, consistent with the Executive Branch's longstanding uniform position, that Congress has not given the President authority to create his own repatriation procedures or to abrogate the substantive humanitarian protections Congress provided by statute. The government's contrary arguments lack merit and are an affront to the separation of powers.

**A. Sections 1182(f) And 1185(a)(1) Do Not Provide Repatriation Authority.**

Congress has by statute created the "sole and exclusive procedure[s]" for removal, 8 U.S.C. § 1229a(a)(3), erecting a two-track removal system—regular and expedited. Section 1182(f)'s authority to "suspend … entry" empowers the President to create *entry* restrictions. It does not authorize him to create his own *ultra-expedited* repatriation system bereft of the protections Congress provided.

1. Statutory interpretation "begins with the statutory text," *National Ass'n of Manufacturers. v. Department of Defense*, 583 U.S. 109, 127 (2018) (citation omitted), and the text of Section 1182(f) conveys no expulsion authority. It authorizes the President to suspend "entry", which involves "the right or privilege of entering" or "the act of entering." *Entry*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/entry. The President may invoke that power to render noncitizens inadmissible and so prevent their lawful entry—as Presidents have done since 1981. *Supra* p. 11-12.

But "removal [is a] distinct concept[]" both "in ordinary usage and under the INA," Katsas Stay Op. 1: While entry involves the "coming of a [noncitizen] into the United States," removal is the expulsion of a noncitizen *already in* the United States. JA262 (quoting 8 U.S.C. § 1101(a)(13)). The INA tracks that division. It specifies who may enter the United States lawfully, *e.g.*, 8 U.S.C. §§ 1181, 1184, and who is inadmissible, *id.* § 1182. And the INA separately identifies which

noncitizens present in the United States are subject to removal, *id.* § 1227; what protections noncitizens on U.S. soil can claim, *e.g.*, *id.* §§ 1158, 1231; and the procedures for removal, *id.* §§ 1229a, 1225(b)(1). No verbal gymnastics can stretch a power to suspend "entry" to authorize creation of a new removal regime.

The structure of Section 1182 confirms that Section 1182(f) confers no expulsion authority. Section 1182(f) appears among a host of other grounds of "Inadmissibl[ity]." 8 U.S.C. § 1182. Those provisions "define[] the universe of [noncitizens] who are admissible into the United States (and therefore eligible to receive a visa)." *Hawaii*, 585 U.S. at 695. Section 1182(f) "operate[s]" within that "sphere[]," *id.*, to authorize the President to make additional classes of persons— beyond those Congress identified in Section 1182's other subsections—ineligible to enter the country "as immigrants or nonimmigrants," 8 U.S.C. § 1182(f). It thus makes perfect sense to read Section 1182(f) as empowering the President to impose certain additional limits on lawful entry into the United States. And it makes no sense to read that section as *sub silentio* authorizing the President to displace the statutes that Congress carefully crafted to address other issues—such as removal and asylum—in separate portions of the INA.

Equally fatal to the government's position is Congress's textual command that full Section 240 proceedings are the "sole and exclusive procedure[s] for determining whether [a noncitizen] may be … removed" "unless 'otherwise

specified' in the INA itself." Katsas Stay Op. 1 (quoting 8 U.S.C. § 1229a(a)(3)). When Congress wanted to specify otherwise—and it did so in the expedited removal statute—it expressly conferred power to "remov[e]." 8 U.S.C. § 1225(b)(1)(A)(i); *accord id.* § 1225(a)(2), (c). Section 1182 specifies no removal power. And when "one statutory section includes particular language that is omitted in another section," it is "presumed that Congress acted intentionally and purposely." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 439-40 (2002).

History reinforces what text and structure show. The Executive Branch has used Section 1182(f) "to prevent noncitizens from entering the territorial land or waters of the United States," not to invent new removal procedures. Millett Stay Op. 22 (listing authorities); *see, e.g., Hawaii*, 585 U.S. at 679-80; *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017); *see also* Proclamation No. 5377, 50 Fed. Reg. 41329 (Oct. 4, 1985). That history speaks powerfully here. *Cf. West Virginia*, 597 U.S. at 725. Section 1182(f) dates to 1952; during the decades since, it doubtless would have been convenient for Presidents to dispense with asylum procedures or the INA's other protections, and yet no President did so until 2025. Meanwhile, Congress has repeatedly and comprehensively amended the INA, including to create an expedited removal procedure with a curtailed screening process for asylum, without conferring the power past Presidents have disclaimed.

2. The government has little to say about text, structure, or history. It argues that Section 1182(f) must *implicitly* confer the power to expel, because otherwise that statute would become "nugatory" and "toothless." Br. 2-3, 29. The government's argument rests on the mistaken assumption that because Congress gave the Executive authority to bar the entry of a category of noncitizens, it must have *necessarily*—albeit silently—given the Executive Branch authority to remove that same category of noncitizens (and to do so immediately and without any substantive or procedural protections). Whatever purchase that atextual argument might have if removal power were otherwise nowhere to be found, Congress has separately and expressly provided that authority in the INA's removal provisions, including expedited removal. The government uses those removal provisions to enforce all of Section 1182's *other* restrictions applicable to noncitizens who are not permitted to enter but nonetheless reach American soil. None of those restrictions becomes nugatory or toothless simply because their enforcement proceeds via these statutory procedures. Section 1182(f) is no different.

Let there be no doubt about the government's theory. The President has issued an "entry" restriction that applies only to noncitizens who are *already* inadmissible under separate provisions located in Section 1182 and so cannot lawfully enter. *Supra* p. 14. And having issued a redundant entry restriction, the government now complains that the Proclamation will be toothless unless it can *also* invent its own

repatriation regime that abrogates Congress's procedural and substantive protections, *infra* p. 32-47. But Section 1182(f) does not become a nullity just because it does not provide the *particular* power this President wants to conjure.

The reality is that Section 1182(f) continues to confer ample—indeed, enormous—power. The power was hardly "toothless" the 90 times Presidents previously invoked it. The President has broad discretion, based on a finding that particular noncitizens' entry would be "detrimental to the interests of the United States," to render those noncitizens inadmissible and bar their entry. *See Hawaii*, 585 U.S. at 683-88. Nothing in the decision below limits Section 1182(f)'s application within its historical sphere. *Cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187-88 (1993) (suggesting in dicta that Section 1182(f) may confer authority to prevent noncitizens on the high seas from physically reaching the United States).

The breadth of Section 1182(f) is, indeed, another reason to reject the government's unprecedented claims. Although the government tries to characterize Section 1182(f) as a limited "emergency" exception from the INA's "default," the government in *Hawaii* successfully argued the opposite: "[N]o Congress that wanted to confer on the President only a residual authority to address emergency situations would ever use language of the sort in § 1182(f)." 585 U.S. at 691. And the Court emphasized that Section 1182 "entrusts to the President the decisions whether and

when to suspend entry" and "whose entry to suspend," *id.* at 684, under a broad standard asking whether their entry is "detrimental to the interests of the United States." Hence, if the government prevails here, it will license the Executive Branch to turn off the INA's procedures governing asylum and removal whenever it desires and for as long as it desires. The district court and stay panel properly rejected that remarkable claim.

It is for good reason that neither the district court nor the stay panel saw anything to the contrary in *Huisha-Huisha*. We need not even dwell on the Court's caution that "[n]o one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case." *Huisha-Huisha*, 27 F.4th at 733. That is because Section 1182(f) differs fundamentally from 42 U.S.C. § 265, a public health statute invoked during the COVID-19 pandemic that authorizes the CDC Director to take steps to prevent disease transmission. *See id.* at 723, 725. To start: Section 265 comes with no companion removal authorities; Section 1182(f) does—*i.e.*, those provided elsewhere in the INA, which facilitate the enforcement of Section 1182's other subsections. More: *Huisha-Huisha* preliminarily concluded that 42 U.S.C. § 265, which aims to prevent disease spread that can *rapidly* occur, would become ineffective absent summary removals. *Id.* at 729. Here, while the President might *prefer* to remove inadmissible noncitizens more quickly, Section 1182(f)'s entry bar

is no more "rendered … nugatory" by the INA's removal procedures than are Section 1182's *other* entry restrictions. And still more: Section 265 does not threaten to swallow the INA's removal procedures; as the government concedes, Br. 29-30, it confers a far more limited public health authority.

*Sale* also does not aid the government. The government's vague claim that this case is the "flip side" of *Sale*, Br. 23, ignores the obvious *textual* difference. *Sale* concerned interdiction of migrants on the high seas and stated in dicta that Section 1182(f) "grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." 509 U.S. at 187. But no stretching can transform the power to prevent entry into the power to remove. Indeed, *Sale* affirms that noncitizens who *do* reach U.S. soil can only be removed pursuant to the INA: The whole point of the interdiction program in *Sale* was that it "prevented Haitians … from reaching our shores and invoking [the INA's] protections" of asylum and withholding. *Id.* at 159-60.

Finding no support in text, precedent, or history, the government turns to a grab bag of off-point cases concerning different textual questions arising in different contexts. Br. 31-32. Those cases show just that structure and purpose sometimes support a particular reading of statutory text. *E.g.*, *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 171 (2020) (interpreting a statutory provision that governed the "addition of any pollutant to navigable waters … from any point source" to include

pollutants that "travel[ed] through groundwater" first). None of those cases support the government's boundless reading of the relevant text here.

3. Section 1185(a)(1) does not help the government. As Defendants note, Br. 33, Section 1185(a)(1) "'substantially overlap[s]' with" Section 1182(f). *Hawaii*, 585 U.S. at 683 n.1. Like Section 1182(f), its text does not mention removal or repatriation. And the authority that Section 1185(a)(1) confers—making it "unlawful" to "enter or attempt to … enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"—is not naturally read to confer removal power. Br. 33. That is particularly true because Congress has identified "exclusive procedure[s]" for removal. As for *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), *superseded by statute as stated in DHS v. Thuraissigiam*, 591 U.S. 103 (2020), that case just recognized that Congress *can* delegate individual exclusion decisions to the President in broad terms. *Id.* at 543. It does not suggest that Congress *has* done so here. On the contrary, when a noncitizen enters "unlawful[ly]," the recourse is to apply the INA's removal provisions. After all, the INA specifically provides that "a violation of section 1185" renders a noncitizen "deportable." 8 U.S.C. § 1227(a)(2)(D)(iv).

4. The government fares no better with its bank-shot alternative argument based on the "'entry fiction' principle." Because the law for some purposes treats a

noncitizen who crossed the border without inspection as "an applicant for admission who has not yet 'entered,'" the government posits that this case is "no different from the [hypothetical] blockade in *Sale*...." Br. 41-42. But no amount of piling fiction on fiction can make noncitizens who are *actually in* the United States like noncitizens on the high seas. Whatever else is true, noncitizens in the United States are subject to Congress's "sole and exclusive" procedures for removal, 8 U.S.C. § 1229a(a)(3), which the noncitizens in *Sale* were not. Nor does the government's argument square with other parts of the INA. The right to seek asylum belongs to any noncitizen "who is physically present in the United States or who arrives in the United States … irrespective of such [noncitizen's] status." 8 U.S.C. § 1158(a)(1). And the expedited removal statute applies to certain noncitizens "present in the United States who [have] not been admitted or who arrive[] in the United States." *Id.* § 1225(a)(1). The entry fiction gets the government no further in its attempt to jettison those statutory procedures in favor of a "parallel" repatriation regime of its own invention.

### B. Sections 1182(f) And 1185(a)(1) Do Not Allow Abrogation Of Statutory Protections.

Even if (counterfactually) the President had authority to invent his own repatriation procedures, the Executive Branch lacks power to wipe away Congress's humanitarian protections by fiat. Neither Section 1182(f) nor Section 1185(a)(1), nor the asylum statute itself, provides the Executive with power to categorically

eliminate the statutory right to apply for asylum. Nor do those statutes permit the abrogation of mandatory withholding of removal or protections under the CAT.

### 1. The Proclamation And Guidance Unlawfully Eliminate Asylum.

To start, the Proclamation and Guidance unlawfully eliminate asylum. The government's defense, notably, now seems to have nothing to do with Sections 1182(f) or 1185(a)(1). *See* Br. 5, 43-45; *cf. RAICES*, No. 25-cv-306, ECF No. 44 at 43-49. No wonder: The asylum statute confers a right to apply for asylum on (as relevant) any noncitizen who is "physically present in ... or who arrives in the United States"—"whether or not at a designated port of arrival" and "irrespective" of the individual's immigration "status." 8 U.S.C. § 1158(a)(1). Nothing in the President's power to "suspend … entry" empowers him to abrogate this right, and Section 1158(a)(1) expressly authorizes asylum applications by noncitizens who cannot lawfully enter under Section 1182(f)'s *other* provisions. That is why the Executive's "consistent position for four decades" has been that Section 1182(f) "does not authorize the President to override the asylum statute." 89 Fed. Reg. at 81163 & nn.53-54; *see supra* at p. 11-13.[5]

---

[5] As for Section 1185(a), the government concedes that it "substantially overlaps" with Section 1182(f) and does not argue that Section 1185(a) offers independent authority to deny asylum protections. Br. 33. In any case, Section 1185(a)'s mere reference to "depart[ures]" does not provide authority to override asylum protections. 8 U.S.C. § 1185(a)(1). And as with Section 1182(f), the Executive has

The government's new position is that because asylum is ultimately "discretionary," Br. 43-44, the President can simply declare that asylum will not be granted to any noncitizen—and with that declaration, the asylum statute's protections vanish. The Attorney General and DHS Secretary, on the government's theory, could do the same thing. This theory is thus *even broader* than the theory that then-Assistant Attorney General Ted Olson rejected, as it lacks even Section 1182(f)'s modest "detrimental to the interests of the United States" limit. The Court should, on full consideration, hold that the government's new theory is wrong.[6]

a. First, as Judge Pillard observed, neither the Proclamation nor the Guidance *actually purports* to operate as a denial of asylum on the merits. Pillard Stay Op. 3-4. The Court cannot sustain the Proclamation or Guidance on a theory they do not invoke. *Healthy Gulf v. FERC*, 107 F.4th 1033, 1040 n.2 (D.C. Cir. 2024). Nor is that omission an accident. The President has no authority to deny asylum on a discretionary basis; that authority is by statute vested elsewhere. *See* 8 U.S.C. § 1158. And while the DHS Secretary does have that authority, the Guidance does not invoke it, much less provide the reasoned basis required to depart from the

---

consistently disavowed the notion that Section 1185(a)(1) empowers the President to "impose [a] condition and limitation on asylum eligibility." 89 Fed. Reg. at 81164 n.56.

[6] Judge Millett expressly cabined her view to the stay stage, stating that the question "remain[ed] open to definitive resolution by a merits panel." Millett Stay Op. 35.

decades-old approach to discretionary asylum denials—which is case-specific and subject to judicial review. *E.g.*, *Pula*, 19 I. & N. Dec. at 473 (stating that this discretionary determination depends on balancing numerous factors, and even a "serious adverse factor," such as whether a noncitizen entered the country unlawfully, should not be considered in a way that leads to categorical denial of asylum). "[D]iscretionary denials of asylum are exceedingly rare" and "require egregious negative activity by the applicant." *Garcia v. Garland*, 73 F.4th 219, 225 (4th Cir. 2023) (citation omitted); *see Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 971 (11th Cir. 2021) ("discretionary denial [of asylum] is 'exceedingly rare'"). Whether or not DHS *could* depart from that approach, the Guidance does not provide the reasoned explanation needed.

b. The government's new theory, even if not foreclosed by *Chenery*, is also at war with the governing statutes, beginning with Section 1158(a)(1). That provision confers a right to apply for asylum on noncitizens who are physically present in or arrive in the United States "whether or not at a designated port of arrival" and "irrespective" of their immigration status. 8 U.S.C. § 1158(a)(1). That statutory command cannot be squared with the government's position that the Proclamation and Guidance can lawfully deny access to asylum *simply because* noncitizens lack lawful status or crossed the border outside of ports of entry. As Judge Bybee explained in invalidating a 2018 rule that tried to achieve the same result via the

regulatory authorities of the Attorney General and the DHS Secretary, such a rule "is inconsistent with § 1158(a)(1)" because "[it] is the hollowest of rights that [a noncitizen] must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact." *East Bay*, 932 F.3d at 771. And even if such a rule "technically applies to the decision of whether or not to *grant* asylum, it is the equivalent of a bar to *applying* for asylum in contravention of a statute that forbids … such a bar on these grounds." *Id.* "The technical differences between applying for and eligibility for asylum," Judge Bybee explained, "are of no consequence to a refugee when the bottom line—no possibility of asylum—is the same." *Id.*; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 992 (9th Cir. 2025) (similar). Courts also invalidated similar asylum bars imposed by the Biden Administration. *Supra* p. 13.

As these decisions underscore, the government builds its entire case on a false premise. The government presumes that the President (or the Attorney General or DHS Secretary) could categorically declare that no noncitizen will receive asylum at the end of the process. Br. 44. So, the government says, the President must be able to simply foreclose access to the asylum process at the front end—because any "applications would be futile." *Id.* (quotation marks omitted). But the government's premise is wrong. Even leaving aside that Congress did not vest in the President

discretionary asylum decisions, the categorical declaration it hypothesizes would be unlawful for the same reasons Judge Bybee gave in 2018: It is inconsistent with Section 1158(a)(1).

This case, moreover, is even easier because the Proclamation and Guidance do the one thing Section 1158(a)(1) most clearly forbids: They state that covered noncitizens "are not permitted to *apply for* asylum." Br. 44 (quoting JA107) (emphasis added). In the 2018 litigation, the government and the challengers debated whether Section 1158(a)(1) protected only the formal right to apply for asylum (as the government argued) or whether it also precluded certain rules that permitted noncitizens to apply for asylum but nonetheless rendered them categorically ineligible to receive asylum (as the challengers contended)—an argument the challengers won. But it was common ground, acknowledged by the Department of Justice in President Trump's first administration, that "Section 1158(a)(1) by its plain terms requires … that [a noncitizen] be permitted to 'apply' for asylum, regardless of the [noncitizen's] manner of entry." App. for Stay Pending Appeal at 29, *Trump v. East Bay*, No. 18A615 (U.S. Dec. 11, 2018);[7] *accord Succar v. Ashcroft*, 394 F.3d 8, 28 (1st Cir. 2005) (noncitizens "must be allowed to apply" and the "Attorney General may *only* exercise his discretion in granting the asylum")

---

[7] The elided word is "only," reflecting the disagreement just described.

(emphasis added); *see also Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of [noncitizens], but that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress."), *aff'd*, 484 U.S. 1 (1987).

c. The rest of the statutory scheme, too, rebels against the government's theory. When Congress authorized the Attorney General and DHS Secretary to enact additional limits on asylum, it cabined that authority substantively and procedurally—specifying that such a limit must be "consistent with" the rest of the statute and established "by regulation," *i.e.*, through the rigors of administrative rulemaking. 8 U.S.C. § 1158(b)(2)(C), (d)(5)(B). The government's theory, however, would authorize the Executive Branch, through the President, the Attorney General, or the DHS Secretary, to categorically foreclose asylum regardless of whether its limits are consistent with the rest of Section 1158 and without recourse to the APA's rulemaking procedures. That is no way to read a statute. *E.g.*, *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must 'be read as a whole.'" (citation omitted)); *accord FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), *superseded by statute as stated in FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898 (2025). While the government tries to shrug off these provisions as concerning "eligibility criteria," Br. 46 (emphasis omitted), that is a distinction without a difference for the same reasons Judge Bybee explained.

Moreover, the asylum statute does not impose its rulemaking requirement solely on eligibility limitations: "any other conditions or limitations on the consideration of an application for asylum" must also be established "by regulation." 8 U.S.C. § 1158(d)(5)(B). The categorical bar on grants of asylum hypothesized by the government is surely a limit on "consideration of an application for asylum." Just as the Attorney General and DHS Secretary cannot promulgate eligibility bars that are inconsistent with Section 1158(a)(1), neither they nor the President can disregard Congress's express judgment in Section 1158(a)(1) by categorically eliminating asylum for noncitizens at the southern border.

No previous Attorney General or DHS Secretary has understood their power in this way. Under both the Trump and Biden Administrations, they litigated the legality of asylum bars promulgated under their regulatory authorities—and generally lost, as courts have invalidated those bars under Section 1158(a)(1). *Supra* p. 12-13. But under the government's theory, had they simply declared that they intended to deny asylum on a discretionary basis to each covered noncitizen, they would have won. And they need not have relied on APA rulemaking; they could simply have promulgated guidance declaring as much. That view is untenable, and once again, "[t]he want of assertion of power by those who presumably would be alert to exercise it, is … significant in determining whether such power was actually conferred." *West Virginia*, 597 U.S. at 725 (citation omitted).

The government's theory also flouts the INA's limits on the Executive's ability to deny asylum as a matter of discretion. The statute provides that discretionary denials of asylum are individualized and subject to judicial review—a far cry from across-the-board, *ex ante* denials of asylum relief. Section 1252 expressly exempts from the bar on judicial review of discretionary decisions asylum determinations "under section 1158(a)." 8 U.S.C. § 1252(a)(2)(B)(ii). It further permits courts to overturn asylum denials that are "an abuse of discretion." *Id.* § 1252(b)(4)(D); *see id.* § 1252(a)(2)(D). Those provisions cannot be squared with the government's new position that it can simply declare that asylum is gone.

Finally, the upfront and categorical denial of asylum violates Section 1225's requirements that noncitizens seeking to apply for asylum "*shall*" receive credible-fear interviews—which turn solely on the possibility of later establishing "eligibility"—and cannot be removed without them. *See* 8 U.S.C. § 1225(b)(1)(A), (b)(1)(B)(v). Congress mandated those procedures precisely because it did not contemplate the Executive making categorical, *ex ante* discretionary denials.

d. All this shows why *Huisha-Huisha*'s asylum-based holding, on which the government places so much weight, is irrelevant. Even (again) aside from its preliminary and tentative posture, *Huisha-Huisha* did not endorse the only argument that the government presses—that simply because the government may deny asylum in the exercise of discretion at the end of the process, it may foreclose access to

asylum categorically at the front end. *Huisha-Huisha* instead rested on that case's unique context and the specific conflict that the Court identified between (on the one hand) 42 U.S.C. § 265's authority to suspend the introduction into the United States of persons posing a "serious danger" of introducing communicable diseases and (on the other) Section 1158(a)'s right to apply for asylum and asylum procedures. *Huisha-Huisha*, 27 F.4th at 730-31. Adhering to the asylum statute, the government asserted, could exacerbate the spread of diseases that Section 265 aims to prevent. *Id.* Here, the government cannot show such a conflict. Asylum procedures no more conflict with entry bars under Section 1182(f) than with the bars to lawful entry under Section 1182's myriad other subsections. And while the government might prefer to eliminate those procedures, that is simply a disagreement with Congress's statutes. *Accord* Pillard Stay Op. 6 (emphasizing that this case, unlike *Huisha-Huisha*, involves only the INA, an "internally coherent statute").

Section 265's text differs too. Section 265 authorizes the government to suspend not just the "introduction" of persons but "the *right* to introduce such persons." *Huisha-Huisha*, 27 F.4th at 731 (emphasis added). The *Huisha-Huisha* court tentatively agreed that this language could "allude[] to the suspension of [asylum] procedures." *Id.* Indeed, that language was key to the government's argument. *See* Gov't Br. at 41, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), 2021 WL 4935466 (arguing that Congress's use of "'right to introduce'—

rather than just 'introduce'"—granted "authority to temporarily suspend the effect" of other laws) (quoting 85 Fed. Reg. 56,424, 56,426 (Sept. 11, 2020))). That is why the same Justice Department that litigated *Huisha-Huisha* in this Court distinguished Section 265 from Section 1182(f), explaining that Section 265's "grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has *no relevance* to the interpretation of section 212(f), which is in title 8." 89 Fed. Reg. at 81164 n.55 (emphasis added).

Although the stay panel divided on asylum, getting this issue right at the merits stage matters immensely. If the Executive Branch may eliminate asylum categorically, the protections of withholding and CAT—important as they are—will prove illusory for many. The Executive Branch will be able to leverage the heightened burden of proof and country-specific nature of withholding and CAT protections to deprive noncitizens of the chance to seek relief at all. Noncitizens will find themselves removed to face persecution or torture in their country of origin— or removed to all manner of third countries—without having received an opportunity to seek any form of protection in the United States. And going forward, the government's position threatens to nullify asylum altogether—undermining both the rights of noncitizens to seek protection and the international law obligations that past American Presidents signed and Congress ratified. The Court should avoid those

immense harms by affirming the district court's careful decision and adhering to the view that the Executive Branch uniformly upheld until January 2025.

### 2. Sections 1182(f) And 1185(a)(1) Do Not Allow Abrogation of Withholding of Removal Or Protection Under The Convention Against Torture.

The Proclamation and Guidance also unlawfully abrogate Congress's mandatory protections. First, the withholding statute provides that "the Attorney General *may not remove* [a noncitizen] to a country if the Attorney General decides" it could result in the noncitizen's persecution. 8 U.S.C. § 1231(b)(3)(A) (emphasis added). Applicable to any noncitizen facing removal from the United States, the statute "*requires* the Attorney General to withhold deportation" where the noncitizen demonstrates a likelihood of persecution. *Cardoza-Fonseca*, 480 U.S. at 423 (emphasis added).

As both the district court and all three panel members agreed, Section 1182(f) does not authorize the government to ignore that requirement: As shown above, it speaks to restricting *entry* and "say[s] nothing about the removal of [noncitizens] who have already entered the United States." JA286. Even if there were any overlap between the provisions, any "general permission" to remove noncitizens under Section 1182(f) would give way to the "specific prohibition" on removal under the circumstances of Section 1231. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

566 U.S. 639, 645 (2012) (applying the "general/specific" canon, which has particular force where Congress has enacted a "comprehensive scheme").

The government's counterargument (Br. 48-49)—that withholding only protects against *removal*, and the Proclamation creates a "parallel" new "repatriation" regime outside the scope of statutory removal procedures—elevates form over substance and has no merit. The government cannot invent a new form of removal found nowhere in the INA and pretend that protections against removal do not apply. Indeed, this Court held as much in *Huisha-Huisha*. *See* 27 F.4th at 732 (finding that under Section 1231(b)(3)(A) and the CAT, "the Executive cannot expel alien[s] to...countr[ies]" where they could be persecuted or tortured). Moreover, as the Supreme Court has noted, Congress enacted the withholding statute "to bring United States refugee law into conformance" with the 1967 United Nations Protocol Relating to the Status of Refugees, which prohibits *refoulement* under any name. *Cardoza-Fonseca*, 480 U.S. at 436. Congress did not write a statute that required the United States to comply with those obligations only when the President deems it convenient.

Section 1185(a)(1) again adds nothing. That provision renders it "unlawful" to enter the United States "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." But among many other problems, a "limitation" or "exception" that

violates Congress's express commands is not a "reasonable" one. *RadLAX Gateway*, 566 U.S. at 645.

Nor does the government fare better with its forfeited and undeveloped claim that 8 U.S.C. § 1231(h) precludes judicial relief. Br. at 49. The government never raised this argument below and cannot do so now. *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 543-44 (2019). It fails in any event because Section 1231(h) "simply forbids courts to construe *that section* 'to create any … procedural right or benefit that is legally enforceable'; it does not deprive [litigants] of the right to rely on" other sources of law to assert violations of Section 1231. *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001) (quoting § 1231(h)). The government's argument would make a mockery of the countless cases where courts have enforced the withholding statute. *E.g.*, *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018-20 (2025); *Huisha-Huisha*, 27 F.4th at 732.

*Second*, the Guidance unlawfully abrogates the binding regulations governing CAT claims. Millett Stay Op. 30-33. Congress required the agency to enact implementing regulations for CAT and required the Executive Branch to follow those regulations. *See* FARRA § 2242(b), 112 Stat. at 2681-822; *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 264 (1954). Those regulations create a clear process to ensure that CAT protection is available—and meaningful. First, an inspecting officer asks a noncitizen whether they fear removal. *See* 8 C.F.R.

§§ 235.3(b)(2). Second, if the noncitizen states that they fear removal, an asylum officer conducts a credible fear screening. 8 C.F.R. §§ 235.3(b)(4), 208.30(e)(1)-(3). Third, if the applicant meets the low screening standard, the applicant is referred to full Section 240 proceedings in immigration court. 8 C.F.R. § 208.30(f).

The Guidance unlawfully disregards those regulations. To begin, noncitizens do not receive a screening *at all* unless they spontaneously and independently manifest a fear of torture. Noncitizens who show up—often tired, traumatized, and with limited English—will not know that their *one chance* to avoid return to torture is to *shout* at the correct (unidentified) government personnel (who may or may not listen). *Accord Las Americas*, 2025 WL 1403811, at *16-*17. Then, even when noncitizens manage to intuit the unstated manifestation rule and shout out a fear to the correct individual, the Guidance "collapse[s] the process [that follows] into a single interview that requires the applicant when first detained to carry [their] ultimate burden of proving [they] will likely be subjected to torture, without the benefit of time to assemble evidence or to prepare a presentation," and at which "the presence of counsel or another representative is forbidden." Millett Stay Op. 32. This new procedure is utterly irreconcilable with the regulations that Congress required the Executive Branch to promulgate and then follow.

The government has no real response. It argues only that DHS can disregard CAT regulations because noncitizens are governed by the Proclamation and not the

expedited-removal statute. Br. 51. Put otherwise: The government can ignore the statute Congress enacted because the Executive Branch decided to create a new procedure that Congress foreclosed. Again, no.

## II.    The Clarified Class Definition Is Permissible, And Classwide Injunctive Relief Is Available.

### A. The Clarified Class Definition Comports With Rule 23.

The government does not argue that the class definition, as clarified by the stay panel, is impermissible, *see* Br. 52-59, and Plaintiffs agree with that clarified definition. The district court defined the class as "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." JA292. To reach the "best and most natural reading" of the district court's language, the stay panel clarified that the class definition includes:

> All individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, … withholding of removal under the Immigration and Nationality Act, … or withholding under the Convention Against Torture….

Millett Stay Op. 19 (citations and quotation marks omitted); *see also* Pillard Stay Op. 1 (concurring in relevant part); Katsas Stay Op. 3-4 (same) ("[A]t this early stage … I would afford no relief on the class-definition point beyond what Judge Millett proposes.").

The stay panel's clarification reflects the district court's intent to include noncitizens as class members only once they are both present in the United States and subject to the Proclamation. Likewise, the panel's clarification effectuates the district court's intent that the class covers only noncitizens who would seek asylum, withholding of removal, or CAT protection "absent the Proclamation": The Proclamation's whole point is to prevent noncitizens from seeking such protection, and the class protects noncitizens who wish to seek such protection. Consistent with the class definition as clarified by the stay panel, the government may not use the Proclamation to impose non-statutory removal or repatriation procedures that bypass protections for noncitizens present within the United States who may seek asylum, withholding, or CAT relief. And consistent with that clarified definition, the government may not exclude certain noncitizens from those procedures *ex ante,* on the ground that the government believes they could eventually be determined ineligible for protection. The whole point of those procedures, after all, is to determine *whether or not* noncitizens who "seek" relief are in fact eligible to receive it.

## B. Section 1252(f)(1) Does Not Bar Classwide Injunctive Relief Or Vacatur Of The Guidance.

Finally, the government is wrong that Section 1252(f)(1) bars classwide injunctive relief or vacatur of the Guidance.

## 1. The Injunction Complies With Section 1252(f)(1).

Section 1252(f)(1) does not limit injunctive relief here. It prohibits district courts from "enjoin[ing] or restrain[ing]," on a classwide basis, "the operation of" certain specified provisions (the "covered provisions") of the INA, located in Chapter 4. 8 U.S.C. § 1252(f)(1). It thus protects Congress's statutory removal system in Chapter 4 by prohibiting classwide injunctions that "interfere with … the Government's efforts to enforce or implement" those Chapter 4 provisions. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550, 551 (2022).

Here, Section 1252(f)(1) does not apply because the Executive Branch is not enforcing or implementing Congress's statutory removal system in Chapter 4. *See Aleman Gonzalez*, 596 U.S. at 550, 551. The government is instead purporting to implement two *noncovered* provisions, 8 U.S.C. §§ 1182(f) and 1185(a)(1), to create its own repatriation system. Indeed, the government's brief is clear that the Proclamation's whole purpose is to remove noncitizens *without regard* to Chapter 4 removal proceedings. *E.g.*, Br. 24. And having relied on non-Chapter 4 authorities to create a non-Chapter 4 repatriation system, the government now cannot invoke as a shield jurisdiction-stripping provisions whose purpose is to protect the Chapter 4 removal system.

This case is thus miles away from the type of injunction *Aleman Gonzalez* barred. That case involved two classwide "injunctions requiring the Government to

provide bond hearings" for noncitizens "detained pursuant to § 1231(a)(6)"—a covered Chapter 4 provision. 596 U.S. at 551 & n.1. The plaintiffs argued that Section 1252(f)(1) bars injunctions only against "the operation of [covered] provisions 'as properly interpreted,'" and that the government had misinterpreted Section 1231. *Id.* at 552 (emphasis omitted). The Court rejected that argument, explaining that Section 1252(f)(1)'s reference to "the 'operation of' [covered provisions] … refer[s] to the Government's efforts to enforce or implement them," whether correctly or not. *Id.* at 550. The Court held that the lower courts' injunctions "interfere[d] with the Government's efforts to operate § 1231(a)(6)," because they "require[d] officials to take actions that (in the Government's view) are not required *by § 1231(a)(6)* and to refrain from actions that (again in the Government's view) are allowed *by § 1231(a)(6)*." *Id.* at 551 (emphasis added).

The injunction here does not have that characteristic—because (as discussed) the government has made no attempt to "enforce" or "implement" any covered provision. *See id.* at 550. Because the government views the removal provisions of Sections 1225(b) and 1229a as speaking to "a legal principle not relevant to … a Proclamation issued pursuant to Section 1182(f)," *RAICES*, No. 25-cv-306, ECF No. 44 at 58; *accord* Br. 48-49, the injunction cannot possibly "interfere with the Government's" nonexistent "efforts to operate" any covered provision, *Aleman Gonzalez*, 596 U.S. at 551.

The government's two counterarguments lack merit.

*First*, the government relies on supposed practical effects—that because the injunction's upshot is to require a "'return to the processes that Congress required' for removal under" Chapter 4, Section 1252(f)(1) bars an injunction. Br. 61 (quoting JA314). Put otherwise: Because the Executive Branch has without authority created its own removal system, and because enjoining that non-statutory system would leave the government (as a practical matter) with only the Chapter 4 system Congress enacted, no injunction can issue. Heads the government wins, tails Plaintiffs lose. *See* Br. 63-64 (trumpeting that, on its reading of Sections 1182(f)(1) and 1252(f)(1), "only … two" outcomes are possible, neither of which affords relief to Plaintiffs).

Even leaving aside that this position would make Kafka blush, it is utterly unsupported by the text. Section 1252(f)(1) asks what conduct is being "enjoin[ed] or restrain[ed]," *i.e.*, what "actions" the district court "order[s]" the government "to take or to refrain from taking." *Aleman Gonzalez*, 596 U.S. at 550. Or as the government itself told the Supreme Court just months ago, Section 1252(f)(1) asks only whether the injunction "restrain[s]" or "run[s] against" a covered provision. Reply Br. in Supp. of Appl. For Stay of Injunction at 4, *DHS v. D.V.D.*, No. 24A1153 (U.S. June 5, 2025), 2025 WL 1605330 ("Gov't's *D.V.D.* Br.") (emphasis omitted). That section does not ask what, as a practical matter, the government may decide to do with the injunction in place.

Here, the district court has not ordered the government to take any actions as to any covered provision. It merely enjoined the government from (1) "removing … class members without complying with the asylum statute"; or (2) "using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' CAT protection claims; and (3) "implementing the Proclamation to remove … class members using non-statutory repatriation or removal proceedings." JA319-20 (emphasis added). The government thus retains (as it always has) discretion with respect to whether and how "to operate" the covered provisions. *Aleman Gonzalez*, 596 U.S. at 551. The government can choose whether to initiate removal proceedings with respect to any class member, when to do so, and what type of proceedings to initiate. *See* Br. 40 (acknowledging government's "discretion to remove aliens eligible for expedited removal using Section 240 proceedings instead"). Because the injunction does not limit how the government implements Chapter 4, Section 1252(f)(1) does not apply.

*Second*, the government points to *why* the district court issued its injunction. Per the government, Section 1252(f)(1) applies because the district court held the Proclamation and Guidance unlawful in part *on the ground* that they violate the removal procedures in Chapter 4. *See* Br. 62-63. But to begin, that was only one reason for the district court's holding. The district court also correctly held that Proclamation and Guidance are simply unauthorized by 8 U.S.C. §§ 1182(f) and

1185(a)(1) (or the asylum statute). JA319. And because that holding independently supports the classwide injunction, it is irrelevant that the Proclamation and Guidance are *also* unlawful because they violate Chapter 4. Judge Katsas, respectfully, overlooked this point when he stated that the Proclamation and Guidance were "likely unlawful precisely because [they] conflict[] with sections 1229a and 1225(b)(1)." Katsas Stay Op. 5. Instead here, as in *Gonzalez v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007), the Proclamation was "held invalid for reasons having nothing to do with any [covered] provision." Br. 63 (quoting Katsas Stay Op. 5).

More fundamentally, the government is wrong that Section 1252(f)(1) prohibits classwide injunctive relief when the government relies on noncovered provisions (like Section 1182(f) and Section 1185(a)(1)) to violate Chapter 4 provisions. As the government told the Supreme Court just months ago, "Section 1252(f)(1) does not address *why* an injunction may issue" or focus on "what provisions the injunction is enforcing," but merely asks whether the injunction "restrain[s]" or "run[s] against" a covered provision. Gov't's *D.V.D.* Br. at 4. Here, the provisions covered by Chapter 4 (*e.g.*, the removal statutes) were at most one reason "why" the injunction issued, while the "enjoin[ed] or restrain[ed]" provisions were those outside of Chapter 4 (Sections 1182(f) and 1185). Indeed, given what the government told the Supreme Court, it is bold indeed for the government to now chide the district court for "attempt[ing] … to distinguish between the Proclamation

as the 'object' of the injunction and the covered statutory provisions as affected in a 'merely incidental' way…." Br. 63 (quoting JA308).

The government was right before, and it is wrong now. The injunction here *restrains* and *runs against* only steps taken pursuant to Sections 1182(f) and 1185(a)(1). Because those two statutes are not covered provisions, courts may permissibly restrain their unlawful operation on a classwide basis. And again, the government's contrary position would turn Section 1252(f)(1) on its head: It would permit the government to simply *make up* its own expulsion system and then avoid a classwide injunction on the ground that this non-statutory expulsion system would (inevitably) violate the statutory procedures and protections of Chapter 4. Congress did not, in enacting Section 1252(f)(1), intend to bless that law-destroying maneuver.

## 2. Section 1252(f)(1) Does Not Bar Vacatur Of The Guidance.

Even if (counterfactually) Section 1252(f)(1) applied to the classwide injunction, it would not bar vacating the Guidance. That is because Section 1252(f)(1) simply does not apply to vacatur. "By its plain terms," Section 1252(f)(1) "is nothing more or less than a limit on injunctive relief," *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 481 (1999), and vacatur is not injunctive in nature, *see, e.g.*, *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) ("There are meaningful differences between an injunction … and vacatur."). The statute's plain terms nowhere mention vacatur. *See* 8 U.S.C.

§ 1252(f)(1). And its title is "Limit on *injunctive relief*," again without mention of comparable limitations on vacatur. *Id.* (emphasis added). Where it applies, Section 1252(f)(1) simply "prohibits lower courts from *entering injunctions.*" *Aleman Gonzalez*, 596 U.S. at 550 (emphasis added). Thus, all courts that have addressed the question—including after *Aleman Gonzalez*—have held that Section 1252(f)(1) does not apply to vacatur. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022).

The government's contrary arguments fail. It first cites *Direct Marketing Ass'n v. Brohl* for the proposition that, "[l]ike an injunction, vacatur 'restrict[s] or stop[s] official action....'" Br. 64 (quoting 575 U.S. 1, 13 (2015)). But *Direct Marketing* did not involve vacatur, so the government's citation is irrelevant. Nor does the government get anywhere with its reliance on Section 1252(f)(1)'s use of the word "*restrain.*" *Id.* The phrase "restrain and enjoin" is a "common doublet" referring to the canonical forms of injunctive relief: injunctions and restraining orders. Bryan A. Garner, *Garner's Dictionary of Legal Usage* 294-96 (3d ed. 2011); *see*, *e.g.*, *California v. Arizona*, 452 U.S. 431, 432 (1981) (using "enjoined and restrained" to describe an injunction). Vacatur is neither.

## <u>CONCLUSION</u>

The Court should affirm.

Dated: September 12, 2025

Respectfully submitted:

/s/ *Lee Gelernt*

Keren Zwick
Mary Georgevich
NATIONAL IMMIGRANT JUSTICE
CENTER
111 W. Jackson Blvd.,
 Suite 800
Chicago, IL 60604
T: 312-660-1370
kzwick@immigrantjustice.org
mgeorgevich@immigrantjustice.org

Melissa Crow
CENTER FOR GENDER & REFUGEE
STUDIES
1121 14th Street, NW, Suite 200
Washington, D.C. 20005
T: 202-355-4471
crowmelissa@uclawsf.edu

Edith Sangueza
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8839
sanguezaedith@uclawsf.edu

Robert Pauw
CENTER FOR GENDER & REFUGEE
STUDIES
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600

Lee Gelernt
 *Counsel of Record*
Omar C. Jadwat
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
lgelernt@aclu.org
ojadwat@aclu.org

Morgan Russell
Cody Wofsy
Spencer Amdur
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
mrussell@aclu.org
cwofsy@aclu.org
samdur@aclu.org

Arthur B. Spitzer
Scott Michelman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF THE
DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045

Seattle, WA 98104
T: 206-682-1080
rpauw@ghp-law.net

Daniel Hatoum
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 208
daniel@texascivilrightsproject.org

Richard Caldarone
REFUGEE AND IMMIGRANT
CENTER FOR EDUCATION AND
LEGAL SERVICES (RAICES)
P.O. Box 786100
San Antonio, TX 78278
T: (210) 960-3206
richard.caldarone@raicestexas.org

T: 202-457-0800
aspitzer@acludc.org
smichelman@acludc.org

Ashley Alcantara Harris
David A. Donatti
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
T: (713) 942-8146
aharris@aclutx.org
ddonatti@aclutx.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P 27(D)(2)(A)

Pursuant to Fed. R. App. P. 27(d)(2)(A), I hereby certify that the preceding motion complies with the type-volume limitation of the Rules, containing 12,715 words, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

*/s/ Lee Gelernt*

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Lee Gelernt*