# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 3, 2025 Decided April 24, 2026

No. 25-5243

REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, ET AL.,
APPELLEES

v.

MARKWAYNE MULLIN, SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00306)

*Drew C. Ensign*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Principal Deputy Assistant Attorney General, *Benjamin Hayes*, Special Counsel to the Assistant Attorney General, and *David Kim* and *Katherine J. Shinners*, Senior Litigation Counsel, Office of Immigration and Litigation, General Litigation and Appeals Section.

*Christopher J. Hajec* and *Matt A. Crapo* were on the brief for *amicus curiae* Federation for American Immigration Reform in support of appellants.

*Patrick M. McSweeney*, *William J. Olson*, and *Jeremiah L. Morgan* were on the brief for *amicus curiae* America's Future in support of appellants.

*Lee Gelernt* argued the cause for appellees. With him on the brief were *Keren Zwick*, *Melissa Crow*, *Omar C. Jadwat*, *Morgan Russell*, *Cody Wofsy*, *Richard Caldarone*, *Arthur B. Spitzer*, and *Scott Michelman*. *Lindsay Harrison* entered an appearance.

*Thomas A. Berry* was on the brief for *amicus curiae* the Cato Institute in support of appellees.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellees.

*Ian M. Kysel*, *Courtney Bell*, Student Counsel, and *Michael Garcia Bochenek* were on the brief for *amici curiae* the Global Strategic Litigation Council, et al. in support of appellees.

Before: PILLARD, WALKER and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

CHILDS, *Circuit Judge*: More than a century of precedent assures that "over no conceivable subject is the legislative power of Congress more complete" than it is over the admission of foreign individuals. *Dep't of State v. Muñoz*, 602 U.S. 899, 903 (2024) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)); *see also INS v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question.").

Exercising this "broad power over naturalization and immigration," *Demore v. Kim*, 538 U.S. 510, 521 (2003), Congress enacted the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. § 1101 *et seq*. The INA created a comprehensive and detailed scheme addressing all aspects of immigration. It articulates why and how foreign individuals may be admitted to our country and why and how they may be removed. In addition, federal law provides various forms of relief to foreign individuals who face persecution or torture if deported. Those protections include, as pertinent here, asylum, withholding of removal under the INA, and withholding of removal under the Convention Against Torture.

On Inauguration Day 2025, President Trump issued Proclamation 10888 (Proclamation). The Proclamation declares that "the current situation at the southern border qualifies as an invasion" because "[t]he sheer number" of foreign individuals "entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border." Proclamation No. 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333, 8,334–35 (Jan. 20, 2025). Invoking authority from various provisions of the INA, the Proclamation and subsequently issued agency guidance (Guidance) suspend the entry of any person who has crossed the southern border outside a designated port of entry, as well as any person crossing at a designated entry port anywhere without sufficient documentation. The Proclamation and Guidance also

subject those individuals who have entered the country despite the entry ban to new summary removal procedures without the rights the INA provides to seek asylum or other removal protections.

Shortly thereafter, thirteen individuals proceeding pseudonymously and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and Florence Immigrant and Refugee Rights Project—filed a putative class action claiming that the Proclamation and Guidance violate the INA. The Proclamation's authority to suspend entry is not challenged here. This case addresses only whether that entry-authority encompasses the power to order removals using new procedures that supplant the INA's existing removal procedures. The district court certified a class consisting of all individuals subject to the Proclamation, declared the Guidance unlawful and vacated it, and enjoined agency officials from perpetrating that same unlawful action under the Proclamation. The Government now appeals.

This is a statutory interpretation case. Our task is to determine whether Congress has granted the Executive the authority to remove foreign individuals present in the United States without adhering to the removal procedures or providing the substantive removal protections that Congress prescribed in the INA.

We conclude that the INA's text, structure, and history make clear that in supplying power to suspend entry by Presidential proclamation, Congress did not intend to grant the Executive the expansive removal authority it asserts. The Proclamation and Guidance are thus unlawful to the extent that they circumvent the INA's removal procedures and cast aside federal laws affording individuals the right to apply and be considered for asylum or withholding of removal protections. Accordingly, we affirm the district court's grant of summary judgment in favor of Plaintiffs. We also affirm the district court's class certification order, modifying the class definition as clarified by this opinion.

**I.**

**A.**

Congress enacted the INA as an exercise of its "plenary power" over the creation of our Nation's immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) (observing Congress is "exclusively" responsible for "formulating" the "[p]olicies pertaining to the entry of [foreign individuals] and their right to remain here").

The INA established a comprehensive framework governing all aspects of immigration, including entry and admissibility of foreign individuals into the United States, 8 U.S.C. §§ 1181, 1182, 1184, the criteria and procedures for removing those who are here but should not be, *id.* §§ 1227, 1225(b)(1), 1229a, and the protections afforded to individuals subject to removal, *see, e.g.*, *id.* §§ 1158, 1231(b)(3).

**1.**

When it was first enacted, the INA defined the term "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952). That definition codified a technical and historical understanding of the term "entry" as requiring "an arrival from some foreign port or place." *Barber v. Gonzales*, 347 U.S. 637, 641–42 & n.3 (1954); *see Vartelas v. Holder*, 566 U.S. 257, 261 (2012) (explaining the same). So, the term entry connotes physically coming into the United States, irrespective of the individual's method of entry or their admitted status.

Section 1182 delineates the grounds of inadmissibility and identifies the classes of foreign persons who are ineligible for admission. 8 U.S.C. § 1182(a)(1)–(10); *see, e.g.*, *id.* § 1182(a)(2) (criminal history and related grounds), (a)(3)(B) (terrorist

activities), (a)(3)(C) (foreign policy). By specifying categories of foreign individuals who are inadmissible in Section 1182(a), Congress has, in turn, also "defined the universe of [individuals] who are admissible." *Trump v. Hawaii*, 585 U.S. 667, 695 (2018).

In addition, Congress has "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Id.* at 683. That authority is found in Sections 1182(f) and 1185(a) of the INA. *See id.* at 683 n.1.

Section 1182(f) allows the President "by proclamation" to "suspend the entry" of "any aliens or of any class of aliens" he finds "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Such entry suspension can last "for such period as he shall deem necessary." *Id.* Section 1182(f)'s proclamation power "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [non-admissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). The INA includes no corresponding provision empowering the President to suspend the statute's expressly mandatory and exclusive procedures for removing individuals already present in the United States.

Section 1185, titled "Travel control of citizens and aliens," allows the President to adopt "reasonable rules, regulations, and orders" to supplement and effectuate the INA's statutory provisions governing any foreign person's "depart[ure] from or ent[ry into] . . . the United States . . . subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).

**2.**

Foreign individuals who have entered the United States but are not legally authorized to be here are subject to "removal." *Id.* §§ 1225(b)(1)(A), 1229a. The INA and its implementing

regulations provide comprehensive procedures for removing such individuals. These procedures detail the grounds on which foreign individuals may be removed, the process the Executive must follow, and the rights of individuals facing removal.

The INA authorizes the Executive to remove a foreign individual from the United States but confines that authority to only two specified methods: regular removal under 8 U.S.C. § 1229a or expedited removal under 8 U.S.C. § 1225(b)(1). Regular removal is the "sole and exclusive procedure" for removal of foreign individuals "[u]nless otherwise specified in [the INA]." *Id.* § 1229a(a)(3); *see Refugee & Immigrant Ctr. for Educ. and Legal Servs. v. Noem (RAICES)*, 793 F. Supp. 3d 19, 79 n.2 (D.D.C. 2025). So far, Congress has only "otherwise specified" one additional removal procedure: "expedited removal," *see United States v. Guzman*, 998 F.3d 562, 567 (4th Cir. 2021), which applies to two classes of foreign individuals who are inadmissible because they lack valid papers or made misrepresentations in seeking protections under the INA, *see* 8 U.S.C. § 1225(b)(1)(A)(i) (referencing individuals generally inadmissible under "section 212(a)(6)(C) or 212(a)(7) of the INA," now codified at 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

Regular removal proceedings are as follows: Individuals present in the United States whom the Executive charges as removable are afforded the right to a hearing before an immigration judge whose decision may be appealed to the Board of Immigration Appeals and, in turn, to a federal court of appeals. *See id.* §§ 1229, 1229a, 1252; 8 C.F.R. § 1003.1. Removal proceedings before an immigration judge are formal, adversarial hearings, and the immigration judge has an affirmative duty to develop a record. *See* 8 U.S.C. § 1229a(a)(1), (b)(1); 8 C.F.R. § 1003.10(b). At the hearing, the foreign individual may be represented by counsel, present evidence, examine witnesses, and challenge the government's evidence. *See* 8 U.S.C. § 1229a(b)(4). An individual may avoid removal by either showing that she is "entitled to be

admitted" or has been so admitted, *id.* § 1229a(c)(2), or by demonstrating her entitlement to relief from removal by way of asylum or withholding of removal under the INA or the Convention Against Torture. *See id.* § 1229a; 8 C.F.R. §§ 208.16–208.17, 1208.4, 1208.13, 1208.16–1208.17, 1240.10–1240.11; *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 527–29 (2021) (detailing the regular removal process).

The second process, expedited removal, "lives up to its name." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 619 (D.C. Cir. 2020). Congress has authorized the Executive to apply expedited removal to individuals "who [are] arriving in the United States," 8 U.S.C. § 1225(b)(1)(A)(i), and to those who are not admitted or paroled and have "not affirmatively shown" to the immigration officer's satisfaction that they have been "physically present in the United States continuously" for two or more years. *Id.* § 1225(b)(1)(A)(iii)(II). If an individual is subject to expedited removal, an immigration officer "shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.* § 1225(b)(1)(A)(i). "Absent such an indication, all that stands between that individual and removal is a paper review by the officer's supervisor." *Make the Rd. N.Y.*, 962 F.3d at 619 (citing 8 C.F.R. § 235.3(b)(7)).

**3.**

Regardless of the removal path, federal law provides limited statutory protections to individuals who have entered the United States, even without authorization, who face risks of torture or persecution if removed. Three such forms of relief are central to this appeal: asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

The most protective form of relief is asylum. *See* 8 U.S.C. § 1158. Asylum is generally available to any individual who is a "refugee," which the statute defines as any individual who is "unable or unwilling to return to" or "avail . . . herself of the protection of" her country of nationality (or the last country where she resided) "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). Asylum confers valuable benefits including protections from deportation or removal, *id.* § 1158(c)(1)(A); 8 C.F.R. § 208.22, legal permission to work in the United States, 8 U.S.C § 1158(c)(1)(B), a pathway to seek lawful permanent residence, 8 C.F.R. § 209.2, and, eventually, citizenship, 8 U.S.C. § 1429. Congress directed the Attorney General to "establish a procedure for the consideration of asylum applications." *Id.* § 1158(d)(1); *see also id.* § 1158(d)(5)(A) (mandating certain procedures).

Per the INA, "[a]ny [individual] who is physically present in the United States or who arrives in the United States" may apply for asylum "irrespective of [their] status" and "whether or not" they arrived "at a designated port of arrival." *Id.* § 1158(a). Individuals in removal proceedings—whether regular or expedited—may file an asylum application which, if granted, is a defense against removal. *See id.* § 1229a(c)(4); 8 C.F.R. § 208.2(b); 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).[1]

Congress has enumerated only three exceptions to the right to apply for asylum: Individuals are precluded from applying if (1) they can be removed to a safe third country, as determined by the Attorney General, where they may seek asylum; (2) they fail to apply for asylum within one year of arriving in the United States; or

[1] Individuals who are not in any kind of removal proceeding may also file an affirmative application for asylum. 8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.1(a)(1).

(3) they have previously applied for and been denied asylum. 8 U.S.C. § 1158(a)(2)(A)–(C). These application-right exceptions are in turn subject to carveouts not relevant here. *See id.* § 1158(a)(2)(D)–(E). The INA otherwise guarantees the right to apply for asylum.

Notably, the statutory right to *apply* reaches even foreign individuals whom the statute renders ineligible to *receive* it. Not all applicants who meet the statutory definition of refugee are eligible for asylum. The INA lists categories of otherwise qualified persons who are nevertheless ineligible for asylum. Among the INA's enumerated eligibility exceptions is a bar against granting asylum "if the Attorney General determines that" an applicant has "participated in the persecution of any person" on account of a protected ground, has been convicted of a "particularly serious crime," or "there are reasonable grounds for regarding" them to be a "danger to the security of the United States." *Id.* § 1158(b)(2)(A)(i), (ii), (iv). In addition to these statutory ineligibilities, "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). The requirement to proceed by regulation also applies to "any other conditions or limitations on the consideration of an application for asylum." *Id.* § 1158(d)(5)(B).

Yet even an applicant who successfully establishes refugee status and is otherwise eligible may nevertheless be denied, because asylum is a form of "discretionary relief." *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013); *see INS v. Aguirre–Aguirre*, 526 U.S. 415, 420 (1999) ("[T]he decision whether asylum should be granted to an eligible alien is committed to the Attorney General's discretion." (citation omitted)). The statute provides only that, when all stars align for a refugee, the Attorney General or the Secretary of the Department of Homeland Security (DHS) "*may* grant asylum." *See* 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Discretionary denials are, however, reviewable in federal court and cannot be

"manifestly contrary to the law" or "an abuse of discretion." *Id.* § 1252(b)(4)(D). The Executive has for decades consistently followed a case-specific approach to discretionary denials of asylum to individuals who meet the statutory criteria, and such denials are "exceedingly rare." *Thatomar v. U.S. Att'y Gen.*, 1 F.4th 958, 971 (11th Cir. 2021) (citation omitted).

In addition to asylum, two other forms of removal protection are available: withholding of removal under the INA and under the Convention Against Torture. Each applies only as protection against particularly grave types of risk, and neither allows an individual to remain in the United States. 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 1208.17(a). Each does, however, offer individuals valuable protections by restricting countries to which an individual may be removed. *See Guzman Chavez*, 594 U.S. at 536–37 (distinguishing "withholding-only relief" from asylum (citations omitted)).

The first type of withholding of removal, under 8 U.S.C. § 1231, forbids the Attorney General from removing a foreign individual "to a country if the Attorney General decides" that the individual's "life or freedom would be threatened in that country because of" their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

The second type of withholding of removal flows from the United States' obligations as a signatory to the Convention Against Torture and bars the removal of individuals to countries where they are likely to be tortured. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. 19 (1988), 1465 U.N.T.S. 85. The Foreign Affairs Reform and Restructuring Act of 1998 implements the Convention Against Torture by requiring agencies that carry out immigration laws to promulgate regulations limiting the Executive's removal powers

accordingly, *see* 8 U.S.C. § 1231 note, which the Department of Homeland Security has done, *see* 8 C.F.R. §§ 208.16–208.18, 1208.16–1208.18. A Convention Against Torture claim protects only against risk of torture but, unlike a claim for asylum or withholding of removal under the INA, requires no "existence of a nexus between the predicted torture and some statutorily protected ground." *Hincapie v. Gonzales*, 494 F.3d 213, 220 (1st Cir. 2007) (citing *Romilus v. Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004)).

**B.**

Shortly after taking office, President Trump signed Proclamation No. 10888. The Proclamation directs federal action to: (1) suspend "entry into the United States" on or after January 20, 2025 of persons "engaged in the invasion across the southern border," Proclamation § 1; (2) suspend "entry into the United States" of persons who—regardless of their point of entry—"fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable" immigration officials to make statutorily required judgments about admissibility, *id.* § 3; and (3) prevent persons subject to the entry suspension from invoking "provisions of the INA that would permit their continued presence in the United States, including but not limited to" the asylum statute, until the President issues "a finding that the invasion at the southern border has ceased," *id.* §§ 2–3. The Proclamation directs the DHS Secretary, in coordination with the Attorney General and Secretary of State, to "take appropriate actions as may be necessary to achieve the objectives of [the Proclamation]" and to "take all appropriate actions to repel, repatriate, or remove" any person "engaged in the invasion across the southern border of the United States on or after" January 20, 2025. *Id.* §§ 4–5.

To implement the Proclamation's directives, the Department of Homeland Security issued informal guidance via three emails, a memorandum, and training materials sent to immigration

enforcement officials. We refer to these informal guidance documents collectively as the "Guidance."

The Guidance for "all Southwest Border Sectors" advises that individuals "who cross[] between the ports of entry on the southern land border" are "*not permitted to apply for asylum*." J.A. 101 (bolding replaced with italics). The Guidance for the northern and coastal borders further directs that entry is suspended for all individuals who "fail to provide" "sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3). J.A. 109 (citing Proclamation § 3). Persons failing to provide medical and criminal-history documentation are also "restricted from invoking provisions of the INA, *including asylum*, that would permit their continued presence." J.A. 109, 114 (bolding replaced with italics).

The Guidance declares that individuals subject to the Proclamation may now be removed by one of two newly announced processes—either "Direct Repatriation" or "Expedited Removal." J.A. 101, 109. Plaintiffs refer to these as "repatriation" measures, to distinguish them from those in the INA; confusingly, the Guidance's "Expedited Removal" is distinct from expedited removal under 8 U.S.C. § 1225(b)(1). The only difference between the two newly declared pathways is that individuals subject to the Guidance's version of Expedited Removal "are served with a Notice to Alien Ordered Removed and issued an Expedited Removal Order" form, while those removed via Direct Repatriation receive no removal order. *RAICES*, 793 F. Supp. 3d at 55 (quoting Gov't Suppl. Br. at 7, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025)). This distinction is material, according to the Government, because "repatriations do not carry the same immigration or criminal consequences as expedited removal." *Id.* (quoting Gov't Suppl. Br. at 8, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025)). The Guidance provides that the "appropriate" removal procedure for

each individual depends on "the totality of the circumstances." J.A. 101, 107, 109, 114, 126.

The Guidance's removal pathways purport to supplant several statutory protections from removal as well as their corresponding administrative procedures in several ways.

Under existing regulations, immigration officers overseeing expedited removal pursuant to Section 1225(b)(1) must inform the individual that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country," and then prompt the individual to advise the officer of any "fear" or "concern" that they have about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to read this information and instruction from Form I-867A to foreign individuals); *RAICES*, 793 F. Supp. 3d at 55; *see also* 9 Charles Gordon et al., *Immigration Law and Procedure*, App'x B, Ex. 16K (2024) (reproducing the text of Form I-867A). Next, the officer must ask the questions provided on Form I-877B and record the individual's answers concerning their fears about being removed. *See* 8 C.F.R. § 235.3(b)(2)(i); *see also* Gordon, *supra* Ex. 16L (reproducing the text of Form I-867B). If the foreign individual "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the immigration officer must refer that individual for an interview by an asylum officer and provide them with "a written disclosure on Form M-444." 8 C.F.R. § 235.3(b)(4). Form M-444 informs the individual about the credible-fear interview process, the right to consult with other persons before the interview, and the right to request review of the asylum officer's credible fear determination by an immigration judge. *Id.*; *see also* 8 U.S.C. § 1225(b)(1)(A)(i).

Yet both summary repatriation processes under the Guidance countermand those statutory and regulatory procedures. The Guidance directs asylum officers to refrain from using Form I-867A, Form I-867B, or Form M-444, and to not "ask specific fear

questions." J.A. 101, 107, 109, 114, 124. Instead, the Guidance directs that only individuals who spontaneously "manifest[] fear" to an immigration officer will be referred for additional assessment. J.A. 139–40. Even then, the referral is limited to a "[Convention Against Torture]-Only Assessment." *Id.* By designating the assessment as "[Convention Against Torture]-Only," the Guidance prevents even those individuals who manifest fear of persecution from being considered for asylum or withholding of removal under the INA. *See* J.A. 101, 109, 114 (guidance stating that subject individuals will not be permitted to apply for asylum); J.A. 134 (guidance explaining that implementing officials will "not assess[] [the risk of] persecution on account of a protected ground"). A [Convention Against Torture]-only assessment provides no relief from likely abuses apart from torture. It would appear to overlook deprivations of rights to speak, associate, worship, or vote based on ethnicity or political opinion, for example, or official threats, or even imprisonment, based on religion or social class, insofar as such abuses are not torture under the Convention.

The Guidance also instructs officers to use a screening standard for this "[Convention Against Torture]-Only" assessment that is more demanding of the applicant than the binding regulation requires. J.A. 140. Specifically, the Guidance collapses what is normally a two-stage review into a single initial assessment by a United States Citizenship Immigration Services (USCIS) officer. *Contrast* J.A. 140–42, *with* 8 C.F.R. § 208.9(a)(1)–(b). At that "interview," the individual must—without the benefit of counsel or time to assemble evidence—carry the burden to show that he or she is "more likely than not" to be tortured if removed to the proposed country. J.A. 134–35, 141–43. Finally, contrary to existing regulations, individuals facing removal under the Proclamation have no opportunity to seek an immigration judge's review of the immigration officer's determination. *Contrast* J.A. 134, 142, *with* 8 C.F.R. § 235.3(b)(4)(i).

**C.**

In February 2025, Plaintiffs filed a putative class action challenging both the Proclamation and Guidance. The complaint names fifteen defendants: President Trump in his official capacity; the Departments of Homeland Security, State, and Justice; three components of the Department of Homeland Security (Customs and Border Patrol, Immigration and Customs Enforcement, and USCIS); and multiple agency officials in their official capacities.

Plaintiffs' complaint asserts that the summary removal provisions of the Proclamation and Guidance exceed the President's statutory authority under Sections 1182(f) and 1185(a) and violate the constitutional separation of powers by unilaterally countermanding acts of Congress. The complaint also alleges that the Proclamation and its implementation violate the INA's prescribed procedures for removal, asylum, and withholding of removal under 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229a, 1158, 1231(b)(3), as well as the Convention Against Torture, *id.* § 1231 note, and its binding regulations, 8 C.F.R. §§ 208.16, 1208.16. Finally, the complaint claims that the Proclamation's implementation is contrary to law, arbitrary and capricious, and procedurally improper under the Administrative Procedure Act, 5 U.S.C. § 706.

The district court certified a class of "all individuals who are or will be subject to the Proclamation and/or its implementation and who are now or will be present in the United States." *RAICES*, 793 F. Supp. 3d at 98. The court also vacated the Guidance implementing the Proclamation as contrary to law, *see* 5 U.S.C. § 706, to the extent it purports to replace statutory removal with extra-statutory summary expulsion procedures. *RAICES*, 793 F. Supp. 3d at 105. It entered a declaratory judgment against all the defendants (except the President) holding that the Proclamation is unlawful "insofar as it purports to suspend or restrict access to asylum, withholding of removal, or the existing regulatory processes

for obtaining [Convention Against Torture] protection." *Id.* at 105. Finally, the court permanently enjoined all defendants (other than the President) from implementing the Proclamation by adopting extra-statutory expulsion procedures, removing foreign individuals without complying with the statutorily mandated withholding procedures under the Convention Against Torture, and comprehensively barring applications for asylum. *Id.* at 110.

The Government appealed and simultaneously asked this court to stay the district court's order pending the resolution of its appeal. We granted in part and denied in part the Government's motion for a stay. *Refugee & Immigrant Ctr. for Educ. and Legal Servs. v. Noem*, No. 25-5243, 2025 U.S. App. LEXIS 19422 (D.C. Cir. Aug. 1, 2025) [hereinafter Stay Order].

The stay panel first held that the Government was likely to succeed in part in challenging the class definition. The panel stayed the district court's class certification insofar as it applied beyond a class limited to:

> [A]ll individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementation, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

*Id.* at *3–4.

Second, the panel held that the Government was unlikely to succeed in establishing that Section 1182(f) or Section 1185(a)(1)

authorizes the President to act "outside of the INA's prescribed procedures" to remove individuals already present in the United States. *Id.* at *38 (Millett, J., concurring); *id.* at *54 (Pillard, J., concurring in relevant part); *id.* at *66 (Katsas, J., concurring in relevant part). Third, the panel ruled that the Government was unlikely to succeed on its contention that the Proclamation and Guidance comply with the mandatory withholding of removal provisions under the INA and the Convention Against Torture. *Id.* at *48 (Millett, J., concurring); *id.* at *54 (Pillard, J., concurring in relevant part); *id.* at *68 (Katsas, J., concurring in relevant part). Fourth, acknowledging it was "a close call," the stay panel thought that the Government had said enough at the "very preliminary stay stage" to make it likely to succeed in defending the Proclamation's categorical suspension of the statutory right of individuals to apply for asylum. *Id.* at *45, *48 (Millett, J., concurring); *id.* at *67 (Katsas, J., concurring in relevant part); *but see id.* at *56–62 (Pillard, J. dissenting in relevant part). Finally, the panel deemed the Government unlikely to succeed in showing that 8 U.S.C. § 1252(f)(1) barred the district court from issuing class-wide injunctive relief. *Id.* at *48–51 (Millett, J., concurring); *id.* at *54 (Pillard, J., concurring in relevant part); *but see id.* at *70–73 (Katsas, J., dissenting in relevant part).

**II.**

The district court exercised jurisdiction under 28 U.S.C § 1331, and this court has appellate jurisdiction under 28 U.S.C. § 1291. "We review class certification decisions for an abuse of discretion." *In re White*, 64 F.4th 302, 312 (D.C. Cir. 2023) (citations omitted), *cert. denied sub nom. Hilton Hotels Ret. Plan v. White*, 144 S. Ct. 487. We review *de novo* the district court's decision to grant summary judgment. *Thompson v. District of Columbia*, 967 F.3d 804, 812 (D.C. Cir. 2020) (citation omitted).

## III.

We affirm the district court's order granting summary judgment to Plaintiffs and its order granting class certification as clarified by the stay panel. The INA does not allow the President to remove Plaintiffs under summary removal procedures of his own making. Nor does it allow the Executive to suspend Plaintiffs' right to apply for asylum, deny Plaintiffs' access to withholding of removal under the INA, or curtail mandatory procedures for adjudicating Plaintiffs' Convention Against Torture claims. Finally, the district court's class-wide relief does not violate Article III or the INA's limit on injunctive relief under 8 U.S.C. § 1252(f)(1).

### A.

The Proclamation and Guidance invoke Sections 1182(f) and 1185(a)(1) of Title 8 to supplant other provisions in the INA that govern the removal of foreign individuals already present in the United States. Neither statutory provision empowers the Executive to displace the INA's exclusive and mandatory removal procedures.

For decades, federal immigration law has treated barring foreign individuals' entry into the United States differently from their removal once they are here. "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693 (citations omitted); *see Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality."). Entry and admission address whether foreign individuals outside the United States may come in, whereas removal addresses whether and how foreign individuals on the domestic side of the border may be expelled. Federal immigration law treats those as separate processes with different statutory constraints.

That distinction is etched into the INA's comprehensive and carefully calibrated statutory scheme. The statute codifies its differing treatment of entry and removal in separate statutory parts.

As detailed above, the removal process is governed by Section 1229a, which provides the "sole and exclusive procedure" for removal of foreign individuals "[u]nless otherwise specified in [the INA]." 8 U.S.C. § 1229a(a)(3); *see RAICES*, 793 F. Supp. 3d at 79 n.2. Recognizing that there may be reason to remove certain individuals more quickly than the regular process contemplates, Congress otherwise specified an expedited removal process in Section 1225(b)(1) of the INA. *See Guzman*, 998 F.3d at 567 ("The expedited procedure of § 1225(b)(1) is, of course, such an otherwise specified procedure."). Section 1225(b)(1)'s expedited removal process applies to only specified classes of inadmissible foreign individuals. *See* 8 U.S.C. § 1225(b)(1) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

The regular and expedited removal provisions spell out who may be removed, on what grounds, and with what procedural safeguards. But regardless of whether individuals are subject to removal under regular or expedited removal procedures, they are statutorily entitled to apply for asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, 8 U.S.C. § 1231 note.

**1.**

The Proclamation invokes the President's authority under Section 1182(f), but that section authorizes a President to suspend only the "entry" of foreign individuals into the United States. It provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States

> would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend *the entry* of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f) (emphasis added). The Government asserts that the President's authority to "by proclamation . . . suspend the entry" of foreign individuals also empowers the President to summarily remove foreign individuals who have entered the United States in violation of the Proclamation's entry bar. *Id.* The statutory text forecloses the Government's ends-justifies-means approach.

By its plain text, Section 1182(f) authorizes the President to suspend only the "entry" of foreign individuals into the United States. The word "entry," as used in the immigration context since Congress enacted Section 1182(f), means "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952); *see also Barber*, 347 U.S. at 641–42 (explaining that definition codified a technical and historical understanding of the term "entry" as requiring "an arrival from some foreign port or place"). Congress has more recently adopted the related term "admission," which is "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

The word "removal" is noticeably absent from Section 1182(f). That omission by a Congress recognizant of the longstanding distinction between "entry" and "removal" is telling. *Contrast* 8 U.S.C. §§ 1229a ("Removal proceedings"), 1225 ("expedited removal of inadmissible arriving aliens"), *and* 1227 (identifying various classes of "deportable aliens" who "shall, upon the order of the Attorney General, be removed"), *with* §§ 1181, 1184 (admission

or "lawful entry" into the United States), *and* 1182 (listing who is ineligible for lawful entry). More pointedly, Congress knows how to authorize alternative or expedited removal procedures. And when it does, it explicitly uses the word "removal." *See, e.g.*, *id.* §§ 1229a ("Removal proceedings"), 1225(b)(1) ("expedited removal of inadmissible arriving aliens").

The structure of the INA confirms that Section 1182(f) addresses entry and not removal. Section 1182 and its neighboring provisions, Sections 1181 and 1184, specify who may be "admitted" or may "lawful[ly] enter" the United States. *Id.* § 1101(a)(13)(A). Those provisions appear in Part II of the INA titled "*Admission* qualifications for aliens; travel control for citizens and aliens." Pub. L. No. 82-414, 66 Stat. 163 (emphasis added). Removal provisions are separately grouped in Part IV of the INA, titled "Inspection, apprehension, examination, exclusion, and removal." *Id.* It would contravene traditional interpretive principles to conclude that Congress acted tacitly—in a provision and statutory part addressing "entry" and "admissibility" with no mention of "removal"—to grant the President the authority to override the INA's removal provisions. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring) (noting "the commonsense interpretive maxim that Congress does not usually 'hide elephants in mouseholes' when granting authority to the President" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))); *cf. Fl. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("The placement of § 1146(a) within a subchapter expressly limited to postconfirmation matters undermines [the argument] that § 1146(a) covers preconfirmation transfers.").

Past practice drives the point home. The Executive Branch has for decades acknowledged the limits of the authority Section 1182(f) confers to suspend "the entry" of foreign individuals: No prior President has used it to enhance the Executive's removal power. "The want of assertion of power by those who presumably would be alert to exercise it," as the Supreme

Court has recently observed, "is . . . significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quoting *FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 352 (1941)). Indeed, Presidents of both political parties have invoked Section 1182(f) at least 90 times over the last four decades. *See* Securing the Border, 89 Fed. Reg. 81,156, 81,163 n.53 (Oct. 7, 2024). Every one of those uses was confined to preventing foreign individuals from *entering* the territorial land or waters of the United States. *Id.*; *see, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993) (using "a naval blockade" to deny foreign individuals "the ability to disembark on our shores"); *Trump v. Hawaii*, 585 U.S. at 675 ("restrict[ing] entry" of "nationals of countries that do not share adequate information for an informed entry determination, or that otherwise present national security risks"); *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 573 (2017) ("suspend[ing] entry of foreign nationals from . . . Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen"); *Goodluck v. Biden*, 104 F.4th 920, 922 (D.C. Cir. 2024) (suspending diversity-visa program); *Doe #1 v. Trump*, 957 F.3d 1050, 1056 (9th Cir. 2020) (restricting family-sponsored immigrant visas); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754 (9th Cir. 2018) ("suspending the 'entry of any alien into the United States across the international boundary between the United States and Mexico'"); *Sesay v. INS*, 74 F. App'x 84, 86 (2d Cir. 2003) (suspending "entry" of "members of the military junta in Sierra Leone" and their families); *see also* Proclamation No. 5377, Suspension of Entry as Nonimmigrants by Officers or Employees of the Government of Cuba or the Community Party of Cuba, 50 Fed. Reg. 41,329 (1985) ("impos[ing] certain restrictions on entry into the United States of officers or employees of the Government of Cuba or the Communist Party of Cuba").

Brushing past the statute's text, structure, and uniform Executive Branch and judicial recognition that Section 1182(f) does not extend to removals, the Government now asserts that the power it confers to suspend entry is "toothless" absent a coordinate power

to override, by proclamation, the INA's removal provisions. Gov't Br. 29. In its telling, "[Section] 1182(f)'s power to *exclude* must include the power to *expel* if the former is to have any meaningful force." *Id.* at 38. But its premise is mistaken. The Executive indeed has the power to remove foreign individuals who enter the country illegally, *see* 8 U.S.C. § 1229a, including an "expedited removal" power that Congress adopted "to substantially shorten and speed up the removal process," *Make the Rd. N.Y.*, 962 F.3d at 618 (describing 8 U.S.C. § 1225(b)(1)). "Where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,"—as it has done here—"courts should not read one part of the legislative regime (the INA) to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere in the federal immigration regime." *Negusie v. Holder*, 555 U.S. 511, 545 (2009) (Thomas, J., dissenting) (quotation marks omitted). There is nothing "toothless" about Section 1182(f)'s power to proclaim exclusions—backed by the INA's existing statutory removal authorities—that justifies devising a new, unwritten form of *even more expedited* removal power distinct from that which Congress codified.

Against this backdrop, we are unpersuaded that our decision to sustain the preliminary injunction in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022), warrants a different interpretation of Section 1182(f). There, we ruled that the authority of the Centers for Disease Control and Prevention (CDC), under a public health law, to prohibit the "introduction of persons and property" into the United States when they pose a "serious danger of the introduction of [a communicable] disease into the United States," *Huisha-Huisha*, 27 F.4th at 729 (citing 42 U.S.C. § 265), came with a companion "authority to expel" such persons as needed to stem the same contagion, *id.* The Government's reliance on *Huisha-Huisha* here is misplaced.

For one, *Huisha-Huisha* involved not only a statute in a different title of the U.S. Code, but a provision therein that is both unaffiliated with the INA and has a substantially different aim. Congress enacted the Public Health Services Act to address public health, not immigration. *See* Pub. L. No. 78-410, 58 Stat. 682 (codified as amended at 42 U.S.C. § 201 *et seq.*). The CDC's Section 265 authority to control individuals or products that pose a communicable health threat to the United States is not an instrument of general immigration policy. It confers separate and distinct authority to limit movement to prevent the spread of disease. *See* 42 U.S.C. § 265; *see also id*. at § 264 (authorizing controls on spread within the United States). The President's Section 1182(f) authority, by comparison, is part of a comprehensive immigration statute that distinguishes and delineates the power to suspend entry into the United States from the power to remove (subject to certain mandatory conditions) individuals who are already inside the country. We held in *Huisha-Huisha* that the CDC's Section 265 power to control entry to prevent the "introduction" and spread of disease allows expulsions not subject to the INA's removal procedures. The logic of *Huisha-Huisha* does not mean a Proclamation relying on the INA itself may order removals not subject to the INA's removal procedures.

A second reason *Huisha-Huisha* does not support the Government is that Section 265 and Section 1182(f) use materially different language. Section 265 does not use the terms "entry" or "removal" at all. Rather, it empowers the Surgeon General, through the CDC, to prevent the "introduction" of people or things anywhere in the United States that, in their judgment, would pose a serious risk of contagion. As *Huisha-Huisha* explains, "introduction into the United States of persons" is defined as "the movement of a person from a foreign country. . . into the United States so as to bring the person into contact with others in the United States . . . in a manner that the director determines to present a risk of transmission of a communicable disease." 27 F.4th at 725 (quoting Suspension of Introduction of Persons Into the United States from Designation

Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020)). That authority over "introduction," we determined, granted the CDC broad power to prevent diseases like COVID-19 from affecting and infecting the people in the United States. The need to prevent the "introduction" of a disease, in other words, follows contagious persons across the border as they move through the country introducing illness again and again to different populations and regions. Because viruses do not obey borders, the power to prevent the introduction of disease would be "nugatory" if it allowed the CDC only to police the borders and not curb the continued presence of people who "managed to set foot on U.S. soil." *Huisha-Huisha*, 27 F.4th at 729. Section 1182(f), in contrast, empowers a President only to proclaim a suspension of "entry," making inapposite *Huisha-Huisha*'s reliance on the CDC's authority to prevent the "introduction" of potentially contagious persons.

The Government's reliance on the "entry fiction" theory, Gov't Br. 41–43, also fails to graft new removal powers onto Section 1182(f)'s authority to "suspend the entry" of foreign individuals. The "fiction" of this theory refers to the idea that inadmissible or not-yet-admitted individuals who have physically entered the country will be treated under the Due Process Clause as if they were "stopped at the border." *See DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (citation omitted). But, as the Supreme Court has recognized, that limitation does not allow the Executive to remove individuals in violation of procedures Congress has guaranteed to them by statute. *Compare Thuraissigiam*, 591 U.S. at 140 (recognizing that an individual physically within the United States has a statutory right to apply for asylum), *with Sale*, 509 U.S. at 160 (interpreting Section 1182(f) to grant the President the authority to form a naval blockade outside U.S. territorial waters to "prevent[] Haitian[] [immigrants] from reaching our shores and invoking [the INA's] protections").

In short, the plain language and structure of the INA, the longstanding and consistent practice of the Executive Branch, and binding Supreme Court and circuit precedent uniformly reject the notion that Congress, in authorizing the "suspen[sion]" of "entry," 8 U.S.C. § 1182(f), tacitly empowered the Executive to override the INA's carefully crafted "sole and exclusive" removal procedures, *id.* § 1229a(a)(3). The power by proclamation to temporarily suspend the entry of specified foreign individuals into the United States does not contain implicit authority to override the INA's mandatory process to summarily remove foreign individuals.

**2.**

Nor does Section 1185(a)(1) "independently," Gov't Br. 34, provide the Executive with removal authority. That section, titled "Travel control of citizens and aliens," reads:

> Unless otherwise ordered by the President, it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). All agree that this language prohibits a foreign individual from "depart[ing] from or enter[ing]" or attempting to "depart from or enter" the United States except as allowed by rules, regulations, or orders prescribed by the President. Yet, like Section 1182(f), it makes no mention of any power to remove foreign individuals already present in the United States.

In the absence of the word "removal," the Government leans heavily on the statute's references to "depart[ures]." Its argument is as follows: Section 1185 "authorizes the President to prescribe 'limitations and exceptions' to the 'rules and regulations' governing how" foreign individuals "must depart," and so the President has the

power to "repatriate[e] or remov[e]" foreign individuals "without recourse to [regular] or expedited removal proceedings." Gov't Br. at 33–34.

But "departure" is not a synonym for "removal." Section 1185(a)(1), by its plain terms, authorizes regulation of noncitizens' own departures or attempts to depart. The challenged Proclamation and Guidance, by contrast, apply to federal officers' forcible removals of foreign individuals who do not wish to leave.

Congress has used the terms "remove" and "depart" in distinct ways in the INA, and this distinction is consistent throughout the INA's implementing regulations. *See* 8 U.S.C. §§ 1229c (granting the Attorney General the authority to allow a foreign individual "voluntarily to depart the United States" at the individual's "own expense . . . in lieu of being subject to [section 1229a removal] proceedings"), 1326 (creating criminal penalties for certain foreign individuals who "ha[ve] departed the United States while an order of . . . removal is outstanding"); 8 C.F.R. § 215.1(h) ("The term depart from the United States means depart by land, water, or air: (1) From the United States for any foreign place, or (2) from one geographical part of the United States for a separate geographical part of the United States."); *see also Dada v. Mukasey*, 554 U.S. 1, 8 (2008) ("Voluntary departure is a discretionary form of relief that allows certain favored aliens . . . to leave the country willingly [rather than] undergo removal."). Given the clear and purposeful distinctions between the use of these two terms in the INA and its implementing regulations, references to departure in Section 1185(a)(1) cannot be read to grant the President authority to proclaim emergency-removal authority in conflict with the INA's express removal provisions. Nor do we understand the Supreme Court to have held anything to the contrary in *Trump v. Hawaii* when it observed that Section 1185(a)(1) "substantially overlaps" with Section 1182(f) and declined to resolve "the precise relationship between the two statutes." 585 U.S. at 683 n.1.

* * * *

Section 1182(f) and Section 1185(a) afford the President discretionary powers over who may cross our borders and enter the United States. But those provisions do not confer presidential discretion over removal procedures. When federal officers act under the INA to remove foreign individuals who are here illegally, *see* 8 U.S.C. §§ 1229a, 1225, neither Section 1182(f) nor 1185(a) grants the President authority to countermand conditions Congress attached to the INA's expressly comprehensive removal provisions.

**B.**

The Proclamation and Guidance purport to strip away the INA's protections against removal to places where the foreign individual faces risk of persecution or other harm, including torture or death. Plaintiffs claim the Proclamation and Guidance are unlawful insofar as they deny the right to seek relief as provided by statute: asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding of removal under the Convention Against Torture, *see* 8 U.S.C. § 1231 note. We address and reject the Government's rationales for denying each form of statutory relief in turn.

**1.**

The Proclamation and Guidance announce an unprecedented decision to preemptively and categorically deny asylum to many thousands of foreign individuals. They purport to have thereby dispensed with the statutory right even to apply for asylum. That wholesale denial applies to any person crossing the southern border into the United States not at a designated port of entry, as well as any person crossing at a designated port of entry without a visa and other required documentation. Denying asylum in one stroke, without any information about the affected individuals, necessarily ignores every risk of persecution they face when forced back to

where they came from. The challenged decision thus necessarily denies asylum even to foreign individuals who are sure to face persecution without it.

The Government asserts that the asylum statute itself authorizes the Executive to "restrict[]" every individual subject to the Proclamation from "invoking" the right to apply for asylum. Gov't Br. 43–44; *see also* Proclamation, §§ 2–3. It does not. To the contrary, barring foreign individuals who are physically present in the United States from applying for asylum and, if they make the statutory showing that they are eligible, from being considered to receive it cannot be squared with the statute.

Section 1158(a) grants foreign individuals physically present in the United States a right to apply for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)].

8 U.S.C. § 1158(a)(1). According to the plain text of Section 1158(a)(1), then, foreign individuals who are "physically present" in the United States have a statutory right to apply for asylum. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020) (observing that "the statutory right to apply attaches once the asylum seeker is on the doorstep"). To be sure, the right to apply is afforded "irrespective of such alien's status" and "whether or not [they arrived] at a designated port of arrival." 8 U.S.C. § 1158(a)(1).

Following that provision are three enumerated restrictions on the right to apply for asylum: those who can be removed safely to a third country, those who fail to apply within one year of arriving to

the United States, and those who have previously been denied asylum. *See id.* § 1158(a)(2)(A)–(C). Consistent with Section 1158(a)(1), none of those restrictions turns on where the individual enters the United States. Nor do they turn on the sufficiency of documentation.

The asylum statute thus makes plain that the right to apply for asylum is broadly available to all foreign individuals present or arriving in the United States unless expressly restricted from applying. But the Proclamation and Guidance purport to deny the right to all individuals who crossed the southern border between ports of entry, in direct conflict with Section 1158(a)(1)'s instruction that any foreign individual who "arrives in the United States" may apply for asylum "whether or not [they arrived] at a designated port of arrival." 8 U.S.C. § 1158(a)(1). The plain text of Section 1158(a) defeats the Government's assertion that it may restrict everyone subject to the Proclamation from "invoking" the right to asylum.

The Government retorts that the Proclamation and Guidance work to preemptively and categorically *deny* asylum to all individuals subject to the Proclamation, and that "because the ultimate disposition of any asylum application is foreordained" it may "disallow [foreign individuals] from even filing such futile applications." Gov't Br. 44.

For support, the Government relies on 8 U.S.C. § 1158(b)(1)(A), which provides that the DHS Secretary or the Attorney General "may grant asylum" to an individual who has applied in accordance with the application procedures and meets the statutory definition of a "refugee." Congress framed the authority to grant asylum in discretionary terms: "*may* grant." 8 U.S.C. § 1158(b)(1)(A) (emphasis added). The Supreme Court has accordingly held that even if an applicant is eligible for asylum—*i.e.* meets the statutory definition of refugee and is not legally ineligible, *see* 8 U.S.C. § 1158(b)(2)(A)–(C); 8 C.F.R. § 208.13(c)—the DHS Secretary or the Attorney General may

exercise their discretion to deny it. *Thuraissigiam*, 591 U.S. at 110 n.4.[2] We do not question that asylum decisions are ultimately discretionary. But the INA does not support categorical, *ex ante* denial of asylum with no consideration of what the would-be applicant may face if removed.

The Government's and our dissenting colleague's interpretation of the Executive's discretionary authority over asylum, if accepted, would apply far beyond the context of this case. It would treat Congress as having empowered the Executive Branch to cut off asylum wholesale for any reason without any assessment of the nature of the risks the affected individuals would face if sent back. The Government, at bottom, urges us to adopt an interpretation of the asylum statute that would allow the Executive Branch to unilaterally and heedlessly return individuals even to countries where they will most certainly face persecution—forced labor, indefinite imprisonment, or even summary execution—on account of a protected ground. We decline to do so.

To start, the INA makes clear that the Executive's discretionary authority to deny asylum must be exercised on an "individualized" basis. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) ("Congress has assigned to the Attorney General and his delegates the task of making the[] hard individualized decision[] . . . of determin[ing] which, if any, eligible refugees should be denied asylum."). Congress's expectation of individualized consideration is evident throughout the INA's prescribed asylum application process. For instance, the asylum statute sets forth "procedures" for the "[c]onsideration of asylum applications," 8 U.S.C. § 1158(d)(5)(A), that require "the identity of the applicant" to be "checked against all appropriate records or databases," *id.* § 1158(d)(5)(A)(i), and require "[an] initial interview or hearing on

---

[2] We assume without deciding that the President may himself exercise the discretionary authority over asylum that the INA vests in the DHS Secretary and the Attorney General.

the asylum application" to "commence not later than 45 days after the date an application is filed," *id.* § 1158(d)(5)(A)(ii).

The procedures for reviewing asylum applications from individuals subject to expedited removal are likewise individualized. When an individual "indicates either an intention to apply for asylum under [section 1158] . . . or [indicates] fear of persecution," Congress directs that "the officer *shall* refer" that person "for an interview by an asylum officer," *id.* § 1225(b)(1)(A)(i)–(ii) (emphasis added), and the "asylum officer *shall*," in turn, "conduct interviews of aliens referred" to them, *id.* § 1225(b)(1)(B)(i) (emphasis added). If the officer determines "at the time of the interview" that the individual "has a credible fear of persecution" then the individual "*shall* be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii) (emphasis added). We know this multi-step credible-fear screening process is mandatory because Congress reliably uses the word shall to "connote[] a requirement." *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)).

Consistent with the statutory scheme, the promulgated regulation delineating asylum procedures explicitly directs that the Executive "shall adjudicate the claim of *each* asylum applicant whose application is complete." 8 C.F.R. § 208.9(a) (emphasis added); *see also id.* § 1003.10(b) ("[A]n immigration judge shall complete administrative adjudication of *an asylum application* within 180 days after the date an application is filed." (emphasis added)). The Executive's announcement by Proclamation of upfront, categorical asylum denials without "[c]onsideration of asylum applications," 8 U.S.C. § 1158(d)(5)(A), and without "adjudicat[ing] the claim of each asylum applicant," 8 C.F.R. § 208.9(a), directly contravenes these statutory and regulatory requirements.

The individualized approach long adhered to by the Executive Branch in exercising this discretionary authority powerfully reinforces Plaintiffs' reading of the statute to require asylum decisions based on individual circumstances.

The Attorney General and DHS Secretary have largely delegated their discretionary denial authority to Immigration Judges and the Board of Immigration Appeals (BIA). *See* 8 C.F.R. §§ 1003.10(b)–(c); *see also* 8 U.S.C. § 1101(b)(4). The BIA hears appeals from immigration judges' asylum decisions. 8 C.F.R. §§ 1003.1, 1003.10(c). Immigration Judges and the BIA may exercise discretion to deny asylum to eligible applicants, but they must do so case by case, based "on the totality of the [individual's] circumstances." *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (B.I.A. 1987); *see* Securing the Border, 89 Fed. Reg. at 81,170–71 (noting that *Matter of Pula* "remains the applicable standard for discretionary determinations"). Denials of asylum by the Attorney General (as opposed to an Immigration Judge or the BIA) are also decided on a case-by-case basis considering the individual applicant's circumstances. *See, e.g.*, *Matter of A-H-*, 23 I. & N. Dec. 774, 783 (2005) (making discretionary decision "based on a thorough review of the record and considering the balance of [various individualized] factors"). The Government's proposed approach of issuing upfront and categorical pre-application, pre-interview denial decisions without considering the individual's circumstances cannot be squared with nearly four decades of individual and case-by-case discretionary asylum denial decisions.

In any event, even if the INA authorized the Executive to exercise its discretion to deny asylum in such a preemptive and categorical manner, the fact that any applications from individuals subject to such a decision would be futile is not a sufficient reason to deny them the right to apply for asylum. After all, the same could be said about individuals who are ineligible for asylum by statute or regulation, and no one disputes that they have a right to apply.

Begin with Section 1158's text and structure. As detailed above, part (a) of Section 1158, titled "Authority to apply for asylum," establishes the asylum-application right and enumerates the three restrictions on applying; but it is the next part, part (b), titled "Conditions for granting asylum," that establishes asylum-eligibility grounds and enumerates the "exceptions" under which an otherwise eligible applicant will be denied asylum. 8 U.S.C. § 1158(b)(1)–(2). Congress also authorized the Attorney General to promulgate by regulation additional grounds "under which an [applicant] shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see* 8 C.F.R. § 208.13(c) (collecting rule-based grounds for "Mandatory denials" of asylum applications).

Part (b) works this way: An applicant that has exercised the right to apply under part (a) must first establish their status as a "refugee." 8 U.S.C. § 1158(b)(1). But even if an applicant qualifies as a "refugee" within the meaning of the statute, the Attorney General must still deny asylum if the applicant is found ineligible. The INA enumerates a series of grounds rendering applicants ineligible for asylum. *Id.* § 1158(b)(2). For example, if the applicant has been convicted of a "particularly serious crime," or there are "reasonable grounds for regarding the [applicant] as a danger to the security of the United States," the application must be denied. *Id.* § 1158(b)(2)(ii), (iv).

Importantly, in the scheme Congress devised, *eligibility* exceptions in part (b) are distinct from the *application* restrictions in part (a). And eligibility exceptions become relevant only after an individual has exercised the right to apply. *See id.* § 1158(b)(2). As a result, even though the INA prohibits ineligible individuals from receiving asylum, it leaves intact their right to apply for asylum in the first place.

Past Executive Branch practice has uniformly recognized and preserved the right to apply for asylum, including for individuals whose applications will ultimately be denied. Even as Attorneys

General across administrations have exercised the prerogative to promulgate by regulation additional limitations and conditions on *eligibility*, none has restricted the right to *apply*—until now. *See, e.g.*, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,952 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208) (First Trump Administration); Securing the Border, 89 Fed. Reg. 48,710-01, 48,754–59 (June 7, 2024) (to be codified at 8 C.F.R. pts. 208, 235, 1208) (Biden Administration). To the contrary, "for four decades," the "Executive Branch's consistent position" has been that the INA guarantees foreign individuals—even those who are apparently ineligible—the right to apply for asylum. Securing the Border, 89 Fed. Reg. 81,156, 81,163 & n.53 (Oct. 7, 2024). Indeed, the First Trump Administration described a proposed rule to render certain individuals ineligible for asylum as "consistent with . . . 8 U.S.C. § 1158(a)(1)," because it "establishe[d] a condition on asylum *eligibility*, not on the ability to *apply* for asylum." Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,940–41 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208) (emphases added).

Finally, even if the Executive could categorically deny the right to apply for asylum based on a broad *ex ante* determination that all the potential applicants will be denied asylum, per the INA it can only promulgate that blanket determination by notice-and-comment rulemaking. Congress expressly contemplated the potential need for new asylum disqualification and provided tools for just that purpose. First, as described above, the asylum statute authorizes the Attorney General to "*by regulation* establish additional limitations and conditions, consistent with this section, under which an alien shall be *ineligible* for asylum." 8 U.S.C. § 1158(b)(2)(C) (emphases added). The asylum statute also authorizes the Attorney General to "provide *by regulation* any other *conditions or limitations on the consideration of an application for asylum* not inconsistent with this chapter." *Id.* § 1158(d)(5)(B) (emphases added).

Thus, even assuming that the Executive's decision to foreclose asylum to individuals subject to the Proclamation could be understood as an "additional limitation[] and condition[] . . . under which an alien shall be ineligible for asylum," *id.* § 1158(b)(2)(C), and that such an eligibility limitation could foreclose the right to apply, that decision would have to be established "by regulation," *id.* Similarly, even assuming that the Executive's decision here could be understood as another "condition[] or limitation[] on the consideration of an application for asylum," it would have to be established "by regulation." *Id.* § 1158(d)(5)(B).

Here, it is undisputed that the challenged Guidance was not established "by regulation"—*i.e.*, through notice-and-comment rulemaking. We cannot license the Executive to do by Proclamation and informal guidance what Congress has determined must be done, if it can be done at all, by rule.[3] *See* 5 U.S.C. § 553(b)–(e) (describing the process of notice and comment rulemaking).

History illustrates this point. No previous Attorney General or DHS Secretary has asserted that the INA authorizes it to preemptively deny asylum to an entire class of individuals by Proclamation. *See West Virginia*, 597 U.S. at 725. Instead, every administration that has sought to categorically bar asylum to certain individuals—including the first Trump administration—has done so

---

[3] Any regulation under either Section 1158(b)(2)(C) or Section 1158(d)(5)(B) would also have to be "consistent" with the asylum statute, *see* 8 U.S.C. § 1158(b)(2)(C) (requiring regulations to be consistent "with this section"), or the INA more broadly, *see id.* § 1158(d)(5)(B) (mandating regulations "not [be] inconsistent with this chapter"). *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 669–71 (invalidating a Section 1158(b)(2)(C) regulation that made foreign individuals ineligible for asylum based on their place of entry as inconsistent with Section 1158(a)(1)). As already discussed, the Proclamation and Guidance squarely conflict with several statutory provisions.

using its regulatory powers in 8 U.S.C. § 1158(d)(5)(B) to establish eligibility restrictions. *See, e.g.*, Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. at 55,952 (interim final rule designating those who enter the United States in violation of "a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico" categorically ineligible for asylum); Securing the Border, 89 Fed. Reg. 48,710-01, 48,718 (interim final rule providing that, with limited exceptions, "persons who enter across the southern border will be ineligible for asylum unless they demonstrate . . . exceptionally compelling circumstances").

We are unpersuaded by the Government's and our dissenting colleague's insistence that our decision in *Huisha-Huisha* counsels otherwise. As already described, the emergency orders in that case were issued pursuant to the CDC's authority under the Public Health Services Act, 42 U.S.C. § 265, to "suspen[d] . . . the right to introduce" persons into the United States in response to a "serious danger" of spreading a communicable disease from a foreign country into the United States. We interpreted Section 265 to authorize the Executive to prevent foreign persons from coming "into contact with persons in the United States" or moving into the interior of the country after crossing the border, including by summarily expelling them from the country. *Huisha-Huisha*, 27 F.4th at 725, 729. We further held, at least "at [that] stage of the litigation," that the Executive could invoke Section 265 to summarily remove those individuals without providing them an opportunity to seek asylum, despite the INA's otherwise binding requirements. *Id.* at 730–31.

Our conclusion hinged on the explicit recognition that the public-health emergency authority in Section 265 conflicted with immigration law's requirement, *see* 8 U.S.C. § 1158(a), that "[foreign individuals]—even those who enter the country illegally—[be allowed] to apply for asylum before they are

expelled." *Huisha-Huisha*, 27 F.4th at 730. But layering the asylum statute's guarantee of the right to apply for asylum over the Executive's power under Section 265 to "prohibit . . . the introduction of persons" posing a threat of spreading communicable diseases into the United States would critically weaken that emergency power. *Id.* at 731. To "harmoniz[e]" the two statutes, we reasoned that Section 265's express authorization of the Surgeon General to effect "a suspension of the right to introduce such persons . . .[as] is required in the interest of the public health," 42 U.S.C. § 265, supported the orders' suspension of the INA's otherwise-required asylum procedures when the "dangers" to public health "are sufficiently pronounced." *Huisha-Huisha*, 27 F.4th at 731. This interpretation we noted, could "explain why Congress has excluded from asylum some categories" or foreign individuals—"such as those who have persecuted others—but has not categorically excluded from asylum those with communicable diseases." *Id.* at 731. Congress "may have trusted that the Executive would use § 265 to protect the country from the introduction of communicable diseases." *Id.* And we expressly limited the effect of our ruling by specifying that, if not deploying the statutory public-health emergency power, "the Executive violates § 1158(a)(1) when it expels [foreign individuals] before allowing them an opportunity to apply for asylum." *Id.*

Unlike *Huisha-Huisha*, this case asks us to interpret only the INA itself, a comprehensive and internally consistent statute that affords foreign individuals—even those whose asylum applications will ultimately be denied—the opportunity to apply for asylum and to receive an "individualized decision[]." *Cardoza-Fonseca*, 480 U.S. at 444. What's more, we explicitly described our interpretation of the Public Health Services Act's emergency power as tentative: "No one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case." *Huisha-Huisha*, 27 F.4th 733. We decline the Government's invitation and resist the dissent's urging to extend the reasoning of that decision here.

Statutory text, structure, and consistent Executive Branch and judicial recognition of the law's constraints all lead to the same conclusion: Congress enacted the asylum statute, with narrow exceptions specified by statute, to grant all foreign individuals "physically present" in the United States a right to apply for asylum and have their individual applications adjudicated. 8 U.S.C. § 1158(a). If the Government wishes to modify this carefully structured and intricate system, it must present those arguments to the only branch of government able to amend the INA: Congress.

**2.**

The Proclamation and Guidance are also unlawful to the extent they suspend the statutory withholding-of-removal protections that Congress has "mandat[ed]." *Aguirre-Aguirre*, 526 U.S. at 419.

The INA's withholding-of-removal provision bars the Executive from removing a foreign individual to a country where they would be persecuted based on race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). Yet the Guidance explicitly states that USCIS is "not assessing persecution on account of a protected ground" in making removal decisions, nor is any other part of the Government making the statutorily mandated assessment. J.A. 134, 143; *see also* J.A. at 116, 120 (instructing Customs and Border Patrol agents to "refer[]" to USCIS only "for a [Convention Against Torture] screening" any individuals "who manifest a fear of the country to which [Customs and Border Control] intends to return them"). Thus, on its face, the Guidance refuses to provide persons in the United States the statutory withholding-of-removal protections against persecution that Congress has prescribed. This, it cannot do.

As this court has already explained, if the Executive wants to remove foreign individuals "to places prohibited by § 1231(b)(3)(A), it must identify a statute that creates an exception

to § 1231(b)(3)(A)." *Huisha-Huisha*, 27 F.4th at 731–32. The Government has identified none. Neither Section 1182(f) nor Section 1185(a) creates such an exception. As spelled out above, *supra* Section III.A, neither provision mentions removal. Neither grants the Executive the authority to supplant the INA's removal procedures. And neither creates any exception to the mandatory withholding-of-removal provisions.

This conclusion is reinforced by *Huisha-Huisha*, where this court determined that the Executive's more robust authority under the Public Health Service Act to prevent the "introduction" of disease permitted it to temporarily supersede certain INA procedures. 27 F.4th at 728–31. Yet statutory withholding of removal to a country where the person's life or freedom would be threatened based on a statutorily protected characteristic, 8 U.S.C. § 1231(b)(3)(A), could not be superseded. *See Huisha-Huisha*, 27 F.4th at 732. Our observation in *Huisha-Huisha* about the steadfast nature of the withholding-of-removal right remains true here.[4]

**3.**

Likewise, the Convention Against Torture's bar against removal to a country where the person will be tortured is mandatory. "[A]n application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's

[4] We decline to address the Government's forfeited assertion that Section 1231(h) of Title 8 precludes judicial relief for APA claims challenging the legality of agency guidance under the withholding statute. The only place the Government even hinted at this argument to the district court was in a footnote in its summary judgment brief, *see* Gov't Summary Judgment Br. at 59 n.5, *RAICES v. Noem*, No. 25-306 (D.D.C. July 2, 2025), which simply quoted Section 1231(h) with no explanation. That is not enough to preserve an argument for appeal. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

eligibility for withholding is established." 8 C.F.R. § 208.16(d)(1); *see id.* § 1208.16(d)(1) (same); *see also Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to [Convention Against Torture] relief and may not be removed to that country.").

Congress directed that the Convention's protections be implemented by regulations, *see* 8 U.S.C. § 1231 note, and the Departments of Homeland Security and Justice have promulgated regulations doing just that. *See* C.F.R. §§ 208.1–31, 1208.1–33. The regulations require a two-stage process for handling Convention Against Torture claims.

At the first stage, an asylum officer conducts a credible fear screening where the applicant must demonstrate that there is "a significant possibility" that they are eligible for the Convention's protection. *Id.* §§ 208.30(e)(3), 1208.30(e); *see also id.* §§ 208.1(a)(1), 1208.1(a)(1). Applicants who clear that threshold move onto a second interview, which is designed "to elicit all relevant and useful information" for a final Convention Against Torture determination. *Id.* § 208.9(b). To qualify for Convention Against Torture protection, the applicant must demonstrate in the second interview that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Id.* § 208.16(c)(2); *id.* § 1208.16(c)(2) (stating the same). The second interview must occur at least twenty-one days after the applicant receives the record of the officer's determination from the first-stage screening, allowing the individual to gather evidence and obtain representation if desired. *See id.* The applicant also "may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.*

The Guidance casts aside the congressionally required rule and collapses the process it mandates into a single interview at which applicants must, without the benefit of time to assemble evidence or

to prepare a presentation, carry the ultimate burden of proving they will likely be subjected to torture. In addition, contrary to existing regulations, in the now-prescribed single "[Convention Against Torture]-Only Assessment," the applicant is not "entitled to" any "consultation period" and cannot be accompanied by a consultant or legal representative. J.A. 140, 141.

Agencies may not adopt guidance or other procedures that conflict with or disregard duly promulgated regulations. *See U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35–36 (D.C. Cir. 2005). The Government has not withdrawn the published regulations. Its Guidance is accordingly arbitrary and capricious and contrary to law to the extent it substitutes the Guidance's less protective process for the Convention Against Torture procedures required under existing regulations.

**C.**

We next consider the Government's challenge to the district court's class certification. Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23 requires class representatives to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

A proposed class must also satisfy one of the three requirements of Rule 23(b). The district court certified the class under Rule 23(b)(2), which applies when a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.'" *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)). Rule 23(b)(2) "exists so that parties and courts . . . can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *Id.*

At the stay stage of this case, we denied the Government's stay request only after clarifying that we thought the district court's judgment was properly limited to a class defined as:

> All individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

Stay Order, 2025 U.S. App. LEXIS 19422, at *3–4. So, as defined, the class is geographically limited to individuals present in the United States, temporally confined to the period the emergency Proclamation remains in effect, and includes only those individuals facing actual and imminent harm from the Proclamation and Guidance.

The Government agrees with the clarified definition in all but one respect: the inclusion of individuals who are not already in the United States. In support, the Government puts forth several arguments as to why we should further narrow the scope of the class, none of which is persuasive.

The Government's first and primary contention is that individuals who are not currently in the United States lack imminent

injuries sufficient to establish Article III standing. This argument clashes with the established law that courts may award class-wide injunctive or declaratory relief under Rule 23(b)(2) so long as one member of the class has standing. *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing."). Indeed, the Supreme Court has long recognized that only one plaintiff need demonstrate standing to satisfy Article III in cases seeking injunctive or declaratory relief. *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (requiring "[a]t least one plaintiff"—but only one plaintiff—to establish "standing to seek each form of relief requested in the complaint"); *see also Baggett v. Bullitt*, 377 U.S. 360, 366 n.5 (1964); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *Horne v. Flores*, 557 U.S. 433, 446–47 (2009). As we have established in this circuit, "the same 'one plaintiff' rule . . . applies with equal force to a Rule 23(b)(2) class action advancing a uniform claim and seeking uniform injunctive and declaratory relief." *J.D.*, 925 F.3d at 1324.

Notwithstanding this settled law, the Government and our dissenting colleague theorize that the one-plaintiff rule for a Rule 23(b)(2) class seeking only injunctive relief is untenable after the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). The Government and dissent overread *TransUnion*.

In *TransUnion*, the Supreme Court considered whether each member of a Rule 23(b)(3) class must establish Article III standing to recover "individual *damages*." *Id.* at 431 (emphasis added). True, the Court answered this question affirmatively. *Id.* at 431 & n.4 (holding "[e]very class member must have Article III standing in order to *recover* individual damages" but declining to "address the distinct question whether every class member must demonstrate standing before a court *certifies* a class" (emphases added)). The Court did not, however, mention anything about the prevailing rule

requiring only one plaintiff to establish Article III standing to *certify* a class seeking only *declaratory or injunctive* relief. *See id.*; *see also Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1023 (9th Cir. 2020), *rev'd and remanded*, 594 U.S. 413 (2021) (clarifying that the court's holding did not "apply to class actions involving only injunctive relief"); *see, e.g.*, *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023) (concluding that because "at least one class representative . . . has Article III standing to seek each form of *equitable* relief requested in the complaint[,] [n]othing more is required on that score" (emphasis added)); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 & n.32 (9th Cir. 2022) (en banc) (observing that "the Supreme Court has long recognized that in cases seeking injunctive or declaratory relief, only one plaintiff need demonstrate standing to satisfy Article III" (collecting cases)); *see also* 1 *Newberg and Rubenstein on Class Actions* § 2:3 (6th ed. 2025) ("If a class representative has standing, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing."). *TransUnion*'s pronouncement about the Article III requirements for awarding individual damages to members of a Rule 23(b)(3) class did not address, and thus hardly "eviscerated," Diss. Op. 6, this circuit's one-plaintiff rule in cases involving a Rule 23(b)(2) class seeking a single injunction, as articulated in *J.D.*, *see Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) ("[I]ntervening Supreme Court precedent must clearly dictate a departure from circuit law" to "eviscerate the law of our circuit." (citation modified)).

The different Article III requirements for a Rule 23(b)(3) class seeking to recover monetary damages, on one hand, and a Rule 23(b)(2) class seeking only injunctive relief, on the other, reflects the different remedy that the court awards.

For a Rule 23(b)(3) class seeking damages, the court orders the defendant to pay an individualized award of monetary damages to each plaintiff. *See Dukes*, 564 U.S. at 362 (explaining that

"individualized monetary claims belong in Rule 23(b)(3)"); *see also* 2 *Newberg and Rubenstein on Class Actions* § 4:54 (6th ed.) (explaining that "each [Rule 23(b)(3)] class member is likely to be entitled to a specific amount of damage pertinent to the harm she suffered"). Such individualized relief demands a concrete injury for each person who would recover, as the awarded damages must redress each plaintiff's individual harm. *See TransUnion*, 594 U.S. at 431 (requiring every class member to demonstrate Article III standing to "recover individual damages"). For a Rule 23(b)(2) class seeking injunctive relief, however, a "single injunction or declaratory judgment . . . provide[s] relief to each member of the class." *Dukes*, 564 U.S. at 361.

But even assuming that courts may not award class-wide injunctive or declaratory relief under Rule 23(b)(2) to a class including individuals who potentially lack Article III standing at the time the class was certified, *but see J.D.*, 925 F.3d at 1324; *Town of Chester*, 581 U.S. at 439, the district court's class definition, as clarified by the stay panel, comports with Article III.

Under the operative class definition, a noncitizen becomes a member of the class—and thus obtains relief—only when present in the United States and only if they are "not statutorily ineligible for" asylum, withholding of removal, or withholding under Convention Against Torture and, "absent the Proclamation and/or its implementing [guidance]," would seek any of those forms of relief or protection. Stay Order, 2025 U.S. App. LEXIS 19422, at *3–4. And it is well established that those who are not yet members of a Rule 23(b)(2) class may become class members in the future once they face imminent harm from the challenged policy. *See Brown v. Plata*, 563 U.S. 493, 531–32 (2011) (affirming class of all California prisoners who are or "*will become*" physically or mentally ill and "*will become* members of the plaintiff classes" (emphases added)); *INS v. Nat'l Ctr. for Immigrant Rights*, 502 U.S. 183, 186 (1991) (addressing the merits of the claims of a class that included "all those persons who have been *or may in the future* be denied the right to

work" pursuant to a federal regulation (emphasis added)); *J.D.*, 925 F.3d at 1312 (affirming class of "pregnant [unaccompanied noncitizen minors] who are *or will be* in [federal] custody" (emphasis added)); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 246, 271 (5th Cir. 2018) (affirming class of "all children now, *or in the future*" in the state's conservatorship program (emphasis added)); *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993) (remanding with instruction to certify "a class comprising at least all current *and future* [state] applicants for [public] assistance" (emphasis added)); *see also A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) ("The inclusion of future class members in a class is not itself unusual or objectionable, because when the future persons referenced become members of the class, their claims will necessarily be ripe." (quotation marks omitted)); Newberg and Rubenstein, *supra* § 3:15 (adducing from federal cases that including "future claimants . . . make[s] class certification more, not less, likely").

Defining a Rule 23(b)(2) class to encapsulate anyone who will face injury from the implementation of the Proclamation is proper because the "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The scope of a Rule 23(b)(2) class likewise tracks the extent of the violation. *See Dukes*, 564 U.S. at 360. Here, the implementation of the unlawful Proclamation will harm present and future class members alike, giving rise to "common claims aris[ing] from systemic harms" such that "a single injunction" will "'provide relief'" to both present and future class members. *DL*, 860 F.3d at 726 (quoting *Dukes*, 564 U.S. at 360). "Relief targeted only at present [class] members," however, in the words of the Supreme Court, would "fail to adequately protect future class members" who will uniformly be subject to the same harmful actions or unlawful policy. *Plata*, 563 U.S. at 531–32; *cf. Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1542 n.39 (D.C. Cir. 1983) ("Since the future class members who actually suffer injury thereby become present class members eligible for relief, a

definition encompassing future members is superfluous." (citation omitted)).

The Government next posits that certifying a class of all persons who have been or will be harmed by the challenged action is an "end-run around" the Supreme Court's condemnation of nationwide injunctive relief in *Trump v. CASA*, 606 U.S. 831 (2025). Gov't Reply 28. The dissenting opinion echoes this sentiment. Diss. Op. 6. But *CASA*, to the extent it addresses class actions at all, says the opposite: *CASA* decried "universal injunctions" as a "workaround" to avoid the appropriate but rigorous process of certifying a class. 606 U.S. at 850. The Court confirmed, however, that "universal relief" may be suitable in cases in which Rule 23's requirements are satisfied because class actions—unlike universal injunctions—have a preclusive effect and thus "protect" defendants "from future suits." *Id.* at 849 & n.15; *accord id.* at 868 (Alito, J., joined by Thomas, J., concurring); *id.* at 869 (Kavanaugh, J., concurring); *id.* at 919 (Sotomayor, J., joined by Kagan and Jackson, JJ., dissenting). The correct route to nationwide injunctive relief, *CASA* says, is to do exactly what Plaintiffs have done: "conduct. . . a proper[] class action" following the "procedure set out in Rule 23." *Id.* at 849 (citation modified).

For these reasons, we hold the class definition as clarified by the stay panel is appropriate.

**D.**

Finally, the Government argues that 8 U.S.C. § 1252(f)(1) barred the district court from both enjoining the Government from implementing the Proclamation and from vacating the Guidance. We disagree.

Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action,

> no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). "[G]enerally," Section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out" part IV of the INA. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Part IV of the INA encompasses 8 U.S.C. §§ 1221–1232. *See Aleman Gonzalez*, 596 U.S. at 549.

**1.**

The district court did not "enjoin or restrain" the Government's "operation" of any provision covered by Part IV of the INA. The district court's injunction thus falls beyond Section 1252(f)(1)'s reach.

The district court enjoined government officials (other than the President) from relying on the Proclamation to enforce the directives in the Guidance—that the district court separately declared unlawful and vacated—to remove "individual plaintiffs or class members using non-statutory repatriation or removal proceedings." J.A. 319. The Proclamation invokes as its source of authority Sections 1182(f) and 1185(a) of Title 8, which are in Part II—not Part IV—of the INA.

More specifically, the district court enjoined government officials (1) "from removing any individual plaintiffs or class members without complying with the asylum statute, 8 U.S.C. § 1158(a)"; (2) from relying on the Proclamation or Guidance to

"narrow[] the eligibility criteria for asylum without complying with 8 U.S.C. § 1158(b)(2)(C)"; and (3) from "using procedures other than those set forth in the relevant regulations when processing individual plaintiffs' or class members' [Convention Against Torture] protection claims." J.A. 319–20. Neither the asylum statute nor Convention Against Torture provisions are in Part IV of the INA: The asylum statute, 8 U.S.C. § 1158, appears in Part I of the INA and the Convention Against Torture provision appears in a different statute altogether, FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998).[5] So Section 1252(f)(1)'s injunction constraints do not apply.

By contrast, the district court declined to enjoin the Government to comply with the withholding of removal statute, 8 U.S.C. § 1231(b)(2), which is in Part IV of the INA and thus subject to Section 1252(f)(1)'s bar on injunctive relief. *RAICES*, 793 F. Supp. 3d at 105–06.[6]

---

[5] The United States Code's codifiers, not Congress, chose to place the directive to promulgate Convention Against Torture removal-withholding rules at Section 1231 in the codified immigration laws. *See* 8 U.S.C. § 1231 note. Both because the rule, not the statute, establishes the applicable process, and because "[t]he legislative intent of Congress is to be derived from the language and structure of the statute itself, if possible, not from the assertions of codifiers," *United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997), that placement does not subject the Convention Against Torture removal process to Section 1252(f)(1)'s remedial restriction. *See Warner v. Goltra*, 293 U.S. 155, 161 (1934) ("The compilers of the Code were not empowered by Congress to amend existing law, and doubtless had no thought of doing so.").

[6] Contrary to our dissenting colleague's interpretation of the district court's injunction, the district court never held that it was requiring

We see no error in how the district court navigated and applied the contours of Section 1252(f)(1) in crafting its injunctive relief. And neither the Government nor our dissenting colleague persuades us otherwise.

To start, it is not enough that the district court's Memorandum Opinion *discusses* provisions in Part IV. *See generally RAICES*, 793 F. Supp. 3d 19. The pertinent inquiry is whether the district court's order "enjoin[s] or restrain[s] the operation of [a] provision" located in Part IV. 8 U.S.C. § 1252(f)(1). True, the district court discussed the Executive's sole removal authorities within the INA—Sections 1229a and 1225(b), in Part IV—in reaching its holding that "neither § 1182(f) and § 1185(a) . . . authorize[s] the President (or his subordinates) to adopt extra-statutory procedures for expelling" foreign individuals. *RAICES*, 793 F. Supp. 3d at 108. And, having concluded that the Proclamation lacks statutory support, the court determined that equitable considerations supported enjoining the Proclamation given the Government's admission that vacating the implementing guidance alone would not alter the Executive's conduct. *Id*. at 109. But just because the district court discussed provisions in Part IV does not mean that the district court enjoined provisions in Part IV.

Nor are we persuaded by the Government's argument that the injunction violates Section 1252(f)(1) because it could have the indirect effect of compelling the Executive to adhere to the INA's exclusive removal procedures, 8 U.S.C. §§ 1229a and 1225(b)(1), both of which are codified in Part IV of the INA. The injunction does not mandate removals; it requires only that if the Executive

---

the Executive to follow statutory procedures "for removal." *See* Diss. Op. 29 (quoting not from the district court's injunction but from its irreparable harm analysis—which applied to the injunction as a whole—in support of the assertion that the district court ordered the Government to follow the statutory removal procedures in Sections 1225(b)(1) and 1229a).

removes foreign individuals, it does so consistent with statutory and regulatory provisions that govern asylum and withholding of removal—neither of which are in Part IV of the INA. In this way, it is the INA itself, not the district court's injunction, that mandates how the Executive is to effectuate removals.

Our dissenting colleague takes a slightly different tack and reaches a contrary conclusion based on his *sua sponte* theory for an "inherent Executive expulsion power." Diss. Op. 43. It is unclear to us how this theory supports the dissent's view that the district court's injunction runs afoul of Section 1252(f)(1)'s bar on enjoining the operation of provisions in Part IV of the INA. But regardless, the Government disclaims any inherent power to summarily remove noncitizens. *See* Gov't Br. 28–35; Oral Arg. Tr. 23:16. And the statutory provisions that the Government does invoke—8 U.S.C. §§ 1182(f), 1185(a)(1)—do not afford the authority it claims in the Proclamation and Guidance, *see supra* Section III.A, which the dissent seems to recognize, *see* Diss. Op. 30–42. The district court's injunction against removing class members "using non-statutory repatriation or removal proceedings," J.A. 319, "merely prohibit[s] the [Executive] from doing what . . . [it] cannot do," Diss. Op. 28. Section 1252(f)(1) does not bar such relief.

**2.**

The Government next argues that Section 1252(f)(1) bars the district court from vacating the Guidance. Because vacatur under the APA is distinct from injunctive relief and Section 1252(f)(1) addresses only the latter, we hold Section 1252(f)(1) inapplicable to the vacatur.

Congress in Section 1252(f)(1) targeted orders that "enjoin" or "restrain" the "operation" of provisions in Part IV. As the Supreme Court has explained, "Putting these terms together, § 1252(f)(1) generally prohibits lower courts from entering *injunctions that order*

federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzales*, 596 U.S at 550 (emphasis added).

The heading Congress enacted for Section 1252(f)(1) describes it as a "Limit on injunctive relief." Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208 § 242(f), 110 Stat. 3009, 3009-611–612 (1996) (citation modified). That title reinforces the limits of the directive in the text. *See Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation modified)). "By its plain terms, and even by its title, [Section 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Biden v. Texas*, 597 U.S. at 801 (alteration in original) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999)).

Vacatur under Section 706 functions quite differently from an injunction. "When a court employs the extraordinary remedy of injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citation modified). Put simply, an injunction "is a means by which a court tells someone what to do or not to do," *id.*, and such an order is "enforceable by contempt," *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986). By contrast, when a court vacates agency action, it simply "h[olds] unlawful and set[s] aside" the action, 5 U.S.C. § 706(2), as the district court did here in divesting the Guidance of enforceability. *See Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022) (holding that Section 1252(f)(1) does not bar vacatur under the APA because "a vacatur does nothing but re-establish the status quo absent the unlawful agency action," and "neither compels nor restrains further agency decision-making"). The district court's vacatur of the Guidance does not "enjoin" or "restrain" anyone; the court's separately specified injunctive relief served that role.

Vacatur is a well-established remedy for unlawful agency action. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *accord Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("When an agency's action is unlawful, vacatur is the normal remedy." (citation modified)). Cognizant of that norm, Congress can, and occasionally does, limit courts' power to vacate agency action under Section 706 of the APA. Those limits are quite unlike Section 1252(f)(1). Congressionally prescribed limits on the court's vacatur power explicitly refer to the inapplicability of APA remedies. *See, e.g.*, 42 U.S.C. § 7607(d)(1) ("[S]ection 706 of [the APA] shall not . . . apply to actions to which this subsection applies.") (Clean Air Act); 15 U.S.C. § 57a(e)(5)(C) ("Section 706(2)(E) of [the APA] shall not apply to any rule promulgated under subsection (a)(1)(B).") (Magnuson-Moss Warranty – Federal Trade Commission Improvement Act); 16 U.S.C. § 1855(f)(1)(B) ("[T]he appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D)," but not (E) or (F).) (Magnuson-Stevens Act). Section 1252(f)(1) makes no reference to the APA.

At bottom, Section 1252(f)(1)'s prohibition is limited to enjoining the operation of certain statutory provisions. It leaves intact the courts' power under the APA to hold unlawful or set aside agency action that violates its terms. Because the district court's vacatur does not enjoin or restrain Executive conduct, but instead sets aside the Guidance to the extent it is arbitrary and capricious or contrary to law, it is unaffected by Section 1252(f)(1).

**IV.**

For these reasons we hold that the Proclamation and Guidance are unlawful insofar as they circumvent Congress's carefully crafted removal procedures and cast aside federal laws that afford individuals the opportunity to apply and be considered for a grant of

asylum or withholding of removal. As such, we affirm the district court's grant of summary judgment and affirm the district court's class certification, as clarified by the stay panel and consistent with this opinion.

*So ordered.*

Walker, *Circuit Judge*, concurring in part and dissenting in part:

Last year, the Department of Homeland Security issued informal guidance related to a proclamation that President Trump signed on his inauguration day. The Proclamation and Guidance generally cover aliens who illegally cross the border. The Guidance subjects those aliens to summary removal procedures — procedures that conflict with more fulsome procedures required by 8 U.S.C. §§ 1225 and 1229a. Both the Proclamation and Guidance prevent those aliens from applying for asylum — a protection that Congress made entirely *discretionary*. And they strip away statutory protections against removal to countries where an alien will be persecuted — protections that Congress made entirely *mandatory*.

The plaintiffs sued. The district court certified a global class and issued, among other remedies, a class-wide injunction. The injunction orders the Executive, among other things, to abide by the procedures specified in 8 U.S.C. §§ 1225 and 1229a and to accept asylum applications.

I agree with much of the majority's thoughtful opinion. The Executive cannot remove aliens to countries where they will be persecuted, and the Proclamation and Guidance cannot strip them of mandatory procedures that protect against that removal. But unlike the majority, I conclude:

I. The district court wrongly issued relief to potentially millions of plaintiffs without standing.

II. The Executive has already exercised his lawful discretion to deny all asylum applications. So he may foreclose the application process as futile.

III. The injunctive relief the district court issued was barred by 8 U.S.C. § 1252(f)(1), which forbids inferior federal courts from issuing injunctions

ordering the Executive to obey §§ 1225 and 1229a.

I take each in turn.

**I**

The district court issued injunctive relief to a class of potentially millions of plaintiffs without standing. The class includes "all individuals who are *or will be* subject to the Proclamation" or Guidance "and who are now *or will be* present in the United States."[1] That includes individuals who will be present in the United States and subject to the Proclamation or Guidance only after several years and the most speculative and attenuated chain of possibilities imaginable. That was wrong. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."[2]

**A**

On a remote island some 700 miles off the coast of mainland India lies North Sentinel Island.[3] Its inhabitants, the

---

[1] JA 292 (emphases added).

[2] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). Because here the district court both certified the class *and* issued relief to it, I need not reach the issue of whether certification posed a problem. *See id.* at 431 n.4 (declining to "address . . . whether every class member must demonstrate standing *before* a court certifies a class").

[3] *See* Satyaki Paul et al., *Sentinelese Contacts: Anthropologically Revisiting the Most Reclusive Masters of the* Terra Incognita *North Sentinel Island*, 11 Humans. & Soc. Scis. Commc'ns 1, 2 (2024).

Sentinelese, "may be the most isolated people group in the world."[4] Little is known about them, and strangers seeking to learn more have often been met with a shower of Sentinelese arrows.[5]

Do the Sentinelese people, who might hypothetically be contacted one day, and might hypothetically decide to come to the United States by illegally crossing the southern Border, have standing in today's case? No. Without knowing the United States exists, they can't even form vague "'some day' intentions" to enter, let alone provide "concrete plans, or indeed even any specification of *when* the some day will be."[6]

True, a Sentinelese individual (let's call him Bob) may be contacted by fishermen who stray onto the shores of North Sentinel Island. Bob may then end up advocating for a less isolationist Sentinelese foreign policy. In response, Bob's Sentinelese brethren may persecute him for his views. Bob may then flee the island, arriving by boat on the shores of India. In India, Bob may learn of the United States and decide to make the voyage to our country. After saving up some funds, Bob may traverse half the globe, ultimately landing in Nuevo Laredo, near the southern border. Bob may then cross the border in violation of the President's entry ban. After Bob is found, he may learn of the asylum process and decide to apply.

---

[4] *Sentinelese in India*, Joshua Project (accessed February 25, 2026), https://perma.cc/Y3JN-863M; *see also The Sentinelese*, Survival International (accessed February 25, 2026), https://perma.cc/H8L8-WAN7 ("The Sentinelese are the most isolated Indigenous people on Earth . . . .").

[5] *See, e.g.*, J. Oliver Conroy, *The Life and Death of John Chau, the Man Who Tried to Convert His Killers*, The Guardian (Feb. 3, 2019), https://perma.cc/SYK5-6J3F.

[6] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

Bob *may* do all these things. And if so, he would fall within the class definition. Still, to put it mildly, that is a speculative and attenuated chain of possibilities. So it cannot ground Article III standing.[7]

What is true of Bob is true of many who fall within the class definition — even those who may seem more likely than Bob to cross our borders. They face the same problem: What will subject them to the allegedly illegal government action is their illegal entry.[8] But the Supreme Court's "cases reveal that, for purposes of assessing the likelihood" that government actors will engage in allegedly illegal conduct toward a plaintiff, the Court has been "unwilling to assume that the party seeking relief will" engage in the sort of "misconduct" that would "place him or her at risk of that injury."[9] If that has been true when the individual has *already* broken the law before, and *already* been subject to the illegal conduct before,[10] then it follows a fortiori that it is true when there is no evidence the people have previously broken the laws at all.[11]

Nor is there any particularized reason to think any particular plaintiff abroad will, in fact, break this nation's immigration laws. But that is what has generally been required to overcome the presumption that parties will not engage in illegal

---

[7] *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024); *Clapper v. Amnesty International USA*, 568 U.S. 398, 401 (2013).

[8] "The Proclamation's authority to suspend entry is not challenged here." Maj. Op. 4.

[9] *Honig v. Doe*, 484 U.S. 305, 320 (1988).

[10] *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983) (discussing *O'Shea v. Littleton*, 414 U.S. 488 (1974)).

[11] *Id.* at 102 (acknowledging that past conduct is relevant to assessing future risk).

conduct.[12] And standing must be assessed plaintiff-by-plaintiff — even in a class action.[13]

Because the only class members who have standing are those who either (a) are already in the United States or (b) have shown some particularized reason for believing they will imminently break the immigration laws so as to render themselves subject to the alleged illegality from enforcement of the challenged Proclamation and Guidance, I would narrow the class.

**B**

This court's opinion in *J.D. v. Azar* doesn't defeat this analysis.[14] Although *J.D.* suggested that "*only* one plaintiff" needs "standing to seek each form of relief requested in the complaint,"[15] after *TransUnion* and *Trump v. CASA*,[16] *J.D.* bears no weight here.

Start with *J.D.*'s relationship to *TransUnion*. In *J.D.*, our court said that if there were multiple "individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement" was "satisfied if" only "one plaintiff" could "establish injury."[17] *TransUnion* had this to say about that: "Article III does not give federal courts the

---

[12] *See, e.g.*, *Honig*, 484 U.S. at 320–21.

[13] *See TransUnion*, 594 U.S. at 431; *see also Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam) (assessing whether each class member had standing to seek injunctive relief under Rule 23(b)(2)).

[14] 925 F.3d 1291 (D.C. Cir. 2019).

[15] *Id.* at 1324.

[16] 606 U.S. 831 (2025).

[17] *J.D.*, 925 F.3d at 1323.

power to order relief to any uninjured plaintiff, class action or not."[18]

*CASA* removes any doubt about whether *J.D.* remains good law. As *CASA* explained, courts lack equitable power to issue relief that is more sweeping than necessary to "offer complete relief to the plaintiffs before the court."[19] So *CASA* stayed the injunctions at issue in that case "to the extent that" they were "broader than necessary to provide complete relief to each plaintiff with standing to sue."[20] Thus, the upshot of *CASA* is clear. Courts lack equitable authority to do what *J.D.* said they could — issue injunctions that protect non-parties. So *J.D.* has been "eviscerated" by *TransUnion* and *CASA*.[21]

---

[18] *TransUnion*, 594 U.S. at 431; *see also Mirabelli*, 146 S. Ct. at 803 (determining whether each plaintiff had standing to seek relief even in a Rule 23(b)(2) class action seeking injunctive relief).

[19] *CASA*, 606 U.S. at 852 (emphasis removed). I do not reach any issues with universal vacatur, which unlike a universal injunction, may be statutorily authorized, and like certain injunctions, may provide relief to non-parties only incidentally. *Cf. id.* at 847 n.10.

[20] *Id.* at 861.

[21] *Dellums v. U.S. Nuclear Regulatory Commission*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988).

I agree with Judge Katsas that *J.D.*'s "one-plaintiff rule" can at most apply "only when, the class seeks" a truly "indivisible remedy" such that "courts cannot dole" it "out plaintiff by plaintiff, or class-member by class-member." *RAICES v. Noem*, No. 25-5243 (Aug. 1, 2025) (slip op. at 57) (Katsas, J., concurring in part and dissenting in part) (cleaned up); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439–40 (2017) (holding that any one-plaintiff rule still requires that additional parties "have Article III standing in order to pursue relief that is different from that which is sought by a party with standing").

**C**

The majority's alternative theory runs into its own problems.

Per the majority, it's no problem that many individuals who fall within the new class definition do not yet have standing. They are not parties. And the court has so far declined to issue relief to them. But in the future, one such individual may have standing. If so, in that very moment, he will be transformed into a class member. Then, and only then, will this new class member receive the protection of the court's remedial order. More may then follow suit, one by one being added to the class, and one by one getting relief against the Government.

I have questions about the majority's theory of the class as a brooding eternality hovering above our legal system, ever gathering new plaintiffs under the shadow of its wings. Here are some that come to mind:

- How does the majority's theory square with the notion of a "final" judgment given that the judgment remains open for all eternity?
- Can an injunction take on a life of its own, changing organically, ever commanding Executive officials to do new things to new individuals?
- How is the majority's theory consistent with the nature of a declaratory judgment, which is a declaration of the rights of the *parties* — not a contingent future declaration of rights of non-parties?[22]

[22] 28 U.S.C. § 2201(a) (authorizing courts to "declare the rights and other legal relations of any interested party seeking such declaration").

- On the majority's theory, the court has not yet issued a remedy protecting those without standing. So will it sua sponte issue a new remedy automatically every time one of those individuals gets standing? Where do courts get authority to do that?
- Is the majority's theory consistent with the nature of a class action? As the Supreme Court has explained, at least for purposes of issuing relief, "[a] class action . . . is a species" of "traditional joinder."[23] In ordinary suits, can we join new parties potentially several centuries after what one might otherwise call the close of the litigation?
- How does the majority's theory accord with *United States v. Mendoza*?[24] Under *Mendoza*, a plaintiff may not "seek[] to estop" the Government as defendant "from relitigating an issue which" it "previously litigated and lost against another plaintiff."[25] But per the majority, individuals who were never plaintiffs, who never earned relief during the pendency of the litigation, may show up into court years after the litigation has concluded and claim relief against the Government simply because the Government lost against other plaintiffs. Isn't that even worse than offensive non-mutual collateral

---

[23] *Shady Grove Orthopedic Associates, PA v. Allstate Insurance Co.*, 559 U.S. 393, 408 (2010) (plurality opinion of Scalia, J.); *see also TransUnion*, 594 U.S. at 431 (treating even absent class members as ordinary plaintiffs when determining who may get relief).

[24] 464 U.S. 154 (1984).

[25] *Appling v. State Farm Mutual Auto Insurance Co.*, 340 F.3d 769, 775 (9th Cir. 2003) (describing offensive non-mutual collateral estoppel); *Mendoza*, 464 U.S. at 162 (holding that offensive non-mutual collateral estoppel doesn't apply against the Government).

estoppel, since on the majority's theory, the new individuals never even have to file suit?

- Is the majority forcing into the class countless future class members who have no opportunity to opt out or even to argue the adequacy of the representation of "their" class? That appears to be the logic of the majority's position.[26] And that may seem fine for future class members if the class wins. But what if the class loses?[27]

---

[26] An alternative approach would let future class members later opt in if the class wins and opt out if the class loses. But ending "one-way intervention" was "one of the major impetuses behind the modern Rule 23." Brian T. Fitzpatrick, *The Future of Class Actions after Oral Argument in Trump v. CASA*, FedSoc Blog (May 22, 2025), https://perma.cc/28PX-5E8T.

[27] On opt out, see *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985). Of course, it has been commonly thought that opt out is not required in a Rule 23(b)(2) class. But the traditional explanation is that the "class seeks an indivisible" remedy "benefitting all its members at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–63 (2011). Perhaps dispensing with opt out makes sense when the relief *necessarily* "affect[s] the entire class at once." *Id.* at 361–62. But it makes much less sense when a Rule 23(b)(2) class involves a remedy that is not truly indivisible. *Cf. RAICES*, *supra*, at 57 (Katsas, J., concurring in part and dissenting in part) ("[T]his case involves no such indivisible remedy because awarding complete relief to any one plaintiff or class-member would be readily feasible."); 2 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 4:34 (6th ed. 2022 and Dec. 2025 Update) (explaining that many courts find Rule 23(b)(2) class actions appropriate merely when the "class's claims are 'cohesive,'" an inquiry that "is similar to 23(b)(3)'s demand that common issues 'predominate'").

As to adequacy, see *Shutts*, 472 U.S. at 812 ("the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members").

- Do these individuals at least get an opportunity to object to "a proposed settlement, voluntary dismissal, or compromise"?[28] Rule 23(e) "entitles all class members to an opportunity to object" before a class action is "dismissed or compromised."[29] But these individuals aren't class members. Do they get to object anyway?
- Do they get notice in case of "a proposed settlement, voluntary dismissal, or compromise?"[30] The court "must direct notice . . . to all class members who would be bound by the proposal."[31] But although these individuals might one day be bound, they are not class members. So must the court provide them notice?[32]
- Does the majority's conception create potential adequacy problems? As the Court explained in *Devlin*, when the class "reach[es] a settlement that is approved over" a class member's "objections," the class member's "interests by definition diverge from those of the class representative."[33] How can we know whether any of these future class

---

Adequacy concerns loom all the larger if future class members get no opportunity to opt out. *See* Newberg & Rubenstein, *supra*, § 4:27 ("Because Rule 23(b)(2) classes are non-opt-out classes, Rule 23(a)'s insistence" on adequacy, among other things, "takes on special resonance . . . .").

[28] Fed. R. Civ. P. 23(e); *id.* 23(e)(5).

[29] *Devlin v. Scardelletti*, 536 U.S. 1, 8–9 (2002).

[30] Fed. R. Civ. P. 23(e).

[31] *Id.* 23(e)(1)(B).

[32] Would someone like Bob, *see supra*, get notice?

[33] *Devlin*, 536 U.S. at 9.

members would've objected? If we can't, how can we know whether representation is adequate?

- As soon as one of these non–class members satisfies standing, he gets ushered into the class. At that precise moment, does the matter become res judicata? Is there any other context where res judicata operates like that?
- How does the right to appeal work for these non–class members?[34] May they appeal a class-certification order?[35] May they appeal an unfavorable judgment, even though it doesn't bind them yet? If not, and they have to wait until they satisfy standing and join the class, will the appeal clock have run?[36]
- Does any of this accord with the class action's historical origins in the bill of peace?[37]

The most fundamental question is this: Why think this extraordinary workaround to *TransUnion*, *CASA*, and Article III is available?[38] The majority's evidence boils down to a passing remark in *Brown v. Plata*.[39] But even read for all its worth, *Brown* does not support issuing relief to those who do not have standing.

---

[34] *Cf. id.* at 11.

[35] *See* Fed. R. Civ. P. 23(f).

[36] *Cf.* Fed. R. App. P. 4 (a "notice of appeal . . . must be filed with the district clerk within" a certain amount of time).

[37] *See CASA*, 606 U.S. at 849.

[38] *Cf. id.* at 868 (Alito, J., concurring) (cautioning against interpretations of class actions that would bring "the universal injunction" back "from the grave").

[39] 563 U.S. 493 (2011).

In *Brown*, the Supreme Court upheld an injunction ordering California to release up to 46,000 convicted criminals from its prisons (nearly a third of California's prison population).[40] The reason for the injunction was generally that overcrowding in the prisons had led to such substandard medical and mental health care that it violated the Eighth Amendment's prohibition on cruel and unusual punishment.[41]

But the remedy faced a problem. The Prison Litigation Reform Act required that "a remedy . . . extend no further than necessary to remedy the violation of the rights of a 'particular plaintiff or plaintiffs.'"[42] Yet, the injunction had ordered the release of tens of thousands of individuals, many of whom were not plaintiffs, nor suffering Eighth Amendment violations.

The Court justified that on the grounds that the injunction was necessary to give complete relief to those suffering Eighth Amendment violations. As the Court put it, "a narrow and otherwise proper remedy for a constitutional violation" is not "invalid simply because it will have collateral effects."[43] The Court also emphasized that the text of the PLRA "mean[t]" by narrow tailoring "only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court."[44] Those plaintiffs had established extensive violations — past, present, and certainly impending — to many individuals.

[40] *Id.* at 500–01.

[41] *Id.* at 510–11, 517–22.

[42] *Id.* at 531 (quoting 18 U.S.C. § 3626(a)(1)(A)).

[43] *Id.*

[44] *Id.* at 530.

The Court also said that because many "[p]risoners" would later "become sick," "[r]elief targeted only at present members of the plaintiff classes" might "therefore fail to adequately protect future class members who w[ould] develop serious physical or mental illness."[45] The Court explained it could take those individuals into account because even if they did "not yet have a claim that they ha[d] been subjected to care that violate[d] the Eighth Amendment," they were "in no sense . . . remote bystanders."[46]

I'm not sure *Brown*'s "future class members" language bears much weight here.[47] For starters, it is probably dicta, since the Court said both that the injunction was necessary in order to grant complete relief to the present plaintiffs and that in any event, the PLRA required only that the Court focus on the constitutional violations "established by the specific plaintiffs before the court," not the constitutional violations actually suffered by those particular plaintiffs.[48] And regardless, *Brown* emphasized that it could take those individuals into account because they were "in no sense . . . remote bystanders."[49]

---

[45] *Id.* at 531–32.

[46] *Id.* at 532.

[47] Even if the majority's reading were the most facially plausible, I would hesitate to read *Brown* that way for two reasons. First, it would be uncharitable to the Court. We would have to assume the Court adopted an extraordinary and novel theory of class actions in an off-hand comment. *See also supra*, at 7–11 (noting some concerns with this theory of class actions). Second, if the Court meant to announce this novel doctrine of class actions, it slipped past the dissent. That's telling. The dissent did not spare its criticism of the majority's understanding of class actions. *See Brown*, 563 U.S. at 552 (Scalia, J., dissenting).

[48] *Brown*, 563 U.S. at 531 (majority opinion).

[49] *Id.* at 532.

That is language the Court has used over and over again in describing the bedrock requirement of Article III standing.[50] So even if we were to squeeze everything we could out of *Brown*, we cannot draw from it authority to create the workaround par excellence to the rule of *TransUnion*, *CASA*, and Article III.

* * *

I cannot subscribe to the majority's theory of class-action-cum-advisory-opinion. On the majority's theory, as soon as any one individual has standing to challenge a policy, he may certify a class. That class may include every single person who may ever have standing to challenge a given government policy — up to billions of people, many of whom may be born decades from now. As soon as those individuals check the standing box — even if it is not for a thousand years after "final" judgment — they get adopted into the class and inherit a judgment issued to their ancestors. The judgment then becomes res judicata for these newly added class members. Thus, via the class device, our holdings, and the holdings of the 94 district courts, will settle, at least for anyone who could ever have any interest in it, any potential legal dispute over a government policy for all time. And to think the Supreme Court once balked at a class action of a mere "one and a half million

[50] *See, e.g.*, *Bost v. Illinois State Board of Elections*, 146 S. Ct. 513, 519–20 (2026) (holding that candidates have standing to challenge "the rules that govern the counting of votes in [their] election[s]" because they "are not mere bystanders in their own elections" (quotation omitted)); *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025) ("To demonstrate standing, . . . plaintiffs must show that they . . . are not mere bystanders."); *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) ("Article III standing 'is not to be placed in the hands of "concerned bystanders"'" (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986))).

plaintiffs."[51] That is a modest proposal compared to the birth-right-for-billions bestowed by the majority.

At bottom, I do not see how the majority's class action accords with the proper understanding of our role. "[C]lass action or not," Article III stays the same.[52] And under Article III, "[t]he Judiciary's role is limited 'to provid[ing] relief to claimants . . . who have suffered, or will imminently suffer, actual harm.'"[53] Either way, it does not countenance relief to those who may, only after the passage of a few decades, suffer harm.

**II**

Next, asylum. As amended in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the asylum statute makes clear that the DHS Secretary or the Attorney General "may grant" or deny "asylum" in that official's discretion.[54] And of course, "because the President *is* the Executive Branch," the discretion ultimately rests with him.[55] The

---

[51] *Wal-Mart*, 564 U.S. at 342.

[52] *TransUnion*, 594 U.S. at 431.

[53] *Bouaphakeo*, 577 U.S. at 466 (Roberts, C.J., concurring) (quoting *Lewis v. Casey*, 518 U.S. 343, 349 (1996)).

[54] IIRIRA, § 604(a), 110 Stat. 3009–690–3009–691 (1996); 8 U.S.C. § 1158(b)(1)(A); *see also INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999).

[55] *Secretary of Labor v. KC Transport, Inc.*, No. 22-1071, 2026 WL 1042075, at *24 (D.C. Cir. 2026) (Walker, J., dissenting); *see also Trump v. United States*, 603 U.S. 593, 610 (2024); *Myers v. United States*, 272 U.S. 52, 133 (1926) (executive officials serve only as the President's "alter ego[s]"); *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 610 (1838) (explaining that "the discharge" of discretionary duties by "officers in the executive department . . . is

majority does not dispute this.[56] Instead, it relies on three other theories offered by the plaintiffs: (A) The plaintiffs have a right to file their asylum applications; (B) the plaintiffs have a right to due consideration of their asylum applications; and (C) the Executive's exercise of discretion directly contravenes Congress's provision for additional asylum restrictions to be made only by regulation. All three fail.

**A**

I start with the main theory the majority and the plaintiffs press.[57] Pointing "to the plain text of Section 1158(a)(1)," they argue the plaintiffs have a "right to apply for asylum."[58] I do not think that is the best way to interpret the text. And even if it were, the plaintiffs' claim would still fail.

**1**

Even if § 1158(a)(1) conferred a "right" to apply, I do not think we should read it as conferring a right to file frivolous or futile applications.

Our court has already rejected that reading — twice. In *Huisha-Huisha v. Mayorkas*, we explained that "if the asylum decision has already been made," then "the statutorily mandated procedures that aliens use to apply for asylum . . . would

---

under the direction of the President"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803).

[56] Maj. Op. 31–32 & n.2.

[57] *See* Maj. Op. 29.

[58] Maj. Op. 30; *see also* 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States . . . may apply for asylum . . . .").

be futile."[59] Because of that, we held, the Executive could foreclose those procedures. And the stay panel in this case also held that the Executive could likely foreclose the asylum procedures as "futile" under the logic of *Huisha-Huisha*.[60]

That makes sense. Background principles of law show that the right to raise a claim doesn't include the right to raise a frivolous claim. Under the Federal Rules of Civil Procedure, for instance, plaintiffs may file complaints, other pleadings, and motions. But there's no right to file frivolous complaints, pleadings, and motions.[61] The rule for civil appeals is similar. "[A]ny party" "may . . . file[]" a "notice of appeal" within a certain number of days "after entry of the judgment."[62] But if the "appeal is frivolous," the appellant may suffer penalties.[63] So too with criminal appeals. Defendants may appeal a conviction or sentence.[64] And when they do, they generally have a right to counsel.[65] But there is no "right to bring a frivolous appeal," nor "concomitantly," to have "counsel for bringing a frivolous appeal."[66] Simply put, the rights to a criminal appeal

---

[59] 27 F.4th 718, 731 (D.C. Cir. 2022).

[60] *RAICES*, *supra*, at 37 (Millett, J., concurring); *see also id.* at 55 (Katsas, J., concurring in part and dissenting in part).

[61] Fed. R. Civ. P. 11(b)(2).

[62] Fed. R. App. P. 4(a)(1)(B); *see also id.* 4(a)(1)(A).

[63] *Id.* 38.

[64] *E.g.*, 18 U.S.C. § 3742(a) ("A defendant may file a notice of appeal in the district court for review of an otherwise final sentence . . . .").

[65] *See Halbert v. Michigan*, 545 U.S. 605 (2005); *Douglas v. California*, 372 U.S. 353 (1963).

[66] *Smith v. Robbins*, 528 U.S. 259, 278 (2000).

and counsel during that appeal do "not include a right to present frivolous arguments to the court."[67]

The asylum statute's text captures these background rules. Section 1158(d)(4) requires the Attorney General to notify aliens applying for asylum "of the consequences . . . of knowingly filing a frivolous application for asylum." And paragraph (6) of that subsection — entitled "Frivolous applications"[68] — prescribes consequences for aliens who have "knowingly made a frivolous application."[69] So § 1158 seems to assume individuals lack authority to file frivolous applications. And so it prescribes punishment for doing so (at least with a certain *mens rea*) — just like the Federal Rules of Civil Procedure do for submitting frivolous pleadings.[70]

**2**

Even if the asylum statute doesn't by itself preclude the plaintiffs' right-to-apply theory, that theory relies on a right "to nothing but procedure."[71] So it is "inadequate even to support standing."[72]

---

[67] *Id.* at 272; *see also Griffin v. Illinois*, 351 U.S. 12, 24 (1956) (Frankfurter, J., concurring in the judgment) (granting the right to counsel in criminal appeals but emphasizing that a State may "protect itself so that frivolous appeals are not subsidized and public moneys not needlessly spent").

[68] IIRIRA, § 604(a), 110 Stat. 3009–694.

[69] 8 U.S.C. § 1158(d)(6).

[70] *See* Fed. R. Civ. P. 11(b), (c).

[71] *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 764 (2005).

[72] *Id.*

The deprivation of the procedural "right" to apply is not itself a cognizable Article III injury. Because Congress cannot "enact an injury into existence," even if we were to read the statute to grant a right to apply, the plaintiffs would still need to prove that the harm of being deprived of the right to apply is the type of "harm traditionally recognized as providing a basis for a lawsuit in American courts."[73] But I am not aware of any traditional claim of tortious interference with futile filings.

To be sure, "'procedural rights' are special."[74] So some procedural-standing cases recognize standing for the deprivation of procedural rights. But the Court's procedural-standing cases require a plaintiff to show he has "been accorded a procedural right *to protect his concrete interests*."[75] Only then can he "assert that right without meeting all the normal standards for redressability and immediacy."[76]

Even then, procedural rights aren't amulets one waves around to make Article III disappear. All that happens in procedural-standing cases is that the normal standards get

---

[73] *TransUnion*, 594 U.S. at 424, 426 (quotation omitted).

[74] *Lujan*, 504 U.S. at 572 n.7.

[75] *Id.* (emphasis added).

[76] *Id.* By "immediacy," *Lujan* is best read to mean imminence. *See id.* (explaining that an individual "has standing to challenge" an "agency's failure to prepare an environmental impact statement" before licensing a "dam," even if "the dam will not be completed for many years"). But in these contexts, imminence and causation may overlap. *See Alliance for Hippocratic Medicine*, 602 U.S. at 385 n.2. And of course, redressability and causation are often — though not always — "flip sides of the same coin." *Id.* at 380–81 & n.1; *see also Murthy v. Missouri*, 603 U.S. 43, 73–74 & n.11 (2024); *United States v. Texas*, 599 U.S. 670, 676 (2023).

"somewhat relaxed."[77] Or as the Court put it recently, "we tolerate uncertainty over whether observing certain procedures would have led to . . . a different substantive outcome."[78]

But here, to find standing, we would need to "tolerate" more than mere "uncertainty over whether observing certain procedures would" change the "substantive outcome."[79] We would need to find standing despite complete certainty that observing the procedures would change nothing. The substantive result is pre-determined because the Executive has denied all the applications. So on even the most "relaxed" approach to causation and redressability, the plaintiffs lack standing to seek relief permitting them to file applications that have already been denied.[80]

**B**

That brings us to the second theory. The majority says the Executive cannot "categorical[ly]" and "*ex ante*" deny asylum without "consideration of what the would-be applicant may face if removed."[81] The logic of this position seems to be that the alien is entitled to meaningful consideration of his individual application.

One might wonder what source of law permits us to subject the Executive to this novel "meaningful consideration"

---

[77] *Gutierrez v. Saenz*, 606 U.S. 305, 321 (2025) (Barrett, J., concurring in part and concurring in the judgment); *Lujan*, 504 U.S. at 572 n.7.

[78] *Department of Education v. Brown*, 600 U.S. 551, 565 (2023).

[79] *Id.*

[80] *Gutierrez*, 606 U.S. at 321 (Barrett, J., concurring in part and dissenting in part).

[81] Maj. Op. 32.

requirement in exercising his discretion over asylum applications. The majority points to § 1158(d), which provides, among other things, that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications."[82]

Nothing in § 1158(d) suggests we can glean some meta-principle about meaningful, individualized consideration out of its bare text. Section 1158(d) contains anodyne provisions, like that "[t]he Attorney General may require applicants to submit fingerprints and a photograph"[83] or that "[a]n applicant for asylum is not entitled to employment authorization."[84] And if we were to glean a principle out of § 1158(d)'s discrete provisions, § 1158(d)(7) would seem to suggest the opposite of what the majority proposes: "**Nothing in this subsection shall be construed to create any substantive or procedural right** or benefit **that is legally enforceable** by any party **against the United States** or its agencies or officers or any other person."[85]

The majority also points to the expedited-removal provision, § 1225(b), which it understands to guarantee procedures for considering asylum applications for those otherwise subject to expedited removal. Section 1225(b) says that an immigration officer in an expedited-removal proceeding "shall refer" an alien who "indicates either an intention to apply for asylum . . . or a fear of persecution . . . for an interview by an asylum officer."[86] Then, for the aliens referred, "[a]n asylum officer shall conduct interviews."[87] "If the officer determines at

---

[82] 8 U.S.C. § 1158(d)(1).

[83] *Id.*

[84] *Id.* § 1158(d)(2).

[85] *Id.* § 1158(d)(7) (emphases added).

[86] *Id.* § 1225(b)(1)(A)(ii).

[87] *Id.* § 1225(b)(1)(B)(i).

the time of the interview that an alien has a credible fear of persecution . . . , the alien shall be detained for further consideration of the application for asylum."[88] Moreover, § 1225(b) defines "credible fear of persecution" by reference to "eligibility for asylum under" the asylum statute.[89] What an oddity it would be, the majority might suggest, that aliens initially funneled into expedited-removal proceedings are entitled to individualized consideration of asylum claims, but other aliens are not.

I find much about that argument appealing, but for three reasons, I am not persuaded.

First, I don't think my reading creates much of an oddity because the "credible fear" interviews in § 1225(b) serve more purposes than protecting asylum. Those interviews also ensure that individuals subject to § 1225(b) get a chance to press withholding-of-removal claims.[90] And today this court unanimously holds that those claims must remain open. So on my reading (like the majority's), § 1225(b) credible-fear interviews still matter.

Second, even if you think the provisions in § 1225(b) really are about only asylum, then an oddity remains no matter what. The majority does not contest that the President may deny all asylum applications. If a President decides to do that, all § 1225(b) does is confer upon individuals the special privilege of being forced to languish in a detention facility while

---

[88] *Id.* § 1225(b)(1)(B)(ii).

[89] *Id.* § 1225(b)(1)(B)(v).

[90] *See* 8 C.F.R. § 208.30(e)(2); *see also DHS v. Thuraissigiam*, 591 U.S. 103, 110 n.5 (2020); *cf. Aguirre-Aguirre*, 526 U.S. at 419 (noting that withholding and asylum "serve similar purposes").

their individual asylum applications get inevitably denied.[91] That is pretty odd.

To be sure, the Congress that wrote § 1225(b) may well have expected that the Executive would usually-or-always be amenable to granting *some* asylum applications. And that prediction has almost always been correct. But by giving the Executive discretion to deny asylum claims, Congress chose not to require what it predicted.[92] And when the Executive exercises that discretion in a way Congress may not have predicted, the majority's interpretation creates quite the oddity — prolonged detention while detainees seek relief that will never be granted.

In short, the expedited-removal scheme creates oddities either way, whether under my interpretation or under the majority's.

Third and finally, whatever oddity remains isn't that suggestive. As noted, the oddity will emerge only in unusual circumstances. It emerges only when Presidents categorically foreclose asylum. So even granting for the moment that there is an odd discrepancy between the asylum statute (§ 1158) and the expedited-removal provisions (§ 1225(b)) when the Executive categorically forecloses asylum, it doesn't bear much weight. Sections 1158 and 1225(b) almost *never* give rise to that discrepancy. Yes, it has arisen here. But a rare oddity arising from the Executive's discretion in one case doesn't mean we must subject the Executive's discretion to novel restrictions in all cases — especially when an oddity arises under either interpretation of the statute.

[91] *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

[92] *Thuraissigiam*, 591 U.S. at 110 n.4 ("even if an applicant" is eligible, "an actual grant of asylum is discretionary").

**C**

Now for the third and final theory the majority proffers. The majority suggests that the Executive's categorical, ex ante denial of asylum, and accompanying refusal to take applications, violates two discrete provisions of the INA: (1) 8 U.S.C. § 1158(b)(2)(C) and (2) 8 U.S.C. § 1158(d)(5)(B). That is wrong.

**1**

Section 1158(b)(2)(C) allows the Attorney General to prescribe additional conditions on asylum eligibility by regulation. The majority argues this undermines the Executive's categorical and ex ante exercise of his asylum discretion. I disagree.

That's because eligibility is just Step 1. At Step 2, the Executive gets to decide whether to grant or deny asylum to whoever is eligible according to his discretion. As the Supreme Court has explained, "even if an applicant" is eligible for asylum, "an actual grant of asylum is discretionary."[93] Put another way, eligibility "does no more than establish that the alien *may* be granted asylum *in the discretion of*" *the Executive Branch*.[94] So any restriction on the Executive's power to create rules concerning who is *eligible* for asylum (the Step 1 inquiry) says nothing about the Executive's discretion to decide whether to *grant* asylum to anyone (the Step 2 inquiry).

[93] *Id.*

[94] *INS v. Cardozo-Fonseca*, 480 U.S. 421, 428 n.5 (1987) (cleaned up).

**2**

The majority also points to § 1158(d)(5)(B), which authorizes "[t]he Attorney General" to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum." But the President's decision to bar the filing of applications by Proclamation doesn't contravene that provision. Section 1158(d)(5)(B) kicks in only after applications have been filed. It says nothing about the President's ability to foreclose applications from the get-go.[95]

Start with how § 1158(d) operates. Paragraph (1) provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under" § 1158(a).[96] Then, paragraph (5) deals with what procedures should govern the process for considering those applications that have been filed. Subparagraph (A) spells some out: "The procedure established under paragraph (1) shall provide," for example, "that in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed."[97] Subparagraph (B), then, authorizes the Attorney General to provide for additional measures by regulation.

That shows that the Proclamation and Guidance, by foreclosing acceptance of applications in the first place, do not contravene § 1158(d)(5)(B). The procedures related to consideration of applications are inapplicable if there are no asylum applications to consider. If no applications have been filed, for

---

[95] The majority also points to two regulations. But they also depend on applications having been filed. *See* 8 C.F.R. § 208.9(a); *id.* § 1003.10(b).

[96] 8 U.S.C. § 1158(d)(1).

[97] *Id.* § 1158(d)(5)(A)(ii).

example, there is no "initial interview or hearing on the" (non-existent) "asylum application" to be had within "45 days after the date" that the (non-existent) "application" was "filed."[98] Nor is there any "final administrative adjudication of the" (non-existent) "asylum application" that must take place "within 180 days after the date" the (non-existent) "application" was "filed."[99] So, sure, (d)(5)(B) might impliedly restrict the President's ability by proclamation to provide new rules governing the consideration of the applications that have already been filed. Maybe the President, for instance, cannot provide by proclamation that all hearings on an asylum application must take place in English. But (d)(5)(B) says nothing about whether the President needs to accept applications in the first place.

* * *

"A major objective of IIRIRA was to protect the Executive's discretion from undue interference by the courts."[100] "Whether or not" an individual is "granted asylum is a matter which Congress has left" to the Executive's discretion.[101]

We should not interfere with that discretion. "[A]n influx of meritless" asylum claims can "strain detention capacity and degrade detention conditions; cause the release of many inadmissible aliens into States and localities that must shoulder the resulting costs; divert Department resources from protecting

---

[98] *Id.*

[99] *Id.* § 1158(d)(5)(A)(iii).

[100] *Thuraissigiam*, 591 U.S. at 112 (cleaned up).

[101] *Cardozo-Fonseca*, 480 U.S. at 450.

the border; and aggravate the humanitarian crisis created by human smugglers."[102]

Our court has already said twice that the Executive — and our country — need not suffer an influx of frivolous asylum claims when the Executive has already exercised his discretion to deny all of them. We were right both times.

**III**

Finally, I turn to the availability of class-wide injunctive relief.

For reasons I will explain below, the President has an inherent, generalized authority to expel aliens. In *Youngstown* terms, the President's authority to expel aliens is a Category 2 authority: The President may expel aliens without statutory authorization, but Congress may choose to limit his authority.[103]

Congress limited the President's inherent expulsion authority in 8 U.S.C. §§ 1225(b) and 1229a. Those provisions prescribe procedures that the Executive must follow. For

[102] *Thuraissigiam*, 591 U.S. at 112 n.9 (quotation omitted).

[103] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility.").

example, the Executive must sometimes afford to an alien a hearing before an immigration judge.[104]

In today's case, the district court issued a class-wide injunction ordering the Executive to follow the procedural requirements of §§ 1225(b) and 1229a. But § 1252(f)(1) forbids a district court from issuing class-wide injunctive relief that orders the Executive to follow §§ 1225(b) and 1229a. So § 1252(f) forbids the injunction in this case.

**A**

8 U.S.C. § 1252(f)(1) provides:

> [N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated.

The remedial question in this case is whether the class-wide injunction restrained the operation of the covered provisions. As relevant here, those covered provisions are 8 U.S.C. §§ 1225(b) and 1229a, which provide "the sole and exclusive procedure" for expelling someone from the country.[105]

---

[104] 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); *see also* 8 U.S.C. § 1225(b)(1)(A)(i) (carving out an exception for certain aliens).

[105] 8 U.S.C. § 1229a(a)(3).

But that question cannot be answered before first answering a different question — whether the President has a generalized expulsion authority that the procedural provisions of 8 U.S.C. §§ 1225(b) and 1229a regulate. If so, the injunction unlawfully restrained the operation of those statutory provisions. If the President *lacks* a generalized expulsion authority, then the majority is correct that the injunction did not restrain the operation of those provisions and therefore was lawful because it merely prohibited the President from doing what, *regardless* of §§ 1225(b) and 1229a, he cannot do.

The majority's logic works like this: The Government has invoked, as the legal basis for the President's system of removals, 8 U.S.C. §§ 1182(f) and 1185(a)(1). Those sections permit the President only to deny entry, not to expel those who have already entered. Thus, even if we set §§ 1225(b) and 1229a to one side, we can still hold the President's action unlawful because he has simply exceeded the scope of the authority vested in him by §§ 1182(f) and 1185(a)(1).

By that logic, the injunction need only order executive officials to stop exceeding the authority vested in the Executive Branch by §§ 1182(f) and 1185(a)(1). Those provisions aren't covered by 8 U.S.C. § 1252(f)(1). So, reasons the majority, the injunction is permissible.

The problem? Well, at first blush, the majority's theory doesn't seem to describe the district court's injunction. The district court "requir[ed]" executive officials "to return to the processes that Congress required" for removal.[106] So the

[106] JA 314; *see also* JA 319 (enjoining executive officials from removing individuals "using non-statutory repatriation or removal proceedings"); JA 313 ("prohibit[ing] defendants from implementing the Proclamation, including by adopting extra-statutory expulsion

injunction we are reviewing appears to order executive officials to follow the procedures laid out in §§ 1225 and 1229a.

That makes sense. The district court's injunction *had* to order executive officials to obey §§ 1225(b) and 1229a. As our decision in *Huisha-Huisha* makes clear, the President has "ample authority to expel" the aliens subject to the Proclamation.[107] So by expelling aliens subject to the Proclamation, the President doesn't exceed the scope of his authority. Rather, he exercises his expulsion authority in contravention of procedural protections provided by Congress in §§ 1225(b) and 1229a. In other words, as Judge Katsas suggested, the enjoined actions are "unlawful precisely because" they "conflict[] with" §§ 1225(b) and 1229a.[108] Thus, the injunction must order the President to comply with §§ 1225(b) and 1229a.

**B**

In this section, I start with the Executive's potential statutory expulsion authority.

The Executive has argued that 8 U.S.C. §§ 1182(f) and 1185(a)(1) imply a power to expel when they expressly supply a power to exclude. For that proposition, the Executive has relied on our Court's decision in *Huisha-Huisha*. There, the Executive argued that 42 U.S.C. § 265 likewise implicitly granted the Executive "ample authority to expel" covered aliens when it expressly gave the Executive the authority to

---

procedures pursuant to § 1182(f) and § 1185(a) and the President's residual constitutional authority").

[107] 27 F.4th at 729.

[108] *See RAICES*, *supra*, at 58 (Katsas, J., concurring in part and dissenting in part).

prohibit their introduction.[109] We held that the Executive was likely correct.

If the differences between the statutory provision there and those here were immaterial, the Executive should again likely prevail. But their differences matter. The provisions come from different statutes, with different lineages, passed at different times, codified in different titles of the United States Code. And unlike in *Huisha-Huisha* — where nothing overcame the presumption that the exclusion authority includes the expulsion authority[110] — the text, structure, and history of §§ 1182(f) and 1185(a)(1) suggest that *their* grant of the power to exclude certain aliens does not encompass the power to expel them.

In discussing the Executive's statutory expulsion authority, this section has four parts. First, because §§ 1182(f) and 1185(a)(1) come from §§ 212(e) and 215(a)(1) of the Immigration and Nationality Act, I start with the text and structure of the INA. Second, I turn to the rich historical tradition of immigration law that the INA channeled. Third, I discuss the precursor provisions to §§ 212(e) and 215(a)(1). That historical backdrop suggests §§ 1182(f) and 1185(a)(1) may not confer expulsion authority.[111] That historical backdrop, though, also

---

[109] 27 F.4th at 729.

[110] That presumption is unrebutted with regard to the President's inherent power to exclude and expel. Rather, it is suggested by original history and confirmed by subsequent caselaw. *See infra*, Part III.C.

[111] My analysis overlaps with the majority's to some degree. But not fully. For instance, the majority seems to invoke the major questions doctrine. *See* Maj. Op. 22. I do not believe that the doctrine applies in this context. To begin with, the doctrine will usually not apply when a delegation implicates foreign affairs, *see Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 691 (2026) (Kavanaugh, J., dissenting), even if there are exceptions to that rule, *see id.* at 638–39 (lead opinion of Roberts, C.J.) (applying the major questions

raises the specter of another statutory candidate for expulsion authority. That leads to the fourth part. Still, that statute likely does not confer statutory expulsion authority either.

**1**

As the Supreme Court observed just a few years after the INA was enacted, the INA "carefully preserved" the long-standing "distinction" between exclusion and expulsion.[112]

---

doctrine in a foreign affairs case that implicates the taxing power because of that power's distinctive importance). In addition, to delegate an expulsion power, Congress did not need to speak with the clarity required by the major questions doctrine because Congress did not need to speak *at all* — for the reasons I explain below, the President has inherent expulsion power. *See infra*, Part III.C; *see also* Curtis Bradley & Jack Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1789–1801 (2024).

That said, because I largely agree with the majority's explanation that "departure" and "removal" are separate concepts, I do not retread that ground. *See* Maj. Op. 27–28; *see also Trump v. Hawaii*, 585 U.S. 667, 683 n.1 (2018) (explaining that §§ 1182(f) and 1185(a)(1) "substantially overlap[]," something that would presumably be false if § 1185(a)(1) provided distinctive expulsion authority); Proclamation No. 2523, *Control of Persons Entering and Leaving the United States* (Nov. 14, 1941) (Proclamation issued under the Alien Visa Act of 1941, a "precursor provision[]" to § 1185(a)(1), *Trump v. Hawaii*, 585 U.S. at 692, making it unlawful for any alien to "depart from or attempt to depart from the United States" without "a valid permit to depart").

[112] *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958).

Sections 212(e) and 215(a)(1) — §§ 1182(f) and 1185(a)(1) respectively — fell on the exclusion side of the line.[113]

Start with the structure of the INA. The fundamental distinction in the INA was between exclusion and expulsion.[114] The dividing line was what it had been for decades preceding the INA: whether the alien had "already entered" the country.[115] If he had not entered, the alien would be put in "exclusion proceedings to determine whether" he should "be allowed to enter."[116] If he "ha[d] already entered the United States," he was "subject to 'expulsion,' as distinguished from 'exclusion.'"[117]

Section 212 fell on the exclusion side of the line. The section was titled, "General classes of aliens ineligible to receive visas *and excluded from admission*."[118] Subsection (a) listed "classes of aliens" who were "excluded from admission."[119] And reflecting the historic tie between exclusion and entry, subsection (e) allowed the President to "suspend the entry" of certain aliens.[120]

---

[113] To avoid the redundancy of speaking both of § 212(e) and § 215(a)(1), I refer only to § 212(e). But what is true of § 212(e) is generally true of § 215(a)(1).

[114] *Id.* at 187; *see also Landon v. Plasencia*, 459 U.S. 21, 25–27 (1982).

[115] *Leng May Ma*, 357 U.S. at 187.

[116] *Id.* (cleaned up).

[117] *Id.*

[118] *See* INA, Table of Contents, 66 Stat. 163 (1952) (emphasis added); *see also id.* § 212, 66 Stat. 182.

[119] *Id.* § 212(a), 66 Stat. 182.

[120] *Id.* § 212(e), 66 Stat. 188.

Expulsion — referred to in the INA by a new "word of art," "deportation" — was covered elsewhere.[121] The deportation provisions were contained in their own chapter, Chapter 5, entitled "Deportation; Adjustment of Status."[122] The primary deportation provision was § 241.[123] For our purposes, the most relevant provision was § 241(a)(1), the "direct descendant" of the original generalized, statutory expulsion authority, which had been passed in 1891.[124] Section 241(a)(1) provided authority to expel those who unlawfully entered — like those who circumvented the restrictions on entry imposed by, say, § 212(e).

The text and structure of the INA suggest that § 212(e), now 8 U.S.C. § 1182(f), probably did not deal with expulsion. As noted, a separate provision, tracing to the original expulsion authority, covered expulsion. So any incidental expulsion authority conferred by § 1182(f) would have been superfluous. Moreover, reading § 1182(f), a provision that sat alongside other exclusion provisions, to confer expulsion authority would contravene the fundamental "distinction . . . carefully preserved in" the INA between exclusion and expulsion, as identified by the Supreme Court in *Leng May Ma*.[125]

---

[121] *Leng May Ma*, 357 U.S. at 187.

[122] INA, Table of Contents, 66 Stat. 163; *see also Leng May Ma*, 357 U.S. at 187.

[123] *See* INA, Table of Contents, 66 Stat. 163 ("General classes of deportable aliens"); *see also id.* § 241, 66 Stat. 208.

[124] Thomas Alexander Aleinikoff et al., *Immigration Process and Policy* 536–37 (3d ed. 1995); *see also infra*, Parts III.B.2, III.B.4 (discussing § 241(a)(1) and its backdrop in more depth).

[125] *Leng May Ma*, 357 U.S. at 187. There are countervailing arguments. That is part of the reason I do not reach a firm conclusion on the statutory grounds. For instance, over half a century before the INA, *Fong Yue Ting v. United States* held that the power to exclude

**2**

The historical backdrop to the INA supports *Leng May May*'s reading of the INA's text and structure. The INA tracked a distinction between exclusion and expulsion that arose with the dawn of federal immigration law. Ever since the first federal immigration restrictions, statutes distinguished between the power to deny entry (*i.e.*, exclude) and the power to remove those who had already entered (*i.e.*, expel).

Let's go back to the beginning of major federal restrictions on immigration — the Page Act of 1875.[126] Like many of the "first federal immigration controls," the Page Act "contained

---

and the power to expel go hand in hand. *See* 149 U.S. 698, 713 (1893); *see also infra*, at 60–62. That legal backdrop may also inform the proper interpretation of §§ 1182(f) and 1185(a)(1). Similarly, the Government has argued that the President's power to "impose on the entry of aliens" the restrictions and conditions "he may deem to be appropriate" allows him to provide for expulsion as a condition on illegal entry. 8 U.S.C. § 1182(f); *see also id.* § 1185(a)(1); Tr. of Oral Arg. at 19–21. That, too, finds some support in the legal backdrop to §§ 1182(f) and 1185(a)(1). *See The Japanese Immigrant Case*, 189 U.S. 86, 99 (1903) (upholding removal of an alien on the theory that he "must be taken to have entered subject to the condition that he might be sent out of the country by order of the proper executive officer . . . if he was found to have . . . illegally entered"). Perhaps for these reasons and others, the Supreme Court, albeit in dicta, has suggested that these provisions confer removal power. *See Trump v. Hawaii*, 585 U.S. at 683 n.1 (noting that § 1185(a)(1) "grants the President authority to adopt reasonable rules, regulations, and orders governing entry *or removal* of aliens" and that that provision "substantially overlaps with § 1182(f)" (emphasis added) (cleaned up)).

[126] Act of Mar. 3, 1875, 18 Stat. 477.

no deportation provision[]."[127] It punished the importation of certain immigrants, and it banned others from entering.[128] But it provided only for exclusion, not expulsion.

From there, entry and importation restrictions expanded. For example, the statute at issue in one of the most famous cases in the U.S. Reports, *Church of the Holy Trinity v. United States*, was the Alien Contract Labor Act of 1885.[129] It prohibited "any person, company, partnership, or corporation" to "assist or encourage the importation or migration of any alien" laborer.[130] Under that law, the "penalty" for violation was "visited only upon the party who aid[ed] and assist[ed] the immigrant," which is why the church was the defendant in the case.[131] So, in 1887, Congress amended the law to provide that

---

[127] Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 512 & n.184 (2009).

[128] *See* Act of Mar. 3, 1875, § 3, 18 Stat. 477 (banning "the importation into the United States of women for the purposes of prostitution"); *id.* § 5 (making it "unlawful" for those "undergoing" certain "sentence[s] for conviction in their own country" from "immigrat[ing] into the United States").

[129] 143 U.S. 457 (1892); *see also Zuni Public School District No. 89 v. Department of Education*, 550 U.S. 81, 108 (2007) (Scalia, J., dissenting) (bemoaning *Church of the Holy Trinity*).

[130] Act of February 26, 1885, § 1, 23 Stat. 332.

[131] *United States v. Craig*, 28 F. 795, 798 (C.C.E.D. Mich. 1886); *see also Lees v. United States*, 150 U.S. 476, 480 (1893). It was unclear whether the statute should be read as banning the immigration itself, rather than just the importation. *Compare Craig*, 28 F. at 798 (suggesting it did), *with* C.S. Fairchild, *Letter from the Secretary of the Treasury* 1 (July 17, 1888), https://perma.cc/X75Z-2BZQ (suggesting it did not).

the covered immigrants "should be sent back" upon arrival "to the nations to which they belonged."[132]

The Treasury Secretary, who was tasked with enforcing the law, thought it gave him only power to exclude, not to expel. So he wrote to Congress requesting "[a]n enlargement of [his] powers."[133] As he explained, his enforcement power "terminate[d] when the landing of the immigrant ha[d] been consummated."[134] But as should surprise no one, aliens had wised up to the restrictions. They would sneak into the country, often through Canada, thereby evading the exclusion and return provisions.[135]

Thus, the Secretary requested that Congress "provide that in all cases where, within a reasonable time after the landing or entry of the immigrant," if an alien were found to have unlawfully entered, the Secretary be empowered to seize and expel him.[136] The Secretary also included recommended statutory language. Just three months later, in October 1888, Congress passed legislation that tracked the Secretary's recommended expulsion provision nearly word-for-word.[137]

---

[132] *Treasury Letter*, *supra*, at 2; *Lees*, 150 U.S. at 480 (noting that the Act of February 23, 1887, permitted the alien "to be returned to the country from which he came").

[133] *Treasury Letter*, *supra*, at 3.

[134] *Id.*

[135] *Id.*

[136] *Id.* at 3–4. The importer or contractor would be required to pay. *Id.* at 4.

[137] *Compare* Act of October 19, 1888, 25 Stat. 566, *with Treasury Letter*, *supra*, at 4.

That 1888 Act would lead to the passage of the first "generalized" expulsion authority just a few years later.[138] Specifically, the Act of March 3, 1891 "ma[de] noncitizens deportable for one year following entry if they were found to have entered in violation of the law."[139]

The Supreme Court seemed to understand that these provisions were what authorized expulsion. As the Court put it in *The Japanese Immigrant Case* about a decade later, these two Acts — from 1888 and 1891 — made "clear that Congress did not intend that" an alien's "mere entering the country, should place him at all times thereafter entirely beyond the control or authority of the executive officers of the government."[140]

This backdrop is important for two reasons.

*First*, it suggests that ever since the first federal immigration restrictions, exclusion and expulsion — or as Judge Katsas put it, "entry and removal" — were "distinct concepts."[141] And a ban on entry was understood to authorize exclusion but not expulsion.

*Second*, the 1891 Act did not go away. It continues to exist almost a century and a half later. The 1891 Act would be followed by its "direct descendant" in the INA, § 241(a)(1), the expulsion provision discussed above, which continued "to enable the government to expel aliens who had no right to enter the country."[142] That provision would later become 8 U.S.C.

[138] Cox & Rodríguez, *supra*, at 514.

[139] *Id.*

[140] 189 U.S. at 99.

[141] *RAICES*, *supra*, at 54 (Katsas, J., concurring in part and dissenting in part).

[142] *See* Aleinikoff, *supra*, at 536–37.

§ 1227(a)(1)(A).[143] So the history of immigration law reinforces that to look for expulsion authority, we need to look elsewhere than § 1182(f).[144]

**3**

One more note on §§ 1182(f) and 1185(a)(1). When Congress passed the INA in 1952, it did not create these provisions ex nihilo. It formed them out of two "[p]recursor provisions," the Alien Visa Act of 1941 and the Wartime Measure Act of

---

[143] *See* IIRIRA, § 305(a)(2), 110 Stat. 3009–597–3009–598.

[144] The Government suggests that this case is not even about expulsion, but about exclusion. *See* Appellant Br. 41–42. For that, the Government relies on the "entry fiction." But the Government has failed to provide adequate support for that theory in this case. The entry fiction is a doctrine holding that certain aliens present in the United States are treated as if they never entered for due process purposes. *See Thuraissigiam*, 591 U.S. at 139–40; *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953). The entry fiction responds, in part, to the "perverse incentive" created by Supreme Court precedent applying due process rights to aliens who unlawfully sneak into the United States, but not to those who have yet to "effect[] an entry." *Thuraissigiam*, 591 U.S. at 140. A problem for the Government, though, is that the entry fiction that existed in 1952, when § 212(e) was enacted, seems to have applied only to those who, say, disembarked at places like Ellis Island. *See Mezei*, 345 U.S. at 213. The Government has failed to show that the aliens subject to this Proclamation should be considered not to have effected an "entry" under that seemingly narrow exception. The Government's best argument relies on the concept of "admission." *See* Appellant Br. 41. But that fails to persuade. "Admission" was a new concept introduced by IIRIRA in 1996 largely to replace "entry." *See* Stephen H. Legomsky & Cristina M. Rodríguez, *Immigration and Refugee Law and Policy* 522 (5th ed. 2009). So the fact that these immigrants haven't been "admitted" doesn't mean they haven't "entered."

1918.[145] And although the evidence is far from conclusive, neither of those precursors appears to have been understood to confer expulsion authority.

To simplify a bit, both the Wartime Measure Act of 1918 and the Alien Visa Act of 1941 authorized the President during wartime to impose additional "restrictions and prohibitions . . . upon the departure of persons from and their entry into the United States."[146] Both also made it "unlawful . . . [f]or any alien to depart from or enter . . . except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe."[147] The provisions also prescribed fines and imprisonment for any violation.[148]

The courts, for their part, do not seem to have read these provisions as conferring expulsion authority. Instead, the courts reasoned that these provisions allowed the President to make entry unlawful.[149] And once he had made entry unlawful,

145 *Trump v. Hawaii*, 585 U.S. at 692; *see also* Congressional Research Service, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* 1 (Feb. 21, 2024) (calling these statutes "predecessor statutes").

146 Act of May 22, 1918, § 1, 40 Stat. 559; *see also* Act of June 21, 1941, § 1, 55 Stat. 252–53.

147 Act of May 22, 1918, § 1(a), 40 Stat. 559.

148 *Id.* § 3, 40 Stat. 559; Act of June 21, 1941, § 2, 55 Stat. 253.

149 *Felich v. Meier*, 23 F.2d 185, 186–87 (8th Cir. 1927); *United States ex rel. Vajta v. Watkins*, 179 F.2d 137, 139 (S.D.N.Y. 1950); *United States ex rel. Faneco v. Corsi*, 57 F.2d 868, 868 (S.D.N.Y. 1932).

he could expel on the basis of other provisions providing for expulsion.[150]

The presidential responses are also somewhat informative, even if far from dispositive.[151] The parties have identified no evidence that any President assumed expulsion authority under these provisions. President Wilson's proclamation in response to the 1918 Act, and his accompanying executive order, said nothing about expulsion; President Wilson announced conditions on entry and departure and cited the punishment provision included in the Act.[152] President Roosevelt's proclamation and regulations (contained in 8 C.F.R. §§ 175.53 and 175.57[153]) likewise said nothing about expulsion.[154] Instead, Roosevelt

---

[150] *Felich*, 23 F.2d at 187; *see also Vajta*, 179 F. Supp. at 138–39; *Faneco*, 57 F.2d at 868–69.

[151] They are not dispositive for at least two reasons. First, Presidents didn't need to provide for expulsion since it appears to have already been provided for elsewhere. Second, the failure to exercise a power does not prove that the power doesn't exist. Still, I mention this evidence because it at least accords with the theory that §§ 1182(f) and 1185(a)(1) shouldn't be read as conferring expulsion authority.

[152] *See* Proclamation No. 1473, *Regulating the Issuance of Passports and the Granting of Permits to Depart From and Enter the United States* (Aug. 8, 1918); *see also* Exec. Order No. 2932, *Prescribing Rules and Regulations Governing the Issuance of Permits to Enter and Leave the United States* (Aug. 8, 1918).

[153] *United States ex rel. Knauff v. Watkins*, 173 F.2d 599, 601–02 (2d Cir. 1949); *see also Mezei*, 345 U.S. at 210 n.7.

[154] They spoke only of "deport[ing]" those who showed up "at a port of entry" and were excluded by the official who determined the alien was "excludable under one of the categories" set forth in the regulation. 8 C.F.R. § 175.57(a) (1945 Supp.); *see also Knauff*, 173 F.2d at 602 (Knauff "excluded and ordered deported").

ordered executive officials to "bring[] to trial and punishment any" violators.[155]

**4**

Earlier I adverted to a statutory provision that descends from the very first statutory expulsion provision. One might think that modern provision, 8 U.S.C. § 1227(a)(1)(A), continues to authorize expulsion today just as its predecessor did. But in what appears to have been an act of extraordinary irony, when Congress passed IIRIRA in 1996 "to protect the Executive's discretion,"[156] Congress may have obliterated this century-old, statutorily authorized expulsion power.

How did Congress do it? By adding three little words. Pre-IIRIRA, the INA provided that "[a]ny alien . . . in the United States" should "be deported if . . . at the time of entry," he was "excludable by the law existing at such time."[157] IIRIRA replaced it with text providing that "[a]ny alien . . . in **and admitted to** the United States" should "be removed if . . . at the time of entry" he was "inadmissible by the law existing at such time."[158]

The key is that IIRIRA defines "admitted" to mean only "the *lawful entry* of the alien into the United States after

[155] Proclamation No. 2523, 55 Stat. 1698 (Nov. 14, 1941); *Mezei*, 345 U.S. at 211 n.7 (noting that "Presidential Proclamation No. 2523" was "promulgated" "pursuant to" these Acts).

[156] *Thuraissigiam*, 591 U.S. at 112 (cleaned up).

[157] *See* 8 U.S.C. § 1251(a)(1)(A) (1995).

[158] 8 U.S.C. § 1227(a)(1)(A) (emphasis added); *see also* IIRIRA, § 301(d)(1), 110 Stat. 3009–579; *id.* § 305(a)(2), 110 Stat. 3009–597–3009–598.

inspection and authorization by an immigration officer."[159] Millions upon millions of illegal immigrants fall outside that category — including the plaintiffs.[160]

### C

To be clear, I need not resolve — and do not purport to resolve — the question of the President's statutory expulsion authority. Perhaps he has that authority; perhaps he doesn't. For this case, it doesn't matter. Either way, he has *inherent* expulsion authority.[161]

---

[159] 8 U.S.C. § 1101(a)(13)(A) (emphasis added).

[160] *See* JA 272 n.13 ("none of" the "individual plaintiffs" or "putative class members in this case" have been "admitted" under IIRIRA).

[161] I reach this argument for at least four reasons. First, the "issue" here is whether § 1252(f)(1) forecloses the injunction. *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991). That is squarely before us. In addressing that issue, we are "not limited to the particular legal theories advanced by the parties." *Id.* So we can address this legal theory, which helps resolve the issue whether § 1252(f)(1) forecloses the injunction. Second, this case "is founded on concerns broader than those of the parties," involving a major executive effort to curb illegal immigration. *Wood v. Milyard*, 566 U.S. 463, 471 (2012); *cf. Nken v. Holder*, 556 U.S. 418, 437 (2009). Third, addressing the President's constitutional expulsion power avoids resolving two thornier questions: (1) whether §§ 1182(f) and 1185(a)(1) confer expulsion authority and (2) whether § 1252(f)(1), "a curious provision" without "analogue elsewhere in the United States Code," is subject to forfeiture at all. *United States v. Texas*, 599 U.S. 670, 692 (2023) (Gorsuch, J., concurring in the judgment) (cleaned up); *see also Biden v. Texas*, 597 U.S. 785, 801 n.4 (2022) (leaving open whether § 1252(f)(1) is subject to forfeiture). There is precedent for exercising our discretion to avoid answering that thorny forfeiture question concerning § 1252(f)(1). *See N.S. v. Dixon*, 141 F.4th 279, 288 (D.C. Cir. 2025). Fourth, if the President possesses inherent power, we might be quicker, as the Government

To support that conclusion, I start with the originalist case for an inherent Executive expulsion power. Then, I turn to the doctrinal case.

**1**

**a**

Constitutional theory has long faced a problem. The Constitution expressly allocates a number of foreign affairs powers: the declare war power to Congress; the Commander-in-Chief power to the President; the power to define and punish international-law offenses to Congress; the power to receive ambassadors to the President. But the Constitution doesn't clearly allocate all foreign affairs powers. Many are missing. For example, nowhere does the Constitution spell out which "of the political branches is . . . to communicate with foreign ministers, to issue passports, or to repel sudden attacks."[162] "These 'missing' powers, and a host of others, were clearly intended for, and have always been exercised by, the federal government, but where does the Constitution say that it shall be so?"[163]

---

argues, to find expulsion authority within §§ 1182(f) and 1185(a)(1). *See* Tr. of Oral Arg. at 11, 23. So these constitutional grounds may be unavoidable.

[162] *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 34 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part).

[163] Louis Henkin, *Foreign Affairs and the U.S. Constitution* 15 (2d ed. 1996).

The most plausible theory may come from an oft-criticized precedent of the Supreme Court, *United States v. Curtiss-Wright Export Corp*.[164]

*Curtiss-Wright* involved a law "that made it a crime to provide arms to two countries involved in a conflict in Latin America if the President determined that an arms embargo would 'contribute to the reestablishment of peace between those countries.'"[165] The Court held that that law did not violate the nondelegation doctrine, because the doctrine did not apply with equal force in the foreign affairs context.[166]

The Court reasoned that domestic and foreign affairs were "different, both in respect of their origin and their nature."[167] For domestic powers, the Constitution "carve[d]" out those powers "from the general mass" of "powers then possessed by the states."[168] Those not expressly enumerated, then, stayed with the states.[169] But "the states severally never possessed

---

[164] 299 U.S. 304 (1936); *see also* Curtis A. Bradley, *Sovereign Power Constitutionalism*, 92 U. Chi. L. Rev. 1807, 1810 (2025) ("*Curtiss-Wright* has been subjected to what has been described as withering criticism." (quotation omitted)). Another plausible theory is the Vesting Clause theory proposed by Saikrishna B. Prakash & Michael D. Ramsey. *See generally* Saikrishna B. Prakash and Michael D. Ramsey, *The Executive Power over Foreign Affairs*, 111 Yale L.J. 231 (2001). If correct, that theory would provide even stronger originalist grounding for an inherent executive expulsion power.

[165] Bradley, *supra*, at 1816 (quoting Joint Resolution of May 28, 1934, 48 Stat. 811); *Curtiss-Wright*, 299 U.S. at 312.

[166] *Curtiss-Wright*, 299 U.S. at 315, 319–22.

[167] *Id.* at 315.

[168] *Id.* at 316.

[169] *Id.*

international powers."[170] And they passed to the United States not from the express enumeration in the Constitution, but from the nature of the Union as the supreme sovereign.[171]

History supports *Curtiss-Wright*'s analysis. Even before the Founding, and "long before being granted them in the 1781 Articles of Confederation," "[t]he Continental Congress . . . exercised" a host of powers understood to be inherent in sovereignty, including foreign affairs powers.[172] Justice Iredell recognized that in 1795. As he put it, "that previously thereto [the National Government] did exercise, with the acquiescence of the States, high powers of what I may, perhaps . . . call external sovereignty, is unquestionable."[173] Or as Alexander Hamilton wrote in 1780, the Continental Congress "ha[s] done many of the highest acts of sovereignty, which were always che[e]rfully submitted to — the declaration of independence, the declaration of war, the levying an army, creating a navy, emitting money, making alliances with foreign powers," &c.[174] "[A]ll these implications of a complete sovereignty were never disputed . . . ."[175]

---

[170] *Id.*

[171] *Id.* at 316–17.

[172] Bradley, *supra*, at 1831–32.

[173] *Penhallow v. Doane's Administrators*, 3 U.S. (3 Dall.) 54, 91 (1795); *see also id.* at 80 (Paterson, J.) (discussing "high acts of sovereignty" that the Continental Congress took before being explicitly allocated such powers in 1781).

[174] Letter from Alexander Hamilton to James Duane (Sept. 3, 1780), *in* 2 *The Papers of Alexander Hamilton, 1779–1781*, at 401 (Harold C. Syrett ed., 1961).

[175] *Id.*

*Curtiss-Wright* even finds theoretical support in the work of one of the most influential Founders, James Wilson.[176] Like the Court in *Curtiss-Wright*, Wilson thought that from the nature of the national structure recognized by the Constitution, certain powers to act "for national purposes" followed.[177] And Justice Sutherland, the author of *Curtiss-Wright*, "drew heavily on Wilson's views in his pre-judicial writings about sovereign power."[178]

One of the sovereign powers was the power to "control the country's borders."[179] As Vattel explained, "every nation has

---

[176] Wilson's influence at the convention has been described as "[s]econd to Madison and almost on a par with him." Max Farrand, *The Framing of the Constitution of the United States* 197 (1913); *see also* Clinton Rossiter, *1787: The Grand Convention* 247–48 (1966) (calling Wilson "[s]econd only to Madison — and an honorable second").

[177] Jud Campbell, *Four Views of the Nature of the Union*, 47 Harv. J.L. & Pub. Pol'y 13, 30, 32 (2024); Jonathan Gienapp, *In Search of Nationhood at the Founding*, 89 Fordham L. Rev. 1783, 1793–1807 (2021).

[178] Bradley, *supra*, at 1833 (citing George Sutherland, *The Internal and External Powers of the National Government*, 191 N. Am. Rev. 373, 377 (1910)).

[179] *Id.* at 1831. Some have sought to ground powers over exclusion and expulsion in the Foreign Commerce Clause. That is doubtful.

The Foreign Commerce Clause might explain why Congress could ban ship-owners from introducing individuals. *Cf. United States ex rel. Turner v. Williams*, 194 U.S. 279, 290 (1904) (citing "the power to regulate commerce with foreign nations" as a basis for provisions dealing with "the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States"). But it likely does not explain why Congress can ban the entry by the immigrant, *id.* (citing inherent sovereign power as the basis for "forbid[ding] the entrance of foreigners" themselves), especially immigrants who

enter the country for non-commercial purposes, *see Gonzales v. Raich*, 545 U.S. 1, 58 (2005) (Thomas, J., dissenting) ("[A]t the time of the founding, the term 'commerce' consisted of selling, buying, and bartering, as well as transporting *for these purposes*." (emphasis added) (cleaned up)); *see also* Thomas Sheridan, *A Complete Dictionary of the English Language* (4th ed. 1790) (defining "commerce" as the "[e]xchange of one thing for another"); *The Federalist* No. 41, at 262 (Clinton Rossiter ed., 1961) (James Madison). In addition, it may not explain the extensive state control over immigration at the Founding, *see* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776–1875)*, 93 Colum. L. Rev. 1833 (1993) (describing these early state laws), given that the Court early on suggested Congress's commerce powers are exclusive, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 197–201 (1824); *id.* at 229–30 (Johnson, J., concurring); *see also* Stephen E. Sachs, *Dormant Commerce and Corporate Jurisdiction*, 2023 Sup. C. Rev. 213, 234–35 (2024).

That said, perhaps the Necessary and Proper Clause could explain why the Federal Government may authorize expulsion as part of the punishment for an unlawful entry after a judicial proceeding. But that's not the expulsion we're dealing with. Instead, we're dealing with whether immigrants should be allowed to remain in the country. *Fong Yue Ting*, 149 U.S. at 730 (explaining that expulsion "is not a punishment for [the] crime" of entry but instead depends on "whether the conditions exist upon which congress has enacted that an alien of this class may remain within the country"). Thus, expulsion provisions — even when responding to unlawful entry — would be, *at most*, like a regulation of people and articles that were *once in* commerce, rather than a punishment affixed to violation of a ban on transporting those people or trading in those articles. But the former probably exceeds Congress's Commerce Clause powers even as supplemented by the Necessary and Proper Clause. *Cf. United States v. Lopez*, 514 U.S. 549, 587 (1995) (Thomas, J., dissenting) (suggesting Congress does not have power to regulate articles just because they were "in the flow of commerce at one time").

a right to refuse admitting a foreigner into her territory."[180] That right to exclude "flow[ed] from the rights of domain and sovereignty."[181] And it included the power "to render" the prohibition "effectual,"[182] including by expelling the foreigner from the land.[183] So, as Justice Scalia explained, "there was no need to set forth control of immigration as one of the enumerated powers of Congress."[184] It was widely understood as "an inherent attribute of sovereignty."[185]

That explains why in 1798, Congress could pass the Alien Friends Act, authorizing the President to "*order* all such *aliens* as he shall judge dangerous to the peace and safety of the United States . . . to depart out of the territory of the United States."[186] No textual hook provided the authority, although the text does assume it.[187]

---

[180] Emer de Vattel, *The Law of Nations*, bk. 1, ch. xix, § 230 (1758) (trans., 1797).

[181] *Id.* bk. 2, ch. vii, § 94.

[182] *Id.*

[183] *See id.* bk. 1, ch. xix, § 228 (discussing "exile" as a form of "expulsion of a foreigner" "but without a mark of infamy" attached).

[184] *Arizona v. United States*, 567 U.S. 387, 422 (2012) (Scalia, J., concurring in part and dissenting in part).

[185] *Id.*

[186] An Act concerning Aliens § 1, 1 Stat. 571 (1798).

[187] *See Arizona*, 567 U.S. at 422 (Scalia, J., concurring in part and dissenting in part). Whatever immigration powers the Foreign Commerce Clause might ground, it appears unable to explain the free-floating expulsion power under the Alien Friends Act. *See supra*, note 179. Nor do textual war powers provide firmer grounding. The Alien Enemies Act was the Act more plausibly grounded in Congress's war powers. And even then, the textual basis remains unclear, as the Alien Enemies Act could be triggered without a declaration of war. *See* An Act respecting Alien Enemies, § 1, 1 Stat. 577

**b**

A difficulty besets the sovereign-powers inquiry, though. We do not know which sovereign powers belong to which branch. Still, as *Curtiss-Wright* suggests, when neither text nor history suggests otherwise, sovereign powers over foreign affairs rest, by default, with the President.[188] And no text or history overrides that default rule as to the expulsion power.

**i**

Start with the default rule. Many foreign affairs powers fall more naturally within the domain of the President, who has been granted the "executive Power,"[189] rather than Congress which has been granted "legislative Powers."[190]

The historical backdrop to the Constitution is telling. "English law undoubtedly informed" the Founders' "understanding of the government they were forging."[191] And the Founders knew that in England, foreign affairs powers traditionally belonged to the Executive. Blackstone, for example, "described powers over 'intercourse with foreign nations' as

(1798); *see also WMM v. Trump*, 154 F.4th 207, 245–46 (5th Cir. 2025) (Oldham, J., dissenting). As far as the Alien Friends Act is concerned, it applied to aliens from any nation in the world. So it is not best grounded in war powers, since "[t]he United States" was "not at war with every nation in the world." *Learning Resources*, 146 S. Ct. at 638.

[188] *Curtiss-Wright*, 299 U.S. at 319–20.

[189] U.S. Const. art. II, § 1, cl. 1.

[190] U.S. Const. art. I, § 1.

[191] John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 27 (2001).

'prerogative' powers naturally belonging to the King."[192] Locke wrote that the executive power and foreign affairs powers, though "really distinct in themselves," were "hardly to be separated, and placed at the same time in the hands of distinct persons."[193] And Montesquieu, who "had perhaps the most influence of any political theorist on our Constitution's division of powers,"[194] thought that foreign affairs powers generally belonged to the Executive.[195] Thus, even scholars who have argued foreign affairs powers don't fit within the ordinary meaning of the term "executive Power" as used in Article II have agreed that "many thought that the various foreign affairs competences ought *usually* to be vested in the same hands that held the executive power."[196]

---

[192] *Learning Resources*, 146 S. Ct. at 684 (Thomas, J., dissenting) (quoting 1 William Blackstone, *Commentaries on the Laws of England* *245 (1765)); *see also* 1 Blackstone, *supra*, at *240 (describing the "substantive or direct prerogatives," which are necessary "to maintain the executive power in due independence and vigour").

[193] John Locke, *Two Treatises of Government* bk. 2, ch. 12, § 148 (1690). Locke generally referred to the foreign affairs powers as the "federative" power. *See id.* bk. 2, ch. 12, § 146; *see also* Curtis A. Bradley & Martin S. Flaherty, *Executive Power Essentialism and Foreign Affairs*, 102 Mich. L. Rev. 545, 560–61 (2004).

[194] Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 745–46; *see also* Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought*, 78 Am. Political Science Rev. 189, 192–96 (1984).

[195] To be sure, Montesquieu might have "betrayed some confusion" over whether this was part of the very concept of executive power. Bradley & Flaherty, *supra*, at 563–64 n.81.

[196] Julian Davis Mortenson, *Article II Vests the Executive Power, Not the Royal Prerogative*, 119 Colum. L. Rev. 1169, 1257 (2019).

Another reason to think foreign affairs powers generally fall to the President is that many are not legislative in nature. The core of the legislative power appears to have been the power to make "generally applicable rules of private conduct."[197] But President Jefferson didn't make a generally applicable rule of private conduct when he sent the Navy to fight off the Barbary pirates.[198] Nor did President Washington when

[197] *DOT v. Association of American Railroads*, 575 U.S. 43, 76 (2015) (Thomas, J., concurring); *see also Gundy v. United States*, 588 U.S. 128, 152–53 (2019) (Gorsuch, J., dissenting) ("When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons."); *see also The Federalist* No. 78, *supra*, at 465 (Alexander Hamilton); 1 Blackstone, *supra*, at *44. Of course, Congress received other powers, too, and we have come to think of those powers "as quintessentially legislative powers." Michael W. McConnell, *The President Who Would Not Be King* 274 (2020). But "many of them were actual, former, or asserted powers of the Crown, which the drafters decided to allocate to the legislative branch." *Id.*; *see also Zivotofsky*, 576 U.S. at 36 (Thomas, J., concurring in judgment in part and dissenting in part). "These include the powers to raise and support armies, to fix the standards of weights and measures," and "to grant copyrights," among others. *Learning Resources*, 146 S. Ct. at 682 (Thomas, J., dissenting). Those are, of course, still "legislative." *See* U.S. Const. art. I, § 1 (vesting Congress with "[a]ll legislate Powers herein granted"); *see also Learning Resources*, 146 S. Ct. at 669 (Gorsuch, J., concurring). Still, the point remains. The general concept of legislative power concerned general rules of private conduct. *See* 1 Blackstone, *supra*, at *44. The unenumerated sovereign powers implicating foreign affairs generally do not fall within that bucket, although text and history may suggest that some such powers do still belong to the legislative branch.

[198] *See* John Yoo, *Jefferson and Executive Power*, 88 Boston U. L. Rev. 421, 430–33 (2008) (discussing this event).

he assumed authority to communicate on behalf of the nation with the King of Morocco.[199]

Structural considerations also support a default rule of presidential foreign affairs power. Take the protective power, for example. Justice Nelson explained why structural considerations support a presidential protective power in *Durand v. Hollins*, an antebellum case upholding an Executive Branch decision to bombard Greytown, Nicaragua:

> Now, as it respects the interposition of the executive abroad, **for the protection of the lives or property of the citizen, the duty must, of necessity, rest in the discretion of the president.** Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for; and **the protection, to be effectual or of any avail**, may, not unfrequently, **require the most prompt and decided action**.[200]

Due to Congress's nature as a large, deliberative body, it does not have the tools to take the sort of "prompt and decided action" needed to protect "the lives or property of" our "citizen[s]" against sudden threats.[201] Only the President does. Only he has the requisite "characteristic of unity at all

[199] *See* Letter from George Washington to Sidi Mohammed (Dec. 1, 1789), https://perma.cc/UH9U-KWLN.

[200] 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4,186) (emphases added).

[201] *Id.*

times,"[202] which is "essential to the protection of the community against foreign attacks."[203]

What is true of the protective power is true of many powers touching on foreign affairs and national security. The President's power in these domains is grounded, in part, in "the structural advantages of a unitary Executive."[204] Success in national security and foreign affairs depends on "[d]ecision, activity, secrecy, and dispatch," traits that "characterize the proceedings of one man in a much more eminent degree than the proceedings of any greater number."[205] Just imagine how successful an operation like the recent Maduro arrest would be — an operation requiring "[d]ecision, activity, secrecy, and dispatch" if there ever was one — if every congressman had to approve it beforehand.[206] Or just imagine how negotiations with foreign powers would go if 535 congressmen got to participate.

---

[202] *Zivotofsky*, 576 U.S. at 14.

[203] *The Federalist* No. 70, at 423 (Clinton Rossiter ed., 1961); *id.* at 424.

[204] *Hamdi v. Rumsfeld*, 542 U.S. 507, 580–81 (2004) (Thomas, J., dissenting).

[205] *The Federalist* No. 70, *supra*, at 424; *see also* George Washington, *Message to the House Regarding Documents Relative to the Jay Treaty* (Mar. 30, 1796), https://perma.cc/WF3N-X3QL ("The nature of foreign negotiations requires caution, and their success must often depend on secrecy . . . ."); *Curtiss-Wright*, 299 U.S. at 319–20.

[206] *The Federalist* No. 70, *supra*, at 424. As to secrecy in particular, see *id.* (explaining that the more people privy to certain information, the more the "qualit[y]" of secrecy "will be diminished"); *WMM*, 154 F.4th at 255 (Oldham, J., dissenting) (John Adams learned a lesson about secrecy and Congress "when [Adams] set off a nationwide panic about an invasion from France simply by handing over to Congress the secret dispatches about the XYZ affair"); *id.* at 243–44 (discussing the XYZ affair and these secret dispatches).

The historical evidence from shortly after the Founding also supports the default rule I have suggested. "The president from the beginning has possessed the power, as Madison put it at the Convention, 'to repel sudden attacks' on the nation."[207] And when wrestling through whether to abide by certain treaties with France, Washington and his administration seemed to think Washington could unilaterally terminate the treaties so long as that termination accorded with the Law of Nations.[208] So too did Washington determine he had constitutional authority to proclaim on behalf of the United States that the nation would "with sincerity and good faith adopt and pursue a conduct friendly and impartial toward the belligerent powers" during the conflict between England and France.[209]

To be clear, I do not mean to suggest that the best originalist theory is that every foreign affairs power belongs exclusively to the President. Some powers may belong to

[207] Jack Goldsmith, *The Middle East and the President's Sweeping Power Over Self-Defense*, Lawfare (Oct. 23, 2023), https://perma.cc/WR9W-LX8L (quoting 2 Max Farrand, *Records of the Federal Convention of 1787*, at 318 (1911)).

[208] Prakash & Ramsey, *supra*, at 324–27.

[209] *Id.* at 328 (cleaned up); *see also id.* at 327–40 (discussing this with a brief postscript on the Nootka Sound Incident).

Congress,[210] and some may be shared.[211] So one will need to proceed power by power. But the default constitutional position is that the President has inherent power over foreign affairs.

**ii**

That default constitutional position is sufficiently supported by the history in the case of the expulsion power.

Before the Founding, the King appears to have exercised "the power to expel aliens . . . without the consent of parliament."[212] Indeed, Blackstone called the power to exclude and expel one of the "principal prerogatives of the king, respecting this nation's intercourse with foreign nations."[213] Even aliens who came from friendly nations and "behave[d] peaceably" were "liable to be sent home whenever the king s[aw] occasion."[214]

---

[210] *See* Curtis A. Bradley, *Extradition in the Early Republic: International Law and Constitution Authority* (manuscript at 4), https://ssrn.com/abstract=5387662 (arguing that the extradition power was believed fairly early on to belong to Congress). One might also think "the law-making component of" any sovereign, foreign affairs power is "vested in Congress." Henkin, *supra*, at 90; *see also* Prakash & Ramsey, *supra*, at 327–28 n.415; *id.* at 340–46 (Congress ultimately passed a law to give legal force to President Washington's Neutrality Proclamation).

[211] In fact, text and history suggest at least some immigration power is shared with Congress. *See infra*, note 227; *see also supra*, note 210; Henkin, *supra*, at 90 ("Presumably," the President "cannot enact general immigration laws by executive order.").

[212] *Fong Yue Ting*, 149 U.S. at 709.

[213] 1 Blackstone, *supra*, at *261.

[214] *Id.* at *259–60.

To be fair, a leading originalist scholar, Michael McConnell, has cast doubt on whether the Founders would have recognized this power. McConnell relies, in part, on the debates from 1792–93 in England about what to do in response to a refugee crisis from revolutionary France.[215] McConnell notes that "the British government investigated . . . whether the Crown had authority to exclude or expel classes of foreigners without parliamentary sanction."[216] And he says that the British Government "obtained a legal opinion" — referring presumably to the report of Serjeant Hill rendered in November 1792 to the treasury solicitor — "which concluded, contrary to Blackstone, that although the king could exclude or expel" alien enemies, "he had no such authority" as to alien friends.[217]

With the utmost respect for McConnell's decades of exceptional scholarship, I have a somewhat different view about the history and importance of the British debates of 1792–93.

For one thing, those debates are less relevant than Blackstone's *Commentaries*, which were "widely read and accepted

---

[215] Michael W. McConnell, *The President Who Would Not Be King* 225 (2020). McConnell also notes that "[t]he last time a monarch had exercised the prerogative to expel a class of foreigners was in 1575." *Id.* Still, Blackstone and the debates of the early 1790s seem to provide more relevant evidence concerning the Founders' understanding of British law.

[216] *Id.*

[217] *Id.*; *see also* Cedric H.R. Thornberry, *Dr. Soblem and the Alien Law of the United Kingdom*, 12 Int'l & Comparative L. Quarterly 414, 423–24 (1963); J.R. Dinwiddy, *The Use of the Crown's Power of Deportation Under the Aliens Act, 1793–1826*, 41 Historical Research 193, 193 (1968).

by the framing generation as the most satisfactory exposition of the common law of England."[218]

For another, the report of Serjeant Hill does not exist in a vacuum. The Crown lawyers also weighed in. They concluded "that the king did have a general power to prevent aliens from entering the kingdom or remaining there," although they acknowledged that it "had been so little used that it would be advisable" as a matter of political expediency "to have recourse to an act of parliament."[219] As then–Foreign Secretary Lord Grenville explained, "[o]ur lawyers seem clear, and Blackstone expressly asserts, that the King may prevent any alien from coming into the kingdom, or remaining there."[220]

The ultimate resolution of the matter is at least consistent with these views. Parliament passed a statute giving the King absolute discretion to expel aliens whenever he should "think necessary for the publick Security."[221] That is hardly a grand statement of parliamentary authority.

---

[218] *Rogers v. Tennessee*, 532 U.S. 451, 472 (2001) (Scalia, J., dissenting) (cleaned up); *see also* Davison M. Douglas, *Foreword: The Legacy of St. George Tucker*, 47 Wm. & Mary L. Rev. 1111, 1112–13 (2006) ("Blackstone's *Commentaries* soon became the most widely read legal text in late-eighteenth-century America . . . ."); Mortenson, *supra*, at 1194 (Blackstone's "landmark treatise on English law probably influenced the Founders more than any other single source."); *id.* at 1260 n.375 ("Blackstone . . . was to American lawyers what the Bible was to Protestants.").

[219] Dinwiddy, *supra*, at 193.

[220] Letter from Lord Grenville to the Marquis of Buckingham (Sept. 20, 1792), in *2 Duke of Buckingham and Chandos, Memoirs of the Court and Cabinets of George III* 217 (1853).

[221] 33 Geo. III, ch. 4, § 18, 39 Eng. Stat. 16.

Moreover, there is little evidence Parliament passed the statute because of a perceived legal necessity. In fact, Foreign Secretary Lord Grenville himself was the one who "introduced" the statute.[222] In doing so, Grenville reaffirmed "that it appeared to be part of the prerogative of the Crown to forbid foreigners to enter or reside within the realm; and this statement was apparently not challenged."[223]

The post-ratification practice fits this vision, too. The Alien Friends Act of 1798 authorized the President to deport "all such *aliens* as he shall judge dangerous to the peace and safety of the United States."[224] In the words of Justice Thomas, this Act "gave the President" virtually "unfettered discretion."[225] One explanation for that sweeping delegation might be that the President has an inherent expulsion power,[226] although admittedly it could also be that non-delegation concerns simply didn't apply in this context.[227]

---

[222] Dinwiddy, *supra*, at 194.

[223] *Id.*

[224] An Act concerning Aliens, § 1, 1 Stat. 571.

[225] *Sessions v. Dimaya*, 584 U.S. 148, 211 (2018) (Thomas, J., dissenting).

[226] *Id.* at 217–18; *see also Learning Resources*, 146 S. Ct. at 666 (Gorsuch, J., concurring) (stating that if early statutes "granted substantial discretion" to the President over a given power, that would suggest the President was understood to have "inherent Article II authority").

[227] *See Learning Resources*, 146 S. Ct. at 681 (Thomas, J., dissenting). Regardless, in this case, the power is likely shared. After all, Congress passed the Alien Friends Act.

**2**

I do not wish to draw overly firm conclusions about the originalist bona fides of an inherent executive expulsion power. But even if the original history is inconclusive, the doctrinal case is clear and compelling. It goes like this:

> **P1**: The President has inherent power to exclude aliens.
>
> **P2**: The power to exclude = the power to expel.
>
> ∴ The President has inherent power to expel aliens.

Premise 1 is grounded in a holding of the Supreme Court in *United States ex rel. Knauff v. Shaughnessy*.[228] Premise 2 is grounded in *Fong Yue Ting v. United States*, where the Court explained that "[t]he power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of *one and the same power*."[229]

*Fong Yue Ting*'s conclusion was sensible. As our court explained in *Huisha-Huisha*, the power to block entry "could be rendered largely nugatory" if it did not bring with it the

[228] 338 U.S. 537, 542–43 (1950).

[229] 149 U.S. 698, 713 (1893) (emphasis added). True, *Fong Yue Ting* didn't quite say the exclusion and expulsion power are one and the same. It said only that they are parts of the same power. But in this context, that is a distinction without a difference. The logic of *Fong Yue Ting* is that the powers are indivisible. And whether the powers are indivisible or identical, the conclusion follows. So for simplicity's sake, I retain my version of Premise 2.

power to take "action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil."[230]

Take a hypothetical. Imagine you are serving as a bouncer for a Christmas gala. In that role, you are to exclude anyone you think poses a danger to any of the guests. The day of the event comes, and you are stationed at the entrance. A nefarious-looking gentleman approaches and begins inquiring into the whereabouts of one of the guests.[231] You grow suspicious. You determine the gentleman may pose a danger. So you deny him entry. A few moments later, you spot the gentleman advancing a couple steps into the venue, apparently attempting to sneak up behind the very man whose whereabouts he had inquired about. What to do? Must you stand on the sidelines and watch, simply because you only have authority to deny entry? Of course not. The authority to deny entry naturally brings with it some authority to remove.[232]

---

[230] 27 F.4th at 729.

[231] This hypothetical generally stems from the famous dispute between Benjamin Constant and Immanuel Kant. *See* Immanuel Kant, *On a Supposed Right to Tell Lies from Benevolent Motives* (1797), *in* Immanuel Kant, *Critique of Practical Reason and Other Works on the Theory of Ethics* 232 (Thomas Kingsmill Abbott ed., 1898).

[232] This, of course, also supports the Government's argument that §§ 1182(f) and 1185(a)(1) implicitly confer some expulsion authority. I agree, as I did in *Huisha-Huisha*. Still, the countervailing historical evidence I discussed above — which was not before our court in *Huisha-Huisha*, both because of the emergency posture and because the case dealt with a different statute — suggests §§ 1182(f) and 1185(a)(1) may not necessarily be best read in line with this common-sensical approach.

To be clear, though, that understanding of the statutory case does not defeat my constitutional analysis. The fact that a century after the Founding statutes seem to have separated exclusion and expulsion does not resolve the constitutional question. On the

More fundamentally, though, *Fong Yue Ting*'s claim that exclusion and expulsion are "one and the same power" was a holding of the Court.[233] The logic of *Fong Yue Ting* worked like this:

**P1**: Congress has power to exclude aliens.[234]

**P2**: The power to exclude = the power to expel.[235]

∴ Congress has power to expel aliens.[236]

Thus, Premise 2 was "necessary to th[e] result" the Court reached, and so "we are bound" by it.[237]

Since *Fong Yue Ting*, many Supreme Court cases have followed suit in recognizing inherent executive expulsion authority.[238] Even if the statements in these later cases are dicta, they

---

constitutional question, *Fong Yue Ting* seemed right to think that it would be strange indeed for the Government to possess constitutional authority to restrict entry while utterly lacking the constitutional authority to expel those who evade the entry restrictions. Instead, as *Fong Yue Ting* recognized, the powers travel together, at least for constitutional purposes.

[233] 149 U.S. at 713.

[234] *The Chinese Exclusion Case*, 130 U.S. 581, 603 (1889).

[235] *Fong Yue Ting*, 149 U.S. at 713.

[236] *Id.* at 713–14.

[237] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996).

[238] *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (The "power to expel or exclude aliens" is "a fundamental sovereign attribute exercised by the Government's political departments."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976) ("The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government.")

reinforce my understanding of the doctrine. After all, 130 years of Supreme Court dicta, even if not binding, cannot be dismissed willy nilly.[239]

* * *

The doctrine affirms what the originalist analysis suggests: The President possesses inherent expulsion authority. Thus, Judge Katsas was right that the executive actions enjoined by the district court were "unlawful" not because the president lacks expulsion authority but "because" they "conflict[] with" the procedural requirements in §§ 1225(b) and 1229a.[240] Thus, § 1252(f)(1), which forbids inferior courts from ordering executive officials to comply with §§ 1225(b) and 1229a, forecloses the injunctive relief issued here.

## IV

In sum, although I agree with the majority on several fronts, I disagree on three: First, the district court improperly issued relief to innumerable individuals without standing. Second, the Executive possesses discretion to categorically and ex ante deny asylum, and once he has done so, he need not accept

---

(quoting *Fong Yue Ting*, 149 U.S. at 713); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("any policy toward aliens" — including one involving "deportation" or "expulsion" — "is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," matters which are "exclusively entrusted to the political branches of government").

[239] *Cf. Boumediene v. Bush*, 553 U.S. 723, 799 (2008) (Souter, J., concurring) ("if dictum it was, it was dictum well considered).

[240] *See RAICES*, *supra*, at 58 (Katsas, J., concurring in part and dissenting in part).

frivolous and futile asylum applications. Third, § 1252(f)(1) stripped the district court of authority to issue the injunction in this case.

I respectfully concur in part and dissent in part.[241]

[241] I join Part III.D.2 of the majority's eloquent opinion: "Because vacatur under the APA is distinct from injunctive relief and Section 1252(f)(1) addresses only the latter," I too would "hold Section 1252(f)(1) inapplicable to the vacatur." Maj. Op. 53. In addition, for many of the reasons explained by the majority in Parts III.B.2 and III.B.3, I agree (1) that the Proclamation and Guidance are "unlawful to the extent they suspend the statutory withholding-of-removal protections that Congress has mandated" and (2) that the Guidance infringes on mandatory rules related to "the Convention Against Torture's bar against removal to a country where the person will be tortured." Maj. Op. 40, 41 (cleaned up).

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-5243** **September Term, 2024**

**1:25-cv-00306-RDM**

**Filed On:** August 1, 2025

Refugee and Immigrant Center for Education and Legal Services, et al.,

Appellees

v.

Kristi Noem, Secretary of the U.S. Department of Homeland Security, in her official capacity, et al.,

Appellants

**BEFORE:** Millett, Pillard, and Katsas, Circuit Judges

**O R D E R**

Upon consideration of the emergency motion for stay pending appeal, the amicus curiae briefs in support of that motion, the opposition to the motion, and the reply; and the motion to expedite, the opposition thereto, and the reply, it is

**ORDERED** that the administrative stay entered on July 11, 2025, be dissolved. It is

**FURTHER ORDERED** that the emergency motion for stay pending appeal be denied in part and granted in part. The motion is granted to clarify that the class definition currently applies only to all individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b), or withholding under the Convention Against Torture, see Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 25-5243** **September Term, 2024**

The motion for stay also is granted as to the district court's orders vacating the Proclamation's implementing guidance on applications for asylum, enjoining removal of any class members without complying with the asylum statute, and declaring unlawful the Proclamation insofar as it purports to suspend or to restrict access to asylum. In all other respects, the motion is denied.* It is

**FURTHER ORDERED** that this appeal be expedited and the following briefing schedule apply:

| | |
|---|---|
| Appellants' Brief | August 22, 2025 |
| Appendix | August 22, 2025 |
| Appellees' Brief | September 12, 2025 |
| Appellants' Reply Brief | September 26, 2025 |

The Clerk is directed to calendar this case for argument on the first appropriate date following the conclusion of briefing. The parties will be informed later of the date of oral argument and the composition of the merits panel.

Due to the expedited nature of this case, the court will not entertain dispositive motions. The parties should therefore address in their briefs any arguments otherwise properly raised in such motions.

Appellants should raise all issues and arguments in the opening brief. The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms. While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not

* A concurring statement from Judge Millett, a statement concurring in part and dissenting in part from Judge Pillard, and a statement concurring in part and dissenting in part from Judge Katsas are attached.

# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 25-5243** **September Term, 2024**

widely known. See D.C. Circuit Handbook of Practice and Internal Procedures 43–44 (2024); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due. Filing by mail may delay the processing of the brief. Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail. See Fed. R. App. P. 25(a). All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover. See D.C. Cir. Rule 28(a)(8).

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY: /s/
Selena R. Gancasz
Deputy Clerk

MILLETT, *Circuit Judge*, concurring in the order granting a stay in part and denying a stay in part: On January 20, 2025, President Trump issued Proclamation 10888, which declares that "the current situation at the southern border qualifies as an invasion" because "[t]he sheer number" of noncitizens "entering the United States has overwhelmed the system" and is "prevent[ing] the Federal Government from obtaining operational control of the border." Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333, 8,334 (Jan. 20, 2025). The Proclamation and subsequently issued agency guidance prevent any person crossing the border outside a designated port of entry, as well as any person crossing at a designated entry port without a visa and other required documentation, from seeking asylum or other removal protections.

Thirteen individuals subject to the Proclamation and its implementation, as well as three nonprofit organizations, filed a class action lawsuit. The district court granted summary judgment in their favor, declared the implementing guidance unlawful and vacated it, enjoined agency officials from perpetuating that same unlawful action under the Proclamation, and certified a class consisting of all individuals who are or will be subject to the Proclamation. The government now seeks a stay of the district court's decision pending appeal.

I would grant the stay in part and deny it in part. The government is likely to succeed in showing that the class definition should be modified. It is also likely to succeed in arguing that the Proclamation and its implementing guidance effect an upfront, categorical discretionary denial of asylum as permitted by circuit precedent. The government, however, is unlikely to show that the Proclamation or its implementing guidance otherwise lawfully allows the removal of noncitizens already present in the United States, or that the Proclamation or its implementing guidance complies with the statutorily mandatory withholding of removal provisions required by the

Immigration and Nationality Act and the Convention Against Torture, as codified in federal law.

**I**

**A**

**1**

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, establishes, among other things, a comprehensive framework governing the admission or entry of foreign persons into the United States. Section 1182 of the INA specifically delineates the grounds of "[i]nadmissib[ility]," and identifies predetermined classes of foreign persons who are ineligible for admission. 8 U.S.C. § 1182(a)(1)–(10). With respect to foreign persons, the terms "admission" and "admitted" are defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A).

"Entry," as a matter of immigration law historically and in precedent, means "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise * * * ." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952); *see also Barber v. Gonzales*, 347 U.S. 637, 641–642 (1954) (explaining that this definition codified a technical and historical understanding of the term "entry" as requiring "an arrival from some foreign port or place").

Section 1182(f), in turn, allows the President "by proclamation" to "suspend the entry" of any foreigners he finds "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). This suspension can last "for such period as

he shall deem necessary[.]" *Id.* Section 1182(f)'s proclamation power "provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [admission] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Courts afford great deference to the President's decisions regarding "whether and when to suspend entry[,] * * * whose entry to suspend[,] * * * for how long[,] * * * and on what conditions[.]" *Trump v. Hawaii*, 585 U.S. 667, 684 (2018).

Relatedly, 8 U.S.C. § 1185, entitled "Travel control of citizens and aliens," allows the President to adopt "reasonable rules, regulations, and orders" to supplement and effectuate the INA's statutory provisions governing any foreign person's "depart[ure] from or ent[ry into] * * * the United States * * * subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1). While the language of Section 1185(a)(1) expressly allows regulation of a foreigner's choice to depart from the United States, the Supreme Court has indicated that this provision also governs the involuntary removal process. *Trump v. Hawaii*, 585 U.S. at 683 n.1 ("8 U.S.C. § 1185(a) * * * grants the President authority to adopt 'reasonable rules, regulations, and orders' governing entry or removal of aliens[.]").

Congress has "plenary power" over the creation of the Nation's immigration laws. *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *see Trump v. Hawaii*, 585 U.S. at 683 ("[Congress] has establishe[d] numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa."); *Immigration and Nationality Service v. Chadha*, 462 U.S. 919, 940 (1983) ("The plenary authority of Congress over aliens under Art. I, § 8, cl. 4 is not open to question[.]"); *see also Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S.

320, 339–340 (1909) (explaining that "over no conceivable subject is the legislative power of Congress more complete" than "over the right to bring aliens into the United States * * * [or the] impos[ition] [of] particular restrictions on the coming in of aliens"); *see generally* U.S. CONST., Art. I, § 8, cls. 4, 18.

The President also has a constitutional role in immigration law given his control over foreign affairs and duty to faithfully execute the immigration laws. *See* U.S. CONST., Art. II, §§ 2–3; *American Ins. Ass'n. v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring)); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.").

In the exercise of its legislative power over immigration, Congress has "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Trump v. Hawaii*, 585 U.S. at 683. *See generally Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("[T]he power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the Government's political departments[.]") (formatting modified).

Finally, the Constitution also vests Congress with the power to "repel Invasions." U.S. CONST., Art. I, § 8, cl. 15. In

addition, Article IV calls upon the "United States" to "protect each [State] against Invasion[.]" U.S. CONST., Art. IV, § 4. The same clause calls upon the "Legislature, or * * * the Executive (when the Legislature cannot be convened)" to protect each state "against domestic Violence." *Id.* While "primarily a legislative power," these clauses empower the two branches to work together to counter invasions. *Texas v. White*, 74 U.S. (7 Wall.) 700, 701 (1868), *overruled on other grounds*, *Morgan v. United States*, 113 U.S. 476 (1885); *see Luther v. Borden*, 48 U.S. (7 How.) 1, 43 (1849); *see also Refugee & Immigrant Center for Educ. & Legal Servs. v. Noem*, ("*RAICES*") No. CV 25-306 (RDM), 2025 WL 1825431, at *38 (D.D.C. July 2, 2025).

**2**

As relevant here, federal law provides three forms of removal protection for foreign individuals who have entered the United States without authorization.

First, the INA authorizes the Attorney General and Secretary of Homeland Security to grant asylum to any individual who is a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A); *see also id.* § 1103(a)(1) & (3). A "refugee" is a person "unable or unwilling to return to" or "avail * * * herself of the protection of" her country of nationality or the last country she resided in "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" *Id.* § 1101(a)(42)(A). Asylum confers a number of benefits, including protection from deportation or removal, *id.* § 1158(c)(1)(A), 8 C.F.R. § 208.22, a pathway to lawful permanent residence, 8 C.F.R. § 209.2, and, eventually, citizenship, 8 U.S.C. § 1429.

Any noncitizen can seek asylum "irrespective" of that person's legal "status[.]" 8 U.S.C. § 1158(a)(1). But the ultimate decision whether to grant asylum, even to those meeting the statutory criteria, rests in the discretion of the Attorney General or Secretary of Homeland Security. *Id.* § 1158(b)(1)(A).[1]

Second, individuals whom the government seeks to expel can obtain withholding of removal. The INA forbids the Attorney General from removing a noncitizen "to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).[2]

Third, a noncitizen can seek relief from removal under the Foreign Affairs Reform and Restructuring Act of 1998

---

[1] The asylum statute forbids individuals from applying for such relief if (1) the Attorney General determines that the applicant can be sent to a country where her life or freedom will not be threatened and she will have a full and fair opportunity to seek asylum there; (2) the applicant fails to apply within one year of arrival; or (3) the applicant was previously denied asylum. 8 U.S.C. § 1158(a)(2)(A)–(C). The government does not claim that the Proclamation or implementing guidance applies solely to individuals who meet these exceptions.

[2] The INA identifies four categories of persons who are statutorily ineligible to receive withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(B) (individuals are ineligible if they participated in the persecution, torture, or extrajudicial killing of others; were convicted of a serious crime and are a danger to the community; committed a serious nonpolitical crime outside the United States; or otherwise are a danger to the security of the United States) (citing 8 U.S.C. § 1227(a)(4)(D)). The government does not claim that the Proclamation or guidance applies only to persons in those categories.

("FARRA"), which implements the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note). The INA requires the agencies carrying out immigration laws to prescribe regulations to implement the Convention Against Torture, 8 U.S.C. § 1231 note (b), by forbidding the removal of individuals to countries where they are likely to be tortured, 8 C.F.R. § 208.16(c)(4); *id.* § 1208.16(c)(4).[3]

Withholding under the INA and the Convention Against Torture are mandatory, not discretionary. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 725 (D.C. Cir. 2022); *see also Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to [Convention Against Torture] relief and may not be removed to that country[.]"); *Immigration and Nationality Service v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) ("[W]ithholding is mandatory if an alien establish[es] that it is more likely than not that [he] would be subject to persecution on one of the specified grounds[.]") (formatting modified).

The withholding provisions provide more limited relief than asylum. Specifically, they ensure only that individuals will not be removed to countries where they will be threatened or tortured, but they "do not entitle [them] to any legal status in the United States" or to avoid removal to other countries where

[3] Individuals who are categorically ineligible for withholding of removal are also ineligible for Convention Against Torture relief. *See* 8 C.F.R. §§ 208.16(d)(2), 1208.16(d)(2) (citing the withholding of removal exceptions, 8 U.S.C. § 1231(b)(3)(B)). The government does not claim the Proclamation or guidance apply only to persons falling within these exclusions.

they will not face persecution or torture. *Huisha-Huisha*, 27 F.4th at 725; *see Nasrallah*, 590 U.S. at 575.

**B**

**1**

In issuing the Proclamation, the President invoked 8 U.S.C. §§ 1182(f) and 1185(a)(1) and Article II of the Constitution. *See* Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8,333 (Jan. 20, 2025). The Proclamation first suspends "entry into the United States" on or after January 20, 2025 of persons "engaged in the invasion across the southern border[.]" Proclamation § 1. The Proclamation further suspends the "entry into the United States" of persons who—regardless of their point of entry—"fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable" immigration officials to make statutorily required judgments about admissibility, 8 U.S.C. § 1182(a)(1)–(3). *See* Proclamation § 3. The Proclamation prohibits all persons subject to the Proclamation from invoking statutory protections "that would permit their continued presence in the United States, including but not limited to" the asylum statute, 8 U.S.C. § 1158. Proclamation §§ 2–3.

Lastly, the Proclamation directs the Secretary of the Department of Homeland Security, in coordination with the Attorney General and Secretary of State, to "take appropriate actions as may be necessary to achieve the objectives of [the Proclamation], until [the President] issue[s] a finding that the invasion at the southern border has ceased," and to "take all appropriate actions to repel, repatriate, or remove" any person "engaged in the invasion across the southern border of the

United States on or after the date of this order." Proclamation §§ 4–5.

**2**

To carry out the directives of the Proclamation, the Department of Homeland Security issued informal guidance to immigration enforcement officials. *See* ECF No. 52-1. In two emails sent February 4, 2025, the Department directed the immediate implementation of the Proclamation at the borders. The first email provided "Update[d] Field Guidance" for "all Southwest Border Sectors." *Id.* at 5. That email defines "illegal alien invading the United States" to mean "an alien who crosses between the ports of entry on the southern land border[.]" *Id.* It also states that "aliens invading the United States are not permitted to apply for asylum." *Id.*

A second "Field Guidance" email advised that entry is suspended at the southern, northern, and coastal borders for all individuals who "fail[], before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable" immigration officials to make statutorily required judgments about admissibility, 8 U.S.C. § 1182(a)(1)–(3). ECF No. 52-1 at 13; Proclamation § 3. In addition, those persons "are restricted from invoking provisions of the INA, including asylum, that would permit their continued presence." ECF No. 52-1 at 13.

In addition, both guidance emails direct that noncitizens subject to the Proclamation may now be removed either by "212(f) Direct Repatriation" or by "212(f) Expedited Removal[.]" ECF No. 52-1 at 5–6, 13–14. The only difference between the two pathways is that persons subject to 212(f) expedited removal "are served with a Notice to Alien Ordered

Removed[,]" while those issued a 212(f) Direct Repatriation order do not receive a removal order. ECF No. 59 at 7. The government explained that the distinction matters because "repatriations do not carry the same immigration or criminal consequences as expedited removal[.]" *Id.* at 8. Which procedure will be applied depends on the "totality of the circumstances." ECF No. 52-1 at 5, 13.

Both removal pathways displant several statutory protections from removal and their accompanying procedures. For example, existing published regulations require an immigration officer both to read a form to a person at the border or who has entered the United States saying "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country," and then to instruct the individual to advise the officer about any "fear" or "concern" about "being removed from the United States or about being sent home." *See* 8 C.F.R. § 235.3(b)(2)(i) (requiring immigration officers to read Form I-867A to noncitizens); *RAICES*, 2025 WL 1825431, at *14; *see also* 9 Charles Gordon *et al.*, Immigration Law and Procedure, App'x B, Ex. 16K (2024) (reproducing the text of Form I-867A). If the individual "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country," the immigration officer must refer that person for an interview by an asylum officer and provide information about the credible-fear interview process, the right to consult with other persons before the interview, and the right to request review by an immigration judge of the asylum officer's credible fear determination. 8 C.F.R. § 235.3(b)(4).

The guidance provided to asylum officers under the Proclamation, however, prohibits adherence to those published regulations and, instead, provides that only those persons who of their own accord "manifest[] fear" to an immigration officer

will be given a "CAT [Convention Against Torture]-Only Assessment[.]" ECF No. 52-1 at 43–44. The purpose of that assessment is "to determine if it is more likely than not that the individual will be tortured" in the country to which she may be returned. *Id.* at 47. Immigration officials, however, will "not assess[] [the risk of] persecution on account of a protected ground." *Id.*; *contrast* 8 U.S.C. § 1231(b)(3)(A). As a result, the guidance extinguishes the mandatory statutory withholding required by 8 U.S.C. § 1231(b)(3)(A). In addition, contrary to existing regulations, individuals are denied the opportunity to review the asylum officer's initial determination of their eligibility for withholding and are denied access to consultants or legal representatives during the interview. *Compare* ECF No. 52-1 at 38, 46, *with* 8 C.F.R. § 208.9(a)(1)–(b).

**C**

Thirteen individuals proceeding pseudonymously and three nonprofit organizations—Refugee and Immigrant Center for Education and Legal Services, Las Americas Immigrant Advocacy Center, and the Florence Immigrant & Refugee Rights Project—filed a putative class action challenging the Proclamation and its implementing guidance. ECF No. 11 at 3–8 (Am. Compl. ¶¶ 9–19). The complaint named fifteen defendants: President Trump, in his official capacity; the Departments of Homeland Security, State, and Justice; three components of the Department of Homeland Security (Customs and Border Patrol, Immigration and Customs Enforcement, and United States Citizenship Immigration Services ("USCIS")); and multiple agency officials sued in their official capacity. *Id.* at 8–10 (Am. Compl. ¶¶ 20–34).

The complaint alleges that the Proclamation and its implementation exceed the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), Article II of the Constitution,

and the separation of powers. ECF No. 11 at 37–39 (Am. Compl. ¶¶ 145–160). The complaint also asserts that the Proclamation and its implementation violate the INA's prescribed procedures for removal, asylum, and withholding of removal, 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229, 1158, 1231(b)(3), as well as the Convention Against Torture, 8 U.S.C. § 1231 note, and its formal regulations, 8 C.F.R. §§ 208.16, 1208.16. ECF No. 11 at 31–35 (Am. Compl. ¶¶ 112–122, 128–131). Finally, the complaint claims that the Proclamation's implementation runs afoul of the Administrative Procedure Act, 5 U.S.C. § 706. ECF No. 11 at 35–37 (Am. Compl. ¶¶ 132–143).

Plaintiffs moved for class certification, ECF No. 13, a preliminary injunction, ECF No. 14, and summary judgment, ECF No. 51. The government cross-moved for summary judgment. ECF No. 44. At the parties' joint request, the district court consolidated the preliminary injunction and summary judgment proceedings. *See* Minute Order (Feb. 26, 2023).

On July 2, 2025, the district court granted in part the Plaintiffs' motions for summary judgment and class certification. *See RAICES*, 2025 WL 1825431. First, the district court granted in part the motion for class certification. *Id.* at *46. The court certified a class of "[a]ll individuals who are or will be subject to Proclamation 10888 and/or its implementation, who are present or who will be present in the United States[.]" ECF No. 72 (internal quotation marks omitted).

Second, the court held that the President lacks statutory or constitutional authority to (1) institute the "212(f) Direct Repatriation" and "212(f) Expedited Removal" procedures, (2) categorically foreclose all asylum and withholding of removal

applications, and (3) short-circuit the regulatory process for withholding under the INA and the Convention Against Torture. *See RAICES*, 2025 WL 1825431, at *31–45.

Third, the district court vacated the Department's guidance implementing the Proclamation as contrary to law, 5 U.S.C. § 706, and entered a declaratory judgment against all the defendants except the President holding that the Proclamation is unlawful "insofar as it purports to suspend or restrict access to asylum, withholding of removal, or the existing regulatory processes for obtaining CAT protection." *RAICES*, 2025 WL 1825431, at *50–51.

Fourth, the district court permanently enjoined all defendants other than the President from "implementing the Proclamation, including by adopting extra-statutory expulsion procedures"; removing noncitizens without complying with the statutorily mandated withholding procedures under the Convention Against Torture; and comprehensively barring asylum. *RAICES*, 2025 WL 1825431, at *55.

The district court denied the government's request for a stay pending appeal and its order went into effect for the individual plaintiffs immediately. *See RAICES*, 2025 WL 1825431, at *56; ECF No. 73 at 3. In so ruling, the court relied on the government's express representation that the Department of Homeland Security "decided, in an exercise of its prosecutorial discretion, not to employ the Invasion Proclamation challenged in this suit as a basis for removal of any of the named Plaintiffs currently in the United States during the pendency of this litigation." ECF No. 21 at 1. The court then postponed the effective date of its order as to absent class members and the plaintiff organizations for fourteen days to allow the government an opportunity to seek a stay pending

appeal from this court. *See RAICES*, 2025 WL 1825431, at *56; ECF No. 73 at 3.

The government appealed and moved to stay the district court's order pending the resolution of its appeal. This court granted an administrative stay on July 11, 2025, except as to the individual plaintiffs for whom the district court's order remains in effect.

**II**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

**III**

I would grant the motion for a stay in part and deny it in part. First, because the precise scope of the district court's class definition is unclear, the government is likely to succeed in showing that the class definition must be clarified to apply only to "[a]ll individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementation, would seek asylum, 8

U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note)."

The government has failed, however, to make a strong showing of likely success on its argument that the Proclamation and its implementation lawfully authorize the removal of noncitizens already present in the United States under the guidance's truncated procedures. In particular, the government is unlikely to succeed in showing that the Proclamation and its implementing guidance comply with the statutorily mandatory withholding of removal provisions required by the INA and the Convention Against Torture for all persons present in the United States, as well as for those arriving at the borders and ports of entry without needed documentation.

As for asylum, the government has demonstrated that it is likely to succeed in showing that the Proclamation's and guidance's prohibition on asylum claims together constitute an advance and categorical discretionary denial of asylum by the President and his Attorney General or the Secretary of Homeland Security for all applicants crossing the Nation's borders.

**A**

The district court's certification of a class action is governed by Federal Rule of Civil Procedure 23. That Rule requires plaintiffs to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will

fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a); *see Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). There is no dispute in this stay proceeding that prong one's requirement of numerosity is satisfied.

Plaintiffs must also demonstrate that their proposed class falls into one of the categories listed in Rule 23(b). As relevant here, a class may be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" FED. R. CIV. P. 23(b)(2).

Article III of the Constitution requires that plaintiffs in federal court demonstrate their standing to file suit. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To demonstrate standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

The individual plaintiffs in this case unquestionably have standing to challenge the Proclamation and its implementing guidance. In a suit "challenging the legality of government action[,]" if the "plaintiff is [herself] an object of the action * * * at issue[,] * * * there is ordinarily little question that the action * * * has caused [her] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–562.

Here, the government's Proclamation and guidance injure the individual plaintiffs by barring them from seeking asylum or withholding of removal and by making it harder for them to obtain Convention Against Torture protection. The government has not disputed that "asylum, withholding of removal, and CAT protection are valuable forms of relief[.]" *RAICES*, 2025 WL 1825431, at *17. And, as the district court found, each individual plaintiff submitted a declaration "expressing a desire to seek asylum and setting forth facts sufficient to state a plausible claim to asylum, withholding of removal, or CAT protection." *See id.* (citing ECF No. 12-1 (A.M. Decl.); ECF No. 12-4 (B.R. Decl.); ECF No. 12-5 (M.A. Decl.); ECF No. 12-6 (G.A. Decl.)). In addition, the Plaintiffs' injuries are redressable through a court order vacating the implementing guidance, declaring the Proclamation unlawful, and enjoining the agencies' enforcement of the Proclamation. As a result, there is no Article III barrier to class certification.[4]

As for class members, no showing is required that every single absent class member has standing in cases seeking only injunctive or declaratory relief. *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019); *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 (9th Cir. 2022); *see also* 1 Newberg and Rubenstein on Class Actions § 2:3 (6th ed. 2025) ("If a class representative has standing, the case is justiciable

---

[4] Because the individual plaintiffs have standing, I do not address the standing of the three association plaintiffs. *See Biden v. Nebraska*, 600 U.S. 477, 493–494 (2023); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

and the proponent of the class suit need not demonstrate that each class member has standing.").[5]

Here the district court broadly included within the class "[a]ll individuals who are or *will be* subject to Proclamation 10888 and/or its implementation, who are currently present or who *will be* present in the United States[.]" ECF No. 72 (emphases added) (quotation marks omitted). The best and most natural reading of the court's language is that the class encompasses only those persons who are or will be present in the United States during the presumably limited time period that the Proclamation and its guidance are in effect. A fair reading of the class certification also suggests that, in referencing those "subject to [the] Proclamation," the district court meant to include only those who are statutorily eligible for the forms of relief at issue in this litigation—asylum, statutory withholding under the INA, or Convention Against Torture withholding.

---

[5] The government argued before the district court that 8 U.S.C. § 1252(f)(1) barred the individual plaintiffs from obtaining any form of relief, making their injuries non-redressable. The government does not re-raise that argument in its stay motion, and for good reason. Section 1252(f)(1) does not apply "with respect to an individual alien against whom proceedings * * * have been initiated[.]" 8 U.S.C. § 1252(f)(1). The Supreme Court has said that this provision "'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–482 (1999)). Seven of the individual plaintiffs were issued I-860 Notices to Appear, initiating proceedings against them. *See RAICES*, 2025 WL 1825431, at *18 (citing ECF No. 43-3 at 3–5 (Hollinder Decl. ¶¶ 4–11)).

The government is likely to succeed in showing that those limitations are necessary to ensure the class includes only those persons who are or will be affected by the litigation. To make those criteria more explicit, I would, to the extent necessary, stay the district court's class certification judgment in part pending appeal so that the class includes only: "All individuals who (1) are present in the United States while Proclamation 10888 and/or its implementation is in effect, (2) are not statutorily ineligible for all forms of relief from removal listed in point (3), and (3) absent the Proclamation and/or its implementing guidance, would seek asylum, 8 U.S.C. § 1158, withholding of removal under the Immigration and Nationality Act, 8 U.S.C. 1231(b), or withholding under the Convention Against Torture, *see* FARRA, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (codified at 8 U.S.C. § 1231 note)."

With the class definition clarified, the government's remaining arguments challenging the class certification are unlikely to succeed. *See* Gov't Stay Mot. 14–17.

**B**

The Proclamation and its implementation rely on Sections 1182(f) and 1185(a) of Title 8 for the asserted authority not just to prevent the entry of foreign individuals, but also to remove noncitizens already present within the United States. Essentially for the reasons provided in the district court's thorough opinion, the government is unlikely to succeed on appeal in showing that those authorities empower the government's wholesale displacement of mandatory statutory removal procedures.

**1**

Federal immigration law treats the entry and removal of noncitizens already present in the United States differently, and it has done so for decades. *See Zadvydas*, 533 U.S. at 693 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. * * * [O]nce an alien enters the country, the legal circumstance changes * * * whether [the noncitizen's] presence here is lawful, unlawful, temporary, or permanent."); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission * * * and those who are within the United States after an entry, irrespective of its legality."); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773–774 (9th Cir. 2018).

That difference is because, as the district court explained, the INA contains different sections with distinct provisions that specify (1) who may or may not lawfully enter or seek admission to the United States, (2) which previously admitted persons are subject to removal, (3) what protections each category of persons can claim, and (4) the procedures for removal. *See RAICES*, 2025 WL 1825431, at *4 (citing 8 U.S.C. §§ 1181, 1182, 1184, 1227, 1158, 1231, 1225(b)(1), 1229a).

As relevant here, Congress has legislated a comprehensive and carefully calibrated set of removal procedures. Regular removal procedures are provided in 8 U.S.C. § 1229a, and expedited removal in § 1225(b)(1). Section 1229a provides the "sole and exclusive procedure" for removal of noncitizens "[u]nless otherwise specified in [the INA]." 8 U.S.C. § 1229a(a)(3). Section 1225(b)(1)'s expedited removal

procedure is one such "otherwise specified" provision that applies to two classes of inadmissible noncitizens. *See id.* § 1182(a)(6)(C), (a)(7). These detailed procedures provide extensive guidelines for who may be removed, on what grounds, and what specific procedural safeguards are mandated. Under both ordinary removal and expedited removal, the opportunities to apply for asylum under Section 1158, withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and withholding under the Convention Against Torture are available.

**2**

The Proclamation grounds its authority in Section 1182(f), which provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

By its plain text, Section 1182(f) authorizes a President to suspend only the "entry" of noncitizens into the United States. At the time of Section 1182(f)'s adoption, the INA defined "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise * * * ." Pub. L. No. 82-414, § 101(a)(13), 66 Stat. 163, 167 (1952). In 1996, Congress adopted the term "admission," which is defined as "the lawful

entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Section 1182(f) says nothing about removal of persons already present and grants the President no authority to suspend statutorily mandated removal requirements. As a result, 8 U.S.C. § 1229a remains the "sole and exclusive procedure" for the removal of noncitizens present in the United States. 8 U.S.C. § 1229a(a)(3).

Case law confirms that reading. Prior to this Proclamation, Section 1182(f) has been used only to authorize emergency measures to prevent noncitizens from entering the territorial land or waters of the United States. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993); *Trump v. Hawaii*, 585 U.S. 667; *Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017); *Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024); *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020); *East Bay Sanctuary Covenant*, 932 F.3d 742; *Sesay v. Immigration and Nationality Service*, 74 F. App'x 84 (2d Cir. 2003); *see also* Proclamation No. 5377, 50 Fed. Reg. 41,329 (1985) (President Reagan, acting pursuant to Section 1182(f), suspending the entry into the United States of officers or employees of the Cuban government or the Cuban Communist Party.).

The government cites no precedent for extending Section 1182(f) far beyond its textual limits to allow the suspension of laws governing the removal of persons already in the United States. Nor can that be inferred. Congress is fully aware of the longstanding statutory distinction in immigration law between entry on the one hand, and removal of those present on the other. Congress also knows how to authorize expedited or emergency removal procedures, and when it does so, it uses the word "removal" explicitly. *See* 8 U.S.C. §§ 1229a ("Removal

proceedings"), 1225(b)(1) ("[E]xpedited removal of inadmissible arriving aliens")

The government's argument also ignores that Congress authorized a President only to "suspend" entry into the United States. A *suspended* opportunity is very different from an *extinguished* one. Suspensions, by definition, are temporary measures. *Suspension*, WEBSTER'S SECOND NEW INT'L DICTIONARY 2541 (unabr. ed. 1952) ("[S]tate or period of being * * * temporarily stopped, interrupted, abrogated, etc."); *Suspension*, BLACK'S LAW DICTIONARY 1616 (4th ed. 1951) ("A temporary stop, a temporary delay, interruption, or cessation."); *Suspension of a right*, BLACK'S LAW DICTIONARY 1616 (4th ed. 1951) ("It differs from extinguishment, because a suspended right is susceptible of being revived, which is not the case where the right was extinguished."); *Suspension*, 10 OXFORD ENGLISH DICTIONARY 258 (def. 1b) (1933) ("The state of being temporarily kept *from* doing, or deprived *of*, something."); *see Trump v. Hawaii*, 585 U.S. at 687 ("We agree * * * that the word 'suspend' often connotes a 'defer[ral] till later[.]'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2303 (1966)). That is why Section 1182(f) provides that a suspension only lasts "for such period as [the President] shall deem necessary[.]" 8 U.S.C. § 1182(f). The Proclamation, in fact, acknowledges the necessarily temporary character of its provisions. *See* Proclamation Preamble ("suspending the physical entry of aliens involved in an invasion into the United States across the southern border *until* [the President] determine[s] that the invasion has concluded") (emphasis added); *see also* Gov't Stay Mot. 11 (describing the suspension power as a "narrow, time-limited authority").

By contrast, removing individuals in violation of statutory protections prohibiting their removal are, by their very nature, permanent. Once a person is removed to a place where she

faces persecution, likely harm, or torture, that person is fully and completely deprived of the protections of the INA's removal provisions, and she faces the very harms in the country of return that Congress said it would not permit. Nor do those removed have any right—even if they had any practical capacity—to return to reclaim those protections once the Section 1182(f) emergency ends.

In short, while the opportunity to make an "entry" can be unsuspended, the opportunity to prevent removal to a place of persecution, harm, torture, or death cannot.

The government leans heavily on *Huisha-Huisha*, 27 F.4th 718, as necessarily linking the power to exclude with the power to remove. That is incorrect.

In *Huisha-Huisha*, this court concluded that the Surgeon General's authority under a different statute, 42 U.S.C. § 265, to prohibit the "introduction of persons and property" into the United States when they pose a "serious danger of the introduction of [a communicable] disease into the United States" includes the "authority to expel" such persons. *Huisha-Huisha*, 27 F.4th at 729 (citing 42 U.S.C. § 265).

As the district court well explained, *RAICES*, 2025 WL 1825431, at *34–36, the government's equation of Section 265 and 8 U.S.C. § 1182(f) is wrong for two central reasons.

First, as noted, *Huisha-Huisha* addressed an entirely different statutory provision—a public health law and not an immigration law. *See* Public Health Service Act of 1944, Pub. L. No. 78-410, 58 Stat. 682 (codified as amended at 42 U.S.C. § 201 *et seq.*). The ability to exclude individuals or products that pose a communicable health threat to the United States

rests on that separate and distinct authority to contain and prevent the spread of disease.

Section 1182(f), by contrast, is part of an immigration law that has long separated the process of exclusion—of barring entry—from the process of removing persons who are already in the United States.

Second, and relatedly, the public health provision (Section 265) uses very different language. It allows the Department of Health and Human Services through the Surgeon General to prevent not the entry, but the "introduction" into the United States of persons or property posing a health risk. So Section 265 grants a broad power to prevent diseases like COVID-19 from affecting and infecting the people of the United States. The "introduction" of a disease, in other words, follows contagious persons across the border as they risk introducing the illness again and again into different populations and areas. Because germs and bacteria are impervious to border lines, the power to prevent the introduction of disease would be "nugatory" if it allowed the Surgeon General only to police the borders and not to address those who "managed to set foot on U.S. soil." *Huisha-Huisha*, 27 F.4th at 729; *see RAICES*, 2025 WL 1825431, at *35; *Suspension of Introduction of Persons Into United States from Designated Foreign Countries or Places for Public Health Purposes*, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020) (Center for Disease Control regulation defining "introduction into the United States" as "the movement of a person from a foreign country * * * *into* the United States *so as to bring the person into contact with others in the United States* * * * in a manner that the [CDC] determines to present a risk of transmission of the communicable disease[.]") (emphases added).

In contrast, Section 1182(f)'s plain text allows a President only to suspend "entry," and not to regulate the removal of those already present in the United States.

**3**

The Proclamation also invokes Section 1185(a), which says:

> Unless otherwise ordered by the President, it shall be unlawful * * * for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe[.]

8 U.S.C. § 1185(a)(1).

That provision adds nothing to the government's argument. Section 1185(a)(1) outlaws a noncitizen from "enter[ing]" or attempting to "enter" the United States except as allowed by rules, regulations, or orders prescribed by the President. The Proclamation no doubt constitutes a presidential order barring noncitizens from "enter[ing]" the United States. All agree on that.

What matters here is that Section 1185(a)(1) says not a word about the power to remove those who are already present in the United States.

As for the language about regulating "depart[ures]," that allows the President to regulate a noncitizen's own "depart[ure]" or attempt to depart. By its plain terms, Section 1185(A)(1) makes it unlawful "for an alien to depart * * * or attempt to depart" except as permitted by presidential rule,

regulation, or order. Yet the government points to nothing in the Proclamation or its implementing guidance that speaks to how noncitizens may choose to depart. The Proclamation and guidance, instead, seek to force persons already in the United States to leave heedless of the threat of persecution, harm, torture, or death they face. Limiting the freedom to leave is not the same as the forcible expulsions undertaken by the guidance here.

In any event, even if Section 1185(a)(1) reaches forced departures and I assume that forced departures means "removal," the government is still no better off. *See Trump v. Hawaii*, 585 U.S. at 683 n.1. That is because Section 1185(a)(1) only allows "*reasonable* rules, regulations, and orders[.]" 8 U.S.C. § 1185(a)(1). That is common-fare statutory language used to grant an agency regulatory authority to implement the law Congress passed, not to cast it aside. *See, e.g.*, *id.* § 1224 ("The Attorney General is authorized (1) by regulation to designate as ports of entry for aliens arriving by aircraft any of the ports of entry for civil aircraft designated as such in accordance with law; (2) by regulation to provide such reasonable requirements for aircraft in civil air navigation[.]"); *United States v. Witkovich*, 353 U.S. 194, 199–200 (1957) (interpreting 8 U.S.C. § 1231(a)(3)(D)'s language authorizing the Attorney General to make "reasonable written restrictions" on the conduct of noncitizens as a "limitation" on the Attorney General's power that must be in line with the "legislative scheme" as a whole); *see also FCC v. Consumers' Research*, No. 24-354, 2025 WL 1773630, at *13 (U.S. June 27, 2025) (describing how the Supreme Court has previously affirmed Congress's authorization to the FCC in the Communications Act to set "just and reasonable" rates, because such an authorization "was not unbridled" in light of the "broader statutory contexts, which informed [its] interpretation and supplied the content necessary to satisfy the intelligible-

principle test") (citing *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–226 (1943)); *Industrial Union Department, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 642–645 (1980) (discussing the Occupational Safety and Health Act's authorization for the Secretary of Labor to promulgate "reasonably necessary or appropriate" health and safety regulations).

Put more simply, like Section 1182(f), Section 1185(a)(1) empowers the President to control who may cross the Nation's borders. It says nothing about the forcible ejection of those already present in the United States, let alone the authority to do so outside of the INA's prescribed procedures. While the government believes that its power to prevent entry would have greater effect if it included the power to remove, that policy complaint must be directed to Congress.

To that same point, it bears emphasizing that nothing about the power to remove persons who are already present strengthens the President's exercise of his temporary power to suspend entry. Entry and removal are distinct processes aimed at different stages of immigration control that operate on opposite sides of the border with different statutory protections. While the government may now prefer otherwise, this court must take immigration law as the Political Branches (including the Executive) wrote it.

**C**

The government's attempt to extra-textually expand Section 1182(f) through its implementing guidance also is unlikely to succeed on appeal as to the withholding provisions. Under binding circuit precedent, though, the Proclamation combined with the guidance likely could be read as exercising

the Executive's discretionary authority to categorically deny asylum upfront.

**1**

The government has not demonstrated that it will likely succeed in showing that its guidance lawfully abrogated the statutorily mandated withholding obligations and procedures.

Congress has withheld from the Executive the authority to remove a noncitizen to a country where they will be persecuted on the basis of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). In those cases, withholding of removal is "mandatory[,]" *Aguirre-Aguirre*, 526 U.S. at 419; *Huisha-Huisha*, 27 F.4th at 725, and the government "must provide" it, *Huisha-Huisha*, 27 F.4th at 725. Full stop.

As a result, if it wants to remove noncitizens "to places prohibited by § 1231(b)(3)(A), the Executive must identify a statute that creates an exception to § 1231(b)(3)(A)." *Huisha-Huisha*, 27 F.4th at 731–732. Yet it has identified none. Nothing in Sections 1182(f) or 1185(a) mentions removal at all, let alone displaces the statutory withholding-from-removal provisions. And the word "entry" is too little to do that work given its long-established usage in immigration law. *See* pp. 2, 20–21, *supra.* Tellingly, even in *Huisha-Huisha*, where this court held that public health officials' more robust authority to prevent the "introduction" of disease covered both barriers to entry *and removal*, this court was explicit that Section 265 did *not* supplant the statutory mandate that removal to a country be withheld if the person's life or freedom would be threatened in that country based on one of the statutorily protected characteristics, 8 U.S.C. § 1231(b)(3)(A). *See Huisha-Huisha*, 27 F.4th at 732. The court explained that "we can give effect

to both [Sections 265 and 1231(b)(3)(A)]. And because we can, we must." *Id.* So too here: The government can both suspend "entry" under the Proclamation to address its declared emergency, and comply with statutory withholding-of-removal requirements. Because it can do both, it must.

But the government has backhanded Congress's command. The implementing guidance is explicit that "USCIS is not assessing persecution on account of a protected ground" in making removal decisions, nor is any other part of the government making the statutorily mandated assessment prior to removal. ECF No. 52-1 at 38, 47; *see also id.* at 20, 24 (instructing Customs and Border Patrol agents to "refer[]" to USCIS any individuals "who manifest a fear of the country to which CBP intends to return them").

To put it more clearly, the guidance on its face refuses to provide persons in the United States the statutory withholding-of-removal protections that Congress has "mandat[ed.]" *Aguirre-Aguirre*, 526 U.S. at 419.

**2**

As the district court well explained, the government has equally failed to show a likelihood that its implementing guidance comports with the withholding requirements under the Convention Against Torture. *See RAICES*, 2025 WL 1825431, at *44–45.

As with withholding of removal under 8 U.S.C. § 1231(b)(3)(A), the bar against removal to a country where the person will be tortured is "mandatory[.]" *Huisha-Huisha*, 27 F.4th at 725; 8 C.F.R. §§ 208.16(d) ("[A]n application for withholding of deportation or removal to a country of proposed removal shall be granted if the applicant's eligibility for

withholding is established[.]"), 1208.16(d) (same); *see also Nasrallah*, 590 U.S. at 575 ("If the noncitizen demonstrates that he likely would be tortured if removed to the designated country of removal, then he is entitled to CAT relief and may not be removed to that country[.]"); *Igiebor v. Barr*, 981 F.3d 1123, 1127–1128 (10th Cir. 2020) ("Relief under the CAT is mandatory if the convention's criteria are satisfied.") (citation omitted); *Andrade-Garcia v. Lynch*, 828 F.3d 829, 835 (9th Cir. 2016) ("[B]oth CAT protection and withholding of removal are mandatory forms of relief.").

Congress provided that the Convention's resolute protection should be implemented by agency regulations, and the Departments of Homeland Security and Justice have enacted notice-and-comment regulations doing just that. 8 C.F.R. §§ 208.1–30, 1208.1–33. The regulations require a two-stage process for handling Torture Convention claims. At the first stage, an asylum officer conducts a credible fear screening where the applicant must demonstrate that there is "a significant possibility" that she is eligible for the Convention's protection. *Id.* §§ 208.30(e)(3), 1208.30(e); *see also id.* §§ 208.1(a)(1), 1208.1(a)(1).

If the applicant clears that threshold, an asylum officer conducts a second interview, which must take place at least twenty-one days after the applicant receives a record of the officer's determination from the initial screening, allowing the individual to consult, gather evidence, and obtain representation if desired. 8 C.F.R. § 208.9(a)(1)–(b). The purpose of the second interview is "to elicit all relevant and useful information" for the Convention Against Torture determination. *Id.* § 208.9(b). The applicant "may have counsel or a representative present, may present witnesses, and may submit affidavits of witnesses and other evidence." *Id.* To qualify for Convention Against Torture protection, the

applicant must demonstrate in the second interview that "it is more likely than not that he or she would be tortured if removed to the proposed country[.]" *Id.* §§ 208.16(c)(2), 1208.16(c)(2).

The implementing materials cast aside all that law and collapse the process into a single interview that requires the applicant when first detained to carry her ultimate burden of proving she will likely be subjected to torture, without the benefit of time to assemble evidence or to prepare a presentation. In addition, the presence of counsel or another representative is forbidden. In the now-prescribed single "CAT-Only Assessment[,]" the applicant cannot have a consultant or legal representative in the room with her and is not "entitled to" any "consultation period." ECF No. 52-1 at 44–46; *see id.* at 38 (USCIS is "unable to accommodate a consultant or attorney at the interview" because interviews are conducted in "secure facilities[.]").

Nothing in the Proclamation or other agency action purports to withdraw the published regulations or to explain why affording a person already in the United States the opportunity to obtain advice and evidence to meet her burden of proof of torture is inconsistent with preventing the "entry" of noncitizens at the border. Nowhere has Congress prescribed torture or death as a tolerable consequence for unauthorized entry. Quite the opposite, Congress has forbidden it, and so have longstanding agency regulations implementing the Convention. Circuit precedent does the same. *Huisha-Huisha* is explicit that even the emergency power to prevent the spread of plagues and epidemics does not allow the government to forgo established protections against removal to a place of torture. 27 F.4th at 732.

Tellingly, the government's stay papers make no argument that Sections 1182(f) or 1185(a) authorize it to displace the

Convention Against Torture or its implementing regulations. That silence falls far short of demonstrating a likelihood of success.

**3**

The Proclamation's and its implementing guidance's foreclosure of asylum applications likely will succeed on appeal, although the question is close and difficult, just as it was in *Huisha-Huisha*. There, this court explained that perhaps "the closest question" in that case was whether an emergency public-health power to prevent the introduction of persons or property that could convey disease allowed the government to preclude all asylum applications. *Huisha-Huisha*, 27 F.4th at 730.

As already explained, the power to foreclose the "entry" of noncitizens into the United States does not, by itself, provide the authority to remove persons who are already in the United States. *See* pp. 20–21, *supra*.

But the asylum statute itself likely allows such suspension of its protections. Section 1158(a)(1) authorizes persons "physically present in the United States or who arrive[] in the United States" to request asylum. 8 U.S.C. § 1158(a)(1). That right applies regardless of immigration status. *Id.*

At the same time, the asylum statute is explicit that the final decision of whether to grant or deny asylum is "committed to the [Secretary of Homeland Security or] Attorney General's discretion." *Aguirre-Aguirre*, 526 U.S. at 420; *see* 8 U.S.C. § 1158(b)(1)(A) ("The Secretary of Homeland Security or the Attorney General may grant asylum[.]"); *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (Asylum is a "form[] of discretionary relief[.]").

So while Sections 1182(f) and 1185(a)(1) say nothing about the Executive's power to foreclose or preemptively deny asylum applications during an emergency, the asylum statute likely does so. To be sure, the statute seems to envision individualized grants or denials of asylum after a person has submitted an application. 8 U.S.C. § 1158(a)(1) (Any individual "physically present in" or "who arrives in the United States * * * may apply for asylum[.]"). But this court held in *Huisha-Huisha* that such categorical and upfront rejections of asylum are permissible in emergency situations for limited periods of time. 27 F.4th at 730–731. This court explained that because granting asylum is "a matter of executive 'discretion[,]'" the President could "foreclose[]" both the "grant of asylum" and "the statutorily mandated procedures that aliens use to apply for asylum." *Id.* at 731 (citation omitted). "[T]hose procedures would be futile[,]" this court reasoned, because the President's Section 265 order "already * * * made" the asylum decision. *Id.*

So the only question on appeal will be whether the Proclamation and implementing guidance similarly have already made the asylum decision, apart from the Proclamation's reliance on Sections 1182(f)'s and 1185(a)(1)'s provisions governing only entry. While it is a close call, *Huisha-Huisha* likely supports the asylum bar.

First, the Proclamation twice expressly bars noncitizens from "invoking" Section 1158. Proclamation § 2 (Noncitizens "engaged in the invasion across the southern border * * * are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including * * * 8 U.S.C. § 1158[.]"); *see also id.* § 3 ("I * * * restrict [noncitizens'] access to provisions of the INA that would permit their continued presence in the United States, including

* * * 8 U.S.C. § 1158."). Both references cite directly to the asylum statute. *Id.* §§ 2–3. In addition, the implementing guidance from the Department of Homeland Security—an agency statutorily authorized to make discretionary asylum decisions, 8 U.S.C. § 1158(b)(1)(A)—is explicit that noncitizens "are *not permitted to apply for asylum*." ECF No. 52-1 at 5, 11 (emphasis in original).

At this very preliminary stay stage, the government appears likely to succeed in showing that those additional references to the asylum statute suffice for the Attorney General or the Secretary of Homeland Security to categorically pre-deny asylum such that allowing applications would be futile, and that invocation of that power under Section 1158 is separate and independent of the power in 8 U.S.C. § 1182(f) to suspend "entry." The Proclamation and guidance contain far more language about foreclosing asylum than the emergency order addressed in *Huisha-Huisha* did. That order, in fact, was silent on the subject. *See Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Yet this court found that such silence was sufficient to close the door on the asylum process across the board.

To be sure, *Huisha-Huisha* addressed a statute that allowed restrictions on noncitizens to apply both at the border and inside the United States. 27 F.4th at 729. That is very different from Sections 1182(f) and 1185(a)(1). That is why it may be at least sufficient, if not necessary, that the Proclamation and implementing materials reference the asylum statute itself in imposing a categorical bar. The question is close and, as in *Huisha-Huisha*, it remains open to definitive resolution by a merits panel. *See Huisha-Huisha*, 27 F.4th at 730 (Plaintiffs' argument that the Executive violates the

asylum statute by expelling noncitizens before they have an opportunity to seek relief "deserves attention from the District Court when it considers the merits."). But *Huisha-Huisha*'s decision on review of a preliminary injunction makes it likely at this similarly preliminary stay stage that the government will succeed.

* * * * *

In sum, the government has failed to show that it is likely to succeed in arguing that the Proclamation complies with the INA's withholding of removal and Convention Against Torture withholding requirements. While a very close question, the government appears likely to succeed in showing that it has permissibly suspended the asylum process during the emergency period. Accordingly, I would stay that portion of the district court's permanent injunction requiring the government to allow asylum applications pending appeal while the Proclamation remains in effect.

**D**

Finally, the government is unlikely to succeed in showing that 8 U.S.C. § 1252(f)(1) barred the district court from issuing class-wide injunctive relief in this case. Gov't Stay Mot. 17–18. Section 1252(f)(1) provides that:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such

> provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). Part IV of the INA encompasses 8 U.S.C. §§ 1221–1232.

Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions[,]" except against an individual in proceedings. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). That bar applies even if the government's administration of a covered provision violates a federal statute or regulation. *Id.* at 552–554.[6]

It is unlikely that Section 1252(f)(1) bars the class-wide relief entered here for the simple reason that the court did not enjoin the government's operation of any provision covered by Part IV of the INA. The district court instead enjoined government officials (other than the President) from relying on the Proclamation to continue enforcing the content of the implementation guidance that the district court had separately declared unlawful and vacated. The Proclamation, of course, is grounded not in Part IV of the INA, but in 8 U.S.C. §§ 1182(f) and 1185(a), which are in Part II of the INA. *RAICES*, 2025 WL 1825431, at *52. The district court also enjoined the government to comply with the asylum statute, 8 U.S.C. § 1158(a), which is in Part I of the INA, and the Convention Against Torture provision, which is in a different statute altogether, FARRA, and was only placed at 8 U.S.C.

[6] As the district court's decision did not resolve any constitutional claims raised by Plaintiffs, this case, at this juncture, does not pose the question of whether Section 1252(f)(1) applies to the remediation of constitutional violations not otherwise redressable.

§ 1231 note by the United States Code's codifiers, not Congress. *See RAICES*, 2025 WL 1825431, at *52; *see also United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997); *Warner v. Goltra*, 293 U.S. 155, 161 (1934) ("The compilers of the Code were not empowered by Congress to amend existing law, and doubtless had no thought of doing so.").

In addition, to comply with Section 1252(f)(1), the district court declined to enjoin the government to comply with the withholding of removal statute, 8 U.S.C. § 1231(b)(2), which is covered by Section 1252(f)(1). *RAICES*, 2025 WL 1825431, at *54.

The government objects that the injunction could have the indirect effect of causing the government to have to adhere to the INA's Part IV withholding provisions when it undertakes removal actions, or to employ the INA's expedited removal procedures, 8 U.S.C. § 1225(b)(1), which also are in Part IV.

But nothing in the injunction requires the government to remove anyone. The injunction requires only that if the government chooses to remove individuals, it may not rely on the unlawful provisions of the Proclamation or the vacated guidance. To the extent the government chooses to undertake removals, it is the INA itself, not the injunction, that prescribes the lawful process. Said another way, the injunction requires only that, if the government chooses to remove noncitizens, it does not do so in excess of its authority under 8 U.S.C. §§ 1182(f) and 1185(a), or in violation of the asylum statute or Convention Against Torture mandate.

The government has failed to show that Section 1252(f)(1)'s bar reaches that far. Instead, it has identified at most a "collateral effect" of the injunction, which the Supreme Court says is outside Section 1252(f)(1)'s bounds. *See Aleman Gonzalez*, 596 U.S. at 553 n.4 (indicating that "a court may

enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision") (citing *Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)); *Al Otro Lado v. Executive Off. for Immigr. Rev.*, 138 F.4th 1102, 1126 (9th Cir. 2025) ("The Supreme Court acknowledged our collateral-effect rule in *Aleman Gonzalez* and left it undisturbed.").[7]

**IV**

The remaining factors weigh against granting a stay any broader than I would provide.

As the party seeking a stay, the government bears the burden of demonstrating that it will suffer an irreparable injury during the time this appeal is pending. *Nken*, 556 U.S. at 433–434. It has not done so.

"To begin with, the Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests." *Huisha-Huisha*, 27 F.4th at 734. Whatever the effects of the Proclamation at the southern border, ECF No. 44-5 (Gunduz Decl. ¶ 43), "our system does not permit agencies to act unlawfully even in pursuit of desirable ends[,]" *Alabama Ass'n of Realtors v. Department of Health & Human Servs.*, 594 U.S. 758, 766 (2021); *see also Youngstown*, 343 U.S. at 582 (The President's determination that an order "was necessary to avert a national catastrophe" did not overcome the lack of

[7] The government does not argue in its stay petition that 8 U.S.C. § 1252(f)(1) limits courts' ability to enter class-wide declaratory relief or to vacate the agency's implementation guidance under 5 U.S.C. § 706. Those arguments accordingly are forfeited here.

congressional authorization). That is especially true here because, as the district court explained, denying a stay simply requires the government to adhere to mandatory statutory procedures and standards. *See RAICES*, 2025 WL 1825431, at *55.

By contrast, a full stay would irreparably harm Plaintiffs and the class members. The government maintains that the district court lacks authority to provide relief once individuals are removed under the Proclamation and guidance. *See RAICES*, 2025 WL 1825431, at *56; *see also* ECF No. 55 at 14–15. If true, then, without a stay, class members may never be able to obtain the protections against removal that Congress mandated.

Even more pressingly, without a stay, class members will continue to be removed to countries where they face persecution, torture, and death—all of which are undoubtedly irreparable harms. *See Huisha-Huisha*, 27 F.4th at 733 (persecution and torture are irreparable harms); *Mozilla Corp. v. FCC*, 940 F.3d 1, 62 (D.C. Cir. 2019) (same as to death). The named plaintiffs in this case have averred, for example, that:

- "We are from Afghanistan, and we came to the United States with the intention of seeking asylum. I and my family fear persecution, torture, and death at the hands of the Taliban." ECF No. 65-1 (A.M. Supp. Decl. ¶ 3).

- "I am from Egypt, and I came to the United States with my wife with the intention of seeking asylum because I had been previously imprisoned and tortured in Egypt by the ruling military regime for my pro-democracy views. * * * * I cannot return to Egypt

> because I will once again be imprisoned and tortured." ECF No. 65-4 (M.A. Supp. Decl. ¶¶ 3, 13).

Notably, the government does not dispute that Plaintiffs and class members will suffer persecution, torture, and death should they be removed.[8]

Finally, the public interest also counsels against a stay as "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436.

**V**

For the foregoing reasons, I would grant in part and deny in part the government's motion for a stay pending appeal. I also would grant Plaintiffs' request for expedited merits briefing and argument.

---

[8] The district court has not yet decided whether it has authority to provide relief to removed individuals, noting that the "question is a difficult one[.]" *RAICES*, 2025 WL 1825431, at *56. I also do not address that question at this stay stage. I note only that, as the district court explained, "a substantial possibility exists that continued implementation of the Proclamation during the pendency of an appeal will effectively deprive tens of thousands of individuals of the lawful processes to which they are entitled." *Id.*

PILLARD, *Circuit Judge*, concurring in part and dissenting in part: I would grant the stay in part as to portions of the class definition, and deny the stay in all other respects. I join Judge Millett's statement explaining why we stay portions of the class definition to the extent they are unclear, and her reasons for denying the motion to stay in all other respects but one. I disagree with the decision to stay the district court's order to the extent it enjoins what Defendants assert is a valid, categorical determination to deny asylum and the right to apply for asylum under the Proclamation and its implementing guidance. Largely for the reasons stated by the district court, I conclude that Defendants have failed to make a "strong showing" that the Proclamation and its implementing guidance lawfully deny Plaintiffs the right to apply for asylum and, if they establish that they qualify, to be considered for asylum under 8 U.S.C. § 1158. *Nken v. Holder*, 556 U.S. 418, 426 (2009). I write separately only to explain my conclusions regarding the asylum issue.

Plaintiffs are noncitizens physically present in the United States who are entitled by section 1158(a) to apply for asylum. The Proclamation, at least as Defendants interpret and apply it, unlawfully deprives Plaintiffs of that right as well as the right under section 1158(b)(1) to be considered for a grant of asylum if they show they are eligible to receive it.

Section 208(a)(1) of the INA provides noncitizens physically present in the United States a statutory right to apply for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply

> for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1). Noncitizen applicants within the United States may, at the unreviewable discretion of the executive, be granted asylum if they prove that they are eligible. Eligible applicants are those who establish inability or unwillingness to return to (and obtain the protection of) the country of their nationality because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42)(A) (defining refugee), incorporated in 8 U.S.C. § 1158(b)(1)(A) (Conditions for granting asylum—In general—Eligibility).

Under the plain text of the asylum statute, noncitizens who are "physically present" in the United States are guaranteed the right to apply for asylum. *Id.* § 1158(a)(1). The statutorily mandated right to apply is reinforced by other provisions of the INA that similarly require the government to interview and consider for asylum any noncitizen who "indicates . . . an intention to apply for asylum"—even if the noncitizen is "inadmissible" under other provisions of the INA. *Id.* § 1225(b)(1)(A), (B). As the district court persuasively explained, the INA itself makes "clear that, even though asylum is itself a discretionary form of relief, providing aliens with the opportunity to apply for asylum (and the opportunity to be heard) is mandatory." Mem. Op. 91.

I.

I do not agree with Judge Millett's conclusion that "the asylum statute itself likely allows . . . suspension" of the rights of the entire plaintiff class to apply for asylum. Millett Op. 33-34. It is of course true that the ultimate decision whether to

grant asylum is a matter of executive discretion. *See* 8 U.S.C. § 1158(b)(1); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987) ("Section 208(a) . . . is a discretionary mechanism which gives the Attorney General the *authority* to grant the broader relief of asylum to refugees."). Nonetheless, Defendants have not made the requisite strong showing that the executive's power under the INA to deny asylum in the exercise of discretion authorizes it to make such a categorical, *ex ante* decision via guidance.

Notably, the asylum statute delineates a process by which the executive may determine in advance that certain classes of noncitizens are ineligible to receive a grant of asylum. But that decision must be both "consistent with" the asylum statute and established "by regulation," with the attendant formalities of administrative rulemaking. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B); *see* Mem. Op. 93-94. In 2018, for instance, when the executive sought to render ineligible for asylum noncitizens who entered the country in contravention of any future presidential proclamation barring entry along the southern border with Mexico, the Attorney General issued an interim final rule to that effect. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55934 (Nov. 9, 2018). The executive has not complied with the requisite rulemaking process here. Neither the Proclamation nor the implementing guidance was issued through notice and comment rulemaking or as an interim final rule under 5 U.S.C. § 553(b)(B).

Indeed, it is not at all clear that the Proclamation or guidance documents even purport to "preemptively deny asylum applications" submitted by the class members. Millett Op. 34-35. Sections 2 and 3 of the Proclamation suspend and impose restrictions on the "entry" of noncitizens attempting to come into the country across the southern border, or to come in

without sufficient documentation. 90 Fed. Reg. 8333, 8335 §§ 2, 3 (Jan. 20, 2025). As one of the restrictions on entry, the Proclamation bars noncitizens from "invoking" or "access[ing] . . . provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158." *Id.* That is the Proclamation's only reference to the asylum statute, and it is a restriction on *entry* into the country.

Neither the Proclamation nor the implementing guidance says anything about ineligibility to be considered for asylum or suspension of the right to apply for it—rights the INA generally makes available to noncitizens who have entered the country despite the Proclamation's entry ban. To the contrary, section 5 of the Proclamation, which directs various executive officers to "repatriate" and "remove" noncitizens who make it across the border, does not mention the asylum statute at all. Removal is an INA-defined process, and it accommodates asylum applications. *See* 8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(A)(ii).

II.

Even if the executive had validly decided to deny asylum to all migrants entering the United States unlawfully since January 20, 2025, the INA does not authorize Defendants to categorically deny as futile the statutorily mandated opportunity to apply.

A.

Plaintiffs are likely to succeed in establishing that foreclosing the opportunity to apply is contrary to the INA. That is so despite the intuitive appeal to the conclusion that protecting Plaintiffs' right to apply for asylum matters little if the executive has already authoritatively announced an

intention to deny asylum. The INA explicitly guarantees to all noncitizens present on U.S. soil the right to apply for asylum, with only three exceptions. The right does not apply to (1) certain noncitizens who can be removed to a safe third country, (2) certain noncitizens who fail to apply for asylum within one year of arriving in the United States, and (3) certain noncitizens who have previously applied for and been denied asylum. 8 U.S.C. § 1158(a)(2). Tellingly, there is no such carveout for noncitizens who are ineligible for asylum and whose applications will ultimately be rejected. That is so even in cases governed by the INA's mandatory bar against granting asylum to certain noncitizens, such as noncitizens who have persecuted others or have been convicted of serious crimes. *See* 8 U.S.C. § 1158(b)(2)(A). The INA prohibits those noncitizens from receiving asylum. But it leaves intact the right of those noncitizens to apply for asylum in the first place.

The Department of Justice has consistently reaffirmed that same understanding of the vigor of the right to apply for asylum within the INA's statutory scheme. Recall the Attorney General's 2018 interim final rule, mentioned above, rendering ineligible for asylum noncitizens who entered the country in contravention of Presidential directives. The proposed rule emphasized that the new "restriction on eligibility to [receive] asylum is consistent with . . . 8 U.S.C. 1158(a)(1)," because the regulation "establishes a condition on asylum eligibility, not on the ability to apply for asylum." 83 Fed. Reg. at 55941. The Department's supporting citation clarified that the "exceptions and bars to granting asylum," whether identified in the INA or promulgated by the executive, are separate from and do not affect the "conditions for *applying* for asylum" described in Section 1158(a). *Id.* (emphasis added). That is why the Department's regulations specify that noncitizens who are categorically ineligible for asylum are subject only to "mandatory denial of an asylum application." 8 C.F.R.

§ 208.13. They are not barred from making the application in the first place.

Importantly, the INA expresses Congress's vision for the nation's immigration system in a single comprehensive and internally coherent statute. As the Proclamation itself acknowledges, the INA establishes a "complex and comprehensive scheme" governing immigration. 90 Fed. Reg. at 8333. One implication of that comprehensiveness is that the outer bounds of authority delegated to the executive to make discretionary asylum eligibility and removal decisions are necessarily delimited by the statute's mandatory procedures. Those limits include Section 1158(a)(1)'s requirement to allow noncitizens on U.S. soil to apply for asylum.

It thus squarely violates the INA to conclude that the asylum provision's mandatory protections can be overcome by the executive's need to address quintessential immigration issues. The INA itself expresses the "balance that Congress struck" between providing asylum to those in need and facilitating efficient removals. Mem. Op. 92-93. The executive has no power to override that policy choice based on its own assessment that the statutory processes are unnecessary or unduly cumbersome.

B.

That the executive here bases its authority to foreclose mandatory asylum procedures on discretionary provisions contained in the same statute that establishes those mandatory procedures renders *Huisha-Huisha v. Mayorkas* inapposite. There, we analyzed an emergency order of the Centers for Disease Control at the Department of Health and Human Services that banned introduction into the United States of certain noncitizens as a measure to limit contagion during the

Covid-19 pandemic. 27 F.4th 718, 725-27 (D.C. Cir. 2022). Critically, that order was issued pursuant to the Surgeon General's "Section 265" authority to "suspen[d] . . . the right to introduce" persons into the United States in response to "serious danger" of spreading a communicable disease from a foreign country to the United States. 42 U.S.C. § 265.

In line with CDC's interpretation of its statutory power to suspend the "introduc[tion]" of persons into the United States, we interpreted Section 265 to authorize the executive to prevent foreign persons from coming "into contact with persons in the United States" or "moving into the interior" of the country after crossing the border, including by summarily expelling them from the country. *Huisha-Huisha*, 27 F.4th at 725, 729. We accordingly held that the Section 265 order against introducing potentially infected persons into the United States permissibly applied to authorize exclusion of persons seeking to enter *and* summary removal, without the opportunity to seek asylum, of persons who had managed to enter the United States before they were detected.

We recognized in *Huisha-Huisha* that the Section 265 authority granted to the executive during a public health emergency conflicted with Section 1185(a)'s requirement that "aliens—even those who enter the country illegally—[be allowed] to apply for asylum before they are expelled." *Id.* at 730. To "harmoniz[e]" the two statutes, we reasoned that Section 265's express authorization of the Surgeon General to effect "a suspension of the right to introduce such persons . . . [as] is required in the interest of the public health" supported the order's suspension of the INA's otherwise-required asylum procedures when the "dangers" to the public health "are sufficiently pronounced." *Id.* at 730-31.

That reasoning is inapplicable here, where we are interpreting only the INA itself, a comprehensive and internally consistent statute that affords noncitizens—even those whose asylum applications will ultimately be denied—the opportunity to apply for asylum and to receive an "individualized decision[]." *Cardoza-Fonseca*, 480 U.S. at 444. That the INA may be "ineffective" at preventing threats to the public health, Proclamation, 90 Fed. Reg. at 8334, does not authorize the President to rewrite Congress's statute. The asylum statute includes none of the sweeping language underpinning our reading of Section 265 at issue in *Huisha-Huisha*, and Defendants do not contend that the executive has here invoked authority under that public health law. Even if it were the case that the "asylum decision has already been made" by the Proclamation, *Huisha-Huisha*, 27 F.4th at 731, Defendants have made no strong showing that they are likely to succeed in establishing that the INA itself grants the executive authority to eliminate Plaintiffs' right to apply for asylum established by that very statute.

Staying the district court's injunction based on *Huisha-Huisha* is all the more problematic in light of our explicit warning against extrapolating the holding of that case too far: "No one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case." *Id.* at 733. That warning is especially pertinent here, where the government seeks a stay pending appeal. Its burden is accordingly higher than it was on the merits appeal from the preliminary injunction in *Huisha-Huisha*, requiring not just a likelihood of success on the merits of its claims, but a "strong showing" to that effect. *Nken*, 556 U.S. at 426.

***

In my view, Defendants have failed to make a strong showing that they are likely to succeed on the merits of their arguments that (1) the executive has lawfully made an *ex ante*, categorical decision to deny asylum to every person entering the United States in contravention of the Proclamation, or (2) even if it had made such a determination, such an asylum bar complies with the INA and revokes the Plaintiffs' statutory right to apply for asylum. I respectfully dissent from that portion of the court's ruling.

KATSAS, *Circuit Judge*, concurring in part and dissenting in part: The Immigration and Nationality Act authorizes the President to suspend the entry of aliens into the United States by proclamation. Invoking this authority, the President suspended entry of certain aliens crossing the southern border, and the Department of Homeland Security then issued informal guidance implementing the proclamation. The proclamation and guidance impose truncated procedures for effecting removal of covered aliens, bar covered aliens from applying for asylum, provide no mechanism for covered aliens to seek withholding of removal under the INA, and narrow the regulatory processes for covered aliens to seek withholding of removal under the United Nations Convention Against Torture (CAT). The district court held that the proclamation and guidance are unlawful in all of these respects, and it granted final injunctive relief to a class of aliens who are or will be affected by the proclamation or guidance. The government seeks a stay pending its appeal, which the Court grants only in part. As summarized below, I mostly agree with the disposition and the analysis set forth by Judge Millett.

*First*, the proclamation and guidance likely cannot impose truncated procedures for the removal of covered aliens. The proclamation rests on section 212(f) of the INA, which permits the President to "suspend the entry of all aliens or any class of aliens" whenever he finds the entry to be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). This provision grants the President sweeping power to control the "entry" of aliens into the United States. *See Trump v. Hawaii*, 585 U.S. 667, 684 (2018). But entry and removal are distinct concepts, in ordinary usage and under the INA. As to removal, section 240 of the INA establishes adjudicatory procedures that "shall be the sole and exclusive procedure[s] for determining whether an alien may be … removed from the United States," unless "otherwise specified" in the INA itself. 8 U.S.C. § 1229a(a)(3). And section 235(b) establishes distinct procedures for the "expedited removal" of aliens covered by

that provision. *Id.* § 1225(b). The President's broad power to impose "entry" restrictions likely does not override these otherwise mandatory removal processes.

*Second*, the proclamation and guidance likely can bar covered aliens from applying for asylum. The asylum statute provides that any alien physically present in the United States "may apply for asylum." 8 U.S.C. § 1158(a)(1). But it confers no right to asylum, which is solely "a matter of executive 'discretion.'" *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 730 (D.C. Cir. 2022) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987)). *Huisha-Huisha* involved the exclusion of aliens under 42 U.S.C. § 265, which allows the government to prohibit the "introduction" into the United States "of persons or property" likely to spread a communicable disease. *See* 27 F.4th at 723–24. We held that the government, in the course of exercising that authority, likely could decide in advance to "foreclos[e] asylum" for covered aliens. *Id.* at 731. And once the "asylum decision ha[d] already been made," the government also likely could bar those aliens from filing "futile" asylum applications. *See id.* In my view, the same reasoning extends to aliens covered by a section 212(f) proclamation suspending entry.

*Third*, the proclamation and guidance likely cannot supersede statutory and treaty protections regarding withholding of removal. The INA prohibits the government from removing an alien to any country where his life or freedom would be threatened on account of various protected characteristics. 8 U.S.C. § 1231(b)(3)(A). Similarly, the CAT prohibits removal to any country where the alien would likely be tortured. *See id.* § 1231 note. Unlike asylum, these substantive protections are mandatory. *See Nasrallah v. Barr*, 590 U.S. 573, 575 (2020) (CAT); *Cardoza-Fonseca*, 480 U.S. at 429 (INA). The regulations establishing procedures for

adjudicating CAT claims likewise are mandatory. And these various withholding provisions have nothing to do with who may or may not lawfully enter the country.

*Fourth*, the class definition is likely overbroad. Article III of the Constitution empowers the federal courts to provide relief only to parties "who have suffered, or will imminently suffer, actual harm." *Lewis v. Casey,* 518 U.S. 343, 349 (1996); *see*, *e.g.*, *SBA List v. Driehaus*, 573 U.S. 149, 159 (2014); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In providing for class actions, Federal Rule of Civil Procedure 23 does not permit courts to change substantive law, much less change the constitutional law of Article III standing. So, in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the Supreme Court stated that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Id.* at 431 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)). And in *Trump v. CASA*, 145 S. Ct. 2540 (2025), the Supreme Court recently held that federal courts likely lack the power to issue "universal" injunctions that "prohibit enforcement of a law or policy against *anyone*." *Id.* at 2548. Here, the district court granted permanent injunctive relief to "all individuals who are or will be subject to Proclamation 10888 and/or its implementation." ECF 72 (cleaned up); *see* ECF 73. This class appears to include aliens abroad who were not physically present in the United States when this suit was filed, or even when the injunction was entered. On that interpretation, the injunction would extend relief to a large number of individuals who lack Article III standing. *See Defs. of Wildlife*, 504 U.S. at 564. In my view, this raises serious constitutional problems.

Nonetheless, at this early stage of the appeal, I would afford no relief on the class-definition point beyond what Judge

Millett proposes. We have held that courts may award class-wide injunctive relief under Federal Rule of Civil Procedure 23(b)(2) if only one member of the class has standing. *See J.D. v. Azar*, 925 F.3d 1291, 1323–24 (D.C. Cir. 2019). In my view, this one-plaintiff rule makes sense when, but only when, the class seeks an "indivisible remedy" that courts cannot dole out plaintiff by plaintiff, or class-member by class-member. *See CASA*, 145 S. Ct. at 2564–65 (Thomas, J., concurring); *see also id.* at 2557 & n.12 (majority). And in my view, this case involves no such indivisible remedy because awarding complete relief to any one plaintiff or class-member would be readily feasible. Nonetheless, the impact of *TransUnion* and *CASA* on *J.D.* is a hard question, and I do not think the Supreme Court has so clearly abrogated *J.D.* as to warrant a stay on that basis. Moreover, the relief sought in *J.D.*—an injunction against enforcement of certain government policies regarding access to abortion for unaccompanied minors in government custody, *see* 925 F.3d at 1300—seems to me just as divisible as the relief sought here.

*Finally*, I dissent from the denial of a stay on one point regarding the remedial limitations imposed by 8 U.S.C. § 1252(f)(1). That provision states that no court other than the Supreme Court "shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter"—*i.e.*, part IV of subchapter II of chapter 12 of Title 8, which consists of 8 U.S.C. §§ 1221 through 1232—"other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." In *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), the Supreme Court held that section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," except in "individual" cases not

involving "classwide injunctive relief." *Id.* at 550. The specified part IV provisions include section 1229a, which sets forth ordinary removal procedures, and section 1225(b)(1), which sets forth expedited removal procedures. The district court held that the proclamation and guidance impermissibly sought to supplant these mandatory removal procedures. As noted above, the court was likely correct on this point, so it properly enjoined application of the proclamation and guidance to the named plaintiffs to that extent. But because such an injunction commanded the government to use the part IV provisions to conduct removals, section 1252(f)(1) barred the extension of this injunctive relief to absent class members.

My colleagues describe the injunctive relief as operating on executive actions grounded in section 1182(f), which lies outside of part IV. But as the district court explained, the enjoined provisions and actions amounted to "an extra-statutory system for expelling aliens from the United States," ECF 71 at 121, which is likely unlawful precisely because it conflicts with sections 1229a and 1225(b)(1). *Aleman Gonzalez* indicated that section 1252(f)(1) does not bar class-wide injunctive relief against the operation of a provision outside part IV simply because the injunction "has some collateral effect on the operation of" provisions inside part IV. *See* 596 U.S. at 553 n.4. But in the only cited case involving such a collateral effect, the enjoined provision was held invalid for reasons having nothing to do with any part IV provision. *See Gonzales v. DHS*, 508 F.3d 1227, 1231–34 (9th Cir. 2007). That seems to me quite different from the situation here, where the court restrained the operation of statutory provisions outside part IV because they conflict with provisions inside it. In my view, the latter kind of case involves a court ordering the government to "enforce, implement, or otherwise carry out" the part IV removal provisions, thereby triggering section 1252(f)(1). *See Aleman Gonzalez*, 596 U.S. at 550. And it is

no answer to say that the government need not carry out any removals at all, which would be a wholesale abdication of its enforcement responsibilities under the INA.

No. 25-5243

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

MARKWAYNE MULLIN, Secretary of the
U.S. Department of Homeland Security,
in his official capacity, *et al.*,
*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

**DECLARATION OF ERIC RUARK**

I, Eric Ruark, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Assistant Secretary for Border Security and Immigration Policy for the U.S. Department of Homeland Security ("DHS") and have served in

this role since November 2025. Prior to my current role, I worked on immigration policy for fifteen years in the non-profit sector. As the Assistant Secretary, I oversee the Department's border security and immigration policies and their implementation. This declaration is based upon my personal and review of documents and information provided to me in my official duties. I make this declaration based on the best of my knowledge as of this day.

## I. **The Necessity of the Proclamation**

2. Since fiscal year 2021, at least 9 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States.[1] Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 FR 8333 (Jan. 20, 2025) (the "Proclamation"). The sheer number of aliens entering the United States has overwhelmed Congress's complex scheme, the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, to protect United States sovereignty and prevent entry of aliens who pose threats to public health, safety, or national security. *Id.* As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide, imposing

[1] Office of Homeland Security Statistics, "Immigration Enforcement and Legal Processes Monthly Tables," Nationwide CBP Encounters by Encounter Type and Region, https://ohss.dhs.gov/topics/immigration/immigration-enforcement/monthly-tables. OHSS analysis of April 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS tab Par 2].

substantial costs and constraints on the States. *Id.* Further, in a border environment with significant information gaps, public safety and national security risks are heightened by the presence of, and control of territory by, international cartels and other Transnational Criminal Organizations (TCOs) on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. *Id.*

3. In response to this unprecedented influx of aliens, on January 20, 2025, the President issued a Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States." Proclamation 10888, 90 FR at 8334–35. The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum in section 208 of the INA, 8 U.S.C. § 1158. *Id.* at 8335. The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1) – (3) of the INA." *Id.*

4. Since the Proclamation was issued, it has had a monumental impact on illegal border crossings and restoring near operational control at the southern border,

making the United States and its citizens safer. In the 465-day period from January 21, 2025, through April 30, 2026, encounters by the U.S. Border Patrol ("USBP") at the southern border decreased by 93 percent compared to the same number of days prior to the issuance of the Proclamation (October 14, 2023-January 20, 2025). Encounters are at the lowest level they have been since the 1960s. The success of the Proclamation is further demonstrated by the removal or return of more than 56,880 aliens encountered at the southwest border (SWB) from when it was issued through April 30, 2026. The number of SWB enforcement actions resulting in releases has dropped from nearly 3,260 (October 14, 2023-January 20, 2025) per day to fewer than one per day.[2] If the Proclamation is enjoined for any period of time, however, DHS anticipates that circumstances at the southern border would rapidly deteriorate to pre-Proclamation conditions or worse, exacerbating the threats to national security and public safety that the federal government is obligated to guard against.

## II. <u>The Problem of the Influx of Illegal Aliens Crossing the Southern Border.</u>

5. In routine circumstances, the provisions of the INA work to prevent the admission of aliens who do not serve the national interest, such as those who pose threats to public health, INA § 212(a)(1), 8 U.S.C. § 1182(a)(1); safety, § 212(a)(2)

---

[2] OHSS analysis of April 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS tab Par 4].

(8 U.S.C. § 1182(a)(2)); and national security, § 212(a)(3) (8 U.S.C. § 1182(a)(3)). *See* Proclamation, 90 FR 8333. But in circumstances where the volume of illegal entries into the United States overwhelms the system, and access to necessary screening information is limited for aliens who have traveled from around the world to enter the United States illegally, these provisions may be rendered wholly ineffective. *Id.*

6. The sheer number of aliens who have entered the country between ports of entry (POEs) at the southern border and who have been released into the United States over during the prior Administration have created exactly these circumstances. As detailed below, these conditions made the Proclamation's provisions—suspending and restricting entry, making asylum protections unavailable to certain aliens, and requiring medical and criminal history documentation—indispensable to preserving national security and public safety.

7. In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s, with USBP making over 1.6 million encounters. In FY 2022, DHS reached a record high number of encounters at the SWB, with total USBP encounters exceeding 2.2 million. And in FY 2023, DHS yet again reached another record year of encounters, totaling over 2 million between SWB POEs. In the first eight-plus months of FY 2024 up through June 4, 2024, there were approximately 1.3 million USBP encounters at the SWB. From June 5, 2024, to January 20, 2025,

despite the proclamations and rules instituted by the prior administration in June 2024 and October 2024, there were over 408,000 USBP encounters at the SWB.[3]

8. Through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009-546, Congress created an expedited removal system for removing certain inadmissible aliens arriving in the United States and certain aliens who entered illegally and were apprehended within two years of their entry. Those procedures were aimed at facilitating the swift removal of inadmissible aliens while also expeditiously resolving any asylum claims.

9. When it was first implemented approximately three decades ago, expedited removal worked well, but its utility has been diminished by the substantial increase in aliens crossing the southern border and the increased rates at which they invoke the credible fear process for determining asylum eligibility. Additionally, in recent years a significant percentage of aliens who are amenable to expedited removal, but are not processed through expedited removal due to resource constraints, were instead released into the United States and placed into removal proceedings under INA § 240, 8 U.S.C. § 1229a ("section 240 removal

[3] OHSS analysis of March 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS tab Par 7].

proceedings"), without any pre-screening to determine a potential eligibility for asylum or related protection.

10. For example, over 1.5 million aliens were encountered by USBP at the SWB between POEs in FY 2024, and about 346,700 were processed for expedited removal, just 24 percent of potentially amenable aliens encountered during that year.[4] Instead, DHS released the majority of these aliens into the United States with notices to appear ("NTAs") for removal proceedings pursuant to section 240 removal proceedings[5]—a process that in most cases takes years to resolve.[6]

11. While challenges to fully utilizing expedited removal are not new, the problem worsened dramatically from 2021 through 2024. During FY 2014 through FY 2019, DHS released less than 10 percent of aliens apprehended by USBP at the SWB into the United States pending section 240 removal proceedings.[7] In contrast,

---

[4] June 2025 OHSS Enforcement Lifecycle using June 2025 OHSS statistical system of record based on data provided by CBP, USCIS, ICE, and DOJ/EOIR. There were 1.4 million potentially amenable encounters between POEs in FY 2024, a count that excludes unaccompanied alien children [OHSS Tab Par 10(a)].

[5] OHSS, analysis of April 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS Tab Par10(b)].

[6] For example, EOIR decisions completed in October 2025 were, on average, initiated in June 2022, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that), but 52 percent of EOIR cases initiated during that time were still pending as of October 2025, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of October 31, 2025 [OHSS Tab Par10(c)].

[7] OHSS, Analysis of March 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS Tab Par 11]; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, "SWB Encounter Book-Outs," *https://ohss.dhs.gov/topics/immigration/immigration-enforcement/immigration-enforcement-and-*

from March 20, 2021, through May 11, 2023, DHS released about 30 percent of aliens apprehended by USBP into the United States, and the percentage of encounters resulting in such releases increased to 60 percent between May 12, 2023, and June 4, 2024.[8] The vast majority of these releases involved aliens who were amenable to expedited removal but were instead placed directly into section 240 removal proceedings and released into the United States.

12. Moreover, aliens encountered at the SWB between POEs who were processed for expedited removal have been more likely to indicate an intent to apply for asylum or some other form of protection in recent years, which prevents their immediate removal.[9] From FY 2014 to FY 2024, the overall percentage of aliens encountered at the SWB between POEs and processed for expedited removal who indicated an intention to apply for asylum, expressed a fear of persecution or torture, or expressed a fear of return to their country and were referred for a credible fear interview increased from approximately 21 percent to 49 percent; similarly, the total

---

*legal-processes-monthly* (last updated Jan. 16, 2025) (select "SWB Book-Outs" and then select "Between Ports of Entry – U.S. Border Patrol (USBP)").

[8] *Id.*

[9] Fifty-three percent of aliens encountered at the SWB processed for expedited removal in the post-title 42 period (after the end of implementation of the Center for Disease Control and Prevention's public health Order pursuant to Title 42 of the U.S. Code on May 11, 2023) through the end of FY 2024 made fear claims, up from thirty-four percent in the pre-pandemic period from FY 2014 through FY 2019. OHSS analysis of June 2025 OHSS Enforcement Lifecycle using June 2025 OHSS statistical system of record based on data provided by CBP, USCIS, ICE, and DOJ/EOIR [OHSS Tab Par 12(a)].

number of credible fear referrals for interviews increased from about 42,000 in FY 2014 to about 168,000 in FY 2024.[10]

13. DHS's inability to process most inadmissible aliens through expedited removal in recent years due to the sheer number of aliens who entered the United States unlawfully, combined with the increase in the number of aliens in expedited removal making fear claims and being referred to section 240 removal proceedings, has had serious consequences for immigration enforcement and adjudication, border security, and communities across the country.

14. Such large-scale releases have created further incentives for aliens to cross illegally into the United States with the belief that, even if initially apprehended and detained, they will ultimately be released to live and work in the United States during their removal proceedings, which, as exacerbated by the drastic increases in initial case receipts of aliens who are subject to but unable to be processed via expedited removal, may take years to resolve. *See Securing the Border*, 89 FR 81156, 81158 (Oct. 7, 2024). This period of time, in addition to the length of time it can take before a removal occurs after a final removal order is issued, creates a strong incentive for some number of aliens without potentially meritorious asylum

[10] OHSS analysis of June 2025 OHSS Enforcement Lifecycle using June 2025 OHSS statistical system of record based on data provided by CBP, USCIS, ICE, and DOJ/EOIR [OHSS Tab Par 12(b)]. *See also* USCIS, *Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions*, https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.

or other claims to make the dangerous journey to the southern border to take their chances on being allowed to remain in the United States for a lengthy period. *Id.* at 81182. More specifically, 61% of aliens processed under expedited removal at the SWB made fear claims even though only 17% of aliens whose cases are completed by the Executive Office for Immigration Review are granted asylum or other form of relief from removal.[11]

15. As a result of these circumstances, screening for public health, safety, and national security was compromised—further worsening the costs to and constraints on the States and communities forced to absorb these large-scale releases of illegal aliens.

16. Notably, DHS lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by INA § 212(a)(1), 8 U.S.C. § 1182(a)(1). Proclamation, 90 FR at 8333. And effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as aliens who are admitted lawfully would. *Id.* As a result, innumerable aliens potentially carrying communicable diseases of public health significance have illegally crossed the southern border and entered

[11] OHSS, analysis of June 2025 Office of Homeland Security Statistics Enforcement Lifecycle using June 2025 OHSS Statistical System of Record based on data provided by CBP, USCIS, ICE, and DOJ/EOIR.

communities across the United States, particularly during the period of high numbers of illegal entrants from 2021 through 2024. *Id.*

17. Moreover, due to the processing time required to manage high numbers of illegal entrants—such as in the border environment that existed from 2021 through 2024, Federal officials do not always have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by INA § 212(a)(2)–(3), 8 U.S.C. § 1182(a)(2)–(3). *Id.* Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials. *Id.*

18. The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other Transnational Criminal Organizations (TCOs) on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. *Id.* The risks associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that inhibit operational control of the border. *Id.*

19. Critically, not only did overall encounters at the SWB increase from FY 2021 to FY 2024, but so did encounters with aliens that pose threats to national security and public safety. In FY 2023, USBP encountered 169 aliens on the terrorist

watchlist attempting to enter the country illegally between POEs at the SWB.[12] In contrast, encounters of aliens on the terrorist watchlist and those with known gang affiliations are both down sharply in recent months. In FY 2025, USBP apprehended less than half of the number of watchlisted individuals attempting to enter the country illegally between POEs for FY 2023.[13] Further, in FY 2023 and FY 2024, respectively, there were 639 and 523 USBP encounters with individuals with known gang affiliations between the POEs, compared to 363 in FY 2020 and 348 in FY 2021.[14] From January 21, 2025 to April 30, 2026, USBP apprehended just 610 individuals with gang affiliations, a pace that projects to 513 per year.[15]

20. TCOs and Foreign Terrorist Organizations (FTOs) capitalized on the invasion at the SWB. TCOs and FTOs take advantage of USBP agents being pulled away from their patrol duties along the borders to detention-related activities to aid in the processing of large groups that characterize the heavy migration flow across the border, utilizing diversionary tactics to circumvent USBP deployment posture and technologies to move illicit contraband and criminal aliens into the interior of

---

[12] *See* CBP, *CBP Enforcement Statistics*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on April 30, 2026) ("CBP TSDS Encounters at and Between Land Ports of Entry" table).
[13] *See* CBP, *CBP Enforcement* Statistics, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited April 30, 2026).
[14] *See* CBP, *Gang Affiliated Enforcement*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited on July 2, 2025).
[15] OHSS, analysis of March 2026 OHSS Statistical System of Record based on data provided by CBP and data provided by CBP on May 4, 2026.

the United States. Cartels, for example, operate with substantial financial resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting.

21. TCOs and FTOs also took advantage of the influx of crossings at the southern border to illegally enter the United States between POEs or fraudulently through parole at POEs. In 2023 and 2024, for example, eight individuals from Tajikistan entered the United States through various means, including at and between POEs. Some of these individuals claimed asylum after securing an appointment through the now-terminated CBP One mobile application ("CBP One app") scheduling function and presenting themselves at a POE. At the time of entry or encounter, none of the individuals was determined to have any information in their background that impacted their ability to be paroled into the United States; however, after entry, they were arrested and suspected of having ties to the Islamic State (ISIS), according to public news sources.[16] Separately, as reported by the Department of Justice (DOJ), on February 26, 2025, another Tajik national who was

[16] *See* CNN, *Feds arrested 8 Tajik nationals on immigration charges after probe found potential ties to terrorism, sources say* (last updated June 12, 2024), https://www.cnn.com/2024/06/11/us/tajik-nationals-arrested-terror-ties-probe/index.html (last visited on March 22, 2025).

illegally present in the United States was arrested after facilitating the payment of tens of thousands of dollars to ISIS-linked extremists overseas, possessing assault rifles, and declaring himself "ready" in a video sent to such individuals. The Tajik national traveled to the United States in June 2016 on a non-immigrant tourist visa, overstayed his visa, then attempted to enter into a sham marriage with an American citizen, which was never recognized.[17]

22. As a result of the invasion at the SWB, TCOs and FTOs have gained a foothold in, and endangered, communities throughout the United States.[18] For example, during the October 1, 2025-November 12, 2025 government shutdown alone, ICE arrested 23 gang members in southwest Texas, "including an MS-13 gang member charged with a triple homicide in Dallas" who was released into the U.S. by the prior Administration in May 2024.[19] On November 16, 2025, in San Antonio, Texas, 27 suspected Tren de Aragua members, at least some of whom entered the

[17] *See* United States Attorney's Office, Eastern District of New York, *Tajik National Arrested in Brooklyn for Conspiring to Provide Material Support to ISIS*, last updated Feb. 26, 2025, https://www.justice.gov/usao-edny/pr/tajik-national-arrested-brooklyn-conspiring-provide-material-support-isis (last visited on March 22, 2025).

[18] *See* DOJ, *Full-Scale Response: A Report on the Department of Justice's Efforts to Combat MS-13 from 2016-2020*, https://www.justice.gov/archives/ag/page/file/1329776/dl (last visited Nov. 26, 2025).

[19] *See* ICE, *ICE Houston arrests more than 3,500 criminal illegal aliens, child predators and murderers during shutdown*, last updated Nov. 18, 2025, https://www.ice.gov/news/releases/ice-houston-arrests-more-3500-criminal-illegal-aliens-child-predators-and-murderers (last visited Nov. 25, 2025).

United States during the prior Administration, were arrested at a nightclub.[20] In Hyattsville, Maryland, a high-ranking MS-13 leader charged in El Salvador with terrorist affiliation was arrested earlier this year,[21] and multiple MS-13 leaders wanted for homicide in El Salvador have been arrested in the past year.[22] In Los Angeles, five members of MS-13 were convicted of heinous murders committed to "advance their standing in the gang," and more MS-13 members are scheduled for trial next year.[23] Violent gang members were also arrested during Operation Midway Blitz in Chicago—including a member of the "Latin Kings who was previously deported, convicted of burglary, obstruction of justice, two counts of aggravated unlawful use of a weapon, two DUIs, illegal reentry and previously

---

[20] *See* DHS, *Homeland Security Task Force Operation Results in the Arrest of More than 150 Illegal Aliens at Tren de Aragua Nightclub in San Antonio*, Nov. 20, 2025, https://www.dhs.gov/news/2025/11/20/homeland-security-task-force-operation-results-arrest-more-150-illegal-aliens-tren (last visited Nov. 25, 2025).

[21] *See* ICE, *ICE, FBI arrest high-ranking MS-13 leader who controlled gang activities in US, Mexico, Europe*, last updated June 13, 2025, https://www.ice.gov/news/releases/ice-fbi-arrest-high-ranking-ms-13-leader-who-controlled-gang-activities-us-mexico (last visited Nov. 25, 2025).

[22] *See* DHS, *ICE Arrests MS-13 Gang Member in California Wanted for Murder in El* Salvador, last updated Apr. 1, 2025, https://www.dhs.gov/news/2026/04/01/ice-arrests-ms-13-gang-member-california-wanted-murder-el-salvador (last visited Apr. 30, 2026); DHS, *In Virginia, ICE Arrests One of El Salvador's "Most Wanted" Fugitives and MS-13 Gang Leader Wanted for Murder*, last updated Nov. 21, 2025, https://www.dhs.gov/news/2025/10/16/virginia-ice-arrests-one-el-salvadors-most-wanted-fugitives-and-ms-13-gang-leader (last visited Nov. 25, 2025).

[23] *See* United States Attorney's Office, Central District of California, *Five MS-13 Members Found Guilty of Committing String of Six Grisly Murders to Advance Their Standing in the Criminal Street Gang*, Nov. 10, 2025, https://www.justice.gov/usao-cdca/pr/five-ms-13-members-found-guilty-committing-string-six-grisly-murders-advance-their (last visited Nov. 25, 2025).

arrested for possession of a controlled substance."[24] In addition to posing a danger to communities, TCOs have taken brazen actions to endanger law enforcement well beyond the SWB.[25]

23. Once here, transnational gangs "increase crimes such as murder, assault and kidnapping in our communities," "often corrupt public officials, law enforcement authorities and judicial systems through bribery, intimidation and coercion," and "create a climate of fear and insecurity in communities."[26] Despite law enforcement's recent successes in routing out TCOs and FTOs, their presence remains widespread—one of the most violent criminal organizations in the United States, MS-13, has over 10,000 members in more than 40 states.[27] MS-13 is "increasingly the most violent and well-organized" street gang[28] made up of

---

[24] *See* DHS, *Operation Midway Blitz Brings Historic Drop in Crime to J.B. Pritzker and Brandon Johnson's Chicago*, last updated Nov. 12, 2025, https://www.dhs.gov/news/2025/11/12/operation-midway-blitz-brings-historic-drop-crime-jb-pritzker-and-brandon-johnsons (last visited Nov. 25, 2025). Similar arrests also occurred during the Department's targeted enforcement actions in Minneapolis. *See, e.g.*, DHS, *DHS Arrests More Worst of Worst Including Gang Members, Rapists, Burglars, and Perpetrators of Frause in Minnesota Yesterday*, last updated Mar. 17, 2026, https://www.dhs.gov/news/2026/01/21/dhs-arrests-more-worst-worst-including-gang-members-rapists-burglars-and (last visited Apr. 30, 2026).

[25] *See* DHS, *Latin Kings Gang Member Arrested in Illinois*, last updated Nov. 19, 2025, https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border (last visited June 5, 2026).

[26] *See* ICE, *Transnational Gangs*, last updated Feb. 20, 2026, https://www.ice.gov/about-ice/hsi/investigate/transnational-gangs (last visited June 5, 2026).

[27] *Id*.

[28] *See* FBI, Statement Before the House Homeland Security Committee, Subcommittee on Counterterrorism and Intelligence, *Combating Gang Violence on Long Island: Shutting Down the MS-13 Pipeline*, https://www.fbi.gov/news/speeches-and-testimony/combating-gang-violence-on-long-island-shutting-down-the-ms-13-pipeline (last visited Nov. 26, 2025).

"immigrants or the descendants of immigrants from El Salvador."[29] Eradicating the threat from MS-13 poses a unique challenge for law enforcement in part because of its "propensity for gruesome violence" and "established international network."[30]

## III. **The Impact and Limitations of the Securing the Border Proclamations and Rule.**

24. On June 3, 2024, in response to circumstances at the southern border and a projected increase in illegal immigration absent policy changes, President Biden issued Presidential Proclamation 10773, 89 FR 48487 (June 3, 2024) ("June STB Proclamation"),[31] invoking INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), finding that the entry into the United States of certain aliens during emergency border circumstances would be detrimental to the interests of the United

[29] *See* DOJ, Office of Public Affairs, *Department of Justice Fact Sheet on MS-13*, April 18, 2017, https://www.justice.gov/archives/opa/speech/file/958481 (last visited Nov. 26, 2025).

[30] *See* FBI, Statement Before the House Homeland Security Committee, Subcommittee on Counterterrorism and Intelligence, *Combating Gang Violence on Long Island: Shutting Down the MS-13 Pipeline*, https://www.fbi.gov/news/speeches-and-testimony/combating-gang-violence-on-long-island-shutting-down-the-ms-13-pipeline (last visited Nov. 26, 2025).

[31] On September 27, 2024, President Biden issued a proclamation amending the June STB Proclamation. *See* Presidential Proclamation 10817, 89 FR 80351 (Oct. 7, 2024). That proclamation amended the June STB Proclamation in two ways to change the way that southern border encounters are calculated for purposes of discontinuing or reactivating the June STB Proclamation's suspension and limitation on entry of certain aliens at the southern border. First, previously the suspension and limitation on entry would be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters. *See* 89 FR at 48491. Under the revised Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive calendar days before the 14-day waiting period is triggered. *See* 89 FR at 80353. Second, the revised Proclamation now counts encounters of unaccompanied alien children from non-contiguous countries as encounters factored into the aforementioned calculation. *See id*.

States, and suspending and limiting the entry of those aliens. *Id.* at 48491. The June STB Proclamation established thresholds based on the number of encounters between POEs for when the suspension and limitation on entry would be discontinued, continued, or reactivated. *Id.* It also directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492.

25. Shortly thereafter, DHS and DOJ issued a corresponding IFR, Securing the Border, 89 FR 48710 (June 7, 2024) ("STB IFR"). The STB IFR effectuated three key changes to the process for those aliens described in the June STB Proclamation who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June STB Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances; (2) rather than asking specific questions of every alien encountered and processed for expedited removal, providing general notice on credible fear and referring an alien for a credible fear interview only if the alien manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because of the STB IFR's

limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and protection under the Convention Against Torture ("CAT") regulations under a "reasonable probability" standard, defined as "substantially more than a 'reasonable possibility' but somewhat less than more likely than not." STB IFR, 89 FR at 48718; *see also* 8 C.F.R. §§ 208.35(b)(2)(i), (iii).

26. Following the June STB Proclamation, STB IFR, and later final rule, Securing the Border, 89 FR 81156 (Oct. 7, 2024) ("STB final rule"), encounter numbers between POEs decreased from an average of 4,910 per day in the six months prior to the rule to an average of 1,880 per day between June and December 2024.[32] However, the STB Proclamations and rules did not go far enough to ensure that the immigration system operates in the manner intended by Congress and with the rigor within the President's authority. Critically, the STB Proclamations and rules contained exceptions and thresholds for deactivation that prevented them from fully achieving these goals.

27. Most prominently, the STB Proclamations contained exceptions to accommodate the Biden Administration's use of the CBP One app[33] for aliens who

---

[32] OHSS, analysis of March 2026 OHSS Statistical System of Record based on data provided by CBP.

[33] In January 2023, the Biden administration announced a new functionality for the CBP One app, which was originally intended to provide a wide variety of services to legitimate travelers and the trade community. *See* CBP, CBP/DHS/PIA-068, *Privacy Impact Assessment for the*

sought appointments to be processed at a POE. Almost all aliens who used the application were then issued NTAs for section 240 removal proceedings and released into the United States, rather than being placed in expedited removal. In FY 2023 and FY 2024, there were 266,840 and 505,740 NTA releases, respectively, for aliens using the application. In FY 2025 through January 20, 2025, there were 153,550.[34]

28. Further, the STB rule itself also contained an exception for exceptionally compelling circumstances. 8 C.F.R. §§ 208.35(a)(2)(i), = 1208.35(a)(2)(i). Over 7,200 aliens who were apprehended by USBP between the POEs at the southern border between June 5, 2024, and January 20, 2025 were able to establish this exception to the STB rule's asylum eligibility limitation during their credible fear screening, and USCIS returned positive fear determinations in approximately 6,000 (84 percent) of these cases, despite these aliens having entered in violation of the STB Proclamations' suspension and limitation on entry.[35] In comparison, for the approximately 56,000 aliens who were found to be subject to

---

*CBP One*™, at 1, July 25, 2024), https://www.dhs.gov/publication/dhscbppia-068-cbp-one-mobile-application. Aliens scheduled about 994,000 appointments through the CBP One app from the scheduling functionality's release through January 2025. *See* OHSS analysis of data provided by CBP Passenger Systems Program Directorate Jan. 22, 2025. Each appointment represents an alien or traveling group who scheduled an appointment, showed proof of the appointment to a U.S. official at the physical boundary between the United States and Mexico, and was permitted to enter a POE for inspection and processing.

[34] OHSS, analysis of March 2026 OHSS Statistical System of Record based on data provided by CBP.

[35] OHSS analysis of USCIS APSO data downloaded from UIP April 29, 2026.

the STB rule's asylum eligibility limitation during their credible fear screening and therefore screened at the "reasonable probability" standard, USCIS returned positive fear determinations in 28,900 cases, or just 51 percent of the time.[36]

29. Therefore, although the STB Proclamations and rules were aimed at deterring aliens from illegally entering the United States and delivering timely consequences to those who did, the CBP One app exception and the rule's exceptionally-compelling-circumstances exception fell far short of securing the border and instead allowed a substantial number of aliens to be released into the United States.

30. The impact of STB was also undercut by other prior administration's policies that granted parole into the United States to large numbers of aliens, including for certain Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) nationals and their immediate family members.[37] In FY 2023 and FY 2024, approximately 532,000 Cuban, Haitian, Nicaraguan, and Venezuelan aliens and their immediate family members were processed and released into the United States pursuant to CHNV parole processes.[38]

---

[36] OHSS analysis of USCIS APSO data downloaded from UIP April 29, 2026.

[37] DHS terminated these programs in 2025. These four parole programs were terminated in a March 25 *Federal Register* Notice. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 FR 13611 (Mar. 25, 2025).

[38] OHSS analysis of data provided by CBP March 2025.

## IV. **<u>The Proclamation is Critical to Addressing the Influx of Illegal Immigration at the Southern Border.</u>**

31. As detailed above, the public health and national security risks posed by the influx of innumerable aliens into the United States, and the insufficient actions of the prior administration, requires the federal government to take measures to uphold its obligations to the States and to the American people. Accordingly, the President issued the Proclamation pursuant to INA §§ 212(f) and 215(a)(1), 8 U.S.C. §§ 1182(f) and 1185(a)(1), declaring that the entry into the United States on or after January 20, 2025, of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. *See* Proclamation, 90 FR 8333. The President took and directed a range of actions in the Proclamation, including:

- Directing that entry of aliens engaged in the invasion across the southern border into the United States is suspended until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 1);
- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that aliens engaged in the invasion across the southern border of the United States on or after January 20, 2025, are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to,

section 208 of the INA, 8 U.S.C. § 1158, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335, (§ 2);

- Proclaiming, pursuant to sections 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), that the entry into the United States, on or after January 20, 2025, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. §§ 1182(a)(1)–(3), is detrimental to the interests of the United States, and directing that entry into the United States of such aliens be suspended and restricting their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158, *see* 90 FR 8335, (§ 3);
- Invoking the authorities provided to the President under Article II of the Constitution of the United States, including the President's control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4 of the Constitution, to suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and directing the Secretary of Homeland

Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the objectives of the Proclamation, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 FR at 8335–36, (§ 4); and

- Directing the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after January 20, 2025, whether as an exercise of the suspension power in section 212(f) and 215(a)(1) of the INA, 8 U.S.C. §§ 1182(f) and 1185(a)(1), or as an exercise of the President's delegated authority under the Constitution of the United States, until the President issues a finding that the invasion at the southern border has ceased, *see* 90 at FR 8336 (§ 5).

32. When the Proclamation was first issued on January 20, 2025, USBP implemented the Proclamation on the southern border in two ways. First, certain aliens could have been processed for INA § 212(f) repatriation. Second, aliens who could not be directly repatriated under INA § 212(f) were generally processed for expedited removal. First, processing for INA § 212(f) repatriation allows DHS to immediately return aliens to their country of origin or a third country that will accept

them without expending its limited law enforcement and detention resources. Second, some countries either do not immediately allow repatriation or do not immediately issue travel documents when aliens lack valid travel documents for DHS to remove them. Aliens subject to the Proclamation—either INA § 212(f) repatriation or expedited removal—who manifested a fear were referred to USCIS for an assessment under the CAT.

33. At the northern and coastal borders, USBP implements Section 3 of the Proclamation only. This means that an alien encountered between POEs on the northern or coastal borders is only subject to the Proclamation if he or she lacks sufficient documentation showing medical, criminal history, and background information.

34. The Proclamation does not impact USBP's processing of unaccompanied alien children (UACs), who continue to be processed consistent with the requirements of the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) and the *Flores* Settlement Agreement.

35. In any case, if an alien could not be removed or repatriated directly to his or her country of citizenship—which was mostly applied to countries that DHS has deemed "hard to remove"—USBP would notify the alien of the country to which he or she would be transferred and provide the alien with a tear sheet identifying the destination country. Aliens who manifested fear of being removed to the specified

country were referred to USCIS for a CAT assessment. If the CAT determination was negative, USBP would continue to remove the alien to the designated country. If the CAT determination was positive, USBP could designate another third country for removal or repatriation, or USBP could place the alien into proceedings with the Executive Office for Immigration Review (EOIR).

36. Aliens subject to the Proclamation whom CBP did not directly remove or repatriate to a designated country were transferred to ICE custody. Aliens who manifested fear while in ICE custody were referred to USCIS for a CAT assessment. If the CAT assessment was negative, ICE would effectuate removal or repatriation. If the CAT assessment was positive, another country could be designated as a country of removal or repatriation.

37. CBP Office of Field Operations ("OFO") implements Section 3 of Proclamation at the land border POEs and at air and seaports. At land border POEs on both the southern and northern border, aliens who lack valid entry documents, or who otherwise fail to provide sufficient medical information or reliable criminal history and background information are prevented from entering the United States at the physical border. Similarly, an alien who arrives at an air or seaport who is determined to be subject to Section 3 of the Proclamation is generally processed for expedited removal or a withdrawal of their application for admission.

38. On July 2, 2025, the U.S. District Court for the District of Columbia issued an order enjoining the government's implementation of the Proclamation in part. On August 1, 2025, the D.C. Circuit issued an order ("August 1st Order") granting in part and denying in part the government's motion for a stay pending appeal of the district court's order. Pursuant to the August 1st Order, USBP ceased processing repatriations under the Proclamation and processed aliens subject to the Proclamation under applicable Title 8 processes, including expedited removal. OFO likewise began processing all aliens subject to the Proclamation under applicable Title 8 processes, including expedited removal. Aliens subject to the Proclamation could still be processed for removal to a third country, as appropriate. Aliens who claimed fear were referred to USCIS for screening. ICE, too, began processing under Title 8, either expedited removal, or if expedited removal is not possible, placing aliens in INA § 240 proceedings.

39. Pursuant to the August 1st Order, USCIS stopped processing CAT assessments referred by CBP or ICE pursuant to INA §§ 212(f) or 215(a), including any pending CAT assessments that had already been accepted. Upon referral by CBP or ICE, USCIS screened *RAICES* class members for statutory withholding of removal and protection under CAT, utilizing existing credible fear procedures and screening standards. Class members were not screened for eligibility for asylum. Class members who had already received CAT Assessments were re-screened for

eligibility for statutory withholding of removal, as well as screened for protection under CAT under applicable credible fear standards.

## V. The Proclamation is Indispensable to Maintaining Operational Control of the Border and Protecting National Security and Public Safety.

40. The Proclamation, which complements other executive orders and actions, has been highly effective up to the present. SWB encounters between POEs have fallen from an average of about 3,470 aliens per day in the 465-day period ending on January 20, 2025, to an average of about 250 per day between January 21, 2025 and April 30, 2026.[39] SWB releases from USBP custody fell from an average of about 1,780 per day to an average of less than 1 per day in the same two time periods.[40] Further, illegal aliens encountered since the Proclamation was implemented generally have been quickly repatriated or removed.[41] That the Proclamation remained effective even after the implementation of certain provisions

[39] OHSS analysis of April 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS tab 40a].
[40] OHSS analysis of April 2026 OHSS Statistical System of Record based on data provided by CBP [OHSS tab 40b].
[41] For CBP SWB encounters Jan. 21, 2025 – Apr. 30, 2026, about 83 percent had been repatriated as of Apr. 30, 2026, with an additional 2 percent in DHS custody and 12 percent turned over to HHS (for unaccompanied alien children) or other law enforcement agencies. OHSS analysis of CBP and ICE data downloaded from UIP June 5, 2026 [OHSS tab Par 40c].

were enjoined, demonstrates the importance of those remaining provisions and, specifically, imposing the restrictions on asylum.

41. By reducing the number of encounters and the number of aliens in custody, the Proclamation has freed up CBP resources to address national security and public safety threats and to secure the border. The immediate savings on facilities alone are significant. In mid-March 2025, in response to the lower encounter numbers, CBP began reducing the number of soft-sided facilities along the SWB, and all soft side facilities have been decommissioned for the past year. This has resulted in cost avoidance between $5 and $30 million per month per facility. But facilities are only one component of the substantial costs of illegal border crossings. Processing aliens at the border is also resource- and personnel-intensive—and as the number of aliens apprehended and in custody increases, USBP must assign additional agents to processing duties. But any reassignment of agents to processing duties diverts them from other activities, including law enforcement priorities like combatting criminal activity at the border. For example, based on data pulled by USBP, as of May 8, 2026, approximately 2.5 percent of agents along the SWB were assigned to processing tasks as compared to approximately 4 percent on July 3, 2025, 6 percent on March, 21, 2025, and 16 percent on December 1, 2024.

Thus, as the number of border crossings remains low, a higher percentage of agents can be deployed to stand watch and secure the border.

42. Criminal activity at the border is a persistent problem during both periods of high and low encounters. On a typical day in 2024, for example, CBP arrested 86 wanted criminals at U.S. POEs and 49 wanted criminals between U.S. ports of entry; seized 1,571 pounds of drugs (including 60 pounds of fentanyl), $152,418 of illicit currency and other monetary instruments, and 55 shipments with $15 million worth of products with Intellectual Property Rights violations; and intercepted five fraudulent documents and 13 shipments worth $4.8 million under forced labor.[42]

43. When border encounters are lower, however, CBP is better positioned to focus its resources on addressing and responding to criminal activity. In FY 2025, OFO encountered 12,962 criminal aliens,[43] and USBP arrested 8,814 aliens with criminal convictions, including for the most severe crimes: 23 for homicide/manslaughter, 704 for assault/battery/domestic violence, 414 for

---

[42] *See* CBP, *Snapshot, A Summary of CBP Facts and Figures*, June 2025 (based on 2024 data) https://www.cbp.gov/sites/default/files/2025-07/25_0702_cbp-snapshot-fy24_0.pdf (last visited July 4, 2025).

[43] *See* CBP, *CBP Enforcement Statistics, Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement*, last updated Apr. 30, 2026, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited May 12, 2026).

burglary/robbery/larceny/theft/fraud,[44] and for sexual offenses. This trend has continued in FY 2026.[45] OFO encountered 4,663 criminal aliens, and in FY 26 through February, USBP arrested 2,664 aliens with criminal convictions.[46] CBP has recently apprehended a number of individuals who were sex offenders. For example, on May 7, 2026, CBP Officers assigned to Laredo Field Office ports of entry during a recent 24-hour period apprehended three men wanted on outstanding felony,[47] and on May 5, San Diego Border Patrol arrested two convicted child sex offenders.[48]

44. Additionally, in FY 2025, USBP had 460 gang-affiliated apprehensions and in FY 2026 through March, USBP had 237 gang-affiliated apprehensions, including from the most violent gangs recently designated as foreign terrorist organizations, such as 51 from Tren de Aragua in FY 2025 and 17 in FY 2026

---

[44] *See* CBP, *Criminal Alien Statistics*, last updated Apr. 30, 2026, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last visited May 12, 2026).

[45] *See* CBP, *CBP Enforcement Statistics, Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement*, last updated Apr. 30, 2026, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited May 12, 2026)

[46] *See* CBP, *Criminal Alien Statistics*, last updated Mar. 20, 2026, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/criminal-noncitizen-statistics (last visited May 12, 2026).

[47] *See* CBP, *Laredo Field Office CBP officers in one day arrest three fugitives wanted for sex-related offenses*, last updated May 7, 2026, https://www.cbp.gov/newsroom/national-media-release/laredo-field-office-cbp-officers-one-day-arrest-three-fugitives (last visited May 19, 2026).

[48] *See* CBP, *San Diego Border Patrol arrests two convicted child sex offenders*, last updated May 5, 2026, https://www.cbp.gov/newsroom/national-media-release/san-diego-border-patrol-arrests-two-convicted-child-sex-offenders (last visited May 19, 2026).

through March and 59 from MS-13 in FY 2025 and 20 in FY 2026 through March.[49] For example, on January 7, 2026, Tampa station apprehended a Mexican national determined to be a Sureños 13 gang member.[50] On November 2025, USBP apprehended a Venezuelan national confirmed to be an affiliate of a South American Theft Group convicted of Grand Theft and three counts of Larceny – Grand Theft.[51] In July 2025, USBP arrested a Colombian national and confirmed member of the South American Theft Group (SATG) in Union, Maine,[52] and in May 2025, USBP encountered and arrested an illegal alien who was not only confirmed to be an MS-13 gang member but also was wanted by the International Criminal Police Organization (INTERPOL) for murder.[53] In FY 2025, CBP officers and agents also

---

[49] *See* CBP, *CBP Enforcement Statistics, Gang Affiliated Enforcement*, last updated Oct. 30, 2025, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last visited Nov. 7, 2025).

[50] *See* CBP, *Felony child sex offender is 1,000th apprehension this year for Border Patrol Tampa Station*, last updated April 30, 2026, https://www.cbp.gov/newsroom/national-media-release/felony-child-sex-offender-1000th-apprehension-year-border-patrol (last visted May 19, 2026).

[51] *Id.*

[52] *See* CBP, *Border Patrol Agents Arrest Confirmed Gang Member in Maine*, last updated Aug. 5, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-arrest-confirmed-gang-member-maine (last visited Nov. 20, 2025).

[53] *See* CBP, *Border Patrol apprehends known MS-13 gang member with international warrant*, last updated May 30, 2025, https://www.cbp.gov/newsroom/local-media-release/border-patrol-apprehends-known-ms-13-gang-member-international-warrant (last visited July 4, 2025).

seized 2,990 firearms, 1,281 explosives, and 35 other types of weapons, as well as 610,174 quantities of gun parts and ammunition and $66.6 million in currency.[54]

45. Additionally, lowering border encounters and freeing-up CBP officers and agents can further increase public safety by enabling CBP to partner with local, state, and other federal agencies to investigate and arrest illegal aliens convicted of heinous crimes. For example, in September 2025, CBP officers from the San Ysidro Port of Entry, including personnel from the Task Force and Anti-Terrorism Contraband Enforcement Team, in collaboration with the San Diego Sheriff's Office Border Crime Suppression Team, intercepted a vehicle of interest, leading to the seizure of multiple firearms and ammunition, and the arrest of one individual.[55] And in March 2025, USBP agents in Miami teamed up with ICE and local police to arrest 10 illegal aliens who were all registered sex offenders for crimes including lewd and

---

[54] *See* CBP, *Weapons and Ammunition Seizures*, last updated Oct. 24, 2025, https://www.cbp.gov/newsroom/stats/weapons-and-ammunition-seizures (last visited Nov. 7, 2025); CBP, *Currency & Other Monetary Instrument Seizures*, last updated Oct. 24, 2025, https://www.cbp.gov/newsroom/stats/currency-other-monetary-instrument-seizures (last visited Nov. 7, 2025).

[55] See CBP, *Joint Operation at San Ysidro Port of Entry leads to major firearms seizure and one arrest*, Sept. 30, 2025, https://www.cbp.gov/newsroom/local-media-release/joint-operation-san-ysidro-port-entry-leads-major-firearms-seizure-and (last visited Nov. 20, 2025).

lascivious acts on a child under age 16, lewd and lascivious sexual battery with a victim 12-15 years old, and solicitation of a child.[56]

46. If encounters at the SWB increase again, criminal activity also can be expected to increase, while CBP's available resources to respond to criminal activity—like that just described—will, once again, be severely diminished.

47. For the same reasons, lower border encounters allow CBP to allocate more resources to national security. In late January 2025, at POEs, OFO commenced enhanced inspections of flights, private aircraft, and cargo to and from Colombia. CBP denied boarding to flagged visa holders and, in coordination with the Department of State, enforced the travel ban on Colombian officials.[57] In late February 2025, Tucson Sector Border Patrol agents arrested three suspected cartel scouts, and one foot guide associated with the Los Memos transnational criminal organization, a faction of the Cártel de Sinaloa, in southern Arizona.[58] In June 2025, USBP Special Operations Group helped arrest two Iranian nationals, in a Southern California home linked to human trafficking, after seven individuals on the FBI's

[56] *See* CBP, *10 Sex Offenders Arrested in Florida by U.S. Border Patrol Agents in the Miami Sector*, last updated March 24, 2025, https://www.cbp.gov/newsroom/local-media-release/10-sex-offenders-arrested-florida-us-border-patrol-agents-miami-sector (last visited July 4, 2025).
[57] *See* CBP, *CBP is taking decisive measures under President Trump's orders in response to Colombia*, last updated Jan. 27, 2025, https://www.cbp.gov/newsroom/announcements/cbp-taking-decisive-measures-under-president-trumps-orders-response (last visited on Mar. 22, 2025).
[58] *See* CBP, Cartel Scouts, Foot Guide Arrested in Arizona, last updated March 4, 2025, https://www.cbp.gov/newsroom/local-media-release/cartel-scouts-foot-guide-arrested-arizona (last visited on Mar. 22, 2025).

Terror Watchlist were arrested at the same location earlier that week.[59] Also in June 2025, a Georgian citizen—who arrived in the United States in 2023 claiming credible fear after leading a criminal organization in Georgia, being convicted of foreign human smuggling, and working with the KGB—was arrested after USBP agents uncovered intelligence about the man, who was in possession of stolen goods at the time of arrest.[60] That same month, USBP agents uncovered and disabled a large-scale narcotics smuggling tunnel linking Tijuana to the San Diego area. The uncompleted tunnel extended more than 1,000 feet inside the U.S. and was highly sophisticated.[61] And, in May 2025, USBP agents dismantled a cartel surveillance and scouting site at the top of an Arizona mountain that was equipped with gear to monitor law enforcement activity;[62] at the same time, they arrested two individuals who faced smuggling, conspiracy, and immigration charges. Again, if CBP

---

[59] *See* Fox 11 Los Angeles, *North Hills home was Iranian human smuggling hub, CBP says: 2 arrested*, June 27, 2025, https://www.msn.com/en-us/news/us/north-hills-home-was-iranian-human-smuggling-hub-cbp-says-2-arrested/ar-AA1Hzgri (last visited July 4, 2025).

[60] *See* Dallas Express, *Georgian Ex-KGB Criminal Arrested In NYC As Trump Targets Asylum Overhaul*, June 28, 2025, https://www.yahoo.com/news/georgian-ex-kgb-criminal-arrested-153053352.html (last visited July 4, 2025).

[61] *See* CBP, *San Diego Sector Border Patrol uncovers sophisticated cross-border drug smuggling tunnel*, last updated June 18, 2025, https://www.cbp.gov/newsroom/local-media-release/san-diego-sector-border-patrol-uncovers-sophisticated-cross-border (last visited July 4, 2025).

[62] *See* News 4 Tucson, *Nogales cartel lookout dismantled in joint U.S.-Mexico operation*, May 18, 2025, https://www.kvoa.com/news/crime/nogales-cartel-lookout-dismantled-in-joint-u-s--mexico-operation/article_890c1d2b-9ef0-4681-895c-b1bc3d6c930a.html (last visited July 4, 2025).

resources are again diverted by an influx of illegal encounters at the SWB, CBP's ability to neutralize national security threats will be significantly weakened.

48. TCOs have also felt the effects of the Proclamation, most notably in reduced income streams from migrant and drug smuggling. From February 2025 to May 2026, there was a 50 percent reduction in fentanyl (lbs.) seized by CBP compared to the five month period of August to December 2024.[63] In March 2025, USBP agents in San Diego—in less than 24 hours—intercepted two drug smuggling attempts, resulting in 139.1 pounds of narcotics seized worth more than $784,000.[64] Between mid-January and the end of February, CBP participated in strategic enforcement operations in California, Arizona, and the Pacific Northwest alongside its federal, state, local, tribal, territorial (FSLTT) and international partners. The operations focused on illicit fentanyl, its analogues, precursor chemicals, and other synthetics like methamphetamine, in addition to other emerging threats like xylazine and nitazenes. During these operations, CBP seized over 10,900 pounds of drugs, consisting of 2,584 pounds of cocaine, 1,266 pounds of fentanyl, 5,683 pounds of methamphetamine, 135 pounds of heroin, 664 pounds of marijuana, and 640 pounds of other illicit substances such as amphetamine, ecstasy, ketamine, hashish, steroids,

---

[63] OHSS analysis of May 2026 OHSS Statistical System of Record based on data provided by CBP.

[64] *See* CBP, Back-to-back busts: *U.S. Border Patrol hits drug smugglers hard in 24-hour takedown*, last updated April 22, 2025, https://www.cbp.gov/newsroom/local-media-release/back-back-busts-us-border-patrol-hits-drug-smugglers-hard-24-hour (last visited July 4, 2025).

and xylazine. These operations continue; in November 2025, CBP arrested a driver who allegedly had more than $1.2 million in methamphetamine hidden in a commercial vehicle seeking to enter the United States[65] and CBP officers seized more than 260 kilos of narcotics in El Paso during the week of October 26, 2025.[66] Additionally, CBP intercepted 140 weapons and seized over $1.3 million in illicit U.S. currency. In total, these joint efforts with FSLTT partners resulted in the cumulative seizure of over 13,348 pounds of illegal drugs, over $1.97 million in illicit U.S. currency, over 180 weapons, and CBP arrests of 317 individuals affiliated with and/or connected to those with direct ties to TCOs. In October 2025, CBP officers intercepted various firearms, firearm parts and over 2,500 rounds of ammunition during an outbound enforcement operation.[67] Through strategic intelligence, collaborative operations, and relentless vigilance, CBP continues to disrupt and dismantle cartels that threaten public safety and national security.[68] Cartels are reportedly selling property and firing personnel to account for loss in

---

[65] *See* Border Report, *CBP: Driver arrested in $1.2M meth seizure at Pharr bridge*, Nov. 4, 2025, https://www.borderreport.com/immigration/border-crime/cbp-driver-arrested-in-1-2m-meth-seizure-at-pharr-bridge/ (last visited Nov. 20, 2025).

[66] *See* KFOX14, *CBP officers seize 263 kilos of narcotics at El Paso ports in a week*, Nov. 6, 2025, https://kfoxtv.com/news/local/cbp-officers-seize-263-kilos-of-narcotics-at-el-paso-ports-in-a-week (last visited Nov. 20, 2025).

[67] *See* CBP, *CBP officers seize firearms and ammunition at Pharr International Bridge*, November 5, 2025, https://www.cbp.gov/newsroom/local-media-release/cbp-officers-seize-firearms-and-ammunition-pharr-international-bridge (last visited Nov. 20, 2025).

[68] *See* CBP, *CBP Releases February 2025 Monthly Update* (last updated Mar.12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update (last visited on Mar. 22, 2025).

fentanyl income that supports their operations.[69] They are also reportedly seeking new tactics for income, including "large scale smuggling," making USBP resources at the border to confront TCOs as important as ever.[70]

49. Additionally, risks to officers and agents and others who operate near the U.S. borders are always present. In FY 2025, CBP records indicate that 780 CBP officers/agents were assaulted.[71] In September 2025, two illegal aliens choked a USBP agent who was transporting them following arrest and subsequently escaped. They were rearrested and are charged with assaulting, resisting, or impeding a federal officer. They face up to 20 years in federal prison and a possible $250,000 fine, as well as an additional one year and up to $100,000 if convicted of escape from federal custody.[72] In June 2025, a 21-year-old Salvadoran national was sentenced to three years in federal prison for assaulting a Border Patrol agent in March 2025.[73] On June 30, 2025, the Federal Bureau of Investigation presented a criminal complaint against an alien from the Dominican Republic who assaulted a

---

[69] *See* New York Times, *Trumps Threats and Mexico's Crackdown Hit Mexican Cartel*, https://www.nytimes.com/2025/03/02/world/americas/mexico-cartel-fentanyl-trump-tariffs.html.
[70] *See* News Nation, *Cartels shift to 'large-scale' smuggling as border crossings drop*, March 14, 2025, https://www.newsnationnow.com/us-news/immigration/border-coverage/cartels/cartels-large-scale-smuggling/ (last visited July 4, 2025).
[71] *See* CBP, Assault and Use of Force Statistics, last updated June 17, 2025, htps://www.cbp.gov/newsroom/stats/assaults-use-force (last visited Nov. 7, 2025).
[72] *See* CBP, *2 illegal aliens charged after choking Border Patrol agent in Houston*, last updated Sept. 25, 2025, https://www.cbp.gov/newsroom/national-media-release/2-illegal-aliens-charged-after-choking-border-patrol-agent-houston (last visited Nov. 20, 2025).
[73] *See* CBP, *Salvadoran national sentenced to three years for assaulting agent*. last updated June 4, 2025, https://www.cbp.gov/newsroom/local-media-release/salvadoran-national-sentenced-three-years-assaulting-agent (last visited July 4, 2025).

Border Patrol agent with an automobile on June 25.[74] Also in late June 2025, an Egyptian man was convicted on federal charges for violently kicking a CBP law enforcement animal with sufficient force to lift the dog off the ground and cause injury.[75] If border crossing numbers increase again, CBP resources will likely be diverted, and risks to CBP personnel and others on the border will likewise increase.

## VI. If the Proclamation is Enjoined, DHS's Operational Capabilities will be Severely Taxed and Large-Scale Releases of Illegal Aliens will Resume.

50. The Proclamation is essential to maintaining operational control of the SWB. Any injunction against implementing the Proclamation would likely undo the substantial benefits to border security, national security, and public safety that flow from the Proclamation's restrictions and subject the States to further large-scale releases of illegal aliens. An injunction against the Proclamation's restrictions on asylum would prove particularly detrimental, as those restrictions have been critical

---

[74] *See* CBP, *Alien arrested by FBI after assaulting a US Border Patrol Agent in Puerto Rico*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/alien-arrested-fbi-after-assaulting-us-border-patrol-agent-puerto-rico (last visited July 4, 2025).

[75] *See* CBP, *Egyptian traveler eats federal charges for kicking Dulles CBP beagle that detected over 100 pounds of prohibited food products*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/egyptian-traveler-eats-federal-charges-kicking-dulles-cbp-beagle (last visited July 4, 2025).

to maintaining the effectiveness of the Proclamation after other provisions were enjoined in August 2025.

51. In addition to removing the most effective tool for managing the significant security challenges at the southern border, news of an injunction against implementation of the Proclamation likely would lead to another surge of aliens seeking to cross at and between POEs at the SWB, as has happened after other court orders.

52. On February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), a programmatic implementation of the Secretary of Homeland Security's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. § 1225(b)(2)(C). STB final rule, 89 FR at 48764–65. Almost immediately, hundreds of aliens arrived en-masse at POEs across the SWB, attempting to immediately enter the United States and creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part. *Id*. at 48765. Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the SWB between the POEs. *Id*. Absent immediate and resource-intensive action taken by CBP, the number of aliens gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 aliens who were in section 240 removal proceedings and had been returned to

Mexico under MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them. *Id*. And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so, they diverted resources away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding lawful trade and travel. *Id*.

53. This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023. At the time, DHS experienced a historic surge in migration as smugglers falsely advertised that aliens who arrived before the Order ended and before the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States. *Id.* at 48765. This surge culminated with what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, 2023, which placed significant strain on DHS's operational capacity at the border. *Id.* Encounters between POEs (which excludes arrival of inadmissible aliens with scheduled appointments through the CBP One app who appeared at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of

the public health Order (from May 8 to May 11). *Id.* The sharp increase in USBP encounters during the 30 days preceding May 12, 2023, represented the largest month-over-month increase in almost two decades—since January 2004.

54. If the Proclamation is enjoined for any amount of time—and especially if TCOs and illegal aliens learn that the Proclamation's restrictions on asylum have been lifted—the result will almost certainly be similar: substantial numbers of illegal aliens will be incentivized to unlawfully enter the United States between POEs and DHS will be without the most effective tool for managing the emergency at the SWB.

55. Since the Proclamation has been in effect (through April 30, 2026), USBP encountered on average 240 aliens per day between POEs on the SWB, and OFO has encountered on average 80 at SWB POEs, with most OFO encounters being quickly repatriated to Mexico or removed based on section 212(f).[76] Without this ability to quickly repatriate or remove them, DHS must instead rely on less efficient procedures, such as section 240 removal proceedings, INA § 235(b)(2)(A), 8 U.S.C. § 1225(b)(2)(A). In the absence of the Proclamation, DHS may not have the resources to ensure that all aliens who enter illegally between POEs are detained and processed for expeditious removal from the United States. As described above, when more aliens enter between POEs than DHS has resources to process and detain,

[76] OHSS analysis of CBP data downloaded from UIP on May 4, 2026.

DHS may be forced to release aliens into the United States to await section 240 removal proceedings, which may in some cases take years to conclude, further straining local, State, and Federal resources that have already been strained for years.

56. Maintaining operational control at the SWB and efficiently repatriating or removing aliens is even more critical now due to the violent and destructive protests taking place at DHS facilities and enforcement operations across the country. In Chicago, Los Angeles, and Portland, protestors have assaulted officers, armed themselves with dangerous weapons, damaged property, and blocked access to facilities. These actions necessitated additional resources and law enforcement presence to restore operations and protect officers and detainees, efforts that would be severely strained if more resources were once again needed at the SWB.[77]

57. In early September 2025 at the ICE Broadview Processing Center (BSSA) outside of Chicago, protestors became increasingly aggressive, blocking ingress and egress at the facility and physically assaulting officers. Protestors sprayed officers with pepper spray, threw bottles, rocks, and canisters of tear gas at officers, shot fireworks toward officers, and threatened to kill them. Some protestors arrived armed with knives, pistols, and concealed handguns, as well as with shields and gas masks. More than thirty ERO officers were injured during these assaults,

[77] *See* Decl. of Russell Hott ¶¶ 13, 39, 50, *Chicago Headline Club v. Noem*, No. 1:25-cv-12173 (N.D. Ill. Oct. 31, 2025) (Dkt. 173-1).

some requiring hospitalization. Protestors also damaged property, slashing officers' tires and vandalizing and damaging the facility, including its plumbing systems.[78]

58. As a result of the escalating violence, specialized law enforcement officers from ICE, as well as other federal agencies, were diverted from other law enforcement operations to secure BSSA and address the increasing violence. Processing of aliens slowed, and in one instance, "the BSSA facility sent an entire plane of approximately 131 unprocessed aliens to the El Paso facility for processing, which then had the domino effect of straining El Paso's resources."[79]

59. Similarly, individuals protesting ICE in Los Angeles over the summer "began throwing concrete chunks, bottles of liquid, and other objects at FPS officers as well as attempting to use large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage the federal building," resulting in the building being shut down. Protestors also blocked garage exits, preventing ICE transport vehicles from moving detainees. In June 2025, "two men were federally charged after throwing Molotov cocktails during immigration enforcement protests in downtown Los Angeles."[80]

60. In Carpinteria and Camarillo, California, a crowd of about 500 protestors gathered and "[r]ioters threw rocks, glass bottles, full water bottles,

[78] *Id.* at ¶¶ 14, 18, 20, 22, 27-28, 32-33, 36.
[79] *Id.* at ¶¶ 37-39.
[80] *Id.* at ¶¶ 45-46.

commercial grade fireworks, and other projectiles at agents, government vehicles, and white vans being used to transport detainees." One individual "fired a gun at federal law enforcement officers, endangering the lives of the officers, as well as journalists and protesters."[81]

61. Violent protests have also broken out at ICE buildings in Portland Oregon. Protestors "assaulted federal law enforcement officers with rocks, bricks, pepper spray and incendiary devices" and "have repeatedly tried to burn down the Portland ERO Office[.]"[82] In one incident on June 14, 2025, protestors, including one carrying a firearm, advanced toward the main gate of an ICE building throwing rocks at officers, launching M80 fireworks at officers, and throwing a mortar that injured an officer. "FPS officers had to barricade themselves inside the building and protesters placed chains on the exterior doors" and "attempted to breach the front door and broke the front door glass."[83] The ERO Portland Office was required to close for three weeks as a result of the destruction, significantly impeding operations, including appointments of non-detained aliens and the processing of arrests.[84]

62. Thus, implementing the Proclamation is vital not only for operations at

---

[81] *See* Decl. of Kyle C. Harvick ¶¶ 12, 14-15, 18, *Los Angeles Press Club v. Noem*, No. 2:25-cv-05563 (C.D. Cal. Aug. 20, 2025) (Dkt. 48-1).
[82] *See* Decl. of Cammilla Wamsley ¶¶ 10-11, *Oregon v. Trump*, No. 3:25-cv-01756 (D. Or. Oct. 2, 2025) (Dkt. 38).
[83] *See* Decl. of Robert Cantu ¶ 7, *Newsom v. Trump*, No. 25-3727 (9th Cir. Oct. 17, 2025) (Dkt. 137-1, pp. 47-50).
[84] *See* Wamsley Decl. ¶ 13.

the SWB, but for protecting and maintaining essential immigration enforcement operations, facilities, and personnel throughout the interior of the United States. These efforts, in turn, are necessary to combat the TCOs and FTOs that have become embedded and endanger communities throughout the United States.

63. Critically, the portions of the district court's injunction in effect following the August 1st Order have already had a negative impact on DHS's operations and ability to efficiently remove or repatriate aliens. The district court's order prohibiting DHS's use of 212(f) repatriations under the Proclamation and implementing guidance, as well as its orders with respect to withholding of removal under INA § 241(b)(3) and any procedures that depart from the credible fear screening standards set forth in DOJ and DHS regulations, have impeded a large number of removals of aliens already in custody who were being staged for removal. Such delays in removal have a domino effect that impacts detention capacity and increases costs. Travel documents may expire, and, in some cases, ICE ERO may not be able to obtain new travel documents to facilitate removal. In other cases, impacted removals have to be rescheduled, which requires new itineraries and country clearances. Delays also increase the likelihood that an alien may need to be moved to a different detention facility to avoid overcrowding. The result is additional costs and barriers to efficient removal that hinder DHS's management of the border and immigration enforcement more broadly.

64. If the injunction is upheld, the damage caused by a reversion to pre-Proclamation conditions at the southern border, and another, ongoing large-scale release of illegal aliens into communities nationwide, would be far-reaching. As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries." Proclamation, 90 FR at 8334. And this is to say nothing of the boon to TCOs and smugglers that would result by the lifting of the suspension and restrictions at the southern border or the dire consequences of releasing illegal aliens who may pose a threat to national security, public safety, or health.

## VII. Conclusion.

65. The Proclamation is an appropriate and necessary response to the unprecedented influx of illegal immigration during the prior Administration. The Proclamation is an indispensable tool for stopping the invasion at the border, combatting the challenges that invasion posed for screening for security and safety, and redressing the impact on communities strained by the influx of aliens over the last four years. Should the Proclamation be enjoined, DHS anticipates that encounters between POE at the SWB will increase dramatically—once again taxing the federal government's resources at the border, undermining its ability to maintain

operational control, depriving it of resources to address national security and public safety threat, and endangering and burdening communities throughout the country.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this fifth day of June 2026.

ERIC A RUARK Digitally signed by ERIC A RUARK Date: 2026.06.05 14:14:38 -04'00'

Eric Ruark
Assistant Secretary for Border Security and Immigration Policy
U.S. Department of Homeland Security

No. 25-5243

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

MARKWAYNE MULLIN, Secretary of the
U.S. Department of Homeland Security,
in his official capacity, *et al.*,
*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

## DECLARATION OF MARKWAYNE MULLIN

I, Markwayne Mullin, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Secretary for Homeland Security, leading the U.S. Department of Homeland Security (DHS), and have served in this role since March 23, 2026.

2. In the four years of the Biden Administration, U.S. leaders sent a message with their words and deeds that the southern border was open. This included eliminating effective tools like the Migrant Protection Protocols, restarting catch-and-release, reducing detention capacity, and even attempting to implement a 100-day moratorium on deportations.

3. The resulting flood of aliens overwhelmed the system and prevented DHS from effectively controlling the border. During that time, more than 8 million illegal aliens were encountered along the southern border of the United States and countless millions more evaded detection and illegally entered the United States. Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (the Proclamation). The sheer number of aliens entering the United States effectively prevented Congress's complex scheme, the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, from functioning as intended to protect United States sovereignty and to prevent entry of aliens who pose threats to public health, safety, or national security. *Id.* As a result, millions of aliens who potentially pose significant threats to health, safety, and national security moved into communities nationwide, placing substantial costs and constraints on the States. *Id.*

4. During those four years, Transnational Criminal Organizations (TCOs), several of which have now been designated as Foreign Terrorist Organizations

(FTOs), capitalized on the invasion at the southern border. When U.S. Border Patrol (USBP) agents are pulled away from their patrol duties along the borders to perform detention-related activities and to process the large groups that characterize heavy migration flow across the borders, TCOs and FTOs exploit the situation, utilizing diversionary tactics to circumvent USBP deployment posture and technologies to move illicit contraband and criminal aliens into the interior of the United States. Cartels, for example, operate with substantial financial resources that support their use of scouts who operate advanced technology including drones, night vision equipment, and radios to track and monitor USBP presence in efforts to exploit certain vulnerabilities, as well as arms and ammunition that empower their sophisticated guerilla warfighting. This was all too common in the last Administration.

5. In that sort of border environment, DHS can have no confidence that it is preventing entry of dangerous criminal and terrorists, contraband like fentanyl, and even weapons of mass destruction. Moreover, as a result of the invasion at the southwest border, TCOs and FTOs have gained a foothold in, and endangered, communities throughout the United States. For example, MS-13, one of the most

violent criminal organizations in the United States, has over 10,000 members in more than 40 states.[1]

6. That level of infiltration by foreign organizations is extremely difficult to reverse. Once organizations like MS-13 gain a foothold in the United States, its members can recruit Americans, have children, and expand their influence deep into our communities.

7. This has devastating effects on public safety, national security, and the American way of life. The tactics used by these groups are beyond anything used by American criminal enterprises. They include routine extrajudicial killings, gaining effective control over entire government institutions through a combination of threats and bribery, and even assassination of high-ranking government officials.

8. To illustrate, just last year, a TCO in Chicago put out a $10,000 hit on a DHS official.[2] That a foreign organization would be bold enough to do this in the heart of America—1,000 miles from our southern border—illustrates the devastating consequences of an open border.

9. In response to this unprecedented influx of aliens and the resulting public safety and national security risks, on January 20, 2025, the President issued a

---

[1] *See*, ICE, *Transnational Gangs*, last updated Feb. 20, 2026, https://www.ice.gov/about-ice/hsi/investigate/transnational-gangs (last visited June 5, 2026).

[2] *See* DHS, *Latin Kings Gang Member Arrested in Illinois*, last updated Nov. 19, 2025, https://www.dhs.gov/news/2025/10/06/latin-kings-gang-member-arrested-illinois-after-placing-hit-commander-large-border (last visited June 5, 2026).

Proclamation finding that "the entry . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States." Proclamation 10888, 90 Fed. Reg. at 8334–35. The Proclamation suspends entry of aliens involved in the invasion and directs that such aliens be "restricted from invoking provisions of the INA that would permit their continued presence in the United States," including but not limited to the provisions governing asylum at section 208 of the INA, 8 U.S.C. § 1158. *Id.* at 8335. The Proclamation also suspends the entry of all aliens, regardless of where or how they enter the United States, who fail to provide "sufficient medical information or reliable criminal history and background information to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA." *Id.*

10. The Proclamation has been extremely effective. Rather than the open borders from the last Administration, illegal border crossings have plummeted to record lows. The Proclamation has contributed substantially to what is arguably the greatest achievement of President Trump's Administration—a secure southern border—and it has been a critical tool enabling DHS to quickly remove aliens who have illegally entered our country. DHS's other tools, while formidable, were not sufficient to obtain the level of control this Administration has obtained over the southern border through the Proclamation.

11. When border numbers are as low as they are now, U.S. Customs and Border Protection (CBP)—which includes USBP and also the Office of Field Operations, which runs the ports of entry—is able to dedicate significantly more resources to address national security and public safety threats at the border. Instead of spending all their manpower processing illegal aliens, when borders crossings are lower CBP is now able to focus its resources on addressing and responding to activity by dangerous criminals and terrorists that threaten the safety and security of Americans. For example, the amount of fentanyl seized by CBP compared to the five-month period of August to December 2024 has decreased 50%.[3] In FY 2026 to date, CBP officers and agents also seized 1,630 firearms, 44 explosives, and 35 other types of weapons, as well as 415,066 quantities of gun parts and ammunition and $37.9 million in currency.[4] As CBP cracks down on criminal and terrorist organizations, they will continue to adapt their tactics to avoid detection and

---

[3] OHSS analysis of May 2026 OHSS statistical system of record based on data provided by CBP; *see also* Declaration of Eric Ruark, para. 48.

[4] *See* CBP, *Weapons and Ammunition Seizures*, last updated Apr. 3, 2026, https://www.cbp.gov/newsroom/stats/weapons-and-ammunition-seizures (last visited Apr. 24, 2026); CBP, *Currency & Other Monetary Instrument Seizures*, last updated Apr. 3, 2026, https://www.cbp.gov/newsroom/stats/currency-other-monetary-instrument-seizures (last visited Apr. 24, 2026).

disruption, which makes it critical to continue dedicating CBP resources to law enforcement.

12. Even with encounter numbers substantially lower since January 20, 2025, challenges at our U.S. borders persist. Thus far in FY 2026, CBP records indicate that 1,097 CBP officers/agents were assaulted, up from 856 CBP officers/agents assaulted in all of FY 2025.[5] In September 2025, two illegal aliens choked a USBP agent who was transporting them following arrest, and subsequently escaped. They were rearrested and are charged with assaulting, resisting, or impeding a federal officer. In June 2025, a 21-year-old Salvadoran national was sentenced to three years in federal prison for assaulting a Border Patrol agent in March 2025.[6] On June 30, 2025, the Federal Bureau of Investigation presented a criminal complaint against an alien from the Dominican Republic who assaulted a Border Patrol agent with an automobile on June 25.[7] In late January 2025, a U.S. citizen and a Canadian citizen were robbed and attacked by armed suspected Mexican cartel terrorists in the Jacumba Wilderness in southern California. CBP

---

[5] *See* CBP, Assault and Use of Force Statistics, last updated Apr. 3, 2026, https://www.cbp.gov/newsroom/stats/assaults-use-force (last visited Apr. 24, 2026).
[6] *See* CBP, *Salvadoran national sentenced to three years for assaulting agent.* last updated June 4, 2025, https://www.cbp.gov/newsroom/local-media-release/salvadoran-national-sentenced-three-years-assaulting-agent (last visited June 4, 2026).
[7] *See* CBP, *Alien arrested by FBI after assaulting a US Border Patrol Agent in Puerto Rico*, last updated June 30, 2025, https://www.cbp.gov/newsroom/local-media-release/alien-arrested-fbi-after-assaulting-us-border-patrol-agent-puerto-rico (last visited June 4, 2026).

agents tracked the assailants back to the border where they returned to Mexico.[8] If border crossing numbers increase again, CBP resources will likely be diverted away from responding to numerous threats like those just described.

13. I am gravely concerned about the Proclamation being enjoined and what that would mean for the safety and security of the American people. If the Proclamation is enjoined—and in particular if TCOs and illegal aliens learn that the Proclamation's restrictions on asylum have been lifted—there is a significant likelihood that will trigger another flood of illegal immigrants arriving at the southern border, which will degrade DHS's ability to maintain operational control of the border and create the environment for criminal cartels and TCOs to operate. The restrictions on asylum proved critical in maintaining the effectiveness of the Proclamation when implementation of other provisions of the Proclamation were enjoined in August 2025. Thus, an injunction on the Proclamation's restrictions on asylum would be especially detrimental to the Executive's ability to maintain operational control of the border.

14. The damage caused by a reversion to pre-Proclamation conditions at the southern border, including another large-scale release of illegal aliens into communities nationwide, would be severe and far-reaching. As mentioned

---

[8] *See* CBP, *American citizen shot in Jacumba Wilderness north of the U.S.-Mexico Border*, last updated January 24, 2025, https://www.cbp.gov/newsroom/local-media-release/american-citizen-shot-jacumba-wilderness-north-us-mexico-border (last visited June 4, 2026).

previously, DHS cannot determine who or what is coming into our country when the border is not secure. Enjoining the Proclamation is also a significant boon to TCOs, FTOs, and smugglers operating near the border after having been significantly weakened by this Administration's efforts. Further, there are significant financial costs. As set forth in the Proclamation, the States "have collectively spent billions of dollars in providing medical care and related human services and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries." Proclamation, 90 Fed. Reg. at 8334.

15. The Proclamation is an indispensable tool to enabling DHS to maintain operational control of the border, deter illegal entry, and have sufficient resources to address the significant national security and public safety threats that arise constantly at the border.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 5th day of June, 2026.

Markwayne Mullin
Secretary of Homeland Security

No. 25-5243

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES, *et al.*,
*Appellees*,

v.

MARKWAYNE MULLIN, Secretary of the
U.S. Department of Homeland Security,
in his official capacity, *et al.*,
*Appellants*.

On Appeal from the U.S. District Court
for the District of Columbia
No. 1:25-cv-00306 (Moss, J.)

## DECLARATION OF MARCO RUBIO

I, Marco Rubio, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Secretary of State of the United States and the head of the United States Department of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As Secretary of State, I am the President's chief foreign affairs advisor. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, based upon information provided to me, that the President's Proclamation, see Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333, 8334–35 (Jan. 20, 2025) (the "Proclamation"), has had a profound effect on the foreign policy of the United States. Therefore, the district court's order enjoining the Proclamation will cause significant and irreparable harm to the foreign policy of the this Nation.

4. In the course of my official duties, I am aware that President Trump issued Executive Order 14159 on January 20, 2025, declaring the unprecedented flood of illegal immigration into the United States an invasion and ordering the heads of several Executive Departments, including the Department of State, to enforce immigration laws against all inadmissible and removable aliens.

5. I am aware that Executive Order 14159 suspended the entry of aliens into the United States from the southern border whose presence in the country would be detrimental to the interests of the United States, and ordered that aliens who enter the United States in violation of the Proclamation may not seek continued presence in the United States under certain provisions of the Immigration and Nationality Act (INA), including asylum.

6. I am aware that President Trump, in issuing Executive Order 14159, exercised a power granted by Congress to suspend or restrict the entry of aliens whose presence in the country would be detrimental to the interests of the United States.

7. I directed the employees of the Department of State to coordinate with other Executive Agencies and implement Executive Order 14159.

8. Prior to President Trump's recognition of an invasion, the lax enforcement of immigration law at the United States' southern border created a welcoming environment for transnational criminals and human smugglers. The years of unenforced immigration and border security allowed for the development of migrant smuggling rings, which would traffic individuals from all over the world into the United States, and dangerous drug trafficking cartels which would terrorize and intimidate the local population.

9. The border crisis that existed from 2021 – 2024 also imposed substantial negative foreign policy consequences on the United States. The massive volume of removable aliens generated by years of lax enforcement required the United States to engage in prolonged and intensive diplomatic negotiations with foreign governments to secure acceptance of their nationals. Many countries were reluctant to accept large-scale returns, forcing the United States to expend significant diplomatic capital, offer concessions in unrelated bilateral matters, or accept slower and less reliable repatriation processes. This situation strained relations with key partners in the Western Hemisphere and beyond. Moreover, the perception of an uncontrolled border seriously damaged U.S. international credibility, signaling weakness in enforcing sovereign boundaries and undermining the United States' negotiating position on other critical foreign policy priorities.

10. Since the issuance of the Proclamation and the implementation of Executive Order 14159, the United States has experienced marked improvements in its foreign policy position regarding border security and migration management. The sharp decline in illegal crossings—evidenced by a 95% reduction in daily average southwest border apprehensions—has substantially decreased the volume of required repatriations, thereby reducing the need for protracted and resource-intensive diplomatic negotiations with foreign governments. Partner nations in the Western Hemisphere and beyond have responded more cooperatively to

repatriation requests, as the clear and consistent enforcement posture has restored credibility to U.S. immigration policy and eliminated the perception of an open border. This has allowed the United States to conserve significant diplomatic capital, avoid unnecessary concessions in unrelated bilateral matters, and strengthen its overall negotiating leverage on a wide range of foreign policy priorities. The Proclamation has thus reversed the prior damage to U.S. international credibility, signaling resolve in defending sovereign boundaries and reinforcing the United States' position as a nation capable of effectively enforcing its laws.

11. If the Proclamation is enjoined and operational control of the border deteriorates as a result, these harmful foreign policy consequences will recur—with particularly severe and irreparable effects given the current foreign policy landscape. The United States is presently engaged in a complex and high-stakes military and diplomatic confrontation with Iran and its proxies following the initiation of hostilities in February 2026. In this environment, any resurgence of uncontrolled illegal immigration and the associated strain on diplomatic resources would critically undermine U.S. leverage. It would force the diversion of limited diplomatic capital away from sensitive negotiations involving the Strait of Hormuz, regional stability, and countering Iranian influence, while further eroding international perceptions of American resolve and border sovereignty. This would

compound existing challenges, weaken alliances in the Western Hemisphere and the broader Middle East, and imperil the Nation's ability to manage multiple simultaneous national security priorities. Even outside of our negotiations with Iran, any resurgence of uncontrolled illegal immigration would negatively impact our ability to help resolve other conflicts, including between Ukraine and Russia and between Israel and Lebanon.

12. I have seen firsthand that the effect of President Trump's Executive Order 14159 has been to produce a deterrent effect for those who would otherwise seek to smuggle themselves, others, or illicit substances through the border illegally. Since President Trump declared the influx of immigration at the southern border an ***invasion*** and suspended such illegal crossings accordingly, the amount of attempted illegal entry into the United States has declined significantly. The daily average apprehensions on the southwest border are 95% lower than in the period from February 2021 to December 2024.

13. Executive Order 14159 is one component of a broader enforcement framework under the current Administration aimed at reducing unauthorized entry and unlawful presence in the United States. The Order directs federal agencies to prioritize the faithful enforcement of immigration laws both at the border and within the interior, and to expand the use of detention, removal, and criminal prosecution where authorized by law. As I have publicly stated before, together,

these measures reinforce a consistent enforcement posture designed to deter illegal entry, address unlawful presence, and restore integrity to the immigration system.

14. Illegal border crossings have declined as a result of strengthened enforcement that restores the credibility of U.S. immigration controls and directly advances national security. Policies emphasizing zero releases, expedited returns, and consistent consequences have reduced incentives for repeated unlawful entry and limited exploitation by transnational criminal organizations. Increased operational capacity, enhanced surveillance, and faster processing and removal has improved situational awareness and allowed authorities to focus resources on higher-risk threats. Clear federal enforcement signals, including expanded use of prosecution authorities and new penalties, have further altered migrant decision-making, particularly among those without viable asylum claims. Together with broader geopolitical and economic factors affecting migration flows, these measures have contributed to a sustained reduction in illegal crossings and strengthened U.S. border security.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 5 th day of June, 2026.

MARCO RUBIO

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATIONAL AND LEGAL SERVICES, *et al*.,<br><br>*Plaintiffs-Appellees*,<br><br>v.<br><br>MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY, in his official capacity, *et al*.,<br>*Defendants-Appellants*. | No. 25-5243 |

**DECLARATION OF SECRETARY OF WAR PETE HEGSETH**

I, PETE HEGSETH, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Secretary of War and have served in this capacity since January 25, 2025. I am the head of the Department of War (DoW) and principal assistant to the President in all matters relating to the DoW. As the Secretary of War, I have the authority, direction, and control over the DoW and of its components, activities, and information. *See* 10 U.S.C. § 113(b).

2. Through the exercise of my official duties, I have been advised of this litigation. I make the following statements based upon my personal knowledge and on information made available to me in my official capacity. The purpose of this declaration is to confirm, in my capacity as Secretary of War and head of the DoW, based upon information provided to me, that the President's Proclamation, *see* Proclamation 10888, Guaranteeing the States Protection Against Invasion, 90 Fed. Reg. 8333, 8334–35 (Jan. 20, 2025) (the "Proclamation"), profoundly enhanced the national security of the United States. Therefore, the district court's order enjoining

the Proclamation will cause significant and irreparable harm to the safety and security of this nation.

3. Border security is inextricably linked to national security; defending the homeland and preserving our national sovereignty remains the foundational priority of our National Defense Strategy. The flood of illegal immigrants into this country between 2021 and 2024, including from adversary nations, posed a severe and immediate threat to the homeland and caused widespread chaos and suffering. This flood of illegal immigration created vulnerabilities at our borders that were then successfully exploited by nation-state adversaries. As the Proclamation described the border crisis in January 2025: "Our Southern border is overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans."

4. Cartels and transnational criminal organizations (TCOs) engage in widespread trafficking of illegal goods, including deadly drugs, and aliens into the United States, and did so at record levels during the border crisis from 2021 - 2024. These criminal enterprises operate multiple, illicit and licit, business operations, including human smuggling, transfer of illegal drugs, fuel theft, and investment businesses amongst others. Each cartel has developed a complex adaptive system to account for uncertainties, just as a business enterprise. When one business element begins to encounter challenges, cartels will shift the balance of their work to other areas. In addition, each cartel, to varying degrees, operates with multiple branches or franchises. This allows cartels to orient geographically and adjust to challenges or particular conditions in each market.

5. The most important and profitable elements of cartel economics rely on the illegal or permissive movement of goods and humans across all approaches to the United States. Land

and maritime operations play a mutually reinforcing role in dismantling these networks. As enforcement hardens the physical land border, cartels are forced to divert operations into maritime transit zones, where concurrent naval and interdiction forces disrupt their alternate supply chains. This synchronized pressure across all domains compounds the economic damage to cartel business models, effectively eliminating safe vectors for their illicit trade. This also extends to the virtual space to enable money laundering.

6. By curbing the invasion at the southern border, the Proclamation played a critical role in combatting the cartel and TCO operations described above. By curbing the flood of illegal aliens into the United States, and cutting off key magnets to illegal immigration (such as asylum), the Proclamation directly targeted multiple cartel critical funding streams derived from the illegal trafficking in narcotics, arms, and human beings. Moreover, additional streams of revenue, more centered in Mexico, such as extortion, necessarily has become less viable as the ability to enter the United States illegally has been cut off. As a consequence, the Proclamation has served a critical role in promoting national security.

7. An injunction against the Proclamation will have severe consequences for national security. In that case, the criminal cartels and TCOs that previously exploited the vulnerabilities at the southern border can be expected to revive their operations, as the border becomes vulnerable to another wave of illegal aliens that will tax the resources of federal officials at the border and create vulnerabilities that will allow the cartels and TCOs to enter the United States illegally, continue to profit from poisoning U.S. citizens, and revive their key sources of revenue (trafficking in narcotics and humans).

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Dated: JUN - 5 2026

PETE HEGSETH

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, *et al.*,<br>Plaintiffs,<br>v.<br><br>MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, in his official capacity, *et al.*,<br>Defendants. | Case No. 25-5243 |

**DECLARATION OF AARON P. LUKAS, PRINCIPAL DEPUTY DIRECTOR OF NATIONAL INTELLIGENCE**

## I. INTRODUCTION

1. I am the Principal Deputy Director of National Intelligence ("PDDNI") and have held this position since July 22, 2025. I was appointed to this position by the President with the advice and consent of the United States Senate. As the PDDNI, I assist the Director of National Intelligence ("DNI") in carrying out the DNI's duties and responsibilities of overseeing the United States Intelligence Community ("IC") and serving as the principal intelligence adviser to the President. I have served in the IC for over 20 years, including as an analyst and covert operations officer in the Central Intelligence Agency ("CIA") and as a Chief of Staff to a former Acting DNI; I have also served as a Deputy Senior Director and then Acting Senior Director at the National Security Council. As a former CIA Chief of Station, I have managed sensitive clandestine programs that have significantly impacted U.S. national security.

## II. PURPOSE OF THIS DECLARATION

2. The purpose of this declaration is to describe national security threats pertaining to the U.S. border. This declaration updates the prior declaration by DNI Tulsi Gabbard in this case, and includes supplemental information about the current state of national security threats at the U.S. border, highlighting how certain threats have since evolved. *See* March 24, 2025 declaration of Tulsi Gabbard, *RAICES v. Noem*, 1:25-cv-00306 (D.D.C.), ECF No. 44-6.

3. I understand that an accompanying declaration from the U.S. Department of Homeland Security will describe the nature of conditions at the U.S. border, as well as the importance of the President's policies in response.

4. I make the following statements based upon my personal knowledge, background, training, and experience, as well as information made available to me in my official capacity, including the coordinated assessments of the IC.

## III. DESCRIPTION OF THE NATIONAL SECURITY THREATS TO THE UNITED STATES PERTAINING TO THE BORDER

***Transnational Criminal Organizations and Gangs***

5. Transnational criminal organizations (TCOs) and other nonstate actors threaten and impact the lives of U.S. persons, the security and prosperity of the U.S. Homeland, and U.S. strength at home and abroad, including through vulnerabilities they can exploit in our southern border and in the processing and vetting of material and individuals moving through it.

6. Western Hemisphere-based TCOs and transnational gangs, some of whom are involved in illicit drug production and trafficking bound for the U.S., endanger the health and safety of millions of Americans. Mexico-based TCOs, including the Sinaloa Cartel and the New Generation Jalisco Cartel, remain the dominant producers and suppliers of large amounts of

illicit drugs to the U.S. market—including fentanyl, heroin, methamphetamine, and South American-sourced cocaine—that imperil American lives and livelihoods. As the President explained in 2025, Mexico-based TCOs "cultivate, process, and distribute massive quantities of narcotics," including fentanyl, "that fuel addiction and violence in communities across the United States." Executive Order 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 7, 2025). Increased U.S. and Mexican counter-cartel pressure, combined with TCO infighting in the interior of Mexico, have disrupted some TCO drug production and trafficking operations. There have been some positive trends—for example fentanyl seizures by weight have decreased by 56 percent at the U.S.-Mexico border since President Donald J. Trump took office—but TCOs continue to threaten U.S. citizens through the production and trafficking of illicit drugs.

7. Official ports of entry along the U.S.-Mexico border probably remain the primary access point for smuggling illicit drugs into the United States, most commonly concealed in passenger vehicles and tractor trailers. However, increased Mexican and U.S. border security has probably caused TCOs to at least temporarily change their smuggling techniques and routes. Mexico-based TCOs oversee the sale and distribution of wholesale amounts of illicit drugs to U.S.-based drug traffickers and may maintain some visibility into regional U.S.-based distribution networks; however, street-level retail sales within the United States are most likely controlled by local gangs.

8. Mexico-based TCOs use multiple routes at the Southwest border to transport illicit drugs into the United States. For example, they are actively recruiting drivers with authorization through the U.S. Customs and Border Protection Secure Electronic Network

Travelers Rapid Inspection program, some of whom are U.S. citizens, to transport illicit drugs across the border.

9. Mexico-based TCOs are also using cross-border tunnels to transport illicit drugs into the United States, as well as commercially available unmanned aerial systems (UASs) to smuggle small amounts of drugs, including fentanyl, into the United States through the U.S.-Mexico border. TCOs also closely monitor U.S. law enforcement activities using UASs and human scouts placed in strategic overwatch positions to determine the optimal time to move drugs across the border.

10. TCOs also conduct other illegal activities that impact U.S. national security, such as human smuggling and human trafficking. Some TCOs probably are increasingly relying on less scrutinized non-drug revenue streams within Mexico—including extortion and kidnappings—to make up for lost revenue from drug and migrant smuggling since President Trump sealed the border with Mexico. However, some TCOs continue to exploit migrants transiting the Western Hemisphere to the United States through extortion, kidnapping for ransom, forced labor, and sex trafficking. TCOs view human smuggling and human trafficking as highly profitable, low risk crimes of opportunity. Some illegal migrants continue to be trafficked by TCOs and other criminal actors upon entering the United States to repay smuggling fees, commonly known as debt bondage. These illegal migrants are forced to work as prostitutes, or in low paying jobs in the United States, including in agriculture and meat packing industries, or are forced to work in illegal marijuana grow houses.

11. Tougher U.S. policies, including foreign public perceptions thereof, and increased U.S. and regional enforcement efforts at the U.S.-Mexico border have drastically reduced

migrant encounters since early 2025. Southwest land border encounters went from over 2 million in FY 2024 to about 400,000 in FY 2025, according to CBP data. The decrease is likely straining some TCO's human smuggling and human trafficking revenue streams.

***Sunni Violent Extremists, Inspired Lone Attackers, and Iran-Backed Threats***

12. The United States and U.S. citizens at home—as well as U.S. citizens abroad—face a diverse and persistent foreign terrorist threat from Sunni violent extremist groups, including the Islamic State of Iraq and ash-Sham (ISIS) and Qa'ida, violent extremists acting alone or in small cells who draw inspiration from foreign terrorists, and actors backed by states, such as Iran. These groups continue to seek to attack the West, including the United States and U.S. persons, with outreach, messaging, and other operations aimed at directing, enabling, or inspiring attacks could exploit vulnerable travel routes and activity.

13. Large flows of migrants and illegal migrants across borders cause strain on local and national infrastructure and resources, making screening and vetting of foreign nationals for potential derogatory information more challenging. Foreign nationals with potential terrorism connections have attempted to enter the U.S. Homeland at both the U.S.-Mexico and U.S.-Canada borders and also through the immigration system.

14. We assess there is a persistent risk that groups such as ISIS will try to assist supporters in the future who seek to exploit perceived border vulnerabilities to advance or facilitate operations in the United States. The IC is aware of instances in 2024 where foreign nationals connected to foreign terror groups have facilitated the entry of other foreign nationals into the United States via the Southwest border. The Canadian border also has presented

opportunities for violent extremists to attempt to enter the United States using lawful entry methods or unlawful access between ports of entry.

15. For example, in June 2024, U.S. law enforcement officers arrested several foreign nationals from Tajikistan suspected of having ties to ISIS, pursuant to immigration authorities. The arrests were closely coordinated with the Federal Bureau of Investigation's Joint Terrorism Task Forces. In September 2024, Canadian authorities arrested a Pakistani national and ISIS supporter, who was planning to be smuggled into the United States to attack a New York-based Jewish institution on or around the anniversary of the 7 October HAMAS attack. By contrast, since January of this year, there have only been a handful of border encounters with with terrorist-associated individuals, such as those with ties to groups like al-Qa'ida and ISIS which maintain a strategic intent to attack the U.S. Homeland.

16. The IC also assesses there is a risk from individuals lacking ties to terrorist organizations who unlawfully crossed U.S. borders in recent years and subsequently became radicalized to use violence based on their exposure to violent extremist messaging once here. At the same time, many terrorists are exploiting new technologies and techniques on secure platforms, complicating intelligence and law enforcement efforts to understand their location, connectivity, and financing.

17. Overall, deportations of individuals with suspected links to Islamist terrorists coupled with strengthened border security measures adopted last year have had beneficial effects on national security by reducing access to the U.S. Homeland and removing potential sources of future violence. While this is a positive trend, the U.S. must maintain its efforts to identify, locate, and remove suspected foreign terrorists who have exploited recent border vulnerabilities.

18. Finally, the IC is continuing to assess how the U.S.–Israel–Iran conflict will affect the worldwide terrorism landscape in the near future. Though degraded by U.S. and Israeli efforts, Iran still possesses the capability to develop lethal operations against Americans in the U.S. homeland and abroad, and probably will attempt pursuit of such efforts again should their current government remain in power and successfully rebuild. If the regime survives, Iran almost certainly will seek to exact revenge for the death of Supreme Leader Ayatollah Ali Khamenei, and calls from prominent Shia religious leaders in Iran to avenge Khamenei are likely to inspire at least some individuals to conduct terrorist activities against U.S. targets globally. The U.S. Government's efforts to secure our borders and enhance screening and vetting capabilities has improved our ability to prevent the exploitation of U.S. borders by foreign adversary, including Iranians.

***Other National Security Threats Pertaining to the Border***

19. In addition to threats posed by individuals who cross the border, other foreign actors, including rival states, could exploit circumstances at the border for their own purposes, including by incorporating border-related issues into influence efforts intended to heighten divisions among Americans and erode confidence in U.S. institutions and policymaking.

## IV. CONCLUSION

20. Circumstances at the U.S. border present persistent, serious national security threats and challenges, both known and unknown. While recent efforts to strengthen border security have had positive effects on the U.S. national security posture, the IC remains concerned

about keeping the U.S. Homeland borders secure to protect U.S. persons and interests from these threats.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of June, 2026.

Aaron Lukas
Principal Deputy Director of National Intelligence

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiffs are Refugee and Immigrant Center for Education and Legal Services; Las Americas Immigrant Advocacy Center; Florence Immigrant & Refugee Rights Project; N.S.; D.G.; E.G.; G.A.; M.A.; F.A., and her minor children K.A. and Y.A.; A.M., Z.A., and their minor children T.A. and A.T.; and B.R.

Defendants are Markwayne Mullin, in his official capacity as Secretary of Homeland Security; U.S. Department of Homeland Security; Rodney S. Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. Customs and Border Protection; Michael Banks, in his official capacity as Chief of U.S. Border Patrol; Diane Sabatino, in her official capacity as Acting Executive Assistant Commissioner, CPB Office of Field Operations; Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; U.S. Immigration and Customs Enforcement; Marco Rubio, in his official capacity as Secretary of State; U.S. Department of State;

Todd Blanche, in his official capacity as Acting Attorney General of the United States; U.S. Department of Justice; Joseph B. Edlow, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. Citizenship and Immigration Services; Donald J. Trump, in his official capacity as President of the United States.

*Amici* are America's Future, Cato Institute, Constitutional Accountability Center, Federation for American Immigration Reform, Global Strategic Litigation Council, Human Rights Watch, Immigration Reform Law Institute, Physicians for Human Rights, Refugees International, State of Texas, Triveni Defries, M.D., MPH, Barbara Eisold, Ph.D., Michele Heisler, M.D., MPA; Jim Recht, M.D., and Adam Richards, M.D., Ph.D., MPH.

No intervenors participated in the district court.

**B. Rulings Under Review**

The ruling under review consists of an opinion (JA189-316) and orders (JA317-321) on cross-motions for summary judgment and a motion for class certification, which the district court, Judge Randolph D. Moss, issued on July 2, 2025.

### C. Related Cases

This case has not previously been before this Court. Overlapping issues are present in the following pending cases: *S.E. v. Bondi*, No. 1:25-cv-01108 (D.D.C.); *Guselnikov v. Noem*, No. 1:25-cv-2630 (D.D.C.).

*/s/Benjamin Hayes*

Benjamin Hayes